**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLC, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | |
| Plaintiffs, | Case No. _____ |
| v. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

Plaintiffs Triumph Foods, LLC, Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLC, Eichelberger Farms, Inc., and Plaintiff Allied Producers' Cooperative in its own capacity and in a representative capacity for its members ("Plaintiffs"), by and through their counsel of record, for their Complaint for Declaratory and Injunctive Relief against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts ("Campbell"), and Ashley Randle, in her official capacity as Massachusetts Commissioner of Agriculture ("Randle") (collectively, "Defendants"), respectfully state to the Court as follows:

**<u>INTRODUCTION</u>**

1.     This case challenges the constitutionality of Massachusetts' Question 3 Minimum Size Requirements for Farm Animal Containment ("Question 3"), passed by Massachusetts voters

1

on November 8, 2016, which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the State of Massachusetts from offspring of a covered animal (as hereinafter defined) confined in a manner inconsistent with Massachusetts' Minimum Size Requirements (as hereinafter defined), regardless of where in the nation the animal was raised.

2.     The Prevention of Farm Animal Cruelty Act was enacted by Acts (2016) Chapter 333 (the "Act") on December 15, 2016, which implemented Question 3.

3.     Regulations to implement and address enforcement of the Act were ultimately promulgated by the Department of Agricultural Resources and went into effect on June 10, 2022, which was well beyond the original date mandated within the Act.  2022 MA REG TEXT 610066 (NS) (the "Regulations").  The Regulations are included at 330 CMR 35.01-08.

4.     Question 3's stated purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts."

5.     The Act's Minimum Size Requirements are inconsistent with pork industry practices and standards, generations of farming experience, scientific research, and the consensus standards of other states.  The Act will impose costly mandates that substantially interfere with commerce among the states in hog and pork markets.  It will impose substantial burdens on pig farmers and pork processors primarily outside of Massachusetts, ultimately having a direct impact on the price of pork for all Americans—the vast majority of whom had no say in the Act—in the interstate pork market. It will take years and cost at least tens of millions of dollars for pig farmers to come into compliance with the Regulations.

6.     The Act primarily serves as a regulation on certain animal confinement practices but seeks to regulate such confinement by banning the sale of non-compliant products. The requirements of the Act itself have nothing to do with the products sold, but instead act as a means by which Massachusetts can regulate what occurs on farms.

7.     Through the Act, Massachusetts seeks to unilaterally impose sweeping changes across the national pork production industry and subject out-of-state pig farmers and processors in the pork market to Massachusetts' scientifically unsupported preferences.

8.     The Act discriminates against out-of-state farmers and pork processors in purpose and effect, unquestionably directly and intentionally targets and seeks to regulate out-of-state activity that is permissible in the states in which it occurs, and substantially burdens the interstate pork market through the confinement and inspection requirements and by stifling interstate commerce through the prohibition of sale of non-compliant Whole Pork Meat (as hereinafter defined) into and within Massachusetts.

9.     The Act's discriminatory purpose and effect further violates the rights of Plaintiffs under the Privileges and Immunities Clause, the Full Faith and Credit Clause of Article IV of the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the Constitution, and the Import-Export Clause of Article I of the United States Constitution.  The Regulations also are invalid under G.L. c. 30A and G.L. c231A.  The Act is also preempted by the Federal Meat Inspection Act and the Packers and Stockyards Act.

10.     The Act poses a current and imminent risk of civil enforcement and injunctive relief against Plaintiffs, as the Act imposes civil penalties on any non-compliant business owner or operator or person who knowingly engages in a sale in Massachusetts involving Whole Pork Meat that a business owner or operator knows or should know is the offspring of a breeding pig that was confined inconsistent with the Minimum Size Requirements.

11.     Without immediate and permanent injunctive relief from this Court, the Act will unconstitutionally and irreparably risk and injure breeding pigs, piglets, and Plaintiffs.[1]

## PARTIES

12.     Plaintiff Triumph Foods, LLC ("Triumph") is a farmer-owned company and produces high-quality pork products that are sold locally, nationally, and internationally. It was

---

[1] Plaintiff will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

founded by independently owned pork farmers in the country, including a cooperative of ██ farmers. It is headquartered in St. Joseph, Missouri, and largely receives its supply of pigs from its member-owners, who are pig farmers (collectively referred to as the "Farmer Plaintiffs") and other independent pig farmers.

13.     Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc., and Allied Producers' Cooperative ("the Farmer Plaintiffs") farm and produce pigs to supply Triumph's pork processing operations. Pork processed by Triumph is shipped directly into Massachusetts.

14.     The Farmer Plaintiffs are farrow-to-finish farmers. This means that each Farmer Plaintiff has breeding pigs, and after the breeding pigs give birth, the Farmer Plaintiff raises the pigs until they are ready for market.

15.     Christensen Farms Midwest, LLC ("Christensen Farms") is a member-owner of Triumph. Its farms are located in Minnesota, Iowa, Nebraska, Illinois, and South Dakota. ████████████████████████████████████████████

16.     The Hanor Company of Wisconsin, LLC ("Hanor") is a member-owner of Triumph and sells approximately 1.8 million market pigs each year. Its farms are located in Wisconsin, Oklahoma, North Carolina, Iowa, Missouri, and Illinois. ████████████████████████████

17.     New Fashion Pork, LLC ("NFP") is a member-owner of Triumph. Its farms are located in Minnesota, Indiana, Iowa, Illinois, South Dakota, Wyoming, and Wisconsin. ███████ ███████████████████

18.     Eichelberger Farms, Inc. ("Eichelberger") is a member-owner of Triumph. Its farms are located in southeast Iowa, Missouri, and Illinois. ████████████████████████████ █████

19.     Allied Producers Cooperative ("APC") is a member-owner of Triumph and is a cooperative that consists of ██ farmers who are mostly multi-generational family pig farms, most of which are farrow-to-finish farmers consisting of several individual farmers. APC is

headquartered in Iowa, but its members operate in various states throughout the Midwest. ██

██████████████████

20.     Defendant Campbell is the Attorney General of the State of Massachusetts. Campbell is responsible for the enforcement of the Act and is sued in her official capacity only.

21.     Defendant Randle is the Massachusetts Commissioner of Agriculture who oversees the Massachusetts Department of Agricultural Resources, which is responsible for implementation of the Act.  Randle is sued in her official capacity only.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this complaint for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 57, 28 U.S.C. § 2201, 28 U.S.C. § 1441(a) and Fed. R. Civ. P. 65.

23.     The Court has authority to enjoin enforcement of the Act's sales ban under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this is the judicial district in which all Defendants reside.

## BACKGROUND ON QUESTION 3 AND REGULATIONS

25.     In 2016, Massachusetts enacted the Prevention of Farm Animal Cruelty Act through ballot initiative Question 3, which established minimum size requirements for egg-laying hens, breeding pigs, and calves raised for veal.

26.     The Act's claimed purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ann. Ch. 129 App., § 1-1 (West). *See also* SEC'Y OF THE COMMONWEALTH OF MASS., *Information for Voters, Massachusetts 2016 Ballot* at 8–11 (2016), https://www.sec.state.ma.us/divisions/elections/research-and-statistics/information-for-voters-2002-2020.htm (stating that a vote in favor "prevents cruel treatment of animals in Massachusetts" and "will remove inhumane and unsafe products from the Massachusetts

marketplace" and that "because cage confinement increases food safety risks . . . a YES vote protects Massachusetts consumers.").

27.     The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" (hereinafter referred to as the "Minimum Size Requirements").  Mass. Gen. Laws Ch. 129 App., § 1-5.

28.     A "covered animal" is defined as any breeding pig, calf raised for veal, or egg-laying hen that is kept on a farm. A "breeding pig" is defined as any female pig of the porcine species kept for the purpose of commercial breeding.

29.     The Act also made it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."  Mass. Gen. Laws Ch. 129 App., § 1-3. This prohibition is without distinction regarding where in the United States the Whole Pork Meat originated from.

30.     The Act does not define what it means for an individual to be "engaged in" a sale within Massachusetts, and by the plain language, an out-of-state farmer or processor is potentially subject to civil fines and injunctive relief for being "engaged in" the chain of sale of non-compliant Whole Pork Meat into the State of Massachusetts.

31.     Whole Pork Meat is defined as "any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives." Mass. Gen. Laws Ch. 129 App., § 1-5.

32.     Pork Meat is defined as "meat of a pig of the porcine species intended for use as human food." Mass. Gen. Laws Ch. 129 App., § 1-5.

33.     The limited exceptions as applicable here include only the five-day period prior to the expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes.  Mass Gen. Laws Ch. 129 App., § 1-4.

34.     In December 2021, the Massachusetts Legislature amended portions of the Act by passing Acts (2021) Chapter 108.  The bill changed the definition of "confined in a cruel manner" regarding egg-laying hens and added other definitions regarding egg-laying hens.

35.     The amendments came on the heels of industry concerns that the Act would cause an extreme shortage of eggs or a steep increase in egg prices in Massachusetts, and an apparent recognition that industry practices for housing hens were not aligned with the Minimum Size Requirements. Chris Lisinski, *Mass. Legislature passes animal welfare law changes, set to ease egg supply fears* (Dec. 20, 2021), https://www.wgbh.org/news/politics/2021/12/20/mass-legislature-passes-animal-welfare-law-changes-set-to-ease-egg-supply-fears.

36.     Yet, no changes were made to the Minimum Size Requirements regarding breeding pigs, apart from extending the date by which the sale of Whole Pork Meat not in compliance with the Act would be prohibited, despite the fact that Massachusetts legislators understood at the time of or before the amendment was passed that less than 4% of pork suppliers were in compliance with the Minimum Size Requirements, and that enforcing the Act would affect the supply and/or cost of pork products within the State. Matt Murphy, *House's Hen Welfare Bill Aims to Assure Egg Supply* (Oct. 6, 2021), https://www.statehousenews.com/news/20211859.

37.     Acts (2021) Chapter 108 § 6 did, however, amend the effective date for the Minimum Size Requirements as applied to breeding pigs to August 15, 2022.

38.     Due to the vagueness of the Act itself, the Act mandated that Regulations be promulgated in order to ultimately assist the Attorney General in ensuring compliance with the Act.

39.     Regulations to implement and address enforcement of the Act were ultimately promulgated by the Department of Agricultural Resources and went into effect on June 10, 2022,

which was well beyond the original date mandated within the Act.  2022 MA REG TEXT 610066 (NS) (the "Regulations").  The Regulations are included at 330 CMR 35.01-08.

40.     The Regulations included that Whole Pork Meat products already in the supply chain as of and including August 15, 2022, would be deemed compliant in what is referred to herein as the "Sell Through Provision." Plaintiffs, as well as much of the pork producing and processing industry, interpreted this to mean that so long as the offspring of a sow existed prior to August 15, 2022 (*i.e.*, the sow has already been inseminated, the offspring is in gestation, or the pig was born but not yet harvested) that the offspring would be deemed compliant and be able to be sold into Massachusetts on or after August 15, 2022. Neither the Act nor the Regulations define the "supply chain," leaving Plaintiffs uncertain in their interpretation of the Sell Through Provision.

41.     The Regulations failed to provide any additional interpretation or guidance as to what constitutes a business owner or operator "engaging in the sale" of Whole Pork Meat within Massachusetts.

42.     In *Massachusetts Restaurant Association et al. v. Healey* (Case No. 4:22-cv-11245-MLW) this Court ordered a stay of the enforcement of the Act and the Regulations until 30 days from the issuance of the United States Supreme Court's final decision in *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023) (the "Stay Period"). (ECF No. 17). The opinion in that case issued on May 11, 2023, and the mandate issued on June 12, 2023. Recently, the Stay Period has been extended until at least August 23, 2023.

43.     After the expiration of the Stay Period, the Act and the Regulations will become enforceable and prohibit the sale of non-compliant Whole Pork Meat in Massachusetts.

44.     Under the Court's order staying enforcement of the Act and Regulations, Former Attorney General Healey and Former Commissioner Lebeaux agreed that they would not enforce

the Pork Sale Rules[2] against any plaintiff or non-party for any conduct that occurs during the Stay Period. *See Massachusetts Restaurant Ass'n v. Healey*, No. 4:22-cv-11245-MLW, (ECF No. 17).

45.     It is unclear whether this means that any Whole Pork Meat[3] that existed in the supply chain prior to the expiration of the Stay Period (*i.e.,* the sow has already been inseminated, the offspring is in gestation, or the pig was born but not yet harvested) may be sold in Massachusetts after the Stay Period, and whether the court's order staying the Act and Regulations created, in effect, another Sell Through Provision.

46.     To date, the Defendants have not published any guidance regarding whether Whole Pork Meat that is already in the supply chain during the Stay Period, may be sold after that Stay Period expires, leaving Plaintiffs uncertain about whether Defendants intend to retroactively apply the Act and Regulations to prohibit the sale of Whole Pork Meat that did not comply with the Minimum Size Requirements during the Stay Period.

47.     Most Pork Meat intended for sale for Massachusetts at the time the Stay Period will expire is already alive, or at least is in gestation. The breeding cycle of the pigs is four months, followed by the piglets being raised for three to four weeks before they are weaned and, ultimately, farrow to finish takes approximately 24-26 weeks.

48.     Without an order confirming that the sale of Whole Pork Meat that is already in the supply chain up to and including the expiration of the Stay Period may be sold after the Stay Period, the Act and Regulations will force the unnecessary slaughter of these breeding pigs, the same pigs that Massachusetts voters were told the Act would help.

49.     The Regulations also create a procedure for certifications for any farm, farm owners, or farm operators who engage in commercial transactions within Massachusetts regarding the meat or products of a covered animal and for any other person who engages in a commercial

---

[2] Pork Sale Rules are defined as "a declaration that M.G.L. c. 129 App. § 1-3(C), 330 CMR § 35.04(1)(c), and the official guidance interpreting same."
[3] The Regulations define Pork Meat as any "meat of a pig of the porcine species that is intended for use as human food." 330 Mass. Code Regs. 35.02

transaction within Massachusetts regarding the meat or products of a covered animal. 330 CMR 35.05.

50.     The Regulations announced, for the first time, that the Department or third-party validators may go beyond the boundaries of Massachusetts and inspect a farm "pursuant to any applicable authority" for compliance with the Minimum Size Requirements to ensure that "animals are not being Confined in a Cruel Manner."  330 CMR 35.06-.07.

51.     This means that Massachusetts intends to have Massachusetts state officials go to out-of-state farms to ensure that they comply with the Act and Regulations.

52.     If, during an inspection of a farm, the Department of Agricultural Resources or a third-party validator observes violations of the Act or the Regulations regarding the implementation of the Act, the Department may refer the violations to the Attorney General's Office.  330 CMR 35.06-.07.

53.     The Attorney General has exclusive authority to enforce the provisions of the Act. Mass. Gen. Laws App., § 1-6.  Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act.  Mass Gen. Laws App., § 1-6.

54.     No guidance has been issued to address what unit of enforcement the Defendants intend to utilize when assessing a civil fine or ultimately resorting to injunctive relief to potentially preclude a seller from importing Whole Pork Meat into Massachusetts.

55.     Regardless of how the unit of enforcement is ultimately applied by the Defendant Attorney General, the civil enforcement and injunctions authorized under the Act are tantamount to a penalty against any business owner or operator who operates within the pork production supply chain in several ways.

56.     The forced exclusion from the Massachusetts marketplace unless Farmer Plaintiffs convert their farm operations to meet Minimum Size Requirements is a penalty at the beginning of the pork production supply chain.

57.    The exclusion from the Massachusetts marketplace operates as a sales embargo for out-of-state business owners and operators who cannot sell compliant Whole Pork Meat within Massachusetts due to the excessive restrictions imposed.

58.    The forced adjustments to the processor – like Triumph's – operations are penalties at the middle phase of the pork production supply chain.

59.    The risk of civil fines and injunctive relief by the Attorney General is a penalty at the end phase of the pork production supply chain for any member who engages in the sale of non-compliant Whole Pork Meat within Massachusetts, which arguably includes both Farmer Plaintiffs and Triumph.

60.    On information and belief, if a seller is precluded from importing Whole Pork Meat into Massachusetts, that seller runs a substantial risk of violating contractual obligations with Massachusetts businesses, state or federal agencies who rely upon the Whole Pork Meat.

## IMMEDIATE NATIONWIDE IMPACTS OF
## THE ACT AND REGULATIONS ON THE PORK INDUSTRY

61.    The sale of Whole Pork Meat is a nationwide, regulated commodity, and the interstate pork market is wholly interconnected. Not only do the Act and Regulations impact pig farmers, but their regulatory impact flows through the complex supply chain to pork processing operations and interferes with the federal government's role, who is already tasked with ensuring that any pork product that enters the interstate market is wholesome and fit for human consumption.

62.    The Act and Regulations' unconstitutional application to out-of-state farmers and processors will have a direct impact on farming practices, processing standards, nationwide pricing of pork, the national pork supply, and consumers nationwide.

63.    Despite making up a large percentage of the national consumer market, Massachusetts itself had as little as 1,500 breeding sows as of 2022, with only 6,000 total market hogs. Relatedly, Massachusetts also has a miniscule number of farms that produce pigs. As of 2017, the total number of pig farmers in Massachusetts was about 336. Of that amount, only one

farmer had a herd size greater than 1,000 head, while 264 farms have a herd size of 1-24 head. USDA, National Agricultural Statistics Service, *2017 Census of Agriculture – Massachusetts State and County Data* (April 2019). Only eight Massachusetts pig farmers had a herd size of 200 or more. This means that, as of 2017, about 78% of Massachusetts pig farmers have the smallest possible pig operation.

64.    In the first quarter of 2023, Missouri and Iowa—the two states that Triumph operates out of and receives a large quantity of its market hogs for processing from—had 450,000 breeding sows and 900,000 breeding sows, respectively. USDA, National Agricultural Statistics Service, *USDA Quarterly Hogs and Pigs* (March 2023*)*.

65.    Massachusetts is the fifteenth most populous state in the nation, representing 2.1% of the U.S. population and consuming approximately 356.8 million pounds of retail pork in 2022. The volume Massachusetts demands to feed its population would well exceed the amount of pork that Massachusetts can produce and sell intrastate from Massachusetts farms, given the small number of breeding sows in Massachusetts. That volume produced within Massachusetts, assuming it is sold and *remains in* Massachusetts, is estimated at only 1.9 million pounds of retail pork in 2022. Therefore, the burden of the Act falls almost entirely upon out-of-state producers and processors, and in effect, the Act regulates pork production and processing throughout the United States, not just in Massachusetts.

66.    As of 2016, when Question 3 was approved by Massachusetts, Massachusetts pig farmers did not use gestation crates for housing breeding sows. Andrea Shea, *Confinement of Farm Animals: A Primer on Question 3 in Mass.* (Sept. 20, 2016) https://www.wbur.org/morningedition/2016/09/20/farm-animal-containment-ballot-question. Given that no Massachusetts pig farmers confine breeding sows in a manner that is prohibited by the Act, the Act directly targeted out-of-state farmers only.

67.    The Act's Minimum Size Requirements are inconsistent with pork industry practices and standards, generations of farming experience, scientific research, and the consensus standards of other states.  The Act will impose costly mandates that substantially interfere with

commerce among the states in hog and Whole Pork Meat markets.  It will impose enormous costs on pork farmers outside of Massachusetts, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in the Act.

68.     It will take years and cost at least hundreds of millions of dollars for pork farmers to come into compliance with the Act and Regulations or to fully convert farms to be compliant with the Act and Regulations to the extent needed in order to supply the quantity of pork into Massachusetts that is currently demanded.

69.     Most Farmer Plaintiffs, from which Triumph primarily sources its supply of pigs, are not currently in compliance with the Act. And compliance measures taken to date by the Farmer Plaintiffs have been instituted in order to satisfy California's Proposition 12 requirements only, which have been insufficient to meet the needs of California, let alone for the demand that will unquestionably arise for Question 3 compliant pork.

70.     Through the Act, Massachusetts seeks to unilaterally force changes across the national pork production industry and subject out-of-state individuals in the production market to Massachusetts' preferences.  Currently, only a miniscule number of pig farmers nationwide could satisfy Massachusetts' onerous standards—something that Massachusetts lawmakers understood when they amended the Act in 2021.  The number is even smaller when accounting for the fact that most of those pigs are already slated for processing pork for California.

71.     Due to the proportion of the national pork supply destined for Massachusetts—and the significant complexity of the national pork production and distribution system—it is neither feasible nor practical for farmers to segregate their product on a state-by-state basis.  While some extraordinary accommodation has been made in the interim for Proposition 12 and Question 3, the situation is tenuous, and this cannot be done for all states across the country.

72.     Furthermore, upon information and belief, Massachusetts is a pork distribution hub for other New England states. In other words, the Act's prohibition on the sale of Whole Pork Meat that is not compliant with the Act within Massachusetts affects the production and sale of pork across an entire region. This means that a significant portion of Whole Pork Meat that enters

Massachusetts does not stay in Massachusetts and goes to states in New England—including states that do not have sow confinement prohibitions similar to the Minimum Size Requirements in the Act.     https://www.wsj.com/articles/massachusetts-wants-your-bacon-national-pork-producers-council-farm-regulations-11660080510

73.     The Act's assertion that non-compliant Whole Pork Meat "threatens the health and safety of Massachusetts consumers, and increases the risk of foodborne illness" is false and inconsistent with scientific studies surrounding housing breeding pigs in group pen settings.  The ballot initiative record for Question 3 and the Regulations implementing the Act are devoid of actual proof that the Act would accomplish the goals it intended (*i.e.,* to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to Massachusetts).

74.     As a result, Massachusetts is forcing massive changes to pig production and processing practices throughout the United States, and in so doing, substantially burdens the interstate pork market. Massachusetts has attempted to create a national regulation on breeding pig housing through the passage of Question 3.

75.     The Act and Regulations ultimately force compliance on farmers who cannot control whether to sell into the Massachusetts market, but due to the interconnected nature of the pork market, such products may still be sold within the stream of commerce in Massachusetts.

76.     Through the Federal Meat Inspection Act ("FMIA"), Congress designated the United States Department of Agriculture ("USDA") as the regulatory body to monitor meat processing. It regulates meat, poultry, and egg products and catfish through one of its own agencies, known as the Food Safety and Inspection Service ("FSIS").

77.     Ensuring that pork does not leave a plant that is at risk for "foodborne illness" is specifically a role assigned to the USDA through the Congressional enacted statutory requirements imposed by the FMIA and other implementing federal laws and regulations. The USDA also is charged with preventing pest or disease of livestock in interstate commerce.

14

78.     The USDA and FSIS are charged with ensuring that pork processors comply with federal law so that meat is "safe, wholesome, and properly labeled." *See, e.g.*, 21 U.S.C. § 602. The USDA is "one of the largest public health regulatory agencies in the U.S. Government."[4]

79.     The federal government published specific guidance to identify how the inspection and segregation process is to occur within the swine industry pursuant to the FSIS, which is identified as "part of a science-based national system to ensure food safety and food defense. FSIS ensures food safety through the authorities of the Federal Meat Inspection Act, the Poultry Products Inspection Act, as well as humane animal handling through the Humane Methods of Slaughter Act." *See* About FSIS | Food Safety and Inspection Service (usda.gov) (last visited July 22, 2023).

80.     Pursuant to the statutory requirements imposed by the FMIA, the USDA is required to be extensively and pervasively involved in performing inspections of the pork production process at all stages to ensure such products are wholesome and not adulterated.  The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 601.

81.     To ensure compliance with federal food safety laws, the USDA regulates and inspects the pigs before they enter the facility (ante-mortem) by either (a) directly inspecting every single pig or (b) otherwise delegating portions of that responsibility to trained employees at the establishment who support the USDA with the ante-mortem inspections through the USDA's segregation procedures set forth within FSIS Directive 6100.1, known as the "Voluntary Segregation Program" ("VSP"). *See* 9 C.F.R. Part 309; FSIS Directive 6100.1.  The USDA's inspection personnel are referred to as "IPP" as they are in the Inspection Personnel Program.  "As

---

[4]Food Safety and Inspection Service, U.S. Department of Agriculture, https://www.fsis.usda.gov/.

required under the FMIA, IPP are to examine and inspect all livestock before slaughter to determine whether the animals are fit for slaughter for human food."  If animals are not presented for this purpose, or the processor is not otherwise fulfilling its responsibilities under the VSP, the pork products produced are not able to be marked by USDA as "inspected and passed."

82.     The USDA continues to regulate and inspect the pigs after they have passed ante-mortem inspection and have entered the facility for processing (post-mortem).   After entering the facility and post-mortem phase, the USDA inspects at every phase of the pig's processing, while facility employees assist with these inspections throughout the line by adhering to the USDA's FSIS regulatory requirements.  *See* 9 C.F.R. § 310.26.

83.     Specifically, to ensure that no adulterated products enter the interstate food supply chain, the USDA inspection process begins outside of the four walls of a FSIS processing facility. Pigs are transported by the farmer to a processing facility via truck or trailer. When the truck or trailer first arrives, farmers begin to unload their trucks carrying market pigs. Throughout this process, the USDA either directly or through their USDA VSP, begins observation for pigs that may qualify as adulterated. If a pig is identified on a truck as adulterated, then the pig will be euthanized on the truck and segregated from the delivery. Indeed, before pigs are even allowed to disembark and unload from a farmer's truck, the USDA is reviewing and inspecting the deliveries of pigs for disease, injury, and other factors to ensure that all pigs entering the plant are wholesome, unadulterated, and suitable for human consumption as final pork products.  This is the first element of this phase of inspection that the USDA will engage in for the purpose of preventing foodborne illness or adulterated pork products.

84.     After this initial element of inspection on the farmers' trucks, the remainder pigs are offloaded into sorting pens and chutes that still remain *outside* the processing area of the facility for a further ongoing inspection by the USDA within the receiving alley.  If not previously identified as possibly adulterated, then they enter a third component of the ante-mortem inspection in the holding pen (or a barn), in which the USDA continues observations again.  These second and third components of ongoing ante-mortem inspection are for the same purpose – in addition

to animal care, they are there to ensure that no pig exhibits any signs of disease specifically for the purpose of preventing any foodborne illness or adulterated pigs from entering the facility itself and ultimately in the pork distributed to the end-consumer.

85.     Once a pig enters the processing facility after ante-mortem inspection has been completed by the USDA, the USDA continues inspection within the facility during the complex post-mortem inspection phase.  During this lengthy phase through the full processing line, USDA inspectors are conducting observations and examinations of the head, viscera and carcass for any indication of disease, parasites, pathology, or any other signs of abnormalities. Indeed, this pervasive USDA inspection process endures from the moment the pigs enter inside the processing facility, through the harvesting process, and through the moment the finished pork products depart for the interstate market.  The USDA officials inspect every phase of the processing and the establishment's employees are regulated by the FSIS to fulfill specific and detailed requirements to support the USDA.  *See* FSIS Directive 6100.2.

86.     ███████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████

87.     Yet, Massachusetts, through Question 3, dictates to the USDA and predetermines for the FSIS regulated facility that all pigs – unless their breeding pig met the Minimum Size Requirements – are adulterated, unfit for human consumption, and cannot be processed *for sale into Massachusetts*.  The determination of what is adulterated and unadulterated is specifically designated to the USDA.   The FSIS facility must then adapt their premises, processing lines and operations to account for the varying additional segregation requirements both ante-mortem and post-mortem as directed by the state to accomplish the Act's requirements.

88.     Pigs raised in compliance with Question 3 must be separated, and kept separated, from conventional pigs at all points during the processing process that occurs at the processing facility. Otherwise, the Question 3 qualified pigs and the conventional pigs that the Act has

predetermined as "adulterated" for Massachusetts, will become unknowingly intermixed prior to entry into the processing facility, or throughout the processing line after entering.

89.     Due to the nature, depth and breadth of this federal inspection process, state inspection requirements like Question 3 also add or impose requirements different from those already implemented by the USDA and impede on the USDA's independent inspections.  Further, given the nature of the national market for pork, it would not be feasible for federal inspectors to cooperate with potentially fifty different state inspection requirements; at a minimum, state regulation on the inspection processes described herein would impair the effective regulation of pork products, and create an obstacle to the accomplishment and execution of the FMIA in light of that statute's stated objectives. *See, e.g.*, 21 U.S.C. § 602.  While processing plants like Triumph have tried to make some accommodation for laws like Question 3 and Proposition 12 for the interim, doing so for numerous states or fifty states would be crippling to processors, if not impossible.

90.     Massachusetts, like all states, purchases its pork from multiple suppliers.  Due to the highly competitive pork industry, not to mention antitrust constraints, there is no practical or risk-free way, without running afoul of antitrust laws and regulations, for pork competitors to cross coordinate or allocate their sales by geographic market to aid in the coordinated supply to one or two states, or on a state-by-state basis.  This leaves each processor left to try to fulfill its portion of sales to the state on its own.  No one processor can fulfill the demand for Massachusetts or California, or any other specific states, and the competitors cannot organize together to do so.  Furthermore, if certain processors were able to become single state suppliers, this would only further eliminate competition and result in local market concentration and likely drive-up pricing for individual states left to obtain their pork from one or two processors nationwide.

91.     The Act and its Regulations, in effect, denies market access to out-of-state pork farmers and processors, like Plaintiffs, unless their farming practices in states outside of Massachusetts comply with Massachusetts' dictates.

92.     The Act and its Regulations will also increase retail pork prices for consumers in Massachusetts, and because Massachusetts imports at least 99.5% of the pork it consumes, the implementation of the Act and Regulations is likely to lead to periodic retail pork stockouts and shortages in Massachusetts.

93.     In addition, the implementation and enforcement of the Act would result in a substantial adjustment for pork prices for consumers *nationwide* and a shortage of pork available for purchase.

94.     More than one in five (21.6 percent) of the adults in the United States reported household food insecurity in the summer of 2022. Pork ranks third in the United States for meat consumption. Waxman E, Salas J, Gupta P, Karpman M, *Food Insecurity Trended Upward in Midst of High Inflation and Fewer Supports*, Robert Wood Johnson Foundation, https://www.rwjf.org/en/insights/our-research/2022/09/food-insecurity-trended-upward-in-midst-of-high-inflation-and-fewer-supports.html#:~:text=More%20than%20one%20in%20five,their%20White%20counterparts%20(17.3%25).

95.     In 2022, food prices overall in the United States increased by 9.9 percent, and food-at-home prices increased by 11.4 percent, according to the United States Department of Agriculture. The Act and its Regulations threaten to significantly increase the cost of pork for consumers, which will make it even more difficult for economically-distressed families and those already facing food insecurity to afford this critical source of protein.

96.     The Act and its Regulations also threaten the public supply of pork within Massachusetts and states to which Massachusetts service in New England, which is necessary to satisfy the needs of the businesses and state facilities, including hospitals, schools, prisons and other public agencies utilizing federal funding.

## IMMEDIATE IMPACTS OF THE ACT AND REGULATIONS

## ON THE PLAINTIFFS

97.     Triumph receives its pig supply from the Farmer Plaintiffs and some additional pig farmers, none of which operate their farms in Massachusetts.

98.     ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

99.     ███████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

100.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

101.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████  While Triumph does not market its pork, it certainly has knowledge, as do the Farmer Plaintiffs, that pork processed from their pigs is sold to Massachusetts, and they supply their pigs without any control to where the pork is distributed.  Massachusetts can take the position that farmers and processors who have such knowledge and supply, are "engaged in the sale" and culpable under the statute.  The statute as written creates risk and vagueness for the entire supply chain.

102.    ███████████████████████████████████████████
████████████████████████████████████████████████████

103. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

104.    Currently, Massachusetts customers demand more compliant product than what Triumph and the Farmer Plaintiffs have available or could possibly ever make available because Massachusetts' requirements are really a subset of California's, and the industry already does not have enough for California. Because Proposition 12 has been implemented and threatens criminal enforcement now, almost all Proposition 12 pork has been diverted to California. This leaves little Question 3 compliant pork available for Massachusetts, as the industry does not have sufficient volume of Proposition 12 compliant pork required to supply California's demand.

105. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

106.    Compliance with the Act and Regulations requires significant and extremely costly changes to the farming operations of the country's pig farmers, including the Farmer Plaintiffs.

107. ████████████████████████████████████████

████████████████████████████████████████████

████████

108.    These capital and operating investments to convert even a portion of operations to be compliant are not enough to supply the volume of pork required for Massachusetts.

109.    The conversions needed are not in the best interest of the breeding pig's animal welfare. Breeding pigs or sows are female pigs utilized for breeding and give birth to the piglets that ultimately become pigs sent to market.  Breeding pigs are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the breeding pigs, and to increase efficiency.  Breeding pigs are generally artificially

inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned.

110.    An overwhelming majority of sow farms use some type of indoor confinement for breeding pig operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

111.    Only a small portion of the pigs that are harvested for meat are breeding pigs that have been kept for reproduction.

112.    Pursuant to decades of scientific research, industry practice is that the vast majority of all farmers house pregnant breeding pigs in individual stalls for insemination, throughout pregnancy, and for the first 30 to 40 days after weaning.  This practice protects the sow, helps prevent pregnancy loss, critically permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing.

113.    The individual stalls also permit breeding pigs to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

114.    Specifically, housing breeding pigs in individual stalls permits farmers to carefully provide each breeding pigs with the right amount of feed to achieve optimal nutrition.  This is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning.

115.    Housing breeding pigs in a group pen also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals, placing the safety and lives of the workers in jeopardy.

116.    The Act imposes restrictions that are contrary to current time-tested, science-based, best practices for pig production.  The Act, in practical effect, bans the use of individual stalls during breeding and most of the gestation period.

117.    The offspring of breeding pigs are raised to market weight in separate, specialized production facilities, including: (1) feeder pig farmers or nurseries; (2) feeder pig finishers; and (3) farrow-to-finish operations.  Farrow to finish takes approximately 24-26 weeks.

118.    Once pigs reach harvest weight, they are sent to packing and processing facilities, like Triumph, throughout the country.  Packing and processing facilities receive pigs from multiple farms, in multiple locations, operated by multiple farmers.

119.    ███████████████████████████████████  Triumph processes the harvested pigs into many different cuts of meat.  The meat is packed and shipped to customers throughout the entire country and abroad, including Massachusetts.

120.    Farmers and processors cannot realistically forego the Massachusetts market.  If forced to exit the Massachusetts market, many farmers' operations will become cost prohibitive based on loss in revenue from Massachusetts and/or regional consumers.  Any temporary increase of  price of pork in Massachusetts will not be sufficient to offset the cost to come into compliance with the Act and Regulations.  This is because it is impossible to segregate which portions of meat will be sold into the Massachusetts market alone without undergoing significant efforts. While space and efforts were made at Triumph to facilitate some allocation for Massachusetts and California for this interim period while the constitutionality of such laws are addressed, it will be impossible to do so for every state's individual preferences on how breeding pigs of the offspring pigs coming into the plant are housed.  The increased cost to come into compliance cannot be recovered from Defendants due to Massachusetts' sovereign immunity, precluding the recovery of monetary damages by Plaintiffs. Or, alternatively, to come into compliance, many farmers will need to limit their supply so that their pigs will have more space, as many do not have the option to buy more real estate.  This means that the national pork supply will drop, again illustrating how the Act and Regulations are affecting the entire country's pork production.

121.    This process Triumph has instituted also increases substantial risk of recall and food waste, leading to additional lost revenue associated with a conventional pig being mistakenly intermingled with a lot of Question 3 compliant pigs ready for processing. This issue would result

in the necessary recall of thousands of pounds of Whole Pork Meat destined for sale to Massachusetts.   This is true even though Triumph is a state-of-the-art facility and one of the best run facilities in the country.  Triumph – as are all processors – is at risk for this happening at any point with the deliveries from their farmers for product it attempts to segregate for California, or when Massachusetts deliveries (assuming there is any product available for Massachusetts), or any states that have similar regulatory preferences.

122.    While Triumph is undertaking extraordinary efforts for the recent California and Massachusetts pig preferences, it is impossible to do so for numerous states across the country. Even for just these two states, product that is compliant for Massachusetts is not compliant for California.  As new states create their own version of the regulations, it will become more difficult for farmers and processors like Triumph to supply pork nationwide and internationally. Each new regulation would require new inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures, and new storage locations to keep each type of product separate. If enough states pass regulations like Question 3, Triumph will be forced to ration its products.

123.    Additionally, the full amount of pork produced from a compliant pig is not typically utilized to fulfill Proposition 12 or Question 3 compliant orders. Pork items for which there is no demand for Proposition 12 or Question 3 pork are sold into the commodity market without any premium to offset the increased cost of production for those products.

124.    The Act and Regulations' Minimum Size Requirements would require significant changes to Farmer Plaintiffs' farming operations, including significant structural changes and the requirement to reduce the number of pigs at the facility.

125.    The Minimum Size Requirements will also create negative impacts on the breeding pigs that are confined within a group pen, likely resulting in significant health risks and piglet loss. The Minimum Size Requirements create significant ongoing harm to breeding pigs.  Breeding pigs are subject to physical aggression, abuse, losing fetuses in utero, lameness, and the inability to obtain proper nutrition when confined in group systems.

126.    Due to not being able to build new barns or retrofit existing barns, it will not be feasible for Farmer Plaintiffs to ever come into full compliance with the Minimum Size Requirements for a variety of reasons, including lack of space and financial inability.  It is expected that smaller pig farmers like APC will be among those unable to comply with the Act, resulting in them being forcibly removed from the industry.  This will result in an acute consolidation of the industry into large farmers and processors who may be more adept to converting facilities or assuming the risk of decreasing their herd sizes and will ultimately significantly harm Farmer Plaintiffs' smaller or family-owned farms.

127.    Small farm operations are already threatened by bigger farmers and small farmers have been on the decline for the last twenty-five years.

128.    As of 2017, about 7% of pigs in the United States are on farms with less than 2,000 head in inventory; 20% of the inventory is on farms with 2,000-4,900 head; and 73% are on farms with 5,000 or more hogs. USDA, National Agricultural Statistics Service, *Census of Agriculture* (2017).

129.    Pork processors like Triumph will also suffer. ██████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ Pig farmers, such as the Farmer Plaintiffs, face significant financial consequences if they are unable to meet contractual obligations to produce pigs that are compliant with the Minimum Size Requirements. ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████

130.    Plaintiffs are also at risk of being subject to conflicting laws throughout the remaining United States, as evidenced by the passage of Proposition 12 in California. While Proposition 12 and Question 3 contain similar language at times, the statutes and regulations implementing the requirements in these two acts contain different definitions and different requirements.

131.    The states in which Triumph and Farmer Plaintiffs operate give farmers, including Farmer Plaintiffs, the right to confine breeding pigs in a manner that is expressly prohibited by the Act. This places Question 3 in direct conflict with state statutes for the actual states in which the breeding pigs are housed.  Further, the states in which Triumph operates do not prohibit the sale of Whole Pork Meat if it is the product of a sow not housed in compliance with the Minimum Size Requirements or is the offspring of such sow.

132.    For example, the Missouri Constitution protects the "right of farmers and ranchers to engage in farming and ranching practices." Mo. Const. art. I, § 35.

133.    Wyoming law provides that "the rights of farmers and ranchers to engage in farm or ranch operations shall be forever guaranteed in this state." Wyo. Stat. § 11-44-104. Further, Wyoming law provides that nothing in its "Protection of Livestock Animals" chapter prohibits "the use of Wyoming industry accepted agricultural or livestock management practices or any other commonly practiced animal husbandry procedure used on livestock animals…" Wyo. Stat. 11-29-115.

134.    Indiana regulations, promulgated pursuant to Indiana statute, establish standards of care for livestock, including that persons responsible for caring for livestock must provide the animals with sufficient shelter from the weather; must take reasonable measures to protect the animals from injury or disease; and must provide the animals with an environment that can reasonably be expected to maintain the health of animals raised using the applicable production method. 345 Ind. Admin. Code 14-2-3 through 14-2-4.

135.    Plaintiffs are uncertain whether pork already in the supply chain as of and including the expiration of the Stay Period, but which are the offspring of an animal not confined within the Minimum Size Requirements during the Stay Period, may still be sold after the Stay Period.

136.    In Massachusetts, meat cannot be sold if it comes from a breeding pig that has been in confinement anywhere in the country that is contrary to the Act or its Regulations.

137.    Thus, Plaintiffs face immediate and irreparable harm if the Act and Regulations continue to go into effect as planned and further enforced.  Injunctive relief will remedy this harm.[5]

## STANDING

138.    Plaintiffs have suffered, and will continue to suffer, concrete and particularized injuries that are a direct result of the Act and the Regulations.  Their injuries will be redressed by a decision of this Court.

139.    Plaintiff APC specifically has associational standing to challenge the Act on behalf of its members and on behalf of the entity itself.

140.    One or more APC members has standing to bring this action in their own right because they are directly subject to the Act because they knowingly breed or raise pigs that are being sold into and within Massachusetts.

141.    APC's Mission Statement is to "support the actions of Triumph Foods by complying with production and ethical guidelines, balancing the relationship between members of Allied Producers' Cooperative receiving the maximum return per market hog delivered to Triumph Foods and the financial strength of Triumph Foods, and continuing the creation of expansion opportunities for all America's Premium Pork members."

142.    The interests APC seeks to protect are germane to APC's mission statement and purpose.

143.    Individual participation by APC's members is not required for the claims asserted or the relief requested.

144.    Farmer Plaintiffs, including APC's members, knowingly supply pigs to be processed into pork and sold into and within Massachusetts, and expect to continue to do so after the expiration of the Stay Period.  A civil enforcement by Defendants against Plaintiffs is not required to challenge the constitutionality of the Act.

---

[5] Plaintiffs will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

145.     Farmer Plaintiffs have been unable to convert enough of their farming operations, due to both financial and time constraints needed to undertake the massive conversions required, in order to supply the quantity of hogs necessary for the demand required for Massachusetts.

146.     ███████████████████████████████████████

███████████████████████████████████████████

147.     The Farmer Plaintiffs that actually can make conversions are faced with the imminent and irreparable Hobson's choice of: (1) being forced to expend significant capital to convert their operations to comply with the Minimum Size Requirements in which they know (a) are not supported by science or demonstrate best practices for the care of the sows; and (b) gamble the expenditure for laws which may be invalidated; ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

148.     Plaintiff Triumph risks substantial civil enforcement measures and injunctive relief for the sale and shipment of Whole Pork Meat products into Massachusetts after the expiration of the Stay Period because it is the entity that knowingly ships Whole Pork Meat directly into Massachusetts, rendering it the party that would be considered by Massachusetts as engaging in the sale of potentially non-compliant Whole Pork Meat into the state.

149.     This risk ultimately results in Triumph losing customers, both at an individual state and potentially national level and being cut out of entire states for the pork market.

150.     ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

151.     The Minimum Size Requirements will be enforceable at the expiration of the Stay Period, thereby creating immediate risk of civil penalties or "injunctive relief" against Plaintiffs. The entire national market for pork is threatened to be irreparably harmed if the Act and

Regulations are enforced, with impacts on nationwide consumers who had no involvement in the passage of Question 3.

152.    These injuries will be remedied by the relief sought in this action.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE COMMERCE CLAUSE (42 U.S.C. § 1983)

153.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-152 as though fully set forth herein.

154.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

155.    The Act and its Regulations violate the Commerce Clause, as they discriminate in purpose and in effect against out-of-state farmers and processors.

156.    Massachusetts' voters approved the Act on November 8, 2016, which prohibits business owners and operators from engaging in the sale of Whole Pork Meat from offspring of breeding pigs confined in a cruel manner, regardless of where the animal was confined.

157.    The Regulations promulgated by the Department of Agricultural Resources acknowledge the Act is a protectionist trade barrier with a discriminatory purpose.

158.    For example, the Regulations acknowledge that the Act is intended to "reduc[e] potential fiscal" threats to Massachusetts consumers.  2022 MA REG TEXT 610066 (NS).  This, combined with one singular stated purpose within the Act to avoid "negative fiscal impacts to the Commonwealth of Massachusetts," portrays the discriminatory purpose.

159.    Additionally, prior to the election in which Question 3 was passed by voters, no Massachusetts pig farmer used gestation crates to confine breeding pigs or used practices that otherwise would be banned by Question 3. This shows that Question 3 was specifically intended to target out-of-state farmers, further illustrating the discriminatory intent behind the Act and its Regulations.

160.     Furthermore, the vast majority of pig farms in the United States are located in states other than Massachusetts and the vast majority of Whole Pork Meat is processed in states other than Massachusetts. Massachusetts has few pig farmers and few breeding sows, and the farmers that are in Massachusetts operate on a much smaller scale than Farmer Plaintiffs' farms. Given how few pig farmers, breeding sows, and general pork production operations are in Massachusetts, in-state pig farmers will be able to easily conform their operations to the Act compared to the Farmer Plaintiffs' operations.

161.     In comparison, out-of-state farmers like Farmer Plaintiffs must make conversions to their pig production facilities in order to continue to supply Pork Meat into Massachusetts.

162.     Again, Farmer Plaintiffs have been unable to convert enough of their farming operations, due to both financial and time constraints needed to undertake the massive conversions required, in order to supply the quantity of hogs necessary for the demand required for Massachusetts.

163.     This forced conversion to adhere to a single state's moral and policy requirements operates as a substantial, forced burden in order to gain access to the Massachusetts marketplace.

164.     Massachusetts also has few USDA-certified pork processors and those that do exist provide Pork Meat primarily for export out of Massachusetts to the larger New England region and arguably do not even "engage in the sale" of Whole Pork Meat under the Act.

165.     Massachusetts' three USDA processors are inspected by the USDA for compliance with the FMIA. Under the Regulations implementing the Act, a sale that is undertaken at an establishment at which an inspection is provided under the FMIA is exempted from the Act's prohibitions of a "sale" involving noncompliant Whole Pork Meat.

166.     In-state processors may sell noncompliant Pork Meat from their FMIA and FSIS inspected facility if the buyer takes possession of the product at that establishment, effectively creating a loophole for in-state farmers. In comparison, out-of-state processors cannot have the sale of any noncompliant Whole Pork Meat be excluded from the definition of a "sale" because they are not located in Massachusetts and are shipping directly into the state from out-of-state

facilities.

167.    The Act and the Regulations confer an advantage to in-state processors over out-of-state processors and creates an unfair advantage for in-state processors because they will not need to comply with the Act, given the exclusions in the regulatory definition of "sale."

168.    The Act and the Regulations will allow farmers to offload noncompliant pigs through Massachusetts processors, diverting business from out-of-state processors like Triumph.

169.    Given the regulatory definition of a "sale," in-state processors can buy noncompliant Whole Pork Meat and organize sales to occur at their in-state facilities, which would create a black market for non-compliant Whole Pork Meat and which subjects out-of-state processors to an undue, unfair, and discriminatory disadvantage.

170.    Therefore, the Act imposes disproportionate burdens on out-of-state pork processors in comparison to in-state pork processors. Such burdens far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

171.    The good-faith defense, dependent upon certifications provided for in the Regulations, will in effect force out-of-state merchants to seek regulatory approval within Massachusetts before undertaking a transaction in Massachusetts, or will result in purchasers in Massachusetts refusing to engage in commercial transactions with out-of-state suppliers, another example of the Act's discrimination against out-of-state suppliers.

172.    Even further, the Regulations also require out-of-state farmers to open up their farms—regardless of where in the country they are located—to inspections by Massachusetts officials and potentially third-party certifiers.  These Regulations were proposed in March of 2022 and indicated for the first time just how far beyond Massachusetts' borders the Act intends to reach. Furthermore, the Act places a substantial burden on Farmer Plaintiffs and the interstate pork market without sufficient justification. Such burdens far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

173.    Specifically, the Regulations, and the Act itself, are tantamount to Massachusetts imputing a penalty onto out-of-state pork processors, like Triumph, and onto farmers, like the

Farmer Plaintiffs.  Through the Act, they are banning the industry wide accepted, and USDA approved, product through an upfront sales embargo or debarment – this itself is a penalty and functions as punitive.

174.    Further, a regulatory scheme created *by a single state*, is controlling other states' access to *entire markets*, as Massachusetts is the primary thoroughfare for all New England states. Said another way, if processors and farmers are not Question 3 compliant, they are penalized not just by blocked access to Massachusetts, but by being excluded and cut out from the whole of New England markets (markets that the mid-west pork industry, including the out-of-state pork market, have operated in for decades).  This further extends the out-of-bounds regulatory nature of commerce, not to mention sanction or penalty, by Massachusetts or other states both who are selling and receiving product.

175.    A regulatory scheme created *by a single state* has direct economic implications that reach nationwide.

176.    For example, if the Act goes into effect, and is enforced through the Regulations, it will have an impact on the national market of pork production, including: decreasing supply, forcing small pig farmers out of the market, consolidating pig production into large farmers, altering sales in all remaining states to conform to the Minimum Size Requirements, altering packers' practices to conform, and ultimately resulting in nationwide increases in the costs of Whole Pork Meat that will be passed along to consumers nationwide.

177.    In effect, Massachusetts is forcing the entire nation's pig production chain to adopt its Regulations for pig production and is no longer permitting each state to set its own regulatory scheme. The Act and Regulations, in practical effect, create a national regulation, and attempt to unilaterally impose Massachusetts' moral and policy preferences for pig farming and pork production on the rest of the nation in an extraterritorial manner in violation of the Commerce Clause. These substantial burdens on the nation's pig production supply chain far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

178. Question 3's ballot initiative record was devoid of actual proof that the Act would actually accomplish the goals it intended (*i.e.*, to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to Massachusetts). Furthermore, Congress has already charged a federal governing body, the USDA, and its regulatory agency, FSIS, with ensuring that meat is safe and that livestock in interstate commerce is pest and disease-free.

179. These substantial burdens on commerce, which impact all stages of the national pork production market, are clearly excessive and outweigh any local benefit, which does not actually exist.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (42 U.S.C. § 1983)

180. Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-179 as though fully set forth herein.

181. Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating rights under the Privileges and Immunities Clause at Article IV, Section 2 of the United States Constitution.

182. Article IV, Section 2 of United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

183. The right to pursue a common calling, such as to pursue a trade, practice an occupation, or pursue a common calling within the state is a fundamental right protected by the Privileges and Immunities Clause. The Privileges and Immunities Clause also restrains state efforts to discriminate against out-of-state citizens.

184. Question 3 was passed on November 8, 2016, and targeted out-of-state farmers by subjecting them to the onerous Minimum Size Requirements in order to sell their pigs into and within Massachusetts.

185. The Regulations reiterate the threat of enforcement if business owners or operators sell Whole Pork Meat into Massachusetts that violate the Minimum Size Requirements.

186.     Due to Massachusetts' inability to produce enough pork for the demand within its borders, combined with Massachusetts' small amount of pig farmers and pork processors, the burden of compliance with the Act's Minimum Size Requirements falls almost entirely on out-of-state pig farmers and pork processors to the benefit of in-state farmers and pork processors.

187.     The Act's discriminatory and disproportionate burden on out-of-state pig farmers and pork processors, to the benefit of in-state pig farmers and pork processors, violates the Privileges and Immunities Clause.

188.     The Act and its Regulations attempt to effectively regulate pig farming, manufacturing, and production in other states.

189.     Sufficient justification does not exist to discriminate against out-of-state farmers and pork processors.

**THIRD CAUSE OF ACTION**

**EXPRESS PREEMPTION BY FEDERAL MEAT INSPECTION ACT**

**(Declaratory Relief; Preemption)**

190.     Plaintiffs incorporate the facts set forth in Paragraphs Nos. 1-189 as though fully set forth herein.

191.     Application of the Act and its Regulations to FSIS inspected processors, like Triumph's, violates the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

192.     The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

193.     The FMIA has an express preemption clause. The FMIA express preemption clause states that *"[r]equirements within the scope of this chapter with respect to premises, facilities and operations* of any establishment at which inspection is provided under subchapter I of this chapter,

which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia . . . ." 21 U.S.C. § 678 (emphasis added).

194.    The FMIA has many requirements with respect to the premises, facilities, and operations of FMIA-inspected facilities. For example, the FMIA requires that "[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce . . . ." 21 U.S.C. § 603. Accordingly, FMIA-inspected facilities accommodate the inspection process as implemented by FMIA inspectors.

195.    Furthermore, the USDA is designated to "appoint from time to time inspectors to make examination and inspection of all amenable species, inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, . . . and said inspectors shall refuse to stamp, mark, tag, or label any carcass or any part thereof . . . until the same shall have actually been inspected and found to be not adulterated . . . ." 21 U.S.C. § 621.

196.    The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. . . . ." 21 U.S.C. § 601.

197.    Furthermore, under the FMIA, USDA inspectors are mandated to "examin[e] and "inspect[]" "all amenable species before they shall be allowed to enter into any slaughter[house] or similar establishment." 21 U.S.C. § 603.

198.    In sum, the FMIA requires the USDA to complete and effectuate inspection processes at all stages of pork processing to ensure pork products that enter interstate commerce are not unwholesome or adulterated, and thus fit for human consumption.

199.    However, Question 3, in purpose and effect, interferes with the USDA's independent determination by examination or inspection: (a) that pigs must be adulterated (or otherwise not used for Massachusetts) that do not meet the Minimum Size Requirements; and (b) cause segregation of the pigs inside the FSIS inspected facility that do not meet the Minimum Size Requirements, when no such requirements are found within the FMIA or its implementing regulations governing post-mortem inspections.  Indeed, Question 3 preempts the USDA in making a determination before and after entrance into the plant, that the pig is not safe for human consumption and may not be processed for pork for Massachusetts due to risk for foodborne illness; and then forces the FSIS inspected facility to segregate the pigs from both the pigs designated by the USDA as unadulterated and otherwise deemed fit for human consumption.

200.    Question 3 has a direct effect on the operations of Triumph's FMIA regulated facility in both (a) the inspection and findings that are under the purvey of the USDA/FSIS and (b) the physical segregation process itself.

201.    Indeed, that Question 3 falls precisely within the scope of the FMIA's express preemption clause is shown by Question 3's stated justification, which is redundant and tracks to the FMIA's express purposes: "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, *which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness*, and have negative fiscal impacts on the Commonwealth of Massachusetts."

202.    While Question 3 attempts to dodge a preemption claim by stating that "sales" undertaken at FSIS facilities are excluded from regulation, this is empty rhetoric without meaning, as (1) the Question 3 "sales" definition specifically  excluded "sale" is *only* where the buyer takes physical possession at the processing plant, and sales for FSIS facilities do not take place at the FSIS plants, and thereby FSIS facilities, like Triumph, do not receive insulation; and (2) there is

no way for an FSIS facility to comply with Question 3 without allowing the Act's requirements to directly interfere with the USDA's purview of inspections in by both their (a) inspection findings; and (b) the physical acts of segregation.

203.    As Question 3 places additional and different requirements from the inspection operations requirements imposed by the FMIA, Question 3 is in violation of the FMIA's express preemption clause.

204.    Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt the Act and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

205.    Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

206.    Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

## FOURTH CAUSE OF ACTION

## CONFLICT PREEMPTION BY FEDERAL MEAT INSPECTION ACT

### (Declaratory Relief; Preemption)

207.    Plaintiffs incorporate the facts set forth in Paragraphs Nos. 1-206 as though fully set forth herein.

208.    Application of the Act and its Regulations to FSIS inspected processors, like Triumph's, violates the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

209.    The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

210.     The federal government of the United States has a critical interest in overseeing the safety and fitness of meat produced for human consumption throughout the Nation.

211.     In response to this critical interest, Congress enacted the FMIA. The express purposes, among others, are to ensure that meat products are "wholesome, not adulterated," to carry out the "effective regulation of meat and meat food products in interstate [] commerce," and to "protect the health and welfare of consumers." 21 U.S.C. § 602.

212.     Reflective of this purpose, the FMIA states that the USDA shall appoint "inspectors to make examination and inspection of all amenable species, inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, . . . and said inspectors shall refuse to stamp, mark, tag, or label any carcass or any part thereof . . . until the same shall have actually been inspected and found to be not adulterated . . . ." 21 U.S.C. § 621. In other words, the USDA is required to determine whether pork products – both before and after the pigs are harvested at the FMIA processing facility – are "adulterated."

213.     The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. . . ." 21 U.S.C. § 601.

214.     Consequently, the question of whether Whole Pork Meat is fit and appropriate for human consumption is a responsibility delegated and assigned to the USDA, as effectuated through the FMIA's inspection processes and USDA inspectors or designees through the USDA's as effectuated through the FMIA's inspection processes and USDA inspectors or by the establishment if it is implementing voluntary segregation procedures in accordance with FSIS Directive 6100.1.

215.     The inspection processes, including requirements as to inspectors themselves and how such inspections are to be carried out, have been further set forth by regulation by the USDA. *See* 9 C.F.R. Part 306; *see also* FSIS Directive 6100.1 & FSIS Directive 6600.1 (providing

instructions to USDA inspectors regarding how to verify that facilities are producing ready-to-cook pork via ante-mortem and post-mortem inspections).

216.    The FMIA's extensive and detailed inspection processes reflect the FMIA's emphasis on ensuring uniformity of such inspections.

217.    Question 3 prohibits a business owner or operator from engaging in the sale of Whole Pork Meat from the offspring of an animal that was not confined in accordance with the Minimum Size Requirements.

218.    The FMIA or its associated regulations does not set any type of Minimum Size Requirement in the raising of breeding pigs or within the definition of what should constitute an "adulterated" product or in determining what is fit for human consumption.

219.    By banning sales downstream from the FMIA processing facility and designating all other pork as adulterated, or unfit for human consumption in Massachusetts, Question 3 preempts the inspection processes at FMIA-inspected facilities and infringes on the Congressionally delegated authority to the USDA, and therefore conflicts with the stated intentions of the FMIA.

220.    Implementation of Question 3 predetermines, from the outset and on the alleged basis of protecting the health of consumers, what pigs are fit for purposes of human consumption. Such predetermination takes the matter out of the hands of the duly appointed federal inspectors in charge of making such decisions.

221.    As a result, Question 3 presents an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as set forth in the FMIA.

222.    Therefore, Question 3 is preempted by the FMIA under principles of conflict preemption.

223.    Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt the Act and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

224.    Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

225.    Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

### FIFTH CAUSE OF ACTION

### PREEMPTION BY PACKERS AND STOCKYARDS ACT

### (42 U.S.C. § 1983)

226.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-225 as though fully set forth herein.

227.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

228.    The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

229.    Massachusetts approved Question 3 on November 8, 2016, which prohibits the sale of Whole Pork Meat by any business owner or operator from an animal that was not confined in accordance with the Minimum Size Requirements.

230.    The Packers and Stockyards Act, 7 U.S.C. § 192, prohibits any meat packer/producer from providing any preference to a particular person or locality and from subjecting any particular locality to a "disadvantage" in the sale of meat. It also prohibits any processor from engaging in any unfair or unjustly discriminatory practice. Further, the Packers and Stockyards Act prohibits processors from taking action that will result in a restraint on trade.

231.    Triumph meets the definition of a "packer" under the Packers and Stockyard Act, contained at 7 U.S.C. § 191.

232.    The Act and the Regulations encourage processors and packers to either source their supply of pigs only from farmers who are completely compliant with the Act or to pay a premium to farmers who produce pigs that are compliant with the Act.

233.    This implicit advantage creates a conflict with the Packers and Stockyards Act because processors like Triumph would necessarily discriminate against farmers who are not compliant with the Act or its Regulations and would provide an unreasonable preference to particular farmers or localities, in violation of the Packers and Stockyards Act.

234.    These trade restraints will also impact the interstate pork industry including, but not limited to, through forcing small businesses out of the market, passing along increased costs to consumers, and reducing the supply of Pork Meat in the state, which also creates a conflict with the Packers and Stockyards Act.

235.    Additionally, three USDA processors operate in Massachusetts. Those processors are inspected by the USDA for compliance with the Federal Meat Inspection Act (21 U.S.C. § 601 *et seq.*) ("FMIA"). Under the Regulations implementing the Act, a sale that is undertaken at an establishment at which an inspection is provided under the FMIA is exempted from the Act's prohibitions of a "sale" involving noncompliant Whole Pork Meat.

236.    In-state processors may sell noncompliant Whole Pork Meat from their FMIA facility if the buyer takes possession of the product at that establishment, effectively creating a loophole for in-state farmers. In comparison, out-of-state processors cannot have the sale of any noncompliant Whole Pork Meat be excluded from the definition of a "sale" because they are not located in Massachusetts and are shipping directly into the state from out-of-state facilities.

237.    The Act and the Regulations confer an advantage to in-state processors over out-of-state processors and creates an unfair advantage for in-state processors because they will not need to comply with the Act, given the exclusions in the regulatory definition of "sale."

238.    The Act and the Regulations will allow farmers to offload noncompliant pigs through Massachusetts processors, diverting business from out-of-state processors like Triumph.

239.    Given the regulatory definition of a "sale," in-state processors can buy

noncompliant Whole Pork Meat and organize sales to occur at their in-state facilities, which would create a black market for non-compliant Whole Pork Meat, and which subjects out-of-state processors to an undue, unfair, and discriminatory disadvantage.

240.    By organizing their sales in this way, in-state processors can essentially create a monopoly for pork processing because they can accept all meat—regardless of whether the meat complies with the Act and the Regulations —while out-of-state processors cannot.

241.    Furthermore, the additional capital investments or contributions for equipment changes and facility conversions that Farmer Plaintiffs will need to undergo for compliance with the Minimum Size Requirements may create a significant obstacle for pork processors to have their pig supply needs met by farmers.

242.    Thus, it is impossible for pork processors to comply both with the Act, its Regulations and the Packers and Stockyards Act.

243.    At a minimum, the Act and the Regulations create hurdles to comply with the Packers and Stockyards Act and the Act.

244.    The Act is therefore preempted by the Packers and Stockyards Act.

245.    The Regulations are therefore invalid.

## SIXTH CAUSE OF ACTION

## VIOLATION OF THE FULL FAITH AND CREDIT CLAUSE (42 U.S.C. § 1983)

246.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-245 as though fully set forth herein.

247.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating these individual members' rights under the Full Faith and Credit Clause at Article IV, Section 1 of the United States Constitution.

248.    Under the Full Faith and Credit Clause, states are to respect the laws and judgments from other states.

249.     The laws of the states in which Farmer Plaintiffs operate their farms do not subject farmers to prohibitions that rise to the level of the Minimum Size Requirements in the Act, and therefore those states confer a right to Farmer Plaintiffs to house breeding pigs in a manner that is expressly prohibited by the Act and the Regulations.

250.     The laws of some states in which Farmer Plaintiffs operate their farms specifically give the Farmer Plaintiffs the right to engage in their farming practices or provide standards of care for livestock with which Farmer Plaintiffs comply.

251.     The laws of Missouri where Triumph operates its pork processing facility either confers a right to, or at least do not prohibit, Triumph to engage in the sale of Whole Pork Meat products that are expressly prohibited from being sold in Massachusetts by the Act.

252.     Even if Farmer Plaintiffs did not want to sell within Massachusetts, it is impossible to prevent pork products from being sold within Massachusetts given the interconnected nature of the pork industry and the logistics behind the production and packing of pork products.

253.     Through the passage of Question 3 and implementation of the Act through the Regulations, Massachusetts is denying Plaintiffs the rights they are guaranteed under the laws in which they operate.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983)

## (FACIAL AND AS APPLIED CHALLENGE)

254.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-253 as though fully set forth herein.

255.     Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

256.     The Act violates the Due Process Clause because it is unconstitutionally vague on its face because it is vague in all its applications.

257. The Act also violates the Due Process Clause as applied to Plaintiffs because it does not define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

258. The Act makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."  Mass. Gen. Laws Ch. 129 App., § 1-3.

259. The Act and Regulations fail to define material words and terminology like "engage in the sale within the Commonwealth of Massachusetts."

260. "Engaging in the sale" is the critical action prohibited by the Act and Regulations and yet no business owner or operator of ordinary intelligence can discern what it means to *be engaged in* the sale.

261. When a term as central to the offense as "engage in the sale" is vague, the Act does not give business owners or operators a reasonable opportunity to know what conduct is prohibited and thus, is vague in all its applications.

262. The Act and Regulations further fail to identify what Massachusetts interprets as compliant breeding pig housing specifications to meet the standards set forth in the Minimum Size Requirements.

263. The square footage requirements for a breeding pig to turn around freely, without touching the sides of an enclosure or other animal can be interpreted in many different ways.

264. For example, the ability of a sow to turn around in the manner specified in the Minimum Size Requirements is expressly dependent on how large the breeding pig actually is. The length of a sow is not a "one size fits all" size.

265. The failure to define the square footage specifications makes the Act and its Regulations vague both on its face and as applied to the Farmer Plaintiffs' operations.

266.    The Act and Regulations' failure to define material words and terminology also makes the Act vague as applied to Plaintiffs.

267.    Plaintiffs are a pork processor and farmers located outside the Commonwealth of Massachusetts, but pigs raised and ultimately processed by Plaintiffs are shipped directly into Massachusetts.

268.    Because the Act and Regulations fail to define material words and terminology like "engage in sale within the Commonwealth of Massachusetts," and provide further specifications for compliance with the Minimum Size Requirements as set forth herein, Plaintiffs are unable to discern whether the shipment of their pork products into Massachusetts, if not compliant with the Minimum Size Requirements, is a prohibited conduct.

269.    Moreover, the Act and Regulations failure to define material words and terminology is insufficiently definite such that it will lead to arbitrary and discriminatory enforcement.

270.    In other words, the Act fails to provide explicit standards for enforcement and so, it is vague as applied to Plaintiffs.

271.    Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act.  Mass Gen. Laws App., § 1-6.

272.    While the Act purports to impose civil penalties only—fines and injunctive relief, the fines are so substantial that they are tantamount to criminal penalties.

273.    Moreover, the injunctive relief available to the Attorney General operates in the same manner as debarment—another criminal penalty.

274.    Accordingly, the Act is a quasi-criminal statute.

275.    For a statute to be unconstitutional for due process, enforcement is not required; enforcement must just be imminent or the legal authority to enforce must be available to the authorities.

276.     Enforcement in this context would carry the presumption that the Whole Pork Meat entering the State of Massachusetts is unfit for human consumption, unwholesome and adulterated.

277.     Plaintiffs have a constitutional right to liberty to be free from risk of enforcement, and associated penalties, of a vague law.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF THE IMPORT-EXPORT CLAUSE (42 U.S.C. § 1983)

278.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-277 as though fully set forth herein.

279.     Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating these individual members' rights under the Import-Export Clause at Article I, Section 10, clause 2 of the United States Constitution.

280.     Article I, Section 10, clause 2 of the United States Constitution states, "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws."

281.     The Import-Export Clause may be interpreted to prevent states from imposing certain especially burdensome taxes and duties on imports from other states, or in interstate commerce, and not just on imports from foreign countries.

282.     The Act and the Regulations, in effect, levy a burdensome duty on out-of-state pork goods because the Act and the Regulations conditions the sale of a good within Massachusetts on the use of Massachusetts' preferred farming practices in the other states in which sows were farmed.

283.     In addition, the Act and the Regulations levy a duty on Triumph to require and confirm a valid certification exists from its Farmer Plaintiffs and other out-of-state pig farmers under the Regulations for all pigs it obtains that may ultimately be processed and distributed to Massachusetts.

284.    The Act and Regulations force Plaintiffs, as a pork processor and farmers, to incur a penalty, either through forced compliance with a regulatory scheme set by a single state to remain active in entire markets (Massachusetts and New England markets) or risk exclusion from those markets, including markets that the mid-west pork industry, including the out-of-state pork market, has operated in, sold to, and transacted in, for decades.

285.    Sufficient justification does not exist to levy a duty on Whole Pork Meat that was derived from breeding pigs not confined in compliance with the Minimum Size Requirements.

**NINTH CAUSE OF ACTION**

**DECLARATORY RELIEF (28 U.S.C. § 2201)**

286.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-285 as though fully set forth herein.

287.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether, under the Stay Order, Defendants are allowing the sale of Whole Pork Meat after the expiration of the Stay Period so long as the offspring to be sold into Massachusetts was in gestation before the expiration of the Stay Period.

288.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the dormant Commerce Clause of the United States Constitution, as set forth in the First Cause of Action.

289.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate Plaintiffs' privileges and immunities under the Privileges and Immunities Clause of the United States Constitution, as set forth under the Second Cause of Action.

290.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Supremacy Clause of the United States Constitution, as set forth in the Third, Fourth and Fifth Causes of Action.

291.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Full Faith and Credit Clause of the United States Constitution, as set forth in the Sixth Cause of Action.

292.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Due Process Clause of the United States Constitution, as set forth in the Seventh Cause of Action.

293.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Import-Export Clause of the United States Constitution, as set forth in the Eighth Cause of Action.

294.     The Act and its Regulations will be enforceable as of the date of the expiration of the Stay Period. Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law.

295.     Plaintiffs are therefore entitled to a judicial declaration of their rights and the duties of Defendants under 28 U.S.C. § 2201.

296.     Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

## TENTH CAUSE OF ACTION

## JUDICIAL REVIEW OF VALIDITY OF REGULATIONS, PURSUANT TO G.L. c. 30A and G.L. c231A

297.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-296 as though fully set forth herein.

298.     The Commissioner of Agriculture promulgated the Regulations to govern the enforcement of the Act and guide the pig farming and pork production industry.

299.     The Regulations are found at 330 CMR 35.00.

300.     330 CMR 35.04 details the prohibition on the sale of products derived from covered animals who were confined in a cruel manner as set forth in 330 CMR 35.03, parroting the prohibitory sale language concerning the Minimum Size Requirements found within the Act.

301.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article I, Section 8 of the Constitution, as set forth more fully in Cause of Action I.

302.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article IV, Section 2 of the Constitution, as set forth more fully in Cause of Action II.

303.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article VI, Clause 2 of the Constitution, as set forth more fully in Count III – V.

304.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article IV, Section 1 of the Constitution, as set forth more fully in Cause of Action VI.

305.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates the Due Process Clause of the Fourteenth Amendment to the Constitutions, as set forth more fully in Cause of Action VII.

306.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article I, Section 10, clause 2 of the Constitution, as set forth more fully in Cause of Action VIII.

307.     330 CMR 35.05 details certification requirements for any person who engages in the sale of Whole Pork Meat within Massachusetts.

308.     These certification requirements are a precondition to the sale of Whole Pork Meat within Massachusetts.

309.     330 CMR 35.07 provides third-party validators authority to ensure compliance with the Act.

310.     The Act, however, provides the Attorney General's Office with exclusive authority to enforce any violations of the Act.

311.     No provision of the Act vests the Commissioner of Agriculture with the authority to delegate enforcement means away from the Attorney General and vest compliance actions within third-party validators.

312.    Because this is not authorized by the enabling Act, it is an unlawful delegation of authority, in excess of the Department's statutory authority, arbitrary or capricious, and otherwise not in accordance with law.

313.    Because of these constitutional violations, and unlawful delegation of authority, and pursuant to G.L. c. 30A, § 7 and G.L. c. 231A, the Regulations at 330 CMR 35 and any guidance issued thereunder must be declared invalid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court set this matter for hearing on a preliminary injunction following review of Plaintiffs' separate Motion for Preliminary and Permanent Injunction to be submitted separately, and award the following relief:

1.    At a minimum, issue an immediate stay of enforcement of the Act until a final, non-appealable judgment is entered in this matter;

2.    Issue a preliminary and permanent injunction prohibiting the enforcement of the Act, its Regulations, its policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them;

3.    Enter judgment declaring that the Act, its Regulations and related policies, practices and customs of the Defendants violate the United States Constitution and may not be lawfully enforced, both now and in the future;

4.    Enter judgment declaring that the Regulations and related guidelines issued thereunder invalid pursuant to G.L. c 30A, § 7 and G.L. c. 231A;

5.    Enter judgment declaring that Whole Pork Meat products derived from breeding pigs that have been in gestation prior to the expiration of the Stay Period, may be sold into and within Massachusetts after the expiration of the Stay Period or another date after that time as agreed upon by the Plaintiffs and Defendants;

6.    Grant Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

7.    Any further relief that the Court deems just and equitable.

Dated: July 25, 2023.

                        .

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLC, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, in its official capacity and on behalf of its members, Plaintiffs.

By: */s/* Robert L. Peabody
Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes (*pro hac vice forthcoming*)
Ryann A. Glenn (*pro hac vice forthcoming*)
Michael A. Raupp (*pro hac vice forthcoming*)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com

*Attorneys for Plaintiffs*