UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TRIUMPH FOODS, LLC, CHRISTENSEN
FARMS MIDWEST, LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW
FASHION PORK, LLP, EICHELBERGER
FARMS, INC., and ALLIED PRODUCERS'
COOPERATIVE, individually and on behalf of its
members,

                Plaintiffs,

                v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of Massachusetts, and
ASHLEY RANDLE, in her official capacity as
Massachusetts Commissioner of Agriculture,

                Defendants.

CIVIL ACTION
NO. 1:23-cv-11671-WGY

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE COMPLAINT**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 1

I.      THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) .......... 4

     A.    Plaintiffs Fail to State a Dormant Commerce Clause Claim (Count I) ....... 5

         1.    Plaintiffs' Dormant Commerce Clause Claim Is Squarely Foreclosed by the Supreme Court's Decision in *NPPC v. Ross* ............................. 5

         2.    Plaintiffs' Discrimination-Based Dormant Commerce Clause Claim Fails as a Matter of Law ................................................................ 7

     B.    Plaintiffs Fail to State a Privileges and Immunities Claim (Count II) ...... 11

     C.    Plaintiffs Fail to State an Express or Conflict Preemption Claim under the Federal Meat Inspection Act (Counts III & IV) ........................................ 11

         1.    The FMIA Does Not Expressly Preempt the Act ............................... 12

            a.    The FMIA's Preemption Clause Is Limited to Slaughterhouses and Similar Facilities, and Contains a Recordkeeping Exception ................................................................................................. 12

            b.    The Act Does Not Regulate "Within the [FMIA's] Scope" or Impose Any "Additional or Different" Requirements ............. 13

         2.    The Act Does Not Conflict with the FMIA ........................................ 15

     D.    Plaintiffs Fail to State a Claim under the Packers and Stockyards Act (Count V) .................................................................................................... 17

     E.    Plaintiffs Fail to State a Full Faith and Credit Clause Claim (Count VI) . 18

     F.    Plaintiffs Fail to State a Due Process Vagueness Claim (Count VII) ....... 18

     G.    Plaintiffs Fail to State an Import-Export Clause Claim (Count VIII) ....... 19

     H.    Plaintiffs Fail to State any Remaining Claim (Counts IX & X) ............... 20

II.     COUNT X SHOULD BE DISMISSED UNDER RULE 12(B)(1) ...................... 20

CONCLUSION ................................................................................................................. 20

## INTRODUCTION

In 2016, Massachusetts voters enacted The Prevention of Farm Animal Cruelty Act, which prohibits, as relevant here, the in-state sale of whole pork meat derived from a breeding pig (or her immediate offspring) confined such that she is unable to stand up, extend her limbs, or turn around, and also prohibits such confinement of breeding pigs within Massachusetts. Plaintiffs contend that the measure is unconstitutional because it "forces" them to make unwanted changes to their businesses.

Plaintiffs present no triable issue of fact. The heart of their complaint—the alleged burden on the national pork market—was rejected by the Supreme Court as the basis for a constitutional challenge in *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023) only months ago. As there, Plaintiffs here allege that laws like the Act will force pork producers and processors to make costly changes to their methods of production. Even putting aside their factual implausibility, these types of allegations categorically do not state a claim under the Supreme Court's dormant Commerce Clause precedent. *See id.* at 1165. Because Plaintiffs' remaining claims also fail as a matter of law, the complaint should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), as well as, in the case of Count X (state law claim), Federal Rule of Civil Procedure 12(b)(1).

## BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint (Dkt. No. 17, hereinafter "C."), documents referenced in it, and other material the court properly may consider on a motion to dismiss.[1]

---

[1] A court may consider on a motion to dismiss "documents the authenticity of which are not disputed by the parties; ... official public records; ... [and] ... documents sufficiently referred to in the complaint" without converting the motion to one for summary judgment. *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013). Further, "[a] Court may take judicial notice of any "decision[s] of a sister court." *Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011).

**State Regulation of Agricultural Production to Promote Animal Welfare**

Multiple states have enacted laws regulating agricultural production and products for the purpose of promoting animal welfare, including humane confinement standards for pigs.  *See, e.g.*, Fl. Art. X, § 21(a) (prohibiting "any person [from] confin[ing] a pig during pregnancy . . . in such a way that she is prevented from turning around freely"); Ariz. Rev. Stat. Ann. § 13-2910.07(A); Me. Rev. Stat. Ann., Tit. 7, § 4020(2); Mich. Comp. L. § 287.746(2); Ore. Rev. Stat. §§ 600.1501(1)-(2); R.I. Gen. L. § 4-1.1-3.  Two states, California and Massachusetts, also prohibit in-state sale of meat produced from inhumanely confined animals, as discussed below.

**The Act: Question 3 (2016) and Legislative Amendment (2021)**

In 2016, Massachusetts voters enacted a law establishing in-state standards for the sale of eggs, veal products, and whole pork meat, "An Act to Prevent Cruelty to Farm Animals," by ballot initiative.  St. 2016, c. 333; C. ¶¶ 25-26 (citing *2016 Ballot Question Booklet*) (reproduced in the Addendum).[2]  The statute, as amended by St. 2021, c. 108, and its implementing regulations are referred to herein as "Question 3" or "the Act."  *See* Mass. G.L. c. 129 App. §§ 1-1 *et seq.*; 330 Code Mass. Regs. §§ 35.00 *et seq.* (reproduced in the Addendum).

The stated purpose of the Act is "to prevent animal cruelty by phasing out extreme methods of farm and animal confinement."  Mass. G.L. c. 129 App. § 1-1.  As relevant here, the Act prohibits sales "within" Massachusetts of whole pork meat that the seller "knows or should know" comes from a breeding pig that was "confined in a cruel manner" or "the immediate offspring" of such an animal, regardless of where the animal was housed.  *Id.* § 1-3.  The Act defines "confined in a cruel manner," with respect to breeding pigs, to mean "in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning

---

[2] Mass. G.L. c. 129 App. § 1-1 declares Massachusetts's local interests "in terms well-nigh conclusive." *See Berman v. Parker*, 348 U.S. 26, 32 (1954).  The Act is part of Massachusetts' longstanding line of laws to prevent animal cruelty.  *See, e.g.*, Mass. G.L. c. 112, § 58B (obligating veterinarians to report suspicions of animal cruelty); Mass. G.L. c. 272, § 77 (prohibiting knowingly and willfully subjecting an animal in one's charge "to unnecessary torture, suffering or cruelty") and its predecessor statutes, St. 1868, c. 212, § 2; St. 1869, c. 344, § 2; P.S. (1882), c. 207, § 53; R.L. (1902), c. 212, § 70.

around freely," with certain exceptions, including during transportation or slaughter of the animal. *Id.* §§ 1-4, 1-5. A "sale" occurs "where the buyer takes physical possession" of the food item. *Id.* § 1-5. The definition of "sale" excludes "any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act." *Id.* The Act also prohibits in-state farms from confining breeding pigs "in a cruel manner." *Id.* § 1-2.

The Defendant, the Commissioner of the Massachusetts Department of Agricultural Resources ("MDAR"), oversees the state agency that implements the statute with regulations. Mass. G.L. c. 129 App. § 1-10. The Defendant Attorney General is authorized to enforce the Act. *Id.* § 1-6. A violation of the Act is punishable by a civil fine of up to $1,000, and the Attorney General may seek injunctive relief to prevent further violations of the Act. *Id.*

### Prior Challenges to the Massachusetts Law

In 2022, the National Pork Producers Council ("NPPC") and others filed suit in this district challenging the Act on dormant Commerce Clause grounds. *Mass. Rest. Ass'n v. Healey*, No. 22-cv-11245 (D. Mass.).[3] The case was stayed pending judgment in *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), a case involving NPPC's challenge to the California law known as Proposition 12, which similarly "forbids the in-state sale of whole pork meat that comes from breeding pigs (or their immediate offspring) that are 'confined in a cruel manner.'" 143 S. Ct. at 1150, quoting Cal. Health & Safety Code Ann. § 25990(b)(2). Following entry of the *Ross* judgment on June 12, 2023, the parties proposed, and the court ordered, that the Act would go into effect on August 24, 2023, with limited stays of enforcement (1) related to the sale of non-compliant product already in the supply chain as of that date and (2) to allow MDAR to propose a regulatory change regarding the Act's application to "Transshipped Whole Pork Meat."[4] *Mass. Rest. Ass'n*, Dkt. Nos. 21 (Aug. 5, 2023) (joint stipulation)

---

[3] Earlier, several states had sought leave to file a bill of complaint with the Supreme Court to challenge the law under the dormant Commerce Clause. It was denied. *Indiana v. Mass.*, USCT 22O149 (2016).

[4] Covered product is "in the supply chain" if it qualifies as "Whole Pork Meat" as defined at 330 Code Mass. Reg. § 35.02. It does not include live animals. "Transshipped Whole Pork Meat" is "'Whole Pork

(reproduced in the Addendum) & 22 (Aug. 8, 2023) (court docket order).

**Present Complaint**

Plaintiffs filed this action on July 25, 2023, Dkt. No. 1, and filed the operative amended complaint on July 31, 2023.  Dkt. No. 17.  The complaint contains over 300 numbered paragraphs, many of which are conclusory, argumentative, or utterly speculative.

Allegations in this complaint about harm to the pork industry overall, characteristics of the national market, Plaintiffs' business practices, in-state consumer demand, and in-state production are materially indistinguishable from the allegations made in NPPC's complaint challenging Proposition 12, which was dismissed for failure to state a claim, as affirmed by the Supreme Court.  As to Massachusetts, Plaintiffs further allege that: (1) "no Massachusetts pig farmer used gestation crates to confine breeding pigs" when the Act passed, and (2) Massachusetts "is the primary thoroughfare for [pork sales to] all New England states." C. ¶¶ 156, 171.  However, Plaintiffs do not allege that their own pork products are sold within Massachusetts for export to other New England states.

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6)

A complaint can survive a motion to dismiss under Rule 12(b)(6) only if it alleges a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court assesses the plausibility of a claim through a two-step process: "Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).  "Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id.*  "If the factual allegations in the complaint are too

---

Meat' that is produced outside of Massachusetts and that enters and exits Massachusetts without additional processing or repackaging, exclusively for the purposes of transshipment or export outside of Massachusetts." *Mass. Rest. Ass'n*, Dkt. No. 21 (Aug. 5, 2023) (reproduced in the Addendum).

meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted).  Plaintiffs fail to state a claim under this standard.

### A.   Plaintiffs Fail to State a Dormant Commerce Clause Claim (Count I)

#### 1.   Plaintiffs' Dormant Commerce Clause Claim Is Squarely Foreclosed by the Supreme Court's Decision in *NPPC v. Ross*

Plaintiffs allege that the Act's "confinement and inspection requirements" and "exclusions in the regulatory definition of 'sale'" violate the dormant Commerce Clause because they "discriminate[] against out-of-state farmers and pork processors," and impose "substantial burdens on commerce . . . [that are] clearly excessive and outweigh any local benefit."  C. ¶¶ 8, 150-176.  But the Supreme Court has foreclosed any conclusion that the Act imposes an unconstitutional burden on interstate commerce.  *See Ross,* 143 S. Ct. at 1165.  *Ross* challenged Proposition 12, California's law banning the in-state sale of certain pork products, which has the same purpose and the same provisions in all material respects to the Massachusetts law challenged here.  *See id.*[5]  The amended complaint has no well-pled allegations distinguishing Plaintiffs' dormant Commerce Clause claim from the one rejected by the Supreme Court in *Ross* on appeal of a Rule 12(b)(6) dismissal.

In *Ross,* the plaintiffs, the National Pork Producers Council and the American Farm Bureau Federation, on behalf of their members who raise and process pigs, had alleged that Proposition 12 impermissibly burdens interstate commerce and fails the balancing test derived from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  Specifically, the *Ross* petitioners alleged that (1) the law burdened interstate commerce by "structurally reworking the industry, requiring costly changes to thousands of facilities, increasing sow mortality, decreasing herd size, and resulting in every pork consumer paying for California's preferred farming practices," and (2) "Proposition 12's purported benefits are invalid or non-existent."  *NPPC v. Ross*, No. 21-468,

---

[5] If anything, California's law is *more* onerous because it imposes a particular size requirement of twenty-four feet and is criminal in nature.  *See* Cal. Health & Safety Code Ann. §§ 25990(b)(2), 25991(e)(1).

Pet'rs' Br. (reproduced in the Addendum) at 47, 50.  The *Ross* petitioners argued compliance burdens fall "exclusively" on out-of-state farms, which "have no practical choice but to comply" given the "difficulty of tracing and segregating pork products." *Id.* at 45-46; *see also Ross*, 143 S. Ct. at 1151 (majority op.) (describing allegations); Complaint, *NPPC v. Ross* (reproduced in the Addendum), *e.g.,* ¶¶ 214-15 (alleging all in-state California pork producers were required to comply with in-state confinement standards since 2015); ¶¶ 20, 106 & 292 (alleging California must import pork to meet consumer demand and national industry unable to meet demand for compliant pork); ¶¶ 7, 136-45 (alleging details of national pork production chain); ¶¶ 104, 128, 130-31, 134 (alleging onerousness of tracking pork through supply chain); ¶ 98 (alleging suppliers are requiring producers to supply compliant pork); ¶ 293 (alleging Proposition 12 will "force costly and unwanted changes in production methods").

The Court in *Ross* concluded these allegations were insufficient to state a dormant Commerce Clause claim. *Ross,* 143 S. Ct. at 1165 (declining "petitioners' incautious invitation[]" to reverse).  A plurality of the Court recognized "a shift from one set of production methods to another promises some costs," but reaffirmed that "the dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.'" *Id.* at 1162 (Gorsuch, J., joined by Thomas, Sotomayor, Kagan, JJ.) (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 119-20 (1978)).[6]  As the *Ross* plurality noted, "many producers have already converted to some form of group housing," and while "the complaint plausibly alleges that *some* out-of-state firms may face difficulty complying (or may choose not to comply) with Proposition 12, . . . from all anyone can tell, *other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void." *Id.*  Because the burden alleged in the *Ross* complaint amounted only to "harm to some producers' favored 'methods of operation,'" with any further harm "nothing more than speculative possibility," the

---

[6] Justice Barrett, concurring in part, would have affirmed on the broader ground that the petitioners' claim was not cognizable at all, *see* 143 S. Ct. at 1167 (citing the "incommensurable" nature of "the benefits and burdens" of California's law), and accordingly the plurality's opinion under the Supreme Court's longstanding *Exxon* doctrine is controlling.  *See Marks v. United States*, 430 U.S. 188, 193 (1977).

plurality concluded that the petitioners' dormant Commerce Clause claim was properly dismissed under Rule 12(b)(6).  *Id.* at 1163 (quoting *Exxon*, 437 U.S. at 127).

Here, Plaintiffs make materially indistinguishable allegations, and their claim is thus foreclosed by *Ross*.  *See* C. ¶ 173 (alleging impacts on "national market of pork production," including decreased supply and nationwide cost increases), ¶ 176 (alleging local benefits do "not actually exist"), ¶¶ 71, 118, 119 (alleging onerousness of "segregating" and tracking through supply chain). [7]  Like the *Ross* petitioners, Plaintiffs here allege the Act "force[s] conversion" of their farming operations.  C. ¶ 160.  But Plaintiffs also acknowledge they only need to make those conversions "in order to gain access to the Massachusetts marketplace."  C. ¶ 160.  As in *Ross*, "vertically integrated businesses face[] a choice" of whether to (1) "withdraw from the local retail market" or (2) comply and supply Massachusetts.  *Ross*, 143 S. Ct. at 1161-62 (plurality op.); *see also* C. ¶ 105 (Christensen Farms has "convert[ed] a small portion of their operations to be compliant" with the Act).  That choice does not, as a matter of law, constitute an impermissible burden on interstate commerce.  *Ross*, 143 S. Ct. at 1162 (plurality op.) (further noting that, "[i]n *Exxon*, the law posed a choice *only* for out-of-state firms").  As in *Ross,* Plaintiffs' alleged burden amounts at most only to "harm to some producers' favored 'methods of operation,'" which categorically fails to state a dormant Commerce Clause claim.  *See id.* at 1163 (plurality op.).  *Ross* compels dismissal.

### 2.    Plaintiffs' Discrimination-Based Dormant Commerce Clause Claim Fails as a Matter of Law

In an effort to circumvent *Ross*, Plaintiffs claim that the Act discriminates against out-of-state businesses because, they allege, "no Massachusetts pig farmer used gestation crates to confine breeding pigs" at the time the Act was passed and because sales made at the

---

[7] The only allegation related to burden that is conceivably distinguishable from *Ross* is that Massachusetts is a distribution hub for New England.  C. ¶ 171.  But Plaintiffs do not allege that their own products are distributed to other states through Massachusetts and so have not plausibly stated a basis to seek relief on those grounds.  Further, by stipulation in another case, there is a stay of enforcement as to whole pork meat sold in Massachusetts solely for further export, so there is no live controversy on those allegations. *Mass. Rest. Ass'n v. Healey*, No. 22-cv-11245 (D. Mass.), Dkt. Nos. 21 & 22.

"establishment" of an in-state federally licensed slaughterhouse are exempt from the Act's definition of "sale."  C. ¶¶ 156, 164.  Plaintiffs fail as a matter of law to allege discrimination.

"Discrimination under the Commerce Clause means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter, as opposed to state laws that regulate evenhandedly with only incidental effects on interstate commerce[.]" *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (cleaned up).  "Plaintiffs bear the initial burden of showing discrimination." *Id.*  If (and only if) Plaintiffs meet their burden, then "[t]he state bears the burden of showing legitimate local purposes and the lack of non-discriminatory alternatives[.]" *Id.*  As in all cases applying the dormant Commerce Clause, the court proceeds with "extreme caution" and "delicacy." *Ross*, 143 S. Ct. at 1165.

The pork industry plaintiffs in *Ross* disavowed a discrimination-based claim for good reason:  both Proposition 12 and the Act are plainly nondiscriminatory.  In both cases, the challenged laws "impose[] the same burdens on in-state pork producers that [they] impose[] on out-of-state ones." *Ross*, 143 S. Ct. at 1153.  For this reason, a California district court dismissed a nearly identical discrimination-based challenge to California's statute. *Iowa Pork Producers Ass'n v. Bonta,* No. 2:21-cv-09940-CAS, 2022 WL 613736, *18-25 (C.D. Cal. Feb. 28, 2022) (dismissing complaint for failing to state a claim).  The court should do the same here.

On its face, the Act is not unconstitutionally discriminatory in either its effect or purpose. The law even-handedly sets conditions on the sale of all whole pork meat in Massachusetts, regardless of where the pigs were raised.  All pork producers are equally subject to the Act, and no subset receives or is denied any specific benefits.  There is no plausible allegation of any in-state economic "benefits" to Massachusetts—if anything, as Plaintiffs' allegations make plain, Massachusetts voters acted against their economic self-interest to promote the welfare of food animals. *See* C. ¶ 92 (alleging the Act will "increase retail pork prices for consumers in Massachusetts").  Further, the Act's direct ban on certain animal confinement practices applies only to in-state producers—meaning that, unlike out-of-state producers, an in-state producer could not simply choose to sell non-compliant products elsewhere.  The Constitution does not

require a state to uniquely discriminate *against* in-state entities by mandating an *exemption* for out-of-state entities from the same neutral legislation that applies to in-state sellers. *Accord United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007) (no dormant Commerce Clause claim where state law favored government-owned businesses but treated all privately-owned businesses, whether in-state or out-of-state, the same).

Plaintiffs also have not plausibly alleged anything in the Act's history that shows a motivation to confer a benefit on Massachusetts businesses. The 2016 Ballot Question Booklet (C. ¶ 26, reproduced in the Addendum) contains no mention of Massachusetts producers or processers. Plaintiffs' allegation that the Act's "one singular stated purpose" was to avoid "negative fiscal impacts" is directly contradicted by the Act's text, which states that the Act's purpose is to "prevent animal cruelty," as well as the essence of its provisions, outlawing certain animal confinement practices in Massachusetts and prohibiting in-state sales of meat produced via such confinement practices. Mass. G.L. c. 129 App. § 1-1; *compare C & A Carbone, Inc. v. Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994) (striking down law aimed at making local facility profitable). The purpose statement's reference to "negative fiscal impacts" is subsidiary to the statute's anti-animal-cruelty purpose and does not evince economic protectionism, as the *IPPA* court correctly concluded about Proposition 12's nearly identical purpose statement. *See IPPA*, 2022 WL 613736, at *12-13 ("[P]laintiff has failed to plausibly allege that the purpose of Proposition 12, which the statute states is 'to prevent animal cruelty by phasing out extreme methods of farm animal confinement,' was motivated by economic protectionism.").[8]

While Plaintiffs allege the Act has a "discriminatory intent" because, they allege, no Massachusetts farmer confined breeding pigs in a "cruel" manner when the voters passed

---

[8] Defendants acknowledge dicta in *Dunn v. Attorney General*, 474 Mass. 675, 681 (2016), that the Act "protects[] Massachusetts farmers who comply with the law," but that unnecessary statement is not consistent with the purpose statement of Question 3, nor with any position taken in this or other litigation by the Defendants. The Act's sale ban neutrally applies to sales of products from both in-state and out-of-state producers; it does not discriminate in favor of in-state or against out-of-state producers at all, much less in a way that offends the Commerce Clause.

Question 3, the particular confinement methods used in Massachusetts in the past does not somehow render discriminatory an even-handed law that treats sales by in-state and out-of-state producers alike. *See IPPA,* 2022 WL 613736, at *14 ("[P]laintiff cannot allege there is a discriminatory burden where in-state businesses are *already in compliance* with the same regulatory standards") (citing *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013), *cert. denied* 135 S.Ct. 398 (2014) (holding a statute that treats all private companies the same does not discriminate against interstate commerce, even when only out-of-state businesses are burdened because there are no comparable in-state businesses))).

Finally, Plaintiffs take aim at three slaughterhouses in Massachusetts that are inspected under the Federal Meat Inspection Act ("FMIA").  C. ¶¶ 161-163.  Because the Act exempts sales "undertaken at an establishment" inspected under that federal act, Mass. G.L. c. 129 App. § 1-5, Plaintiffs speculate that this provision of the Act "will allow farmers to offload noncompliant pigs through Massachusetts processors, diverting business from out-of-state processors like Triumph." C. ¶ 165.  The Act's limited exception for sales undertaken at these facilities does not evince an unconstitutional aim to advantage in-state businesses.  Notably, the same limited "sales" exception also appears in Proposition 12 and yet was not the subject of a dormant Commerce Clause challenge in either *Ross* or *IPPA*.  *See* Cal. Health & Safety Code Ann. § 25991(o).  Plaintiffs make no allegation that slaughterhouse sales were even mentioned during debate on the Act, and the provision appears to have been included to avoid any possible suggestion of preemption under the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq*.  *Cf. Nat'l Meat Ass'n v. Harris*, 132 S. Ct. 965 (2012) (finding a different California law preempted under the FMIA).  The dormant Commerce Clause prevents States from "build[ing] up . . . domestic commerce" through "burdens upon the industry and business of other States," *Ross*, 143 S. Ct. at 1152, not from attempting to comply with federal law.  And Plaintiffs' allegations of discrimination due to this provision rest solely on pure speculation about the possible development of a future "black market"—an utterly implausible suggestion that Massachusetts is both attempting to ban the sale of certain products, while also purposefully creating a black

market for those same products.  C. ¶ 166.  Plaintiffs thus have failed to plausibly allege the Act

unconstitutionally discriminates against out-of-state producers.

Having failed to plausibly allege a substantial burden on commerce or discrimination,

Plaintiffs' dormant Commerce Clause fails to state a claim and should be dismissed.

### B.  Plaintiffs Fail to State a Privileges and Immunities Claim (Count II)

As a threshold matter, the Privileges and Immunities Clause "extend[s] only to natural

persons and not to corporate entities," like the Plaintiffs. [9]  *BoylstonD3 LLC v. Galvin*, 496 F.

Supp. 3d 692, 696 (D. Mass. 2020) (citing *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 514

(1939)); *see also IPPA*, 2022 WL 613736 at *9.  This alone requires dismissal of Count II.

Plaintiffs also fail to set forth sufficient factual allegations regarding the other elements

of a Privileges & Immunities Clause claim.  C. ¶¶ 177-186.  The Privileges and Immunities

Clause "applies only when a state distinguishes among residents and nonresidents with respect to

. . . fundamental interests."  *A.C. by Waithe v. McKee*, 23 F.4th 37, 47-48 (1st Cir. 2022).  As

discussed, *supra* Part I.A.2, the Act "applies equally to all pork meat sold within

[Massachusetts], regardless of where it was produced," and does not "treat[] nonresidents and

residents differently."  *See IPPA*, 2022 WL 613736 at *9 (dismissing Privileges and Immunities

claim).  Accordingly, Plaintiffs' Privileges and Immunities Clause claim should be dismissed.

### C.  Plaintiffs Fail to State an Express or Conflict Preemption Claim under the Federal Meat Inspection Act (Counts III & IV)

Plaintiffs allege the Act is either expressly preempted by, or preempted through conflict

with, the FMIA because the Act decides what is "wholesome and not adulterated" meat and

requires "segregation" at slaughterhouses.  C. ¶¶ 80, 230, 187-222.  But as the complaint itself

appears to concede, the Act "act[s] as a means by which Massachusetts can regulate what occurs

on *farms*," not slaughterhouses.  C. ¶ 6 (emphasis added).  Further, as the Supreme Court has

---

[9] Although Plaintiff APC purports to bring its claims "on behalf of its members," C. ¶ 137, there is no
allegation that any members are natural persons.  And where the remaining Producer Plaintiffs are all
corporate entities, it is not reasonable to draw that inference from the facts alleged in the complaint.

noted, "[d]espite the persistent efforts of certain pork producers, Congress has yet to adopt any statute that might displace Proposition 12 or laws regulating pork production in other States." *Ross*, 143 S. Ct. at 1152 (citing proposed federal bills from 2015 to 2019 that were not enacted). Neither the FMIA nor the Packers and Stockyards Act (*infra*, Part I.D.) preempts the Act.

### 1.   The FMIA Does Not Expressly Preempt the Act

#### a.   The FMIA's Preemption Clause Is Limited to Slaughterhouses and Similar Facilities, and Contains a Recordkeeping Exception

Because the FMIA contains an express preemption clause, the court first must determine the substance and scope of that clause, *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008), relying on "the plain language of the statute and its legislative history" to discern Congressional intent. *Medicaid & Medicare Adv. Prod. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted)).

Congress intended the FMIA to prevent adulterated or misbranded meat from entering commerce by implementing a meat inspection regime at slaughterhouses and meat processing facilities. *See, e.g.*, *Harris*, 565 U.S. at 455-46 (FMIA regulates "broad range of activities at slaughterhouses to ensure both safety of meat and humane handling of animals"); S. Rep. 90-799 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 2188, at 2208-09 (meat inspection program expanded by 1967 amendment, including addition of preemption Section 408).

The FMIA's express preemption clause prohibits a state from imposing any "[r]equirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this [Act], which are in addition to, or different than those made under this [Act], . . . except that any such jurisdiction may impose recordkeeping and other requirements within the scope of section 642 of this title, if consistent therewith, with respect to any such establishment." 21 U.S.C. § 678.[10] The preemption provision also expressly allows a state to regulate, consistent with the FMIA, "with

---

[10] 21 U.S.C. § 642, "Recordkeeping requirements," requires all swine processors, among other entities, to "keep such records as will fully and correctly disclose all transactions involved in their businesses."

respect to any other matters regulated under this [Act][.]"  *Id.* ("This chapter shall not preclude any State . . . from making requirement [s] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter").

Plaintiffs fail to plausibly allege that the Act imposes any requirements—let alone "additional or different" ones—that are (1) "within the scope of the [Act]" *and* (2) directly "concern slaughterhouses' premises, facilities or operations."  *See id.*  Their express preemption claim therefore fails to state a claim as a matter of law.

### b.   The Act Does Not Regulate "Within the [FMIA's] Scope" or Impose Any "Additional or Different" Requirements

A state requirement falls within the scope of [FMIA] preemption if the Food Safety and Inspection Service ("FSIS") "could issue regulations under the [Act] . . . mandating" the requirement.  *See Harris*, 565 U.S. at 466.  As relevant here, the Act prevents the sale within Massachusetts of whole pork meat originating from sows that were "confined in a cruel manner," which excludes by definition any confinement during "[t]ransportation" or "[s]laughter." M.G.L. c. 129 App. §§ 1-3(C), 1-4(A), (C), 1-5.  The Act further expressly exempts sales at facilities inspected under the FMIA (*i.e.*, slaughterhouses).  Mass. G.L. c. 129 App. § 1-5. Neither the FMIA nor FSIS regulations address humane handling of animals *prior* to their arrival at a slaughterhouse or similar facility, only how they are inspected, handled, and processed once they get there.  *See generally* 9 C.F.R. 300 *et seq.* (FSIS's mandatory and voluntary meat inspection regulations).  Thus, the FMIA and the Act operate in entirely different spaces that do not overlap—the FMIA operates within slaughterhouses while the Act operates at farms of origin. The Act thus regulates entirely outside the FMIA's scope.

Plaintiffs nevertheless assert the Act (1) "preempt[s]" a determination under the FMIA that meat is unadulterated, and (2) "forces" slaughterhouses to segregate compliant pigs from non-compliant pigs.  C. ¶ 196.  The plain text of the Act shows that these allegations are inaccurate and conclusory.  First, the Act does not define non-compliant meat as "adulterated," "unwholesome" or unsafe for human consumption; in fact, it does not use those terms at all.  *See*

13

Mass. G.L. c. 129 App. § 1-5; 330 C.M.R. § 35.02 (defining "confined in a cruel manner").  A pig (or meat from that pig) whose confinement complied with the Act could just as easily pass FSIS inspection at a slaughterhouse or fail it, depending on whether that pig is healthy or diseased, or its meat otherwise adulterated.  *See* 21 U.S.C. § 601(m)(1)-(8) (defining adulterated meat as meat which contains, among other things, any "filthy, putrid, or decomposed substance" or was prepared in unsanitary conditions).  The Act does not require inspectors at FSIS-inspected facilities to change in any manner their assessment of whether inspected meat is or is not "adulterated."  Indeed, the Act does not touch upon FSIS inspection or its adulteration determinations in any way.  *See generally* Mass. G.L. c. 129 App.; 330 C.M.R. §§ 35.00 *et seq.* It only addresses the preharvest confinement conditions for breeding pigs and so is outside the FMIA's preemptive scope.  *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted").

Second, Plaintiffs' allegation that the Act has a "direct effect" on processing facilities by imposing a "physical segregation process" is not plausibly alleged in light of the Act's text. C. ¶ 197.  Plaintiffs do not identify any language in the Act that would require slaughterhouses to handle or process compliant pigs in any particular manner.  As stated above, the Act explicitly excludes FSIS-inspected facilities from its scope and does not impose *any* requirements on those facilities.  At most, a natural consequence of the Act is that a seller of whole pork meat in Massachusetts must be able to identify whether meat originated from a compliant pig.  This could be accomplished several ways, none of which are mandated by the Act.  Even if this could be construed as imposing a record-keeping requirement on FSIS-inspected facilities—which Defendants do not concede—record-keeping requirements are explicitly *excluded* from the FMIA's express preemptive scope.  *See* 21 U.S.C. § 601(m)(1)-(8).

Further, the Act is clearly distinguishable from the California law invalidated in *National Meat Association v. Harris*.  There, the law instructed *slaughterhouses* to handle nonambulatory animals on their premises contrary to FSIS regulations, which included "specific provisions for

the humane treatment of nonambulatory animals" at slaughterhouses, and also banned the sale of meat from such animals. *Harris*, 565 U.S. at 457 (citing 9 C.F.R. § 313.2(d)). California's sale ban, therefore, functioned "as a command to slaughterhouses to structure their operations in the exact way" the law mandated with respect to handling those animals on-premises. *Id.* at 463-64. Unlike the California law in *Harris*, the Act does not purport to prohibit a slaughterhouse from slaughtering a non-compliant pig, either directly or through a sales provision. *Id.* at 460, 464. Indeed, the Act does not serve to direct a slaughterhouse how to manage its site-based activities *in any respect*—the sales provision only requires that sellers in Massachusetts ensure whole pork meat originated from sows housed humanely *on farms*.

The Act is more akin to previously upheld laws that "work[] at a remove from the sites and activities the FMIA most directly governs," like California's ban on force-fed foie gras or Texas's ban on horse meat for human consumption. *See, e.g.*, *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1151 (9th Cir. 2017), *cert. denied,* 139 S. Ct. 862 (2019) ("Nothing in the federal law or its implementing regulations limits a state's ability to regulate the *types* of poultry that may be sold for human consumption."); *Empacadora de Carnes de Fresnillo, S.A. v. Curry*, 476 F.3d 326 (5th Cir. 2007), *cert. denied*, 550 U.S. 957 (2007). Similarly, the Act does not impose any "requirements" on slaughterhouses' day-to-day operations. It only regulates the type of meat that may be sold within Massachusetts, which is conditioned on confinement standards on *farms*, not on how the animals were handled, or how the meat was inspected or processed, at an FSIS-inspected facility.

In short, the Act does not regulate a single activity related to "the slaughtering and processing of animals at a given location," and so, on its face, falls well outside the express preemption provision of the FMIA. S*ee Harris*, 565 U.S. at 463.

### 2.   The Act Does Not Conflict with the FMIA

Plaintiffs' claim of conflict preemption fares no better. C. ¶¶ 204-222. The "presumption against preemption" applies in the conflict preemption analysis where, as here,

States have traditionally applied police powers.  *See Me. Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022); *see also Ross,* 143 S. Ct. at 1150 ("As far back as 1641, the Massachusetts Bay Colony prohibited 'Tirranny or Crueltie towards any bruite Creature'"); *IPPA*, 2022 WL 613736 at \*11 (applying presumption against preemption as to Proposition 12). Plaintiffs must therefore allege compelling evidence of an intent to preempt "even if there is also a history of federal regulation."  *See Medtronic v. Lohr*, 518 U.S. 470, 485 (1996).  And Plaintiffs' facial challenge must show that "no set of circumstances exists under which" the Act "would be valid."  *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st Cir. 2001) (citation omitted).  Moreover, obstacle preemption, the "offshoot" of conflict preemption Plaintiffs appear to raise here, applies only where "a state law confers rights or imposes restrictions that conflict with the federal law." *Cormier*, 51 F.4th at 8 (quoting *Murphy v. Nat'l Coll. Ath. Ass'n*, 138 S. Ct. 1461, 1480 (2018)).  The conflict between federal and state schemes must be "irreconcilable," not potential.  *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

Plaintiffs allege the Act presents an "obstacle" to accomplishing the FMIA's purposes of ensuring meat safety.  C. ¶¶ 207, 218.  But this legal conclusion—which the court need not accept as true—has no factual support or legal basis.  Congress made explicit in the Wholesome Meat Act of 1967, which amended the FMIA, that it did not intend to occupy the entire field of meat inspection or meat commerce.  *See* 21 U.S.C. § 661(a) (explicitly contemplating federal-state cooperation in meat inspection regime); *Empacadora*, 476 F.3d at 334.  Instead, "Congress actually designed the Act to 'protect the consuming public from meat and meat food products that are adulterated or misbranded *and to assist in efforts by State* and other Government *agencies to accomplish this objective.*'" *Chi-Midwest Meat Ass'n v. Evanston*, 589 F.2d 278 (7th Cir. 1978) (citing 21 U.S.C. § 661(a)) (emphasis added).

As already described, *supra* Part I.C.1., the FMIA and the Act operate in entirely separate spheres.  The Act does not designate non-compliant pork as "unfit for human consumption," *see* C. ¶ 216, but rather forbids its sale in Massachusetts in furtherance of the Act's primary purpose to improve animal welfare.  The Act thus does not in any way infringe on, present an obstacle to,

16

or conflict with the FMIA's procedures for inspecting meat to ensure it is "unadulterated," as defined by federal statute.  C. ¶¶ 213, 218.  Plaintiffs accordingly have failed to state a claim for conflict preemption.

### D.   Plaintiffs Fail to State a Claim under the Packers and Stockyards Act (Count V)

The Plaintiffs further allege the Act "create[s] an obstacle" to—and is therefore preempted by—the Packers and Stockyards Act ("PSA") by "encourag[ing]" processors to "advantage" compliant producers, creating "trade restraints," and advantaging three in-state processers. C. ¶¶ 223-42.  The district court in *IPPA* dismissed a nearly identical preemption claim, and this court should do the same.  *See IPPA*, 2022 WL 613736, at *11.  The "presumption against preemption" applies here as well.  *Id.; see also supra*, Part I.C.2.

The PSA prohibits any "packer or swine contractor" from "giv[ing] any undue or unreasonable preference or advantage to any particular person or locality."  *See* 7 U.S.C. § 192(b).  The purpose of the PSA is to prevent "unfair, discriminatory, or deceptive practices" in the packing industry.  *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922).  Through the PSA, Congress intended to preempt state laws imposing requirements on the "bonding of packers or prompt payment."  *IPPA*, 2022 WL 613736 at *11 (concluding "[t]he statutory language implies that Congress . . . intended that the statute only preempt state laws in narrow circumstances when states were imposing requirements on the 'bonding of packers,' which Proposition 12 does not do"); *see also De Vries v. Sig Ellingson & Co.*, 100 F. Supp. 781, 786 (D. Minn. 1951) ("Obviously Congress had no intention of regulating the entire business of the livestock and meat industry."), *aff'd*, 199 F.2d 677 (8th Cir. 1952);   The Act imposes no "bonding" requirements and does not encourage unfair, discriminatory, or deceptive practices.  Contrary to Plaintiffs' conclusory allegations, it is not an "undue or unreasonable preference or advantage" or a "restraint on trade" for a pork processor to source meat because it is compliant with a state law. *See* C. ¶¶ 229, 231.  And as discussed, *supra* Part I.A.2., Plaintiffs' allegations regarding the potential for a "black market" of non-compliant product, C. ¶¶ 232-37, are utterly speculative

17

and need not be taken as true on a motion to dismiss.  *See Schatz*, 669 F.3d at 55.

### E.   Plaintiffs Fail to State a Full Faith and Credit Clause Claim (Count VI)

Plaintiffs allege that, because the Act differs from the laws of other states where they "operate their farms," it violates the Full Faith and Credit Clause.  C. ¶¶ 131-32, 246, 243-50. But the Supreme Court has stated, "the Full Faith and Credit Clause . . . does not give rise to an implied federal cause of action," but is rather a "rule by which courts . . . are to be guided[.]" *Thompson v. Thompson*, 484 U.S. 174, 182-83 (1988). Plaintiffs cannot state a standalone claim under the Full Faith and Credit Clause, whether through 42 U.S.C. § 1983 or the declaratory judgment statute, because, as explained in *Thompson*, that clause does not create substantive rights or a cause of action, only a rule of procedure.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002) (§ 1983 does not provide a remedy for "benefits" or "interests"); *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007) (Declaratory Judgment Act "creates a remedy, not a cause of action"). A Full Faith and Credit claim would also be meritless because, so long as a state has "not adopt[ed] any policy of hostility to the public Acts" of another state—which Plaintiffs have not alleged here—the first state need not "substitute for its own statute, applicable to persons and events within it, the statute of another State reflecting a conflicting and opposed policy."  *Fran. Tax Bd. of Cal. v. Hyatt*, 578 U.S. 171, 176 (2016) (citations omitted).

### F.   Plaintiffs Fail to State a Due Process Vagueness Claim (Count VII)

Plaintiffs fail to state a due process vagueness claim.[11]  Because the Act is civil in nature, the vagueness analysis is "less exacting" than for criminal statutes.  *McCoy v. Town of Pittsfield*, 59 F.4th 497, 509 (1st Cir. 2023); *see also Draper v. Healey*, 98 F. Supp. 3d 77, 84 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016).[12]

---

[11] Plaintiffs assert facial and as-applied challenges, C. ¶¶ 253-54, but "[v]agueness challenges to statutes not threatening First Amendment interests are . . . judged on an as-applied basis.'" *Randall v. Ally Fin. Inc.*, 491 F. Supp. 3d 1, 6 (D. Mass. 2020) (quoting *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991)).

[12] Contrary to Plaintiffs' conclusory allegations, the Act is not "quasi-criminal."  C. ¶¶ 269-71.  A reasonable monetary fine is neither "unreasonable [n]or excessive" and does not come close to, for

Under any standard, though, the Act is not unconstitutionally vague because it (1) "provide[s] a person of ordinary intelligence fair notice of what is prohibited" and (2) is not "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Plaintiffs challenge the terms "engage in sale" and "turn around freely," C. ¶¶ 251-74, but neither are vague in any manner. *See IPPA*, 2016 WL 8902576 at *6 (Proposition 12 "clearly defines the various operative terms and standards of conduct").

Starting with "engaged in sale," the Act's plain text establishes that producers who do not make sales in Massachusetts would not be liable for a distributor's Massachusetts transactions. A "sale" is "deemed to occur at the location where the buyer takes physical possession" of covered product and the Act covers only sales "within the Commonwealth of Massachusetts." Mass. G.L. c. 129 App. §§ 1-3, 1-5. As the *IPPA* court correctly concluded, there is nothing ambiguous about this: an out-of-state producer is liable only if it sells to a buyer who takes physical possession of covered product in Massachusetts. *See IPPA*, 2016 WL 8902576 at *6. The same is true for "turn around freely," which is an ordinary, comprehensible term and is further defined in detail as: "turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal." Mass. G.L. c. 129 App. § 1-5. While Plaintiffs allege sows can vary in size, C. ¶ 261, that does not create vagueness because a producer of ordinary intelligence can understand what it means for a sow to "turn around freely," regardless of size. *See also IPPA*, 2016 WL 8902576 at *7.

### G.  Plaintiffs Fail to State an Import-Export Clause Claim (Count VIII)

Plaintiffs also cannot state a claim under the Import-Export Clause, Art. I, § 10, cl. 2, because the Supreme Court has "limited that Clause to imports from *foreign countries*." *Ross*, 143 S. Ct. at 1175 (Kavanaugh, J., concurring) (citing *Woodruff v. Parham*, 75 U.S. 123 (1869));

---

example, the loss of a professional license. *See One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237 (1972); *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001).

*see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019) ("[T]he Import-Export Clause was long ago held to refer only to international trade.") (citing *Woodruff*). While the complaint asserts the Import-Export Clause applies to taxes imposed between States, C. ¶ 278, clear Supreme Court law says otherwise, and this claim too should be dismissed.

### H.   Plaintiffs Fail to State any Remaining Claim (Counts IX & X)

Plaintiffs' claim for declaratory relief, C. ¶¶ 283-93, further fails as a matter of law because (1) "[a] request for declaratory relief is not an independent cause of action," *Finamore v. Piader*, 618 F. Supp. 3d 23, 29 (D. Mass. 2022) (citing *Buck*, 476 F.3d at 33 n.3), and (2) the claim is entirely duplicative of the prior claims, which are also subject to dismissal, *Tyler v. Michaels Stores, Inc.*, 840 F. Supp. 2d 438, 452 (D. Mass. 2012).  On Plaintiffs' state law claim, C. ¶¶ 294-310, even if the court had subject-matter jurisdiction to hear that claim, *see infra*, Part II, it would fail on the merits.  First, having failed to plausibly plead unconstitutionality in any of their prior claims, Plaintiffs cannot base their derivative state law claim on any of those grounds. C. ¶¶ 298-303.  Second, the *law itself* references a role for third-party validators. *See* Mass. G.L. c. 129 App. § 1-10. Accordingly, MDAR's regulations related to such validators are explicitly authorized by the Act and are not, as a matter of law, an "unlawful delegation" of enforcement authority away from the Attorney General.  C. ¶¶ 306-09.

## II.   COUNT X SHOULD BE DISMISSED UNDER RULE 12(B)(1)

Count X alleges the challenged regulations do not comply with state law, citing Mass. G.L. c. 30A, § 7 and c. 231A.  C. ¶¶ 294-310.  Under the Eleventh Amendment, federal courts lack jurisdiction to grant relief against state officials on the basis of state law.  *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998) ("It is not the proper purview of a federal court to supervise state officials' compliance with state law.")  Count X should be dismissed pursuant to Rule 12(b)(1).

### <u>CONCLUSION</u>

For these reasons, the Defendants' motion to dismiss the complaint should be granted.

Respectfully submitted,

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of Massachusetts, and

ASHLEY RANDLE, in her official capacity as
Commissioner of the Massachusetts Department of
Agricultural Resources,

By their attorneys,

*/s/ Grace Gohlke*
Grace Gohlke, BBO No. 704218
Vanessa A. Arslanian, BBO No. 688099
Assistant Attorneys General
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
One Ashburton Place
Boston, MA  02108
617-963-2527
grace.gohlke@mass.gov
617-963-2107
vanessa.arslanian@mass.gov

Maryanne Reynolds, BBO No. 627127
Assistant Attorney General
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
10 Mechanic Street, Suite 301
Worcester, MA  01608
774-214-4407
maryanne.reynolds@mass.gov

Dated: September 28, 2023

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies
will be sent to those indicated as non-registered participants.

/s/ *Grace Gohlke*
Grace Gohlke

Dated: September 28, 2023

21