**ADDENDUM**

*Information for Voters 2016 Ballot Questions*............................................................................1

*Mass. Gen. L. c. 129 App. §§ 1-1 et seq* ......................................................................33

*330 Code Mass. Reg. §§ 35.00 et seq* ........................................................................49

*Mass. Rest. Ass'n v. Healey, No. 22-cv-11245-MRG (D. Mass. Aug. 4, 2023),*
*Docket No. 21 (Joint Stipulation and Motion for Partial Extended Stay)*....................................54

*Nat'l Pork Producers Council v. Ross, No. 19CV2324 (S.D. Cal. Dec. 5, 2019),*
*Docket No. 1 (Complaint)*............................................................................60

*Nat'l Pork Producers Council v. Ross, No. 21-468 (U.S.), Brief of Petitioners*.........................132



# Massachusetts

# INFORMATION FOR VOTERS

## 2016 Ballot Questions

## STATE ELECTION

### Tuesday, November 8, 2016

**Voter Registration Mail-In Form Enclosed!**

 Massachusetts Register to Vote Online

**registertovotema.com**

*Published by*

# William Francis Galvin

## Secretary of the Commonwealth

Addendum 1



*The Commonwealth of Massachusetts*
*Secretary of the Commonwealth*
*State House, Boston, Massachusetts 02133*

*William Francis Galvin*
*Secretary of the Commonwealth*

Dear Voter:

Your vote really matters!

This year your vote will choose a new President and may make new laws by vote of the people on questions presented in this publication.

To make it even easier to cast your vote, this year for the first time Massachusetts will have "early voting" available. This means that for the period from October 24, 2016 through November 4, 2016 any voter can cast their ballot at specially designated voting sessions; no reason is required to participate. Times and locations for early voting can be found on our website at www.sec.state.ma.us/ele or by checking with your local election official.

If you have not yet registered to vote or need to re-register because you moved, we have enclosed a form for you to fill out and mail back, but you must register by October 19, 2016 to have your name appear on the voting list. You can also now register online at www.RegisterToVoteMa.com.

There are four binding statewide ballot questions that will appear on your ballot. Some cities and towns will also have binding local questions. The 2016 Official Information for Voters booklet lists each statewide question with the text of the proposed law, statements describing the effect of a yes or no vote, a summary, statement of fiscal consequences and brief arguments for and against each question. This information will assist you in making a thoughtful decision before you enter your polling place and you can even take it with you into the voting booth if you wish.

I urge you to vote on November 8, 2016 and exercise the most essential right of our democratic system. Polling places will be open from 7 a.m. to 8 p.m. statewide.

Very truly yours,

William Francis Galvin
Secretary of the Commonwealth

Addendum 2

## Offices on the Ballot in 2016

**Electors for President and Vice President**

**Representative in Congress**

**Councillor**

**Senator in General Court**

**Representative in General Court**

**Sheriff**

**County Commissioner**
(Barnstable, Bristol, Dukes, Norfolk, Plymouth, or Franklin Council of Governments)

**Register of Deeds**
(Dukes & Suffolk only)

**District Attorney**
(Bristol only)

## Deadline to Register to Vote!

**To vote in the State Election, your Mail-in Voter Registration Form must be postmarked by Wednesday, October 19, 2016!**



### Voter Registration Mail-In Form Enclosed!

To receive additional Mail-in Voter Registration Forms, visit our website at **www.sec.state.ma.us/ele** or call the Elections Division at 617-727-2828 or 1-800-462-VOTE.

## Contents

Question 1 Expanded Slot-Machine Gaming ........................................................................4

Question 2 Charter School Expansion .................................................................................6

Question 3 Conditions for Farm Animals .............................................................................8

Question 4 Legalization, Regulation, and Taxation of Marijuana .........................................12

How to Register to Vote ....................................................................................................25

Online Tools ....................................................................................................................26

Early and Absentee Voting…..............................................................................................27

Military and Overseas Voters.............................................................................................27

Voting..............................................................................................................................28

Services of the Secretary of the Commonwealth of Massachusetts.....................................29

If You Have Been the Victim of Investment Fraud ..............................................................30

Help for Victims of Domestic Violence................................................................................30

Massachusetts Voters' Bill of Rights… ..............................................................................31

Voter Checklist.........................................................................................Back Cover

¡Atención! Si desea recibir este folleto en Español, llame al 617-727-2828 o al 1-800-462-VOTE (8683).

請注意！如果您希望索取本手冊的中文譯本，請致電 617-727-2828 或 1-800-462-8683。

Addendum 3

3

# 1

QUESTION 1: Law Proposed by Initiative Petition

# *Expanded Slot-Machine Gaming*

*Do you approve of a law summarized below, on which no vote was taken by the Senate or the House of Representatives on or before May 3, 2016?*

**SUMMARY ▶**
As required by law, summaries are written by the State Attorney General.

This proposed law would allow the state Gaming Commission to issue one additional category 2 license, which would permit operation of a gaming establishment with no table games and not more than 1,250 slot machines.

The proposed law would authorize the Commission to request applications for the additional license to be granted to a gaming establishment located on property that is (i) at least four acres in size; (ii) adjacent to and within 1,500 feet of a race track, including the track's additional facilities, such as the track, grounds, paddocks, barns, auditorium, amphitheatre, and bleachers; (iii) where a horse racing meeting may physically be held; (iv) where a horse racing meeting shall have been hosted; and (v) not separated from the race track by a highway or railway.

**WHAT YOUR VOTE WILL DO ▶**
As required by law, statements describing the effect of a "yes" or "no" vote are written jointly by the State Attorney General and the Secretary of the Commonwealth.

*A YES VOTE* would permit the state Gaming Commission to license one additional slot-machine gaming establishment at a location that meets certain conditions specified in the law.

*A NO VOTE* would make no change in current laws regarding gaming.

**STATEMENT OF FISCAL CONSEQUENCES ▶**
As required by law, statements of fiscal consequences are written by the Executive Office of Administration and Finance.

The fiscal consequences of this proposed measure for state and municipal government finances could range from 0 dollars to an unknown positive amount. Under the Expanded Gaming Act, the Massachusetts Gaming Commission has the discretion to determine whether a gaming license should be issued and when that determination would be made.  If the Gaming Commission did award the proposed license, a new analysis of the casino market would be needed to determine the amount of revenue from this license, based on proposed size and operations, and the potential impact of competition from other gaming establishments in Massachusetts and surrounding areas.

**ARGUMENTS ▶**
As provided by law, the 150-word arguments are written by proponents and opponents of each question, and reflect their opinions. The Commonwealth of Massachusetts does not endorse these arguments, and does not certify the truth or accuracy of any statement made in these arguments. The names of the individuals and organizations who wrote each argument, and any written comments by others about each argument, are on file in the Office of the Secretary of the Commonwealth.

*IN FAVOR:* Voting YES allows one additional slots parlor in Massachusetts, providing millions of dollars to Massachusetts communities and creating thousands of jobs. In 2013 alone, Massachusetts residents who played at neighboring state gaming facilities gave those states over $240 Million that could have stayed in Massachusetts.

Under the Gaming Law, nearly half the revenue collected benefits all Massachusetts residents. Over the past year, the existing slots parlor contributed over $60 million for Massachusetts communities, plus additional funds paid to the host-community. (The Gaming Law ensures that a slots parlor will only be licensed in a community that votes for it.)

About $1 of every $5 collected goes to our State's horse racing industry, sustaining jobs at racetracks and breeding farms. A second slots parlor, together with the existing parlor,

*AGAINST:* Legalized casino gambling in the Commonwealth is too new and unproven to expand at this time.

- Only one slot parlor has opened in Massachusetts, and it is significantly underperforming.

- Five casinos are expected to open in Massachusetts by 2019. *The Wall Street Journal* warns that New England already has more casinos than the market wants or needs.

- This ballot question was written by one casino developer, for one purpose: his own financial gain. It disrupts the process and limits established by the Legislature to protect communities and existing businesses.

- Proponents of the 'Act Relative to Gaming' have traveled across the globe to exploit the Commonwealth and send a message to other casino developers – they can come to

## QUESTION 1: Law Proposed by Initiative Petition

**ARGUMENTS** ▶ will assure that the long tradition of horse
**(continued)** racing in Massachusetts survives while bringing
thousands of new jobs to Massachusetts.

**Authored by:**
**Eugene McCain**
**Horse Racing Jobs and Education Committee**
**353 Broadway**
**Revere, MA 02151**
**978-972-8156**
**www.Massachusettsquestion1.com**

Massachusetts and do the same.

Vote "No" to postpone the question of gambling
expansion until a review of the costs and
benefits of existing Massachusetts gaming
establishments is completed.

**Authored by:**
**Celeste Ribeiro Myers**
**Chair, Committee for Responsible and**
**Sustainable Economic Development**
**256 Marginal St**
**Boston, MA 02128**
**MaCasinos.net**

---

### FULL TEXT OF QUESTION

Be it enacted by the People, and by their authority:

SECTION 1. Subsection (a) of Section 8 of Chapter 23K of
the General Laws, as appearing in the 2012 Official Edition
is hereby amended by striking out the first sentence and
inserting in place thereof the following sentence:-

The commission shall issue a request for applications for
category 1 and category 2 licenses.

SECTION 2. Section 20 of said Chapter 23K of the
General Laws, as so appearing, is hereby amended by
adding the following subsection:-

(g) Notwithstanding any general or special law, rule, or
regulation to the contrary, the commission may issue 1
additional category 2 license; provided, however, that

the additional category 2 license shall only be issued to
applicants who are qualified under the criteria set forth in
this chapter as determined by the commission and that the
additional category 2 license meet the following additional
qualification:

(1) The proposed location of the gaming establishment
shall be at least 4 acres large, and shall be adjacent to,
and within 1500 feet of, a race track, including the track,
grounds, paddocks, barns, auditorium, amphitheatre and/
or bleachers, if any, where a horse racing meeting may
physically be held, which race track shall have hosted a
horse racing meeting, provided that said location is not
separated from said race track by a highway or railway.

**QUESTION 2: Law Proposed by Initiative Petition**

# 2

# *Charter School Expansion*

*Do you approve of a law summarized below, on which no vote was taken by the Senate or the House of Representatives on or before May 3, 2016?*

---

**SUMMARY ▶**
As required by law, summaries are written by the State Attorney General.

This proposed law would allow the state Board of Elementary and Secondary Education to approve up to 12 new charter schools or enrollment expansions in existing charter schools each year. Approvals under this law could expand statewide charter school enrollment by up to 1% of the total statewide public school enrollment each year. New charters and enrollment expansions approved under this law would be exempt from existing limits on the number of charter schools, the number of students enrolled in them, and the amount of local school districts' spending allocated to them.

If the Board received more than 12 applications in a single year from qualified applicants, then the proposed law would require it to give priority to proposed charter schools or enrollment expansions in districts where student performance on statewide assessments is in the bottom 25% of all districts in the previous two years and where demonstrated parent demand for additional public school options is greatest.

New charter schools and enrollment expansions approved under this proposed law would be subject to the same approval standards as other charter schools, and to recruitment, retention, and multilingual outreach requirements that currently apply to some charter schools. Schools authorized under this law would be subject to annual performance reviews according to standards established by the Board.

The proposed law would take effect on January 1, 2017.

---

**WHAT YOUR VOTE WILL DO ▶**
As required by law, the statements describing the effect of a "yes" or "no" vote are written jointly by the State Attorney General and the Secretary of the Commonwealth.

*A YES VOTE* would allow for up to 12 approvals each year of either new charter schools or expanded enrollments in existing charter schools, but not to exceed 1% of the statewide public school enrollment.

*A NO VOTE* would make no change in current laws relative to charter schools.

---

**STATEMENT OF FISCAL CONSEQUENCES ▶**
As required by law, statements of fiscal consequences are written by the Executive Office of Administration and Finance.

This proposed measure would make no changes to the current funding formula, which mandates that state and local per-pupil funding follow students who enroll in public charter schools.

School districts that experience annual increases in payments to public charter schools receive transitional state education aid.

---

**ARGUMENTS ▶**
As provided by law, the 150-word arguments are written by proponents and opponents of each question, and reflect their opinions. The Commonwealth of Massachusetts does not endorse these arguments, and does not certify the truth or accuracy of any statement made in these arguments. The names of the individuals and organizations who wrote each argument, and any written comments by others about each argument, are on file in the Office of the Secretary of the Commonwealth.

*IN FAVOR:* A YES vote on Question 2 gives parents the right to choose the best public schools for their children.

Charter schools are PUBLIC schools open to all children. They offer longer school days and more individual attention, and have a proven record of closing the achievement gap for kids trapped in failing school districts.

Today, almost 33,000 children are stuck on waiting lists for public charter schools because of the legislature's arbitrary cap on enrollment. Voting YES would give more children the opportunity to attend these great public schools -- especially in the state's lowest-performing school districts.

*AGAINST:* Every time a new charter school opens or expands, it takes funding away from the public schools in that district. This year alone, charter schools will take more than $400 million from already-underfunded Massachusetts public schools. And charter schools are not accountable to the local taxpayers who fund them.

Under this proposal, the number of charter schools in Massachusetts would nearly triple in just 10 years, costing local public school districts more than $1 billion a year.

If some public schools are falling short, we should fix them, not take money away and give it to privately-run charters. We need to support schools that serve all children. That means

---

## QUESTION 2: Law Proposed by Initiative Petition

**ARGUMENTS ▶**
**(continued)**

Voting YES does not harm local school districts. Cities and towns with new public charter schools will receive MORE state education aid if Question 2 passes. Charter growth would happen gradually; new public charter schools must be approved by the State Board of Education and are subject to rigorous and frequent performance reviews.

**Authored by:**
**AnnMarie O'Connor Little**
**Great Schools Massachusetts**
**67 Kemble St. Suite 2.1**
**Roxbury, MA, 02119**
**617-439-7775**
**greatschoolsma.org**

investing in areas such as STEM (science, technology, engineering, and math), arts and music, and Pre-K, not diverting even more resources to charters, which educate just four percent of students. Save Our Public Schools. Vote NO on 2.

**Authored by:**
**Juan Cofield, Chair**
**Campaign to Save Our Public Schools**
**P.O. BOX 15**
**Boston, MA 02137**
**617-460-7337**
**saveourpublicschoolsma.com**

### FULL TEXT OF QUESTION

Be it enacted by the People, and by their authority, as follows:

SECTION 1.

Subsection (i) of section 89 of chapter 71 of the General Laws, as appearing in the 2014 Official Edition, is hereby amended by inserting after paragraph (4) the following new paragraph:—

(5) Notwithstanding the provisions of this subsection (i) relative to the number of charter schools allowed to operate in the commonwealth or in any district, the board may approve up to 12 additional commonwealth charters, commonwealth charter amendments to increase authorized enrollment, or a combination thereof per year; provided that the total enrollment authorized by all such approvals in a single fiscal year shall not exceed 1% of the total statewide public school enrollment for such year as determined by the board; provided further, that in the event that the number of qualified applicants in any year exceeds 12, the board shall give priority among such qualified applicants to those seeking to establish or expand enrollment in commonwealth charter schools in districts where overall student performance on the statewide assessment system approved by the board is in the bottom 25% of all districts in the two years preceding the charter application and where the demonstrated parent demand for additional public school options is greatest; provided

further that the board shall apply to all such applicants review and approval standards as rigorous as those applied to all other commonwealth charter applicants; provided further that the recruitment and retention and multilingual outreach provisions of paragraph (3) shall apply to any commonwealth charter school authorized under this paragraph; and provided further that any new commonwealth charter schools authorized by this paragraph shall be subject to annual performance reviews according to standards established by the board.

Nothing in this paragraph shall affect the issuance of commonwealth charters under paragraph (3). The percentages of net school spending set forth in paragraphs (2) and (3) shall not apply to or otherwise operate to limit the board's authority to approve commonwealth charters or commonwealth charter amendments under this paragraph; provided, however, that such percentages shall continue to apply to commonwealth charters issued otherwise than under this paragraph. Except as provided in this paragraph, all otherwise applicable provisions of this section shall apply to commonwealth charters or amendments approved under this paragraph.

SECTION 2.

This act shall become effective January 1, 2017, and shall apply to commonwealth charter and commonwealth charter amendment applications pending as of that date.

**3**

QUESTION 3: Law Proposed by Initiative Petition

# *Conditions for Farm Animals*

*Do you approve of a law summarized below, on which no vote was taken by the Senate or the House of Representatives on or before May 3, 2016?*

**SUMMARY ▶**
As required by law, summaries are written by the State Attorney General.

This proposed law would prohibit any farm owner or operator from knowingly confining any breeding pig, calf raised for veal, or egg-laying hen in a way that prevents the animal from lying down, standing up, fully extending its limbs, or turning around freely. The proposed law would also prohibit any business owner or operator in Massachusetts from selling whole eggs intended for human consumption or any uncooked cut of veal or pork if the business owner or operator knows or should know that the hen, breeding pig, or veal calf that produced these products was confined in a manner prohibited by the proposed law. The proposed law would exempt sales of food products that combine veal or pork with other products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food items.

The proposed law's confinement prohibitions would not apply during transportation; state and county fair exhibitions; 4-H programs; slaughter in compliance with applicable laws and regulations; medical research; veterinary exams,

testing, treatment and operation if performed under the direct supervision of a licensed veterinarian; five days prior to a pregnant pig's expected date of giving birth; any day that pig is nursing piglets; and for temporary periods for animal husbandry purposes not to exceed six hours in any twenty-four hour period.

The proposed law would create a civil penalty of up to $1,000 for each violation and would give the Attorney General the exclusive authority to enforce the law, and to issue regulations to implement it. As a defense to enforcement proceedings, the proposed law would allow a business owner or operator to rely in good faith upon a written certification or guarantee of compliance by a supplier.

The proposed law would be in addition to any other animal welfare laws and would not prohibit stricter local laws.

The proposed law would take effect on January 1, 2022. The proposed law states that if any of its parts were declared invalid, the other parts would stay in effect.

**WHAT YOUR ▶
VOTE WILL DO**
As required by law, the statements describing the effect of a "yes" or "no" vote are written jointly by the State Attorney General and the Secretary of the Commonwealth.

*A YES VOTE* would prohibit any confinement of pigs, calves, and hens that prevents them from lying down, standing up, fully extending their limbs, or turning around freely.

*A NO VOTE* would make no change in current laws relative to the keeping of farm animals.

**STATEMENT ▶
OF FISCAL
CONSEQUENCES**
As required by law, statements of fiscal consequences are written by the Executive Office of Administration and Finance.

Because the law would not take effect until January 1, 2022, the fiscal consequences of

this proposed measure for state and municipal government finances are unknown.

Addendum 8

## QUESTION 3: Law Proposed by Initiative Petition

**ARGUMENTS ▶**
As provided by law, the 150-word arguments are written by proponents and opponents of each question, and reflect their opinions. The Commonwealth of Massachusetts does not endorse these arguments, and does not certify the truth or accuracy of any statement made in these arguments. The names of the individuals and organizations who wrote each argument, and any written comments by others about each argument, are on file in the Office of the Secretary of the Commonwealth.

*IN FAVOR:* A YES vote prevents cruel treatment of animals in Massachusetts by ending the practice of cramming farm animals into cages so small they can't turn around or stretch their limbs, and will remove inhumane and unsafe products from the Massachusetts marketplace.

Endorsed by the MSPCA, Animal Rescue League of Boston, The Humane Society of the United States, and 400 Massachusetts veterinarians because no animal should be immobilized in a cramped cage.

Endorsed by the Center for Food Safety and Consumer Federation of America because cage confinement increases food safety risks, and a YES vote protects Massachusetts consumers.

Endorsed by Massachusetts family farmers and the United Farm Workers because proper treatment of animals is better for farmers. From McDonald's to Walmart, retailers are switching to cage-free eggs—the right thing to do at the right cost.

Vote YES. Protect consumers. Prevent animal cruelty.

**Authored by:**
**Stephanie Harris, Campaign Director**
**Citizens for Farm Animal Protection**
**PO Box 470857**
**Brookline, MA 02447**
**617-522-2016**
**www.citizensforfarmanimals.com**

*AGAINST:* A NO vote is necessary to protect Massachusetts consumers' right to choose from the variety of healthy foods available for purchase today.

Question 3 proposes to ban the sale of any veal, pork, and eggs in **any** state unless produced according to the wishes of the ballot promoters. A recent study undertaken at Cornell University estimates the cost to consumers–just on eggs—would be $70 a year for a family of five.

This study also notes that an increase in food prices "disproportionately harms lower income households" and can impact their ability to maintain a "healthy and adequate diet."

**Let the free marketplace respond to consumer concerns**. The veal industry plans to be completely phased out of veal crates by the end of 2017. 175 food suppliers have already pledged to switch to cage free eggs. Others will follow.

This proposed government mandate is neither necessary nor wise.

**Authored by:**
**William Bell**
**New England Brown Egg Council**
**97 A Exchange Street, Suite 305**
**Portland, Maine 04101**
**207-752-1392**
**www.newenglandbrownegg.com**

---

### FULL TEXT OF QUESTION

Be it enacted by the People, and by their authority:
Prevention of Farm Animal Cruelty Act

SECTION 1. The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts.

SECTION 2. Notwithstanding any general or special law to the contrary, it shall be unlawful for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner.

SECTION 3. Notwithstanding any general or special law to the contrary, it shall be unlawful for a business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any:

(A) Shell egg that the business owner or operator knows or should know is the product of a covered animal that was confined in a cruel manner.

(B) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner.

(C) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner.

SECTION 4. For the purposes of this Act, a covered animal shall not be deemed to be "confined in a cruel manner" during:

(A) Transportation.

(B) State or county fair exhibitions, 4-H programs, and similar exhibitions.

(C) Slaughter in accordance with any applicable laws, rules, and regulations.

(D) Medical research.

**FULL TEXT OF QUESTION** (continued)

(E) Examination, testing, individual treatment or operation for veterinary purposes, but only if performed by or under the direct supervision of a licensed veterinarian.

(F) The five (5) day period prior to a breeding pig's expected date of giving birth,and any day that the breeding pig is nursing piglets.

(G) Temporary periods for animal husbandry purposes for no more than six (6) hours in any twenty-four (24) hour period.

SECTION 5. For purposes of this Act, the following terms shall have the following meanings:

(A) "Breeding pig" means any female pig of the porcine species kept for the purpose of commercial breeding.

(B) "Business owner or operator" means any person who owns or controls the operations of a business.

(C) "Calf raised for veal" means any calf of the bovine species kept for the purpose of commercial production of veal meat.

(D) "Covered animal" means any breeding pig, calf raised for veal, or egg-laying hen that is kept on a farm.

(E) "Confined in a cruel manner" means confined so as to prevent a covered animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.

(F) "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or guinea fowl kept for the purpose of commercial egg production.

(G) "Enclosure" means any cage, crate, or other structure used to confine a covered animal or animals. "Enclosure" includes what is commonly described as a "gestation crate" or "stall" for pigs during pregnancy, a "veal crate" for calves raised for veal, and a "battery cage, enriched cage, or colony cage" for egg-laying hens.

(H) "Farm" means the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food; and does not include live animal markets or establishments at which inspection is provided under the Federal Meat Inspection Act.

(I) "Farm owner or operator" means any person who owns or controls the operations of a farm.

(J) "Fully extending the animal's limbs" means fully extending all limbs without touching the side of an enclosure. In the case of egg-laying hens, fully extending the animal's limbs means fully spreading both wings without touching the side of an enclosure or other egg-laying hens and having access to at least 1.5 square feet of usable floor space per hen.

(K) "Person" means any individual, firm, partnership, joint venture, limited liability corporation, estate, trust, receiver, syndicate, association, or other legal entity.

(L) "Pork meat" means meat, as defined in 105 CMR 531.012 as of June 1, 2015, of a pig of the porcine species, intended for use as human food.

(M) "Sale" means a commercial sale by a business that sells any item covered by Section 3, but does not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act. For purposes of this section, a sale shall be deemed to occur at the location where the buyer takes physical possession of an item covered by Section 3.

(N) "Shell egg" means a whole egg of an egg-laying hen in its shell form, intended for use as human food.

(O) "Turning around freely" means turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

(P) "Uncooked" means requiring cooking prior to human consumption.

(Q) "Usable floor space" means the total square footage of floor space provided to each hen, as calculated by dividing the total square footage of floor space provided to hens in an enclosure (including both ground space and elevated flat platforms) by the number of hens in that enclosure.

(R) "Veal meat" means meat, as defined in 105 CMR 531.012 as of June 1, 2015, of a calf raised for veal, intended for use as human food.

(S) "Whole pork meat" means any uncooked cut of pork (including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet) that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives. Whole pork meat does not include combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

(T) "Whole veal meat" means any uncooked cut of veal (including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet) that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives. Whole veal meat does not include combination food products

## QUESTION 3: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION (continued)**

(including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

SECTION 6. The Attorney General shall have exclusive authority to enforce the provisions of this Act. Each violation of this Act shall be punished by a civil fine not to exceed one thousand dollars ($1,000). The Attorney General may also seek injunctive relief to prevent further violations of this Act.

SECTION 7. It shall be a defense to any action to enforce this Act that a business owner or operator relied in good faith upon a written certification or guarantee by the supplier that the shell egg, whole pork meat, or whole veal meat at issue was not derived from a covered animal that was confined in a cruel manner, or from the immediate offspring of a female pig that was confined in a cruel manner.

SECTION 8. The provisions of this Act are in addition to, and not in lieu of, any other laws protecting animal welfare. This Act is not intended, and should not be construed to limit any other state law or rules protecting the welfare of animals or to prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations that are more stringent than this section.

SECTION 9. The provisions of this Act are severable and if any clause, sentence, paragraph or section of this Act, or an application thereof, shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof but shall be confined in its operation to the clause, sentence, paragraph, section or application adjudged invalid.

SECTION 10. The Attorney General shall promulgate rules and regulations for the implementation of this Act on or before January 1, 2020.

SECTION 11. Sections 2-7 of this Act shall take effect on January 1, 2022.

# 4

**QUESTION 4: Law Proposed by Initiative Petition**

# *Legalization, Regulation, and Taxation of Marijuana*

*Do you approve of a law summarized below, on which no vote was taken by the Senate or the House of Representatives on or before May 3, 2016?*

**SUMMARY** ▶
As required by law, summaries are written by the State Attorney General.

The proposed law would permit the possession, use, distribution, and cultivation of marijuana in limited amounts by persons age 21 and older and would remove criminal penalties for such activities. It would provide for the regulation of commerce in marijuana, marijuana accessories, and marijuana products and for the taxation of proceeds from sales of these items.

The proposed law would authorize persons at least 21 years old to possess up to one ounce of marijuana outside of their residences; possess up to ten ounces of marijuana inside their residences; grow up to six marijuana plants in their residences; give one ounce or less of marijuana to a person at least 21 years old without payment; possess, produce or transfer hemp; or make or transfer items related to marijuana use, storage, cultivation, or processing.

The measure would create a Cannabis Control Commission of three members appointed by the state Treasurer which would generally administer the law governing marijuana use and distribution, promulgate regulations, and be responsible for the licensing of marijuana commercial establishments. The proposed law would also create a Cannabis Advisory Board of fifteen members appointed by the Governor. The Cannabis Control Commission would adopt regulations governing licensing qualifications; security; record keeping; health and safety standards; packaging and labeling; testing; advertising and displays; required inspections; and such other matters as the Commission considers appropriate. The records of the Commission would be public records.

The proposed law would authorize cities and towns to adopt reasonable restrictions on the time, place, and manner of operating marijuana businesses and to limit the number of marijuana establishments in their communities. A city or town could hold a local vote to determine whether to permit the selling of marijuana and marijuana products for consumption on the premises at commercial establishments.

The proceeds of retail sales of marijuana and marijuana products would be subject to the state sales tax and an additional excise tax of 3.75%. A city or town could impose a separate tax of up to 2%. Revenue received from the additional state excise tax or from license application fees and civil penalties for violations of this law would be deposited in a Marijuana Regulation Fund and would be used subject to appropriation for administration of the proposed law.

Marijuana-related activities authorized under this proposed law could not be a basis for adverse orders in child welfare cases absent clear and convincing evidence that such activities had created an unreasonable danger to the safety of a minor child.

The proposed law would not affect existing law regarding medical marijuana treatment centers or the operation of motor vehicles while under the influence. It would permit property owners to prohibit the use, sale, or production of marijuana on their premises (with an exception that landlords cannot prohibit consumption by tenants of marijuana by means other than by smoking); and would permit employers to prohibit the consumption of marijuana by employees in the workplace. State and local governments could continue to restrict uses in public buildings or at or near schools. Supplying marijuana to persons under age 21 would be unlawful.

The proposed law would take effect on December 15, 2016.

**WHAT YOUR VOTE WILL DO** ▶
As required by law, the statements describing the effect of a "yes" or "no" vote are written jointly by the State Attorney General and the Secretary of the Commonwealth.

*A YES VOTE* would allow persons 21 and older to possess, use, and transfer marijuana and products containing marijuana concentrate (including edible products) and to cultivate marijuana, all in limited amounts, and would provide for the regulation and taxation of commercial sale of marijuana and marijuana products.

*A NO VOTE* would make no change in current laws relative to marijuana.

Addendum 12

## QUESTION 4: Law Proposed by Initiative Petition

**STATEMENT OF FISCAL CONSEQUENCES**

As required by law, statements of fiscal consequences are written by the Executive Office of Administration and Finance.

▶ The fiscal consequences of this proposed measure may affect both projected state and municipal revenues and expenditures, but these consequences are difficult to project due to the lack of reliable data. A March 2016 report from the Special Senate Committee on Marijuana concluded as follows: "Tax revenues and fees that would be generated from legal sales may fall short of even covering the full public and social costs (including regulation, enforcement, public health and safety, and substance abuse treatment)."

**ARGUMENTS**

As provided by law, the 150-word arguments are written by proponents and opponents of each question, and reflect their opinions. The Commonwealth of Massachusetts does not endorse these arguments, and does not certify the truth or accuracy of any statement made in these arguments. The names of the individuals and organizations who wrote each argument, and any written comments by others about each argument, are on file in the Office of the Secretary of the Commonwealth.

▶ *IN FAVOR:* Law enforcement veterans support this initiative because it replaces the current unregulated marijuana market, controlled by drug dealers, with a tightly regulated system controlled by state and local authorities. Passing this measure will allow local law enforcement to shift resources and focus to serious and violent crimes.

The initiative includes strict regulations for business licensing, product testing, labeling and packaging, providing many more consumer safeguards than exist now. Marketing to minors is strictly prohibited, as is public use and driving under the influence.

Local cities and towns can limit or ban marijuana businesses, and will govern operating hours, locations, and signage.

Taxing marijuana will generate an estimated $100 million in annual revenue for state and local governments.

Regulation and taxation is working in Colorado, Washington, Alaska and Oregon, generating millions of dollars for education, infrastructure and more. Massachusetts can improve on the regulatory standards already in place and working elsewhere.

**Authored by:**
**Will Luzier**
**YES on 4**
**P.O. Box 961354**
**Boston, MA 02196**
**857-239-8743**
**www.regulatemass.com**

*AGAINST:* Vote "NO" on creating a billion-dollar commercial marijuana industry that, just like Big Tobacco, would make millions on the backs of our communities, compromise health and safety, and harm kids.

Vote "NO" because this measure:

- Allows the sale and marketing of highly-potent marijuana edibles like candy, cookies, gummy bears, and soda that are attractive to young people and can lead to accidental overdose by kids and pets.

- Allows people to "home grow" thousands of dollars' worth of marijuana, even if neighbors object.

- Severely restricts the ability of cities and towns to control the number of marijuana retailers entering communities and allows pot shops to locate near preschools and playgrounds.

- Ignores the deadly opioid epidemic and the impact legalized pot will have on overall drug use.

This legalization scheme would force Massachusetts into the commercial marijuana industry when communities across Colorado, the first state to legalize, are trying to get out.

**Authored by:**
**Representative Hannah Kane**
**The Campaign for a Safe and Healthy Massachusetts**
**PO Box 15**
**Boston, MA 02137**
**909-969-8374 (campaign manager)**
**www.SafeAndHealthyMA.com**

**Daniel J. Delaney**
**Safe Cannabis Massachusetts**
**11 Beacon Street**
**Boston, MA 02108**
**857-239-8471**
**www.safecannabisma.com**

# QUESTION 4: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION**

Be it enacted by the People, and by their authority, as follows:

THE REGULATION AND TAXATION OF MARIJUANA ACT

SECTION 1. The purpose of this Act is to control the production and distribution of marijuana under a system that licenses, regulates and taxes the businesses involved in a manner similar to alcohol and to make marijuana legal for adults 21 years of age or older. Its intent is to remove the production and distribution of marijuana from the illicit market and to prevent the sale of marijuana to persons under 21 years of age by providing for a regulated and taxed distribution system. To the fullest extent possible, its terms are to be interpreted in accordance with the purpose and intent set forth in this section.

SECTION 2. This act may be known as "The Regulation and Taxation of Marijuana Act."

SECTION 3. Chapter 10 of the General Laws is hereby amended by inserting after section 75 the following sections:

Section 76. Cannabis Control Commission; members; appointment; terms; chairman; secretary

(a) There shall be a commission known as the cannabis control commission to have general supervision and sole regulatory authority over the conduct of the business of marijuana establishments as defined in chapter 94G of the General Laws. The commission shall consist of 1 commissioner and 2 associate commissioners who shall be appointed by the treasurer. Not more than 2 members of the commission shall be of the same political party. The commissioner shall serve a term co-terminous with the treasurer. The associate commissioners shall serve a term of 4 years. Any vacancy occurring for any reason other than the expiration of a term shall be filled for the unexpired term in the same manner as the original appointment.

(b) The treasurer shall appoint commissioners based on their experience or expertise in public health, law enforcement, social justice, the regulation and business of consumer commodities and the production and distribution of marijuana and marijuana products.

(c) The commissioner shall serve as chair and shall preside over all official activities of the commission.

(d) The treasurer may remove any member for neglect of duty, misconduct or malfeasance in office, after providing the member with a written statement of the charges and an opportunity to be heard.

(e) Two members shall constitute a quorum for conducting the business of the commission. A vacancy shall not impair the right of the remaining members to exercise the powers of the commission.

(f) The commission may expend for such investigators and clerical and other assistants as may be necessary for the performance of its duties. The commissioner may appoint a chief investigator and other investigators, who shall be exempt from chapter 31 of the General Laws, to enforce or cause to be enforced the penalties provided by law against a marijuana establishment that violates chapter 94G of the General Laws and shall make all necessary and appropriate investigations for that enforcement.

(g) All records of the commission shall be considered public records within the meaning of chapter 66 of the General Laws.

Section 77. Cannabis Advisory Board

(a) There shall be a cannabis advisory board to study and make recommendations on the regulation of marijuana and marijuana products. The board shall consist of 15 members appointed by the governor and shall consist of: 1 expert in marijuana cultivation, 1 expert in marijuana retailing, 1 expert in marijuana product manufacturing, 1 expert in marijuana testing, 1 board member or officer of a medical marijuana treatment center, 1 registered medical marijuana patient, 1 individual who represents marijuana retail consumers, 2 experts in public health, 2 experts in law enforcement, 2 experts in social welfare or social justice, and 2 attorneys with experience providing legal services to marijuana businesses, marijuana consumers or medical marijuana patients in the commonwealth. Members of the board shall serve terms of 2 years. Members of the board shall serve without compensation but shall be reimbursed for their expenses actually and necessarily incurred in the discharge of their official duties. Members of the board shall not be state employees for purposes of chapter 268A of the General Laws by virtue of their service on the advisory board. The board shall meet at the discretion of the commission. A majority of the members of the board present and voting shall constitute a quorum.

(b) The cannabis advisory board shall:

(1) advise the commission on marijuana cultivation, processing, manufacture, transport, distribution, testing and sale;

(2) consider all matters submitted to it by the commission;

(3) on its own initiative, recommend to the commission guidelines, rules and regulations and any changes to guidelines, rules and regulations that the board

Addendum 14

## QUESTION 4: Law Proposed by Initiative Petition

---

**FULL TEXT OF QUESTION** (continued)

considers important or necessary; and

(4) advise on the preparation of regulations under chapters 64N and 94G.

(c) All records of the cannabis advisory board shall be public records under chapter 66 of the General Laws.

SECTION 4. The General Laws are hereby amended by inserting after chapter 64M the following chapter:

CHAPTER 64N.

MARIJUANA TAX.

Section 1. Definitions. As used in this chapter, the following words shall, unless the context clearly requires otherwise, have the following meanings:

(a) "Commissioner", the commissioner of revenue.

(b) "Marijuana," "Marijuana establishment," "Marijuana product" and "Marijuana retailer", as defined in chapter 94G of the General Laws.

Section 2. State excise imposition; rate; payment. An excise tax is hereby imposed upon the sale of marijuana or marijuana products by a marijuana retailer to anyone other than a marijuana establishment at a rate of 3.75 per cent of the total sales price received by the marijuana retailer as a consideration for the sale of marijuana or marijuana products. The excise tax shall be levied in addition to state tax imposed upon the sale of property or services as provided in section 2 of chapter 64H of the General Laws and shall be paid by a marijuana retailer to the commissioner at the time provided for filing the return required by section 16 of chapter 62C of the General Laws.

Section 3. Local tax option. Any city or town may impose a local sales tax upon the sale or transfer of marijuana or marijuana products by a marijuana retailer operating within the city or town to anyone other than a marijuana establishment at a rate not greater than 2 per cent of the total sales price received by the marijuana retailer as a consideration for the sale of marijuana or marijuana products. A marijuana retailer shall pay a local sales tax imposed under this section to the commissioner at the same time and in the same manner as the sales tax due to the commonwealth.

All sums received by the commissioner under this section shall not be considered received on account of the commonwealth and shall at least quarterly be distributed, credited and paid by the state treasurer upon certification of the commissioner to each city or town that has adopted this section in proportion to the amount of such sums received from the sale or transfer of marijuana and marijuana products in the city or town.

Section 4. Exemptions. This chapter shall not apply to the sale of marijuana or marijuana products by a medical marijuana treatment center or a registered personal caregiver to a qualifying patient or personal caregiver pursuant to chapter 369 of the acts of 2012, nor to any unlawful sale subject to taxation pursuant to chapter 64K of the General Laws.

Section 5. Application of tax revenue. The commissioner shall deposit revenue collected pursuant to this chapter, other than revenue collected pursuant to section 2 of chapter 64H of the General Laws, in the Marijuana Regulation Fund established by chapter 94G of the General Laws and it shall be subject to appropriation.

SECTION 5. The General Laws are hereby amended by inserting after chapter 94F the following chapter:

CHAPTER 94G

REGULATION OF THE USE AND DISTRIBUTION OF MARIJUANA NOT MEDICALLY PRESCRIBED

Section 1. Definitions

As used in this chapter, the following words shall, unless the context clearly requires otherwise, have the following meanings:

(a) "Consumer", a person who is at least 21 years of age.

(b) "Controlling person", an officer, board member or other individual who has a financial or voting interest of 10 per cent or greater in a marijuana establishment.

(c) "Commission", the cannabis control commission established by section 76 of chapter 10 of the General Laws.

(d) "Experienced marijuana establishment operator", (i) a medical marijuana treatment center as defined in chapter 369 of the acts of 2012 with a registration in good standing, or (ii) a reorganized marijuana business established by a vote of at least 2/3 of the board of directors of an entity that submitted an application for a registration to operate a medical marijuana treatment center to the department of public health before October 1, 2015 and was issued a provisional registration to operate a medical marijuana treatment center by the department of public health before the effective date of this chapter.

(e) "Hemp", the plant of the genus Cannabis or any part of the plant, whether growing or not, with a delta-9-tetrahydrocannabinol concentration that does not exceed 0.3 per cent on a dry weight basis of any part of the plant of the genus Cannabis, or per volume or weight of marijuana product, or the combined per cent of delta-9-

## QUESTION 4: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION (continued)**

tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant of the genus Cannabis regardless of moisture content.

(f) "Manufacture", to compound, blend, extract, infuse or otherwise make or prepare a marijuana product.

(g) "Marijuana" or "Marihuana", all parts of any plant of the genus Cannabis, not excepted below and whether growing or not; the seeds thereof; and resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin including tetrahydrocannabinol as defined in section 1 of chapter 94C of the General Laws; provided that "Marijuana" shall not include:

(1) The mature stalks of the plant, fiber produced from the stalks, oil, or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks, fiber, oil, or cake made from the seeds of the plant or the sterilized seed of the plant that is incapable of germination;

(2) Hemp; or

(3) The weight of any other ingredient combined with marijuana to prepare topical or oral administrations, food, drink or other products.

(h) "Marijuana accessories", equipment, products, devices or materials of any kind that are intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, ingesting, inhaling or otherwise introducing marijuana into the human body.

(i) "Marijuana cultivator", an entity licensed to cultivate, process and package marijuana, to deliver marijuana to marijuana establishments and to transfer marijuana to other marijuana establishments, but not to consumers.

(j) "Marijuana establishment", a marijuana cultivator, marijuana testing facility, marijuana product manufacturer, marijuana retailer or any other type of licensed marijuana-related business.

(k) "Marijuana product manufacturer", an entity licensed to obtain, manufacture, process and package marijuana and marijuana products, to deliver marijuana and marijuana products to marijuana establishments and to transfer marijuana and marijuana products to other marijuana establishments, but not to consumers.

(l) "Marijuana products", products that have been manufactured and contain marijuana or an extract from marijuana, including concentrated forms of marijuana and products composed of marijuana and other ingredients

that are intended for use or consumption, including edible products, beverages, topical products, ointments, oils and tinctures.

(m) "Marijuana testing facility", an entity licensed to test marijuana and marijuana products, including certification for potency and the presence of contaminants.

(n) "Marijuana retailer", an entity licensed to purchase and deliver marijuana and marijuana products from marijuana establishments and to deliver, sell or otherwise transfer marijuana and marijuana products to marijuana establishments and to consumers.

(o) "Process" or "processing", to harvest, dry, cure, trim and separate parts of the marijuana plant by manual or mechanical means, except it shall not include manufacture as defined in subsection (f) of this section.

(p) "Unreasonably impracticable", that the measures necessary to comply with the regulations, ordinances or by-laws adopted pursuant to this chapter subject licensees to unreasonable risk or require such a high investment of risk, money, time or any other resource or asset that a reasonably prudent businessperson would not operate a marijuana establishment.

Section 2. Limitations

(a) Operating under the influence. This chapter does not amend existing penalties for operating, navigating or being in actual physical control of any motor vehicle, train, aircraft, motorboat or other motorized form of transport or machinery while impaired by marijuana or a marijuana product or for consuming marijuana while operating, navigating or being in actual physical control of any motor vehicle, train, aircraft, motorboat or other motorized form of transport or machinery.

(b) Transfer to or possession by a person under 21 years of age. This chapter shall not be construed to permit the knowing transfer of marijuana, marijuana products or marijuana accessories, with or without remuneration, to a person under 21 years of age or to allow a person under 21 years of age to possess, use, purchase, obtain, cultivate, process, manufacture, deliver or sell or otherwise transfer marijuana or marijuana accessories.

(c) Manufacture of products. Unless done pursuant to a marijuana product manufacturer license issued by the commission, this chapter does not authorize a person to manufacture marijuana or hemp by means of any liquid or gas, other than alcohol, that has a flashpoint below 100 degrees Fahrenheit.

(d) Property. This chapter shall not be construed to:

(1) prevent a person from prohibiting or otherwise regulating the consumption, display, production,

## QUESTION 4: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION** (continued)

processing, manufacture or sale of marijuana and marijuana accessories on or in property the person owns, occupies or manages, except that a lease agreement shall not prohibit a tenant from consuming marijuana by means other than smoking on or in property in which the tenant resides unless failing to do so would cause the landlord to violate a federal law or regulation;

(2) prevent the commonwealth, a subdivision thereof or local government agency from prohibiting or otherwise regulating the possession or consumption of marijuana or marijuana accessories within a building owned, leased or occupied by the commonwealth, a political subdivision of the commonwealth or an agency of the commonwealth or a political subdivision of the commonwealth; or

(3) authorize the possession or consumption of marijuana or marijuana accessories on the grounds of or within a public or private school where children attend classes in preschool programs, kindergarten programs or grades 1 to 12, inclusive, or on the grounds of or within any correctional facility.

(e) Employment. This chapter shall not require an employer to permit or accommodate conduct otherwise allowed by this chapter in the workplace and shall not affect the authority of employers to enact and enforce workplace policies restricting the consumption of marijuana by employees.

(f) Negligent conduct. This chapter shall not amend existing penalties for conduct involving the performance of any task while impaired by marijuana that would constitute negligence or professional malpractice and shall not prevent the imposition of any civil, criminal or other penalty for such conduct.

(g) Relation to medical use of marijuana. This chapter shall not be construed to affect the provisions of chapter 369 of the acts of 2012, relating to the medical use of marijuana as enacted by the people in the state election in 2012.

(h) Adulteration and misbranding. This chapter shall not exempt marijuana or marijuana products from sections 186 to 195, inclusive, of chapter 94 of the General Laws, relating to the adulteration and misbranding of food, drugs and various articles. Marijuana included in a marijuana product manufactured in compliance with the regulations under this chapter shall not be considered an adulterant.

Section 3. Local control

(a) A city or town may adopt ordinances and by-laws that impose reasonable safeguards on the operation of marijuana establishments, provided they are not unreasonably impracticable and are not in conflict with this chapter or with regulations made pursuant to this chapter and that:

(1) govern the time, place and manner of marijuana establishment operations and of any business dealing in marijuana accessories, except that zoning ordinances or by-laws shall not prohibit placing a marijuana establishment which cultivates, manufactures or sells marijuana or marijuana products in any area in which a medical marijuana treatment center is registered to engage in the same type of activity;

(2) limit the number of marijuana establishments in the city or town, except that a city or town may only adopt an ordinance or by-law by a vote of the voters of that city or town if the ordinance or by-law:

(i) prohibits the operation of 1 or more types of marijuana establishments within the city or town;

(ii) limits the number of marijuana retailers to fewer than 20 per cent of the number of licenses issued within the city or town for the retail sale of alcoholic beverages not to be drunk on the premises where sold under chapter 138 of the General Laws; or

(iii) limits the number of any type of marijuana establishment to fewer than the number of medical marijuana treatment centers registered to engage in the same type of activity in the city or town.

(3) restrict the licensed cultivation, processing and manufacturing of marijuana that is a public nuisance;

(4) establish reasonable restrictions on public signs related to marijuana establishments; and

(5) establish a civil penalty for violation of an ordinance or by-law enacted pursuant to this subsection, similar to a penalty imposed for violation of an ordinance or by-law relating to alcoholic beverages.

(b) The city council of a city and the board of selectmen of a town shall, upon the filing with the city or town clerk of a petition (i) signed by not fewer than 10 per cent of the number of voters of such city or town voting at the state election preceding the filing of the petition and (ii) conforming to the provisions of the General Laws relating to initiative petitions at the municipal level, request that the question of whether to allow, in such city or town, the sale of marijuana and marijuana products for consumption on the premises where sold be submitted to the voters of such city or town at the next biennial state election. If a majority of the votes cast in the city or town are not in favor of allowing the consumption of marijuana or marijuana products on the premises where sold, such city or town shall be taken to have not authorized the consumption of

**FULL TEXT OF QUESTION (continued)**

marijuana and marijuana products on the premises where sold.

(c) No city or town shall prohibit the transportation of marijuana or marijuana products or adopt an ordinance or by-law that makes the transportation of marijuana or marijuana products unreasonably impracticable.

(d) No agreement between a city or town and a marijuana establishment shall require payment of a fee to that city or town that is not directly proportional and reasonably related to the costs imposed upon the city or town by the operation of a marijuana establishment. Any cost to a city or town by the operation of a marijuana establishment shall be documented and considered a public record as defined by clause Twenty-Sixth of section 7 of chapter 4 of the General Laws.

Section 4. The Cannabis Control Commission

(a) The commission shall, in consultation with the cannabis advisory board and in accordance with chapter 30A of the General Laws, adopt regulations consistent with this chapter for the administration, clarification and enforcement of laws regulating and licensing marijuana establishments. The regulations shall include:

(1) procedures for the issuance and renewal of licenses to operate marijuana establishments;

(2) a schedule of application, license and renewal fees in an amount necessary to pay for all regulation and enforcement costs of the commission; provided however that fees may be relative to the volume of business conducted or to be conducted by the marijuana establishment and shall not exceed:

(i) For an initial application, $3,000;

(ii) For a license for a retail marijuana store, $15,000;

(iii) For a license for a marijuana product manufacturer, $15,000;

(iv) For a license for a marijuana cultivator, $15,000; and

(v) For a license for a marijuana testing facility, $10,000.

(3) qualifications for licensure and minimum standards for employment that are directly and demonstrably related to the operation of a marijuana establishment and similar to qualifications for licensure and employment standards in connection with alcoholic beverages as regulated under chapter 138 of the General Laws; provided that a prior conviction solely for a marijuana-related offense or for a violation of section 34 of chapter 94C of the General Laws shall not disqualify an

individual or otherwise affect eligibility for employment or licensure in connection with a marijuana establishment, unless the offense involved the distribution of a controlled substance, including marijuana, to a minor;

(4) procedures and policies to promote and encourage full participation in the regulated marijuana industry by people from communities that have previously been disproportionately harmed by marijuana prohibition and enforcement and to positively impact those communities;

(5) requirements for the security of marijuana establishments, including security, lighting, video and alarm requirements and requirements for the secure transportation and storage of marijuana, marijuana plants and marijuana products, provided that the requirements shall not prohibit the cultivation of marijuana outdoors or in greenhouses;

(6) requirements to prevent the sale of marijuana and marijuana products to persons under 21 years of age;

(7) requirements for record keeping by marijuana establishments and procedures to track marijuana and marijuana products cultivated, processed, manufactured, delivered or sold by marijuana establishments;

(8) health and safety standards for the cultivation, processing, manufacture and distribution of marijuana and marijuana products, including standards regarding sanitation for the preparation, storage, handling and sale of food products and reasonable limitations on the use of organic and non-organic pesticides;

(9) requirements for the packaging of marijuana and marijuana products, which shall include special packaging requirements to protect children from ingesting marijuana or marijuana products and requirements for dividing each serving within a package containing multiple servings in a manner that allows consumers to easily identify a single serving;

(10) requirements for the labeling of a package containing marijuana or marijuana products that shall include a symbol or other easily recognizable mark indicating that the package contains marijuana and an identification of the marijuana cultivator or the marijuana product manufacturer who produced the marijuana or marijuana product, and for the labeling of a package containing marijuana products, the amount of tetrahydrocannabinol in a package and in each serving of a marijuana product, the number of servings in a package and a list of ingredients and possible allergens;

(11) requirements for the testing of random samples of marijuana and marijuana products to verify

**FULL TEXT OF QUESTION** (continued)

that marijuana and marijuana products are accurately labeled and to verify that products intended for human consumption do not contain contaminants that are in excess of typical standards applied to other commercially available products intended for human consumption;

(12) requirements for safe disposal of excess, contaminated, adulterated or deteriorated marijuana or marijuana products;

(13) reasonable restrictions on signs, marketing, displays and advertising with respect to marijuana, marijuana products and marijuana accessories, including prohibiting marketing or advertising designed to appeal to children;

(14) procedures and requirements to enable the transfer of a license for a marijuana establishment to another qualified person or to another suitable location, which shall not be more restrictive than laws governing the transfer of a license for the sale of alcoholic beverages under chapter 138 of the General Laws; and

(15) provisions for: enforcing this chapter, including penalties for civil violations for the failure to comply with any regulation made pursuant to this section or for any violation of section 13 of this chapter; collecting fees and penalties imposed; suspending the license of a marijuana establishment that include provisions to allow for the continued maintenance and security of any marijuana and marijuana products; terminating the license of a licensee; and appealing civil penalties or licensing actions.

(b) In furtherance of the intent of this act, the commission may also adopt regulations in accordance with chapter 30A of the General Laws which:

(1) establish and provide for issuance of additional types or classes of licenses to operate marijuana-related businesses, including licenses that authorize only limited cultivation, processing, manufacture, possession or storage of marijuana or marijuana products, limited delivery of marijuana or marijuana products to consumers, licenses that authorize the consumption of marijuana or marijuana products on the premises where sold, licenses that authorize the consumption of marijuana at special events in limited areas and for a limited time and licenses intended to facilitate scientific research or education;

(2) regulate the cultivation, processing, distribution and sale of hemp by marijuana establishments; and

(3) limit the total amount of marijuana cultivated within the commonwealth, if the commission determines after an analysis of the current and anticipated supply of and demand for marijuana and marijuana products, that a limit on the amount of marijuana cultivated within the

commonwealth is necessary to minimize illicit markets for marijuana. If the commission limits the total amount of marijuana that may be cultivated within the commonwealth, the commission shall reconsider that determination biannually and shall not set the limit at a level below that which is necessary to provide an adequate supply of marijuana and marijuana products in the commonwealth. No such limit shall be imposed if the import or export of marijuana to or from the commonwealth is not prohibited by federal law.

(c) Regulations made pursuant to this section shall not:

(1) prohibit the operation of a marijuana establishment either expressly or through regulations that make operation of a marijuana establishment unreasonably impracticable;

(2) require testing of marijuana or marijuana products before the commission has licensed any marijuana testing facilities or, if such facilities have been licensed, before such facilities are capable of performing any required tests in a timely manner;

(3) require a customer to provide a marijuana retailer with identifying information other than identification to determine the customer's age and shall not require the marijuana retailer to acquire or record personal information about customers other than information typically required in a retail transaction;

(4) prohibit a medical marijuana treatment center and an experienced marijuana establishment operator from operating a medical marijuana treatment center and a marijuana establishment at a shared location;

(5) prohibit marijuana establishments from transferring or acquiring marijuana seeds, clones, cuttings, plants or plant tissue from other marijuana establishments or from medical marijuana treatment centers or prohibit a marijuana establishment from transferring or otherwise selling marijuana to a marijuana retailer, a marijuana product manufacturer or a marijuana cultivator; or

(6) prohibit marijuana establishments from using inorganic cultivation methods.

(d) The commission shall administer the laws and regulations relating to licensing in this chapter.

(e) The commission may suspend or revoke the license of a licensee under regulations made pursuant to this chapter upon written notice of a violation and, if applicable, an opportunity to cure any violation within 30 days of such notice. All licensees shall be entitled to an adjudicatory hearing pursuant to chapter 30A of the General Laws prior to suspension of a license for longer than 5 days or the revocation of a license.

## QUESTION 4: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION** (continued)

(f) The commission shall enforce the laws and regulations relating to the cultivation, processing, manufacture, delivery, storage, sale and testing of marijuana and marijuana products by marijuana establishments. The commission shall conduct investigations of compliance with this chapter and shall perform regular inspections of marijuana establishments and the books and records of marijuana establishments as necessary to enforce this chapter. The commission shall cooperate with appropriate state and local organizations to provide training to law enforcement officers of the commonwealth and its political subdivisions.

(g) The commission shall hold a public hearing before the adoption, amendment or repeal of any regulation. Adjudicatory proceedings shall be conducted pursuant to chapter 30A of the General Laws and to standard rules of adjudicatory procedure established pursuant to section 9 of chapter 30A of the General Laws.

(h) The commission shall annually publish a full report of its action during each year containing a comprehensive description of its activities and including the number of licenses of each class issued, actions taken pursuant to clause (4) of subsection (a) of this section and a statement of revenue and expenses of the commission.

(i) The commission shall annually review the tax rate established by chapter 64N of the General Laws and may make recommendations to the General Court as appropriate regarding changes to the tax rate that further the intent of this act. The commission may study marijuana commerce and make recommendations to the General Court regarding changes in the laws of the commonwealth that further the intent of this act by filing those recommendations with the clerk of the house and senate who shall forward the recommendations to the joint committee on consumer protection and professional licensure, the joint committee on revenue and any other committee deemed appropriate by the commission.

(j) The commission shall deposit all license, registration and monetary penalties collected pursuant to this chapter in the Marijuana Regulation Fund established by section 15 of this chapter.

(k) The commission and the department of public health shall work collaboratively to ensure that the production and distribution of marijuana is effectively regulated in the commonwealth in furtherance of the intent of this act.

Section 5. Licensing of marijuana establishments

(a) Upon receipt of a complete marijuana establishment license application and the application fee, the commission shall forward a copy of the application to the city or town in which the marijuana establishment is to be located, determine whether the applicant and the premises qualify for the license and has complied with this chapter and shall, within 90 days:

(1) issue the appropriate license; or

(2) send to the applicant a notice of rejection setting forth specific reasons why the commission did not approve the license application.

(b) Except as provided in subsection (c) of this section, the commission shall approve a marijuana establishment license application and issue a license if:

(1) the prospective marijuana establishment has submitted an application in compliance with regulations made by the commission, the applicant satisfies the requirements established by the commission, the applicant is in compliance with this chapter and the regulations made by the commission and the applicant has paid the required fee;

(2) the commission is not notified by the city or town in which the proposed marijuana establishment will be located that the proposed marijuana establishment is not in compliance with an ordinance or by-law consistent with section 3 of this chapter and in effect at the time of application;

(3) the property where the proposed marijuana establishment is to be located, at the time the license application is received by the commission, is not located within 500 feet of a pre-existing public or private school providing education in kindergarten or any of grades 1 through 12, unless a city or town adopts an ordinance or by-law that reduces the distance requirement; and

(4) an individual who will be a controlling person of the proposed marijuana establishment has not been convicted of a felony or convicted of an offense in another state that would be a felony in the commonwealth, except a prior conviction solely for a marijuana offense or solely for a violation of section 34 of chapter 94C of the General Laws, unless the offense involved distribution of a controlled substance, including marijuana, to a minor.

(c) If a city or town limits the number of marijuana establishments that may be licensed in the city or town pursuant to clause (2) of subsection (a) of section 3 of this chapter and that limit prevents the commission from issuing a license to all applicants who meet the requirements of subsection (b) of this section:

(1) until January 1, 2018, the commission shall issue licenses first to applicants with the most experience operating medical marijuana treatment centers and then by

## QUESTION 4: Law Proposed by Initiative Petition

---

**FULL TEXT OF QUESTION** (continued)

lottery among qualified applicants; or

(2) on and after January 1, 2018, the commission shall issues licenses by lottery among qualified applicants.

The lottery shall also designate the priority order of unselected applicants in the event that a license becomes available within a year.

Section 6. Expiration and renewal

(a) License term. Unless the commission authorizes the renewal of a license for a longer period, all licenses under this chapter shall be effective for 1 year from the date of issuance.

(b) Renewal. The commission shall issue a renewal license within 30 days of receipt of a renewal application and renewal license fee from a marijuana establishment to licensees in good standing and who have filed any tax returns required pursuant to chapter 64N of the General Laws.

Section 7. Personal use of marijuana

(a) Notwithstanding any other general or special law to the contrary, except as otherwise provided in this chapter, a person 21 years of age or older shall not be arrested, prosecuted, penalized, sanctioned or disqualified under the laws of the commonwealth in any manner, or denied any right or privilege and shall not be subject to seizure or forfeiture of assets for:

(1) possessing, using, purchasing, processing or manufacturing 1 ounce or less of marijuana, except that not more than 5 grams of marijuana may be in the form of marijuana concentrate;

(2) within the person's primary residence, possessing up to 10 ounces of marijuana and any marijuana produced by marijuana plants cultivated on the premises and possessing, cultivating or processing not more than 6 marijuana plants for personal use so long as not more than 12 plants are cultivated on the premises at once;

(3) assisting another person who is 21 years of age or older in any of the acts described in this section; or

(4) giving away or otherwise transferring without remuneration up to 1 ounce of marijuana, except that not more than 5 grams of marijuana may be in the form of marijuana concentrate, to a person 21 years of age or older, as long as the transfer is not advertised or promoted to the public.

(b) Notwithstanding any other general or special law to the contrary, except as otherwise provided in this chapter, if the import or export of marijuana to or from the commonwealth is not prohibited by federal law, a person 21 years of age or older shall not be arrested, prosecuted, penalized, sanctioned or disqualified under the laws of the commonwealth in any manner, or denied any right or privilege and shall not be subject to seizure or forfeiture of assets for possessing, using, purchasing, cultivating, processing or manufacturing any amount of marijuana or marijuana products for personal use.

(c) Notwithstanding any other general or special law to the contrary, except as otherwise provided in this chapter, a person shall not be arrested, prosecuted, penalized, sanctioned or otherwise denied any benefit and shall not be subject to seizure or forfeiture of assets for allowing property the person owns, occupies or manages to be used for any of the activities conducted lawfully under this chapter or for enrolling or employing a person who engages in marijuana-related activities lawfully under this chapter.

(d) Absent clear, convincing and articulable evidence that the person's actions related to marijuana have created an unreasonable danger to the safety of a minor child, neither the presence of cannabinoid components or metabolites in a person's bodily fluids nor conduct permitted under this chapter related to the possession, consumption, transfer, cultivation, manufacture or sale of marijuana, marijuana products or marijuana accessories by a person charged with the well-being of a child shall form the sole or primary basis for substantiation, service plans, removal or termination or for denial of custody, visitation or any other parental right or responsibility.

(e) The use of marijuana shall not disqualify a person from any needed medical procedure or treatment, including organ and tissue transplants.

(f) Notwithstanding any general or special law to the contrary, except as otherwise provided in this chapter, a person 21 years of age or older shall not be arrested, prosecuted, penalized, sanctioned or disqualified and is not subject to seizure or forfeiture of assets for possessing, producing, processing, manufacturing, purchasing, obtaining, selling or otherwise transferring or delivering hemp.

(g) For the purposes of this section, "marijuana concentrate" shall mean the resin extracted from any part of the plant of the genus Cannabis and every compound, manufacture, salt, derivative, mixture or preparation of that resin but shall not include the weight of any other ingredient combined with marijuana to prepare marijuana products.

Section 8. Marijuana accessories authorized

Notwithstanding any general or special law to the contrary,

## QUESTION 4: Law Proposed by Initiative Petition

**FULL TEXT OF QUESTION (continued)**

except as otherwise provided in this chapter, a person 21 years of age or older shall not be arrested, prosecuted, penalized, sanctioned or disqualified and shall not be subject to seizure or forfeiture of assets for possessing, purchasing or otherwise obtaining or manufacturing marijuana accessories or for selling or otherwise transferring marijuana accessories to a person who is 21 years of age or older.

Section 9. Lawful operation of marijuana establishments

(a) Notwithstanding any general or special law to the contrary, except as otherwise provided in this chapter, the following people involved in the distribution of marijuana as authorized by this chapter shall not be arrested, prosecuted, penalized, sanctioned or disqualified and shall not be subject to seizure or forfeiture of assets for activities specified for:

(1) a marijuana retailer or an owner, operator, employee or other agent acting on behalf of a marijuana retailer possessing or testing marijuana or marijuana products; purchasing, selling or otherwise transferring or delivering marijuana or marijuana products to or from a marijuana establishment; or selling or otherwise transferring or delivering marijuana or marijuana products to a consumer;

(2) a marijuana cultivator or an owner, operator, employee or other agent acting on behalf of a marijuana cultivator cultivating, propagating, breeding, harvesting, processing, packaging, testing, storing or possessing marijuana or marijuana products, or selling or otherwise transferring, purchasing or delivering marijuana and marijuana products to or from a marijuana establishment;

(3) a marijuana product manufacturer or an owner, operator, employee or other agent acting on behalf of a marijuana product manufacturer packaging, processing, manufacturing, storing, testing or possessing marijuana or marijuana products, or delivering, selling or otherwise transferring and purchasing marijuana or marijuana products to or from a marijuana establishment; or

(4) a marijuana testing facility or an owner, operator, employee or other agent acting on behalf of a marijuana testing facility possessing, processing, storing, transferring or testing marijuana or marijuana products.

(b) Notwithstanding any general or special law to the contrary, except as otherwise provided in this chapter, a person acting in the person's capacity as an owner, employee or other agent of a marijuana retailer who transfers marijuana or marijuana accessories to a person under 21 years of age shall not be subject to arrest or prosecution, penalty, sanction or disqualification, or seizure

or forfeiture of assets, if the person reasonably verified that the recipient appeared to be 21 years of age or older by means of government-issued photographic identification containing a date of birth.

Section 10. Contracts pertaining to marijuana enforceable

It is the public policy of the commonwealth that contracts related to the operation of marijuana establishments under this chapter shall be enforceable. A contract entered into by a licensee or its agents as permitted pursuant to a valid license issued by the commission, or by those who allow property to be used by a licensee or its agents as permitted pursuant to a valid license issued by the commission, shall not be unenforceable or void exclusively because the actions or conduct permitted pursuant to the license is prohibited by federal law.

Section 11. Provision of professional services

A person engaged in a profession or occupation subject to licensure shall not be subject to disciplinary action by a professional licensing board solely for providing professional services to prospective or licensed marijuana establishments related to activity under this chapter that is not subject to criminal penalty under the laws of the commonwealth.

Section 12. General marijuana establishment operation

(a) In addition to requirements established by regulation pursuant to section 4 of this chapter or by a city or town pursuant to section 3 of this chapter, a marijuana establishment shall:

(1) secure every entrance to the establishment so that access to areas containing marijuana is restricted to employees and others permitted by the marijuana establishment to access the area and to agents of the commission or state and local law enforcement officers and emergency personnel; and

(2) secure its inventory and equipment during and after operating hours to deter and prevent theft of marijuana, marijuana products and marijuana accessories.

(b) No marijuana establishment may cultivate, process, test, store or manufacture marijuana or marijuana products at any location other than at a physical address approved by the commission and within an area that is enclosed and secured in a manner that prevents access by persons not permitted by the marijuana establishment to access the area. A greenhouse or outdoor marijuana cultivation area shall have sufficient security measures to demonstrate that outdoor areas are not readily accessible by unauthorized individuals, including perimeter security fencing designed to prevent unauthorized entry.

## QUESTION 4: Law Proposed by Initiative Petition

---

**FULL TEXT OF QUESTION** (continued)

(c) No marijuana establishment shall allow cultivation, processing, manufacture, sale or display of marijuana or marijuana products to be visible from a public place without the use of binoculars, aircraft or other optical aids.

(d) No marijuana establishment shall refuse representatives of the commission the right at any time of operation to inspect the entire licensed premises or to audit the books and records of the marijuana establishment.

(e) No marijuana establishment shall allow any person under 21 years of age to volunteer or work for the marijuana establishment.

(f) No marijuana establishment shall cultivate, manufacture, sell or otherwise transact business with any products containing cannabinoids other than those that were produced, distributed and taxed in compliance with this chapter.

Section 13. Penalties

(a) Restrictions on personal cultivation. No person shall cultivate or process marijuana plants pursuant to section 7 of this chapter if the plants are visible from a public place without the use of binoculars, aircraft or other optical aids or cultivate or process marijuana plants outside of an area that is equipped with a lock or other security device. A person who violates this subsection shall be punished by a civil penalty of not more than $300 and forfeiture of the marijuana, but shall not be subject to any other form of criminal or civil punishment or disqualification solely for this conduct.

(b) Restrictions on personal possession. No person shall possess more than 1 ounce of marijuana or marijuana products within the person's place of residence pursuant to section 7 of this chapter unless the marijuana and marijuana products are secured by a lock. A person who violates this subsection shall be punished by a civil penalty of not more than $100 and forfeiture of the marijuana.

(c) Restrictions on public consumption of marijuana. No person shall consume marijuana in a public place or smoke marijuana where smoking tobacco is prohibited. A person who violates this subsection shall be punished by a civil penalty of not more than $100. This subsection shall not apply to a person who consumes marijuana or marijuana products in a designated area of a marijuana establishment located in a city or town that has voted to allow consumption on the premises where sold and shall not be construed to limit the medical use of marijuana.

(d) Possession of marijuana in motor vehicles. No person shall, upon any way or in any place to which the public has a right of access, or upon any way or in any place to which members of the public have access

as invitees or licensees, possess an open container of marijuana or marijuana products in the passenger area of any motor vehicle. A person who violates this subsection shall be punished by a civil penalty of not more than $500. For purposes of this section, "open container" shall mean that the package containing marijuana or marijuana products has its seal broken or from which the contents have been partially removed or consumed and "passenger area" shall mean the area designed to seat the driver and passengers while the motor vehicle is in operation and any area that is readily accessible to the driver or passenger while in a seated position; provided however that the passenger area shall not include a motor vehicle's trunk, locked glove compartment or the living quarters of a house coach or house trailer, or if a motor vehicle is not equipped with a trunk, the area behind the last upright seat or an area not normally occupied by the driver or passenger.

(e) Possession or cultivation of excess marijuana. Notwithstanding chapter 94C of the General Laws and until the import or export of marijuana to or from the commonwealth is not prohibited by federal law, a person who is at least 21 years of age and who cultivates more than 6 but not more than 12 marijuana plants or who possesses an amount of marijuana outside of his or her place of residence having a weight of more than 1 ounce but not more than 2 ounces shall be subject only to a civil penalty of not more than $100 and forfeiture of the marijuana not allowed by section 7 of this chapter, but shall not be subject to any other form of criminal or civil punishment or disqualification solely for this conduct.

(f) Procurement of marijuana by a person under 21 years of age. A person under 21 years of age, except a qualifying patient holding a valid registration card for the medical use of marijuana, who purchases or attempts to purchase marijuana, marijuana products or marijuana accessories, or makes arrangements with any person to purchase or in any way procure marijuana, marijuana products or marijuana accessories, or who willfully misrepresents such person's age, or in any way alters, defaces or otherwise falsifies identification offered as proof of age, with the intent of purchasing marijuana, marijuana products or marijuana accessories, shall be punished by a civil penalty of not more than $100 and shall complete a drug awareness program established pursuant to section 32M of chapter 94C of the General Laws. The parents or legal guardian of any offender under the age of 18 shall be notified in accordance with section 32N of chapter 94C of the General Laws and the failure within 1 year of the offense of such an offender to complete a drug awareness program may be a basis for delinquency proceedings for persons under the age of 17 at the time of the person's

**FULL TEXT OF QUESTION** (continued)

offense.

(g) Enforcement. Civil penalties imposed pursuant to this section shall be enforced by utilizing the non-criminal disposition procedures provided in section 32N of chapter 94C of the General Laws.

Section 14. Marijuana Regulation Fund

(a) There shall be established and set up on the books of the commonwealth a separate fund, to be known as the Marijuana Regulation Fund. It shall, subject to appropriation, consist of all monies received on account of the commonwealth as a result of applications for and licensing of marijuana establishments, all civil penalties received for violations of this chapter, revenue generated by the state tax imposed by section 2 of chapter 64N of the General Laws and interest earned or other income on balances in the fund.

(b) Subject to appropriation, the fund shall be expended first for the implementation, administration and enforcement of this chapter by the commission and by the cities and towns that authorize the operation of marijuana establishments within their jurisdictions. Subject to appropriation, at the end of a fiscal year, unexpended balances may be redeposited in the General Fund after all necessary funds are expended for the implementation, administration and enforcement of this chapter.

SECTION 6. Notwithstanding any general or special law to the contrary, if the cannabis control commission fails to adopt regulations necessary for the implementation of this chapter on or before January 1, 2018, each medical marijuana treatment center may begin to possess, cultivate, process, manufacture, package, purchase or otherwise obtain and test marijuana and marijuana products and may deliver, sell or otherwise transfer marijuana to any person who is at least 21 years of age until the commission adopts the regulations necessary for implementation of this chapter and begins to issue licenses to operate marijuana establishments pursuant to section 5 of this chapter.

SECTION 7. The state treasurer shall make the initial appointments to the cannabis control commission under section 76 of chapter 10 of the General Laws by March 1, 2017. The initial appointments shall include 1 member who shall serve an initial term of 2 years.

SECTION 8. The governor shall make the initial appointments to the cannabis advisory board under section 77 of chapter 10 of the General Laws by February 1, 2017. Seven of the initial appointees, as determined by the governor, shall serve for a term of 1 year.

The cannabis advisory board shall meet not less frequently than quarterly until January 1, 2020.

SECTION 9. The cannabis control commission shall promulgate the initial regulations under section 4 of chapter 94G of the General Laws not later than September 15, 2017.

SECTION 10. The commission shall begin accepting applications:

(a) for marijuana testing facility licenses, by October 1, 2017;

(b) from each experienced marijuana establishment operator for 1 marijuana cultivator license, 1 marijuana product manufacturer license and 1 marijuana retailer license, by October 1, 2017;

(c) if fewer than 75 provisional registrations to operate medical marijuana treatment centers have been issued on October 1, 2017, from all applicants for marijuana retailer, marijuana product manufacturer and marijuana cultivator licenses, on and after January 1, 2018;

(d) from all applicants for marijuana retailer licenses or for marijuana product manufacturer licenses, on and after October 1, 2018; and

(e) from all applicants for marijuana cultivator licenses, on and after October 1, 2019.

SECTION 11. If the commission accepts applications pursuant to subsection (c) of section 10 of this act, it shall license no more than 75 marijuana retailers, 75 marijuana product manufacturers and 75 marijuana cultivators until additional applications are accepted pursuant to subsection (d) or subsection (e) of section 10 of this act. If this section prevents the commission from issuing licenses to all applicants who meet the requirements of this act, the commission shall issue licenses first to qualified applicants who submitted applications for registrations to operate medical marijuana treatment centers to the department of public health by October 1, 2015 and then by lottery among qualified applicants.

SECTION 12. This act shall take effect on December 15, 2016.

# *How to Register to Vote...*

**You may submit a voter registration form if you are:**

- a **U.S. citizen**, and
- a **resident of Massachusetts**, and
- at least **16 years old**, and
- **not currently incarcerated** for a felony conviction.

## Pre-registering to Vote

While you must be 18 years old in order to vote, you may pre-register to vote if you are at least 16 years old. If you would like to pre-register, you may submit a voter registration form to your local election official. Your local election official will add you to the list of pre-registrants who will become registered voters upon turning 18. You will be notified by mail when you become eligible to vote.

Please note that you will only be eligible to vote in the November 8, 2016 State Election if you will be 18 years old on or before that date. If you will be turning 18 by Election Day, you must register by the October 19, 2016 deadline for registering to vote – even if your birthday falls after the deadline.

## When to Register

There is no waiting period to be eligible to register to vote. As soon as you consider your address your "home," you may register to vote from that address. Please remember that any time you move, you must re-register. If you move, you may register to vote as soon as you move into your new home.

The deadline to register to vote for the November 8th State Election is October 19th. Your mail-in voter registration form must be postmarked by October 19, 2016 for you to be eligible to vote in the November 8, 2016 State Election.

## How to Register

**Online**: If you have a Massachusetts driver's license or other identification card issued by the Registry of Motor Vehicles, you may submit your application online at **www.RegisterToVoteMA.com**. Online voter registration forms must be submitted before midnight on October 19th in order for you to be eligible to vote on November 8th.

**In Person**: Go to any registration location, such as your city or town hall, and complete an affidavit of registration. Local election offices must be open for voter registration until 8 p.m. on October 19, 2016.

**By Mail**: Mail-in registration forms are widely available. A mail-in registration form is enclosed with this booklet. To obtain additional mail-in registration forms please visit our website at **www.sec.state.ma.us/ele** to download a form or call 1-800-462-VOTE (8683). Mail the completed form to your local city or town hall.

**At the Registry of Motor Vehicles**: While applying for, or renewing, a driver's license or updating your address at the RMV, you may complete a voter registration application. Check your Motor Voter receipt before you leave—it will indicate whether or not you registered to vote. Keep your Motor Voter receipt until you receive confirmation from your local election official.

## Changing Your Address

If you have moved, you must register again. You may register to vote as soon as you move into your new home. You may update your registration by submitting a new form online, by mail, or in person at any voter registration location. Any changes must be made by the October 19th deadline to register to vote.

## Confirmation of Voter Registration

No matter how you register, you should receive confirmation of your registration from your local election official within 2-3 weeks. If you do not receive your notice in the mail, please contact your local election office to verify your voting status. You may also confirm your voter registration status on our website at **www.sec.state.ma.us/ele**.

## *Reminder!* Bring Personal Identification to the Polls!

You may be required to show personal identification in order to vote. If you registered to vote by mail, you may be required under federal law to show identification the first time you vote in a federal election, such as the 2016 State Election. Under Massachusetts law, any voter may be asked to show identification if there is a question about their identity. It is recommended that all voters be prepared to show identification on Election Day.

Acceptable identification must include your name and the address at which you are registered to vote, for example: a current and valid driver's license, photo identification card, current utility bill, bank statement, pay stub, government check, letter from your dormitory on school letterhead, or any other official and current document that shows your name and the address at which you are registered.

Addendum 25

**25**

# *Online Tools*






## Register to Vote Online

Many Massachusetts citizens may now submit their voter registration forms online. If you have a Massachusetts driver's license or any other identification card issued by the Registry of Motor Vehicles, you may submit your voter registration form at **www.RegisterToVoteMA.com**.

The Secretary of the Commonwealth's online voter registration system allows you to register to vote, change your address, or update your political party. Whether you are registering to vote for the first time or you wish to make changes to an existing registration record, you may go to **www.RegisterToVoteMA.com**, click the button that says "I Have an RMV ID," and complete a new voter registration form. If you are making changes to your registration, your new form will be used to update your previous registration record.

Once you have submitted your online voter registration, you will be provided with a confirmation page to print for your records. This page is your proof that you submitted your form by the registration deadline. Your form will then be sent to your local election official, who must review and approve your form. Once your local election official has processed your form, you will be sent confirmation of your voter registration by mail. Applications submitted online must be completed by 11:59 p.m. on October 19, 2016, in order for you to be eligible to vote on November 8, 2016.

## Check Your Voter Registration Status

If you would like to confirm that you are registered to vote at your current address, you may find your voter registration information online by going to **www.sec.state.ma.us/ele** and clicking on the button that says "Am I Registered to Vote?" We recommend confirming your voter registration information before the October 19, 2016 deadline to register to vote, so that you can make any changes necessary before that deadline.

Use this website to confirm your voter registration, address, and political party. If you are unable to find your voter registration information, you may still be registered to vote at a previous address. If you are not registered to vote at your current address, or you wish to make any other changes to your registration information, you may submit a new voter registration form at **www.RegisterToVoteMA.com** to make those changes.

## Find Your Polling Place & View Your Ballot

Your polling place may have changed since you last voted. You may find your polling place by entering your address at **www.WhereDoIVoteMA.com**. In addition to your polling place information, you will also be provided with the option to view your ballot. Click "View My Ballot" to look at the candidates and questions that will appear on your ballot on November 8th.

## Track Your Ballot

If you have applied for an absentee ballot or an early ballot by mail, you may track your ballot at **www.sec.state.ma.us/ele**. Enter your name and the address at which you are registered to view the date your ballot was mailed to you, the date it was received by your local election official, and the disposition of your ballot.

The information displayed on the website is provided by your local election official. You should contact your local election official with any questions or concerns about your absentee or early ballot. If your ballot has been rejected for any reason (such as failure to sign the affidavit on the ballot envelope), you will be sent a new ballot as long as time allows. It is recommended that you apply for your ballot and return it as soon before Election Day as possible.

Addendum 26

# Early and Absentee Voting

### Introducing… Early Voting!

Beginning with the November 8th State Election, Massachusetts voters will be able to cast early ballots in biennial state elections.

**What –** Early ballots are regular election ballots which voters may request and cast before Election Day. All valid early ballots will be counted on Election Day, along with ballots cast at polling places.

**Who –** All registered Massachusetts voters are eligible to vote early.

**How –** You may request your early ballot by mail or in person. A printable early ballot application for mailed ballots is available at **www.MassEarlyVote.com**. This form should be completed and submitted to your local election official, who will then mail you your ballot. All ballots must be returned to your local election official by 8 p.m. on Election Day.

**Where –** If you would like to vote early in person, you may do so in the office of your local election official, or at any other designated early voting location in your city or town. Beginning in early October, you will be able to find available early voting locations at **www.MassEarlyVote.com**.

**When –** The early voting period will begin on Monday, October 24th and it will end on Friday, November 4th. Your local election official must conduct early voting sessions during their regular business hours, but they may hold extended hours. You may find your town's early voting days and hours at **www.MassEarlyVote.com**, beginning in early October.

### Absentee Voting

Absentee voting will continue to be available to those who qualify. Voters may cast absentee ballots if they will be absent from their municipality on Election Day, or if they have a disability or religious belief which prevents them from voting at their polling place. Unlike early voting, which is currently available only for November state elections, absentee voting will continue to be available for all elections.

Absentee ballot applications are available at **www.sec.state.ma.us/ele**.

The Postal Service recommends that voters mail ballots **no later than one week before Election Day** to account for any unforeseen events or weather issues and to allow for timely receipt and processing by election officials.

## Military and Overseas Voters

In Massachusetts, members of the Uniformed Services serving on **active duty**, their families and U.S. citizens residing overseas are eligible to vote in all elections. These voters **do not need to register to vote to request an absentee ballot**. Absentee ballots can be requested using the Federal Post Card Application or any form of written communication, or a **family member can request** that an absentee ballot be sent to the voter.

These voters can request that their absentee ballots be sent to them either by mail, fax, or e-mail; ballots may also be returned to the local election officials by any of these methods.

Massachusetts also allows military and overseas voters to vote absentee in all elections by using the Federal Write-In Absentee Ballot (FWAB). The FWAB can be used to vote any time before an election, even if the voter did not apply for an absentee ballot. After voting on the FWAB, the voter may submit it by mail or electronically. Both the Federal Post Card Application and the Federal Write-in Absentee Ballot may be found on the website of the Federal Voting Assistance Program, **www.FVAP.gov**.

# *Voting…*

## Where do I vote?

Every precinct in your city or town is assigned a polling place. Call your local election official or the Elections Division at 1-800-462-VOTE (8683) or 617-727-2828 to find out where your polling place is located. You can also visit the Elections Division website at **www.wheredoivotema.com** to look up your polling place and view a sample ballot.

All polling places are required by federal and state law to be accessible to elderly and disabled voters.

## How long are the polls open?

The polls must be open from 7:00 a.m. to 8:00 p.m. for state elections. Some municipalities may open their polls as early as 5:45 a.m. Please call your city or town clerk to verify your polling hours.

## How do I find out what offices and candidates are on my ballot?

Sample ballots as well as instruction cards are posted at the polls on Election Day. You may also view a sample ballot at our website: **www.wheredoivotema.com**.

## I registered to vote, but my name is not on the voting list—what do I do?

If you registered to vote, but your name is not on the voting list, ask the election officer in charge of the polling place to check your registration by looking at the inactive voter's list and by checking with the city or town clerk to see if you may be registered in another precinct in that municipality.

If they still cannot find your name, you may go to city or town hall to attempt to establish your identity as a registered voter or you may cast a provisional ballot at the polling place.

To cast a provisional ballot, you must complete a provisional ballot affirmation before a precinct officer at the polling place, declaring that you are a registered voter in the city or town and reside within the geographical boundaries of said precinct. You must also show suitable identification.

After the election, the local election official will search for records to confirm your voter registration. If your eligibility is confirmed, your ballot will be counted. If your eligibility cannot be confirmed, your ballot will remain sealed in an envelope until such time as it is required to be kept and then will be destroyed without being viewed.

## What is the voting process?

In Massachusetts, every voter casts a paper ballot. Upon entering the polling place, each voter must give their address and name so the poll worker can check it off the list before giving you a ballot. Once you get your ballot, you go to a booth where you mark your choices for the candidates for offices and ballot questions. After marking your ballot, you must check-out by providing your address and name again before depositing your ballot into either the ballot box or tabulator.

## What if I need assistance?

If you need assistance because of vision impairment, disability, or inability to read or to read English, you may seek help from any person of your choice, including from the election officials in your polling place.

You may also ask the election officials to show you to the AutoMARK Voter Assist Terminal, an accessible ballot marking device which allows you to mark your ballot privately and independently. There will be at least one AutoMARK Voter Assist Terminal at each polling location. After inserting the ballot into the AutoMARK, the voter can review the ballot and make selections by using the touch screen and/or the keypad, while listening to the ballot over a set of headphones. The AutoMARK will mark the ballot in accordance with the voter's choices, by filling in the corresponding ovals or connecting the arrows on the ballot. The ballot will then be returned to the voter for deposit into the ballot box.

## What if I make a mistake on my ballot?

If you make a mistake on your ballot, you may request a new one. You may request up to two new ballots.

## Can I bring materials into the polling place?

Yes, you may bring materials into the voting booth. You can bring preprinted brochures or pamphlets, or your own notes, but you cannot display such materials while in the polling location. Also, you must take any materials with you when you leave the voting booth.

# Services of the Secretary of the Commonwealth of Massachusetts

● **Citizen Information Service** functions as the primary information and referral agency for the state, offering information on state programs and agencies. CIS attempts to answer all requests, by providing either direct assistance or an immediate referral to the appropriate agency. As part of its goal to make state government more accessible to the public, CIS has established a publication series on specific topics of interest, including:

• The Citizens' Guide to State Services: A Selective Listing of Government Agencies and Programs, with addresses, phone numbers and agency descriptions. Price: $23.50 ($18 plus $5.50 shipping cost). Free online at **www.sec.state.ma.us/cis/ciscig/guide.html**. Available from the State House Bookstore, see below.

• Welcome to Massachusetts: A Practical Guide to Living in the State, free.

• Automobile Excise Tax, free.

• Property Tax Exemptions for Elders, Surviving Spouses and Minors, free.

• Safe and Sanitary Housing for Massachusetts Residents, free.

• Veterans Laws and Benefits Guide, free.

• Massachusetts Facts: A Review of the History, Government and Symbols of the State, for junior high to high school age students, free.

Citizen Information Service can be contacted at 617-727-7030 or 1-800-392-6090 (toll-free in Massachusetts only), website: **www.sec.state.ma.us/cis**, where many of the above documents are available for viewing.
Email: cis@sec.state.ma.us

● **The Elections Division** administers all state elections, provides information on voting, and supplies election materials to the public, candidates and government officials. 617-727-2828 or 1-800-462-VOTE (8683), website: **www.sec.state.ma.us/ele**
Email: elections@sec.state.ma.us

● **The Securities Division** endeavors to protect Massachusetts investors by licensing the sale of securities, requiring that high-risk securities be registered, investigating complaints, and taking appropriate enforcement and disciplinary actions. 617-727-3548 or 1-800-269-5428 (within Massachusetts), website: **www.sec.state.ma.us/sct**
Email: securities@sec.state.ma.us

● **The Public Records Division** maintains, preserves and makes accessible government records and records all gubernatorial appointments and commissions. 617-727-2832, website: **www.sec.state.ma.us/pre**
Email: pre@sec.state.ma.us

● **Real Estate Records**. Foreclosure and Homestead Information - Massachusetts is divided into 21 registry districts with an elected Register of Deeds responsible for each office. Documents related to the ownership of real estate within the district are recorded at the Registry of Deeds. Website: **www.masslandrecords.com**

● **The Massachusetts Archives** collects, catalogs, and preserves records of enduring value from nearly 400 years of state government. It serves as a vital resource to scholars, genealogists, and students and as an advisor to the historical records community in Massachusetts. 617-727-2816, website: **www.sec.state.ma.us/arc**
Email: archives@sec.state.ma.us

● **The Commonwealth Museum** brings Massachusetts history alive through exhibits, outreach and student programs and publications. 617-727-9268, website: **www.commonwealthmuseum.org**

● **The Massachusetts Historical Commission** is the state agency responsible for historical preservation in the Commonwealth. It offers assistance to communities in listing properties with the National Register of Historic Places and establishing local historic districts. 617-727-8470, website: **www.sec.state.ma.us/mhc**
Email: mhc@sec.state.ma.us

● **The State Bookstore** offers a wide range of books and pamphlets published by the Secretary of the Commonwealth and other state agencies, including the Code of Massachusetts Regulations. A free Bookstore Catalog is available. 617-727-2834, website: **www.sec.state.ma.us/spr**
Email: bookstore@sec.state.ma.us

● **The Regional Offices** in Springfield and Fall River offer many of the services provided by the Boston office and bring state government closer to the citizens of Massachusetts. Springfield 413-784-1376, Fall River 508-646-1374, website: **www.sec.state.ma.us/wso**

● **The Corporations Division** is responsible for registering all Massachusetts profit and non-profit corporations and providing immediate summary information about almost 400,000 entities doing business in the state. 617-727-2850 or 617-727-9640, website: **www.sec.state.ma.us/cor**
Email: corpinfo@sec.state.ma.us

Other divisions include:

● **Lobbyist:** website: **www.sec.state.ma.us/lob**

● **State Records Center** website: **www.sec.state.ma.us/rec**

● **State Publications and Regulations** website: **www.sec.state.ma.us/spr**

● **State House Tours:** website: **www.sec.state.ma.us/trs**

# If you have been the victim of investment fraud, Secretary Galvin's office might be able to help!

Secretary Galvin's office regulates and enforces laws relating to risk investments of all kinds that are offered or sold in Massachusetts.

Secretary Galvin's office has been successful in returning millions of dollars directly back to defrauded investors.

**See if some of these situations where we were able to help are similar to yours:**

- An elderly widow went to her local bank branch to deposit money from the sale of property and was persuaded by the broker to invest in stock market funds and a market-linked CD. The customer was confused as to the nature of the investments because they were sold to her within the bank branch and the broker went against her express wishes not to have exposure to the stock market by placing her in those products. The customer contacted Secretary Galvin's office and was able to reverse the transactions and recover all of her money.

- Two rogue brokers from a broker-dealer engaged in excessive trading in an elderly man's account in order to generate substantial commissions for themselves. The agents concealed the amount charged to the customer so he would not detect the churning of his account. The customer contacted Secretary Galvin's office and was able to recover some of the excessive fees charged to his account and the brokerage firm was permanently barred from doing business in Massachusetts.

- An older couple contacted Secretary Galvin's office because all of their money had been put into an annuity by their broker and they could not access their money without incurring substantial fees. Secretary Galvin's office was able to get them out of the annuity without having to pay the fees.

- An individual preyed on his elder relatives to obtain total control over their brokerage accounts and steal their money to use for personal expenses. They notified Secretary Galvin's office when he admitted what he did and Secretary Galvin's office was able to get the brokerage firm to reimburse the stolen funds.

- A retired couple hired an investment adviser to help them with their finances. He put them into a product for which he earned a large commission, but the product was unsuitable for their needs and the couple incurred substantial fees. Secretary Galvin's office was able to help get them out of the product and get the fees reimbursed to them.

- A large broker-dealer failed to provide adequate disclosures and documents to older customers regarding surrender charges they incurred when the customers switched variable annuities. Secretary Galvin's office was able to have the broker-dealer reimburse the surrender charges to Massachusetts senior citizens.

- A company paid an individual to advertise and sell its unregistered promissory notes related to real estate to Massachusetts residents. Secretary Galvin's office was able to get the company to offer reimbursements to all Massachusetts investors and stop the note sales in Massachusetts. Further, his office prevented the individual from being able to get into the securities industry in the future.

If you need help you can reach us toll-free at 1-800-269-5428.

## Help for Victims of Domestic Violence

Massachusetts tries to protect victims of domestic violence, sexual assault, or stalking by helping them establish new confidential addresses to prevent perpetrators of violence from finding relocated victims.

This program, called the Address Confidentiality Program (ACP), is administered by the Secretary of the Commonwealth.

In order to be certified as a program participant, an applicant must show that disclosure of his or her address threatens the safety of the applicant or the applicant's children. ACP permits program participants to use a substitute mailing address when interacting with government agencies. The substitute address is used as the program participant's legal residence, as well as work and/or school address. Consequently, government records may be disclosed to the public without identifying the victim's new location.

**How do I locate an application assistant to initiate the application process?**

You may call ACP at 1-866-SAFE-ADD in order to locate an application assistant. You may also contact an agency or non-profit program that provides counseling, referral, shelter or other specialized services to victims of domestic abuse, rape, sexual assault, or stalking.

# *Massachusetts Voters' Bill of Rights*

**Your voting rights are protected. These rights are guaranteed to qualified registered voters.**

1. You have the right to vote if you are a qualified registered voter.

2. You have the right to cast your ballot in a manner that ensures privacy. You have the right to vote without any person trying to influence your vote and to vote in a booth that prevents others from watching you mark your ballot.

3. You have the right to remain in the voting booth for five (5) minutes if there are other voters waiting and for ten (10) minutes if there are no other voters waiting.

4. You have the right to receive up to two (2) replacement ballots if you make a mistake and spoil your ballot.

5. You have the right to request assistance when voting from anyone of your choice. If you do not bring someone with you, you have the right to have two (2) poll workers assist you.

6. You have the right to vote if you are disabled. The polling place must be accessible, and there must be an accessible voting booth.

7. You have the right to vote if you cannot read or write or cannot read or write English.

8. You have the right to vote but must show identification if: you are a first-time voter who registered to vote by mail and did not submit identification with the voter registration form; or your name is on the inactive voter list; or your vote is being challenged; or if requested by a poll worker. Acceptable forms of identification are: Massachusetts driver's license, other printed documentation containing your name and address such as a recent utility bill, rent receipt on landlord's letterhead, lease, or a copy of a voter registration acknowledgment or receipt.

9. You have the right to vote by absentee ballot if: you will be absent from your city or town on Election Day; or if you have a physical disability that prevents your voting at the polling place; or if you cannot vote at the polls due to religious belief.

10. You have the right to cast a provisional ballot if you believe you are a qualified registered voter but a poll worker tells you that you are ineligible to vote.

11. You have the right to follow up any challenge to your right to vote through the complaint process.

12. You have the right to vote if you are not currently incarcerated for a felony conviction and have registered as a voter after your release.

13. You have the right to take this Voters' Bill of Rights or any other papers, including a sample ballot, voter guide or campaign material into the voting booth with you. Please remember to remove all papers when you leave the booth.

14. You have the right to vote at your polling place any time between 7 a.m. and 8 p.m. for state and federal elections—hours may vary for local elections. If you are in line at your polling place when the polls close at 8 p.m., you have the right to vote.

15. You have the right to bring your children into the voting booth with you.

If you feel that your right to vote has been violated in any way, call the Secretary of the Commonwealth's Elections Division at 1-800-462-VOTE (8683). This call is free within Massachusetts.



**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Room 1705
Boston, MA 02108

Non-Profit Org.
ECRWSS
U.S. Postage
**PAID**
Massachusetts
Secretary of the
Commonwealth



OFFICIAL DOCUMENT

## *Residential Customer VOTERS*

---

### ✗ *Voter Checklist* Tear out and take to the polls.

**BALLOT QUESTIONS** ▶ Question 1  ☐ Yes  ☐ No       Question 3  ☐ Yes  ☐ No
Question 2  ☐ Yes  ☐ No       Question 4  ☐ Yes  ☐ No

**BALLOT OFFICES** ▶ Offices on the ballot in 2016 appear in the following order:

Electors for President and Vice President_____

Representative in Congress _____

Councillor _____

Senator in General Court _____

Representative in General Court_____

Sheriff _____

County Commissioner _____
*(Barnstable, Bristol, Dukes, Norfolk, Plymouth, or Franklin Council of Governments)*

Register of Deeds _____
*(Dukes & Suffolk only)*

District Attorney_____
*(Bristol only)*

**INFORMATION FOR VOTERS** is sent to voters by mail to residential addresses, to voters residing in group quarters and to convenient public locations throughout the Commonwealth. Limited additional copies may be obtained at local city and town halls and some libraries, or by calling Secretary Galvin's Elections Division at 617-727-2828 or 1-800-462-VOTE (8683); or Citizen Information Service at 617-727-7030 in the Boston area or 1-800-392-6090. TTY users call 617-878-3889. Be sure to visit our website at www.sec.state.ma.us. The Spanish and Chinese editions of Information for Voters and a large print edition for the visually impaired are also available at the same phone numbers. An audio edition is also available from the Braille and Talking Book Library in Watertown at 1-800-852-3133.

♻ Printed on recycled paper
Addendum 32

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act |

M.G.L.A. Pt. I, T. XIX, Refs & Annos

Currentness

M.G.L.A. Pt. I, T. XIX, Refs & Annos, MA ST Pt. I, T. XIX, Refs & Annos
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| --- |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-1

§ 1-1. Purpose

Currentness

The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts.

**Credits**

Added by St.2016, c. 333, § 1, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-1, MA ST 129 App. § 1-1
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-2

§ 1-2. Knowing confinement of covered animal in cruel manner

Currentness

Notwithstanding any general or special law to the contrary, it shall be unlawful for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 2, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-2, MA ST 129 App. § 1-2
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| --- |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-3

§ 1-3. Sale of products of covered animals confined in cruel manner

Currentness

Notwithstanding any general or special law to the contrary, it shall be unlawful for a business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any:

(A) Shell egg and other egg products that the business owner or operator knows or should know is the product of a covered animal that was confined in a cruel manner.

(B) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner.

(C) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 3, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-3, MA ST 129 App. § 1-3
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-4

§ 1-4. Circumstances not deemed to be confined in a cruel manner

Currentness

For the purposes of this Act, a covered animal shall not be deemed to be "confined in a cruel manner" during:

(A) Transportation.

(B) State or county fair exhibitions, 4-H programs, and similar exhibitions.

(C) Slaughter in accordance with any applicable laws, rules, and regulations.

(D) Medical research.

(E) Examination, testing, individual treatment or operation for veterinary purposes, but only if performed by or under the direct supervision of a licensed veterinarian.

(F) The five (5) day period prior to a breeding pig's expected date of giving birth, and any day that the breeding pig is nursing piglets.

(G) Temporary periods for animal husbandry purposes for no more than six (6) hours in any twenty-four (24) hour period; provided, however, that in the case of egg-laying hens, for not more than 24 hours total in any 30-day period.

**Credits**

Added by St.2016, c. 333, § 4, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-4, MA ST 129 App. § 1-4
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**§ 1-4. Circumstances not deemed to be confined in a cruel manner, MA ST 129 App. § 1-4**

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-5

§ 1-5. Definitions

Currentness

For purposes of this act, the following terms shall, unless the context requires otherwise, have the following meanings:

"Breeding pig", any female pig of the porcine species kept for the purpose of commercial breeding.

"Business owner or operator", any person who owns or controls the operations of a business.

"Cage-free housing system", an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted, are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes and dust bathing areas, and within which farm employees can provide care while standing within the hens' usable floor space; provided, however, that "cage-free housing system" shall include, to the extent that such systems comply with the requirements of this definition, multi-tiered aviaries, partially-slatted systems, single-level all litter floor systems and any future systems that will comply with the requirements of this definition; provided further, that "cage-free housing system" shall not include systems commonly described as "battery cages", "colony cages", "enriched cages", "enriched colony cages", "modified cages", "convertible cages" or "furnished cages" or other similar cage systems.

"Calf raised for veal", any calf of the bovine species kept for the purpose of commercial production of veal meat.

"Confined in a cruel manner", confining: (i) a calf raised for veal or a breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely; or (ii) an egg-laying hen in an enclosure other than a cage-free housing system or with less than:

(A) 1 square foot of usable floor space per hen in multi-tiered aviaries, partially-slatted cage-free housing systems or any other cage-free housing system that provides hens with unfettered access to vertical space; or

(B) 1.5 square feet of usable floor space per hen in single-level, all-litter floor cage-free housing systems or any other cage-free housing system that does not provide hens with unfettered access to vertical space.

"Covered animal", any breeding pig, calf raised for veal or egg-laying hen that is kept on a farm.

Addendum 39

"Egg-laying hen", any female domesticated chicken, turkey, duck, goose or guinea fowl kept for the purpose of commercial egg production.

"Egg products", eggs of an egg-laying hen broken from the shells, intended for human food, whether in liquid, solid, dried or frozen form, whether raw or cooked, and with the yolks and whites in their natural proportions or with the yolks and whites separated, mixed or mixed and strained; provided, however, that "egg products" shall not include combination food products, including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream or other similar food products that are comprised of more than egg products, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers and similar food additives.

"Enclosure", any cage, crate or other structure used to confine a covered animal or animals; provided, however, that "enclosure" shall include what is commonly described as a "gestation crate" or "stall" for pigs during pregnancy, a "veal crate" for calves raised for veal and a "battery cage", "enriched cage" or "colony cage" for egg-laying hens.

"Farm", the land, building, support facilities and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food; provided, however, that "farm" shall not include live animal markets, establishments at which inspection is provided under the Federal Meat Inspection Act or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act.

"Farm owner or operator", any person who owns or controls the operations of a farm.

"Fully extending the animal's limbs", fully extending all limbs without touching the side of an enclosure.

"Meat", the part of the muscle of any cattle, sheep, swine or goats, which is skeletal or which is found in the tongue, in the diaphragm, in the heart or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing; provided, however, that "meat" shall not include the muscle found in the lips, snout or ears.

"Multi-tiered aviary", a cage-free housing system in which hens have unfettered access to multiple elevated platforms that provide hens with usable floor space both on top of and underneath the platforms.

"Partially-slatted system", a cage-free housing system in which hens have unfettered access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.

"Person", any individual, firm, partnership, joint venture, limited liability corporation, estate, trust, receiver, syndicate, association or other legal entity.

"Pork meat", meat of a pig of the porcine species intended for use as human food.

"Sale", a commercial sale by a business that sells any item covered by section 3; provided, however, that "sale" shall not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act or any

sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act; provided further, that for purposes of this section, a "sale" shall be deemed to occur at the location where the buyer takes physical possession of an item covered by said section 3.

"Shell egg", a whole egg of an egg-laying hen in its shell form and intended for use as human food.

"Single-level all litter floor system", a cage-free housing system bedded with litter and in which hens have limited or no access to elevated flat platforms.

"Turning around freely", turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

"Uncooked", requiring cooking prior to human consumption.

"Usable floor space", the total square footage of floor space provided to each egg-laying hen, as calculated by dividing the total square footage of floor space provided to the hens in an enclosure by the number of hens in that enclosure; provided, however, that "usable floor space" shall include both ground space and elevated level or nearly level flat platforms upon which hens can roost; provided further, that "usable floor space" shall not include perches or ramps.

"Veal meat", meat of a calf raised for veal and intended for use as human food.

"Whole pork meat", any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole pork meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

"Whole veal meat", any uncooked cut of veal, including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole veal meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or similar processed or prepared food products, that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

**Credits**

Added by St.2016, c. 333, § 5, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-5, MA ST 129 App. § 1-5
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| --- |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-6

§ 1-6. Enforcement

Currentness

The Attorney General shall have exclusive authority to enforce the provisions of this Act. Each violation of this Act shall be punished by a civil fine not to exceed one thousand dollars ($1,000). The Attorney General may also seek injunctive relief to prevent further violations of this Act.

**Credits**

Added by St.2016, c. 333, § 6, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-6, MA ST 129 App. § 1-6
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** <span>© 2023 Thomson Reuters. No claim to original U.S. Government Works.</span>

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-7

§ 1-7. Good faith reliance upon written certification or guarantee by supplier

Currentness

It shall be a defense to any action to enforce this act that a business owner or operator relied in good faith upon a written certification or guarantee by the supplier that the shell egg, egg products, whole pork meat or whole veal meat at issue was not derived from a covered animal that was confined in a cruel manner or from the immediate offspring of a female pig that was confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 7, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-7, MA ST 129 App. § 1-7
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-8

§ 1-8. Application

Currentness

The provisions of this Act are in addition to, and not in lieu of, any other laws protecting animal welfare. This Act is not intended, and should not be construed to limit any other state law or rules protecting the welfare of animals or to prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations that are more stringent than this section.

**Credits**

Added by St.2016, c. 333, § 8, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-8, MA ST 129 App. § 1-8
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| --- |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-9

§ 1-9. Severability

Currentness

The provisions of this Act are severable and if any clause, sentence, paragraph or section of this Act, or an application thereof, shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof but shall be confined in its operation to the clause, sentence, paragraph, section or application adjudged invalid.

**Credits**

Added by St.2016, c. 333, § 9, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-9, MA ST 129 App. § 1-9
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    13

| Massachusetts General Laws Annotated |
|---|
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-10

§ 1-10. Regulations

Currentness

The department of agricultural resources, in consultation with the attorney general, shall promulgate rules and regulations for the implementation of this act not more than 6 months after the effective date of this act. Any authorized use of third-party validators in such rules or regulations to assist with compliance under this act shall be jointly approved by the secretary of energy and environmental affairs and the attorney general.

**Credits**

Added by St.2016, c. 333, § 10, eff. Dec. 8, 2016. Amended by St.2021, c. 108, § 5, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-10, MA ST 129 App. § 1-10
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| Massachusetts General Laws Annotated |
| --- |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-11

§ 1-11. Effective dates

Currentness

Section 2, clause (A) and clause (B) of section 3 and sections 4 to 7, inclusive, shall take effect on January 1, 2022.

**Credits**

Added by St.2016, c. 333, § 11, eff. Dec. 8, 2016. Amended by St.2021, c. 108, § 6, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-11, MA ST 129 App. § 1-11
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

| Massachusetts General Laws Annotated |
| Part I. Administration of the Government (Ch. 1-182) |
| Title XIX. Agriculture and Conservation (Ch. 128-132b) |
| Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos) |

M.G.L.A. 129 App. § 1-12

§ 1-12 . Effective date of clause (C) of section 3

Currentness

Clause (C) of section 3 shall take effect on August 15, 2022.

**Credits**

Added by St.2021, c. 108, § 6, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-12, MA ST 129 App. § 1-12
Current through Chapter 7 the 2023 1st Annual Session. Some sections may be more current, see credits for details.

330 CMR:   DEPARTMENT OF AGRICULTURAL RESOURCES

330 CMR 35.00:     REGULATIONS IMPLEMENTING THE ACT TO PREVENT CRUELTY TO FARM ANIMALS

Section

35.01:   Scope
35.02:   Definitions
35.03:   Prohibition on the Confinement of Covered Animals
35.04:   Prohibition on the Sale of Products
35.05:   Certifications
35.06:   Referrals by the Department
35.07:   Third-party Validators
35.08:   Severability

35.01:   Scope

   330 CMR 35.00 applies only to the production and Sale of Veal Meat, Pork Meat, Shell Eggs, and Egg Products in Massachusetts as defined in St. 2021, c. 108.

35.02:   Definitions

   Act.  An Act to Prevent Cruelty to Farm Animals as enacted in St. 2016, c. 333, as amended by St. 2021, c. 108, "An Act further regulating hen welfare and establishing cage-free standards."

   Breeding Pig.  Any female pig of the porcine species kept for the purpose of commercial breeding.

   Business Owner or Operator.  Any Person who owns or controls the operations of a business.

   Cage-free Housing System.  An indoor or outdoor controlled environment for Egg-laying Hens within which Hens are free to roam unrestricted, are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes and dust bathing areas, and within which Farm employees can provide care while standing within the Hens' usable floor space; provided, however, that Cage-free Housing System shall include, to the extent that such systems comply with the requirements of this definition, Multi-tiered Aviaries, Partially-slatted Systems, Single-level All-Litter Floor Systems and any future systems that will comply with the requirements of Cage-free Housing System; provided further, that Cage-free Housing System shall not include systems commonly described as "battery cages", "colony cages", "enriched cages", "enriched colony cages", "modified cages", "convertible cages" or "furnished cages" or other similar cage systems.

   Calf Raised for Veal.  Any calf of the bovine species kept for the purpose of commercial production of Veal Meat.

   Certify.  To make the sworn representations specified in 330 CMR 35.05.

   Confined in a Cruel Manne.  Confining:
      (a)  a Calf Raised for Veal or a Breeding Pig in a manner that prevents the animal from lying down, standing up, Fully Extending the Animal's Limbs or Turning around Freely; or
      (b)  an Egg-laying Hen in an Enclosure other than a Cage-free Housing System or with less than:
         1.    one square foot of usable floor space per Hen in Multi-tiered Aviaries, Partially-slatted Cage-free Housing Systems or any other Cage-free Housing System that provides Hens with unfettered access to vertical space; or
         2.    1.5 square feet of usable floor space per Hen in Single-level All-Litter Floor Cage-free Housing Systems or any other Cage-free Housing System that does not provide Hens with unfettered access to vertical space.

   Covered Animal.  Any Breeding Pig, Calf Raised for Veal, or Egg-laying Hen that is kept on a Farm.

330 CMR:   DEPARTMENT OF AGRICULTURAL RESOURCES

35.02:   continued

Department.  The Massachusetts Department of Agricultural Resources.

Direct Supervision of a Licensed Veterinarian.  An order or directive from a licensed veterinarian for the care or treatment of an individual animal.

Egg-laying Hen.  Any female domesticated chicken, turkey, duck, goose, or guinea  fowl kept for the purpose of commercial egg production.

Egg Products.  Eggs of an Egg-laying Hen broken from the shells, intended for human food, whether in liquid, solid, dried or frozen form, whether raw or cooked, and with the yolks and whites in their natural proportions or with the yolks and whites separated, mixed or mixed and strained; provided, however, that Egg Products shall not include combination food products, including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream or other similar food products that are comprised of more than Egg Products, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers and similar food additives.

Enclosure.  Any cage, crate, or other structure used to confine a Covered Animal or Animals. Enclosure includes what is commonly described as a "gestation crate" or "stall" for pigs during pregnancy, a "veal crate" for calves raised for veal, and a "battery cage, enriched cage, or colony cage" for Egg-laying Hens.

Farm.  The land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food; and does not include live animal markets, establishments at which inspection is provided under the Federal Meat Inspection Act, or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act.

Farm Owner or Operator.  Any Person who owns or controls the operations of  a Farm.

Fully Extending the Animal's Limbs.  Fully extending all limbs without touching the side of an Enclosure.

Guarantee.  A contractual promise, in writing, by a seller of Shell Egg or Egg Products, Whole Pork Meat, or Whole Veal Meat to indemnify the purchaser of such products for any fine or monetary penalties relating to the purchased products that is imposed on the purchaser as a result of any noncompliance with the Act or 330 CMR 35.00 by the seller.

Meat.  The part of the muscle of any cattle or swine, which is skeletal or which is found in the tongue, in the diaphragm, in the heart or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve and blood vessels which normally accompany the muscle tissue and which are not separate from it in the process of dressing; provided, however, that Meat shall not include the muscle found in the lips, snout or ears.

Multi-tiered Aviary.  A Cage-free Housing System in which hens have unfettered access to multiple elevated platforms that provide hens with Usable Floor Space both on top of and underneath the platforms.

Partially-slatted System.  A Cage-free Housing System in which hens have unfettered access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.

Person.  Any individual, firm, partnership, joint venture, limited liability corporation, estate, trust, receiver, syndicate, association, or other legal entity.

Pork Meat.  Meat of a pig of the porcine species intended for use as human food.

Sale.  A commercial sale by a business that sells any item covered by St. 2021, c. 108, § 3, but does not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act. For purposes of

330 CMR:   DEPARTMENT OF AGRICULTURAL RESOURCES

35.02:   continued

330 CMR 35.02, a Sale occurs at the location where the buyer takes physical possession of an item covered by St. 2021, c. 108, § 3.

Shell Egg.  A whole egg of an Egg-laying Hen in its shell form, intended for use as human food.

Single-level All-Litter Floor System.  A Cage-free Housing System bedded with litter and in which hens have limited or no access to elevated flat platforms.

Turning around Freely.  Turning in a complete circle without any impediment, including a tether, and without touching the side of an Enclosure or another animal.

Uncooked.  Requiring cooking prior to human consumption.

Usable Floor Space.  The total square footage of floor space provided to each Egg-laying Hen, as calculated by dividing the total square footage of floor space provided to the Hens in an Enclosure (including both ground space and elevated level or nearly level flat platforms upon which Hens can roost) by the number of Hens in that Enclosure.  Usable Floor Space shall not include perches or ramps.

Veal Meat.  Meat of a Calf Raised for Veal and  intended for use as human food.

Whole Pork Meat.  Any Uncooked cut of pork (including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet) that is comprised entirely of Pork Meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar Meat additives. Whole Pork Meat does not include combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than Pork Meat, seasoning, curing agents, coloring, flavoring, preservatives and similar Meat additives.

Whole Veal Meat.  Any Uncooked cut of veal (including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet) that is comprised entirely of Veal Meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar Meat additives. Whole Veal Meat does not include combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than Veal Meat, seasoning, curing agents, coloring, flavoring, preservatives and similar Meat additives.

35.03:   Prohibition on the Confinement of Covered Animals

(1)   It is a violation of St. 2021, c. 108, and 330 CMR 35.00 for a Farm Owner or Operator within Massachusetts to knowingly cause any Covered Animal to be Confined in a Cruel Manner.

(2)   Knowingly causing a Covered Animal to be confined during any of the following activities shall not be deemed to be a violation of St. 2021, c. 108, or 330 CMR 35.00:
   (a)   Transportation;
   (b)   State or county fair exhibitions, 4-H programs, and similar exhibitions;
   (c)   Slaughter in accordance with any applicable laws, rules, and regulations;
   (d)   Medical research;
   (e)  Examination, testing, individual treatment, or operation for veterinary purposes, but only if performed by or under the Direct Supervision of a Licensed Veterinarian;
   (f)   The five-day period prior to a Breeding Pig's expected date of giving birth, and any day that the Breeding Pig is nursing piglets; or
   (g)   Temporary periods for animal husbandry purposes for no more than six hours in any 24-hour period; provided, however, that in the case of Egg-laying Hens, for not more than 24 hours total in any 30-day period.

35.04:   Prohibition on the Sale of Products

(1)   It is a violation of St. 2021, c. 108, and 330 CMR 35.00 for a Business Owner or Operator to knowingly engage in the Sale within Massachusetts of any:

330 CMR:   DEPARTMENT OF AGRICULTURAL RESOURCES

35.04:   continued

(a)   Shell Egg or other Egg Products that the Business Owner or Operator knows or should know is the product of a Covered Animal that was Confined in a Cruel Manner;
(b)   Whole Veal Meat that the Business Owner or Operator knows or should know is the Meat of a Covered Animal that was Confined in a Cruel Manner; or
(c)   Whole Pork Meat that the Business Owner or Operator knows or should know is the Meat of a Covered Animal that was Confined in a Cruel Manner, or is the Meat of the immediate offspring of a Covered Animal that was Confined in a Cruel Manner; provided, however, that Whole Pork Meat products already in the supply chain as of and including August 15, 2022, shall be deemed compliant such that their sale on or after this date shall not be a violation of St. 2021, c. 108, or 330 CMR 35.00.

(2)   It is a defense to any action to enforce 330 CMR 35.00 or to any action to enforce St. 2021, c. 108, that a seller of Shell Eggs, Egg Products, Whole Pork Meat, or Whole Veal Meat in Massachusetts relied in good faith upon either:
(a)   a Guarantee;
(b)   a written certification made pursuant to 330 CMR 35.05(1); or
(c)   a written certification made pursuant to 330 CMR 35.05(2).

35.05:   Certifications

(1)   Any Farm or Farm Owner or Operator that raises a Covered Animal and engages in a commercial transaction within Massachusetts involving any Shell Egg, Egg Products, Whole Veal Meat, or Whole Pork Meat derived from a Covered Animal raised on said Farm may Certify in writing under pains and penalties of perjury that such Farm does not knowingly cause any Covered Animal to be Confined in a Cruel Manner.

(2)   Any Person who engages in a commercial transaction within Massachusetts involving any Shell Egg, Egg Products, Whole Veal Meat, or Whole Pork Meat, including, but not limited to, a Farm, Farm Owner or Operator, Business Owner or Operator, or supplier, residing or operating within or outside of the Commonwealth, may Certify in writing that particular Shell Eggs, Egg Products, Whole Pork Meat, or Whole Veal Meat were not derived from a Covered Animal that was Confined in a Cruel Manner, or from the immediate offspring of a female pig that was Confined in a Cruel Manner.

(3)   A certification made pursuant to 330 CMR 35.05(1) will be effective for one calendar year from the date it is executed and shall be renewed annually.  Additionally, any Persons or entities that provide certification pursuant to 330 CMR 35.05(1) or (2) may use a single blanket certification that applies to all of that Person's or entity's products, provided that all such products are compliant with St. 2021, c. 108, and 330 CMR 35.00 at the time of the commercial transaction involving the covered product.

(4)   Any certification made pursuant to 330 CMR 35.05(1) and (2) shall be produced upon demand to:
(a)   the Massachusetts Office of the Attorney General;
(b)   the Department; and
(c)   any Person who will rely on or has relied on such certification.

(5)   Any Person, Farm, Farm Owner or Operator, Business Owner or Operator, or supplier who includes all of the following information in a certification is in compliance with the requirements of 330 CMR 35.05(1) or (2), whichever is applicable:
(a)   the name and address of the entity or operation;
(b)   the type of  Covered Animal raised, Covered Animal product produced, or Covered Animal product sold or supplied by the entity or operation;
(c)   the date;
(d)   a written statement, that is signed under pains and penalties of perjury, that the entity or operation does not knowingly cause any Covered Animal to be Confined in a Cruel Manner or that the Covered Animal product(s) sold or supplied by the entity or operation were not derived from a Covered Animal that was Confined in a Cruel Manner as prohibited by the St. 2021, c. 108; and

330 CMR:   DEPARTMENT OF AGRICULTURAL RESOURCES

35.05:   continued

        (e)   if applicable, the name of the entity or operation to which the Covered Animal product(s) were sold or supplied and the date of such Sale or transaction.

    (6)   A Person, Farm, Farm Owner or Operator, Business Owner or Operator, or supplier shall retain certification records for a period of three years.

35.06:   Referrals by the Department

        Whenever the Department inspects a Farm pursuant to any applicable authority, the Department may inspect Farms for compliance with the Enclosure and Usable Floor Space for Covered Animals under St. 2021, c. 108, and 330 CMR 35.00 to ensure that these  animals are not being Confined in a Cruel Manner.

        If the Department observes violations of St. 2021, c. 108, or 330 CMR 35.00 during its inspections  of Farms within Massachusetts, the Department may refer those violations to the Attorney General's Office.

35:07:   Third-party Validators

        Third-party Validators may be used to assist with compliance under St. 2021, c. 108, and 330 CMR 35.00 subject to joint approval of the Validators by the Secretary of Energy and Environmental Affairs or his designee and the Attorney General.  A list of approved Third-party Validators will be made available from the Department as the Secretary and the Attorney General mutually agree to approve such Validators.

35.08:   Severability

        If any provision of 330 CMR 35.00 or the application of any provision of a regulation to any Person or circumstance is held to be invalid, the validity of the remainder of 330 CMR 35.00 and the applicability of such provision to other Persons or circumstances will not be affected.


REGULATORY AUTHORITY

        330 CMR 35.00:  St. 2016, c. 333, as amended by St. 2021, c. 108.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS RESTAURANT ASSOCIATION, HOSPITALITYMAINE, NEW HAMPSHIRE LODGING & RESTAURANT ASSOCIATION, RHODE ISLAND HOSPITALITY ASSOCIATION, RESTAURANT LAW CENTER, and the NATIONAL PORK PRODUCERS COUNCIL, <br><br>      Plaintiffs, <br><br> v. <br><br> ANDREA JOY CAMPBELL, in her Official Capacity as the Attorney General of Massachusetts, and ASHLEY E. RANDLE, in her Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources, <br><br>      Defendants. | Civil Action No. 4:22-cv-11245-MRG |

## JOINT STIPULATION AND
## MOTION FOR PARTIAL EXTENDED STAY PENDING REGULATORY PROPOSAL

Plaintiffs Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, Rhode Island Hospitality Association, Restaurant Law Center, and the National Pork Producers Council ("Plaintiffs"), and defendants Andrea Joy Campbell, in her Official Capacity as the Attorney General of Massachusetts, and Ashley E. Randle, in her Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources ("Defendants") (collectively, "Parties"), respectfully submit this Joint Stipulation and Motion for a Partial Extended Stay.

As background to this Joint Stipulation and Motion, the Parties state as follows:

(1)     On August 3, 2022, Plaintiffs filed the Complaint in this matter seeking a declaration that Mass. G.L. c. 129 App. § 1-3(C), 330 Code Mass. Reg. § 35.04(1)(c), and the official guidance interpreting same (the "Pork Sale Rules") violate the dormant Commerce Clause of the Constitution of the United States.  Dkt. No. 1.

(2)     Also on August 3, 2022, Plaintiffs filed an Emergency Motion for Preliminary Injunction seeking an order that would prevent the Defendants from enforcing the Pork Sale Rules, which were then scheduled to take effect on August 22, 2022.  Dkt. No. 3.

(3)     On August 10, 2022, the parties moved to stay this case until 30 days after a final decision by the Supreme Court in a constitutional challenge to a similar California law that raised many of the same issues that are raised in this case.  *See National Pork Producers Council v. Ross*, 143 S.Ct. 1142 (May 11, 2023) ("*Ross*").  The Defendants also agreed to stay enforcement of the Pork Sale Rules against any Plaintiff or non-party during this "Stay Period" and agreed not to enforce the Pork Sale Rules against any Plaintiff or non-party for any conduct that occurs during the Stay Period.

(4)     The Supreme Court's decision in *Ross* upholding California's law became final on June 12, 2023, when the mandate issued to the Ninth Circuit.

(5)     At the request of the parties and by order of the Court, the Stay Period was extended until August 23, 2023.  Dkt. Nos. 19 & 20.

The Parties hereby stipulate as follows:

(6)     Pursuant to its regulatory authority, the Massachusetts Department of Agricultural Resources ("MDAR") is in the process of proposing amendments to the regulations at 330 Code

Mass. Reg. § 35.00 that would, if finalized, address the status of "Whole Pork Meat" that is produced outside of Massachusetts and that enters and exits Massachusetts without additional processing or repackaging, exclusively for the purposes of transshipment or export outside of Massachusetts. Whole Pork Meat meeting these criteria is referred to herein as "Transshipped Whole Pork Meat."

(7)     The Parties request that this case be further stayed for six months, and potentially longer, to allow Plaintiffs to assess whether the potential regulatory change resolves the remaining legal issue. If the regulatory process has not concluded within six months, the Parties will file a status report and request for further stay as necessary. The parties acknowledge that Defendant MDAR is required to comply with Mass. G.L. c. 30A when proposing any amendment to its regulations.

(8)     The Parties agree that the Pork Sale Rules, but for those pertaining to Transshipped Whole Pork Meat, should go into effect on August 24, 2023. Insofar as the Pork Sales Rules pertain to Transshipped Whole Port Meat, the Parties request that those rules be stayed until 60 days after the date of publication of the amended regulations in the Massachusetts Register in accordance with Mass. G.L. c. 30A but in no event longer than one year from the date of the Court's approval of this Stipulation. This period of time shall be referred to herein as the "Regulatory Stay Period."

(9)     The Defendants agree to stay enforcement of the Pork Sales Rules as to Transshipped Whole Pork Meat during the Regulatory Stay Period. The Defendants further agree not to enforce the Pork Sales Rules as to Transshipped Whole Pork Meat against any Plaintiff or non-party for any conduct that occurs during the Regulatory Stay Period.

3

(10)     The Defendants further agree not to enforce the Pork Sales Rules as to any Whole Pork Meat that is in the supply chain as of August 23, 2023.  Whole Pork Meat is considered "in the supply chain" on August 23, 2023 if, on that date, it satisfies the definition of "Whole Pork Meat" as that term is defined in the Pork Sale Rules at 330 Code Mass. Reg. § 35.02.  That term does not include live animals.

(11)     The Plaintiffs agree to withdraw their pending motion for preliminary injunction (Dkt. No. 3), without prejudice to refiling the motion insofar as the motion pertains to Transshipped Whole Pork Meat following the regulatory proposal process described herein.

(12)     The Stay Period, including Defendant's stay of enforcement, will end as to all other portions of the Pork Sale Rules not otherwise addressed herein on August 23, 2023.  The Parties agree that, on August 24, 2023, the Defendants may begin to enforce the Pork Sale Rules, unless otherwise provided herein.  The Defendants will not enforce the Pork Sale against any Plaintiff or non-party for any conduct that occurred during the Stay Period, i.e. at any time on or before August 23, 2023.

(13)     Nothing in this stipulation and joint motion shall be construed as an admission concerning the merits of this lawsuit with respect to the Pork Sale Rules applicable to Transshipped Whole Pork Meat.  The Parties reserve all claims and defenses.

WHEREFORE, the Parties jointly request that the Court order a partial further stay of this action until 60 days after the promulgation of final regulations, as proposed under paragraphs 6-8 of this Joint Stipulation and Motion, by which time the Parties will file a proposal for future proceedings in the case, if any.

4

**STIPULATED and AGREED this 4th day of August, 2023.**

**ALL PLAINTIFFS,**

by their counsel,


 /s/ Robert M. Shaw
Jeremy M. Sternberg, BBO No. 556566
Robert M. Shaw, BBO No. 669664
HOLLAND & KNIGHT LLP
10 St. James Ave.
Boston, MA 02116
617-523-2700
*jeremy.sternberg@hklaw.com*
*robert.shaw@hklaw.com*


Charles E. Borden*
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006
202-469-5461
*charles.borden@hklaw.com*
*Motion for admission *pro hac vice*
forthcoming.

**PLAINTIFF NATIONAL PORK PRODUCERS COUNCIL,**

by its counsel,


 /s/ Michael C. Formica
Michael C. Formica*
NATIONAL PORK PRODUCERS COUNCIL
122 C Street, N.W. Suite 875
Washington, DC 20001
202-347-3600
*formicam@nppc.org*
*Motion for admission *pro hac vice*
forthcoming.

**PLAINTIFF RESTAURANT LAW CENTER,**

by its counsel,


 /s/ Angelo I. Amador
Angelo I. Amador*
RESTAURANT LAW CENTER
2055 L Street, N.W., Suite 700
Washington, DC 20036
202-331-5913
*aamador@restaurant.org*
*Motion for admission *pro hac vice*
forthcoming.

5

**DEFENDANTS ANDREA JOY CAMPBELL, in her Official Capacity as the Attorney General of Massachusetts, and**

**ASHLEY E. RANDLE, in her Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources**

by their counsel,

 */s/ Maryanne Reynolds*
Maryanne Reynolds, BBO #627127
Assistant Attorney General
Office of the Attorney General
Government Bureau
10 Mechanic Street, Suite 301
Worcester, MA 01608
(774) 214-4407
*maryanne.reynolds@mass.gov*

Grace Gohlke, BBO #704218
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2527
*grace.gohlke@mass.gov*

**SO ORDERED,**

_____
Hon. Margaret R. Guzman
United States District Judge

Date: _____

6

MAYER BROWN LLP
TIMOTHY S. BISHOP (IL 6198062)
(*pro hac vice application forthcoming*)
 tbishop@mayerbrown.com
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

MAYER BROWN LLP
C. MITCHELL HENDY (SBN 282036)
 mhendy@mayerbrown.com
350 South Grand Avenue
25th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Plaintiffs National Pork Producers
Council & American Farm Bureau Federation

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL PORK PRODUCERS COUNCIL & AMERICAN FARM BUREAU FEDERATION,<br><br>Plaintiffs,<br><br>v.<br><br>KAREN ROSS, in her official capacity as Secretary of the California Department of Food & Agriculture, & SONIA ANGELL, in her official capacity as Director of the California Department of Public Health, and XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendants. | CASE NO. **'19 CV 2324 W    AHG**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the National Pork Producers Council and the American Farm Bureau Federation allege upon information and belief as follows:

## INTRODUCTION AND NATURE OF CLAIMS

1.      The market for pork produced in the United States ("U.S.") is enormous and national and international in scope.

2.      It meets a demand for high-quality, affordable protein.

3.      According to the U.S. Department of Agriculture's Census of Agriculture for 2017, nearly 65,000 farms nationwide sold hogs that year with a market value of more than $26 billion.

4.      During the first nine months of 2019, some 94 million hogs were slaughtered at federally inspected facilities, for a rate of about 125 million hogs slaughtered per year.

5.      Pigs are raised throughout the country, but production is concentrated in the Midwest and North Carolina.  The latest Agriculture Census reported that 22.7 million pigs were sold by Iowa farms in 2017, 8 to 9 million each by North Carolina, Oklahoma, and Minnesota farms, 5.25 million by Illinois farms, and 4.5 million by South Dakota farms.

6.      The U.S. is one of the world's top five pork exporters.  It has exported over 5 billion pounds of fresh and frozen pork cuts annually to foreign markets, on average, since 2010, principally to Mexico, China, Japan, and Canada.

7.      The U.S. commercial production chain for pork is complex and varied, using principally a segmented production model driven by herd health considerations and to achieve economies of scale.

8.      Sows are female pigs held for breeding that give birth to the piglets that ultimately become hogs sent to market.  For disease prevention and efficiency, sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities.  On those sow farms, the sows are generally artificially inseminated, litters of piglets are born ("farrowed"), and the piglets are then raised

1

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

for about three weeks before they are weaned at the weight of approximately 10 pounds.

9. The overwhelmingly vast majority of sow farms use some type of indoor confinement for these processes. Indoor housing allows year-round production by protecting sows from seasonal weather changes, disease exposure, and predators, while facilitating the management of each sow's health, conditioning, feeding, and reproduction.

10. Only a small portion of the pigs that are slaughtered for meat are sows that have been kept to reproduce—only 2.2 million in the first nine months of 2019, compared to 91.8 million of their male ("barrows") and female offspring, which are raised as feeder or market hogs. And almost none of the meat from those sows is sold as whole pork cuts; it is instead used in prepared or cooked products and sausages.

11. The offspring of sows ("market hogs") are raised to market weight in separate, specialized production facilities: (1) feeder pig producers, or nurseries, which raise pigs from weaning to about 40-60 pounds, then sell them for finishing; (2) feeder pig finishers, which buy feeder pigs and grow them to their slaughter weight of about 240-280 pounds; and (3) farrow-to-finish operations, a small percentage of farms that raise hogs from weaning to their slaughter weight. Farrow to finish takes 24-26 weeks.

12. Once they reach slaughter weight, hogs are sent to packing facilities, which may be local or in other states. Packer facilities receive hogs from multiple farms, operated by multiple producers. These farms may be owned by affiliates of the packer, by producers who have contracts to deliver hogs to the packer, or by independent producers.

13. A packing facility typically slaughters thousands, or even tens of thousands, of hogs daily. Packers process the slaughtered hogs into whole pork cuts (or send them to separate processing facilities for this and later steps), pack the

2

meat, and deliver it to wholesale or large retail customers throughout the country and abroad.

14.    California's Proposition 12, challenged here, is a ballot initiative that was passed in November 2018 and that amended the California Health and Safety Code.

15.    Proposition 12 has thrown a giant wrench into the workings of the interstate market in pork.

16.    In California itself, there are estimated to be only some 8,000 breeding sows, most of which are in family-focused "4-H" and other county fair and similar show-pig programs.

17.    It is believed that only about 1,500 out of California's 8,000 sows are used in commercial breeding in the state, housed in a handful of very small farms.

18.    Commercial sows typically produce two litters a year of about 10 piglets, so those 1,500 sows may produce around 30,000 offspring a year.  Those sows are therefore insufficient even to supply the current in-state farms' annual capacity of approximately 65,000 commercial hog finishing spaces that exist in California, which must therefore be filled from out-of-state sows.

19.    By contrast to the tens of millions of hogs sold by farms in many other states, the Agriculture Census reports that only 208,000 hogs were sold by all farms in California in 2017, including those born (farrowed) outside California.

20.    California's pork consumption makes up about 13 percent of the national market.  Accordingly, California's in-state sow breeding scarcely puts a dent in the demand for pork consumed in the state.  The offspring of about 673,000 sows is required to satisfy California consumers' demand for pork meat annually, compared to the 1,500 sows that are commercially bred in-state.

21.    Proposition 12 forbids the sale in California of whole pork meat from hogs born of sows that were not housed in conformity with the law's requirements.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

22.     A violation of Proposition 12 is a criminal offense punishable by fines and imprisonment, and also the basis for civil liability under California's unfair competition statute.

23.     Proposition 12 requires that a sow cannot be confined in such a way that it cannot lie down, stand up, fully extend its limbs, or turn around without touching the sides of its stall or another animal.  This requirement is often referred to as "stand up-turn around."

24.     Stand-up turn-around effectively requires that producers house their sows together in a group, referred to as "group housing."  This housing structure may also be referred to as a "pen."  In contrast, individual stalls each hold one sow apiece and do not allow sows to turn around.

25.     Proposition 12 bans the use of individual stalls that do not meet stand-up turn-around requirements, except during the five-day period prior to farrowing and during weaning.  It accordingly bars the use of individual stalls during breeding and most of the gestation period.

26.     After December 31, 2021—but with immediate impact now on what producers must do given the lead time needed for building and production changes—each sow must be allotted at least 24 square feet of space in the group pen, subject to the same limited exception for the five-day period prior to farrowing and during weaning.

27.     Only a miniscule portion of sows in the U.S. are housed in compliance with all of Proposition 12's requirements.

28.     Proposition 12 institutes a wholesale change in how pork is raised and marketed in this country.  Its requirements are inconsistent with industry practices and standards, generations of producer experience, scientific research, and the standards set by other states.  They impose on producers costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat.  And they impose these enormous costs on pork producers, which will

4

ultimately increase costs for American consumers, making it more difficult for families on a budget to afford this important source of protein. And they do all this for reasons that are both fallacious and vastly outweighed by the economic and social burdens the law imposes on out-of-state producers and consumers and on the authority of other states over their domestic producers.

29. Proposition 12 imposes these severe requirements as the result of a ballot initiative drafted by the Humane Society of the United States ("HSUS").

30. Because Proposition 12 was a ballot initiative, it was passed without any semblance of meaningful legislative deliberation, let alone inclusive input and inquiry into the impacts of its requirements on national commerce in pork, on the pork production industry, or even the welfare of sows.

31. Because it reaches extraterritorially to impose California's idiosyncratic and unjustified sow housing requirements on other states and their producers, because it Balkanizes hog production in ways inconsistent with our Federalist system, and because it imposes burdens on interstate commerce that far outweigh any of its benefits, Proposition 12 violates the dormant Commerce Clause and is unconstitutional.

32. Plaintiffs seek a declaration that Proposition 12's requirements with regard to breeding pigs violate the Commerce Clause and principles of interstate federalism embodied in the U.S. Constitution, and an injunction against the enforcement of Proposition 12's requirements concerning pork.

33. While Proposition 12 regulates the production of veal, pork, and eggs, the basis of Plaintiffs' challenge here is Proposition 12's extraterritorial reach and market disruption regarding pork production.

5

## **JURISDICTION**

34. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case presents a federal question arising under the Commerce Clause of the U.S. Constitution and under 42 U.S.C. § 1983.

35. This Court has authority to enjoin enforcement of Proposition 12 under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## **VENUE**

36. Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants maintain an office and conduct their official duties within this judicial district.

37. Additionally, substantial events giving rise to this lawsuit occurred and will continue to occur within this judicial district. Plaintiffs' members produce and sell pork that is or may be sold in California (including within this judicial division). Pork produced by Plaintiffs' members inevitably is imported into and consumed within this district, because the roughly 9% of California's population located within this district consumes more pork than can be produced by the approximately 8,000 sows located within California.

## **THE PARTIES**

38. Plaintiff National Pork Producers Council ("NPPC") is a federation of 42 affiliated state associations and other regional and area organizations. NPPC's members include U.S. pork producers along with other industry stakeholders such as packers, processors, companies that serve the pork industry, and veterinarians. NPPC is the global voice of the U.S. pork industry. Its mission is to advocate on behalf of its members to establish reasonable federal legislation and regulations, develop revenue and export-market opportunities, and serve the interests of pork producers and other industry stakeholders. This includes advocating for free

6

market access for pork producers and opposing measures that restrict producers' market opportunities.

39.    Plaintiff American Farm Bureau Federation ("AFBF") is a voluntary membership organization formed by farm and ranch families in 1919.  Today, AFBF represents just under 6 million member families through Farm Bureau organizations in all 50 States plus Puerto Rico.  America's largest general farm organization, AFBF represents the people who grow and raise virtually every agricultural product in the United States.  AFBF seeks to promote the development of reasonable and lawful public policy for the benefit of farmers and consumers.  According to AFBF's mission statement: "We are farm and ranch families working together to build a sustainable future of safe and abundant food, fiber, and renewable fuel for our nation and the world."

40.    Defendant Karen Ross is sued in her official capacity as the Secretary of the California Department of Food and Agriculture ("CDFA"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

41.    Defendant Sonia Angell is sued in her official capacity as the Director of the California Department of Public Health ("CDPH"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

42.    Xavier Becerra is sued in his official capacity as the Attorney General of California.  The Attorney General's office is responsible for enforcing the provisions of Proposition 12 that make its violation a criminal offense.

## STANDING

43.    AFBF and NPPC bring this suit on behalf of themselves and their members.  They have each suffered and continue to suffer concrete and particularized injuries that are fairly traceable to Proposition 12.  Their injuries will

be redressed by a favorable decision. *See Organic Consumers Assoc. v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005 (N.D. Cal. 2018).

44.     As a result of Proposition 12, AFBF and NPPC have expended substantial resources to understand the obligations, requirements and impacts of Proposition 12, and then to explain to pork producer members the meaning and requirements of Proposition 12 and changes to farming practices that would be necessary to comply with Proposition 12.

45.     On NPPC's part, these efforts have entailed fielding inquiries from members regarding Proposition 12 and its expected impact on pork production and the supply chain, developing data sheets that summarize Proposition 12 into audience-friendly information, and holding and participating in meetings and teleconferences with members and industry-stakeholders. *See* Exh. A, Decl. D. Hockman, ¶¶ 21-24.

46.     NPPC personnel additionally fielded numerous questions from suppliers, packers, distributors, retailers, and food-service companies regarding the impact that Proposition 12 will have on the supply of pork product. *Id.*

47.     AFBF personnel have also hosted and participated in presentations, teleconferences, and other events for purposes of informing members and state Farm Bureau staff about what coming into compliance with Proposition 12 will require. *See* Exh. B, Decl. S. Bennett, ¶¶ 9-11.

48.     Both AFBF and NPPC submitted detailed comments to the CDFA on June 3, 2019, explaining how Proposition 12 will negatively impact the pork production industry and is unconstitutional. *See* Exh. A, Decl. D. Hockman, ¶ 22; Exh. B, Decl. S. Bennett, ¶ 11.

49.     Because of resources they have expended addressing Proposition 12, both AFBF and NPPC have diverted resources from pursuing other matters central to the organizations' missions. *See* Exh. A, Decl. D. Hockman, ¶ 30; Exh. B, Decl. S. Bennett, ¶ 12.

8

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

50.     On AFBF's part, this includes time and money that could have been spent advancing other issues critical to AFBF's mission to advance reasonable farm policy.  Exh. B, Decl. S. Bennett, ¶ 4.

51.     On NPPC's part, these diverted costs include time and resources that could have been spent pursuing NPPC's core mission of establishing reasonable industry regulation on a nationwide level.  Exh. A, Decl. D. Hockman, ¶ 20.

52.     Resources have also been diverted from NPPC's efforts on behalf of its members to address other important issues, including international trade and free access to markets.  *Id.* ¶ 30; Exh. C, Decl. H. Roth, ¶¶ 9-12.

53.     Both NPPC and AFBF anticipate that, as California implements Proposition 12, they will need to divert more resources and time from other core organizational priorities to assist members with understanding what is involved in coming into compliance (or not coming into compliance) with Proposition 12.  *See* Exh. A, Decl. D. Hockman, ¶ 28; Exh. B., Decl. S. Bennett, ¶ 13.

54.     These organizational injuries would be remedied by the relief sought in this action.

55.     In addition, both AFBF and NPPC have associational standing to challenge Proposition 12 on behalf of their members.

56.     One or more members of AFBF and NPPC have standing to bring this action in their own right.  Plaintiffs are submitting declarations from some of these members as exhibits, attached to this Complaint and incorporated herein by reference.  *See* Exh. D, Decl. G. Boerboom; Exh. E, Decl. P. Borgic; Exh. F, Decl. N. Deppe; Exh. G, Decl. M. Falslev; Exh. H, Decl. T. Floy; Exh. I, Decl. T. Hays; Exh. J, Decl. P. Jordan; Exh. K, Decl. C. Leman; Exh. L, Decl. G. Maher; Exh. C, Decl. H. Roth; Exh. M, Decl. R. Spronk; Exh. N, Decl. J. Hofer.

57.     Thousands of AFBF and NPPC pork producer members are directly subject to Proposition 12 because they breed or raise pigs that are or may be sold into California.  Almost all of these members are currently raising pigs that do not

9

1    meet Proposition 12's requirements and are suffering and will suffer imminent,

2    concrete and particularized injuries as a result of Proposition 12—either substantial

3    compliance costs or loss of a major market for their products.

4          58.    While all manner of hog farms across the country are harmed by

5    Proposition 12, from large-scale to small, independent farms, a sampling of

6    affected NPPC and AFBF pork producer members who have submitted

7    declarations in support of the Complaint includes the following:

8          a.  Mr. Greg Boerboom is a hog producer on his third-generation farm in

9              Southwest Minnesota. He has lived on that farm since he was born.

10              Mr. Boerboom now owns a total of 10,000 sows, from which he

11              produces around 320,000 market hogs annually. Some of his sows are

12              housed in group pens, and others in individual stalls. But, as a

13              consistent practice since 1988, Mr. Boerboom has always housed his

14              sows in individual stalls for at least seven days between weaning and

15              breeding. He noticed when he held his sows in group pens for these

16              seven days after weaning that they would fight and bite at each other,

17              resulting in rips and permanent damage to the sows' udders. Since

18              keeping sows in breeding stalls during this time, the productivity rate

19              on his farm has increased, and incidences of sow injuries have

20              decreased. Mr. Boerboom is one of the most successful hog

21              producers in the U.S. to operate under a group housing system, which

22              he manages through an incredible amount of hard work and an

23              expensive electronic feeding system developed by a Dutch company,

24              Nedap, that requires skilled labor and training to operate. Despite Mr.

25              Boerboom's great success in managing sows, his farming practices do

26              not comply with Proposition 12, because he does not provide each

27              sow 24 square feet, and he cannot not imagine moving his sows back

28              into a group pen directly after weaning, as Proposition 12 requires.

10

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   Nor does Mr. Boerboom comply with Proposition 12's requirements
2   as to gilts (young, unbred sows), because he follows the standard
3   industry practice of keeping gilts in individual stalls until they are first
4   bred at about seven months of age, which is past the six months
5   during which Proposition 12 allows use of stalls. Because Mr.
6   Boerboom will not comply with Proposition 12, his product will be
7   barred from the California market. *See* Exh. D, Decl. G. Boerboom.
8   b.  Mr. Phil Borgic is the owner of a family farm located in Nokomis,
9      Illinois. Mr. Borgic produces around 225,000 hogs annually and sells
10      his product under market contracts with Smithfield Foods
11      ("Smithfield") and JBS USA ("JBS"). Mr. Borgic houses his sows in
12      individual stalls throughout gestation because, based on his lifetime of
13      experience raising sows, he determined that individual stalls are best
14      for the welfare of his sows and the productivity of his farm. Mr.
15      Borgic's housing of gilts also does not comply with Proposition 12.
16      Compliance with Proposition 12 would be cost-prohibitive for Mr.
17      Borgic. It would require him either to spend around three million
18      dollars on construction costs expanding his facilities or to reduce his
19      sow herd by one-third, destroying his farm's productivity and
20      rendering him unable to meet delivery performance requirements in
21      his contracts with JBS and Smithfield. It would also result in worse
22      welfare outcomes for his sows, significantly lower sow productivity,
23      and increased labor costs. If Proposition 12 remains in place, Mr.
24      Borgic is concerned that the price he receives for his product will drop
25      because whole meat from his market hogs could not be sold into
26      California. Mr. Borgic also stands to lose his longstanding business
27      relationships with JBS and Smithfield, both of which sell into
28      California. *See* Exh. E, Decl. P. Borgic.

11

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

c. Mr. Nathan Deppe operates a farrow-to-finish hog farm in Washington, Missouri, that has been in his family for generations. He produces around 30,000 market hogs annually, which he then sells to JBS under a marketing contract. Mr. Deppe houses his sows in group pens that provide about 15 square feet per sow for most of gestation. Nevertheless, he also uses individual breeding stalls to help sows regain weight post weaning, to accomplish artificial insemination, and then to house the sows for an additional 28 days until he can confirm that his sows are pregnant before moving them back into the group pens. The changes required to comply with Proposition 12 are too costly for Mr. Deppe's business to survive. Mr. Deppe anticipates Proposition 12's restrictions would significantly damage productivity on his farm and negatively impact the welfare of his animals. Productivity losses, along with construction costs to convert his housing to provide 60% more space per sow to comply with Proposition 12, would be too high for him to bear. Because of Proposition 12, Mr. Deppe has lost the opportunity to sell his whole pork product into supply chains bound for the large California market. *See* Exh. F, Decl. N. Deppe.

d. Mr. Mike Falslev is an independent hog producer on his farm near Logan, Utah. Mr. Falslev's farm specializes in serving the predominantly Asian-American market for suckling pigs. To satisfy the demand primarily from Asian-American consumers in California, he sells about 600 pigs per week under a five-year contract to a packing plant located in California. Thus, essentially all of his product is bound for California. Currently, Mr. Falslev houses all of his sows in individual stalls until he confirms that they are pregnant. He keeps some of the sows in individual stalls throughout gestation,

12

but, after confirming that these sows are pregnant, moves others into a hoop barn where they are housed in a group. Changing these practices to comply with Proposition 12's housing requirements would lower productivity on Mr. Falslev's farm by requiring him to move his sows into the hoop barn directly after weaning. He would lose the ability to provide a peaceful environment for the sows to recover and regain weight from their previous litter, and instead be required to subject them to stress and fighting with other animals during the vulnerable time between insemination and before the embryo attaches to the uterine wall. This would seriously damage productivity and conception rates, because his pigs fight for feed and territory when moved into the group pen. It would also make Mr. Falslev's process for artificially inseminating sows much more difficult and increase his labor costs, because it is more difficult for him to care for the sows in the hoop barn. Compliance would also require Mr. Falslev to expend significant construction costs to construct a new barn with open space. Alternatively, constructing enough hoop barns to replace his lost production would cost Mr. Falslev almost as much, and would take up an enormous amount of land. Operating solely out of hoop barns rather than using individual breeding stalls would also significantly increase Mr. Falslev's operating costs. For example, the colder hoop barn requires straw bedding to provide warmth, and the straw bedding triples the amount of waste and manure that needs to be disposed of, requiring a great deal of additional labor. It also makes it much more difficult to maintain comfortable temperatures for his sows during the cold of winter and the heat of summer. If Mr. Falslev does not bear these significant costs, Proposition 12 will block Mr. Falslev's product from

13

the lucrative suckling pig market in California.  Proposition 12 leaves Mr. Falslev with no good alternatives.  *See* Exh. G, Decl. M. Falslev.

e.  Mr. Tom Floy has been an Iowa hog producer for the past 45 years. Mr. Floy produces 1,500 to 2,000 market hogs annually.  He sells his hogs exclusively to Tyson Foods ("Tyson"), which in turn sells the resulting product all over the country and the world.  Mr. Floy houses his sows in individual stalls that do not allow them to turn around. Compliance with Proposition 12 would require Mr. Floy to bear significant construction costs to provide his sows with around 40% more space.  Mr. Floy would need to expend significant time to select appropriate equipment and design and educate himself on how to manage the new sow housing system.  Mr. Floy also expects that compliance would significantly lower productivity on his farm and reduce the welfare of his sows.  After moving from open lots to individual stalls in 1994, Mr. Floy noticed that his sows experience fewer injuries and produce a greater number of parities (farrowings). Because of Proposition 12, Mr. Floy's product will be barred from the California market.  He is concerned that loss of access to the market harms the value of his product and will decrease its price.  *See* Exh. H, Decl. T. Floy.

f.  Mr. Todd Hays is a fifth-generation hog producer on a farrow-to-finish farm located in Monroe City, Missouri, who raises and finishes approximately 13,500 market hogs per year.  Pursuant to a two-year contract, Mr. Hays sells ninety percent of these hogs to Smithfield, which he has been in business with for the past ten years.  Mr. Hays houses his sows in individual stalls.  Mr. Hays anticipates that changing his sow housing practices to comply with Proposition 12 would increase sow mortality and lameness rates on his farm,

14

1   dramatically reduce his productivity rates, and require more labor and
2   personnel to operate his farm.  These productivity losses and the costs
3   of either constructing new Proposition 12-compliant facilities or
4   reducing his current sow population to provide the needed space per
5   sow are likely greater than his business could bear, because Mr. Hays
6   would not receive enough return to cover these large costs.  Because
7   of Proposition 12, Mr. Hays will lose the opportunity to sell his whole
8   pork product into supply chains bound for the large California market
9   and his business will become less attractive to suppliers who choose
10  to comply with Proposition 12.  *See* Exh. I, Decl. T. Hays.

g.  Mr. Phil Jordan is a hog producer on his family-owned farm in Ohio,
where he produces approximately 35,000 market hogs annually and is
looking to expand his operations.  Mr. Jordan sells his market hogs
primarily to JBS under a marketing agreement.  He holds the majority
of his sows in individual stalls, but is currently in the process of
converting his sow housing to a group pen system as required under
Ohio regulations by December 2025; however, those group pens will
not provide 24 square feet per sow.  In addition, as permitted by
Ohio's regulations, Mr. Jordan will continue to place all of his sows in
individual breeding stalls for the first thirty-five to forty days after
weaning until they are confirmed pregnant in order to maximize
embryonic welfare.  Mr. Jordan does not plan to comply with
Proposition 12, because he cannot imagine moving a sow directly
after weaning into a group pen in her weakened state rather than
protecting the sow in an individual stall and providing her with
enough feed to recover from weaning.  Further, coming into
compliance with Proposition 12 would require Mr. Jordan to
significantly downsize his herd or incur steep construction costs to

15

expand his sow housing.  It would be very difficult for Mr. Jordan to change his plans to come into compliance with Ohio's regulations by December 2025 to also come into compliance with California's more restrictive regulations at the earlier date of December 31, 2021.  Because of Proposition 12, Mr. Jordan will lose the opportunity to sell his whole pork product into supply chains bound for the California market.  *See* Exh. J, Decl. P. Jordan.

h. Mr. Chad Leman is a third-generation hog producer in Woodford County, Illinois. He produces between 90,000 and 100,000 market hogs annually, which he sells under contracts with Tyson and JBS.  Mr. Leman houses two-thirds of his sows in group pens that provide about 19 square feet per sow.  These sows are held in farrowing rooms to give birth and wean piglets, and then in individual stalls for approximately thirty-five days after weaning until they are confirmed pregnant, when they are moved into group housing.  Mr. Leman houses the remaining one-third of his sows in individual stalls.  It would be cost-prohibitive for Mr. Leman to convert his individual sow housing to group housing or to remodel his existing group pen to provide 24 square feet per sow, while maintaining the same number of sows.  Because the sows fight each other in the pens and it is more difficult for him to provide care and feed sows according to their needs in the pen, Mr. Leman expects complying with Proposition 12 would be disastrous for productivity on his farm and harmful to sow welfare.  Moving sows into the group pens during the vulnerable time directly after weaning would lower conception rates and result in sow injuries.  Because he cannot convert to Proposition 12, Mr. Leman stands to lose business with suppliers because his whole pork product is barred from the large California market.  He is concerned that

16

1   activist measures such as Proposition 12 will drive him out of the

2   industry.  *See* Exh. K, Decl. C. Leman.

3       i.   Mr. Greg Maher, a hog producer on his small family farm outside of

4            Monroe City, Missouri, produces around 52,000 pigs annually.  He

5            sells many of his pigs to Smithfield, which sells pork in all 50 states,

6            including California.  Mr. Maher converted his sow housing five or

7            six years ago from individual stalls to group pens that provide 16

8            square feet per sow.  As a result of this change, his sow mortality rate

9            skyrocketed and his costs of production increased under the group pen

10           system.  For these reasons, Mr. Maher would like to move back to

11           housing all of his sows in individual stalls as soon as possible.  He

12           now holds only about 40% of his sows in the group pen, and the

13           remaining sows in individual stalls.  For all sows, Mr. Maher makes

14           use of breeding stalls until he confirms that the sow is pregnant in

15           order to allow the embryo to attach before she is moved back into the

16           group pen, where fights between sows risk pregnancy loss.  If

17           required to bear construction costs and productivity losses to comply

18           with Proposition 12, Mr. Maher may have to exit the hog production

19           business.  *See* Exh. L, Decl. G. Maher.

20       j.  Mr. Howard "A.V." Roth is a fifth-generation producer who produces

21           hogs on his family farm located in Crawford County, Wisconsin.  Mr.

22           Roth's farm produces approximately 72,000 weaned pigs annually.

23           While Mr. Roth previously used a group pen, he now houses his sows

24           in individual stalls that provide about 15 square feet per sow.  After he

25           moved from group pens to individual stalls, Mr. Roth's sows

26           experienced far fewer injuries and were much easier to manage.  His

27           average litter size also increased from 9.2 to 10.2 piglets per litter.  If

28           required to comply with Proposition 12, Mr. Roth expects that he

17

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    would have to pull out of the hog production business, because it
2    would no longer be sustainable for him.  If Mr. Roth moved his sows
3    back to a group pen and eliminated the use of breeding stalls for the
4    first 30 days after breeding as Proposition 12 requires, Mr. Roth
5    expects his productivity rates would plummet.  Mr. Roth would also
6    bear increased labor costs to run his farm, and significant initial
7    construction costs to convert his sow housing.  Because of Proposition
8    12, Mr. Roth's whole pork product will be barred from sale in the
9    California marketplace.  *See* Exh. C, Decl. H. Roth.

10   k.  Mr. Randy Spronk is a third-generation Minnesota farmer and hog
11       producer.  Working with his brother, Mr. Spronk produces around
12       250,000 market hogs annually, mostly under contracts with JBS and
13       Tyson.  He also sells a great deal of his product to Hormel.  While he
14       previously held his sows in group pens, Mr. Spronk was heartsick
15       watching smaller sows get picked on by the dominant animals, and
16       now houses his sows in individual stalls.  Mr. Spronk does not plan to
17       comply with Proposition 12 because Proposition 12's housing
18       requirements would compromise the welfare of his animals, cause
19       productivity rates on his farm to drop, and increase his production
20       costs.  Compliance would also require him to undergo costly
21       construction.  At some of his barns, there would not be enough space
22       for him to expand sow housing to comply with Proposition 12.  Mr.
23       Spronk does not believe that any increased price for Proposition-12
24       compliant pork in California would recoup his increased production
25       costs, because cuts of pork from his market hogs are shipped to many
26       different end users, most of whom would not value Proposition-12
27       compliant pork.  Because of Proposition 12, Mr. Spronk's product is

28

18

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

barred from the California market. Mr. Spronk is concerned about losing business as a result. *See* Exh. M, Decl. R. Spronk.

l. Mr. Joe Hofer is President and Senior Minister of a Hutterite colony. He speaks on behalf of the roughly 30 pork-producing Hutterite colonies located in Montana, most of which rely on hog production as a major source of income. Much of the pork product that comes from the colonies' hogs is shipped into the State of California. Mr. Hofer's colony, along with eight others, contracts regularly to sell pork to a packer who has demanded that the colonies comply with Proposition 12 for *all* of the product that they provide to it. This is despite the fact that this packer only sells an estimated one-third of the product it receives from these communities into California. If the colonies do not comply, it will disrupt their business relationship with this packer. Because most of the colonies house sows in individual gestation stalls, changing their practices to comply with Proposition 12 would be incredibly costly. The majority of the colonies would need to reduce their sow populations by 20%. The colonies would also need to purchase 20% more replacement gilts to replace sows that are injured in fights between sows held in group housing. The colonies stand to incur substantial costs if required to comply with Proposition 12. If they do not comply, they stand to lose a longstanding business relationship. *See* Exh. N, Decl. J. Hofer.

59. These farmers' experiences exhibit a common theme: Proposition 12 damages producers whose product is or may be sold into California, regardless of whether they choose to comply with Proposition 12 or not.

60. To come into compliance with Proposition 12's stand-up turn-around requirements, along with its 24 square foot per sow requirement, members of NPPC and AFBF who operate sow farms would be forced to immediately expend

19

substantial capital costs to build new group housing that provides 24 square feet per sow, or to retrofit existing barns to provide sows with 24 square feet of space each. *See* Exh. E, Decl. P. Borgic, ¶¶ 27-31; Exh. C, Decl. H. Roth, ¶ 26; Exh. J, Decl. P. Jordan, ¶ 14; Exh. K, Decl. C. Leman, ¶ 12; Exh. H, Decl. T. Floy, ¶¶ 24-25.

61.     One producer, Mr. Borgic, estimates that construction costs to comply with Proposition 12 for his herd of 10,000 sows would reach around three million dollars.  Exh. E, Decl. P. Borgic, ¶ 28.

62.     Another farmer, Mr. Maher, also estimates steep construction costs, as he previously spent a million-and-a-half dollars building a group pen with space for 16 square feet per sow.  Exh. L, Decl. G. Maher, ¶ 17.

63.     Exacerbating these costs, sow housing is a decades-long investment. To reconstruct an existing barn is to waste a significant part of that investment. *See* Exh. M, Decl. R. Spronk, ¶ 18.

64.     Cheaper alternatives, such as constructing a hoop barn that would consist of a concrete floor and a tarp, expose sows to extremely cold weather and cold-related injuries and lack cooling measures to maintain comfortable temperatures in summer.  Exh. G, Decl. M. Falslev, ¶ 34.  Hoop barns are also less efficient, require more labor, and are more expensive to operate. *Id.*

65.     In addition, because they are colder, hoop barns require a great deal of straw bedding and external heating to provide warmth.  Conventional barns, with greater numbers of animals in closer proximity to each other, are warmer and do not require this bedding.  The more bedding provided for warmth, the more manure stacks up, increasing the amount of waste and manure the farm needs to dispose of and spiking labor costs.  Exh. G, Decl. M. Falslev, ¶¶ 32, 34.

66.     In addition to direct construction costs, producers would be required to obtain various permits and comply with state regulatory requirements.  Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 13.

20

67.     During any construction, many producers would need to depopulate their entire sow barn, which would grind production to a halt.  *See* Exh. K, Decl. C. Leman, ¶ 13.

68.     Producers' alternative would be to significantly reduce their production by removing sufficient sows from existing group housing so that each sow has 24 square feet of space.  Exh. J, Decl. P. Jordan, ¶ 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. I, Decl. T. Hays, ¶ 16.

69.     Removing sows from an existing group pen that provides 16 square feet per sow to allow 24 square feet per sow would reduce sow inventories (and increase average fixed costs) by an estimated 33%.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

70.     For farmers who do not employ group housing, going from 14-square-foot gestation stalls to 24 square feet of pen space per sow would drive an estimated 42% reduction in sow inventory and the same percentage increase of average fixed costs.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

71.     Members would face additional penalties by taking this route.  Many producers operate under years-long contracts with suppliers that obligate them to deliver a certain number of market hogs to each supplier at certain times.  If they miss a shipment, they would be in breach and potentially subject to monetary penalties.  Exh. E, Decl. P. Borgic, ¶ 31; Exh. J, Decl. P. Jordan, ¶ 16; Exh. K, Decl. C. Leman, ¶ 17.

72.     And whether they chose to drastically reduce their sow populations or to bear the exorbitant costs of constructing new sow housing facilities, Proposition 12 would also require farmers to substantially change their animal husbandry practices—methods of caring for sows that they have selected as best for the management of their farms and their animals based on decades of experience.  *See* Exh. I, Decl. T. Hays, ¶¶  8-9.

21

73. Proposition 12 effectively requires sows be held in group housing instead of individual stalls, as a sow would need more than 24 square feet to turn around in an individual stall without touching the sides of the enclosure.

74. These required changes would lower productivity on members' farms. Producers who must move sows from individual stalls and into group pens will experience lower productivity rates because sows in pens fight each other to establish dominance and access to food, leading to serious injuries and fatalities. *See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. C, Decl. H. Roth, ¶¶ 16-18; Exh. J, Decl. P. Jordan, ¶ 7; Exh. I, Decl. T. Hays, ¶¶ 9-11; Exh. F, Decl. N. Deppe, ¶ 18; Exh. K, Decl. C. Leman, ¶ 14; Exh. G, Decl. M. Falslev, ¶¶ 2, 24-25; Exh. N, Decl. J. Hofer, ¶ 27.

75. For example, one member noticed that the sow mortality rate on his farm "skyrocketed" after moving from individual stalls to a group pen. Exh. L, Decl. G. Maher, ¶ 9.

76. Producers also expect lower average litter sizes if required to house gestating sows in a group pen given the stress associated with these fights and lower level of care that sows often receive in a group, as opposed to individual, housing system. Exh. C, Decl. H. Roth, ¶ 21; Exh. F, Decl. N. Deppe, ¶ 19.

77. Even worse for productivity rates on farms, Proposition 12's restriction on the use of breeding stalls would require producers to move sows into a group pen before pregnancy is confirmed.

78. As a practice, almost all producers use breeding stalls to artificially inseminate sows and hold them individually at least through the confirmation of pregnancy. To move the sows prior to the confirmation of pregnancy would increase the risk of pregnancy loss. Exh. C, Decl. H. Roth, ¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

79.    Keeping a sow within an individual stall for at least the first five to seven days after breeding is critical to allow the embryos to attach.  Exh. C, Decl. H.  Roth, ¶ 22; Exh. K, Decl. C. Leman, ¶ 16.

80.    And keeping a sow in an individual stall for the first 30 to 40 or so days after weaning and through the confirmation of the next pregnancy guards against the high risk of loss of pregnancy caused by fights.  Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶ 14; *See* Exh. M, Decl. R. Spronk, ¶ 11.

81.    It also allows sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized feed at a time when they are vulnerable.  Exh. J, Decl. P. Jordan, ¶ 12; Exh. F, Decl. N. Deppe, ¶ 16-17.

82.    It is also dangerous to the herd to move sows back into a group pen prior to confirmation of pregnancy.  When sows in heat are returned to a group pen, they may fight or injure other sows by trying to mount or ride them.  Exh. E, Decl. P. Borgic, ¶¶ 20-21.

83.    Because of additional sow injuries and deaths and lower productivity on farms as a result of these requirements, compliance with Proposition 12 would require members to breed additional replacement gilts or sows each year.  Exh. E, Decl. P. Borgic, ¶ 24.

84.    These changes would further disrupt farm management practices, and increase production costs.  Exh. C, Decl. H. Roth,  ¶15; Exh. J, Decl. P. Jordan, ¶¶ 11-12; Exh. I, Decl. T. Hays, ¶¶  13-14; Exh. K, Decl. C. Leman, ¶¶ 14-15; Exh. E, Decl. P. Borgic, ¶¶ 10-17; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 31-32.

85.    Many producers carefully provide each sow with the right amount of feed to achieve the appropriate body condition, which is difficult in a group housing system and especially critical shortly after weaning.  Exh. J, Decl. P. Jordan, ¶ 12.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

86.     While some producers with a group pen utilize an electronic feeding system to provide individualized feed to each sow, these systems are difficult to manage and cost-prohibitive for smaller producers.  *See, e.g.*, Exh. J, Decl. P. Jordan, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12; Exh. D, Decl. G. Boerboom, ¶ 37.

87.     It is also more difficult to provide individualized care to sows when they are housed in a group, including providing immunizations, monitoring sows' feed intake, and noticing when sows require medical care.  *See* Exh. I, Decl. T. Hays, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12;  Exh. M, Decl. R. Spronk, ¶ 14; Exh. H, Decl. T. Floy, ¶¶ 19.

88.     Housing sows in a group also requires complicated grouping of sows based on their sizes and personalities.  Exh. L, Decl. G. Maher, ¶ 12.

89.     Because of the more labor-intensive nature of group pens, some members would have to hire additional farm hands.  Exh. C, Decl. H. Roth,  ¶ 23; Exh. I, Decl. T. Hays, ¶ 13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

90.     Housing sows in a group pen also raises worker safety issues, given the large size of the animals and the need for farm hands to enter the pens with 400 pound animals.  *See* Exh. I, Decl. T. Hays, ¶ 11; Exh. M, Decl. R. Spronk, ¶ 15.

91.     Producers carefully manage gilts—young sows that have not yet been bred—to allow them to develop into healthy breeding sows.  Proposition 12 allows gilts to be housed in individual stalls or in group pens in which they have less than 24 square feet of space per gilt until six months of age (or until they are bred, if that is earlier).

92.     But gilts are not usually bred until about seven months of age.  Exh. D, Decl. G. Boerboom, ¶ 27.  A sow farm seeking to comply with Proposition 12 would therefore need to change the way it handles not only its breeding sows, but also its gilts, and would need to ensure that all its replacement sows were Proposition 12 compliant—contrary to current industry practice—during the month

24

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

or so before first breeding.  Entire herds will have to be replaced from Proposition 12 compliant gilts.  *See* Exh. E, Decl. P. Borgic, ¶ 25; Exh. D, Decl. G. Boerboom, ¶¶ 26-32.

93.    Some compliance methods will be impossible to achieve for farm-specific reasons (*e.g.*, lack of space or permits to build or retrofit barns).  *See* Exh. M, Decl. R. Spronk, ¶ 16.

94.    And for some farmers, the expense of conforming to Proposition 12 will be cost-prohibitive.  Many producers would no longer be able to operate if required to comply with Proposition 12.  *See* Exh. C, Decl. H. Roth, ¶ 28; Exh. F, Decl. N. Deppe, ¶ 22; Exh. K, Decl. C. Leman, ¶¶ 12; Exh. L, Decl. G. Maher, ¶ 17.

95.    This is due to the costs they would expend converting to comply with Proposition 12, reduced productivity on their farms, and increased labor costs as a result of Proposition 12.  *See* Exh. I, Decl. T. Hays, ¶ 17; *see also* Exh. F, Decl. N. Deppe, ¶ 22 (expressing uncertainty as to whether his farm could remain economically viable).

96.    Pork producer members are also concerned that any increased price of pork in California would not offset their increased costs of production from compliance with Proposition 12.  This is because pork product from one hog is cut into primals, meaning different cuts of meat, and then shipped to many different end users across the country and sometimes internationally.  There is no expectation that customers outside of California would see any value in Proposition-12 compliant pork.  But Proposition 12 dictates changes that increase the costs of production for the entire pig, resulting in higher-cost products that are not of higher value to most consumers.  *See* Exh. M, Decl. R. Spronk, ¶ 19.

97.    If producer members do not come into compliance with Proposition 12, they will lose direct access to the California market and stand imminently to lose business with packers that are supplying the California market.  *See* Exh, N,

25

Decl. J. Hofer, ¶ at 19; Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. F, Decl. N. Deppe, ¶ 21-22; ; Exh. K, Decl. C. Leman, ¶ 18; Exh. M, Decl. R. Spronk, ¶ 17; Exh. H, Decl. T. Floy, ¶ 33.

98. Some AFBF and NPPC members have already received letters from customers with which they have supply contracts explaining that they expect their suppliers to comply with Proposition 12. *See* Exh. A-1, Decl. D. Hockman, (Performance Group Food notice). These producers stand to lose business relationships.

99. Plaintiffs' members who sell pork into California are also subject to an imminent risk of an enforcement action. The compliance date for Proposition 12's stand-up, turn-around requirement as applied to out-of-state producers is unclear. Thus, members who sell pork into California and who are not in compliance with this mandate are exposed to potential enforcement suits.

100. Some producers have already received letters from animal welfare activists explaining that the activists are aware that most of the pork industry is not in compliance with Proposition 12 and that the activists are committed to ensuring that they comply with Proposition 12. *See* Exh. A, Decl. of D. Hockman, ¶¶ 12-15.

101. Other members have been notified that "every US retailer chain has been notified" about Proposition 12 and that the activists "are going to vigilantly ensure that [Proposition 12's requirements] are followed." *See* Exh. A-3, Decl. of D. Hockman.

102. Plaintiffs' members involved in every segment of the pork production industry face imminent injury from Proposition 12, because its requirements have a dramatic, negative impact on pork production and the pork supply chain as a whole. It steeply increases producers' production costs, some of which will be passed along each segment of the supply chain. And producers who do not comply will need to adjust their businesses to avoid placing pork into a supply chain that does or may result in sales to California.

26

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

103.   NPPC and AFBF members who operate farms at any stage of the complex pork production process—for example as piglet nurseries, gilt farms, sow farms, or finishing farms, and the packers who purchase hogs that originated from them—face concrete, imminent injury caused by Proposition 12.

104.   Operations will need to change dramatically for any producer whose product eventually reaches California, and new, difficult tracing methods will be necessary to determine which products do so.

105.   Because of steeper costs, pork products will become more expensive at every step of production and distribution and for the consumer.

106.   And because the industry is not currently capable of supplying enough Proposition 12 compliant pork to California to meet California's demand, pork suppliers stand to lose business and face serious product availability issues, at least in the short term.

107.   These imminent injuries will be redressed by the injunctive and declaratory relief sought in this action.

108.   The interests that NPPC and AFBF seek to protect in this action are germane to the purposes of the organizations.  As organizations that advocate for the economic interests of pork producers nationwide, California's regulation of pork production practices and of the interstate market for pork, as well as its interference with farm management practices, is of vital concern to AFBF and NPPC.

109.   Neither the nature of the claims nor the forms of relief sought in this action require the participation by the Plaintiff associations' individual members.  Plaintiffs' facial challenge to Proposition 12 does not require individualized proof and Plaintiffs seek prospective relief.  *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

# FACTUAL BACKGROUND

## I. PORK PRODUCTION IN THE U.S.

### A. The U.S. Pork Market

110.   Pork production in the U.S. is an industry that is vital to the agricultural economy and the Nation's overall economy.

111.   In the U.S., approximately 65,000 pork producers market around 125 million hogs per year at a total gross income of around $26 billion annually.

112.   Iowa alone contains nearly 6,000 hog farms.

113.   Other top producing states include North Carolina, Minnesota, Illinois, Indiana, Missouri, Ohio, and Utah.

114.   Pork products include fresh products such as whole cuts, pork chops, ribs, or butts, among many others; processed meat such as sausages; further processed, ready-to-eat items such as smoked and cured products; and cooked items.

115.   Breeding pigs, referred to as "sows," produce market hogs.

116.   Market hogs are raised until they are sent to market, while sows are kept on the farm for the purpose of breeding more market hogs.

117.   Typically, a sow will bear about six parities, or litters, and then be culled, meaning removed from the sow farm and sold.

118.   Only a small amount of product from sows themselves enters the market: About 125 million head of market hogs are slaughtered per year as opposed to just 2 million head of sows.

119.   Almost all sow meat goes into sausage manufacturing, a processed product not subject to Proposition 12.

### B. Pork Producers And The Pork Supply Chain

120.   Pork producers include vertically integrated companies, that is, they own breeding farms, raise gilts to breeding age, raise hogs to market weight in nursery and finishing facilities, slaughter hogs, and process and distribute pork.

28

121. Producers also include individual farmers who own facilities at one or more but not at all of these stages of production.

122. For example, some producers own only breeding farms and sell all or most of their sows' offspring to feeder nursery or finisher farms.

123. And some packers are vertically integrated while others purchase most of the pigs they slaughter from independent finishers.

124. Packers operate slaughterhouses and then sell pork product to wholesale or large retail customers who distribute pork to consumers.

125. Packers may obtain some of their supply of hogs from affiliated producers. They may obtain other hogs from family farms or other independent producers.

126. Many pork producers enter into supply agreements with packers, some of which are multi-year contracts, such that very little pork product in the U.S. is sold on the open market. Producers who contract with packers do not sell directly to wholesalers or consumers.

127. The number of steps before a product reaches a consumer or business depends on the ultimate purchaser and the amount that a product is processed. Downstream supply chain participants include processors, brokers, distributors, warehouses, retailers, foodservice operators, and other actors.

128. Pork is a particularly difficult product to trace throughout the supply chain because of the multiple and segmented steps in the production process.

129. Because the U.S. Department of Agriculture's Food Safety and Inspection Service already inspects pork meat for wholesomeness, the industry does not closely track production details for the vast majority of commodity pork products.

130. The origin of a market hog is not always clear upon its arrival at packer slaughter facilities. The animals are segmented for slaughter based on a producer's identity, so hogs that were born and raised on a single farm generally

29

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

can be traced back to their producers. But the origin of a hog is often unclear if it is purchased from a producer that only finishes market hogs, and who in turn had purchased the hog after weaning from a different farm. And while some hogs are purchased from known producers under longstanding contracts, others are bought on the spot market directly at the packing plant.

131. The housing conditions of the sow from which a market pig came are even more uncertain to packers. Sow farms often have different barns with different conditions. And a gilt may have been purchased rather than bred by the sow farm, making the determination of a sow's housing conditions throughout the period it was subject to Proposition 12 even more difficult.

132. After pork comes out of a packing house, it becomes very difficult to ascertain where pork product came from. This is because, when pork product leaves a slaughter facility and enters processing, it is often cut into many parts and combined with product from pigs raised by different producers.

133. It is especially difficult to determine the origin of pork products that are not whole but undergo further processing, such as sausages. These products run through multiple "touch points" such that tracing the original farm where a product originated becomes extremely difficult.

134. To determine if pork product is Proposition 12 compliant, the entire product line would need to be segregated.

135. This burden to segregate product will fall on farmers at every stage of pork production as well as packers.

**C. The Steps Involved In The Production Of Pork**

136. Pork production in the U.S. is complex and driven by herd health and efficiency considerations.

137. Throughout the production process, pigs are carefully grouped to form herds with similar health status. This minimizes the need for treatment with

30

vaccines or antibiotics. Producers also keep pigs in groups of the same age and with a similar diet.

138.   For herd health reasons as well as economies of scale, the production process is segmented.  This means that most farms hold pigs at a specific phase or phases in the production process, and they are moved between farms as they develop.

139.   Breeding farms contain sows, female pigs that produce piglets.

140.   Farms strive to locate sow breeding farms in isolated areas with low concentrations of pigs.  Their remote location is a biosecurity measure to protect sow herds from disease.  Biosecurity is a set of preventive measures to help avoid the transmission of infectious diseases in livestock.

141.   Sows deliver piglets in farrowing stalls on breeding farms.

142.   After being weaned at about 21 days in the farrowing stall, piglets are moved away to nursery farms in a separate location.  These locations are often removed from breeding farms for biosecurity and other concerns.

143.   Piglets are kept in nursery farms until they weigh approximately 50 pounds at about 6-8 weeks, at which point they are referred to as "feeder pigs" and are transferred to separate finishing facilities.

144.   Pigs spend 16-17 weeks at a finishing farm, where they develop and gain weight before being sent to markets and packers, where they are slaughtered.

145.   A small percentage of farms are structured as "wean to finish," meaning that pigs are held at the same farm rather than transferred between farms as they develop throughout the production process.

**D. Sow Housing At Breeding Farms**

146.   A breeding farm houses sows that are bred, usually by artificial insemination, to produce piglets.

147.   Determining how to house sows is a critical farm management decision.

31

148.   Sow housing affects the ability of farm management to provide appropriate care to sows, maintain sow and herd health, and appropriately sequence sows through farrowing stalls where they give birth, and it is critical to farm productivity.

149.   Thus, at breeding farms, many production and animal welfare considerations go into determining how to house sows.

150.   Most types of sow housing fit into one of two categories: individual or group housing.

151.   Individual stall housing is the most common housing method in the industry.  Individual stalls may be referred to as "breeding stalls," meaning individual stalls where a single sow is held after weaning piglets until confirmation of another pregnancy, or as "gestation stalls," meaning individual stalls where a single sow is held after confirmation of pregnancy.

152.   Individual stalls typically provide around 14 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

153.   Individual stalls serve important animal health and efficiency purposes, because when using breeding and gestation stalls, it is easier to feed, treat, and observe sows.

154.   Throughout breeding and gestation, producers typically confine sows to these individual stalls.

155.   The stalls prevent a sow from turning around, such that a pig is fed only at one end of the stall and defecates only at the other end.  This prevents the sow from eating feces.

156.   The stalls allow the sow individual access to critical resources, including water and feed, without competition from other sows.

157.   And they facilitate nutrition tailored to the needs of the individual sow to recover peacefully from the stress and strain of delivering and nursing their previous litter and allow the sows to regain body weight and prepare to be re-bred.

32

158.   Individual stalls also provide a sow with easy access to veterinary care.

159.   They further protect sows from aggression and injury from other sows.

160.   Consumer demands from purchasers of pork to increase space for sows during gestation has led roughly 28% of the industry to convert from individual gestation stalls to group housing.

161.   Group housing for sows is defined as a housing environment for more than one sow in which the sow has the ability to lie down and stand up and to turn around unimpeded.

162.   Group housing generally provides around 16 to 18 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

163.   Many variables can negatively impact sow welfare and productivity when they are held in groups rather than individual stalls.

164.   It is more difficult for producers to identify and remove sick sows for medical care in group housing, and to ensure that each sow receives appropriate nutrition tailored to its individual needs to achieve and maintain a healthy body condition.

165.   Group housing systems increase the chance that a sow will be injured from aggressive interactions with other sows.  Anytime a new group of sows is formed, there will be significant stress and injuries, because the sows will fight to establish their social order in group housing.

166.   Sows also compete for feed in group housing, which risks dominant sows becoming overweight and subordinate sows becoming underweight.

167.   The welfare of sows held in group housing depends more heavily than that of sows held individually on the care and skill of the producers who tend to them.

33

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

168. Farm management using group housing must make a variety of decisions to attempt to alleviate this aggression among sows and to ensure that sows receive appropriate nutrition.

169. This requires flexibility in housing type and design to appropriately care for and ensure the productivity of sows held in group pens.

170. As an example, producers select peer groups of sows based on both the size of their operation and how sows will fit into farrowing room sequencing when they give birth and nurse piglets.

171. The size of the group may range from five to more than 100 sows per pen.

172. Producers must also consider whether the group-housed sow population will be dynamic, meaning that different sows will be regularly added or removed from the group to retain stocking levels in pens, or static, meaning that the same group of sows will be kept together.

173. Another factor managers consider is the feeding system employed. The choice of feeding method is critical in group housing because the producer is not able to tailor the nutrition provided to each sow as with individual stalls. The system employed can also influence the level of aggression and competition between sows for feed. The appropriate feeding system will be influenced by the size and make-up of the group, as well as the size of the pen.

174. Feeding practices range from floor feeding, meaning that feed is simply dropped on the floor at one time; feeding in free access stalls, which allow sows to enter stalls that close behind them to eat individually; electronic sow feeding systems, which can be employed in larger pens where sows are directed to eat and given an individualized ration based on a tag on the sow's ear; and "trickle" feeding, meaning that feed is slowly released into feeding sites.

34

175.   The type of flooring used is another decision that can impact hygiene and sow injuries.  While solid flooring with bedding can increase sow comfort, slatted flooring to clear away manure can improve hygiene.

176.   Another housing permutation is whether to provide free access stalls within the group housing.  When a sow voluntarily enters a free access stall, the stall will close behind the sow and prevent other sows from entering.  The sow within the free access stall cannot turn around, but it can voluntarily leave the stall by backing out.

177.   All of these factors will impact sows' ability to avoid aggressive encounters that could result in injury and reduce farm productivity.

178.   Producers require flexibility in housing design to make these decisions.

179.   The "best" housing design, including space per sow, will depend on the interplay between each of the above factors as well as producer experience and preferences.

180.   Housing features that work well for one producer may fail to secure sow welfare and negatively impact sow productivity in a different setting.

**E. The Importance Of Individual Stalls During Breeding And Gestation**

181.   The overwhelmingly vast majority of producers, even if they use group housing at other stages, hold sows in individual breeding stalls for approximately 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, it is bred, and pregnancy is confirmed.

182.   After weaning piglets for about 21 days, a sow will generally enter estrus five to seven days later.

183.   Once a producer confirms that a sow has entered estrus, the sow will be bred, typically by artificial insemination.

184.   Pregnancy is confirmed around 21 days later.

35

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

185. The use of breeding stalls for around 30 to 40 days after weaning is a widely accepted industry practice that is endorsed by veterinarians.

186. It is also critical to managing sows for breeding and productivity.

187. Breeding stalls assist producers with detecting when a sow is in estrus to determine when it is time to breed the sow.

188. Commonly, producers will expose sows to a boar to assist with estrus detection by walking a boar along the side of the pen or stalls.

189. It is much more difficult to ensure that each sow is adequately exposed to the boar in order to detect estrus in a group pen setting as compared to individual stalls.

190. Additionally, the separation of sows into individual stalls during estrus reduces the risk of injuries to sows and to human caretakers.

191. A sow's normal behavior during this time period is to attempt to mount or ride other sows, which can place farm workers at great risk of injury. Thus, keeping sows in group settings during this time presents safety concerns.

192. Use of breeding stalls after implantation and prior to confirmation of pregnancy ensures that the embryo properly attaches.

193. It also guards against the risk of the loss of pregnancy or a drop in litter size due to the stress of socialization in the group setting, as well as the risk of aggression from other sows.

194. Sows in stalls do not face the risk of aggression or jostling that occurs in group settings.

195. Sows placed immediately in a group housing setting after weaning have lower conception rates.

196. Breeding stalls also assist producers in confirming that the sow is pregnant. It is challenging in a group-housing setting to detect whether a sow is pregnant. While producers can use ultrasound technology, the ability of the sow to move around in a pen complicates the confirmation of pregnancy. Even with

36

ultrasound technology, it is difficult to confirm pregnancy prior to 30 or 40 days after breeding.

197. Production management also benefits greatly from the ability to keep a sow in a stall until confirmed pregnant such that, if the sow does not conceive, it can be easily re-bred once it returns to estrus.

198. After pregnancy is confirmed, some pork producers transfer sows to group housing.

199. Of these sows, some will not adapt healthily to the group setting and will be moved back to an individual stall.

200. As a farm management decision, most producers elect to hold sows continually in breeding or gestation stalls throughout pregnancy rather than to move sows into group housing facilities after pregnancy is confirmed.

201. Although the first several weeks after breeding are most critical and present the highest risk of embryo mortality, stress from a group setting at any stage of the production process may result in a pregnancy loss.

202. Breeding stalls protect gestating sows from aggression that is common when sows are moved from stalls into a group housing setting.

203. When mixed into groups, sows experience increased levels of fighting, cortisol, lameness, and body and vulva lesions as compared to sows housed in stalls. These conditions directly erode animal health.

204. The worst parts of this aggression occur for the first several days while the sows establish their social order.

205. Producers report a higher rate of injuries and fatalities in group than in individual housing.

206. Breeding stalls also enable farm managers to provide each sow with the proper nutrition during gestation. Producers can better ensure that sows that lost weight during lactation or those that have excessive body weight receive the correct amount of feed when they are housed in individual stalls.

37

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

## II. PROPOSITION 12

### A. The History Of Proposition 12

207.   On November 6, 2018, California voters approved Proposition 12, a ballot initiative that amends the California Health and Safety Code with prescribed requirements for housing covered farm animals, including breeding pigs, calves raised for veal, and egg-laying hens.

208.   Proposition 12 was drafted and sponsored primarily by the HSUS as well as supported by various other animal rights activists.

209.   Proposition 12's requirements were driven by activists' conception of what qualifies as "cruel" animal housing, not by consumer purchasing decisions or scientifically based animal welfare standards.

210.   The Proposition states that its "purpose … is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness …."

211.   Proposition 12's requirements add to and amend those previously imposed by another ballot initiative, Proposition 2, titled *Standards for Confining Farm Animals*, which was also sponsored by the HSUS.

212.   Passed November 4, 2008, Proposition 2 imposed animal housing requirements *on California producers* based on activists' conception of ideal animal housing.

213.   Proposition 2 required that egg-laying hens, breeding pigs, and calves raised for veal *in California* must be housed in a manner that allows the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions.

214.   The effective date of Proposition 2 was January 1, 2015, over six years after Proposition 2 passed.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

215.   To come into compliance, Proposition 2 obligated California producers to undergo major, costly changes in their production practices that required millions of dollars' worth of investments in capital improvements to their animal housing facilities.

216.   Recognizing the economic impact Proposition 2 would impose on California producers and eager to level the playing field, the California legislature enacted Assembly Bill 1437 (AB 1437).

217.   AB 1437 exported Proposition 2's requirements to apply to all sales of eggs in California, even if the eggs were produced entirely outside of California. AB 1437 also had an effective date of January 1, 2015.

218.   AB 1437 did not apply to pork.

219.   AB 1437 was subject to legal challenge by six states as in violation of the Commerce Clause of the U.S. Constitution, but the lawsuit was dismissed for lack of *parens patriae* standing.

220.   Through Proposition 12, activists have now imposed even more stringent requirements for housing to an expanded range of farm animals, to the detriment of animal health and the success of small family farms.

221.   Proposition 12 redefines supposedly "cruel" animal confinement, dictating the amount of space and type of housing that producers must provide to breeding pigs, calves raised for veal, and egg-laying hens.

222.   This time, activists drafted the ballot initiative so as to require *all* producers to follow the requirements of Proposition 12 in order for their products to be sold in California, regardless of whether the product was produced inside or outside of California.

223.   Thus, their intent was to have Proposition 12 impose an extra-territorial effect on interstate commerce.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

224. Indeed, multiple statements confirm the activists' intent to reach out-of-state production through Proposition 12, as well as their awareness of Proposition 12's extraterritorial impact.

225. For example, in an editorial to support passage of Proposition 12 sponsored by a committee of HSUS, the activists explained that California does not have a sizable pork industry, and that the proposition would ban sales from other states not meeting California's standards. "Editorial: Vote Yes on Prop. 12 to Give Farm Animals a Cage-Free Life," *Mercury News* (September 4, 2018), https://perma.cc/45Y7-WVFX.

226. HSUS officials and other activists explained how Proposition 12 would have an out-of-state impact, forcing producers outside of California to meet its "historical" standards in order to reach the California market. *See, e.g.*, Charlotte Simmonds, "'History in the Making': California Aims for World's Highest Farm Animal Welfare Law", *The Guardian* (March 7, 2018), https://perma.cc/6RL3-99ZL (The vice-president of farm animals protection for HSUS claims that Proposition 12 "is history in the making"); Anna Keeve, "Farm Animal Rights Bill, Proposition 12: Everything You Need to Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-AHUZ, (Humane League activist states that Proposition 12 "has the potential to be the biggest legislative victory for animals in history, not just in the state but in the country."); *see also* Nicole Pallotta, "Wins for Animals in the 2018 Midterm Election", *Animal Legal Defense Fund* (January 5, 2019), https://perma.cc/J7T5-98XP (Proposition 12 is "being called the strongest law of its kind in the world").

227. Thus, as is the intent behind Proposition 12, producers outside of California who wish to sell in the California market must comply with Proposition 12.

228. A report regarding Proposition 12 prepared by the Legislative Analyst Office for the Attorney General for the State of California (LAO Report) also

40

recognized that Proposition 12 inevitably regulates extraterritorial conduct with regard to pork. The LAO Report explained that most of the pork that Californians purchase is produced in other states.

229. The LAO Report further anticipated that in response to Proposition 12, California farmers would stop or reduce their production, potentially causing a decrease of millions of dollars of state tax revenue that California collects annually.

230. In addition, the LAO Report explained that consumer prices for pork would likely increase as a result of Proposition 12.

231. The LAO Report explained that Proposition 12 will require many producers—including those "in California **and other states**" —to remodel existing housing or build new housing for animals to satisfy the new definition of "cruel" animal confinement.

232. Further, the LAO Report explained that it could take several years for producers to change their housing systems to come into compliance with Proposition 12. Demand for Proposition 12-compliant products in California would outpace supply.

233. The LAO Report also anticipated a $10 million cost to California annually in ensuring that products sold in California, whether produced in-state or out-of-state, comply with Proposition 12.

234. The LAO Report did not quantify the costs that Proposition 12 imposes outside of California.

235. Because Proposition 12 was a ballot initiative, it passed without legislative debate or legislative hearings to investigate the impact it would have on interstate commerce, on the pork industry, or on sow welfare.

236. Proposition 12 passed with approval of 62.66% of participating California voters.

41

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

## B. Proposition 12's Space Requirements As Applied To Breeding Pigs

237.  Proposition 12 prohibits "confining [breeding pigs] in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely."

238.  This means that a sow must be able to fully extend all of its limbs "without touching the side of an enclosure or another animal," and must be able to "tur[n] in a complete circle without any impediment, including a tether, and without touching the side of the enclosure or another animal."

239.  These requirements mean that meat from the offspring of sows housed in individual stalls may not be sold in California.

240.  Proposition 12 permits only narrow exclusions from this requirement that breeding pigs not be housed in individual stalls.  Individual stalls may be used:

  a.  for five days before a breeding pig is expected to give birth, and any day a pig is nursing piglets;

  b.  for animal husbandry purposes, limited to six hours in any 24 hours, and not more than 24 hours in any 30 days;

  c.  for "examination, testing, individual treatment, or operation for veterinary purposes";

  d.  for medical research; and

  e.  during transportation, during shows, during slaughter, at establishments where federal meat inspection takes place, and at live animal markets.

241.  These exclusions do not allow the housing of sows in individual breeding stalls to detect estrus or to ensure that a pig is pregnant and that the eggs have properly attached.

242.  They also do not allow a sow to recover peacefully from the strain of delivering and weaning her last litter of piglets, protected from fighting and competing against dominant and aggressive sows.

42

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

243.   Subject to the same narrow exceptions, Proposition 12 also prohibits, after December 31, 2021, "confining a breeding pig with less than 24 square feet of useable floor space per pig."  "Usable floor space" is defined as the total square footage of floor space divided by the number of animals in the enclosure.

### C. Proposition 12's Space Requirements As Applied To Gilts

244.   Proposition 12's requirements apply to breeding pigs, which it defines as "any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant."  Gilts which are not pregnant are therefore exempt until they are six months old.

245.   However, standard industry practice is not to breed gilts until they are about seven months old.

246.   Accordingly, gilts over six months old must be housed in compliance with Proposition 12.

247.   Virtually no gilts currently are housed that way.

248.   Many sow farms raise their own gilts.  Others buy their sows, or some sows, from gilt producers.

249.   In order to be Proposition 12 compliant, even a sow farm that complied with Proposition 12 for its breeding pigs would also need to ensure that all its sows were raised as gilts in compliance with Proposition 12.  And currently non-compliant herds would need to be entirely replaced using compliant gilts.

### D. The Scope Of Proposition 12

250.   Proposition 12's requirements apply to sales of covered products in California even if the product derives from a farm animal raised entirely outside of California.  Specifically, covered products from a breeding pig or from the offspring of a breeding pig cannot be sold in California if the breeding pig was ever confined in conditions that do not satisfy Proposition 12.

251.   This restriction covers business owners and operators who know or should know that covered product does not comply with Proposition 12.

43

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

252.   There is a defense to a violation of Proposition 12 if the seller proves that it did not know, and should not have known, that the product was from an animal that did not meet Proposition 12's confinement mandates, or if the seller proves that it relied in good faith upon certification "by the supplier" that the product was not from an animal confined in conditions that fail to meet Proposition 12's requirements.

253.   The products covered by Proposition 12 are uncooked, whole pork meat comprised entirely of pork intended for human consumption.

254.   "Whole pork meat" means any uncooked cut of pork that is comprised entirely of pork meat, or of pork meat with very basic additives, such as seasoning, curing agents, coloring, and preservatives.  Examples of covered products include "bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet."

255.   This definition "does not include combination food products" that consist of more than pork meat and such basic meat additives, such as "soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products."

256.   In the industry, a "processed" product generally refers to a product that is ready to eat and need not be cooked for food safety reasons.

257.   A covered sale is the commercial sale of a covered product in California, deemed to occur where the buyer takes physical possession of the item. It does not include sales that occur at facilities that are federally inspected pursuant to the Federal Meat Inspection Act.

258.   Because there is no exclusion for pork raised outside the country, Proposition 12 applies to foreign producers as well as the entire U.S. pork market.

**E. Implementation Of Proposition 12**

259.   A sale of pork in California that does not comply with Proposition 12 is a criminal offense that carries a penalty of up to a $1,000 fine or 180 days imprisonment.

44

260. A violation is also defined as "unfair competition" under the California Business & Professional Code § 17200. This definition subjects a seller to a civil action for damages or injunctive relief by any person injured in fact by the violation.

261. Proposition 12 charges the CDFA and the CDPH with jointly promulgating regulations to implement Proposition 12.

262. The CDFA is in the process of developing this regulatory framework. Proposition 12 required CDFA and CDPH to produce final regulations by September 1, 2019.

263. On April 2, 2019 the CDFA issued a Notice of a Request for Information.

264. CDFA explained that Proposition 12's implementing regulations may include "production facility registration, certification, verification audits or inspections, border station inspection, and a penalty matrix for violations including an appeal process."

265. On June 3, 2019, Plaintiffs AFBF and NPPC submitted comments in response to the CDFA's Request for Information. In these comments, the NPPC explained that the production of pork in the U.S. is driven by a complex industry that is vastly different from the egg and dairy industries.

266. Both Plaintiffs further explained that the arbitrary housing requirements in Proposition 12 have no connection to animal welfare, that the costs of compliance will force producers to choose between incurring untenable compliance costs or losing access to the California market, and that Proposition 12 violates the Commerce Clause.

267. As of the filing of this lawsuit, no regulations have been promulgated.

**F. The Proponents' Justifications For Proposition 12**

268. The purported justifications for the section of the California Health and Safety Code that Proposition 12 amends is to "prevent animal cruelty by

45

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California."

269.  The Proposition 12 Official Voter's Guide did not explain how Proposition 12 has anything to do with pork product safety.  And its discussion of animal cruelty with regard to pork production reflected a misunderstanding of industry practices.

270.  Proponents of Proposition 12 stated in the Voter Guide:  "Voting YES prevents . . . mother pigs . . . from being crammed inside tiny cages for their entire lives.  It will eliminate inhumane and unsafe products from these abused animals from the California marketplace.  Voting YES reduces the risk of people being sickened by food poisoning . . . ."

271.  In the Voter Guide proponents also stated:  "A mother pig shouldn't be locked in a tiny, metal cage where she can barely move.  She's trapped, forced to live in this small amount of space for *nearly four years.*"

272.  Proponents also stated in the Voter Guide:  "Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning."

273.  These proponent statements in support of Proposition 12 in the Voter Guide that concern breeding pigs are inaccurate. They arise from misconceptions about the industry and housing practices.

274.  The proponents did not explain why 24 square feet per sow are needed to prevent animal cruelty, or have anything to do with it.

275.  Their arguments relied on inaccurate depictions instead of prevailing industry standards of space provided per sow.

276.  They made no reference to the reasons for the use of breeding stalls, or the ways and periods in which breeding stalls are used.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

277.   And they did not explain or point to scientific studies that show how sow housing can affect public health when the pork sold to consumers comes almost exclusively from pigs raised and slaughtered in other facilities.

278.   The proponent statements in the Voter Guide are inaccurate, and fail to take into account the benefits to animal health of limiting group housing of sows.

## III. PROPOSITION 12 REGULATES WHOLLY OUT-OF-STATE CONDUCT

### A. Proposition 12 Requires Massive Changes In Pork Production Practices Nationwide

279.   A 24-square-foot-per-sow requirement and severe restriction on—indeed almost complete elimination of—the use of breeding stalls is entirely inconsistent with current industry best practices.

280.   While a handful of states have passed laws requiring that pregnant or gestating sows be confined in conditions that permit them to stand up, fully extend their limbs, and turn around, Proposition 12's ban on breeding stalls prior to pregnancy and its square-foot-per-sow requirement are singular in the U.S.

281.   Even more, these other state regulations that require stand-up turn-around have only imposed these requirements on in-state producers.  Only Massachusetts has passed a law that, once in effect, will similarly export its requirements to out-of-state producers.  That law was also passed via ballot proposition, and lacked any semblance of legislative investigation, debate, or deliberation.

282.   Agreed-upon industry standards developed in collaboration with veterinarians and other industry stakeholders recognize that a variety of housing systems can adequately provide for the welfare of sows and do not require one type of housing system, let alone set one prescriptive space-per-sow numerical requirement or end the use of breeding stalls.

47

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

283.   Compliance with Proposition 12 will require massive changes in production practices nationwide.

284.   Although approximately 28% of the U.S. market houses sows in group housing systems, only a miniscule portion meets all of the housing requirements prescribed by Proposition 12.  Exh. A, Decl. D. Hockman, ¶ 9.

285.   Of the approximately 28% of the market that uses group housing, those facilities generally house sows with anywhere from 16-18 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶ 11.

286.   Approximately 72% of U.S. pork producers house sows in individual stalls throughout gestation.  Exh. A, Decl. D. Hockman, ¶ 9.

287.   The overwhelmingly vast majority of producers typically use individual breeding stalls for the first 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, is bred, and pregnancy is confirmed.  Exh. A, Decl. D. Hockman, ¶ 9.

288.   None of these pork producers are in compliance with the stand-up turn-around requirements or the 24-square-foot-per-sow group housing space requirement of Proposition 12.

289.   Demonstrating the massive changes that Proposition 12 requires, almost the entire industry is out of compliance with Proposition 12.

**B. By Dictating Producers' Production Practices Outside Of California, Proposition 12 Disrupts The Interstate Pork Supply Chain**

290.   The inevitable effect of Proposition 12 is to regulate out-of-state production.

291.   Proposition 12 targets an industry whose production occurs almost entirely outside of California, in other states and countries.

292.   California's consumption of pork is hugely disproportionate to its production.  California consumes about 13% of the pork sold in the U.S.  But pork production inside California is minimal.  There are approximately 8,000 sows in

48

California, and only approximately 1,500 of those are in commercial production. Yet, California annually consumes the pork from approximately 673,000 sows.

293.   Accordingly, the inevitable effect of Proposition 12 is to project California's required methods of production into other states and countries that allow different methods of production, and to force costly and unwanted changes in production methods that producers believe are both inefficient and harmful to their sows.

294.   The extraterritorial reach of Proposition 12 is a substantial barrier to interstate commerce, which functions through a well-established and complex supply chain in which virtually no participant is Proposition 12 compliant.

295.   Proposition 12 will remove from the California market pork product derived from the offspring of sows whose producers provide for animal welfare but do not meet Proposition 12's prescriptions.

296.   Out-of-state producers must submit to California's mandated production methods or lose access to California's large market.

297.   In addition, because of the difficulty of tracing pork products back to sows and gilts housed in particular facilities, Proposition 12 disrupts the entire U.S. pork chain of supply.  Absent tracing individual cuts of whole pork product throughout that chain of supply back to particular sow facilities (indeed, particular sow housing), and segregation of any Proposition 12 compliant hogs and individual pork meat cuts at slaughter and processing facilities, it will be impossible to sell any commercially produced pork into California.

298.   As an alternative to tracing and segregation, producers will be forced to change their production practices for pork intended for other, non-California markets in order to make all of their production Proposition 12-compliant.

299.   End of chain suppliers who sell pork into California will likely force their pork suppliers to produce *all* product they provide to those suppliers in compliance with California's specifications, or to carefully segregate products.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

300. Furthermore, some buyers will require that all products they receive from suppliers meet the same specifications and therefore avoid the need to segregate products. *See, e.g.*, Exh. N, Decl. J. Hofer, ¶¶ 18-21 (explaining that a packer with whom nine Hutterite colonies contract demanded that the colonies meet California's specifications for all pork product they sell to it); Exh. A, Decl. D. Hockman, ¶¶ 16-19.

301. Thus, even sow farms developing all or most of their product primarily for sale outside of California will likely be required to meet Proposition 12's strictures in order to sell their products to packers who supply those customers.

302. Confirming the extraterritorial nature of Proposition 12, it is impossible to conceive how CDFA will ensure compliance with Proposition 12 unless it certifies facilities in other states through direct field verification audits or inspections by state employees or third party auditors. Indeed, CDFA explains on its webpage regarding the implementation of Proposition 12 that certification and verification audits are among the methods it is considering for policing compliance.

303. By imposing drastic changes in production on an industry that is national in scope, and in which whole cuts of pork are shipped around the country, Proposition 12 interferes with the functioning of $26 billion a year in interstate commerce.

304. By imposing drastic changes that regulate how producers house sows in other states, California is directly challenging the sovereignty of other states to regulate their own citizens' animal husbandry practices.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

# IV. PROPOSITION 12 IMPOSES AN EXCESSIVE BURDEN ON INTERSTATE COMMERCE

## A. Proposition 12 Imposes Substantial Costs On Out-of-State Producers

305.   The overwhelmingly vast majority of the market is not in compliance with Proposition 12.

306.   Producers who attempt to alter their practices to comply with Proposition 12 face severe and costly burdens.

307.   To come into compliance with Proposition 12, the minority of producers who currently use group sow housing will need to decrease their production by removing sows from barns until the 24 square foot requirement is met, retrofit barns to increase available group housing space, or build new group housing barns, all with no corresponding financial benefit.  Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 12; Exh. J, Decl. P. Jordan, ¶ 14.

308.   Farms with group housing currently provide around 16-18 square feet per sow.  These farms will need to reduce their sow inventories by 33% to come into compliance with Proposition 12.  *See* Exh. O, Decl. S. Meyer, ¶ 13.

309.   To comply with Proposition 12, producers who currently use individual sow housing will need to reduce their sow inventory by 42%, or build new or convert existing barns to group sow housing that provides 24 square feet per sow.  *See* Exh. O, Decl. S. Meyer, ¶¶ 13, 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. C, Decl. H. Roth, ¶ 26.

310.   In addition to the direct costs of renovation and reconstruction, the process will also require producers to shut down their existing farms while the farms are retrofitted.  *See, e.g.*, Exh. H, Decl. T. Floy, ¶ 28; Exh. K, Decl. C. Leman, ¶¶ 13.

311.   New construction costs will for some hog producers reach millions of dollars, and those costs will be in addition to any costs that some producers have already incurred in prior barn renovations transitioning to group housing.

312.    As an example, Smithfield, a vertically-integrated pork processor and hog producer, already spent $360 million over a ten-year period to convert from individual stall housing to group housing.  *See* Decl. of Robert Darrell, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18, 2019).  Smithfield estimates that retrofitting its barns to meet Proposition 12's 24–square-feet-per-sow requirement for all of its company-owned sows would in turn cost an additional $100 million in capital investments and increased operating costs.  *See* Decl. of Robert Darrell, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18, 2019).  Clemens, a vertically coordinated company that produces, processes, and distributes pork, estimates that restructuring its company-owned sow farms as well as those of its suppliers to comply with Proposition 12 would require a capital investment of over $45 million.  *See* Decl. Joshua Rennells, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-9 (C.D. Cal. Nov. 18, 2019).

313.    Smaller operations also face steep construction costs and have less ability to meet them.  Illinois hog producer Mr. Borgic estimates that construction costs to comply with Proposition 12 for his herd of 10,000 sows would reach around $3 million.  Exh. E, Decl. P. Borgic, ¶ 28.  Missouri hog producer Mr. Maher explains that he previously spent $1.5 million building a group pen with space for 16 square feet per sow.  Exh. L, Decl. G. Maher, ¶¶ 7,17.

314.    Some farms will not have the capital available to meet these costs.  *See* Exh. O, Decl. S. Meyer, ¶ 16.

315.    Permits to construct new or retrofit existing barns are difficult to obtain in many states and restricted by state regulation.  Available space for new facilities is also limited by zoning regulation, and often subject to significant construction or litigation delays.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

316.   Producers that elect to undergo these steep construction costs will need to secure financing, which will also likely require them to negotiate revised, long-term contracts with suppliers.  Exh. F, Decl. N. Deppe, ¶ 20.

317.   The timeline for producers to come into compliance with Proposition 12's spacing requirements is abbreviated and requires action now.  Exh. C, Decl. H. Roth, ¶ 10.

318.   Before beginning construction, producers will need to consult with equipment manufacturers and experts regarding how to design the group housing and select appropriate equipment and fixtures.  Exh. H, Decl. T. Floy, ¶¶ 26-33.

319.   Producers who intend to retrofit or build new barns to meet Proposition 12's 24-square-foot-per-sow requirement by the December 31, 2021 deadline would likely have needed to start planning and contracting for construction during 2019.

320.   By early 2020, pork producers who intend to construct new barns or retrofit their facilities will need to begin construction on new sow housing units.

321.   Thus, Plaintiffs' members must begin retrofitting or constructing new barns to come into compliance now, or be prepared to lose certain customers and access to the California market.  Exh. C, Decl. H. Roth, ¶ 10.

322.   Compliance with Proposition 12 will require entirely new and less efficient methods of animal husbandry that will increase operating, staff training, and veterinary costs.

323.   Proposition 12 significantly interferes with production by taking farm management practices out of the hands of the farmers who are most informed about animal care.  The impact of this intrusion will also jeopardize animal health (as previously explained), increase production costs, and decrease productivity. Exh. C, Decl. H. Roth, ¶¶ 15-26; Exh. J, Decl. P. Jordan, ¶¶ 12-14; Exh. I, Decl. T. Hays, ¶¶ 9-10, 14; Exh. K, Decl. C. Leman, ¶¶ 14-16; Exh. E, Decl. P. Borgic, ¶¶ 10-22; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 16-18.

53

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

324. Proposition 12 eliminates the use of breeding stalls on which the vast majority of producers rely for managing the breeding of sows based on generations of experience. Those farmers will need to completely change their methods of operation to accommodate sows in estrus and during breeding and early pregnancy in group housing, which will require changes in the sow population and/or in the physical plant.

325. Proposition 12 will also require virtually all farms to change the way they acquire or raise and first breed gilts.

326. In an expedited timeframe, Proposition 12 upends generations of animal husbandry, training, and knowledge.

327. It will be significantly more difficult for producers to oversee the production process with restricted breeding stall use.

328. It will be much more difficult for many producers to artificially inseminate their sows under the limited animal husbandry exceptions permitted under Proposition 12. *See* Exh. I, Decl. T. Hays, ¶¶ 9-10.

329. Sow productivity will drop and sow injuries will increase without farm management's ability to place sows in breeding stalls during estrus, implantation of the embryo, and confirmation of pregnancy. Exh. C, Decl. H. Roth, ¶¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

330. Producers will need to expend resources to provide additional training to stockpersons on how to properly care for gestating sows held in groups rather than individual stalls. Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

331. Stockpersons will need to be differently trained to recognize sows that require specific nutrition or care and remove them from a group housing setting, and to confirm more carefully when a sow is in estrus or whether a sow is pregnant. Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33; Exh. G, Decl. M. Falslev, ¶ 29.

54

332. Proposition 12 forces farmers to utilize group housing even when their animal care, staff knowledge, and farm management practices are best suited to individual stall systems.

333. The decrease in farm productivity driven by Proposition 12 will cause producers to lose revenue. Small farms are more likely to cease operations than large farms, due to a lack of adequate capital to undertake the massive investment required to meet Proposition 12's requirements.

334. As a conservative estimate, farrowing rates will decrease on farms that comply with Proposition 12 and eliminate the use of breeding stalls by around 9%. *See* Exh. O, Decl. S. Meyer, ¶ 20.

335. For some farmers, the economic and productivity costs described above will be too steep to come into compliance with Proposition 12. *See* Exh. F, Decl. N. Deppe, ¶ 20; Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. E, Decl. P. Borgic, ¶ 35.

336. Proposition 12 will also cause producers who are unable to comply with Proposition 12 to lose business, including for sales that occur entirely outside the State of California. Some of this lost business may be from suppliers with whom producers have contracted for many years. *See* Exh. G, Decl. M. Falslev, ¶ 9; Exh. H, Decl. T. Floy, ¶ 33; Exh. J, Decl. P. Jordan, ¶ 9.

337. Producers have already received letters from suppliers demanding compliance with Proposition 12. *See* Exh. A, Decl. D. Hockman, at ¶ 12-15.

338. Producers may be forced to satisfy Proposition 12 to continue the supply relationship with suppliers that intend to sell pork product in California, even if their sale of product to those suppliers takes place outside of California.

339. Some suppliers will set specifications that must be met for all of their pork product across the board, regardless of what market it is sold into. Producers thus may be forced to comply with Proposition 12 to continue a supply relationship with these suppliers, even if most of their product is not bound for California.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

340.   These changes in physical plants and operations required in order to comply with Proposition 12 impose serious financial hardship on pork producers.

341.   The consequences of this would likely include further consolidation of the pork industry, as larger farms with greater capital are able to adapt and smaller farms are forced to cease operation.

**B. Proposition 12 Substantially Interferes with Interstate Commerce in Pork**

342.   Producers who comply with Proposition 12 will need to spend at least an estimated $293,894,455 to $347,733,205 of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes.  *See* Exh. O, Decl. S. Meyer, ¶ 24.

343.   Plaintiffs expect that compliance with Proposition 12 will increase production costs per pig by over $13 dollars per head, a 9.2% cost increase at the farm level.  *See* Exh. O, Decl. S. Meyer, ¶ 25.

344.   Proposition 12 will impact sales of pork that take place entirely outside of California.

345.   Because of the small in-state production of sows in California compared to California's greater consumption of pork, the majority of the costs and operational changes to supply the California market will necessarily be incurred by producers operating entirely out-of-state.

346.   Selling a cut from a pig to California means the entire pig must be raised according to Proposition 12's requirements, regardless of where the other cuts are sold.  *See* Exh. A, Decl. of D. Hockman, ¶ 17; Exh. O, Decl. S. Meyer, ¶ 8.

347.   As a consequence, producers will be required to conform to Proposition 12's requirements even for pork product that is bound for other markets, even though there is no consumer demand in other states for Proposition 12 compliant pork.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

348.   Further, segregating pork product throughout the supply chain is very difficult and complicated.  *See* Exh. A, Decl. D. Hockman, ¶¶ 17-18, 28.

349.   Thus, some packers and food distributors will require all of the product that they receive to comply with Proposition 12, regardless of where they sell it.  *See* Exh. N, Decl. J. Hofer, ¶¶ 18-21; Exh. A, Decl. D. Hockman, ¶¶ 16-19.

350.   This has already been the experience of NPPC members who operate sow farms on Hutterite colonies in Montana, who have been told by a packer that sends only an estimated one third of its pork to California that all hogs it buys must be Proposition 12-compliant.  Exh. N, Decl. J. Hofer, ¶¶ 18-21.

## V. THERE IS NO SOW WELFARE BENEFIT FROM MANDATING 24 SQUARE FEET PER SOW OR RESTRICTING THE USE OF BREEDING STALLS

### A. The Concept Of Sow "Welfare"

351.   Proposition 12 will not advance sow welfare.

352.   Sow welfare depends on an assessment of the individual sow and the care that is provided to that sow, not an arbitrary, prescriptive housing space number.

353.   To assess sow welfare, farmers, veterinarians, and other industry stakeholders consider a variety of objective factors.

354.   The industry uses voluntary, third party audits that consider objective physical criteria developed in collaboration with veterinarians.  These factors include body condition scoring, lameness scoring, nutrition, and water provided to the sow.

355.   Veterinarians also consider whether the needs of the sow are provided for in order to enable the sow to produce.

356.   Human management, not a prescriptive space requirement, is the most important factor determining sow welfare.

57

357.   Care from dedicated, knowledgeable farmers leads to the best welfare results for sows.  This is because the best individual to determine how to raise and house a sow is the person who is caring for it, taking into account the barn and the specific animals involved.

358.   A variety of farm management factors impact the care and attention that a sow receives, including the producers' knowledge, the feeding system used, the type of stall, the number of sows in the pen, the size of the operation, and the ease of human access in and out of stalls.

359.   Further, a sow's needs change throughout production, from the time it is weaned through inception and gestation.

360.   And a sow's welfare needs are unique to the particular sow.  One mandatory practice may harm many sows, while advancing the welfare of others.

**B. Sow Welfare And Housing**

361.   Research repeatedly demonstrates that there is no single "best" method for housing sows to provide for sow welfare.

362.   Indeed, based on their lifelong experience producing hogs, AFBF and NPPC members rely on various methods of caring for and housing their sows.  *See, e.g.*, Exh. D, Decl. G. Boerboom, ¶¶ 20, 24, 37; Exh. E, Decl. P. Borgic, ¶ 10; Exh. F, Decl. N. Deppe, ¶ 10; Exh. G, Decl. M. Falslev, ¶¶ 15, 20; Exh. H, Decl. T. Floy ¶ 23; Exh. I, Decl. T. Hays, ¶¶ 3, 20; Exh. J, Decl. P. Jordan, ¶ 11; Exh. K, Decl. C. Leman, ¶ 5; Exh. L, Decl. G. Maher, ¶¶ 6-8; Exh. C, Decl. H. Roth, ¶ 15; Exh. M, Decl. R. Spronk, ¶¶ 6-8, 21.

363.   The American Veterinary Medical Association has concluded that "[t]here are advantages and disadvantages to any sow housing system."

364.   Within a group housing system, the amount of space a sow needs depends not on a prescriptive number, but instead on the type of group housing system used, the quality of the space, and the make-up of the group in terms of size, age, parity, and type of sow.

58

365.   It is disastrous to farm management and sow welfare to prescribe one specific number without considering these factors.

366.   For example, gilts and younger sows are smaller than older sows, and need less space than mixed groups or groups comprised solely of older sows.

367.   As another example, group size will directly influence quality of space and the social interactions among the sows.  The larger the group, the greater the number of sub-groups that develop among dominant, intermediate, and submissive sows.  In a large group setting, the design of the feeding space becomes particularly critical to prevent submissive sows from being displaced from the feeding space and to mitigate sow aggression.

368.   Quality of space provided to sows is much more important than quantity of space per sow.

369.   Elements dictating quality of space include not only space per sow, but also design of the housing system, flooring type, group size, bedding, nutrition, the feeding mechanism, and the training of farm staff in removing sows that need individual care.

370.   Because the amount of space a sow needs depends on a variety of situation-specific factors, a prescriptive requirement will not be appropriate in all cases.

371.   Many guidelines produced by collaboration between industry stakeholders and veterinarians regarding appropriate care and housing of sows to secure sow welfare recognize that a variety of factors determine what amount of space is appropriate and do not prescribe one specific number in sow housing requirements.

372.   For example, the Common Swine Industry Audit is a third party, voluntary audit based upon standards developed by a task force of industry stakeholders, including veterinarians, producers, animal scientists, packers,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

processers, and retail and food service representatives. The audit reviews 27 aspects of swine care and pre-harvest pork safety.

373.   One animal well-being topic reviewed by the audit considers space allowance per sow. Instead of tying space per pig to an arbitrary number, the Common Swine Industry Audit assesses whether a sow has the ability to easily lie down fully and stand back up within the housing. The Audit also considers body condition scores, the number of pigs with lameness or lesions, air temperature, feed and water access, and caretaker training, among other factors.

374.   The Pork Checkoff's 2018 Swine Care Handbook, drafted by academics, producers, and veterinarians, also creates recommendations for group housing space allowances. Regarding sow housing during breeding and gestation, the Handbook notes that pregnant sows can be kept "in a variety of housing situations," and that the management system should provide access to appropriate feed, water, sanitation, and air quality, facilitate the observation of individual sows to assess their well-being, and provide adequate quality and quantity of space to permit sows to "assume normal postures and express normal patterns of behavior," among other factors. It states that there are disadvantages and advantages to any sow-housing system, and that each system should be weighted based on scientific evidence, veterinary professional judgment, and caretaker management abilities. The Handbook also explains that group housing systems are less restrictive than individual stalls but "could lead to increased lameness," as well as aggression and competition for resources.

375.   With regard to space allowance recommendations in indoor group housing, the Handbook does not require one prescriptive number. Instead, it explains that space requirements are influenced by "feeding method, group size, flooring type, pen design, management practices and other factors." It states that adequate space in group housing will allow sows space for full lateral recumbency and minimize the risk of injury.

60

### C. There Is No Scientific Basis For The Belief That The 24-Square-Feet-Per-Sow Requirement Promotes Sow Welfare

376. The requirement of 24 square feet per sow is an arbitrary number.

377. It has not been scientifically shown to improve sow welfare.

378. To compare sow welfare under different housing systems, studies look at stress hormones (cortisol), injury levels, the number of fights between sows, the ability of sows to get enough feed, the ability to maintain pregnancy, and sow longevity.

379. In terms of square footage, at most, the science suggests that sows need room for lying down separate from room for defecating, and that less than 15 square feet per sow may compromise sow welfare in terms of longevity and risk of injury.

380. U.S. producers typically provide at least 16 square feet per sow, with the average being 18-19 square feet per sow in group housing.

381. There are no marginal gains to sow welfare from increasing space allowances per sow from 16-19 square feet per sow to 24 square feet per sow.

382. Providing too large an area may decrease sow welfare. It may lead to sows defecating in the lying area, rather than the dunging area, thus compromising hygiene. *See* Exh. M, Decl. R. Spronk, ¶ 13.

383. And additional floor space may permit more room for fighting, thereby increasing sow stress levels and negatively impacting sow welfare.

384. In large floor spaces, there is often a great deal of wasted space. Given the option, many sows choose to spend their time in a more confined pen.

385. On the other hand, the selection of one prescriptive number is detrimental to animal welfare and farm management.

386. The blanket 24 square feet requirement limits the ability of farm management to make housing adaptations to best address the welfare of their sows.

61

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

387.   In imposing an arbitrary square foot per sow requirement, Proposition 12 requires producers to divert costs that could be spent on more direct influencers of sow welfare such as optimal nutrition, stockperson training, and advanced feeding systems to an arbitrary square feet per sow number.

388.   Blindly imposing a single square foot per sow requirement on all farms denies producers the ability to manage their farms to optimally manage production while providing for sow welfare.

**D. Limiting The Use Of Breeding Stalls Harms Sow Well-Being**

389.   Proposition 12 prohibits the use of individual stalls except during the period from five days before farrowing and while nursing piglets, and in certain additional narrow circumstances.  It therefore prohibits the industry's almost universal practice of using breeding stalls until pregnancy is confirmed, as well as the use of individual stalls to ensure the welfare of specific sows.

390.   Restrictions on the use of breeding stalls decrease sow welfare during breeding and gestation.

391.   Farmers who transitioned from group pens to individual stalls noticed that the sows appeared calmer and healthier in individual stalls.  *See* Exh. C, Decl. H. Roth, ¶ 19; Exh. G, Decl. M. Falslev, ¶ 19; Exh. H, Decl. T. Floy, ¶¶ 20-22.

392.   Sows held in individual stalls lasted on average for a greater number of parities, or farrowings, than when held in the group pen.  Exh. H, Decl. T. Floy, ¶ 18.

393.   Group housing exposes sows to aggression and fights, leading to a greater incidence of injuries.  The sows tear at each other's vulvas and ears, leading to serious injuries that can render sows unable to continue to farrow, as well as fatalities.  *See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. I, Decl. T. Hays, ¶ 9; Exh. N, Decl. J. Hofer, ¶ 33.  These fights occur regardless of the number of sows held in the pen.  Exh. F, Decl. N. Deppe, ¶ 18.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

394.   Producers that transitioned from individual stalls to group housing experienced higher cull rates and sow injuries.  *See* Exh. L, Decl. G. Maher, ¶ 9.

395.   Conversely, producers that transitioned from group housing to individual pens experienced the opposite.  *See* Exh. E, Decl. P. Borgic, ¶¶ 14-15; Exh. C, Decl. H. Roth, ¶ 16; Exh. G, Decl. M. Falslev, ¶ 20; Exh. H, Decl. T. Floy, ¶¶ 14-18.  One farmer noticed that despite tripling his herd size at the time that he transitioned from a group pen to individual stalls, the number of sows culled due to serious injuries remained constant—even with three times as many animals.  Exh. C, Decl. H. Roth, ¶ 16.  Thus, the percentage of injured sows sharply decreased on his farm.

396.   Because of these fights, sows experience greater stress in group housing than in individual stalls.

397.   The consequences of stress and fights are particularly severe to sow welfare prior to the confirmation of pregnancy and in the early stages of gestation.

398.   Mixing sows into a group setting after weaning results in higher levels of stress than mixing sows into a group setting after pregnancy is confirmed.  *See, e.g.*, Exh. M, Decl. R. Spronk, ¶ 11.

399.   By preventing the use of breeding stalls during the 30 to 40 day period between weaning and confirmation of pregnancy, Proposition 12 puts sows at greater risk of injury and stress during the vulnerable stages of breeding and gestation.

400.   The stress and fights in the group pen increase the chance that a sow's embryo will fail to attach following implantation, or that a sow will lose a pregnancy or drop a litter size.  Exh. E, Decl. P. Borgic, ¶ 22-23; Exh. F, Decl. N. Deppe, ¶¶ 18-19; Exh. H, Decl. T. Floy, ¶ 16; Exh. K, Decl. C. Leman, ¶ 16.

401.   As one farmer explained, Proposition 12's restriction on the use of breeding stalls after weaning until the confirmation of pregnancy would effectively "kill piglets."  Exh. C, Decl. H. Roth, ¶ 22; *see also* Exh. M, Decl. R. Spronk, ¶ 11.

63

402. Proposition 12 will also cause sows still in heat to be moved back into a group pen. This is dangerous to the individual sow, the herd, and workers, because the sow in heat may attempt to mount or ride other sows and farm hands and cause injury. Exh. E, Decl. P. Borgic, ¶¶ 19-21.

403. Proposition 12 also prohibits many producers' practice of relying on breeding stalls to allow sows to recover peacefully from their pregnancies and gain back needed weight when in a weakened and vulnerable state after weaning. Exh. E, Decl. P. Borgic, ¶ 19; Exh., F, Decl. N. Deppe, ¶¶ 16-17; Exh. K, Decl. C. Leman, ¶ 16.

404. It is much harder to provide a sow with individualized nutrition appropriate to its body condition and stage of pregnancy in a group setting.

405. Appropriate nutrition is especially critical for sows coming out of farrowing and prior to a new pregnancy. Sows may have lost weight during lactation or gained excessive weight, and require tailored nutrition to recover. *See* Exh. E, Decl. P. Borgic, ¶ 19; Exh. F, Decl. N. Deppe, ¶¶ 16-17.

406. Thus, it is a cruel practice to move a sow back into a group setting directly after weaning when it is weak and vulnerable.

407. In addition to providing benefits during breeding and gestation, individual stalls advance the welfare of sows that do poorly in group housing.

408. Group housing is particularly detrimental to the welfare of submissive sows, which are bullied by more aggressive sows and can be cut off from food sources. Exh. I, Decl. T. Hays, ¶¶ 9-10; Exh. H, Decl. T. Floy, ¶ 14.

409. A pig that is not growing will receive better care in an individual stall than in a group setting, as the stall permits more individualized attention and care. Exh. M, Decl. R. Spronk, ¶¶ 11-12; Exh. H, Decl. T. Floy, ¶ 19.

410. It is more difficult for producers to identify ill or injured sows in a group setting and remove them to stalls for individualized care. Exh. I, Decl. T. Hays, ¶ 12.

64

## E. Policing Compliance With Proposition 12 Threatens Sow Welfare

411. CDFA explains that it may regulate compliance with Proposition 12 through verification audits. Verification audits or inspections would require auditors to visit the sow farms to inspect producers' practices.

412. Direct inspections threaten the health and welfare of sows due to biosecurity concerns.

413. Contagious diseases can quickly decimate herds and present a serious problem for the welfare of sows housed on breeding farms.

414. Farms take careful measures to prevent the potential of any pathogen entry, including filtering air that enters the barn.

415. Breeding farms are intentionally constructed in remote areas to prevent the spread of diseases.

416. A critical biosecurity measure on farms is to limit access to the farm by unnecessary persons, which is considered a hazard to herd health.

417. Persons who have recently visited other hog farms of unknown health status present a serious threat to biosecurity and herd health. Inspectors who visit multiple farms of unknown health status may compromise the biosecurity of breeding farms by spreading contagious diseases among breeding farms.

418. In this manner, CDFA's likely method of verifying compliance with Proposition 12 poses a direct threat to the welfare of sows.

## VI. AT LEAST AS APPLIED TO PORK, PROPOSITION 12 OFFERS NO HUMAN HEALTH OR SAFETY BENEFIT

### A. Proposition 12 Has No Relation to Foodborne Illness or Human Health

419. Contrary to the proponents' claims, there are no human health benefits to Proposition 12 as applied to pork.

420. Proposition 12 is unnecessary because under the Federal Meat Inspection Act, the U.S. Department of Agriculture's Food Safety and Inspection

65

Service (FSIS) inspects meat product shipped into California to ensure that the product is safe. Indeed, 488 FSIS employees operate specifically in California to protect food safety.

421. FSIS ensures product safety by issuing regulations that require establishments to adopt Hazard Analysis and Critical Control Point Plans governing safe slaughter and production practices. FSIS also tests samples of products at facilities to ensure that the products are safe and wholesome.

422. Proposition 12 will not provide any additional protection against the threat of foodborne illness in pork products, because it has no relation to food safety.

423. First, Proposition 12 addresses only *sow* housing practices at breeding farms. But sows do not generally enter the food chain, and when they do it is as cooked or processed pork that is not covered by Proposition 12.

424. The pork products that enter the market and present some risk of causing foodborne illness derive almost entirely from the *offspring* of sows, not from the sows themselves. Proposition 12 does nothing to address the safety of these products.

425. The idea that the square footage provided to sows has bearing on the safety of the food product derived from their offspring is incredible.

426. A foodborne risk to human health from uncooked pork would generally result from pathogen transmission. Salmonella is the most common pathogen in pork products that might cause human illness, as well as the most researched. Around 90 percent of the scientific literature is focused on salmonella.

427. Pigs rarely become ill from most types of salmonella.

428. If a sow contracted salmonella, the salmonella would only potentially transmit to its offspring if the sow was shedding pathogens in the farrowing stall when she gave birth.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

429.   Even if a sow passed salmonella on to her piglets, this transmission would not pose a threat to human health.  There is almost no likelihood of the offspring carrying the salmonella to market.

430.   Piglets are separated from the sow after three weeks of nursing in the farrowing stalls.  And during much of nursing, piglets have maternal antibody protection that would stem disease transmission.

431.   After weaning, piglets are transferred to nurseries or wean-to-finish barns and are physically separated from the sows.

432.   This separation is done deliberately to prevent diseases from being transmitted from the sow to the offspring while the piglets develop.

433.   There is a six month lapse between the birth of offspring and the slaughter of market hogs.  Any salmonella the offspring received from the sow would have run its course by the time the sows reached market.  Any infection held early in life is not likely to be present even several months later.

434.   Thus, even if a sow transmitted salmonella to her offspring, the transmission would not pose a realistic threat to human health.

435.   Second, even putting aside that Proposition 12 does not address the housing of market hogs, the animals that actually enter the market, the scientific evidence does not support a causal link between swine housing and food safety characteristics of pigs.

436.   Interventions taken on farms to prevent the spread of salmonella into food products are only minimally effective, because salmonella that may infect the food supply is more commonly contracted at plants than on farms.

437.   Strains of salmonella found in food products at grocery stores are more commonly traced to strains of salmonella found at slaughter and processing plants than at farms.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

438.   Further, there is no connection between requiring 24 square feet per sow and sow health, let alone the health of piglets or humans.

439.   The majority of research analyzing any link between space provided to pigs and their health analyzes the health of growing animals such as market hogs and finishing pigs, not breeding animals such as sows.

440.   Although some of these studies suggest that lower stocking density correlates with lower salmonella rates among growing pigs, those studies do not apply to sows.  Growing pigs are generally held in much different space allocations than sows.

441.   Even assuming that research related to housing conditions for market hogs and finishing pigs applies to sows, no studies establish that a move from 16 to 24 square feet per sow in open housing impacts health, let alone in any way that would transfer to food products

442.   There is no link between Proposition 12's sow housing requirements and food safety or foodborne illness.

**B. If Anything, Proposition 12 Will Increase Pathogen Transmission**

443.   Studies show that sows housed in groups rather than in individual stalls have a higher incidence of salmonella.  This worse health outcome is likely due to the fact that sows in group housing, unlike animals confined in stalls, have the opportunity to eat manure, which spreads pathogens and disease.  Thus, restricting the amount of time that a sow can spend in an individual breeding stall may increase the risk of pathogen transmission among the sows.

444.   Proposition 12 will likely lead to more pigs being housed outdoors in pastures, rather than in indoor open housing that must comply with Proposition 12.

445.   Studies demonstrate that pigs housed outside, where they have the opportunity to wallow in mud, exhibit greater incidence of pathogens than those housed indoors.  Thus, the greatest risk of pathogen transmission is from pasture-raised sows.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

446.   If Proposition 12 does result in pigs being moved outside, we can expect an increase in other kinds of pathogens that create a greater risk to human health than salmonella, including one called Trichinella, and another called Toxoplasma.

447.   Trichinella can lead to trichinosis in humans, a disease caused by infection from the Trichinella roundworm.  Trichinella results in diarrhea, abdominal cramps, nausea, and vomiting in humans.

448.   When the industry moved pigs inside to barn housing, issues with this pathogen were largely eliminated.  Indeed, the Centers for Disease Control and Prevention reports that between 2008 and 2012, there were only 10 cases nationwide from commercial pork.  Other cases of trichinosis resulted from wild game or home-raised pork.

449.   Re-introduction of outdoor housing could revive incidences of Trichinella.

450.   It could also increase incidences of Toxoplasma. The infective oocysts of Toxoplasma are shed in the feces of infected cats and are transmitted to mammals through ingestion of cat feces.

451.   Interaction with cats and their feces is more likely for pigs that are held outdoors.

452.   Many studies widely consider Toxoplasma in the top five causes of death due to foodborne illness

453.   There is no possibility that Proposition 12 will improve human food safety.

## FIRST CLAIM FOR RELIEF

### (Impermissible Extraterritorial Regulation)

454.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

455.  The Commerce Clause affirmatively grants Congress the power to "regulate Commerce … among the several States."  U.S. Const. art. I, § 8.

456.  The dormant Commerce Clause in consequence restricts states from engaging in extraterritorial regulation.

457.  A state law that has the practical effect of regulating commerce occurring outside the state is invalid under the Commerce Clause.

458.  Proposition 12 violates the Commerce Clause and principles of interstate federalism by regulating pork producers and the pork market outside the State of California.

459.  Proposition 12 extends California's police powers beyond its borders by regulating conduct that occurs outside the state.

460.  Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

461.  Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in its structure.

462.  Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

## SECOND CLAIM FOR RELIEF
### (Excessive Burden on Interstate Commerce in Relation to Putative Local Benefits)

463.  Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

464.  The Commerce Clause restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

465.   Proposition 12 places excessive burdens on interstate commerce without advancing any legitimate local interest.

466.   Proposition 12 is not justified by any animal-welfare interest.

467.   Proposition 12 has no connection to human health or foodborne illness.

468.   Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

469.   Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution.

470.   Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that Proposition 12 is invalid because it violates the U.S. Constitution and is unenforceable;

B. A permanent injunction enjoining the Defendants from implementing or enforcing Proposition 12;

C. An order awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Such other and further relief as the Court deems just and proper.

Dated: December 5, 2019              MAYER BROWN LLP
                                     Timothy S. Bishop
                                     C. Mitchell Hendy


                                     By:   _s/ C. Mitchell Hendy_____

                                     C. Mitchell Hendy
                                     E-mail: *mhendy@mayerbrown.com*
                                     Attorneys for Plaintiffs

71

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

No. 21-468

# In the Supreme Court of the United States

———————

NATIONAL PORK PRODUCERS COUNCIL &
AMERICAN FARM BUREAU FEDERATION,

*Petitioners*,

v.

KAREN ROSS, ET AL.,

*Respondents.*

———————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

———————

**BRIEF FOR PETITIONERS**

———————

DAN HIMMELFARB
COLLEEN M. CAMPBELL
 *Mayer Brown LLP*
 *1999 K Street, NW*
 *Washington, DC 20006*
 *(202) 263-3000*

TIMOTHY S. BISHOP
 *Counsel of Record*
BRETT E. LEGNER
AVI M. KUPFER
 *Mayer Brown LLP*
 *71 South Wacker Drive*
 *Chicago, Illinois 60606*
 *(312) 701-7829*
 *tbishop@mayerbrown.com*

*Counsel for Petitioners*
*Additional Counsel Listed on Signature Page*

## QUESTIONS PRESENTED

Whether allegations that California's Proposition 12 has dramatic economic effects largely outside of the State and requires pervasive changes to an integrated nationwide industry state a violation of the dormant Commerce Clause.

Whether such allegations, concerning a law that is based solely on preferences regarding out-of-state housing of farm animals, state a claim under *Pike* v. *Bruce Church*.

ii

## PARTIES TO THE PROCEEDING AND RULE 29.6 STATEMENT

Petitioners here, plaintiffs-appellants below, are the National Pork Producers Council (NPPC) and the American Farm Bureau Federation (AFBF).

NPPC is an agricultural organization representing the interests of the $26-billion-a-year U.S. pork industry. Its members include pig farmers as well as the entire pork chain and associated businesses such as veterinarians, pork packers and processors, and other allied companies that serve the pork industry. NPPC does not have any parent corporation, and no publicly held corporation owns 10% or more of NPPC.

AFBF is an agricultural organization whose purpose is to improve the conditions of farmers. Nearly six million families, including farmers who grow and raise virtually every agricultural product in the U.S., are members of AFBF. AFBF does not have any parent corporation, and no publicly held corporation owns 10% or more of AFBF.

State defendants-appellees below, respondents here, are Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture; Tomas Aragon, in his official capacity as Director of the California Department of Public Health (substituted for original defendant Sonia Angell); and Robert Bonta, in his official capacity as Attorney General of California (substituted for original defendant Xavier Becerra).

Intervenors-defendants-appellees below, respondents here, are the Humane Society of the United States of America; Animal Legal Defense Fund; Animal Equality; The Humane League; Farm

iii

Sanctuary; Compassion in World Farming USA; and
Compassion Over Killing.

iv

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED .......................................i

PARTIES TO THE PROCEEDING AND
RULE 29.6 STATEMENT.......................................... ii

TABLE OF AUTHORITIES.....................................ix

OPINIONS BELOW..................................................1

JURISDICTION .........................................................1

CONSTITUTIONAL, STATUTORY, AND
REGULATORY PROVISIONS INVOLVED .............1

STATEMENT ............................................................2

    A.    Proposition 12 .......................................6

    B.    The Pork Industry.................................8

        1.    Sow housing................................9

        2.    Vertical segmentation of
                pork production .......................11

        3.    Processing market hogs
                into different cuts.....................12

        4.    Pig and human health .............12

    C.    Proposition 12's Nationwide
        Impact On Pork Production And
        Pricing ...................................14

    D.    The Rulings Below ..............................17

SUMMARY OF ARGUMENT..................................19

ARGUMENT ..........................................................21

v

**TABLE OF CONTENTS—continued**

**Page**

I.     Proposition 12 Unconstitutionally Regulates Commerce Occurring Wholly Outside California ........................................21

     A.     The Extraterritoriality Doctrine Serves Fundamental Purposes At The Heart Of The Constitutional Design...................................22

          1.     The extraterritoriality doctrine preserves interstate commerce.................23

          2.     The extraterritoriality doctrine safeguards State sovereignty ...............................25

          3.     The extraterritoriality doctrine safeguards nationwide markets .................26

          4.     The extraterritoriality doctrine is a necessary check on one State placing the burdens of achieving its policy goals on the citizens of other States.............27

     B.     Proposition 12 Violates The Extraterritoriality Doctrine...............27

II.    Proposition 12 Is Unconstitutional Because It Governs Extraterritorial Activity Beyond California's Police Powers...........................................................36

vi

**TABLE OF CONTENTS—continued**

Page

    A.    A Law That Applies Extraterritorially But Has No Local Benefits Violates The Commerce Clause ...............................36

    B.    Proposition 12 Bears No Relation To California's Internal Health And Safety..........................................39

III.    Petitioners State A Claim Under *Pike*..........44

    A.    Proposition 12 Imposes A Substantial Burden On National Pork Production And Any Local Benefits Are Illusory...........................44

    B.    The Court Of Appeals Erroneously Narrowed The Scope Of *Pike* At The Pleading Stage...........48

CONCLUSION .......................................................50

APPENDICIES TO THE PETITION

APPENDIX A: Opinion, *National Pork Producers Council* v. *Ross*, No. 20-55631 (9th Cir. July 28, 2021), ECF 70, printed at 6 F. 4th 1021..1a

APPENDIX B: Order Granting Defendants' Motion to Dismiss and Granting Defendant-Intervenors' Motion for Judgment on the Pleadings, *National Pork Producers Council* v. *Ross*, No. 19-cv-02324 (S.D. Cal. Apr. 27, 2020), ECF 37, printed at 456 F. Supp. 3d 1201 ................................................................21a

vii

**TABLE OF CONTENTS—continued**

**Page**

APPENDIX C: Judgment, *National Pork Producers Council* v. *Ross*, No. 19-cv-02324 (S.D. Cal. June 16, 2020), ECF 41 ...............................36a

APPENDIX D: *Prevention of Cruelty to Farm Animals Act*, Cal. Proposition 12 (Nov. 6, 2018), codified at Cal. Health & Safety Code §25990 *et seq*. ................................................37a

APPENDIX E: California Department of Food and Agriculture, *Title 3. Food and Agriculture Proposed Regulations—Animal Confinement* (May 25, 2021), https://www.cdfa.ca.gov/ ahfss/pdfs/regulations/AnimalConfinement1st NoticePropReg_05252021.pdf ......................47a

APPENDIX F: California Department of Food and Agriculture, *Animal Health and Food Safety Services Proposed Regulations—Animal Confinement* (May 25, 2021), https://www.cdfa. ca.gov/ahfss/pdfs/regulations/AnimalConfine- mentText1stNotice_05252021.pdf ...............99a

APPENDIX G: Complaint for Declaratory and Injunctive Relief and Exhibits A-O, *National Pork Producers Council* v. *Ross*, No. 19-cv- 02324 (S.D. Cal. Dec. 5, 2019), ECF 1 .......147a

APPENDIX TO THE PETITION REPLY

Title 3: Food and Agriculture 15-day Notice of Modified Text and Documents Added to the Rulemaking File Relating to Animal Confinement....................................................1a

viii

**TABLE OF CONTENTS—continued**

**Page**

Department of Food and Agriculture, *Animal Health and Food Safety Services Proposed Regulations—Animal Confinement*—Proposed Modified Text ...............................................5a

ix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ableman* v. *Booth*,
    62 U.S. 506 (1858)...............................................25

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009).................................................2

*Ass'n des Eleveurs de Canards et d'Oies du*
    *Quebec* v. *Harris*,
    729 F.3d 937 (9th Cir. 2013)...............................21

*Baldwin* v. *G.A.F. Selig, Inc.*,
    294 U.S. 511 (1935).............................4, 33, 37, 38

*Bonaparte* v. *Tax Court*,
    104 U.S. 592 (1882)............................................25

*Brennan* v. *City of Titusville*,
    153 U.S. 289 (1894)............................................37

*Brimmer* v. *Rebman*,
    138 U.S. 78 (1891)..............................................41

*Brown-Forman Distillers Corp.* v. *N.Y. State*
    *Liquor Auth.*,
    476 U.S. 573 (1986).............................2, 21, 22, 29

*C&A Carbone, Inc.* v. *Town of Clarkston*,
    511 U.S. 383 (1994).....................22, 26, 37, 39, 40

*Cal. Hisp. Chambers of Com.* v. *Ross*,
    No. 34-2021-80003765, 2022 Cal. Super.
    LEXIS 8135 (Jan. 21, 2022)...................................7

x

## TABLE OF AUTHORITIES—continued

Page(s)

*Camps Newfound/ Owatonna, Inc.* v. *Town of Harrison, Me.*,
520 U.S. 564 (1997)..............................................24

*Central Hudson Gas & Electric* v. *Pub. Serv. Comm'n*,
447 U.S. 557 (1980)..............................................39

*City of Phila.* v. *New Jersey*,
437 U.S. 617 (1978)..............................................37

*Comptroller of Treasury of Maryland* v. *Wynne*,
575 U.S. 542 (2015).........................................24, 27

*Dep't of Rev. of Ky.* v. *Davis*,
553 U.S. 328 (2008)..............................................44

*Edgar* v. *MITE Corp.*,
457 U.S. 624 (1982)..................................22, 26, 40

*Energy & Env't Legal Inst.* v. *Epel*,
793 F.3d 1169 (10th Cir. 2015)......................21, 35

*Exxon Corp.* v. *Governor of Maryland*,
437 U.S. 117 (1978)..............................................50

*Gonzales* v. *Oregon*,
546 U.S. 243 (2006)..............................................36

*Gregory* v. *Ashcroft*,
501 U.S. 452 (1991)..............................................23

xi

## TABLE OF AUTHORITIES—continued

**Page(s)**

*H.P. Hood & Sons, Inc.* v. *Du Mond,*
  336 U.S. 525 (1949).............................................25

*Hannibal & St. J.R. Co.* v. *Husen,*
  95 U.S. 465 (1877)..........................................37, 41

*Head* v. *N.M. Bd. of Exam'rs in Optometry,*
  374 U.S. 424 (1963).............................................38

*Healy* v. *Beer Inst., Inc.,*
  491 U.S. 324 (1989)
  ...........................2, 3, 18, 21, 22, 24, 25, 26, 30, 31

*Hill* v. *Colorado,*
  530 U.S. 703 (2000)........................................36, 38

*Hodel* v. *Va. Surface Mining & Reclamation
  Ass'n,*
  452 U.S. 264 (1981).............................................36

*Hughes* v. *Oklahoma,*
  441 U.S. 332 (1979).............................................23

*Kan. City S. Ry.* v. *Kaw Valley Drainage
  Dist.,*
  233 U.S. 75 (1914)..............................................38

*Kassel* v. *Cons. Freightways Corp. of Del.,*
  450 U.S. 662 (1981)...................................38, 47, 49

*Legato Vapors, LLC* v. *Cook,*
  847 F.3d 825 (7th Cir. 2017).........................34, 39

xii

## TABLE OF AUTHORITIES—continued

Page(s)

*Meyer* v. *Nebraska*,
262 U.S. 390 (1923)........................................37, 38

*Minnesota* v. *Barber*,
136 U.S. 313 (1890)........................................38, 41

*Nat'l Meat Ass'n* v. *Harris*,
565 U.S. 452 (2012)........................................14, 43

*New State Ice Co.* v. *Liebmann*,
285 U.S. 262 (1932).............................................35

*Ogden* v. *Saunders*,
25 U.S. 213 (1827)..........................................25, 30

*Paul* v. *Virginia*,
75 U.S. (7 Wall.) 168 (1869)................................23

*Pharm. Rsch. & Mfrs of Am.* v. *Walsh*,
538 U.S. 644 (2003)........................................18, 21

*Pike* v. *Bruce Church, Inc.*,
397 U.S. 137 (1970)
........................ 2, 4, 5, 18, 19, 20, 23, 44, 48, 49, 50

*Raymond Motor Transp., Inc.* v. *Rice*,
434 U.S. 429 (1978)........................................44, 47

*Reid* v. *Colorado*,
187 U.S. 137 (1902).............................................40

*Sentell* v. *New Orleans & C.R. Co.*,
166 U.S. 698 (1897).............................................40

xiii

## TABLE OF AUTHORITIES—continued

**Page(s)**

*South Dakota* v. *Wayfair*,
   138 S. Ct. 2080 (2018)........................23, 26, 27, 32

*Southern Pac. Co.* v. *State of Arizona ex rel.
   Sullivan*,
   325 U.S. 761 (1945)................26, 27, 31, 32, 37, 39

*Tennessee Wine & Spirits Retailers Ass'n* v.
   *Thomas*,
   139 S. Ct. 2449 (2019)....................................24, 37

*United Haulers Ass'n* v. *Oneida-Herkimer
   Solid Waste Mgmt. Auth.*,
   550 U.S. 330 (2007)..............................................44

*West Lynn Creamery, Inc.* v. *Healy*,
   512 U.S. 186 (1994)..............................................27

## Constitutional Provision, Statutes and Regulations

U.S. Const. art. I § 8, cl. 3 ..........................................1

Pork Promotion, Research, and Consumer
   Information Act, 7 U.S.C. § 4801 *et seq.*
   § 4801(a)(1)..............................................................9
   § 4801(a)(2)..............................................................8
   § 4801(a)(3).........................................................9, 32
   § 4801(a)(4)............................................................32

xiv

## TABLE OF AUTHORITIES—continued

**Page(s)**

Federal Meat Inspection Act,
21 U.S.C. § 601 *et seq.*
§ 602 ...............................................................14, 43
§ 610(c)...............................................................43

28 U.S.C. § 1254(1) ....................................................1

Cal. Bus. & Prof. Code
§§ 17203-17207 ........................................................6

Cal. Health & Saf. Code
§ 25990.....................................................................1
§ 25990(a) ................................................................6
§ 25991(a) ............................................................6, 10
§ 25991(e) ................................................................6
§ 25993(a) ................................................................7

Colo. Rev. Stat.
§ 35-50.5-102(1)(b) ...............................................31

Mass. Gen. Laws Ann. ch. 129 App.
§ 1-3(C) ..................................................................31
§ 1-5(E) ..................................................................31

Mich. Comp. Laws
§ 287.746(1)(d) ......................................................31
§ 287.746(1)(j).........................................................31
§ 287.746(2)(a)........................................................31

Ohio Admin. Code
§ 901:12-8-02(G)(4)..........................................5, 31
§ 901:12-8-02(G)(5)..........................................5, 31

xv

## TABLE OF AUTHORITIES—continued

**Page(s)**

Rhode Island Stat.
  § 4-1.1-4(7) ............................................................ 31

9 C.F.R.
  § 309.1 ................................................................... 43
  § 309.2(n) ............................................................. 43
  § 309.13(a) ............................................................ 43

### Other Authorities

Animal Welfare Inst., *Animals and Their
  Legal Rights: A Survey of American
  Laws from 1641 to 1990* (1990) ............................ 40

Chuck Abbott, *Judge Delays Prop 12
  Enforcement on California Retailers*,
  Successful Farming (Jan. 26, 2022),
  https://www.agriculture.com/news/busin
  ess/judge-delays-prop-12-enforcement-
  on-california-retailers ............................................ 7

The Federalist No. 11 (Hamilton) (Clinton
  Rossiter ed. 1961) .................................................. 24

The Federalist No. 22 (Hamilton) (Clinton
  Rossiter ed. 1961) .................................................. 24

Ernst Freund, *The Police Power* (1904) .................... 36

Madison, *Vices of the Political System of the
  United States*, 2 Writings of James
  Madison (Gaillard Hunt ed. 1901) ...................... 24

xvi

**TABLE OF AUTHORITIES—continued**

**Page(s)**

McDonald's Corp., *2022 Annual Meeting
    Update* (May 2022)................................................48

National Agricultural Law Center, *Farm
    Animal Confinement*,
    https://nationalaglawcenter.org/state-
    compilations/farm-animal-welfare ......................45

Official Voter Information Guide,
    Proposition 12 (Nov. 6, 2018),
    https://vigarchive.sos.ca.gov/2018/genera
    l/propositions/12/ .................................................15

Pallotta, *Wins for Animals in the 2018
    Midterm Election*, Animal Legal Defense
    Fund (Jan. 5, 2019) ................................................6

2 Ronald D. Rotunda & John E. Nowak,
    *Treatise on Constitutional Law* (5th ed.
    2012) .............................................................38, 39

## BRIEF FOR PETITIONERS

### OPINIONS BELOW

The Ninth Circuit's decision (Pet. App. 1a-20a) is reported at 6 F.4th 1021 (9th Cir. 2021). The district court's decision (Pet. App. 21a-35a) is reported at 456 F.Supp.3d 1201 (S.D. Cal. 2020).

### JURISDICTION

The judgment of the court of appeals was entered on July 28, 2021. Pet. App. 2a. The timely filed petition for certiorari was granted on March 28, 2022. This Court has jurisdiction under 28 U.S.C. § 1254(1).

### CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3.

Proposition 12, codified at Cal. Health & Safety Code § 25990 *et seq.*, is reproduced at Pet. App. 37a-46a.

The initial and revised proposed regulations of the California Department of Food and Agriculture (CDFA) implementing Proposition 12 are reproduced at Pet. App. 47a-146a and Pet. Reply App. 1a-104a, respectively.[1]

---

[1] CDFA submitted final regulations to California's Office of Administrative Law for review on April 21, 2022, but as of June 9 no final rules have been promulgated.

2

**STATEMENT**

A state law runs afoul of the negative implications of Congress's power "[t]o regulate Commerce * * * among the several States" if its "practical effect" is to "'control [commercial] conduct beyond the boundaries of the State'" (*Healy* v. *Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)), even if the law is "triggered only by sales" occurring "within the State" (*Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986)). A state law also is unconstitutional if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).[2]

Petitioners' complaint (Pet. App. 147a-233a) alleges that Proposition 12 violates the dormant Commerce Clause in both of these ways. Petitioners allege that Proposition 12 in practice controls pork production, 99.87% of which occurs in other States. And petitioners allege that California has no valid justification for that interference with out-of-state commerce. Because this case comes to the Court from the grant of  motions to dismiss and for judgment on the pleadings, petitioners' factual allegations are accepted as true and the question is whether those facts "plausibly give rise to an entitlement to relief." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). They do.

Proposition 12 will transform the pork industry nationwide. The law makes it a criminal offense and civil violation to sell whole pork meat in California unless the pig it comes from was born to a sow—an

---

[2] Another prohibition of the dormant Commerce Clause—a bar on protectionist state statutes that discriminate against interstate commerce—is not in issue here.

3

adult female—that was housed with 24 square feet of space and in conditions that allow the sow to turn around without touching her enclosure. Hardly any commercially bred sows are housed with that much space, including those raised in group pens; and farmers almost universally keep sows in individual pens that do not comply with Proposition 12 during the vulnerable period between a sow's weaning a litter of piglets and confirmation of her next pregnancy.

Though Proposition 12 applies to sales of pork meat in California, its practical effects are almost entirely extraterritorial. There are very few sow farms in California. The State imports 99.87% of the pork it consumes. Proposition 12 therefore governs the housing conditions of sows located almost exclusively outside of California. As the United States and its Department of Agriculture (USDA) told the Ninth Circuit, the "'critical inquiry'" under this Court's decision in *Healy* is "'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State'" and the "district court erred by dismissing the complaint" under that standard. U.S. Am. Br. 1 (9th Cir. ECF 23) (U.S. Am. Br.).

Proposition 12's extraterritorial effects are not limited to the 13% of U.S. pork production needed to satisfy demand in California. A market pig progresses through multiple farms outside of California as it is raised, and then is processed into many different cuts of meat that are sold across the country. If *any part* of a pig is sold in California, the sow it came from must be Proposition 12-compliant. And sow farmers cannot say with certainty that no meat from any of their pigs will be sold in California, after those pigs pass through nursery and finishing farms, a packer-slaughter plant, then distributors, before their meat reaches

4

consumers. As the Ninth Circuit recognized, "[a]s a practical matter," "all or most [sow] farmers will be forced to comply with California requirements." Pet. App. 9a.

Those requirements necessitate reducing herd sizes or building costly new facilities, and they will require changes in every aspect of caring for sows, including feeding, breeding, medical care, and farm labor. That will raise prices in transactions with no California connection. It will drive smaller sow farms out of business, leading to greater industry consolidation. CDFA has proposed that California's agents will police compliance through intrusive inspections on out-of-state farms and burdensome record-keeping rules. These "dramatic upstream effects," the Ninth Circuit acknowledged, will force "pervasive changes to the pork production industry nationwide" and cause "cost increases to market participants and customers" everywhere. Pet. App. 18a, 20a. And farmers will be forced to adopt practices that they believe are harmful to their sows and employees.

If any law violates the dormant Commerce Clause's extraterritoriality principle because of its practical effects on commerce in other States, it is Proposition 12. And if Proposition 12 is constitutional, so is a state law that prohibits the sale of goods unless they were made by workers who were paid the State's minimum wage or belong to a union. Yet this Court has made clear that the Commerce Clause prevents a State from conditioning the importation of goods on "proof of a satisfactory wage scale." *Baldwin* v. *G.A.F. Selig, Inc.*, 294 U.S. 511, 524 (1935).

Petitioners also allege that Proposition 12 fails the *Pike* test. California's justifications for the law are

5

simply invalid. The law is based on philosophical preferences about conduct occurring almost entirely outside California. As the United States explained below, banning pork imports "based solely on a desire to prevent what California considers animal cruelty that is occurring entirely outside the State's borders" is "an improper purpose." U.S. Am. Br. 2. Proposition 12 rests otherwise on a human health rationale—one California did not defend below and CDFA admits lacks any scientific basis—that is false. Because petitioners plausibly allege that California advances no "legitimate local interest" to justify Proposition 12's wrenching effect on interstate commerce (*id.* at 18), their *Pike* challenge should not have been dismissed.

Proposition 12 undermines our federalist system, as 20 States explained below. Its extraterritorial reach infringes other States' sovereignty, including their "decisions *not* to impose burdensome animal-confinement requirements on their farmers." States' Am. Br. 16 (9th Cir. ECF 22). Ohio, for example, expressly permits sow farmers to do what Proposition 12 forbids—to confine sows in breeding pens post-weaning until a new pregnancy is confirmed. Ohio Admin. Code § 901:12-8-02(G)(4), (5). Proposition 12 also effectively regulates "transactions occurring wholly in other States—such as farm procurement and production, sale to distributors, and slaughter and packing"—before any transaction occurs in California. States' Am. Br. 14. And California agents will inspect and certify out-of-state farms and demand an "audit trail" for every cut of pork. Horizontal federalism principles embodied in this Court's dormant Commerce Clause jurisprudence protect California's sister States from these intrusions, which invite "tit-for-tat state regulatory conflict" and threaten to transform our "integrated national

6

market into a patchwork of regulatory regions." States' Am. Br. in Support of Cert. 13-14.

### A.    Proposition 12

Proposition 12 forbids farmers "within the state" from housing sows "in a cruel manner"—a provision petitioners do not challenge. Cal. Health & Saf. Code § 25990(a), Pet. App. 37a. It also prohibits the sale in California of "any uncooked cut of pork" when the seller knows or should know that the meat came from the offspring of a sow that was confined—anywhere in the world—"in a cruel manner." *Id.*, §§ 25990(b)(2), 25991(u), Pet. App. 38a, 43a; see Pet. Reply App. 8a, § 1322(k) (defining "cut"). It is that prohibition that petitioners allege is unconstitutional.

"A cruel manner" means confining a sow "six months or older or pregnant" in a way that prevents her "from lying down, standing up, fully extending the animal's limbs, or turning around freely" and, starting January 1, 2022, "confining a [sow] with less than 24 square feet of useable floorspace." Cal. Health & Saf. Code §§ 25991(a), (e), Pet. App. 40a. Among other narrow exclusions, these requirements do not apply for five days before a sow gives birth or while it is nursing piglets. *Id.*, § 25992(f), Pet. App. 45a.

Every sale of covered pork in California that does not meet these standards is a crime punishable by a $1000 fine or 180-day prison sentence, and subjects the seller to a civil action for an injunction and damages. *Id.*, § 25993(b), Pet. App. 45a; Cal. Bus. & Prof. Code §§ 17203-17207. The animal-rights activists who created and promoted the Proposition 12 ballot initiative tout it as "the strongest law of its kind in the world." Pallotta, *Wins for Animals in the 2018*

7

*Midterm Election*, Animal Legal Defense Fund (Jan. 5, 2019).

The stated justifications for Proposition 12's housing standards are (1) "to prevent animal cruelty by phasing out extreme methods of farm animal confinement" and (2) to protect California consumers from "the risk of foodborne illness and associated negative fiscal impacts on the State of California." Pet. App. 37a § 2. Because Proposition 12 was adopted by citizen initiative, no legislative findings address these rationales.

Proposition 12 directed CDFA and the California Department of Public Health (CDPH) to produce implementing regulations by September 1, 2019. Cal. Health & Saf. Code § 25993(a). The agencies missed that deadline, and as of the filing of this brief, nearly three years later, still have not promulgated final regulations.[3] Their proposed regulations, however, indicate how they plan to implement Proposition 12. In addition to reiterating the space requirements of the law, the proposed regulations provide for certification of sow farms as Proposition 12-compliant, which involves on-site inspections—"announced or unannounced"—by agents of California. Pet. Reply App. 38a-39a, § 1326.5(a). CDFA's agents must be

---

[3] Because the agencies violated the rulemaking timetable, a court enjoined implementation of the law until 180 days after the final rule is effective. *Cal. Hisp. Chambers of Com.* v. *Ross*, No. 34-2021-80003765, 2022 Cal. Super. LEXIS 8135, at *22-23 (Jan. 21, 2022), appeal pending. CDFA says that stay "applies only to retailers," "not to pork producers providing pork products to California." Chuck Abbott, *Judge Delays Prop 12 Enforcement on California Retailers*, Successful Farming (Jan. 26, 2022), https://www.agriculture.com/news/business/judge-delays-prop-12-enforcement-on-california-retailers.

8

given "access to the production" operation, "offices," and any place "where covered animals and covered animal products may be kept, produced, processed, handled, stored or transported," regardless of where those animals or products might be sold. Pet. Reply App. 33a, § 1326.1(c). Farmers and distributors must maintain an "audit trail" documenting compliance. Pet. Reply App. 5a-6a, § 1322(b); 34a-35a, § 1326.2. The rules require that all sale and shipping documents identify whether pork is "Pork CA Prop 12 Compliant." Pet. Reply App. 17a, § 1322.4(a). And they mandate that any out-of-state government entity certifying facilities as Proposition 12-compliant must use a "process equivalent" to that required by CDFA rules. Pet. Reply App. 38a, § 1326.4(d).

Californians consume 13% of the pork eaten in the U.S. Pet. App. 151a ¶20, 344a ¶7. But California has only "about 0.133% of the national breeding pig herd," as CDFA admits. Pet. App. 80a. Thus, 99.87% of the pork consumed there comes from hogs born on farms outside the State, and it is to out-of-state sow farms that Proposition 12's production mandates almost exclusively apply. Pet. App. 150a-151a, ¶¶16-20.

**B.   The Pork Industry**

Congress has found that "the production of pork" plays "a significant role in the economy of the United States" because pork is "produced by thousands of producers, including many small- and medium-sized producers," and is "consumed by millions of people" on "a daily basis." Pork Promotion, Research, and Consumer Information Act, 7 U.S.C. § 4801(a)(2). "[P]ork and pork products are basic foods that are a valuable and healthy part of the human diet" and "must be available readily and marketed efficiently to

9

ensure that the people of the United States receive adequate nourishment." *Id.*, § 4801(a)(1), (3).

Across the country, 65,000 farmers raise 125 million hogs a year with sales of $26 billion. Pork production is segmented. The production chain starts on a sow farm—most in the Midwest or North Carolina—where sows give birth to piglets. Production then involves multiple steps, transactions, and actors before pork from a market hog reaches consumers. This segmented model promotes herd health and produces economies of scale that enable pork farmers to provide consumers with affordable and plentiful proteins. Pet. App. 147a-148a, ¶¶3-7. It also makes it very difficult to trace every cut of pork back to a particular sow housed in a particular way. Pet. App. 181a-183a, ¶¶128-135, 214a ¶348.

### 1.  Sow housing

How sows are housed is a critical farm-management decision informed by animal-welfare and production considerations. Pet. App. 184a, ¶¶147-149. Sow housing is either individual or group, or some combination of the two. Pet. App. 185a-186a, ¶¶150-152, 161-162. Most sow farmers—some 72%—care for their sows in individual pens throughout gestation. Pet. App. 204a, ¶286. These pens provide around 14 square feet of space and—for hygiene, safety, and animal-welfare and husbandry reasons—do not allow the sow to turn around. Pet. App. 151a, ¶24; 185a, ¶155. Individual pens provide a sow with access to water and feed without competition or aggression from other sows, which reduces sow stress, injury, and mortality; improves hygiene by separating food from manure; allows the farmer to provide individualized food rations and veterinary care; and protects farm workers from injury from sows that can

10

weigh 400 pounds. Pet. App. 172a-175a, ¶¶74-90; 185a-186a, ¶¶156-159; 222a, ¶¶394-395.

The remaining 28% of farmers keep their sows most of the time in group pens, which generally provide 16 to 18 square feet of space per sow. Pet. App. 186a, ¶162; 204a, ¶284.[4] In a group setting sows fight to establish their social order, and competition for food can lead to dominant sows becoming overweight and subordinate sows underweight. Pet. App, 186a, ¶¶165-166. Group housing poses complex management challenges in dealing with nutrition, medical care, sow safety and productivity, and employee safety. Pet. App. 186a-188a, ¶¶163-177.

Almost universally, farmers who use group pens nevertheless house sows in individual pens for the 30 to 40 days from the time a sow finishes weaning a litter through the time she is re-bred and pregnancy is confirmed. Pet. App. 173a-174a, ¶¶77-82; 204a, ¶287. This practice allows farmers to provide individualized care and nutrition that foster recovery from the stress of giving birth and weaning, and it protects sows from death, injury, pregnancy loss, or a drop in litter size due to aggression from other sows. Pet. App. 173a-175a,  ¶¶79-90; 189a-191a,  ¶¶181-206. Most farmers consider individual breeding pens vital to keeping sows healthy and successfully breeding piglets. Pet. App. 158a-169a, ¶58(a)-(l); see also Pet.

---

[4] Farmers keep young, unbred female pigs (gilts) in group pens with less space per pig because gilts are smaller than mature sows. Gilts are kept separate from sows until they are ready to breed at seven or eight months. Pet. App. 175a-176a, ¶¶91-92. But Proposition 12 covers the housing of gilts from six months of age. Cal. Health & Saf. Code § 25991(a), Pet. App. 39a. It therefore requires substantial changes in the housing of gilts supplied to sow farms. Pet. App. 198a, ¶¶244-249.

11

App. 266a, ¶25; 281a, ¶23; 289a-290a, ¶¶16-17; 312a, ¶14; 317a-318a, ¶¶12-13; 323a-324a, ¶16; 332a, ¶11.

In short, very few farmers in the country satisfy Proposition 12's sow-housing requirements, and most believe that those requirements harm their animals, employees, and operations. Pet. App. 172a-174a, ¶¶73-84; 175a, ¶90; 204a, ¶¶283-289. The same is true in nations like Canada, which supplies live piglets and finished pork to the U.S. Pet. App. 200a, ¶258; see Am. Br. of Canadian Pork Council in Support of Cert. 4, 7-8.

## 2. Vertical segmentation of pork production

After weaning, piglets are moved to nursery farms in a separate facility. Pet. App. 184a, ¶142. Nursery farms raise piglets for six to eight weeks, until they have grown into "feeder pigs." Pet. App. 149a, ¶11; 184a, ¶143. Feeder pigs are then raised for 16 to 17 weeks at finishing farms. Pet. App. 149a, ¶11; 181a, ¶121.

Once market hogs reach 240 to 280 pounds, they are sold to packer-slaughter facilities, often through years-long supply agreements that specify the number and timing of hogs to be delivered to the packer. Pet. App. 149a, ¶11; 181a, ¶126; 184a, ¶144. Packers slaughter thousands or tens of thousands of market hogs daily to process and pack cuts of pork. Pet. App. 150a, ¶13; 181a, ¶124. Some vertically integrated companies breed, raise, slaughter, and process hogs, but packers most commonly receive hogs from many different farms, including affiliated and independent farms, under multi-year contracts, and also acquire hogs on the spot-market. Pet. App. 149a, ¶¶11-12; 181a, ¶¶125-26.

12

Because pigs are serially transferred among multiple farming operations as they grow, it often is not clear upon their arrival at a packing facility which sow farm they originated from—let alone the housing conditions after the age of six months of the sow that gave birth to them. Pet. App. 181a-182a, ¶¶125, 130-131; 198a, ¶¶244-249.

### 3. Processing market hogs into different cuts

Packers process hogs received from different sources into cuts of pork destined for different markets across the country and abroad. Pet. App. 150a, ¶¶13, 19; 176a-177a, ¶96. Pork-product packages may combine meat from different pigs. Pet. App. 149a, ¶12; 158a-169a, ¶58; 176a-177a, ¶96; 182a-183a, ¶¶130-133. Rarely is the whole pig sold.

Packers sell pork cuts to wholesale distributors and large retail customers. Pet. App. 150a, ¶13; 181a, ¶124. Retailers in turn sell pork to consumers. Pet. App. 181a, ¶124. Each pork cut bears production costs stemming from the beginning of the supply chain—the sow that gave birth to the market hog—no matter where it is sold. Pet. App. 177a-178a, ¶96.

### 4. Pig and human health

Although Proposition 12 purports to protect Californians from "the risk of foodborne illness" (Pet. App. 37a §2), California declined to justify that goal below. Cal. Br. 33 n.13 (9th Cir. ECF 35). That is not surprising. CDFA conceded in its Standard Regulatory Impact Statement (SRIA) that Proposition 12's "[a]nimal space confinement allowances" are "not based on specific peer-reviewed published scientific literature or accepted as standards within the scientific community to reduce human food-borne

13

illness." Pet. App. 75a. In a later addendum to its SRIA, CDFA stated that it could not "confirm, according to its usual scientific practices, that the specific minimum confinement standards" in Proposition 12 "reduce the risk of human food-borne illness." Pet. Reply App. 74a. CDFA asserted that it nevertheless was not "unreasonable for California's voters to pass" Proposition 12 "as a precautionary measure to address any potential threats" while "scientific scrutiny" continues. *Id.*, 74a-75a. Petitioners allege, however, that no "potential threats" exist—still less ones that would be reduced by the increment of additional space afforded sows by Proposition 12. Pet. App. 225a-230a, ¶¶419-453.

Industry action and federal inspection fully address any "risk of foodborne illness" from pigs. To begin with, the rapid removal of piglets from sow farms after weaning, and the separation of sow farms from other hog farms, protects herds from disease. Pet. App. 184a, ¶142. Biosecurity is a major concern for pig farmers, because whole herds can be wiped out by diseases like African swine fever, which has killed hundreds of millions of pigs around the world. The spread of diseases is addressed by strict separation and decontamination measures and by limiting access to farms. Pet. App. 225a, ¶¶412-417.

Geographic and temporal separation of sows from market pigs also ensures that any disease a piglet might contract at a sow farm has disappeared before slaughter, six months and multiple farms later. Pet. App. 226a-229a, ¶¶426-442.[5]

---

[5] There is no such dual separation in the case of veal or eggs. Proposition 12 applies to the housing of veal calves, which are the product that is consumed, and to egg-laying hens, which

14

In addition, the Federal Meat Inspection Act (FMIA), 21 U.S.C. § 601 *et seq.*, "protect[s] the health and welfare of consumers" by "assuring" the safety of "meat and meat food products" in interstate commerce. *Id.*, § 602. The FMIA "establishes 'an elaborate system of inspecti[ng]' live animals and carcasses in order 'to prevent the shipment of impure, unwholesome, and unfit meat.'" *Nat'l Meat Ass'n* v. *Harris*, 565 U.S. 452, 455-456 (2012).

USDA's Food Safety and Inspection Service (FSIS) administers the FMIA. An inspector conducts an "'ante-mortem' examination of each animal brought to a slaughterhouse," and if the inspector finds no "evidence of disease or injury, he approves the animal for slaughter." 565 U.S. at 456. Any diseased animal is slaughtered separately and "no part of its carcass may be sold for human consumption." *Id.* at 457. If the inspector deems an animal "suspect," it is "'slaughtered separately'" and "an inspector decides at a 'post-mortem' examination which parts, if any, of the suspect animal's carcass may be processed into food for humans." *Ibid.*

## C. Proposition 12's Nationwide Impact On Pork Production And Pricing

Proposition 12 imposes steep compliance costs on farms that are almost all located outside of California. It requires production methods that increase sow mortality, decrease litter sizes, and reduce product-

---

produce eggs that carry a well-documented risk to human health and are immediately packed on the farm for human consumption. The Official Voter Guide for Proposition 12 (prepared by HSUS) mentions only eggs as a source of foodborne illness. https://vigarchive.sos.ca.gov/2018/general/propositions/12/.

15

ivity (because fewer sows can be housed in the same amount of space). Petitioners allege that farmers would need to spend "$293,894,455 to $347,733,205 of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes." Pet. App. 214a, ¶342. Smaller sow farms may not be able to bear these costs, which will drive consolidation in the industry. Pet. App. 213a, ¶341; 166a-167a, ¶58(i).

Proposition 12 will cause significant market dislocation and price impacts that cannot be cabined to California sales. Petitioners allege that compliance will increase farmers' production costs by over $13 per pig, a 9.2% cost increase. Pet. App. 214a, ¶343. Increased production costs will flow through to every market hog born to every sow raised in compliance with Proposition 12, and to every cut of meat from each of those market hogs—regardless of where that meat is sold. Variations in demand by location and season mean there is virtually no such thing as a hog whose cuts are all sold in California. Proposition 12's massive additional costs will necessarily spill over to sales of pork that have nothing to do with California. Pet. App. 214a-215a, ¶¶344-350.

CDFA acknowledged that, within California, Proposition 12 will make pork "more expensive to consumers," "disproportionately reduce food purchasing power of low-income consumers," substantially increase costs to public entities like schools, and impose significant conversion, operating, and record-keeping costs on sow farmers, including "lower piglet output per animal and increased breeding pig mortality." Pet. App. 68a, 85a-86a; see Pet. App. 195a,

16

¶230.[6] But Proposition 12 will necessarily have those same effects *outside* California as well, because compliance costs apply not only to the cuts of pork sold in California, but to all pork from any hog born to a Proposition 12-compliant sow, wherever that pork is sold. Farmers and consumers everywhere will pay for California's preferred animal-housing methods. Pet. App. 214a, ¶¶343-347.

Packers, distributors, and retailers that serve California will amplify these nationwide effects. It is infeasible to selectively house sows in compliance with Proposition 12 only when the pork from their offspring will be sold in California: sow farmers do not know where any particular pig's meat will be sold. And because it is impracticable, in the complex, multi-stage pork production process, to trace a single cut of pork back to a particular sow housed in a particular manner from six months of age on, buyers of market hogs everywhere will demand that their suppliers comply with Proposition 12. Pet. App. 206a, ¶¶298-301. As the complaint alleges, that is already happening. Pet. App. ¶300; see U.S. Am. Br. 21 (although "some of these burdens would result from the decisions of other market participants rather than the direct terms of Proposition 12, they are properly subject to consideration and proof as part of determining the overall 'practical effect' of the law").[7]

---

[6] As litigation progressed CDFA walked back as not "definitive" its admission that Proposition 12 adversely affects pig health. Pet. Reply App. 76a-77a. But the complaint alleges that Proposition 12 will increase sow mortality and reduce litter size, and accompanying farmer declarations provide vivid examples. Pet. App. 173a-74a, ¶¶78-83, 159a, 163a-164a, 166a-168a.

[7] Tracing would involve knowing how an unbred gilt was housed from six months of age (gilts are raised in separate facilities and

17

### D.   The Rulings Below

The district court dismissed petitioners' challenge to Proposition 12. Pet. App. 21a-35a. On de novo review the Ninth Circuit affirmed. It accurately characterized petitioners' allegations:

> A single hog is butchered into many different cuts which would normally be sold throughout the country. In order to ensure that they are not barred from selling their pork products into California, all the producers and the end-of-chain supplier will require assurances that the cuts and pork products come from [sows] confined in a manner compliant with Proposition 12. * * * As a practical matter, given the interconnected nature of the nationwide pork industry, all or most [sow] farmers will be forced to comply with California requirements. The cost of compliance with Proposition 12's requirements is high, and would mostly fall on non-California transactions, because 87% of the

---

sow farmers often buy rather than raise them); knowing which sow bred the market pig and how the sow was housed at all times; knowing which nursery a piglet was moved to, and segregating it there (nurseries get pigs from many different sow farms); knowing which finishing farm a pig was moved to, and segregating it there; then segregating that pig when it arrives at the packer, which may receive 10,000 pigs a day from many different finishing farms, some under contract and some spot purchases; then segregating the whole meat from that pig and keeping it segregated throughout packing and distribution. Tracing at each step is difficult; put them together and tracing from gilt to whole pork cut is not currently possible. Pet. App. 182a-183a, ¶¶129-135. The sow farmers whom petitioners represent often have no control over segregation or tracing beyond their own farms.

18

> pork produced in the country is consumed
> outside California.

Pet. App. 9a. Petitioners thus "plausibly alleged that Proposition 12 will have dramatic upstream effects," "require pervasive changes to the pork production industry nationwide," and cause "cost increases to market participants and customers" everywhere. Pet. App. 18a, 20a. Nevertheless, the court of appeals held that petitioners failed to state a claim, for three reasons.

First, the "broad language" in this Court's *Healy* line of cases is "'overbroad extraterritoriality dicta'" that "'cannot mean what they appear to say.'" Pet. App. 7a. *Healy*'s explanation that the extraterritoriality principle "'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the [regulating] State'" (491 U.S. at 336), concerns only "'price control or price affirmation statutes.'" Pet. App. 8a (quoting *Pharm. Rsch. & Mfrs of Am.* v. *Walsh*, 538 U.S. 644, 669 (2003)). Though Proposition 12 causes "cost increases" everywhere, it does not "dictat[e]" pork prices or tie "California to out-of-state prices." Pet. App. 8a, 18a.

Second, if the extraterritoriality doctrine does apply beyond price controls, "significant upstream effects outside of the state" do not violate it if the law directly "regulate[s] only conduct in the state," like in-state sales. Pet. App. 10a, 13a-14a.

Third, turning to *Pike*, the court of appeals attributed no "significant burden on interstate commerce" to Proposition 12, deeming its effects to be only "increased costs," which "do not qualify" for dormant Commerce Clause purposes. Pet. App. 17a-

19

18a. Having found no qualifying burden, the court did not consider the purported benefits of the law.

## SUMMARY OF ARGUMENT

Petitioners' complaint should not have been dismissed because it plausibly alleges that Proposition 12 violates the Commerce Clause under this Court's extraterritoriality and *Pike* v. *Bruce Church* doctrines. As petitioners allege:

**I.** Proposition 12 violates the dormant Commerce Clause's extraterritoriality doctrine, which holds almost *per se* invalid State laws that have the practical effect of controlling commerce outside the State.

Proposition 12 forbids the sale in California of pork unless the sow was housed the way California prefers. Because California produces so little commercial pork itself, nearly all those sows are located outside California—and almost none are housed in a manner that satisfies Proposition 12. The practical effect of Proposition 12 is therefore to govern sow housing outside the State. And because of the nature of the industry and its product, Proposition 12 will govern sow housing generally, not just for out-of-state pigs destined for the (very large) California market. It will require massive and costly changes across the entire $26-billion-a-year industry. And it inescapably projects California's policy choices into every other State, a number of which expressly permit their farmers to house sows in ways inconsistent with Proposition 12.

Proposition 12 thus should be invalidated because it is inimical to the core constitutional principles that the dormant Commerce Clause has long been understood to protect. It prevents the orderly operation of

20

an unobstructed nationwide pork market—a market that is unquestionably essential to the Nation's food security. It upends the foundational principle of horizontal federalism that guarantees each state equal footing in the Union and its own sovereign dignity. And it threatens even greater harm, as other States enact competing and potentially retaliatory regulations, Balkanizing the national pork market.

**II.** Even if Proposition 12 were not *per se* invalid, its vast extraterritorial impact requires close scrutiny of California's two purported justifications for the law: animal welfare and human health.

Those justifications do not vindicate Proposition 12's extraterritorial effects on commerce and our federalist system. California lacks police power to address the welfare of farm animals in other States; that is the proper concern of the States where animals are located. And concern over food-borne illnesses in humans is bogus, because features of the industry and a robust federal meat-inspection system eradicate that risk, which would in any event be unaffected by a change from current to Proposition 12-mandated housing standards.

**III.** Proposition 12 also fails the *Pike* standard. Petitioners adequately allege that Proposition 12 imposes extreme burdens on interstate commerce that far outweigh justifications for Proposition 12 that are illusory and invalid.

21

## ARGUMENT

## I. PROPOSITION 12 UNCONSTITUTIONALLY REGULATES COMMERCE OCCURRING WHOLLY OUTSIDE CALIFORNIA

More than 99% of pork consumed in California is produced outside of that State. This fact triggers the dormant Commerce Clause's extraterritoriality principle, under which regulation of "commerce that takes place wholly outside of the State's borders" is prohibited "whether or not the commerce has effects within the [regulating] State." *Healy*, 491 U.S. at 336; see *Brown-Forman*, 476 U.S. at 583 (1986) (whether a state law "is addressed only to [in-state] sales is irrelevant if the 'practical effect' of the law is to control" conduct in other states).

The "critical inquiry" is "whether *the practical effect* of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (emphasis added). And "practical effect" is evaluated by "considering the consequences of the statute itself" and "how [it] may interact with the legitimate regulatory regimes of other States." *Ibid*. To serve its important purposes—preserving interstate markets, maintaining the federal-state regulatory balance, and protecting state sovereign dignity—the extra-territoriality doctrine should be given a scope that bars Proposition 12.[8]

---

[8] Some courts of appeals say the extraterritoriality doctrine is limited to dormant Commerce Clause challenges to price-control or price-affirmation statutes. *E.g.*, *Energy & Env't Legal Inst.* v. *Epel*, 793 F.3d 1169, 1174-75 (10th Cir. 2015); *Ass'n des Eleveurs de Canards et d'Oies du Quebec* v. *Harris*, 729 F.3d 937 (9th Cir. 2013). But the needs served by the doctrine do not arise only in the case of price-control or -affirmation laws. And *Pharm-*

22

## A.  The Extraterritoriality Doctrine Serves Fundamental Purposes At The Heart Of The Constitutional Design

The rule that a State may not enact laws that have the practical effect of controlling conduct outside that State's borders serves vital functions central to the structure of our federalist system.

*First*, the extraterritoriality rule is important to achieving the Commerce Clause's aim of avoiding the Balkanization that characterized the Nation prior to ratification of the Constitution.

*Second*, the rule prevents one State from imposing its policy choices on another and thereby protects the dignity and sovereignty of all States.

*Third*, there are nationwide markets for which regulation, if any, must be at the federal level to ensure uniformity and allow the free flow of trade. The extraterritoriality rule safeguards national markets against parochial or retaliatory regulatory efforts.

*Fourth*, the rule protects citizens of other States who, lacking a voice in the enactment of the regulating state's laws, could be unfairly burdened under the guise of achieving parochial interests.

---

*aceutical Research*, 538 U.S. at 669, did not limit the *Healy* line to such cases. This Court has examined the extraterritorial effects of state laws in non-price cases as varied as environmental standards (*C&A Carbone, Inc.* v. *Town of Clarkston*, 511 U.S. 383 (1994)) and corporate-registration requirements (*Edgar* v. *MITE Corp.*, 457 U.S. 624 (1982)). And in *Brown-Forman*, 476 U.S. at 583, this Court relied on *Southern Pacific*—a case about train length—for the proposition that courts must consider the practical effects of a state law.

23

These constitutional principles require rigorous scrutiny of state laws that have material extra-territorial effects because those laws pose unique dangers to the structure of our federalism and the operation of nationwide markets. Indeed, this Court recently recognized that the extraterritoriality doctrine remains an independently operating "exception" to or "variation" of other dormant Commerce Clause rules governing discriminatory state laws or regulations subject to *Pike* balancing. *South Dakota* v. *Wayfair*, 138 S. Ct. 2080, 2091 (2018) (citing *Brown-Forman*, 476 U.S. 573). Whether regarded as a negative implication of Congress's commerce power or located elsewhere in the Constitution's federalist scheme of state territoriality and interstate "competition for a mobile citizenry" (*Gregory* v. *Ashcroft*, 501 U.S. 452, 458 (1991)), the extraterritoriality doctrine serves interests that are cornerstones of our constitutional design. See, *e.g.*, *Paul* v. *Virginia*, 75 U.S. (7 Wall.) 168, 180 (1869) (the Privileges and Immunities Clause "was not intended * * * to give to the laws of one State any operation in other States; such laws "can have no such operation" except by consent).

### 1.   The extraterritoriality doctrine preserves interstate commerce

The Commerce Clause "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States." *Hughes* v. *Oklahoma*, 441 U.S. 332, 325-326 (1979). Thus, a "special concern" of the Constitution is "the maintenance of a national

24

economic union unfettered by state-imposed limitations on interstate commerce." *Healy*, 491 U.S. at 335-336; see *Tennessee Wine & Spirits Retailers Ass'n* v. *Thomas*, 139 S. Ct. 2449, 2459-2460 (2019) (dormant Commerce Clause "preserves a national market for goods and services"); *Camps Newfound/ Owatonna, Inc.* v. *Town of Harrison, Me.*, 520 U.S. 564, 596 (1997) (Scalia, J., dissenting) ("We have often said that the purpose of our negative Commerce Clause jurisprudence is to create a national market").

Madison understood that allowing states to impose requirements on commercial actors beyond their borders "tends to beget retaliating regulations." Madison, *Vices of the Political System of the United States*, 2 Writings of James Madison 361, 363 (Gaillard Hunt ed. 1901). And Hamilton recognized that "interfering and unneighborly regulations of some States, contrary to the true spirit of the Union," give "just cause of umbrage and complaint to others" and could "be multiplied and extended" until they become "serious sources of animosity and discord," "injurious impediments to the intercourse" among the states, and a threat to the Union. The Federalist No. 22 at 144 (Hamilton) (Clinton Rossiter ed. 1961); see also The Federalist No. 11 at 89 (Hamilton) ("unrestrained intercourse between the states" will "advance the trade of each by an interchange of their respective productions").

This Court's precedent, which interprets the Commerce Clause to avert Balkanization by prohibiting states from impeding the interstate flow of goods, therefore "has deep roots." *Comptroller of Treasury of Maryland* v. *Wynne*, 575 U.S. 542, 549 (2015); see *Tennessee Wine*, 139 S. Ct. at 2460 ("without the dormant Commerce Clause, we would be

25

left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising"). Indeed—and particularly relevant here—it "was the vision of the Founders" that, through the protections of the Commerce Clause, "every farmer" and "craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them." *H.P. Hood & Sons, Inc.* v. *Du Mond*, 336 U.S. 525, 539 (1949).

## 2. The extraterritoriality doctrine safeguards State sovereignty

A State "is sovereign within its territorial limits." *Ableman* v. *Booth*, 62 U.S. 506, 516 (1858). But a State's projection of its laws to control commerce "occurring wholly outside the boundaries of [the] State exceeds the inherent limits of the enacting State's authority." *Healy*, 491 U.S. at 336. As a matter of constitutional design, "[n]o State can legislate except with reference to its own jurisdiction." *Bonaparte* v. *Tax Court*, 104 U.S. 592, 594 (1882). State action that "pass[es] beyond" its territorial limits and "the rights of [its] own citizens," and "act[s] upon the rights of citizens of other States," is "incompatible with the rights of other States, and with the constitution of the United States." *Ogden* v. *Saunders*, 25 U.S. 213, 369 (1827).

Recognizing the inherent right of *each* State to regulate in-state conduct as the State sees fit, the extraterritoriality doctrine bars the "projection of one state's regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337. While States retain "autonomy" within "their respective sphere,"

26

the Constitution preserves each State's dignity and sovereignty by forbidding States from intruding upon the policy choices of their sister States through extraterritorial regulation. *Id.* at 336. Fundamentally, sovereign dignity requires that a State may not "attach restrictions" to "imports" that "control commerce in other States," because that "would extend the [State's] police power beyond its jurisdictional bounds." *C. & A. Carbone*, 511 U.S. at 393. Therefore, when the practical effect of a law is to "regulate directly * * * interstate commerce, including commerce wholly outside the State, it must be held invalid," "'regardless of the purpose with which it was enacted.'" *Edgar*, 457 U.S. at 642, 643 (plurality op.).

### 3.    The extraterritoriality doctrine safeguards nationwide markets

"The basic principles of the Court's Commerce Clause jurisprudence are grounded in functional, marketplace dynamics." *Wayfair*, 138 S. Ct. at 2095. Regulation of a nationwide market often is the sole province of the federal government, either due to the nature of the goods or because the complexities of the market that have freely developed without state interference require it. See *Southern Pac. Co.* v. *State of Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945) ("[T]he states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority"). The extraterritoriality doctrine's focus on the practical effects of a state law is well-grounded in this jurisprudence, which "has eschewed formalism for a sensitive, case-by-case analysis of purposes and

effects." *West Lynn Creamery, Inc.* v. *Healy*, 512 U.S. 186, 201 (1994). The extraterritoriality doctrine plays an important role in safeguarding "those subjects that by their nature imperatively demand a single uniform rule, operating equally on the commerce of the United States." *Wayfair*, 138 S. Ct. at 2090.

> **4.  The extraterritoriality doctrine is a necessary check on one State placing the burdens of achieving its policy goals on the citizens of other States**

State economic regulation with material extra-territorial effects also must be viewed with great skepticism because the usual constraints of the democratic process do not apply. Laws that serve the enacting State's policies by controlling conduct outside of that State will rarely be politically unpopular within the enacting State. See *Comptroller of Treasurer of Maryland*, 575 U.S. at 555-556. In those situations, the harm to interstate commerce "is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *Southern Pac.*, 325 U.S. at 767 n.2.

> **B.  Proposition 12 Violates The Extra-territoriality Doctrine**

1. Proposition 12 in practical effect regulates wholly out-of-state conduct. Petitioners' complaint describes the features of raising pigs for pork, in which a market hog typically moves through different farms at different stages of life before being processed into numerous cuts of pork destined for different markets. This complex sequence includes numerous transactions—among farmers, packers, and distribu-

28

tors—that occur entirely outside California but will nonetheless effectively be regulated by Proposition 12.

Petitioners allege that Californians consume about 13% of the Nation's pork, but California farmers produce only a miniscule fraction of that meat. Nearly all pork sold in California comes from pigs raised outside the State. P. 8, *supra*. Petitioners detail the complex, segmented commercial pork production process that has evolved in this country. That vertically segmented production model evolved to protect herd health and to achieve economies of scale necessary to provide consumers with affordable pork products. Pp. 8-12, *supra*.

As the Ninth Circuit found, petitioners sufficiently alleged that Proposition 12 is incompatible with this production model and will impose significant costs on farmers and consumers outside California. Pet. App. 9a. Proposition 12 mandates that farmers provide each sow with 24 square feet of usable floor space and largely prohibits the use of individual stalls, even during the critical period between weaning and confirmation of pregnancy, when sows recover from the stress of giving birth, the sows are bred, and the embryo attaches. P. 6, *supra*. Both the square-feet requirement and the ban on breeding stalls are contrary to how the vast majority of sow farmers house their herds, and many farmers believe they are affirmatively harmful to sow health. Pp. 9-11, *supra*.

But because of the impracticality of tracing a single cut of pork back to a particular sow housed in a particular manner from six months of age on (p. 16 n.7, *supra)*, farmers everywhere will be required to conform their *entire* operations with Proposition 12 for all their sows. Pp. 16-17, *supra*. Thus, a pig raised

29

entirely outside California (as virtually all pigs are), but whose meat is sold even partly in California, will have to conform with Proposition 12. And because sow farmers will not know whether any cut from their pigs will be sold in California, all sows will need to be raised in a Proposition 12-compliant manner. As the complaint alleges, packers have already started telling their suppliers that *all* hogs must be raised in a way that meets the Proposition 12 criteria. P. 16, *supra*. Changing sow facilities to meet the California-imposed burdens will impose hundreds of millions of dollars of upfront costs on farmers, increasing production costs by about $13 per pig, regardless of where it is sold. P. 15, *supra*.

It is no answer, as California has urged, that Proposition 12 by its terms governs only sales of pork within California. The fact that the law purports to regulate only in-state commerce "is *irrelevant* if the 'practical effect' of the law is to control" conduct in other States. *Brown-Forman*, 476 U.S. at 583. Because 99.9% of pork consumed in California derives from sows raised out-of-state, the burden of transforming facilities will be borne by farmers virtually entirely outside of California. And because 87% of the Nation's pork is sold outside of California, the significant increase in the cost of pork resulting from Proposition 12 will be borne by consumers throughout the country. This is a material, practical, extraterritorial-regulation-driven effect on a $26 billion-per-year industry whose production processes have successfully evolved over decades in response to free-market forces.

2. Proposition 12 also violates the extraterritoriality doctrine because it impermissibly intrudes into the operations of out-of-state businesses

30

with its invasive inspection requirements. CDFA's proposed regulations make clear the extent to which California plans to inject itself into oversight of farms located out-of-state. Those proposed regulations provide for on-site inspections, including unannounced visits, by California's agents to certify out-of-state sow farms as Proposition 12 compliant. Pet. Reply App. 38a-39a, § 1326.5(a). California's agents must be afforded "access to the production" facility, offices, and any other places where covered animals may be kept, handled, processed, or transported. Pet. Reply App. 33a, § 1326.1(c). This physical intrusiveness cannot be reconciled with the territorial limits of a State's jurisdiction. See *Ogden*, 25 U.S. at 369.

3. Proposition 12 subjects pork farmers to inconsistent regulations and will lead to the Balkanization that the Framers called a constitutional convention to avoid. *Healy* directed courts to consider how a challenged law may interact with the regulatory regimes of other States and what effect would follow if other States adopted similar legislation. 491 U.S. at 336. The comprehensive and intrusive manner in which Proposition 12 prescribes farming practices for predominantly out-of-state businesses is precisely the type of regulation that is likely to "offend Sister states" and conflict with their regulation of in-state businesses. *Id.* at 336 n.13.

Allowing Proposition 12 to stand would encourage other States to impose sow housing requirements on out-of-state farmers, resulting in a regulatory patchwork that would throttle the nationwide pork market. Indeed, faced with an ever-growing array of state-imposed sow-housing requirements, some of which would be contradictory, the pork market would be stuck in the type of "gridlock" that required the

31

Court in *Healy* to strike down Connecticut's price-affirmation law. 491 U.S. at 340.

This scenario is not speculative. A Michigan statute permits that State's farmers to use individual pens from seven days prior to farrowing until pregnancy is confirmed, which Proposition 12 forbids. Mich. Comp. Laws § 287.746(1)(d), (j) & (2)(a). Ohio regulations permit Ohio sow farmers to confine sows in breeding pens post-weaning until a new pregnancy is confirmed, Ohio Admin. Code § 901:12-8-02(G)(4), (5), a practice that Proposition 12 forbids. Colorado permits its farmers to confine pregnant sows in individual stalls for 12 days before farrowing (Colo. Rev. Stat. § 35-50.5-102(1)(b)), and Rhode Island for 14 days (Rhode Island Stat. § 4-1.1-4(7)). Proposition 12 limits confinement of sows in farrowing stalls *anywhere* to 5 days. Pet. App. 45a. A Massachusetts citizen initiative advanced by HSUS two years before Proposition 12 imposes a stand-up, turn-around rule on pork sales in the State, but unlike Proposition 12 includes no square footage requirement. Mass. Gen. Laws Ann. ch. 129 App., §§ 1-3(C), 1-5(E). The practical effect of Proposition 12 is to override all those laws, and with them the sovereign dignity and policy choices of the enacting States.

In *Southern Pacific*, this Court invalidated the Arizona Train Limit Law, which capped the length of passenger and freight trains operated within the State, finding that it "must inevitably result in an impairment of uniformity of efficient railroad operation" because other States either did not regulate train length at all or imposed different (less strict) limits. 325 U.S. at 773. The "evident" confusion and difficulty created by imposing different regulations on an industry that operated nationwide

32

left "unsatisfied the need for uniformity." *Id*. at 774. And because of the impracticality of breaking down and reassembling trains at the Arizona borders, the practical effect of the Arizona law was that it "often controls the length of passenger trains all the way from Los Angeles to El Paso." *Ibid*. Similarly here, Proposition 12 disrupts a national market and controls, in practical effect, how hogs are raised in Iowa, North Carolina, and every pig-producing State, regardless of their local laws.

4. Proposition 12's extraterritorial effects are incompatible with the national policy proclaimed in the Pork Promotion, Research, and Consumer Information Act. In *Southern Pacific*, the Court explained that the Arizona Train Limit Law created a "substantial obstruction to the national policy proclaimed by Congress to promote adequate, economical and efficient railway transportation service." 325 U.S. at 773. In the Pork Promotion statute, Congress declared that pork "must be available readily and marketed efficiently" to provide food security to millions of Americans and that the "maintenance and expansion of existing markets" is vital to "the general economy of the United States." 7 U.S.C. § 4801(a)(3), (4).

Principles like the extraterritoriality rule "accommodate the necessary balance between state and federal power." *Wayfair*, 138 S. Ct. at 2090. From the outset of its Commerce Clause jurisprudence, this Court has recognized that certain "subjects by their nature 'imperatively demand a single uniform rule, operating equally on the commerce of the United States.'" *Ibid*. (quoting *Cooley* v. *Bd. of Wardens of Port of Phila. ex rel. Soc'y for Relief of Distressed Pilots*, 12 How. 299, 319 (1852)). In the Pork

33

Promotion statute, Congress has signaled the importance of fostering an efficient nationwide pork market. The practical effects of Proposition 12 are inconsistent with that congressional policy.

5. Without the territorial constraints imposed by the dormant Commerce Clause and the principles of horizontal federalism it embodies, there is nothing (short of congressional action) to stop any state from imposing production standards on imports and sales, regardless of whether and how that destroys investments made in other States, disrupts national markets, or inflames tensions with other States. California could bar sales of goods not produced by union members, even though in right-to-work States employees may opt out of union membership, and right-to-work laws are one aspect of competition among states. Or California might bar imports of goods not produced by workers paid California's $15-an-hour minimum wage, even though in most States the minimum wage is below $10, another key element in interstate competition.[9] It is not farfetched, given the deep divisions on moral and social issues within our country, to see a threat to the Union in the construction of these kinds of legal moats around a State's markets.

This Court in *Baldwin* mocked the idea that the Commerce Clause allows a State to "condition importation [of goods] upon proof of a satisfactory wage scale." 294 U.S. at 524. Yet if Proposition 12 is constitutional, that and any number of other laws

---

[9] California argued in another case challenging Proposition 12 that a minimum-wage-based ban on sales would be constitutional. Oral Argument at 16:09-18:30, *N. Am. Meat Inst.* v. *Becerra*, https://www.ca9.uscourts.gov/media/video/?20200605/19-56408.

34

conditioning sales on compliance with a State's rules governing the operation of manufacturing plants, of the type struck down in *Legato Vapors, LLC* v. *Cook*, 847 F.3d 825 (7th Cir. 2017), could proliferate. There, the Seventh Circuit held that a State violated the extraterritoriality rule when, citing public health reasons, it conditioned obtaining a permit to sell vaping liquids in the State on the manufacturer—90% of them located out of state—maintaining specified security arrangements, satisfying "construction, design, and operation" requirements, and submitting to audits by State agents. *Id.* at 828. Proposition 12 likewise tells out-of-state farms how to produce pigs, and is likewise unconstitutional.

6. In sum, petitioners have sufficiently alleged that Proposition 12 will have substantial extra-territorial effects on conduct that takes place outside of California. Those effects are manifested in multiple ways. Proposition 12:

- requires farmers in other States and abroad to significantly change their operations, even though most of the pork they produce will not be sold in California;

- authorizes California's agents to inspect sow farms, almost all of which are outside California's borders;

- places farmers at risk of contradictory state regulations that will hamstring the nationwide pork industry;

- overrides other states' policy choices about the way their farmers may raise hogs; and

35

- imposes state regulations on a market that, as Congress has recognized, needs to be fostered by the nationwide free flow of pork.

These allegations state a claim that Proposition 12 violates the Commerce Clause's extraterritoriality rule.

7. In light of the damage they do to the horizontal-federalism and free-interstate-commerce principles that are foundations of our Union, extraterritorial laws, like discriminatory laws, should be "deemed almost *per se* invalid." *Energy and Env't Legal Inst.*, 793 F.3d at 1172. When a State has genuine, fact-based concerns about the health and safety of its residents, it may reasonably be assumed that its sister States share those concerns and will regulate their own businesses accordingly. If not, the Commerce Clause gives Congress authority to step in. Often, Congress will address States' concerns through a federal regulatory regime, as with federal meat inspection. California may experiment as it wishes within its own borders. But as Justice Brandeis described that "happy inciden[t] of the federal system," "a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments *without risk to the rest of the country.*" *New State Ice Co.* v. *Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (emphasis added). Allowing a State to export its social experiments extraterritorially threatens our federalism. That is certainly true of Proposition 12, which many States strongly oppose.

36

## II. PROPOSITION 12 IS UNCONSTITUTIONAL BECAUSE IT GOVERNS EXTRATER-RITORIAL ACTIVITY BEYOND CALIF-ORNIA'S POLICE POWERS

Even if California's extraterritorial projection of its sow-husbandry laws is not a *per se* violation of the Commerce Clause, it nevertheless is unconstitutional because *this* extraterritorial projection exceeds California's police powers.

Under this Court's cases, a law with extra-territorial effects on commerce that has no local benefits exceeds the police power and violates the Commerce Clause. Courts do not accept at face value a State's invocation of police power, but ask whether the law reasonably can be justified as a measure to protect the health and safety of its citizens. Proposition 12 projects California's sow husbandry rules extraterritorially, but bears no relation to the State's internal health. And its concern for the "moral satisfaction, peace of mind, social approval" of its citizens is not within the police power. Pet. App. 75a.

### A. A Law That Applies Extraterritorially But Has No Local Benefits Violates The Commerce Clause

1. States may exercise "'police powers to protect the health and safety of their citizens.'" *Hill* v. *Colorado*, 530 U.S. 703, 715 (2000). They enjoy "'great latitude'" to do so. *Gonzales* v. *Oregon*, 546 U.S. 243, 270 (2006). But the police power is not limitless. This Court has long recognized constitutional "checks upon the police power of the states." Ernst Freund, *The Police Power* § 68 (1904); see *Hodel* v. *Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring) (exercise of police power

37

may be "challenged as violating some specific provision of the Constitution").

One of those checks is the Commerce Clause. A state law that governs commerce extraterritorially is unconstitutional if, though "clothed as police-power regulations" (*Tenn. Wine*, 139 S. Ct. at 2468), it bears no "reasonable relation to some purpose within the competency of the state to effect." *Meyer* v. *Nebraska*, 262 U.S. 390, 400 (1923); see, *e.g.*, *S. Pac.*, 325 U.S. at 781-782; *Brennan* v. *City of Titusville*, 153 U.S. 289, 304 (1894); *Hannibal & St. J.R. Co.* v. *Husen*, 95 U.S. 465, 469 (1877). Such a law must be "directed to legitimate local concerns" (*City of Phila.* v. *New Jersey*, 437 U.S. 617, 624 (1978)); otherwise it extends the "police power" of a State "beyond its jurisdictional bounds." *C & A Carbone*, 511 U.S. at 393; see U.S. Am. Br. 18 (a State may not "attemp[t] to address harms occurring outside the State").

*Baldwin*, for example, concerned a law that established a minimum price for milk sold in New York regardless of where it was produced. 294 U.S. at 519. New York claimed the law would "promote health." *Id.* at 524. In New York's view, the law would provide additional "economic security for farmers" so that they would not "be tempted to save the expense of sanitary precautions." *Id.* at 523.

Writing for a unanimous Court, Justice Cardozo rejected that argument. He observed that the relationship between the earnings of out-of-state farmers and the health of New York residents was "too remote and indirect" to "be upheld as a valid exercise by the state of its internal police power." 294 U.S. at 523-524. The "prope[r]" maintenance of "farms or factories" in other States, the Court reasoned, is a matter for which *those* States' legislatures, exercising

38

*their* police power, should "supply the fitting remedy." *Id.* at 524. Put simply, state laws that project extraterritorially but bear no relation to internal "public safety or public order are beyond the police power of a state or locality and thus violate the commerce clause." 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 11.7(a) n.2 (5th ed. 2012) (collecting decisions).

2. In determining whether a law exceeds the police power, courts do not accept at face value the proffered rationale. Even the most well-intentioned regulation "might well exceed the scope of the State's legitimate interests." *Head* v. *N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 447 (1963). A State's determination that a law "constitutes proper exercise of police power is not final or conclusive" (*Meyer* v. *Nebraska*, 262 U.S. 390, 400 (1923)), regardless of whether it was enacted "in good faith" to "protect the health of the people" (*Minnesota* v. *Barber*, 136 U.S. 313, 319 (1890)). Thus, the mere "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel* v. *Cons. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (op. of Powell, J.); see *Kan. City S. Ry.* v. *Kaw Valley Drainage Dist.*, 233 U.S. 75, 79 (1914) (Holmes, J.) (a "state cannot avoid the operation of" the Commerce Clause "by simply invoking the convenient apologetics of the police power").

The question ultimately is one of reasonableness: Can the law reasonably be justified as a measure to "'protect the health and safety of th[e] citizens'" of the State or locality given its effects outside the State? *Hill*, 530 U.S. at 715. The "test of 'reasonableness' under the interstate commerce clause cases is much stricter" than the "test of 'reasonableness' of economic

39

activities under the due process and equal protection cases." 2 *Treatise on Constitutional Law*, *supra,* § 11.7(a) (discussing *S. Pac.*, 325 U.S. at 778). To protect interstate commerce and interstate relations from harm, courts must take a hard look at the proffered rationales for a law with substantial extraterritorial effects, and how well the law serves those purposes. See *Legato Vapors*, 847 F.3d at 834 n.1 ("extraterritorial laws" may be upheld "in the unusual circumstances where the state law serves an important purpose and the state can show that no less restrictive or intrusive measures would serve the purpose"); cf. *Central Hudson Gas & Electric* v. *Pub. Serv. Comm'n*, 447 U.S. 557, 561-566 (1980) (protecting commercial speech by requiring that the government's regulatory interest be substantial, that regulation directly advance that interest, and that regulation be no more extensive than necessary to serve that interest).

### B.   Proposition 12 Bears No Relation To California's Internal Health And Safety

This case presents a textbook example of a law that extends the police power of the State "beyond its jurisdictional bounds." *C & A Carbone*, 511 U.S. at 393. Proposition 12's stated justification to prevent animal cruelty is invalid, because California has no interest in methods of out-of-state farm animal confinement. And its health-and-safety rationale is so baseless that the State did not try to defend the law on that ground in the district court or court of appeals. Dist. Ct. Dkt. 18-1, at 12 n.6; Cal. Br. 33 n.13. As the United States explained below, the State "does not invoke any legitimate interest in avoiding in-state harm." U.S. Am. Br. 19 n.3. At a minimum, the complaint raises plausible concerns about the validity

40

of Proposition 12 as a legitimate exercise of police power that state a Commerce Clause claim.

1. The first justification for Proposition 12 is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement." Pet. App. 37a §2. Although safeguarding the welfare of domestic animals is a valid exercise of police power, a law that attempts to address perceived harms to animals in *other* States is not. California's interest in preventing perceived animal cruelty is not a legitimate reason for regulating the production of goods outside its borders.

By the early twentieth century, every State had enacted laws to protect animal welfare. Animal Welfare Inst., *Animals and Their Legal Rights: A Survey of American Laws from 1641 to 1990* 4 (1990). This Court has long held that statutes that prohibit actions that are "injurious to its domestic animals" are legitimate exercise of police power. *Reid* v. *Colorado*, 187 U.S. 137, 151 (1902); see *Sentell* v. *New Orleans & C.R. Co.*, 166 U.S. 698, 705 (1897).

But the police power does not extend "beyond * * * jurisdictional bounds" to protect the welfare of animals in other States. *C&A Carbone*, 511 U.S. at 393; cf. *Edgar*, 457 U.S. at 644 (State had "no legitimate interest in protecting nonresident shareholders"); see U.S. Am. Br. 18.

One measure enacted in Proposition 12 is aimed at protecting the welfare of California's "domestic animals." That provision prohibits farmers "within the state" from confining sows "in a cruel manner." Pet. App. 37a § 25990(a). But the measure at issue here prohibits the sale of pork in California that "is the meat of immediate offspring" of a sow that was "confined in a cruel manner." Pet. App. 38a

41

§ 25990(b)(2). That measure has *no* impact on pigs housed in California. As the State has acknowledged (Pet. App. 80a), 99.87% of commercial sows in the United States are housed in other States. And Proposition 12 already makes it illegal for in-state farmers to "confine[] in a cruel manner" the small number of in-state sows. As the United States explained below, "there can be no plausible argument" that the challenged provision "is intended to promote the welfare of animals within California." U.S. Am. Br. 18.

2. The second justification for Proposition 12 is to protect "the health and safety of California consumers" by reducing "the risk of foodborne illness and associated negative fiscal impacts on the State of California." Pet. App. 37a §2. Although States may enact food-safety measures to protect the public health, Proposition 12's minimum-space requirements are unconnected to that objective.

To protect public health, a State has authority to regulate "animals having contagious or infectious diseases." *Hannibal & St. J.R.*, 95 U.S. at 471. But this Court repeatedly has held that purported meat-safety measures that burden interstate commerce and bear no real relation to public health violate the Commerce Clause. In *Brimmer* v. *Rebman*, 138 U.S. 78, 80 (1891), for instance, a State law imposed an inspection fee on beef slaughtered more than 100 miles from its place of sale. The law was "avowedly enacted to protect" the State's citizens from "unwholesome meats." *Id.* at 84. Yet this Court concluded that it was a "regulation of commerce beyond the power of the state to establish" because it lacked any "real or substantial relation to" the stated public-health objective. *Ibid.*; see *Barber*, 136 U.S. at

42

329 (meat-inspection law was not a "legitimate exertion of the police powers of the state").

The same is true of Proposition 12. The stated justification of protecting the health and safety of citizens by reducing the risk of foodborne illness is bogus. Pet. App. 37a § 2. No evidence connects that objective to the requirement that farms house sows with 24 square feet of space (rather than 16 to 18) and cease to use gestation stalls.

Proposition 12 "addresses only *sow* housing practices"—not housing practices for the "*offspring* of sows" that actually "enter the market" for whole pork meat and might "present some risk of causing foodborne illness." Pet. App. 226a, ¶¶423-424. Sows and offspring "are physically separated" after nursing precisely "to prevent diseases from being transmitted from the sow to the offspring while the piglets develop." Pet. App. 227a, ¶¶430-32; 184a, ¶142. Offspring then are raised for five more months in different facilities than sows. Pet. App. 149a, ¶11. "Any infection held [by offspring] early in life is not likely to be present even several months later." Pet. App. 227a, ¶433.

CDFA—the agency with responsibility for ensuring food safety in California—agreed that the food-safety justification is baseless. In its SRIA, the CDFA stated that "the law was not primarily written" to address "human foodborne illness." Pet. App. 76a. The prescribed "space allowance[e]," the SRIA explained, is not "accepted" as a "standar[d] within the scientific community to reduce human food-borne illness" or "other human or safety concerns," and is not "based in specific peer-reviewed scientific litera-ture" or, for that matter, in any "scientific research" at all. Pet. App. 75a-76a. The addendum to the SRIA

43

confirmed that no scientific literature allowed CDFA to confirm, according to "usual scientific practices, that the specific minimum confinement standards" in Proposition 12 "reduce the risk of human-borne illness." Pet. Reply App. 74a.

Anyway, federal law already "protect[s] the health and welfare of consumers" by "assuring" the safety of "meat and meat food products" in interstate commerce. 21 U.S.C. § 602. The Federal Meat Inspection Act "establishes 'an elaborate system of inspect[ing]' live animals and carcasses in order 'to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products.'" *Nat'l Meat Ass'n*, 565 U.S. at 455-456 (quoting *Pittsburgh Melting Co.* v. *Totten*, 248 U.S. 1, 4-5 (1918)). USDA inspects "each animal brought to a slaughterhouse" for "evidence of disease." *Id.* at 456; see 9 C.F.R. § 309.1. A diseased animal is slaughtered in a separate facility, and "no part of its carcass" is "sold for human consumption." *Nat'l Meat Ass'n*, 565 U.S. at 457; see 21 U.S.C. § 610(c); 9 C.F.R. § 309.13(a). An animal that a USDA inspector suspects of being diseased also is "slaughtered separately." 9 C.F.R. § 309.2(n). "[P]ost-mortem' examination" determines "which parts, if any," may "be processed into food for humans." *Nat'l Meat Ass'n*, 565 U.S. at 457

\*   \*   \*

In short, neither of the purported aims of Proposition 12 is a legitimate exercise of California's police power. Neither justifies the extraterritorial regulation of sow housing under *any* standard, let alone the searching inquiry necessary to protect interstate commerce and horizontal federalism.

44

## III. PETITIONERS STATE A CLAIM UNDER *PIKE*

Putting aside the special scrutiny required of extraterritorial laws, and even if Proposition 12's purported objectives lay within the police power, the law fails the balancing test of *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970). Under *Pike*, "the question becomes one of degree." *Raymond Motor Transp., Inc.* v. *Rice*, 434 U.S. 429, 441 (1978). Courts ask whether "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *United Haulers Ass'n* v. *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (alterations omitted) (quoting *Pike*, 397 U.S. at 142); see *Dep't of Rev. of Ky.* v. *Davis*, 553 U.S. 328, 353 (2008) ("nondiscriminatory burdens on commerce may be struck down" if they "clearly outweigh the benefits of a state or local practice"). Petitioners' complaint states a Commerce Clause claim because it plausibly alleges that Proposition 12's burden on interstate commerce substantially outweighs any local concerns. The court of appeals erred by not engaging in meaningful *Pike* balancing.

### A. Proposition 12 Imposes A Substantial Burden On National Pork Production And Any Local Benefits Are Illusory

The complaint alleges that Proposition 12 imposes substantial burdens on the national pork industry that are borne entirely by out-of-state farmers and their customers. Those burdens clearly outweigh any negligible benefits of Proposition 12 to in-state sows and human health.

1. The facts in the complaint, supported by declarations from sow farmers, an economist, and

45

trade groups, plausibly allege that Proposition 12 imposes a substantial burden on pork production outside California.

The farms regulated by the challenged requirements are outside California. The State's consumption accounts for approximately 13% of the national pork market, or the annual offspring of approximately 673,000 sows. Pet. App. 151a, ¶20. Only 1,500 sows are commercially bred in California (*ibid.*), and those sows are housed on farms that have to comply with a separate Proposition 12 measure. Accordingly, the burdens of the challenged requirements fall exclusively on out-of-state sow farmers. CDFA acknowledged this fact (Pet. App. 80a), and the State has not disputed it in litigation.

The practices of the vast majority of farmers nationwide do not comply with Proposition 12. While some States impose stand-up, turn-around requirements on their own sow farmers, none has established square-footage requirements. Pet. App. 203a, ¶280; see National Agricultural Law Center, *Farm Animal Confinement*, https://nationalaglawcenter.org/state-compilations/farm-animal-welfare. A number of those States expressly permit pre-farrowing and gestation confinement longer than does Proposition 12. *Supra*, p. 31. And with one exception—a Massachusetts ballot initiative—no State has applied its sow-housing regulations extraterritorially. Pet. App. 203a, ¶281.

Yet sow farmers outside California have no practical choice but to comply with Proposition 12. Sow farmers rarely sell pork directly to businesses or consumers and do not know where their pork may eventually be sold. There are many intermediate actors. Individual sow farms sell piglets to nurseries that sell feeder pigs to finishing farms that sell hogs

46

to slaughter-packer plants that sell whole pork meat to businesses through distributors. Pet. App. 181a, ¶¶126-27; 183a-84a, ¶¶136-44. Downstream market participants will require sow farmers to comply with Proposition 12 in order to avoid the difficulty of tracing and segregating pork products. Pet. App. 177a, ¶97; 181a, ¶128; 206a, ¶¶299-300; 213a, ¶¶337-39; see p. 16 n.7, *supra*.

To comply with Proposition 12, farmers will have to decrease production or build new facilities, and change the way they care for their animals. Farmers who can no longer use individual stalls during gestation will lose pigs due to pregnancy loss and increased sow injuries and fatalities. Pet. App. 172a-74a, ¶¶74-84; 158a-69a, ¶58. Farmers who already use group housing will need to reduce herd size to meet the square-foot minimum. Pet. App. 171a-72a, ¶¶68-70; 160a-61a, ¶58(c); 164a-66a, ¶58(g)-(h). Building compliant sow housing and developing and implementing new processes (such as for feeding and insemination) will require millions of dollars in additional capital and labor expenditures. Pet. App. 208a-10a, ¶¶311-22. These changes will increase the per-pig production cost by an estimated 9.2%. Pet. App. 214a, ¶343.

Some farms, especially smaller operations, will be forced from the market, caught between the prohibitive cost of complying with Proposition 12 and losing relationships with packers that insist on compliance by their suppliers. Pet. App. 176a-77a, ¶¶94-95, ¶97. As a consequence, the industry will consolidate around larger farms, and more vertical integration will occur to facilitate packer control of housing conditions and tracing. Pet. App. 213a, ¶341.

47

2. Those burdens on interstate commerce clearly exceed any putative local benefits of Proposition 12. The burden-benefit inquiry involves "a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transp.*, 434 U.S. at 441. A state law that interferes with commerce "substantially" while furthering the stated purpose "marginally" is invalid. *Kassel*, 450 U.S. at 670.

We have explained that Proposition 12's purported benefits are invalid or non-existent. Part II.A, *supra*. But even if there are cognizable local impacts, they are flimsy. The complaint sufficiently alleges that their effects are marginal, and that they do not outweigh the substantial burden on commerce.

First, though CDFA claims "hard-to-quantify [local] benefits such as moral satisfaction, peace of mind, [and] social approval" for California residents (Pet. App. 75a), petitioners allege that Proposition 12 in fact "aggravate[s], rather than ameliorate[s]," animal cruelty (*Kassel*, 450 U.S. at 674). Sows in group housing experience more injuries and fatalities than sows housed in breeding stalls because they are exposed to aggression. Pet. App. 221a-22a, ¶¶393-95. Sows in breeding stalls are calmer and healthier. Pet. App. 221a, ¶¶390, 396-99. In addition, providing health care and critical nutrients to pregnant sows is more difficult in group housing. Pet. App. 223a-24a, ¶¶404-05.[10]

---

[10] Notably, in consultation with the American Association of Swine Veterinarians and respondent HSUS, the largest U.S. restaurant chain has committed to sourcing pork products from farmers who house sows in "individual stalls for the viability of

48

Second, the complaint alleges that Proposition 12 has no beneficial impact on human health, and the State's own food-safety agency agrees. Part II.A.2, *supra*. Geographic and temporal separation between sows and their offspring ensures that any disease a piglet might contract at a sow farm has disappeared before slaughter. USDA ensures that any diseased animals are slaughtered separately from livestock intended for human consumption. Anyway, there is no evidence that Proposition 12-housed sows are healthier than sows as currently housed. Industry action and federal inspection fully address any "risk of foodborne illness" from pork, which petitioners allege would actually be exacerbated by Proposition 12. Pet. App. 229a-230a, ¶¶443-453.

## B. The Court Of Appeals Erroneously Narrowed The Scope Of *Pike* At The Pleading Stage

The Ninth Circuit's holding that petitioners failed to state a claim was based on the view that "increase[d] compliance costs, without more," cannot be a "significant burden" on commerce. Pet App. 17a. But the court itself recognized that the burden of Proposition 12 on interstate commerce is far greater than simply the cost of compliance.

The court of appeals observed that petitioners "plausibly alleged that Proposition 12 will have dramatic upstream effects and require pervasive changes to the pork production industry nationwide." Pet. App. 20a. Indeed, the entire national, $26-billion industry will be compelled to restructure. Pet. App.

[sows'] embryos and safety of themselves, the other animals and the humans that care for them." McDonald's Corp., *2022 Annual Meeting Update* 7 (May 2022), bit.ly/3kRVMuf.

49

207a-213a, ¶¶305-340; pp. 14-16, *supra*. The court recognized that Proposition 12 "forc[es]" "all or most hog farmers" to "comply with California requirements"; that the costs of doing so "mostly fall on non-California transactions"; and that ultimately it will result in "higher costs to consumers." Pet. App. 9a, 19a-20a. Those effects on commerce go far beyond industry "compliance costs." Pet. App. 17a.

In addition, petitioners allege that the housing practices dictated by California will affirmatively harm out-of-state sows. Pet. App. 220a, ¶379; 221a-224a, ¶¶390-410. And independent sow farmers who cannot afford to comply with Proposition 12 will be forced out of business, leading to industry consolidation. Pet. App. 213a, ¶341. Those too are effects on interstate commerce that are not mere "compliance costs."

In any case, the Ninth Circuit got the law wrong. It cited no decision of this or any other Court to support its holding that "increase[d] compliance costs" cannot "constitute a significant burden on interstate commerce." Pet. App. 17a. The effects of most laws that burden commerce could be characterized as "compliance costs," including laws that this Court has invalidated. For instance, the law in *Kassel* barring trucks longer than 60 feet from Iowa highways "increased costs" for trucking companies by millions of dollars by forcing them to reroute shipments or use smaller vehicles. 450 U.S. at 674. And in *Pike*, the requirement that fruit grown in Arizona be packed there before shipment out of state would have required the company challenging the law to build a $200,000 in-state packing facility. 397 U.S. at 140, 142-143.

50

The only decision of this Court cited by the court of appeals, *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117 (1978), is inapposite. *Exxon* held that shifting business "from one interstate supplier to another" in response to a regulation that prohibited producers of petroleum products from operating gas stations in Maryland did not burden "the interstate market," reasoning that "the Commerce Clause [does not] protect[t] the particular structure or methods of operation in a retail market" and "there was no reason to assume" that the challenged law would have any effect on the "entire supply" of petroleum products entering Maryland. *Id.* at 127-128. The burden petitioners assert is far greater than the minor burden at issue in *Exxon*. Petitioners allege that Proposition 12 will in practice require sow farms everywhere to adopt its production standards, structurally reworking the industry, requiring costly changes to thousands of facilities, increasing sow mortality, decreasing herd size, and resulting in every pork consumer paying for California's preferred farming practices. Unlike the law in *Exxon*, which would have no effect beyond Maryland's market and at most have a negligible effect within Maryland, Proposition 12 will seriously upset the interstate market, imposing a cognizable burden on interstate commerce that is "clearly excessive in relation to the putative local benefits" of the law. *Pike*, 397 U.S. at 142.

## CONCLUSION

The judgment of the court of appeals should be reversed.

51

Respectfully submitted.

DAN HIMMELFARB
COLLEEN CAMPBELL
  *Mayer Brown LLP*
  *1999 K Street, NW*
  *Washington, DC 20006*

TIMOTHY S. BISHOP
  *Counsel of Record*
BRETT E. LEGNER
AVI M. KUPFER
  *Mayer Brown LLP*
  *71 South Wacker Drive*
  *Chicago, Illinois 60606*

ELLEN STEEN
TRAVIS CUSHMAN
  *American Farm Bureau*
  *Federation*
  *600 Maryland Avenue SW*
  *Suite 1000W*
  *Washington, DC 20024*

MICHAEL C. FORMICA
  *National Pork*
  *Producers Council*
  *122 C Street NW*
  *Suite 875*
  *Washington, DC 20001*

*Counsel for Petitioners*

JUNE 2022