# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TRIUMPH FOODS, LLC, CHRISTENSEN
FARMS MIDWEST, LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW
FASHION PORK, LLP, EICHELBERGER
FARMS, INC. and ALLIED PRODUCERS'
COOPERATIVE, individually and on behalf
of its members,

          Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of
Massachusetts, and ASHLEY RANDLE, in
her official capacity as Massachusetts
Commissioner of Agriculture,

          Defendants.

Case No. 1:23-cv-11671-WGY

The Honorable William G. Young

## *AMICI CURIAE* BRIEF OF ANIMAL WELFARE ORGANIZATIONS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ................................................................................. 1

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

   I.    Dormant Commerce Clause ................................................................................ 4

      A.   Discrimination ............................................................................................ 4

      B.   Market Burdens and Local Objectives ..................................................... 7

   II.   Privileges & Immunities Clause ....................................................................... 10

   III.  Federal Meat Inspection Act ............................................................................ 11

      A.   Express Preemption ................................................................................. 12

      B.   Conflict Preemption ................................................................................ 14

   IV.  Packers & Stockyards Act ................................................................................ 15

   V.   Full Faith and Credit Clause ............................................................................ 16

   VI.  Due Process Clause .......................................................................................... 17

   VII. Import-Export Clause ....................................................................................... 19

CONCLUSION .............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*,
  870 F.3d 1140 (9th Cir. 2017) ................................................................................13, 14

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*,
  139 S. Ct. 862 (2019) ........................................................................................................15

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ........................................................................................5, 9

*Aulson v. Blanchard*,
  83 F.3d 1 (1st Cir. 1996) ....................................................................................................8

*Barnes v. Glen Theatre*,
  501 U.S. 560 (1991) ..........................................................................................................12

*Camps Newfound/Owatonna, Inc. v. Harrison*,
  520 U.S. 564 (1997) ..........................................................................................................20

*Capron v. Off. of Att'y Gen. of Mass.*,
  944 F.3d 9 (1st Cir. 2019) ................................................................................................16

*Cavel Int'l. Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ..........................................................................................13

*Chamber of Commerce of U.S. v. Whiting*,
  563 U.S. 582 (2011) ..........................................................................................................15

*Chinatown Neighborhood Ass'n v. Harris*,
  33 F. Supp. 3d 1085 (N.D. Cal. 2014), *aff'd*, 794 F.3d 1136 (9th Cir. 2015) ........................13

*Commonwealth v. Harris*,
  119 N.E.3d 1158 (Mass. 2019) ........................................................................................16

*Cramer v. Harris*,
  591 F. App'x 634 (9th Cir. 2015) ....................................................................................19

*Cresenzi Bird Importers, Inc. v. State of New York*,
  658 F. Supp. 1441 (S.D. N.Y. 1987) ................................................................................9

*Empacadora de Carnes de Fresnillo, S.A. DE CV v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ..........................................................................................13

*Exxon Corp. v. Governor of Md.*,
  437 U.S. 117 (1978) ......................................................................................................5, 10

*Fam. Winemakers of Cal. v. Jenkins*,
    592 F.3d 1 (1st Cir. 2010)..................................................................................6

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)..........................................................................................12

*Franchise Tax Board v. Hyatt*,
    538 U.S. 488 (2003)..........................................................................................16

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..........................................................................................17

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)............................................................................................14

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)..............................................................................................19

*Iowa Pork Producers Ass'n v. Bonta*,
    No. 21-cv-9940, 2022 WL 1042561 (C.D. Cal., Feb. 28, 2022) ........................1

*IPPA v. Bonta*,
    Ninth Circuit No. 22-55336 (filed Apr. 4, 2022)..............................6, 18, 19

*Kassel v. Consol. Freightways Corp. of Del.*,
    450 U.S. 662 (1981)............................................................................................9

*Maine v. Taylor*,
    477 U.S. 131 (1986)..........................................................................................10

*McBurney v. Young*,
    569 U.S. 221 (2013)..........................................................................................11

*McKiver v. Murphy-Brown, LLC*
    2020 WL 6787917 (4th Cir. Nov. 19, 2020)......................................................9

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)..........................................................................................11

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981)........................................................................................5, 7

*N. Am. Meat Inst. v. Becerra*,
    No. 19-cv-08569, Dkt. 83 (June 15, 2023) ....................................................1, 6

*N. American Meat Inst. v. Becerra*,
    420 F. Supp. 3d 1014 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518
    (9th Cir. 2020)....................................................................................................1

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................................................ *passim*

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) .......................................................................................... 7, 8, 10

*Portland Pipe Line Corp. v. City of S. Portland*,
    332 F. Supp. 3d 264 (D. Me. 2018) ...................................................................... 5, 6

*Schumacher v. Cargill Meat Sols. Corp.*,
    515 F.3d 867 (8th Cir. 2008) .................................................................................. 15

*Stafford v. Wallace*,
    258 U.S. 495 (1922) ............................................................................................... 15

*United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor &*
    *Council of City of Camden*,
    465 U.S. 208 (1984) ............................................................................................... 11

*United States v. Ragen*,
    314 U.S. 513 (1942) ............................................................................................... 18

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................................. 9

*W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*,
    451 U.S. 648 (1981) ............................................................................................... 11

*Woodruff v. Parham*,
    8 Wall. 123 (1869) ................................................................................................. 20

**Statutes**

7 U.S.C. §§ 181-229 ..................................................................................................... 15

21 U.S.C. § 603 ............................................................................................................. 12

21 U.S.C. § 678 ............................................................................................................. 12

M.G.L.A. 129 App. § 1-1 to 1-12 ....................................................................... *passim*

M.G.L.A. ch. 94G, §§ 1-22 .......................................................................................... 17

Mo. Const. art. XIV, § 2 (2022) ................................................................................... 17

U.S. Const. art. IV, § 1 ................................................................................................. 16

**Other Authorities**

87 Fed. Reg. 48562, 48574 (Aug. 5, 2022)......................................................................10

http://www.supremecourt.gov/Docket PDF/21/21-
    468/228373/20220617170252460_21-
    468AgriculturalAndResourceEconomicProfessors.pdf...........................................................8

## INTERESTS OF *AMICI CURIAE*

Pursuant to this Court's order on September 19, 2023 (Dkt. No. 50) (denying animal welfare organizations' motion to intervene, but "welcom[ing] the proposed intervenors as amici curiae"), *amici Curiae* The Humane Society of the United States, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming USA, and Animal Outlook (collectively "*Amici*") submit this brief in support of Defendants' motion to dismiss Plaintiffs' Amended Complaint. *Amici* are nonprofit organizations that crafted and sponsored the law challenged by Plaintiffs and have litigated many similar cases challenging state laws preventing farm animal cruelty, and protecting the interests of humane-conscious consumers.

## INTRODUCTION

This lawsuit is the latest in a series of unsuccessful cases claiming that state laws protecting the food system from unsafe and inhumane products somehow offend the Constitution. None have succeeded, and one involving a nearly identical California law was rejected by the U.S. Supreme Court just a few months ago. Despite this precedent, and with no explanation for why they filed this case so long after other pork producers initiated litigation and lost, Plaintiffs challenge Ballot Question 3, codified at M.G.L.A. 129 App. § 1-1 to 1-12 ("Question 3" or "the Act"), which prohibits the production and sale within Massachusetts of an identified and limited set of cruel and unsafe products—an area of regulation within states' historic police powers.

Similar claims have been dismissed before, and Plaintiffs' Amended Complaint offers nothing that should counsel a different result here. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*Ross*"); Stip. of Dismissal, *N. Am. Meat Inst. v. Becerra*, No. 19-cv-08569, Dkt. 83 (June 15, 2023); *Iowa Pork Producers Ass'n v. Bonta*, No. 21-cv-9940, 2022 WL 613736, at *10-11 (C.D. Cal., Feb. 28, 2022) ("*IPPA MTD Ruling*") (a case brought by the same law firm as this action).[1] As in those cases, no further case development is necessary to resolve these claims.

---

[1] Nearly identical requests for preliminary injunctions were denied in two of those cases, as well. *Iowa Pork Producers Ass'n v. Bonta*, No. 21-cv-9940, 2022 WL 1042561 (C.D. Cal., Feb. 28, 2022); *N. American Meat Inst. v. Becerra*, 420 F. Supp. 3d 1014 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518 (9th Cir. 2020).

Nor do Plaintiffs' new tacked on claims—under the Full Faith and Credit Clause and the Import-Export Clause—counsel a different result. These are plucked straight out of one Justice's dissent in the recent Supreme Court ruling upholding California's Proposition 12, claims that Justice recognized as inconsistent with existing precedent, and as to which he "express[ed] no view on whether such an argument ultimately would succeed." *Ross*, 598 U.S. at 409 (Kavanaugh, J., concurring in part and dissenting in part). Controlling precedent makes it clear that Plaintiffs have not and could not state a claim on these new grounds.

Many of Plaintiffs' claims fail because they proceed from the same faulty premise—that the U.S. Constitution precludes state laws with upstream practical effects on out-of-state market participants whose products are sold in the regulating state. But that is not the rule from any court, and the Supreme Court affirmatively – and unanimously – rejected that *per se* extraterritoriality doctrine. *Ross*, 598 U.S. at 375. And the Act draws no discriminatory distinction between in-state and out-of-state entities, which the Court suggested was the foundation for such claims. In several of their claims, Plaintiffs also ask this Court to invalidate the Act's restriction on sale of products within Massachusetts simply because producers make those products in other states. But there is no constitutional guarantee of the right to engage in commerce in every state, free from regulation. And Plaintiffs' apocalyptic predictions of the financial doom that will befall them and their members (and the pork industry and consumers, generally) are belied by their own allegations—allegations rife with implausible assumptions and speculation and which mirror allegations regarded as insufficient to survive a motion to dismiss by multiple other courts—as well as the on-the-ground reality following enactment of similar laws in other states.

Because no set of facts can support cognizable legal claims here, no further proceedings are necessary in this case, including summary judgement or trial. Should the Court decide to conduct a trial in this case —even if limited to the bounds of the legally irrelevant and insufficient averments in the Amended Complaint—Defendants should be afforded a reasonable opportunity to first

conduct discovery and depose potential witnesses for the plaintiffs *before* facing them for the first time at trial, and thus losing their right to properly cross-examine those witnesses. However, as explained below, no discovery or trial is necessary here, where Plaintiffs have entirely failed to state legally cognizable claims in the first instance.

Question 3 was widely supported among Massachusetts voters when it passed *nearly seven years ago*, and it is in their interest to resolve these duplicative and otherwise non-cognizable claims as quickly and efficiently as possible, so that consumers across the state can see their humane and public health goals in passing this legislation fully and finally actualized at last.

## ARGUMENT

Plaintiffs have not pled sufficient allegations to sustain any of their claims.

*First*, each of Plaintiffs' dormant Commerce Clause theories mirror arguments rejected by the Ninth Circuit and the Supreme Court in regard to a materially similar California law. Proposition 12 neither discriminates against interstate commerce, nor regulates extraterritorially, nor imposes a substantial burden on interstate commerce. Rather, it evenhandedly regulates the production and sale of certain pork products (as well as veal and egg products) within Massachusetts' borders. In fact, major players in the pork industry are selling Question 3-compliant pork in Massachusetts, and have declared that the law will not be an impediment to continued sales.

*Second*, because Plaintiffs have failed to allege that they or their members are natural persons, and because Question 3 does not discriminate against citizens of other states in favor of its own by the law's clear terms, Plaintiffs have failed to sufficiently plead a Privileges and Immunities Clause claim.

*Third*, the Federal Meat Inspection Act contains a preemption clause that precludes Plaintiffs' express preemption argument, and Plaintiffs' conflict preemption argument is foreclosed by a failure to articulate any actual obstacle to federal law imposed by Question 3.

*Fourth,* because there is no conflict—let alone an irreconcilable one—between Proposition 12's in-state sales prohibition and the Packers and Stockyards Act, Plaintiffs' theory of preemption under that federal law is not viable.

*Fifth*, Plaintiffs fundamentally misunderstand the Full Faith and Credit Clause, and controlling precedent does not support judicial invalidation of Question 3 under that constitutional provision.

*Sixth*, Question 3 clearly defines prohibited conduct and provides clear standards to prevent arbitrary and discriminatory enforcement, and prior due process challenges making the exact same claims with respect to the exact same statutory language have been rejected by other courts.

*Seventh*, Plaintiffs' Import-Export Clause claim is entirely divorced from controlling precedent, and the Supreme Court has long held that the Clause applies *only* to trade with foreign nations, and not trade among the states.

## I.    <u>Dormant Commerce Clause</u>

Question 3 neither discriminates against interstate commerce nor imposes a substantial burden on interstate commerce. Rather, it evenhandedly regulates the production and sale of certain pork products (as well as veal and egg products) *in Massachusetts*. And major players in the pork industry are already capable of selling pork that complies with the Act, and have declared that laws like Question 3 will not be an impediment to their operations outside of Massachusetts.[2]

### A.    *Discrimination*

The Supreme Court has said that the dormant Commerce Clause is focused on preventing economic protectionism. *Ross*, 598 U.S. at 369-70, citing *Tenn. Wine and Spirits Retailers Assn. v. Thomas*, 139 S. Ct. 2449, 2461 (2019). Like the near-identical law at issue in *Ross*, Question 3

---

[2] *See, e.g.*, Hormel Foods*, California Proposition 12 and Massachusetts Question 3 Space Requirements for Animal Housing* (May 11, 2023), *at* <u>https://www.hormelfoods.com/responsibility/our-approach-to-issues-that-matter/animal-care/hogs/#california-proposition-12-and-</u>massachusetts (Hormel faces "no risk of material losses from compliance" with Proposition 12 and Question 3); Smithfield Foods, Inc., *2021 Sustainability Impact Report* 22 (2021), *at* <u>https://www.smithfieldfoods.com/getmedia/7ecf12e2-da3b-4d31-8796-d07e38b39e51/2021-Sustainability-Impact-Report.pdf</u> ("As a leader in group housing gestation, Smithfield will comply with these laws."); Tyson *Foods*, *Third Quarter 2021 Earnings*, at 15 (Aug. 9, 2021), *at* <u>s22.q4cdn.com/104708849/files/doc_   financials/2021/q3/08-11-21_Tyson-Foods-080921.pdf</u> (CEO of Tyson Foods noting that Proposition 12's impact is "not significant" for the company, which "can do multiple programs simultaneously" to comply with Proposition 12).

is even-handed—it regulates in-state and out-of-state entities the same. Plaintiffs briefly allege that Question 3 has a protectionist purpose, simply because the state seeks—in part—to "avoid negative fiscal impacts to the Commonwealth of Massachusetts." Mass. G.L. c. 129 App. § 1-1. In doing so, Plaintiffs obscure the full purpose section of the law,[3] which clearly states that the negative fiscal impacts contemplated are those which result from increased risk of foodborne illness from extreme methods of farm animal confinement. Dkt. No. 17 (Amended Complaint) ("Complaint") at ¶ 155. There is, however, nothing discriminatory about a state seeking to keep its residents out of the hospital for foodborne illness, and Plaintiffs do not suggest otherwise. *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 463 n.7 (1981) (courts generally "assume that the objectives articulated by the legislature are the actual purposes of a statute").

The focus of Plaintiffs' discrimination allegations is that there will be a greater impact felt by producers outside Massachusetts. Complaint at ¶¶ 157-60. But, the mere fact that there are greater impacts on out-of-state businesses than in-state businesses is not itself sufficient to establish discrimination. *See, e.g.*, *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125 (1978) (fact that a state prohibition fell "solely on interstate companies," without more, "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce"); *Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 302 (D. Me. 2018).

Plaintiffs allege that discrimination is evident from the fact that there are few pork producers inside Massachusetts. Complaint at ¶ 157. But, courts have rejected discrimination claims even where there were zero in-state businesses affected, noting that a lack of in-state entities actually belies any claim of protectionism.[4] *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) ("[A] statute that treat[s] all private companies exactly

---

[3] The purpose section of Question 3 reads in full: "The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. G.L. c. 129 App. § 1-1.

[4] Plaintiffs assume too much in alleging that the Act must be protectionist because existing Massachusetts-based producers cannot produce enough pork to meet current pork demand in the state. Complaint at ¶¶ 183-84. The Act does not require or guarantee that the demand for more humane pork in Massachusetts be met.

the same does not discriminate against interstate commerce…. This is so even when only out-of-state businesses are burdened because there are no comparable in-state businesses."); *Portland Pipe Line Corp.*, 332 F. Supp. 3d at 301 ("[W]hen there are no direct competitors to suffer a relative disadvantage from the supposedly protectionist state law, there is no risk of the kind of economic protectionism that the dormant Commerce Clause prohibits."). The First Circuit decision in *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010) is not to the contrary. In *Jenkins*, the denial of retail shipping licenses to large wineries was unconstitutional because it created a protectionist *advantage* for in-state entities over out-of-state entities, not because of the absence of regulated entities within the state. *Id.* at 13 (a law "is not discriminatory [when] there is no local market to benefit").

In the Supreme Court, the pork industry's primary national trade group *conceded* that California's Proposition 12—substantially the same as Massachusetts' Question 3—is not discriminatory. *Ross*, 598 U.S. at 369 ("petitioners *disavow* any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones" (emphasis in original)). In a separate case, the North American Meat Institute initially pursued a narrow discrimination claim challenging Proposition 12 as generating a "lead time" advantage for in-state producers, but then voluntarily dismissed that claim following the Supreme Court decision upholding Proposition 12. Stip. of Dismissal, *N. Am. Meat Inst. v. Becerra*, No. 19-cv-08569, Dkt. 83 (June 15, 2023). As with other claims in this case, Plaintiffs parrot the discrimination claim made by the Iowa Pork Producers Association ("IPPA") in its challenge to Proposition 12. But, IPPA's discrimination claim has also been dismissed. *IPPA MTD Ruling*, 2022 WL 613736, at *13-14.[5] Claims that state confinement-related sales bans are *per se* invalid under the Commerce Clause because they are discriminatory or extraterritorial keep popping up like zombies, even though these claims have previously been conceded, abandoned by industry, and rejected by federal courts. The Court should quickly put an end to the latest resurrection.

---

[5] This ruling is now on appeal. *IPPA v. Bonta,* Ninth Circuit No. 22-55336 (filed Apr. 4, 2022).

B.       *Market Burdens and Local Objectives*

Plaintiffs also fail to state a claim under the test in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The Supreme Court in *Ross* held that the primary purpose of the *Pike* test is to determine if "a law's practical effects may also disclose the presence of a discriminatory purpose." 598 U.S. at 377-80 (Part IV-A). In this case, the Act's practical effects do not disclose any discrimination.

A plaintiff fails to state a valid *Pike* claim if the burdens alleged are focused on particular producers and their preferred methods of operation in the market. *Ross*, 598 U.S. at 384, *quoting Exxon*, 437 U.S. at 127-28 ("If the dormant Commerce Clause protects the 'interstate market … from prohibitive or burdensome regulations,' … it does not protect 'particular … firms' or 'particular structure[s] or methods of operation.'"). Yet, this appears to be the thrust of Plaintiffs' allegations of burden. *See* Complaint ¶¶ 158-60 (noting costs of conversion for *Plaintiffs* in order to sell pork in Massachusetts). Question 3, like virtually all government regulations, may require Plaintiffs to expend some resources to comply with the law, but only to the extent *they choose* to sell their products in Massachusetts.[6] Plaintiffs allege that they do not and will not have enough Question 3-compliant pork to meet the Massachusetts demand. Complaint at ¶¶ 102, 106, and that some producers may exit the Massachusetts market—or pork production altogether—rather than comply with the Act. *Id.* at ¶ 124. However, the dormant Commerce Clause is not a protection against shifts in the current market share of individual firms selling products to a specific market. *Clover Leaf Creamery Co.*, 449 U.S. at 473.

Plaintiffs also allege a fear of pork supply shortages and pork price increases, as plaintiffs challenging California's Proposition 12 did. Complaint at ¶¶ 92-93. But this rank speculation

---

[6] According to Plaintiffs, a company that is not a party to this case—Seaboard Foods—will decide whether Plaintiffs' products are sold in Massachusetts. Complaint at ¶ 100. It has been reported that Seaboard has chosen to no longer send products to California rather than market more humane products there. *See* Bitker, *infra* note 9. Thus, there *will be zero costs of conversion* if Seaboard chooses not to market Plaintiffs' pork in Massachusetts during the pendency of this case, or thereafter. And if Plaintiffs' pork products are directed to the Massachusetts market, the associated costs—which a significant percentage of pork producers have already chosen to take on, *see* company statements, *supra* n.2, and that companies will pass on to consumers in Massachusetts, *see* discussion of price increase predictions, *infra* at nn.7-9, will be a choice that Seaboard will make. If there will be any harm to Plaintiffs, it is the result of intervening decisions by a company that isn't even a party to this case.

cannot support a finding that Plaintiffs' *Pike* claim is likely to succeed. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (courts need not accept "bald assertions, unsupported conclusions, periphrastic circumlocutions, and the like"). The pork industry's primary trade group has indicated that just under forty percent of pork production is now shifted away from using the cruelest confinement methods, and confinement practices continue to trend toward housing models compliant with Question 3.[7] And, the pork industry's own economists explained in an *amicus* brief filed in support of *neither* party in *Ross* that principles of economics indicate that pork prices will increase only modestly, and only in the jurisdictions enacting the laws (a burden chosen by the citizens who voted for the laws), and that prices would likely decrease a very small amount everywhere else. Brief of Agricultural and Resource Economics Professors and Amicus Curiae, *NPPC v. Ross*, No. 21-468, at 6, 15-23 (June 17, 2022).[8] Moreover, California's initial confinement-related sales restrictions have been in place since the beginning of 2022, and yet producers' alarmist forecasts did not come to fruition—with no pork supply shortages or huge price increases attributable to Proposition 12.[9]

With respect to the state interests involved, courts consider the "*putative* local benefits" of the law. *Pike*, 397 U.S. at 142 (emphasis added). Courts will credit an assumed local interest "so

---

[7] Tom Johnston, *Concerns Grow as Prop 12 Stews*, MEATINGPLACE (Oct. 19, 2022) *at https://www.meatingplace.com/Industry/News/Details/106857* (quoting NPPC's director of animal health: "many companies have transitioned to group sow housing, which now makes up some 38% of U.S. pork production," though many of these companies "will take awhile" to meet consumer demand for crate-free pork). This trend may be driven by the financial interests of producers, as research economists have found it can be more affordable for producers to raise pigs outside of restrictive gestation crates. Iowa State University, *Alternatives to Sow Gestation Stalls Researched at Iowa State* (Apr. 9, 2007), *available at* https://www.cals.iastate.edu/news/2007/alternatives-sow-gestation-stalls-researched-iowa-state ("group housing ... resulted in a weaned pig cost that was 11 percent less").

[8] The industry economists' brief is available on the Supreme Court's docket at http://www.supremecourt.gov/DocketPDF/21/21-468/228373/20220617170252460_21-468AgriculturalAndResourceEconomicProfessors.pdf.

[9] Dennis W. Smith, *What I'm Seeing, What I'm Hearing, What I'm Expecting*, National Hog Farmer (Dec. 6, 2021), *at* https://www.nationalhogfarmer.com/news/what-imseeing-what-im-hearing-what-im-expecting ("CA Prop 12 is not going to present a major disruption to pork distribution and pork pricing"); Janelle Bitker, Has the 'Great California Bacon Crisis' arrived? Not yet — but here's what might happen in the Bay Area, SAN FRANCISCO CHRONICLE (Jan. 13, 2022), available at https://www.sfchronicle.com/food/article/California-s-Prop-12-hasn-t-resulted-in-a-16771372.php; Katharine Gammon, *Why California's 'great bacon crisis' has yet to arrive,* THE GUARDIAN (Jan. 24, 2022), *at* https://www.theguardian.com/ environment/2022/jan/23/california-bacon-crisis-animal-welfare-standards. Similarly, the egg industry's predictions of price increases as a result of California's ban on sale of eggs from cruelly confined hens proved false. *See* Meredith Dawson, California's egg market settles after housing mandate, WATTPOULTRY (June 21, 2022), *available at* https://www.wattagnet.com/egg/cage-free-laying-systems/article/15535997/us-californias-egg-market-settles-after-housing-mandate?v=preview (industry trade publication reporting economist findings that "the actual price increase per carton of eggs is $0.08 per dozen wholesale in California" since 2020—less than a penny an egg).

long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 681 (1981). The interests that Massachusetts voters sought to advance through Question 3 are identical to the interests sought to be advanced by California's Proposition 12, and in the Supreme Court pork producers conceded that states "may sometimes ban the in-state sale of products they deem unethical or immoral" and may address "health risks associated with goods sold within their borders." *Ross*, 598 U.S. at 381.

Courts have routinely recognized that that "prevent[ing] animal cruelty—on its own—is a legitimate exercise of state police powers." *United States v. Stevens*, 559 U.S. 460, 469 (2010); *Ass'n des Eleveurs*, 729 F.3d at 952-53 ("Plaintiffs give us no reason to doubt that the State believed that the [foie gras] sales ban in California may discourage the consumption of products produced by force feeding birds and prevent complicity in a practice that it deemed cruel to animals."). In other words, states have a legitimate interest in preventing the products of cruelty from entering their markets,[10] and Question 3 ensures Massachusetts consumers are not unwittingly turned into economic supporters of practices they find morally reprehensible.

Question 3 also effectuates public health objectives. First, it is clear that cruel, intensive confinement is linked to food safety threats, and studies suggest that lower stocking density correlates with lower rates of zoonoses among growing pigs.[11] The USDA recognizes that giving animals "sufficient space and freedom to lie down, turn around, stand up, fully stretch their limbs, and express normal patterns of behavior" has human-health implications. USDA, Agric. Mktg.

---

[10] *See Cresenzi Bird Importers, Inc. v. State of New York*, 658 F. Supp. 1441, 1447 (S.D. N.Y. 1987)*, aff'd sub. nom.* 831 F.2d 410 (2d Cir. 1987) ("New York has a legitimate interest in regulating its local market conditions which lead, in a short causal chain, to the unjustifiable and senseless suffering and death of thousands of captured wild birds … The State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical.").

[11] It is "well-established that close confinement leads to the increased spread of disease between hogs" and that "humans are not far behind." *McKiver v. Murphy-Brown*, LLC, No. 19-1019, 2020 WL 6787917, at *30 (4th Cir. Nov. 19, 2020) (Wilkinson, J., concurring). Scientific studies show that offspring of sows subjected to extreme confinement in gestation crates suffer reduced immune resistance compared to other piglets. M. Kulok *et al*., *The Effects of Lack of Movement in Sows During Pregnancy Period on Cortisol, Acute Phase Proteins and Lymphocytes Proliferation Level in Piglets*, 24 Polish J. of Vet. Sci. 85, 90 (2021); *see also* Xin Liu *et al*., *A Comparison of the Behavior, Physiology, and Offspring Resilience of Gestating Sows When Raised in a Group Housing System and Individual Stalls*, 11 Animals 2076, at 5 (2021). That reduced resistance threatens food safety. Piglets often become colonized with *Campylobacter*—"one of the leading causes of human bacterial gastroenteritis"—"within a few hours of birth" and "remain carriers until slaughter." C.R. Young *et al*., *Enteric Colonisation Following Natural Exposure to* Campylobacter *in Pigs*, 68 Rsch. Vet. Sci. 75, 75-77 (2000). *Campylobacter* "in the intestinal tract of animals … can thus contaminate foods." *Id.* at 75.

Serv., Proposed Rule to Amend Organic Livestock and Poultry Production Requirements, 87 Fed. Reg. 48562, 48574 (Aug. 5, 2022). Proposing that pork cannot be sold as "organic" absent such conditions, the USDA explained that providing sufficient space "supports the [animals'] natural behaviors" and thus "may be positively associated with improved health and well-being, may be better for the environment, and may result in *healthier livestock products for human consumption*." *Id.* at 48565, 48570 (emphasis added). Second, Question 3 is no less legitimate with respect to its public health purposes because these risks may be imperfectly understood. *Maine* v. *Taylor*, 477 U.S. 131, 140, 148 (1986) (a state need not "sit idly by and wait … until the scientific community agrees" about risks "before it acts to avoid such consequences," even with respect to "imperfectly understood … risks" that "may ultimately prove to be negligible").

The Supreme Court rejected the *Pike* challenge to California's Proposition 12, without a remand for factual development of the industry's allegations that that the stated purposes of the law could not be achieved through the measure, just as Plaintiffs have alleged here. The plurality opinion of the Court determined that the industry had not alleged a substantial burden on the interstate market itself.[12] *Ross*, 598 U.S. at 383-87 (Part IV-C). And the decision to affirm dismissal of the *Pike* claim was supported by Justice Barrett, who indicated that the alleged economic burdens to industry operators and the non-economic benefits to the regulating state are "incommensurable" and cannot possibly be weighed against each other under *Pike*. *Id*. at 393-94 (Barrett, J., concurring in part); *see also id.* at 380-89, 1163-64 (Parts IV-B and IV-D of the opinion, which J. Barrett joined). Because Plaintiffs' *Pike* allegations are the same as the allegations the pork industry previously made against Proposition 12, this Court should follow *Ross* and find no likelihood of success for this claim.

## II.    Privileges & Immunities Clause

Plaintiffs' Privileges & Immunities Clause ("P&I Clause") claim repeats an error they make in pleading discrimination under the dormant Commerce Clause: conflating greater

---

[12] The four-Justice plurality drew an apt comparison to the Maryland law upheld in *Exxon*. "In *Exxon*, vertically integrated businesses faced a choice: They could divest their production capacities or withdraw from the local retail market. Here, farmers and vertically integrated processors have at least as much choice…." *Ross*, 598 U.S. at 383-84.

incidental burden on out-of-state producers with actual discrimination. The P&I Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 216 (1984) ("*Camden*"), *quoting Toomer v. Witsell*, 334 U.S. 385, 395 (1948). Thus, the Supreme Court has made clear that laws setting residency requirements that grant opportunity to the regulating state's citizens not also granted to the citizens of other states, when the opportunity is fundamental "to the vitality of the Nation as a single entity," offend the P&I Clause. *Camden*, 465 U.S. at 216-18. But the threshold inquiry is whether there is a distinction drawn between citizens of the regulating state and the citizens of other states. *Id.* In this case, there is no such distinction.

Plaintiffs' P&I Clause claim actually fails at the outset because the Clause applies only to natural persons, not legal entities, and none of the Plaintiffs appear to be natural persons. *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 656 (1981) ("[T]he Privileges and Immunities Clause is inapplicable to corporations."). However, Plaintiffs' claim also lacks merit. As another federal court held in dismissing an identical P&I Clause claim, when the state law "applies equally to all pork meat sold within [the state], regardless of where it was produced, [the] plaintiff cannot state a claim that [the law] treats nonresidents and residents differently." *IPPA MTD Ruling*, 2022 WL 613736, at *10; *see also McBurney v. Young,* 569 U.S. 221, 226 (2013) (no P&I Clause violation where citizens of other states are on "the same footing"). Question 3 regulates even-handedly among Massachusetts citizens and citizens of other states.

## III.   Federal Meat Inspection Act

Plaintiffs' preemption claims also fail. Courts assume "that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (*quoting Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This presumption against preemption is especially strong where federal law touches on an area of traditional state regulation—which, despite Plaintiffs' arguments to the contrary, clearly includes regulation of food products brought to

market.[13] Here, the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.* ("FMIA"), contains a preemption clause that precludes Plaintiffs' express preemption argument, and Plaintiffs' conflict preemption argument is foreclosed by a failure to articulate any actual obstacle to federal law imposed by Question 3.

    A.    *Express Preemption*

The FMIA does not preempt all state regulation of meat sales. Rather, its preemption clause, 21 U.S.C. § 678, only precludes states from imposing requirements on the "premises, facilities, and operations of any establishment at which inspection is provided under … this [Act]." *Id.* In other words, the clause prevents states from imposing additional or different requirements than established in the FMIA *for facilities or operations at which USDA inspections occur*, *i.e.*, federally-regulated slaughterhouses.[14] Question 3, however, does not regulate the premises, facilities, or operations of slaughterhouses. By definition, a "sale" prohibited by the Act "shall not include any sale undertaken at an establishment at which inspection is provided under the [FMIA]…." M.G.L.A. 129 App. § 1-5. Thus, Plaintiffs' contention that Question 3 regulates where the FMIA has expressly forbidden states to regulate is simply wrong.

Plaintiffs next contend that Question 3 is preempted by the FMIA's adulteration provisions, because it "supplant[s] [the FMIA's] definition of adulteration." But Question 3 does not purport to define prohibited products as "adulterated." At most, Plaintiffs identify that both Question 3 and the FMIA generally share consistent purposes of protecting public health. But that has nothing to do with express preemption. And the fact that both federal and state law seek to protect similar interests is not unusual,[15] and does not trigger express preemption concerns where—as discussed above—the federal preemption clause is concerned only with requirements related to federally

---

[13] *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963) (upholding California law requiring maturity standards for avocados sold within the state that were stricter than federal requirements, as "a subject matter of the kind [the Supreme] Court has traditionally regarded as properly within the scope of state superintendence").

[14] Plaintiffs attempt to equate slaughterhouse "site[s]" inspected by USDA with farms where animals are raised—which they are not. The very FMIA provisions Plaintiffs point to illustrate that FMIA inspections occur only at slaughterhouse-type facilities. *See, e.g.,* 21 U.S.C. § 603 (requiring USDA to conduct premortem inspections at "any slaughtering, packing, meat-canning, rendering, or similar establishment, in which [amenable species] are to be slaughtered").

[15] A state's traditional police power "is defined as the authority to provide for the public health, safety, and morals" of its residents. *Barnes v. Glen Theatre*, 501 U.S. 560, 569 (1991).

inspected slaughterhouse facilities the state law does not touch. The FMIA's adulteration provisions are simply not implicated.

Plaintiffs are also incorrect that Question 3 creates additional or different requirements than federal law because it allegedly "forces FSIS inspected facilit[ies] to segregate" Question 3-compliant pigs from those which would otherwise pass USDA inspection." Complaint at ¶ 196. First, Question 3 does not require segregation at all, let alone create requirements for federally inspected slaughterhouse operations. Producers using only Question 3-compliant housing do not need to segregate pigs to send pork to the Massachusetts market. Producers who *choose* to run dual supply lines of pork from crated pigs and non-crated pigs will have separated them long before the animals reach the slaughterhouse. Second, the same argument previously failed in the Ninth Circuit in a challenge to a state law restricting the sale of products from force-fed birds. There, the court noted that "even if [the Foie Gras Law] results in the total ban of foie gras regardless of its production method, it would still not run afoul of the [Poultry Product Inspection Act's (PPIA)] preemption clause." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017). This conclusion was based on the fact that the PPIA's express preemption clause (which is identical to the FMIA's) does not *require* that products actually be made; it only regulates inspection of slaughter establishments *if* animals are brought there. Federal law does not limit a state's authority to regulate what kinds of meat products can be sold within its borders. Thus, "[t]he fact that Congress established adulteration standards for covered products that *are* produced does not preclude a state from banning products based on concerns—here, for example, on the basis of animal cruelty—arising well before the animals are slaughtered."[16] *Id.* In the absence of a federal guarantee of a market for a particular product, courts have found that states may ban whole categories of animal products, even if some part of the downstream process is

---

[16] This case is distinguishable from *Animal Legal Def. Fund Bos., Inc. v. Provimi Veal Corp.*, in which this Court recognized that "Massachusetts can enact meat laws aimed at protecting the health and well-being of its citizens [and] … [p]reparation of foodstuffs for market has traditionally been a matter of local concern." However, the plaintiffs' claim that Massachusetts consumer protection laws *required a specific label*, describing how the defendant's animals were raised, was expressly preempted by the FMIA, because it sought to impose labeling or packaging requirements that were different or in addition to those required by federal law. 626 F. Supp. 278, 286 (D. Mass.), *aff'd*, 802 F.2d 440 (1st Cir. 1986). Question 3 does no such thing.

regulated by the federal government.[17] Question 3 excludes certain products from the state's market; it does not regulate or place requirements on the premises, facilities or operations of federally inspected establishments. *Ass'n des Eleveurs*, 870 F.3d at 1150.

B. _Conflict Preemption_

Federal law preempts state law when, "under the circumstances of [a] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). Plaintiffs have articulated no such obstacle here. In fact, they admit that the FMIA does not require Minimum Size Requirements—the standards at the core of the Question 3 provision challenged here—making any conflict argument a nonstarter. Complaint at ¶ 196. Plaintiffs nevertheless recast their express preemption allegations as conflict preemption, again starting from the false premise that Question 3 "designate[s]" non-compliant pork "as adulterated, or unfit for human consumption in Massachusetts." Complaint at ¶ 216.

In *Nat'l Meat Ass'n v. Harris*, the Court accepted that "the FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses." 565 U.S. 452, 463 (2012) (internal quotations omitted). However, the state law at issue in that case regulated how animals are handled *inside federally inspected slaughterhouses*—an area of regulation committed solely to federal law by the FMIA. *Id.* at 459-62.  To the Supreme Court, the law's provision banning the sale of meat derived from the slaughter of non-ambulatory animals was also preempted, not merely because it regulated downstream of the slaughterhouse, but because it "function[ed] as a command to slaughterhouses to structure their operations" in a particular way. *Id.* at 464. The decision thus leaves room for state laws that do *not* regulate the operations of official establishments (directly or indirectly), like Question 3—which regulates *only*

---

[17] *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1105 (N.D. Cal. 2014), *aff'd*, 794 F.3d 1136 (9th Cir. 2015) (no preemption of law that banned the sale of shark fins even where federal fisheries law anticipated a domestic market for commercial shark fisheries); *Empacadora de Carnes de Fresnillo, S.A. DE CV v. Curry*, 476 F.3d 326, 336 (5th Cir. 2007) (upholding Texas law prohibiting selling or transporting horsemeat for human consumption because the FMIA "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place"); *accord Cavel Int'l. Inc. v. Madigan*, 500 F.3d 551, 556–67 (7th Cir. 2007) (if horsemeat "is not produced, there is nothing so far as horse meat is concerned for the [federal law] to work upon").

on-the-farm treatment of animals in Massachusetts, and the sale of products in Massachusetts based on such on-farm treatment.[18] Thus, Plaintiffs are incorrect that Question 3 presents any obstacle to the execution of the FMIA.

**IV.    <u>Packers & Stockyards Act</u>**

Plaintiffs' claim that Question 3 is preempted by the Packers & Stockyards Act, 7 U.S.C. §§ 181-229 ("P&S Act") is identical to a claim dismissed in another case challenging California's Proposition 12. *IPPA MTD Ruling*, 2022 WL 613736, at *10-11. Plaintiffs do not argue that it is impossible for any of them to comply with both Question 3 and the P&S Act. There is no direct conflict. Plaintiffs raise the specter of "obstacle" preemption, but the Supreme Court has made clear that this form of preemption still only occurs when the deliberate intent to preempt is manifestly obvious from an act of Congress, as "it is Congress rather than the courts that pre-empts state law." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), *citing Gade v. Nat'l Solid Wastes Mgmt Assn.,* 505 U.S. 88, 110-11 (1992).

Plaintiffs fundamentally misapprehend the P&S Act. Congress enacted the law in 1922 to "regulate packers by preventing them from forming monopolies that would enable them to unduly and arbitrarily … lower prices." *Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867, 871 (8th Cir. 2008) (quotation marks omitted); *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922) (P&S Act "forbids [packers] to engage in unfair, discriminatory, or deceptive practices in commerce, or to … control prices or establish a monopoly in the business"). Thus, the P&S Act works to *restrict* certain practices by packers, it does not *insulate* practices by packers from uniformly applicable regulations.

Plaintiffs' allegations boil down to an argument that Question 3 conflicts with the P&S Act because the former limits competition among packers by setting a specific product standard for pork sold within Massachusetts. Complaint at ¶¶ 229-230. This is akin to saying that any regulation of commercial activity applicable to all packers limits competition, and that the P&S Act requires

---

[18] The Supreme Court denied a petition for certiorari in the preemption challenge to California's ban on sale of products from force-fed birds, despite claims by producers that the law was preempted for exactly the reasoning set forth in *Harris. Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 139 S. Ct. 862 (2019) (denying *certiorari*).

an unfettered opportunity to compete and sell any and all products. But Plaintiffs' theory turns the P&S Act's *restrictions on* anti-competitive behavior into an implied *guarantee* that packers be allowed to engage in any commercial behavior they would like. The courts may not ground a finding of obstacle preemption by looking beyond Congress' stated objectives to speculate about broader implicit intentions. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 28 (1st Cir. 2019), *citing Whiting*, 563 U.S. at 607. Moreover, if Plaintiffs' theory were correct, *every* state restriction on the commercial activity of packers would be unconstitutional, including labor rules, environmental protections, and building codes. The P&S Act does not prevent a state from enacting limits on sale of products voluntarily directed to that state.

## V.    Full Faith and Credit Clause

Plaintiffs repackage their theory that producers must be allowed to sell the products of their choosing in Massachusetts as long as they are allowed to produce them in other states in a claim under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1 ("FF&CC"). Complaint at ¶¶ 246-48. Contrary to Plaintiffs' misguided reading of the FF&CC, "the full faith and credit command is exacting with respect to a final judgment rendered by a court … [but the] Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Franchise Tax Board v. Hyatt*, 538 U.S. 488, 494 (2003) (internal quotations and citations omitted); *see also Commonwealth v. Harris*, 119 N.E.3d 1158, 1165 (Mass. 2019) (Massachusetts was not required to substitute New Hampshire's gun-licensing laws for its own and recognize a New Hampshire gun license as valid).

Current precedent does not support judicial invalidation of Question 3 under the FF&CC, as a law review article Justice Kavanaugh points to in his *Ross* dissent makes clear.[19] *See* State Extraterritorial Powers Reconsidered, 85 Notre Dame L. Rev. 1133, 1147, 1144 (2010) ("In the twentieth century the Court formally endorsed a 'concurrent' structure of state regulatory authority," under which "most limitations are sub-constitutional and are best (ultimately) chosen

---

[19] In his dissent, Justice Kavanaugh "express[ed] no view on whether [a FF&CC claim] ultimately would succeed." *NPPC v. Ross*, 598 U.S. at 409 (Kavanaugh, J., concurring in part and dissenting in part). And it would not—Justice Kavanaugh's concern for "conflicting regulations," *see id.*, is not present here. Many states *allow* use of gestation crates for pregnant pigs, but no state *requires* them, and Massachusetts does not prohibit use of such crates in other states.

by the political branches rather than courts"). Ignoring this clear precedent, Plaintiffs invoke the FF&CC to dictate how Massachusetts can regulate the sale of products that affect its own residents—subject matter the Commonwealth is most certainly competent to legislate. *See Ross*, 598 U.S. at 375 ("this Court has recognized the usual 'legislative power of a State to act upon persons and property within the limits of its own territory'").

Plaintiffs' overbroad interpretation of the FF&CC would lead to absurd outcomes, creating far more extraterritoriality concerns than it purports to resolve and undermining long-standing state regulatory structures. Plaintiffs reference "right to farm" laws in certain states, alleging that Massachusetts is failing to respect those laws. Complaint at ¶ 246. If the "right to farm laws" in certain states forced other states to permit the sale of all agricultural products regardless of how they were produced, then states could not restrict the sale of crops grown with dangerous pesticides or even unpasteurized or expired milk. All states would be required to allow the sale of products such as vaping devices and fireworks because some states have authorized and developed regimes to oversee their production. Indeed, while the States of Wyoming and Indiana might enjoy the projection of their "right to farm" laws into other states, these states could no longer restrict the sale of cannabis products as they now do, because Massachusetts and other states (including Missouri) affirmatively permit and regulate production and sale of cannabis. *See* Mass. Gen. Laws Ann. ch. 94G, §§ 1-22; Mo. Const. art. XIV, § 2 (2022). Plaintiffs have obviously mischaracterized the FF&CC and have not stated a valid claim.

## VI. <u>Due Process Clause</u>

To survive a challenge that a statute is void for vagueness, it must only "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Plaintiffs take issue with two provisions of the Act, claiming they cannot understand what it means to "engage in sale" or to allow an animal "to turn around freely." Complaint at ¶¶ 256, 260. But prior due process challenges making the exact same claims with respect to the exact same statutory language have been rejected by other courts, as discussed below. And Plaintiffs' allegations that the Act fails to

give fair notice of prohibited conduct is belied by their simultaneous pursuit of other claims that depend on being able to prove immutable negative impacts of the Act on interstate commerce, the operation of federal laws, and citizens of other states. It is fatal to their vagueness claim that Plaintiffs purport to know what Question 3 requires, and the impacts of those requirements, in pleading other claims. *See United States v. Ragen*, 314 U.S. 513, 524 (1942) (rejecting a claim of unconstitutional uncertainty of terms in federal tax law that was contrary to an apparent lack of confusion as to operation of the law). There can be no likelihood of success when Plaintiffs, through their pleadings, disprove the basis of a claim.

Plaintiffs claim that the Act's prohibition on "engag[ing] in" the sale of covered products lacks "sufficient definiteness." Complaint at ¶ 254. However, Plaintiffs undermine their own claim with other Complaint allegations: they say their business partners decide where to market their pork and they themselves are "without any control" as to "where the pork is distributed," yet they fear they might still be engaged in a prohibited sale. Complaint at ¶ 100.[20] This purported fear is dubious and unfounded, and the same allegation was recently discredited by another federal district court. *IPPA MTD Ruling*, 2022 WL 613736, at *5-8. In the *IPPA* case, the defendants (including the same group of *amici* filing this brief) noted that the California law's plain terms indicate that a violation occurs only during a sale "within the state," and that a sale is clearly defined as occurring "at the location where the buyer takes physical possession of an item." *IPPA MTD Ruling*, 2022 WL 613736, at *5. The district court agreed. *Id.* at *6. Question 3 includes the same language. M.G.L.A. 129 App. §§ 1-3, 1-5.

Plaintiffs' claim that the Act fails to clearly define "confined in a cruel manner" fares no better. Plaintiffs do not actually profess confusion as to the meaning of the term. Nor could they, as the term is defined with particularity in the statute, which offers additional definitions for the terms "fully extending the animal's limbs," and "turning around freely," and goes so far as to provide how to calculate square footage of "usable floor space." *Id*. at § 1-5. Instead, Plaintiffs take issue with its application, because the minimum space needed for an animal to freely turn

---

[20] Plaintiffs' statements that a non-party controls whether Plaintiffs' pork products will be sold in Massachusetts raises serious questions as to their standing to bring the claims as pleaded in the Amended Complaint.

around differs from animal to animal. Complaint at ¶ 261 (referring to the prohibition on selling covered products derived from animals "confined in a cruel manner" as the "Minimum Size Requirements"). Plaintiffs may not like that the opportunity to sell pork in Massachusetts requires that producers use confinement systems in which even the largest mother pig must be able to turn around, but that does not make the terms of the Act unclear. The pork industry raised the same argument in the *IPPA* case, and it was rejected by the court on grounds that Proposition 12 clearly defined the term "confined in a cruel manner," and the plaintiffs appeared to understand (even if they did not like) that removing pigs from gestation crates is a means of providing the space required. *IPPA MTD Ruling*, 2022 WL 613736, at *6.[21] Similarly, the Ninth Circuit previously rejected a vagueness claim challenging a prohibition on confining certain farm animals "in a manner that prevents the animal from lying down, standing up, [and] fully extending the animal's limbs" in California. *Cramer v. Harris*, 591 F. App'x 634, 635 (9th Cir. 2015) ("Because … turning radius … can be observed and measured, a person of reasonable intelligence can determine the dimensions of an appropriate confinement that will comply with [the law].")." "[T]he Due Process Clause does not demand 'perfect clarity' or 'precise guidance,'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010), and certainly not more than the definition of "confined in a cruel manner" that Question 3 provides.

## VII.   Import-Export Clause

Plaintiffs' Import-Export Clause claim is entirely divorced from controlling precedent, and for this reason, they have not stated a claim for relief. Nor could they. While Plaintiffs may be searching for refuge in the *Ross* court's recent decision, only Justice Kavanaugh's separate opinion raised the specter of application of the Import-Export Clause to the innumerable state laws restricting sale of products that originate both within their borders and in other states. Not one of the other Justices—including other dissenters—saw fit to co-sign that statement, and even Justice Kavanaugh expressed doubt as to "whether such an argument ultimately would prevail." *Ross*, 598

---

[21] The court also cited an *amicus* brief from Niman Ranch, stating that "'compliance [with Proposition 12] is straight-forward and feasible,' and that Niman Ranch and other 'industry leaders have already implemented and satisfied compliance requirements' weaken[ed] plaintiff's vagueness arguments." *IPPA MTD Ruling*, 2022 WL 613736 at *7.

U.S. at 408. The Supreme Court has long held that the Import-Export Clause applies *only* to trade with foreign nations, and not to trade among the states. *Woodruff v. Parham*, 8 Wall. 123 (1869).

The Supreme Court has never overruled this principle, nor has a majority of the Court ever expressed an interest in revisiting it. A desire to revisit *Woodruff* garnered two votes in 1997. *See Camps Newfound/Owatonna, Inc. v. Harrison*, 520 U.S. 564, 609-40 (1997) (Thomas, J., dissenting). There is nothing in the Court's ruling in *Ross* to suggest this divergent view of the Import-Export Clause commands a greater share of the Supreme Court today. Nor should there be. Applying the Import-Export Clause to state regulation of commerce in today's economy would be entirely unworkable, and leave no room for states to protect their citizens from harmful or otherwise objectionable products. What limits on imports to a state would be permissible, if any? Local authority to set health, safety, and moral standards for the marketplace would be swept aside, and Congress would have to regulate every transaction across state borders to provide for the public weal. This Court need not attend to Plaintiffs' desire to so dramatically change constitutional doctrine, as established precedent precludes Plaintiffs' Import-Export Clause claim.

<u>**CONCLUSION**</u>

Because Plaintiffs have failed to state any claim in their Amended Complaint, this Court should grant, in full, Defendants' motion to dismiss.

Dated: September 28, 2023

/s/ Kimberly D. Ockene
Kimberly D. Ockene
MA #638097
Humane Society of the United States
1255 23rd St. NW, Suite 450
Washington, DC 20037
Telephone: (202) 452-1100
kockene@humanesociety.org

Bruce A. Wagman (CSB No. 159987)
(*pro hac vice* forthcoming)

Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA  94104
Telephone: (415) 275-8540
Facsimile: (415) 275-8551
bwagman@rshc-law.com

*Counsel for Amici*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of September 2023, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Kimberly D. Ockene*
