EXHIBIT
A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TRIUMPH FOODS, LLC, CHRISTENSEN
FARMS MIDWEST, LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW
FASHION PORK, LLP, EICHELBERGER
FARMS, INC. and ALLIED PRODUCERS'
COOPERATIVE, individually and on behalf
of its members,

        Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of
Massachusetts, and ASHLEY RANDLE, in
her official capacity as Massachusetts
Commissioner of Agriculture,

        Defendants.

Case No. 1:23-cv-11671-WGY

**PLAINTIFFS' PROPOSED JOINT
STATEMENT OF FACTS**

      The Plaintiffs, by their undersigned counsel, hereby set forth their Proposed Joint Statement of Facts. To the extent the statements below cite to documents, the documents are true and accurate copies and the Plaintiffs refer the Court to those documents for a more thorough discussion of the facts.

**The Plaintiffs**

      1.    Plaintiff Triumph Foods, LLC ("Triumph") is a farmer-owned company and produces high-quality pork products that are sold locally, nationally, and internationally. ECF No. 27-1, ¶ 5. It was founded by independently owned pork farmers in the country, including Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc., and Allied Producers Cooperative, both in their official capacity and on behalf of their members (collectively referred to as the "Farmer Plaintiffs"). *Id.*, ¶ 6. It is headquartered in St. Joseph, Missouri, and largely receives its supply of pigs from the Farmer

1

Plaintiffs. *Id.*, ¶ 7.

2.       Triumph processes approximately 5.7 million pigs annually, which results in 1.45 billion pounds of pork products marketed and sold each year. *Id.*, ¶ 8. Triumph is a primary supplier of product to the country and to Massachusetts.

3.       As an example, during one year, Triumph and the pig farmers who supply pigs to Triumph produced and distributed 11,482,655 lbs. of Pork Meat to Massachusetts (equating to approximately $16,855,664.00 in sales). *Id.*, ¶ 25.

4.       Christensen Farms Midwest, LLC ("Christensen Farms") is a member-owner of Triumph. ECF No. 27-4, ¶ 6. Its farms are located in Minnesota, Iowa, Nebraska, Illinois, and South Dakota. *Id.*, ¶ 3.

5.       Christensen Farms has approximately 140,000 breeding pigs and is responsible for providing pork to approximately 15 million people annually across the county, including Massachusetts. Christensen Farms sells about 3.6 million hogs each year. *Id.*, ¶ 5.

6.       The Hanor Company of Wisconsin, LLC ("Hanor") is a member-owner of Triumph and sells approximately 1.8 million market pigs each year. ECF No. 27-3, ¶¶ 5, 6. Its farms are located in Wisconsin, Oklahoma, North Carolina, Iowa and Illinois. *Id.*, ¶ 3.

7.       New Fashion Pork, LLP ("NFP") is a member-owner of Triumph. ECF No. 27-2 ¶ 7. Its farms are located in Minnesota, Indiana, Iowa, Illinois, South Dakota, Wyoming, and Wisconsin. *Id.*, ¶ 3.

8.       NFP markets approximately 1.4 million market hogs each year, equating to over a half million pigs that need constant monitoring and care each day. *Id.*, ¶ 6.

9.       Eichelberger Farms, Inc. ("Eichelberger") is a member-owner of Triumph. ECF No. 27-6, ¶ 4. Its farms are located in southeast Iowa, Missouri, and Illinois. *Id.*, ¶ 3.

10.    Eichelberger currently has 60,000 breeding pigs. *Id.*, ¶ 7.

11.    Allied Producers Cooperative ("APC") is a member-owner of Triumph and is a cooperative that consists of a group of midwestern farmers who own and operate mostly multi-generational family pig farms, most of which are farrow-to-finish farmers consisting of several individual farmers. ECF No. 27-5, ¶¶ 3, 5. APC is headquartered in Iowa, but its members operate in various states throughout the Midwest. *Id.*, ¶ 3.

12.    One or more APC members is directly subject to the Act because they knowingly breed or raise pigs that are being sold into and within Massachusetts. *Id.*, ¶ 10.

13.    APC's Mission Statement is to "support the actions of Triumph Foods by complying with production and ethical guidelines, balancing the relationship between members of Allied Producers' Cooperative receiving the maximum return per market hog delivered to Triumph Foods and the financial strength of Triumph Foods, and continuing the creation of expansion opportunities for all America's Premium Pork members." Allied Producers' Cooperative Mission Statement, Allied Producers' Cooperative, https://alliedproducers.com/about_us.html (last visited Sept. 20, 2023).

14.    The interests APC seeks to protect are germane to APC's mission statement and purpose.

15.    The Farmer Plaintiffs farm and produce pigs to supply Triumph's pork processing operations, and are farrow-to-finish farmers. This means that each Farmer Plaintiff has breeding pigs, and after the breeding pigs give birth, the Farmer Plaintiff raises the pigs until they are ready for market. ECF No. 27-2, ¶ 5; ECF No. 27-3, ¶ 4; ECF No. 27-4, ¶ 4; ECF No. 27-5, ¶ 3; ECF No. 27-6, ¶ 5.

HB: 4864-6717-5046.1

**The Defendants**

16.    Defendant Campbell is the Attorney General of the State of Massachusetts, and is charged with enforcing the Act. Mass. Gen. Laws App., § 1-6.

17.    Defendant Randle is the Massachusetts Commissioner of Agriculture who oversees the Massachusetts Department of Agricultural Resources, which is responsible for implementation of the Act. *See generally* 330 CMR 35.00.

**The Act and Regulations**

18.    A ballot committee was formed to support the passage of the ballot initiative, called the Citizens for Farm Animal Protection ("CFAP"), that was eventually deemed "Question 3." *See generally* ECF No. 33.

19.    The national Humane Society of the United States ("HSUS") was the primary author and chief proponent of Question 3, which established minimum size requirements for housing egg-laying hens, breeding pigs, and calves raised for veal. ECF No. 33, p. 3.   HSUS is a separate and distinct organization from the locally known Human Society animal shelters.

20.    Stephanie Harris, of the HSUS, was the treasurer of the ballot committee. Carter Lake, of the Massachusetts Society for the Prevention of Cruelty to Animals-Angell Animal Medical Center was the chairman of the ballot committee.

21.    The HSUS was also the author and a primary supporter of California's Proposition 12, passed in 2018, which also prevents "cruel confinement" of and established minimum size requirements for egg-laying hens, breeding pigs, and calves raised for veal, and prohibited the sale of products that were the product of "cruel confinement."   Cal. Health & Saf. Code §§ 25990, 25993.

22.    Other groups claim to have sponsored the passage of Question 3, including the

4

Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming USA, and Animal Outlook. *See* ECF No. 33, pp. 3-5.

23.    The Information for Voters, 2016 Ballot Questions, published by the Secretary of the Commonwealth, provided a summary of Question 3 and provided the full text of the proposed law for the voters to review. *See* Exhibit 1. It described that a "Yes" vote "would prohibit any confinement of pigs, calves, and hens that prevents them from laying down, standing up, fully extending their limbs, or turning around freely" and would further prohibit the sale of such products derived from those breeding pigs. The summary further identified the categories of processed foods such as hot dogs that would be exempted from the law, without providing any reasoning for such exemption. *Id.* It described that a "No" vote "would make no change in current laws relative to the keeping of farm animals." *Id.*  The summary did not explain what current laws existed within the Commonwealth concerning the keeping of farm animals.

24.    The Secretary also published arguments from those in favor and against Question 3. *Id.* Stephanie Harris, Campaign Director for CFAP, authored the arguments in favor, which state: "A YES vote prevents cruel treatment of animals in Massachusetts by ending the practice of cramming farm animals into cages so small they can't turn around or stretch their limbs, and will remove inhumane and unsafe products from the Massachusetts marketplace." *Id.*

25.    The information also included three sections regarding who endorsed the initiative and why. The first section states: "Endorsed by the MSPCA, Animal Rescue League of Boston, The Humane Society of the United States, and 400 Massachusetts veterinarians because no animal should be immobilized in a cramped cage." *Id.* The second section states: "Endorsed by the Center for Food Safety and Consumer Federation of America because cage confinement increases food safety risks, and a YES vote protects Massachusetts consumers." *Id.* The third section states:

5

"Endorsed by Massachusetts family farmers and the United Farm Workers because proper treatment of animals is better for farmers. From McDonald's to Walmart, retailers are switching to cage-free eggs—the right thing to do at the right cost." *Id.* Finally, the supporters end their arguments by stating, "Vote YES. Protect consumers. Prevent animal cruelty." *Id.*

26.     On November 8, 2016, Massachusetts voters approved the Prevention of Farm Animal Cruelty Act through ballot initiative Question 3. ECF No. 35-1, pp. 3-58, 60-65. The Prevention of Farm Animal Cruelty Act was enacted by Acts (2016) Chapter 33 on went into effect on January 1, 2022. ECF No. 35-1, pp. 60-65.

27.     The Act states that its purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ch. 129 App., § 1-1.

28.     The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" (hereinafter referred to as the "Minimum Size Requirements"). Mass. Gen. Laws Ch. 129 App., § 1-5.

29.     A "covered animal" is defined as any breeding pig, calf raised for veal, or egg laying hen that is kept on a farm.

30.     A "breeding pig" is defined as any female pig of the porcine species kept for the purpose of commercial breeding. Mass. Gen. Laws Ch. 129 App., § 1-5.

31.     The Act also makes it unlawful for a "business owner or operator to knowingly

6

engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Mass. Gen. Laws Ch. 129 App., § 1-3.

32.     This prohibition applies regardless of where in the United States the Whole Pork Meat was produced or processed. Mass. Gen. Laws Ch. 129 App., § 1-3.

33.     The Act does not define what it means to be "engaged in" the sale of prohibited product within Massachusetts. Mass. Gen. Laws Ch. 129 App., § 1-5.

34.     A "sale" is defined as a "commercial sale by a business that sells any item covered by section 3; provided, however, that 'sale' shall not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act." Mass. Gen. Laws. Ch. 129 App., § 1-5. Further, a sale occurs "at the location where the buyer takes physical possession of the item covered by said section 3." *Id.*

35.     In-state processors may sell noncompliant Whole Pork Meat from their FMIA facility if the buyer takes possession of the product at that establishment. Mass. Gen. Laws. Ch. 129 App., § 1-5.

36.     Whole Pork Meat is defined as "any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives." Mass. Gen. Laws Ch. 129 App., § 1-5. The definition of Whole Pork Meat specifically excludes "combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives." *Id.*

7

37.    Pork Meat is defined as "meat of a pig of the porcine species intended for use as human food." Mass. Gen. Laws Ch. 129 App., § 1-5.

38.    Pork Meat of a sow is exclusively made into combination pork food products that are included in the exception to the definition of Whole Pork Meat.

39.    The Act contains limited exceptions to the Minimum Size Requirements, including for a five-day period prior to the expected date of giving birth, during nursing, and for temporary periods of less than six hours for breeding purposes. Mass Gen. Laws Ch. 129 App., § 1-4.

40.    The Act does not provide Minimum Size Requirements for the offspring of breeding pigs. *Id.* at § 1-3, 1-4.

41.    In December 2021, the Massachusetts Legislature amended portions of the Act by passing Acts (2021) Chapter 108. The bill changed the definition of "confined in a cruel manner" regarding egg-laying hens and added other definitions regarding egg-laying hens. ECF No. 35-1, pp. 67-74.

42.    No changes were made to the Minimum Size Requirements regarding breeding pigs, apart from extending the date by which the sale of Whole Pork Meat not in compliance with the Act would be prohibited. The Act was amended in a manner that changed the effective date for the Minimum Size Requirements as applied to breeding pigs to August 15, 2022. ECF No. 35-1, pp. 67-74.

43.    The Act originally mandated the Attorney General to promulgate regulations for the implementation of the Act by January 1, 2020. ECF No. 35-1, pp. 64-65.

44.    The Attorney General failed to promulgate regulations by the date mandated within the Act, and instead promulgated regulations that were not effective until October 1, 2021, nearly two years delayed. Mass. Register 1453 (Oct. 1, 2021) at 424-34.

45.     Acts (2021) Chapter 108 amended the Act to defer the mandate to the Department of Agricultural Resources—instead of the Attorney General—to promulgate regulations for the implementation of the Act not more than six months after the effective date of Acts (2021) Chapter 108 (October 1, 2021). ECF No. 35-1, pp. 73.

46.     Regulations to implement and address enforcement of the Act were finally promulgated by the Department of Agricultural Resources and went into effect on June 10, 2022 (the "Regulations"), two and a half years after the date that Question 3 mandated the operational Regulations be fully promulgated. The Regulations are included at 330 CMR 35.01-08.

47.     The Regulations would have applied to the sale of Whole Pork Meat in August 2022, but have been voluntarily stayed multiple times by Defendants, ultimately staying enforcement of the Regulations until August 23, 2023. *See e.g., Massachusetts Restaurant Association et al. v. Healey*, Case No. 4:22-cv-11245-MLW, ECF Nos. 19, 20.

48.     The Regulations supersede any such previously issued regulations imposed by the Attorney General's office.

49.     However, the Regulations are subject to voluntary amendment today.  Defendants have now voluntarily agreed to propose an amendment to the Regulations in order to allow for the transshipment of Whole Pork Meat into and through the Commonwealth, as the current Regulations do not authorize the sale of Whole Pork Meat within the Commonwealth even if it is destined for neighboring New England states.

50.     The Regulations included that Whole Pork Meat products already in the supply chain as of and including August 15, 2022, would be deemed compliant in what is referred to herein as the "Sell Through Provision."

51.     Neither the Act nor the Regulations define the phrase "supply chain." 330 CMR

35.04(1); Mass. Gen. Laws Ch. 129 App., § 1-5.

52.     The Regulations created a procedure for certifications for any farm, farm owners, or farm operators who engage in commercial transactions within Massachusetts regarding the meat or products of a covered animal and for any other person who engages in a commercial transaction within Massachusetts regarding the meat or products of a covered animal. *See generally* 330 CMR 35.05.

53.     The Regulations require that "[a]ny Farm or Farm Owner or Operator that raises a Covered Animal and engages in a commercial transaction within Massachusetts involving any … Whole Pork Meat derived from a Covered Animal raised on said Farm may Certify in writing under pains and  penalties of perjury that such Farm does not knowingly cause any Covered Animal to be Confined in a Cruel Manner." 330 CMR 35.05(1).

54.     Further, the Regulations state "[a]ny Person who engages in a commercial transaction within Massachusetts involving any … Whole Pork Meat, including, but not limited to, a Farm, Farm Owner or Operator, Business Owner or Operator, or supplier, residing or operating within or outside of the Commonwealth, may Certify in writing that particular … Whole Pork Meat … were not derived from a Covered Animal that was Confined in a Cruel Manner, or from the immediate offspring of a female pig that was Confined in a Cruel Manner." 330 CMR 35.05(2).

55.     Such certifications provide a defense to a Massachusetts seller regarding to any action to enforce 330 CMR 35.00 or any action to enforce Acts (2021) Chapter 108—or the Act. 330 CMR 35.04(2).

56.     The Regulations authorized the Department or third-party validators to go beyond the boundaries of Massachusetts and inspect a farm "pursuant to any applicable authority" for

HB: 4864-6717-5046.1

compliance with the Minimum Size Requirements to ensure that "animals are not being Confined in a Cruel Manner." 330 CMR 35.06-.07.

57.    If, during an inspection of a farm, the Department of Agricultural Resources or a third-party validator observes violations of the Act or the Regulations regarding the implementation of the Act, the Department may refer the violations to the Attorney General's Office. 330 CMR 35.06-.07.

58.    The Attorney General has exclusive authority to enforce the provisions of the Act. Mass. Gen. Laws App., § 1-6. Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act. Mass Gen. Laws App., § 1-6.

59.    Accordingly, subject to the limited exceptions described herein, as of August 24, 2023, the Act and the Regulations are currently enforceable and prohibit the sale of non-compliant Whole Pork Meat.

**Pig Farm Operations**

60.    Breeding pigs or sows are female pigs utilized for breeding and give birth to the piglets that ultimately become pigs sent to market. ECF No. 27-7, ¶ 13.

61.    Breeding pigs are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the breeding pigs, and to increase efficiency. *Id.*

62.    Breeding pigs are generally artificially inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned. *Id.*, ¶¶ 13-15.

63.    Farrow to finish takes approximately 24-26 weeks. *Id.*

64.    An overwhelming majority of sow farms use some type of indoor confinement for

HB: 4864-6717-5046.1

breeding pig operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

65.    Only a small portion of the pigs that are harvested for meat are breeding pigs that have been kept for reproduction.

66.    The vast majority of pig farmers across the industry house pregnant breeding pigs in individual stalls for at least a portion of the breeding pig's pregnancy, such as during insemination, the first 42 days after insemination, and for the first 30 to 40 days after weaning. ECF No. 27-7, ¶¶ 56-60.

67.    This practice protects the sow, helps prevent pregnancy loss, permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing. *Id.*; ECF No. 27-3, ¶¶ 30, 32-33; ECF No. 27-4, ¶ 28; ECF No. 27-5, ¶¶ 20, 24-25; ECF No. 27-6, ¶¶ 21-23, 30-31.

68.    Farmer Plaintiffs and industry experts believe that individual stalls also permit breeding pigs to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

69.    Housing breeding pigs in individual stalls permits farmers to carefully provide each breeding pigs with the right amount of feed to achieve optimal nutrition. Industry experts maintain that this is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning. Housing breeding pigs in a group pen in the manner required by the Act also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals at a time the breeding pigs are most aggressive. *See generally* ECF No. 27-7; see also ECF No. 27-3, ¶¶ 30, 32-33; ECF No. 27-4, ¶ 28; ECF No. 27-5, ¶¶ 20, 24-25; ECF No. 27-6, ¶¶ 21-23, 30-31.

70.     Once pigs reach harvest weight, Farmer Plaintiffs send them to packing and processing facilities, like Triumph. Packing and processing facilities receive pigs from multiple farms, in multiple locations, operated by multiple farmers. ECF No. 27-1, ¶ 7, 9; ECF No. 27-4, ¶¶ 7, 21.

71.     The states in which Farmer Plaintiffs operate give farmers, including Farmer Plaintiffs, the right to confine breeding pigs in a manner that is expressly prohibited by the Act. For example, the Missouri Constitution protects the "right of farmers and ranchers to engage in farming and ranching practices." Mo. Const. art. I, § 35. Wyoming law provides that "the rights of farmers and ranchers to engage in farm or ranch operations shall be forever guaranteed in this state." Wyo. Stat. § 11-44-104. Further, Wyoming law provides that nothing in its "Protection of Livestock Animals" chapter prohibits "the use of Wyoming industry accepted agricultural or livestock management practices or any other commonly practiced animal husbandry procedure used on livestock animals…" Wyo. Stat. 11-29-115. And Indiana regulations, promulgated pursuant to Indiana statute, establish standards of care for livestock, including that persons responsible for caring for livestock must provide the animals with sufficient shelter from the weather; must take reasonable measures to protect the animals from injury or disease; and must provide the animals with an environment that can reasonably be expected to maintain the health of animals raised using the applicable production method. 345 Ind. Admin. Code 14-2-3 through 14-2-4.

**Plaintiff Farmers' Compliance with The Act**

72.     Farmer Plaintiffs knowingly supply pigs to be processed into pork and sold into and within Massachusetts that would not be compliant with the Act. ECF No. 27-2, ¶¶ 15-16; ECF No. 27-3, ¶ 9; ECF No. 27-4, ¶ 5, 18-19; ECF No. 27-5, ¶ 9; ECF No. 27-6, ¶ 11.

13

HB: 4864-6717-5046.1

73.    The Act and the Regulations conditions the sale of Whole Pork Meat within Massachusetts on the use of sow housing practices that are compliant with the Act, regardless where the sow is raised.

74.    The Farmer Plaintiffs and other farmers have each entered into an agreement with Triumph to sell pigs. These contracts are known as HPAs. ECF No. 27-1, ¶ 11. The HPAs provide specific terms governing the sale of pigs by the Farmer Plaintiffs, including the annual supply volume of pigs required by each Farmer Plaintiff. *Id.*

75.    Compliance with the Act and Regulations' Minimum Size Requirements would require significant changes to Farmer Plaintiffs' farming operations, including significant structural changes and reducing the number of pigs at their facilities. ECF No. 27-2, ¶¶ 21-24; ECF No. 27-3, ¶¶ 22-31; ECF No. 27-4, ¶¶ 23-32; ECF No. 27-5, ¶¶ 12-13, 16-23; ECF No. 27-6, ¶¶ 18-24, 27-30.

76.    Farmer Plaintiffs do not agree that the Minimum Size Requirements are in the best interest of the sow's welfare, contrary to the ballot initiative supporters' moral opinions.

77.    Aggressive sows can place Farmer Plaintiffs' employees at risk of substantial injury and harm.

78.    Operating costs are necessarily impacted as a result of negative sow welfare issues tied to the Minimum Size Requirements of the Act.  Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12.

https://dof.ca.gov/Forecasting/Economics/Major_Regulations/Major_Regulations_Table/documents/CDFA_Proposition_12_SRIA.pdf.

79.    Due to not being able to build new barns or retrofit existing barns, it will not be feasible for any of the Farmer Plaintiffs to ever convert their entire farms come into full

14

compliance with the Minimum Size Requirements for a variety of reasons, including lack of space and financial inability. *Id.*

80.    Several Farmer Plaintiffs cannot convert any of their operations to come into compliance with the Minimum Size Requirements given the amount of time between when the requirements came fully into effect and when the sell through provision expires, or even from the time *Ross* was decided by the Supreme Court to when the Extended Stay Period ended. Since the smaller Farmer Plaintiffs cannot produce compliant pigs, they will not be able to sell Triumph their pro rata share of market pigs, and they will risk incurring damages or defaulting under their HPAs with Triumph. ECF No. 27-5, ¶ 12; ECF No. 27-6, ¶ 20.

81.    Some Farmer Plaintiffs, such as Christensen Farms, have spent significant capital in converting a small portion of their operations to be compliant with the Minimum Size Requirements. Compliance measures taken to date by the Farmer Plaintiffs have been instituted in order to satisfy California's Proposition 12 requirements only, which have been insufficient to meet even the needs of California. ECF No. 27-4, ¶¶ 23-33; 40-42.

82.    The Act and Regulations do not provide a space or size specification for breeding pig housing specifications to meet the standards set forth in the Minimum Size Requirements. *See generally* Mass. Gen. Laws Ch. 129 App. §§ 1-1 *et seq.*; 330 CMR 35.00 *et seq.*

83.    The Act and Regulations further do not regulate the housing requirements for the offspring of breeding pigs. *Id.*

84.    The square footage requirements for a breeding pig to turn around freely, without touching the sides of an enclosure or another animal, is expressly dependent on how large the individual breeding pig is and how large the other pigs it is kept with are. ECF No. 27-3, ¶ 23.

85.    Plaintiff Farmers cannot comply with the Minimum Size Requirements without

HB: 4864-6717-5046.1

constructing full group pen housing systems. *See e.g.,* ECF No. 27-3S, ¶ 23; ECF No. 27-5, ¶ 19.

86.    Farmer Plaintiffs do not know what activities would be considered "engaging in the sale" within the Commonwealth and cannot discern whether shipment of their pork products into Massachusetts, if not compliant with the Act and Regulations, is prohibited conduct. *See e.g.*, ECF 27-2, ¶ 20; ECF No. 27-3, ¶ 20; ECF No. 27-4, ¶ 34; ECF No. 27-5, ¶ 14; ECF No. 27-6, ¶ 16.

**Triumph and Pork Processing Facilities**

87.    Triumph receives its pig supply from the Farmer Plaintiffs and some additional pig farmers. ECF No. 27-1, ¶ 7.

88.    The states in which Triumph operates do not prohibit the sale of Whole Pork Meat if it is the offspring of a sow not housed in compliance with the Minimum Size Requirements or is the offspring of such sow. For example, the laws of Missouri, where Triumph operates its pork processing facility, either confers a right to or does not prohibit Triumph from engaging in activity that is expressly prohibited by the Act. ECF No. 27-1, ¶ 52.

89.    The chain of title of a pig from a Farmer Plaintiff to a cut of whole pork meat to a Massachusetts consumer through Triumph's plant is as follows:

   a. A Farmer Plaintiff raises a pig from after it is born from the sow until the pig it is ready for market;

   b. The Farmer Plaintiff ships and sells the pig to Triumph under a Hog Procurement Agreement;

   c. Under that agreement, title to the pig passes to Triumph once the pig passes US Department of Agriculture inspections, including ante-mortem and post-mortem inspections, at Triumph's plant.

   d. At its plant, Triumph processes the pig into multiple cuts of Whole Pork Meat; and

16

> e. For customers in Massachusetts, Triumph ships that Whole Pork Meat from its
> plant directly to the customer in Massachusetts, at which point title transfers
> directly from Triumph to the buyer in Massachusetts.

ECF No. 38-1, ¶ 10.

90.     Like most of the industry, the vast majority of pigs that are sold to and then processed, packed, and distributed by Triumph is the product of an animal not housed in compliance with the Minimum Size Requirements. *See e.g.*, ECF No. 27-1, ¶ 17.

91.     Triumph will process, package, and distribute the pork it processes directly from Triumph's facility into Massachusetts. ECF No. 27-1, ¶ 19.

92.     Almost all sales of Triumph's product take place at locations separate from Triumph, not at the physical plant, and the products do not transfer from Triumph to the buyer until Triumph's product is delivered to each customer in their state. ECF No. 27-1, ¶ 36.

93.     As an out-of-state processor, Triumph, cannot have a sale of noncompliant Whole Pork Meat be excluded from the definition of a "sale" under the Act and Regulations because they are not located in Massachusetts and ship directly into the state. *Id.*

94.     Triumph always aims to operate at full capacity. ECF No. 27-1, ¶ 14. The plant processes harvested pigs into many different cuts of meat. ECF No. 27-1, ¶ 9. The meat is packed and shipped to customers throughout the entire country and abroad, including Massachusetts. *Id.*; see also, ECF No. 38-1, ¶ 10.

95.     Triumph receives its orders for pork through its exclusive marketer of pork, Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard") through a Marketing Agreement. ECF No. 27-1, ¶ 15–16.

96.     Triumph Foods' products are sold through the use of the Marketing Agreement.

With a handful of limited exceptions for by-products, Seaboard Foods markets, advertises and sells Triumph's products through the Marketing Agreement.

97.     Triumph pays Seaboard Foods a fee for their services to market and advertise products and execute its obligations under the Marketing Agreement.

98.     Triumph owns and sells its pork by producing products as scheduled and directed by Seaboard, shipping directly from Triumph into Massachusetts, and receiving the revenue from those sales.  ECF No. 38-1, ¶¶ 7-11.

99.     Farmer Plaintiffs and Triumph, who have such knowledge and supply, are thus arguably "engaged in the sale" but do not know whether Massachusetts would consider them to be "engaged in the sale" and culpable under the statute for their sales into the state and certainly Massachusetts could take that position under the statute. ECF No. 27-1, ¶ 35; ECF 27-2, ¶ 20; ECF No. 27-3, ¶ 20; ECF No. 27-4, ¶ 34; ECF No. 27-5, ¶ 14; ECF No. 27-6, ¶ 16.

100.     Triumph is also at risk of losing customers, both at an individual state and potentially national level, and being cut out of entire states for the pork market if it cannot supply Seaboard with the amount of compliant Whole Pork Meat it requires. ECF No. 27-1, ¶¶ 20, 40.

101.     If Seaboard is unable to supply an order that requires compliant Whole Pork Meat, Seaboard and Triumph risk losing the nationwide sale associated with those entities. ECF No. 27-1, ¶¶ 20, 22.

102.     Currently, Massachusetts customers demand more compliant product than what Triumph and the Farmer Plaintiffs have available because Massachusetts' requirements are really a subset of California's, and the industry already does not have enough for California. ECF No. 27-1, ¶ 21.  Whatever product is available, has been diverted to California given Proposition 12's implementation and threat of criminal enforcement. *Id.*

18

103.    Additionally, the full amount of pork produced from a compliant pig is not typically utilized to fulfill Proposition 12 or Question 3 compliant orders. Pork items for which there is no demand for Proposition 12 or Question 3 pork are sold into the commodity market without any premium to offset the increased cost of production for those products. ECF No. 27-1, ¶ 30.

104.    Further, the Act and the Regulations encourage processors, like Triumph, and packers to either source their supply of pigs only from farmers who are completely compliant with the Act or to pay a premium to farmers who produce pigs that are compliant with the Act. ECF No. 27-1, ¶ 42.

**The Federal Meat Inspection Act (the "FMIA") and Triumph's Operations**

105.    Congress designated the United States Department of Agriculture (the "USDA") as the regulatory body to monitor meat processing through the FMIA. 21 U.S.C. § 601. The USDA is a public health regulatory agency.

106.    The USDA regulates meat, poultry, egg products, and catfish through one of its agencies, the Food Safety and Inspection Service (the "FSIS"). Inspection of Meat Products, Food Safety and Inspection Service, U.S. Department of Agriculture, https://www.fsis.usda.gov/inspection/inspection-programs/inspection-meat-products. The USDA is charged with ensuring that meat, including pork, does not leave a plant if it is at risk for foodborne illness. Protecting Public Health and Preventing Foodborne Illness, U.S. Department of Agriculture, https://www.usda.gov/topics/health-and-safety. The USDA is also charged with preventing pest or disease of livestock in interstate commerce. 9 C.F.R. § 71, *et seq*.

107.    The FMIA contains an express preemption clause, which states that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are

in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia . . . ." 21 U.S.C. § 678.

108.    The FMIA requires that "[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce . . . ." 21 U.S.C. § 603.

109.    The USDA is designated to "appoint from time to time inspectors to make examination and inspection of all amenable species, inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, . . . and said inspectors shall refuse to stamp, mark, tag, or label any carcass or any part thereof . . . until the same shall have actually been inspected and found to be not adulterated . . . ." 21 U.S.C. § 621.

110.    The USDA and FSIS are charged with ensuring that pork processors comply with federal law so that meat is "safe, wholesome, and properly labeled." *See, e.g.*, 21 U.S.C. § 602.

111.    The federal government published specific guidance to identify how the inspection and segregation process is to occur within the swine industry pursuant to the FSIS, which is identified as "part of a science-based national system to ensure food safety and food defense. FSIS ensures food safety through the authorities of the Federal Meat Inspection Act, the Poultry Products Inspection Act, as well as humane animal handling through the Humane Methods of Slaughter Act." About FSIS | Food Safety and Inspection Service (usda.gov) (last visited July 22, 2023).

112.    Under the FMIA, the USDA performs inspections at meat packing facilities to

HB: 4864-6717-5046.1

ensure that the products are wholesome and not adulterated. 21 U.S.C. § 606.

113.    The FMIA defines "adulterated" as a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 601.

114.    To ensure compliance with federal food safety laws, the USDA regulates and inspects the pigs before they enter the facility (ante-mortem) by either (a) directly inspecting every single pig or (b) otherwise delegating portions of that responsibility to trained employees at the establishment who support the USDA with the ante-mortem inspections through the USDA's segregation procedures set forth within FSIS Directive 6100.1, known as the "Voluntary Segregation Program" ("VSP"). 9 C.F.R. Part 309; FSIS Directive 6100.1.

115.    The USDA's inspection personnel are referred to as "IPP" as they are in the Inspection Personnel Program. 9 C.F.R. Part 309; FSIS Directive 6100.1. "As required under the FMIA, IPP are to examine and inspect all livestock before slaughter to determine whether the animals are fit for slaughter for human food." *Id.* If animals are not presented for this purpose, or the processor is not otherwise fulfilling its responsibilities under the VSP, the pork products produced are not able to be marked by USDA as "inspected and passed." ECF No. 27-1, ¶ 48.

116.    The USDA continues to regulate and inspect the pigs after they have passed antemortem inspection and have entered the facility for processing (post-mortem). ECF No. 27-2, ¶ 31. After entering the facility and post-mortem phase, the USDA inspects at every phase of the pig's processing, while facility employees assist with these inspections throughout the line by adhering to the USDA's FSIS regulatory requirements. 9 C.F.R. § 310.26; *see also* ECF No. 27-

1, ¶ 45.

117.    To ensure that no adulterated products which could cause food borne illness enter the interstate food supply chain, the USDA inspection process begins outside of the four walls of a FSIS processing facility. ECF No. 27-1, ¶ 46; ECF No. 27-2, ¶ 30; ECF No. 27-4, ¶ 15.

118.    Pigs are transported by the farmer to a processing facility like Triumph via truck or trailer. *See e.g.,* ECF No. 27-4, ¶ 14. When the truck or trailer first arrives, farmers begin to unload their trucks carrying market pigs. *Id.* Throughout this process, the USDA, either directly or through their USDA VSP, begins observation for pigs that may qualify as adulterated. *Id.* If a pig is identified on a truck as adulterated, then the pig will be segregated from the delivery. *Id.*, ¶ 15.

119.    Before pigs are even allowed to disembark and unload from a farmer's truck, the USDA is reviewing and inspecting the deliveries of pigs for disease, injury, and other factors to ensure that all pigs entering the plant are wholesome, unadulterated, and suitable for human consumption as final pork products. ECF No. 27-1, ¶ 46. This is the first element of this phase of inspection that the USDA will engage in for the purpose of preventing foodborne illness or adulterated pork products. *Id.*

120.    After this initial element of inspection on the farmers' trucks, the remainder pigs are offloaded into sorting pens and chutes that are outside the processing area of the facility for a further ongoing inspection by the USDA within the receiving alley. ECF No. 27-1, ¶ 46; ECF No. 27-2, ¶ 30 –31. If not previously identified as possibly adulterated, then they enter a third component of the ante-mortem inspection in the holding pen (or a barn), in which the USDA continues observations. *Id.* These second and third components of ongoing ante-mortem inspection are for the same purpose – in addition to animal care, they are there to ensure that no pig exhibits any signs of disease, specifically for the purpose of preventing any foodborne illness or adulterated

pigs from entering the facility itself and ultimately in the pork distributed to the end-consumer. *Id.*

121.    Once a pig enters the processing facility after ante-mortem inspection has been completed by the USDA, the USDA continues inspection within the facility during the complex post-mortem inspection phase. ECF No. 27-1, ¶ 47. During this lengthy phase through the full processing line, USDA inspectors are conducting observations and examinations of the head, viscera and carcass for any indication of disease, parasites, pathology, or any other signs of abnormalities. *Id.*

122.    This USDA inspection process for food borne illness endures from the moment the pigs enter inside the processing facility, through the harvesting process, and through the moment the finished pork products depart for the interstate market. The USDA officials inspect every phase of the processing and the establishment's employees are regulated by the FSIS to fulfill specific and detailed requirements to support the USDA. FSIS Directive 6100.2; *see also* ECF No. 27-1, ¶ 45–46.

123.    The FMIA or its associated regulations do not set any type of minimum size requirement for raising breeding pigs, or within the definition of what should constitute an "adulterated" product or in determining what is fit for human consumption. *See generally* 21 U.S.C. § 601 *et seq*.

124.    Under the HPAs that Triumph has with the pig farmers, title of a particular pig does not transfer to a processor and does not qualify as a purchase by Triumph, until the pig has passed complete and full inspection by the USDA both prior to entrance inspections at the processor and following the full inspections inside the facility. ECF No. 38-1, ¶ 10.c. See also ECF No. 27-1, ¶ 45; ECF NO. 27-2, ¶ 31.

125.    Pigs raised in compliance with Question 3 must be separated, and kept separated,

from conventional pigs at all points during the antemortem and postmortem processing operations that occurs at the processing facility. ECF No. 27-1, ¶ 49. Otherwise, the Question 3 qualified pigs and the conventional pigs will become unknowingly intermixed prior to entry into the processing facility, or throughout the processing line after entering. *Id.*

126.    The FMIA and Voluntary Segregation Program do not identify pigs who are non-compliant with Minimum Size Requirements as adulterated or unfit for human consumption, but will have to do so now, in effect, under the Act and Regulations in order to ensure they are segregated from conventional pigs. *See generally* 21 U.S.C. § 601 *et seq.*; 9 C.F.R. Part 309; FSIS Directive 6100.1.

127.    While Triumph has tried to make some accommodation for laws like the Act and Proposition 12 for the interim, doing so for numerous states or fifty states would be crippling and impossible to processors, including  Triumph.. ECF No. 27-1, ¶ 17, 29.

128.    Each new regulation would require new inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures, and new storage locations to keep each type of product separate. ECF No. 27-1, ¶ 29.  If enough states pass regulations like Question 3, Triumph will be forced to ration its products. *Id.*

**The Pork Market**

129.    The sale of Whole Pork Meat is a nationwide, regulated commodity, and the pork market is interconnected.

130.    Massachusetts had as few as 1,500 breeding sows as of 2022 and approximately 6,000 total market hogs. ECF No. 27-8, ¶ 7. As of 2017, the total number of pig farmers in Massachusetts was about 336, and only one farmer had a herd size greater than 1,000 head, while 264 farmers have a herd size of 1-24 head. USDA, National Agricultural Statistics Service, 2017

HB: 4864-6717-5046.1

Census of Agriculture – Massachusetts State and County Data (April 2019). Only eight Massachusetts pig farmers had a herd size of 200 or more. This means that, as of 2017, about 78% of Massachusetts pig farmers have the smallest possible pig operation. *Id.*

131.    In the first quarter of 2023, Missouri and Iowa had 450,000 breeding sows and 900,000 breeding sows, respectively. ECF No. 27, p. 4–5 (citing USDA, National Agricultural Statistics Service, USDA Quarterly Hogs and Pigs (March 2023)).

132.    Massachusetts is the fifteenth most populous state in the nation, representing 2.1% of the U.S. population and consuming approximately 356.8 million pounds of retail pork in 2022. ECF No. 27-8, ¶ 7–8. The volume Massachusetts demands to feed its population would well exceed the amount of pork that Massachusetts can produce and sell intrastate from Massachusetts farms, given the small number of breeding sows in Massachusetts. *Id.*

133.    That volume produced within Massachusetts assuming it is sold and remains in Massachusetts is estimated at only 1.9 million pounds of retail pork in 2022. ECF No. 27-8, ¶ 8

134.    As of 2016, when Question 3 was approved by Massachusetts, Massachusetts pig farmers did not use gestation crates for housing breeding sows. Andrea Shea, Confinement of Farm Animals: A Primer on Question 3 in Mass. (Sept. 20, 2016) https://www.wbur.org/morningedition/2016/09/20/farm-animal-containment-ballot-question.

135.    More than one in five (21.6 percent) of the adults in the United States reported household food insecurity in the summer of 2022. Pork ranks third in the United States for meat consumption. Waxman E, Salas J, Gupta P, Karpman M, Food Insecurity Trended Upward in Midst of High Inflation and Fewer Supports, Robert Wood Johnson Foundation, https://www.rwjf.org/en/insights/our-research/2022/09/food-insecurity-trended-upward-in-midstof-high-inflation-and-

fewersupports.html#:~:text=More%20than%20one%20in%20five,their%20White%20counterparts%20(17.3%25).

136.    In 2022, food prices overall in the United States increased by 9.9 percent, and food-at-home prices increased by 11.4 percent. Food Prices and Spending, ECONOMIC RESEARCH SERVICE U.S. DEPARTMENT OF AGRICULTURE (July 19, 2023).

137.    The Act will impose costs on pork farmers outside of Massachusetts, ultimately directly impacting the price of pork for all Americans. ECF No. 27-1, ¶ 53–54; ECF No. 27-8, ¶ 15.

138.    The Act and its Regulations also threaten the public supply of pork within Massachusetts and states to which Massachusetts service in New England, which is necessary to satisfy the needs of the businesses and state facilities, including hospitals, schools, prisons and other public agencies utilizing federal funding. ECF No. 27-1, ¶ 24; ECF No. 27-8, ¶¶ 32–36.

139.    Triumph's supply of fresh Whole Pork Meat that was harvested on or before August 23, 2023, will quickly be depleted. In an effort to continue supplying pork to Massachusetts, Triumph obtained cold storage space at its facilities to increase its supply of frozen Whole Pork Meat so that there would be additional product that could be sold into Massachusetts after August 24, 2023; however, the same efforts are being used to supply California—whose own Sell Through Provision expired on July 1, 2023—with Whole Pork Meat and therefore placing Massachusetts and California in competition for who will receive Triumph's fresh and frozen products. ECF No. 34, ¶¶ 8-10.

140.    Massachusetts demands approximately 365 million pounds of pork product a year, and the last 12 months of Triumph's, and the pig farmers who supply Triumph, historical net volume pork shipped into Massachusetts was 11.4 million pounds of pork.

HB: 4864-6717-5046.1

141.    The amount of product available to Massachusetts, either fresh or frozen, is *de minimus* for the coming months, causing Massachusetts product from Triumph to imminently deplete. *Id.*, ¶ 12.

142.    This pork is shipped for supply into Massachusetts for distribution to in-state grocery stores, retailers, schools, hospitals, prisons, and other public entities requiring pork through the last quarter of 2023 and thereafter. A shortage is anticipated across all processors, with processors having little ability to fill the gaps for others, and other processors may not have taken the efforts that Triumph has to preserve and freeze the product to assist Massachusetts' pork supply. *Id.*, ¶¶ 13-15.

Plaintiffs propose that all documents attached to this filing be stipulated as to authenticity.


Dated: October 10, 2023


TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, Plaintiffs.


By: */s/ Ryann A. Glenn*

Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes *(admitted pro hac vice)*
Ryann A. Glenn *(admitted pro hac vice)*
Michael Raupp *(admitted pro hac vice)*

HB: 4864-6717-5046.1

HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8381
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 10th day of October 2023, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Ryann A. Glenn*

HB: 4864-6717-5046.1