UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture,<br><br>Defendants. | Case No. 1:23-cv-11671-WGY<br><br>The Honorable William G. Young |

**SUPPLEMENTAL BRIEF OF *AMICI CURIAE*[1] ON PENDING CASE STATED PROCEEDING**

---

[1] Pursuant to this Court's order on September 19, 2023 (Dkt. No. 50) (denying animal welfare organizations' motion to intervene, but "welcom[ing] the proposed intervenors as amici curiae" and inviting them to "submit briefs on every issue," *amici curiae* The Humane Society of the United States, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming USA, and Animal Outlook (collectively "*Amici*") have submitted amicus briefs throughout this litigation. If the Court will allow it, local animal welfare organizations the Massachusetts Society for the Prevention of Cruelty to Animals and Animal Rescue League Boston join existing *Amici* on this brief. Counsel for Defendants consented to their joining existing *Amici*, and counsel for Plaintiffs took no position with respect to the local animal welfare organizations joining as *Amici*, provided that the local organizations' participation will not increase or change arguments made in any briefing, and that they will not be seeking to participate in any other manner.

- i -

## **TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | THE EXEMPTION'S PURPOSE IS UNRELATED TO THE ORIGIN OF PORK | 1 |
| III. | THE EXEMPTION IS NOT DISCRIMINATORY IN EFFECT | 5 |
| IV. | CONCLUSION | 10 |

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*All. of Auto. Mfrs. v. Gwadosky*,
 430 F.3d 30 (1st Cir. 2005) ......................................................................................................9

*Andrus v. Allard*,
 444 U.S. 51 (1979) ...................................................................................................................2

*Ayotte v. Planned Parenthood of N. New Eng.*,
 546 U.S. 320 (2006) ...............................................................................................................10

*Barbuto v. Advantage Sales & Mktg., LLC*,
 78 N.E.3d 37 (Mass. 2017) ...................................................................................................1, 3

*Barnes v. Glen Theatre, Inc.*,
 501 U.S. 560 (1991) .................................................................................................................2

*Brockett v. Spokane Arcades, Inc.*,
 472 U.S. 491 (1985) ...............................................................................................................10

*Champlin Refining Co. v. Corporation Comm'n of Okla.*,
 286 U.S. 210 (1932) ...............................................................................................................10

*Cherry Hill Vineyard v. Baldacci*,
 505 F.3d 28 (1st Cir. 2007) ......................................................................................................9

*Cresenzi Bird Imps., Inc. v. New York*,
 658 F. Supp. 1441 (S.D.N.Y. 1987), *aff'd*, 831 F.2d 410 (2d Cir.1987) (per curiam) ..............2

*Family Winemakers of Cal. v. Jenkins*,
 592 F.3d 1 (1st Cir. 2010) ...............................................................................................7, 8, 9

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) .................................................................................................................6

*Just Puppies, Inc. v. Frosh*,
 565 F. Supp. 3d 665 (D. Md. 2021) .........................................................................................7

*McKiver v. Murphy-Brown, LLC*,
 980 F.3d 937 (4th Cir. 2020) ...................................................................................................3

*Minnesota v. Clover Leaf Creamery Co.*,
 449 U.S. 456 (1981) .................................................................................................................7

*Missouri Pet Breeders Ass'n v. Cnty. of Cook*,
    106 F. Supp. 3d 908 (N.D. Ill. 2015) ........................................................................................5

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................................................... *passim*

*Peterson v. Commissioner of Revenue*,
    444 Mass. 128 (2005) ................................................................................................9

*Portland Pipeline v. City of S. Portland*,
    332 F. Supp. 3d 264 (D. Me. 2018) ..........................................................................7

*Pugsley v. Police Dept. of Boston*,
    472 Mass. 367 (2015) ................................................................................................5

*Signs for Jesus v. Town of Pembroke, NH*,
    977 F. 3d 93 (1st Cir. 2020) .......................................................................................9

**Statutes**

Mass. Gen. Laws Ann. Ch. 129 App., § 1-1 ..................................................................2

Mass. Gen. Laws Ann. Ch. 129 App., § 1-5 ..................................................................4

**Other Authorities**

88 Fed. Reg. 75394, 75399 (Nov. 2, 2023) ....................................................................2

## I.  INTRODUCTION

Plaintiffs' claim that Question 3's exemption for sales occurring directly on the premises of facilities inspected by USDA's Food Safety and Inspection Service ("FSIS-inspected facility exemption" or "exemption") is unconstitutional should fail for the same reason the rest of its dormant Commerce Clause claim failed: Plaintiffs do not adequately allege or supply evidence that the exemption is discriminatory to the interstate pork market in either purpose or in effect. As articulated in *Amici*'s prior briefs, and as briefly elaborated on below, Question 3 (including the exemption) was enacted for legitimate animal welfare and public health and safety reasons well within a state's purview—as the Supreme Court recently acknowledged in *NPPC v. Ross*. Plaintiffs have not provided a shred of evidence that the purpose of the sales exemption is to the contrary. Moreover, Question 3 simply does not deny out-of-state pork processors the ability to compete on equal footing with in-state processors. The exemption merely operates to preserve the status quo prior to enactment of Question 3 with respect to sales on the premises of processing facilities—both in-state and out-of-state processors can sell non-compliant pork products at these facilities to the exact same degree as they could if Question 3 was never enacted. Plaintiffs do not plead facts showing, and could not show as an evidentiary matter, that the exemption will shift the pork market to increase the market share of in-state businesses, which they must establish to show a discriminatory effect.

## II.  THE EXEMPTION'S PURPOSE IS UNRELATED TO THE ORIGIN OF PORK

Plaintiffs' speculation that the FSIS-inspected facility exemption was designed as an advantage to in-state businesses is belied by Queston 3's plain terms as to its purpose, which controls here. *Barbuto v. Advantage Sales & Mktg., LLC*, 78 N.E.3d 37, 49 (Mass. 2017) (noting that the best evidence of the people's purpose in enacting a ballot measure is the measure itself, and the ballot arguments accompanying the measure). Here, the text of the measure is clear: "The

purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. G.L. c. 129 App. § 1-1.[2]

As the Supreme Court recently noted in upholding the materially similar California farm animal product sales law, laws like Question 3 "serve[] moral and health interests . . . for in state residents." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023). First, Question 3's purpose ensures Massachusetts citizens are not unwittingly turned into supporters of animal welfare practices they find reprehensible and ensures that their food standards can be effectively enforced. *Cf. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) (state's traditional police power includes "the authority to provide for the public health, safety, and morals"); *Andrus v. Allard*, 444 U.S. 51, 58 (1979).[3] The USDA agrees that allowing animals sufficient space "may be positively associated with . . . improved well-being of the animals, environmental benefits, and healthier livestock and poultry products for human consumption." USDA, Agric. Mktg. Serv., Final Rule to Amend Livestock and Poultry Production Requirements, 88 Fed. Reg. 75394, 75399 (Nov. 2, 2023).[4]

---

[2] Likewise, the Information for Voters Guide articulated these purposes: "a YES vote prevents animal cruelty," and will "remove inhumane and unsafe products from the Massachusetts marketplace." Notably, the "no" arguments made no mention of protecting in-state pork processors or harming out-of-state processors.

[3] *See also Cresenzi Bird Imps., Inc. v. New York*, 658 F. Supp. 1441, 1447 (S.D.N.Y. 1987), *aff'd*, 831 F.2d 410 (2d Cir.1987) (per curiam) ("'New York has a legitimate interest in regulating its local market conditions which lead . . . to the unjustifiable and senseless suffering and death of thousands of captured wild birds.' . . . The State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical." (citation omitted)).

[4] *See also Ross*, Br. of Amicus Curiae Donald Broom, *et al.*, in which animal welfare scientists and over 300 veterinarians explained the harmful effects of gestation crates on pig welfare, *available at* http://www.supremecourt.gov/DocketPDF/21/21468/233565/20220815174931670_Broom%20et%20al.%20amicus%20brief%20-%20Natl%20Pork%20v.%20Ross%20-%20No.%2021-468.pdf.

Second, Question 3 addresses the demonstrable public health risk posed by pork produced from the offspring of breeding pigs. It is "well-established that close confinement leads to the 'increased risk of the spread of disease' between hogs" and that "humans are not far behind." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 980 (4th Cir. 2020) (Wilkinson, J., concurring). Studies show that offspring of sows subjected to extreme confinement suffer reduced immune resistance and that reduced resistance threatens food safety.[5] The federal government found that piglets typically become colonized with campylobacter — "one of the leading causes of human bacterial gastroenteritis" — "within a few hours of birth" and "remain carriers until slaughter." C.R. Young *et al.*, Enteric Colonisation Following Natural Exposure to Campylobacter in Pigs, 68 Rsch. Vet. Sci. 75, 75-77 (2000).[6] In addition to addressing food safety risks, Massachusetts has an interest in mitigating the emergence and spread of zoonotic diseases, which is also addressed by Question 3.[7]

To construe the FSIS-inspected facility exemption as altering Question 3's purpose to be anything other than what is clearly articulated in Question 3 and the Information for Voters Guide would be both contrary to how this Court determines such purposes, *Advantage Sales & Mktg., LLC*, 78 N.E.3d at 49, and entirely unsupported by the evidence before this Court. Plaintiffs have

---

[5] *See* M. Kulok *et al.*, The Effects of Lack of Movement in Sows During Pregnancy Period on Cortisol, Acute Phase Proteins and Lymphocyte Proliferation Level in Piglets in Early Postnatal Period, 24 Polish J. of Vet. Scis. 85, 90 (2021); Xin Liu *et al.*, A Comparison of Behavior, Physiology, and Offspring Resilience of Gestating Sows Raised in a Group Housing System and Individual Stalls, 11 Animals 2076, at 5 (2021).

[6] *See also Ross*, Br. of Amicus Curiae American Public Health Association, *et al.*, detailing the food safety and public health risks posed by the intensive confinement of sows, *available at* http://www.supremecourt.gov/DocketPDF/21/21-468/233519/20220815153028184_21-468_Amicus%20Brief.pdf.

[7] Pigs carry infectious diseases that can be transmitted to humans, including influenza, Nipah virus, and brucellosis. Jason R. Rohr *et al.*, Emerging Human Infectious Diseases and the Links to Global Food Production, 2 Nature Sustainability 445, 451 (2019). There is "strong evidence" that extreme confinement conditions reduce immune resistance, creating greater opportunity for "amplification"—yielding more transmissible and virulent strains and variants. Bryony A. Jones *et al.*, Zoonosis Emergence Linked to Agricultural Intensification and Envt'l Change, 110 Proceedings Nat'l Acad. Scis. 8399, 8399 (2013).

not produced any evidence suggesting the exemption has a purpose that is any different than the rest of the law — let alone one that is protectionist. As the primary drafters, proponents, and supporters of the law, *Amici* are well situated to know that this exemption was drafted out of an abundance of caution for avoiding the *incorrect* perception that Question 3 in any way treads upon regulation of activity that might be preempted under the Federal Meat Inspection Act ("FMIA").[8] Regardless, Plaintiffs have neither plausibly alleged nor proved that the purpose of the exemption was to create market opportunity for in-state businesses.

Moreover, Question 3 is even-handed, ECF No. 88 at 9, and it burdens in-state producers — who themselves *opposed* the initiative[9] — such that no pork sold pursuant to the exemption could come from in-state producers. In-state producers are prohibited by the separate confinement provision from using production methods like gestation crates, and therefore cannot benefit from the sales exemption. *See* Mass. Gen. Laws Ann. Ch. 129 App., § 1-5 (the exemption is part of the definition of "sale", and expressly applies only to section 3 of Question 3). Thus, the only non-compliant pork that could be sold at FSIS-inspected establishments must come from out-of-state producers, and so in-state producers are actually *disadvantaged* by the exemption as compared to out-of-state producers. "A regulation that shifts business to out-of-state firms at the expense of in-

---

[8] Plaintiffs suggest this rationale for the exemption means Question 3 is preempted in its entirety (even if the exemption is severed away from Question 3 by the Court). ECF No. 88 at 15-16. That is not true. First, preemption under the FMIA's express preemption clause is limited to restrictions of activity *on FSIS-inspected premises* (including slaughterhouses); Question 3 applies more broadly. Second, there is no preemption where a state sales ban excludes products based on a condition arising *upstream* of federally-regulated activity. Animal Welfare Organizations' Amicus Brief, Dkt. 56, at 13-14 (citing *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017), *cert. denied* -- U.S. --, 139 S. Ct. 862 (2019) ("The fact that Congress established 'ingredient requirements' for poultry products that *are* produced does not preclude a state from banning products based on concerns—here, for example, on the basis of animal cruelty—arising well before the animals are slaughtered.").

[9] *See* ECF No. 95 at 16, noting Massachusetts Farm Bureau's opposition to Question 3.

state firms is not the type of harm the Commerce Clause prohibits." *Missouri Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908, 922 (N.D. Ill. 2015).

### III.  THE EXEMPTION IS NOT DISCRIMINATORY IN EFFECT

Plaintiffs' argument that the FSIS-inspected facility exemption is discriminatory in effect, because it purportedly creates an advantage for in-state activity they do not engage in, fails for multiple reasons. First, Plaintiffs' argument is a *non sequitur*, because the exemption simply preserves the status quo—its result is that any sale that occurs on the premises of an FSIS-inspected establishment is *the same for everyone as before Question 3 was enacted*. Plaintiffs complain that large buyers of pork products in Massachusetts will not purchase pork from out-of-state processors if they can purchase pork from in-state processors, *see* ECF No. 88 at 17, but this is an argument based only on geographic location alone, and these conditions are the exact same as those that existed prior to enactment of Question 3. Plaintiffs gain nothing by winning on the specific issue contested in this case stated proceeding. Indeed, Plaintiffs admit that "*[l]ike most plants*" they do not conduct many sales to their buyers at processing facilities, even the out-of-state facilities they currently own and control, and they have never suggested that they intend to do so. ECF No. 27-1 (England Dec.), ¶ 36 ("Like most plants, almost all sales do not take place at Triumph itself, and customers do not accept FOB for the sale until Triumph's product is delivered to each customer in their state."); ECF No. 88 at 12-13; ECF No. 94-1, ¶ 35 (same). So, a ruling that invalidates the exemption from the definition of a prohibited "sale" *would not affect the Plaintiffs at all—*according to their own testimony. Thus, Plaintiffs do not even have standing to raise this claim. *Pugsley v. Police Dept. of Boston*, 472 Mass. 367, 371 (2015) (the court should address a lack of

standing "whenever it appears, whether by suggestion of a party or otherwise" (quoting *Litton Bus. Sys., Inc. v. Comm'r of Revenue*, 383 Mass. 619, 622 (1981)).[10]

The exemption draws no in-state versus out-of-state distinction as to who may engage in sales on the premises of a processing facility. The exemption allows specific conduct (sale) at certain types of facilities (FSIS-inspected establishments) — it does not apply to, or draw a distinction between, different *actors*. Plaintiffs erroneously cast the exemption as applicable to "processors within Massachusetts" in order to make it seem like the exemption is available to some businesses and not others, ECF No. 88 at 11, but the exemption allows sale of non-compliant pork *by anyone* (including Plaintiffs) on the premises indicated. Plaintiffs bemoan this option, as well as the option of having buyers take possession of non-compliant pork outside of Massachusetts, because these options would stray from their current "well-honed and efficient" supply practices. *Id.* at 17. That is exactly the point of Question 3—the law is designed to limit commercial conduct *within Massachusetts* that contributes to cruel treatment of animals. Plaintiffs are simply frustrated that the exemption does not fit their current business model. They baldly assert that the exemption might cut them out of imagined, counter-factual[11] sales to "hospitals" or "prison systems" about which Plaintiffs adduce no evidence. ECF No. 88 at 16. Nowhere do Plaintiffs point to any evidence regarding direct sales on the property of *any* FSIS-inspected facilities. And, as noted above, Plaintiffs have themselves stated—and claim that it is undisputed fact—that such pork sales are exceedingly rare, and that Plaintiffs rarely engage in them in *any* state. See *supra* p. 5. The

---

[10] The fact that Plaintiffs do not currently sell products at FSIS-inspected establishments means their reliance on *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) is misplaced. Plaintiffs do not have an earned advantage that Question 3 would take away, as was the case with the discriminatory nature of the North Carolina law at issue in *Hunt*.

[11] Plaintiffs' focus in their briefing on hypothetical sales from Massachusetts processors to hospitals and prisons is contradicted by their own declarant. *See* ECF No. 27-1, England Dec. at 24 (Massachusetts pork industry is too small to supply the state's "hospitals" and "prisons").

dormant Commerce Clause does not privilege preferred methods of operation. *Ross*, 598 U.S. at 384-85, 386-87, *citing Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 15-28 (1978). Out-of-state businesses are no more limited than in-state businesses in their ability to sell non-compliant pork in Massachusetts.[12]

Conversely, in-state business are *more limited* than out-of-state businesses with respect to the exemption. As noted in Section I, *supra* p. 5, the exemption allowing sale of non-compliant products on the premises of FSIS-inspected facilities can only be used by *out-of-state* producers, because in-state producers cannot produce non-compliant pork in the first place. Thus, out-of-state businesses benefit from the exemption if anyone does. *Portland Pipeline v. City of S. Portland*, 332 F. Supp. 3d 264 (D. Me. 2018) (a challenged law "cannot be said to favor in-state commercial interests at the expense of out-of-state competitors when the entities most directly harmed by the practical effects of the [law] are in-state, local businesses."). And a law is not unconstitutional if "the effect of the challenged law [is] only to shift business from one set of out-of-state suppliers to another." *Ross*, 598 U.S. at 378; *id*. at 384 (a "change [in] the market structure" that shifts market opportunity among different out-of-state suppliers … is not unconstitutional) (quoting *Exxon*, 437 U.S. at 137); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981) (state regulation resulting in a shift between different sources or methods of supply is not unconstitutional). Further, Plaintiffs' Statement of Facts asserts that Massachusetts businesses *lack the capability* to shift the market to the extent seen in *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10 (1st Cir. 2010). Indeed, Plaintiffs repeatedly emphasize the "miniscule" amount of pork production in

---

[12] *See Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 721-22 (D. Md. 2021) (upholding a Maryland puppy sales law containing an exemption for face-to-face sales with breeders against a challenge that Maryland buyers would more likely buy puppies from in-state breeders than out-of-state breeders based merely on geographic proximity, noting the law does not differentiate between in-state and out-of-state breeders in regard to permissible distribution methods).

Massachusetts. SOF, Dkt. 89, ¶¶ 28–31. *See also* Am. Cmplt., Dkt. 17, ¶¶ 62–65, 92. Plaintiffs have presented no allegations, let alone evidence, indicating how much pork is currently sold on the premises of federally-inspected processing establishments in Massachusetts (and how much of that comes from in-state production), nor how much would be sold at these facilities after Question 3 is implemented.[13] Plaintiffs' arguments here are rank speculation—the reality could easily be that the exemption has zero impact on relative market share for in-state and out-of-state businesses.

The First Circuit has made clear that showing a state law "may have had a negative impact on [a particular interstate firm's] business model is, in itself, *insufficient to show discriminatory effect*." *Jenkins,* 481 F.3d at 15 (emphasis added). Massachusetts voters decided by an overwhelming majority vote that they do not want their market riddled with cruel and unsafe pork. Plaintiffs don't want to withdraw from the Massachusetts market, they don't want to provide their pigs more space, and they don't want to change their methods of supplying their buyers. They hope to convince the Court that the dormant Commerce Clause protects them from having to make a choice here, because they are not faced with the same choice in other states. But, settled constitutional doctrine is to the contrary. *See Ross*, 598 U.S. at 384-85; Jack Goldsmith & Eugene Volokh, *State Regulation of Online Behavior: The Dormant Commerce Clause and Geolocation*, 101 Tex. L. Rev. 1083, 1116 (2023) ("[C]ompanies that do business . . . in multiple states must comply with the laws of those multiple states.").

Plaintiffs' frustration that they cannot funnel cruel pork products into Massachusetts through the FSIS-inspected facility exemption, except by changing their current business model,

---

[13] By example, there are only three FSIS-inspected meat slaughterhouses in Massachusetts, one of which—Meatworks in the town of Westport, MA—is run by a non-profit that describes its processing facility as "small-scale." *See* The Livestock Institute, About TLI, https://www.thelivestockinstitute.org/about-tli.html (last visited Nov. 3, 2023); Elspeth Hay, A Slaughterhouse in Westport, CAI (Mar. 9, 2023), https://www.capeandislands.org/in-this-place/2023-03-09/a-slaughterhouse-in-westport.

purportedly at great expense, does not amount to a discrimination claim under the dormant Commerce Clause. Because Plaintiffs have failed to show that Question 3—or the exemption, specifically—will cause an actual shift in the pork market to in-state businesses, their discrimination claim must fail. *Cherry Hill Vineyard v. Baldacci*, 505 F.3d 28, 37–38 (1st Cir. 2007) (plaintiffs bear burden of providing "substantial evidence that shows in-state companies are favored by a challenged law"); *Jenkins*, 592 F.3d at 10 (discrimination exists when "the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market") (quoting *Exxon*, 437 U.S. at 126 n.16). It is worth repeating that only pork from out-of-state producers can be sold at processing facilities under the exemption, which should end the inquiry. But even if it did not, Plaintiffs present *no evidence* as to impact on the market, except that *Plaintiffs* have trumpeted that only a miniscule share of the overall pork market belongs to Massachusetts businesses. SOF, Dkt. 89, ¶¶ 28–31; Am. Cmplt., Dkt. 17, ¶¶ 62–65, 92. In order to establish a discrimination claim here, Plaintiffs must offer more than just their own imagined ideas of what might be. *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 41 (1st Cir. 2005). And the Supreme Court's reasoning in rejecting the Commerce Clause challenge to the nearly identical California law applies here: "Further experience may yield further facts. But . . . [a] substantial harm to interstate commerce remains nothing more than a speculative possibility." *Ross*, 598 U.S. at 386-87.

If the court nevertheless finds the sales exemption contravenes the Commerce Clause, the proper remedy "when confronting a constitutional flaw in a statute, .... [is to] sever its problematic portions while leaving the remainder intact ...." *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 100 (1st Cir. 2020), *quoting Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006); *Peterson v. Commissioner of Revenue,* 444 Mass. 128, 138 (2005) (noting the Massachusetts Legislature's preference for severability, such that "if any part of any statute shall

be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof") (citing G.L. c. 4, § 6, Eleventh). As the Supreme Court has made clear :"[b]ecause '[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions,' *Champlin Refining Co. v. Corporation Comm'n of Okla.,* 286 U.S. 210, 234 (1932), the 'normal rule' is 'partial, rather than facial, invalidation.'" *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504 (1985); *Ayotte*, 546 U.S. 320, 329 ("we try not to nullify more of a legislature's work than is necessary, for we know that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people" (quotations omitted)).

## IV.   CONCLUSION

Because Plaintiffs have not properly pled—let alone proved—a discrimination claim, judgment should be entered in favor of Defendants.

Dated: December 15, 2023

>                          */s/ Kimberly D. Ockene*
>                          Kimberly D. Ockene
>                          MA #638097
>                          Humane Society of the United States
>                          1255 23rd St. NW, Suite 450
>                          Washington, DC 20037
>                          Telephone: (202) 452-1100
>                          kockene@humanesociety.org
>
>                          Bruce A. Wagman (CSB No. 159987)
>                          (*pro hac vice* pending)
>
>                          Riley Safer Holmes & Cancila LLP
>                          456 Montgomery Street, 16th Floor
>                          San Francisco, CA  94104
>                          Telephone: (415) 275-8540
>                          Facsimile: (415) 275-8551
>                          bwagman@rshc-law.com
>
>                          *Counsel for Amici*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 15th day of December 2023, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Kimberly D. Ockene*