UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
TRIUMPH FOODS, LLC,             )
CHRISTENSEN FARMS MIDWEST, LLC, )
THE HANOR COMPANY,              )
OF WISCONSIN, LLC,              )
NEW FASHION PORK, LLP,          )
EICHELBERGER FARMS, INC.,       )
ALLIED PRODUCERS' COOPERATIVE,  )
individually and on behalf      )
of their members,               )
                                )          CIVIL ACTION
                 Plaintiffs,    )          No. 23-11671-WGY
                                )
            v.                  )
                                )
ANDREA JOY CAMPBELL, in her     )
official capacity as Attorney   )
General of Massachusetts,       )
ASHLEY RANDLE, in her official  )
capacity as Massachusetts       )
Commissioner of Agriculture,    )
                                )
                 Defendants.    )
_____)

YOUNG, D.J.                                February 5, 2024

**MEMORANDUM & ORDER**


**I.   PROCEDURAL HISTORY**

     The Plaintiffs Triumph Foods, LLC, Christensen Farms

Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion

Pork, LLP, Eichelberger Farms, Inc., and Allied Producers'

Cooperative (collectively, the "Pork Producers") filed their

amended complaint, ECF No. 17, on July 31, 2023.  The complaint

alleged ten causes of action, most under the dormant Commerce

Clause of the United States Constitution, against the
Defendants, the Massachusetts Attorney General and the
Massachusetts Commissioner of Agriculture (collectively, "The
Commonwealth"), due to the Prevention of Farm Animal Cruelty Act
("the Act"), Mass. Gen. Laws Ann. ch. 129 App., § 1-1.  See Am.
Compl., ECF No. 17.  The Pork Producers requested a preliminary
injunction and, after a motion hearing on September 6, 2023, the
Court collapsed that motion with trial on the merits in
accordance with Rule 65(a)(2).  Electronic Clerk's Notes, ECF
No. 42.  The Commonwealth then filed a motion to dismiss.  Mot.
Dismiss, ECF No. 53; see also Mem. Supp. Mot. Dismiss, ECF No.
54.  The Court granted the Commonwealth's motion to dismiss with
respect to Counts II - X but denied the motion to dismiss with
respect to Count I, alleging a violation of the dormant Commerce
Clause.  See Electronic Clerk's Notes, ECF No. 66.

The Pork Producers then brought a motion for partial
summary judgment on Count I.  Mot. Summ. J., ECF No. 87; see
also Mem. Supp. Mot. Summ. J., ECF No. 88.  The parties fully
briefed the issues and the Commonwealth requested that summary
judgment be entered against the Pork Producers pursuant to Fed.
R. Civ. P. 56(f)(1).  See Mem. Opp'n Summ. J., ECF No. 94.  On
November 14, 2023, the Court heard oral argument on the motion
for summary judgment.  See Electronic Clerk's Notes, ECF No. 99.
The Court entered summary judgment sua sponte, per the request

of the Commonwealth, against all Plaintiffs aside from Triumph Foods, LLC ("Triumph"), <u>id.</u>, on all claims under a <u>Pike</u> theory of discrimination.  <u>Id.</u>; <u>see</u> Hr'g Tr. 16:1-7,[1] ECF No. 103; <u>see also</u> <u>Pike</u> v. <u>Bruce Church, Inc.</u>, 397 U.S. 137 (1970).

The parties agreed to proceed on a case stated basis as to Triumph's claim under Count I with respect to the sales provision of the Act (the "slaughterhouse exception").  <u>Id.</u>  The parties have briefed the slaughterhouse exception issue of Count I on a case stated basis.  Defs.' Br. Case Stated, ECF No. 109; Pl.'s Br. Case Stated, ECF No. 110.

On December 18, 2023, the Commonwealth filed a motion to dismiss for lack of jurisdiction.  <u>See</u> Mot. Dismiss, ECF No. 114; <u>see also</u> Mem. Supp. Mot. Dismiss, ECF No. 115.  The parties have briefed that issue fully.  <u>See</u> Opp'n. Mot. Dismiss, ECF No. 121.

## II. FINDINGS OF FACT

In 2016, Massachusetts enacted the Act through ballot initiative.  Am. Compl. ¶ 25.  The Act's purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of

---

[1] PLAINTIFFS' COUNSEL (Mr. Raupp): With respect to the claims under <u>Pike</u> vs. <u>Bruce Church</u>, which I don't think were moved on, certainly not by us –
  THE COURT: Well theirs was an outright [] opposition, and I think they're properly before me, and in any event I reject it [i.e., the argument based on <u>Pike</u>].

Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts."  Mass. Gen. Laws Ann. ch. 129 App., § 1-1.  The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner."  Id. § 1-2.  The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" ("Minimum Size Requirements").  Id. § 1-5.  The Act also makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any . . . [w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."  Id. § 1-3.  A sale is defined in the Act as "a commercial sale by a business that sells any item covered by section 3 [of the Act]," but does not include "any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act."  Id. § 1-5(M).  The definition goes on to state that "for purposes of this section, a 'sale' shall be deemed to occur at the location where the

buyer takes physical possession of an item covered by . . . section 3 [of the Act]." Id.

The Attorney General has exclusive authority to enforce the provisions of the Act. Id. § 1-6. Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act. Id.

The Pork Producers here are a combination of pig farmers ("the Farmer Plaintiffs") and one pork processor, Triumph. Collectively, the Pork Producers are located outside the Commonwealth of Massachusetts, in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana. Am. Compl. ¶¶ 12-19. The Farmer Plaintiffs allege that the Act will force them to "convert their farm operations to meet Minimum Size Requirements." Id. ¶ 56. Triumph alleges that the adjustments it will need to make as a pork processor in order to comply with the Act are "penalties." Id. ¶ 58.

### a. Triumph's Business Model and Sales

Triumph, a farmer-owned company headquartered in St. Joseph, Missouri, is a processor and producer of pork products. Id. ¶ 12. Triumph largely receives its supply of pigs from its member-owners, many of whom were its fellow plaintiffs in this case (prior to summary judgment entering against them). Id.;

see Electronic Clerk's Notes, ECF No. 99.  Pork produced by
Triumph is sold into Massachusetts as well as throughout the
country.  Am. Compl. ¶ 117.  In 2022, Triumph processed over
eleven million pounds of pork meat sold into Massachusetts.
Joint Mot. Clarification Expedited Status Conf., Attach. A,
Partial Stipulation of Facts ¶ 4, ECF No. 107-1.  Triumph has
made efforts to adjust its business model and structure in order
to comply with the Act.  Am. Compl. ¶ 120.

Triumph receives its orders for pork products through what
it refers to as its "exclusive pork marketer," Seaboard
Corporation, Seaboard Foods, LLC, and Seaboard Foods of
Missouri, Inc. ("Seaboard" or "SBF").  Id. ¶ 99.  Triumph and
Seaboard's relationship is governed by a contract between the
two ("the Marketing Agreement") which states that "[Triumph]
shall produce pork products at the TF Plant and that [Seaboard]
shall purchase, market and sell such products pursuant to this
Agreement."[2]  Mem. Supp. Mot. Dismiss, Declaration, Ex. A,
Marketing Agreement § 2.01, ECF No. 115-2; Mem. Supp. Mot.
Dismiss 3.  The Marketing Agreement further states that "SBF
shall have the exclusive right to, and shall be obligated to,
market and sell on behalf of TF all TF Plant Products."  Mem.
Supp. Mot. Dismiss, Declaration, Ex. A, Marketing Agreement §

---

[2] "TF Plant" refers to Triumph's pork processing plant.
"SBF" refers to Seaboard, and "TF" refers to Triumph.

6.01(a).  "SBF shall use its commercially reasonable efforts (taking into account customer needs and requirements) to schedule, market, and sell to customers all of the TF Plant Products."  Id.  Finally, the Marketing Agreement states that Triumph agrees to produce "pork products that conform to the relevant quality standards and specifications made available by SBF to TF (the "Quality Standards") . . . , as amended from time to time."  Id. § 7.02(a).  "TF shall be solely responsible and liable for any Losses arising out of the production and sale of products produced at the TF Plant that do not meet the Quality Standards."  Id. § 7.02(b).  "TF Plant Products that do not, in the Reasonable Good Faith Determination of SBF, meet the applicable Quality Standards ("Non-Conforming Products") shall be marketed and sold to customers by SBF as it deems appropriate in its sole discretion."  Id. § 7.02(c).

### b. The Act's FMIA Exception ("Slaughterhouse Exception")

A processing facility is inspected under the Federal Meat Inspection Act ("FMIA") when the United States Department of Agriculture Food Safety and Inspection Service examines the product, facilities, and records of such pork processing plant. See Am. Compl. ¶¶ 76-86.  Triumph is an FMIA-inspected facility. See Mem. Supp. Mot. Summ. J. 12.  There are three pork processing facilities that are FMIA-inspected within the Commonwealth of Massachusetts.  See Pl.'s Br. Case Stated 3.

Outside Massachusetts, there are 101 other FMIA-inspected facilities that package and distribute such products for sale. See id.

As stated above, see p.4, supra, the Act here provides an exemption from its requirements for pork products when those products are sold on the premises of an FMIA-inspected facility.

The exemption only occurs for the sale at the inspected facility.  If, for instance, a Massachusetts FMIA-inspected pork processer sold non-compliant pork on its premises to a grocery store, that sale would be exempt; however, the store's attempts to then sell that non-compliant pork in-store, off the premises of the FMIA-inspected facility, would be covered under the Act. Were that same pork processor to sell directly to the consumer at its facility, however, whether a family purchasing pork for dinner or a hospital chain purchasing pork to be served, not sold, to hundreds of patients, there would be no further sale of the pork after the sale on the facility's premises, and the noncompliant pork sale would therefore be entirely exempt from the Act.

## III. ANALYSIS

### A.  The Commonwealth's Motion to Dismiss

The Commonwealth, in its motion to dismiss, argues that because Seaboard, not Triumph, markets and sells Triumph pork product into Massachusetts, Triumph "has not substantiated harm

to Triumph causally connected" to the Act.  Mem. Supp. Mot.
Dismiss 1-2 (emphasis in original).  This is a distinction
without a difference, however, and the Commonwealth's motion to
dismiss is denied.

### 1. Standard of Review

When evaluating a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(1), granting such a motion "is
appropriate only when the facts alleged in the complaint, taken
as true, do not justify the exercise of subject matter
jurisdiction."  Muniz-Rivera v. United States, 326 F.3d 8, 11
(1st Cir. 2003); see also MSP Recovery Claims Series 44, LLC v.
Bunker Hill Ins. Co., No. CV 22-11681-WGY, 2023 WL 4744739, at
*3 (D. Mass. July 25, 2023).  "When a district court considers a
Rule 12(b)(1) motion, it must credit the plaintiff's well-pled
factual allegations and draw all reasonable inferences in the
plaintiff's favor."  Merlonghi v. United States, 620 F.3d 50, 54
(1st Cir. 2010).  "In addition, the court may consider whatever
evidence has been submitted, such as the depositions and
exhibits submitted in this case."  Aversa v. United States, 99
F.3d 1200, 1210 (1st Cir. 1996).  "While the court generally may
not consider materials outside the pleadings on a Rule 12(b)(6)
motion, it may consider such materials on a Rule 12(b)(1)
motion."  Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir.
2002), as corrected (May 8, 2002).

**2. Standing under Article III**

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case -- in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).

The Commonwealth characterizes Triumph's relationship with Seaboard to that of a buyer and seller.  As the Commonwealth describes it, Triumph sells its pork products to Seaboard, and Seaboard then, as now-owner of these products, markets and sells them into Massachusetts.  Mem. Supp. Mot. Dismiss 6-7.  Triumph disputes this characterization, however, instead describing Seaboard as a contractor Triumph engages to market its products. See Opp'n. Mot. Dismiss 10.  Drawing every reasonable inference in favor of Triumph as the plaintiff, the contractual relationship between Seaboard and Triumph does not prevent Triumph from suffering injury under the Act.  Triumph's pork products can only be sold into Massachusetts when they are

compliant with the Act; who markets the products and creates relationships with customers does not change that fact.

In order to produce compliant pork, Triumph must (and in fact, has begun to) restructure its processing facility and procedures, segregating pork that meets the requirements of the Act.  See Am. Compl. ¶ 89.  Without compliant pork, Triumph is unable to sell its products into Massachusetts at all.  These are both concrete, particularized injuries to Triumph.  See, e.g., Gustavsen v. Alcon Labs., Inc., 903 F.3d 1, 8 (1st Cir. 2018) ("[A]ctual economic loss . . . is the prototypical concrete harm.").

This injury to Triumph is also imminent and actual economic harm.  See Lujan, 504 U.S. at 555.  The Commonwealth argues that Seaboard is required "to sell all of Triumph's product."  Mem. Supp. Mot. Dismiss 8 (emphasis in original).  With this claim, however, the Commonwealth misreads the Marketing Agreement. Seaboard is only required to sell all of Triumph's product that meets the Quality Standards set forth by Seaboard.  Product that fails to meet these Quality Standards is only sold at Seaboard's discretion, and Triumph is responsible for any loss suffered due to the sale or failure to sell such products.  Seaboard designs its Quality Standards based on the needs of its consumers; consumers in Massachusetts likely have more stringent

requirements due to the Act.  Triumph, therefore, must produce
pork compliant with the Act in order to make its sales.

Triumph has standing to challenge the Act.  The
Commonwealth's motion to dismiss is denied.

**B.  The Pork Producers' Claims under <u>Pike</u>**

Triumph and its co-plaintiffs have attempted to reserve
argument of their claims under <u>Pike</u>.  <u>See Pike</u>, 397 U.S. at 142.
Under this argument, the Pork Producers argue that "the burdens
on interstate commerce outweigh the putative local benefits of
the statute."  <u>See</u> Mem. Supp. Mot. Summ. J. v.  The Court
entered summary judgment against this claim at oral argument;
the Pork Producers, however, continue to raise it.  The claim is
foreclosed by the recent Supreme Court decision in <u>National Pork
Producers Council</u> v. <u>Ross</u>, 598 U.S. 356, 371 (2023), and the
Court therefore entered summary judgment against the Pork
Producers on this argument.  In <u>Ross</u>, two organizations of pork
producers filed suit on behalf of their members to challenge
Proposition 12, a California state statute that is nearly
identical to the Act.  <u>Id.</u> at 367.  The Supreme Court ruled that
"harm to some producers' favored methods of operation" did not
rise to a "substantial harm to interstate commerce," and that
"increased production expenses" cannot be compared by a court to
"noneconomic" state benefits.  <u>Id.</u> at 385-87 (internal quotation
marks omitted); <u>id.</u> at 380-81.  Further, the Court explained,

"judges often are 'not institutionally suited to draw reliable
conclusions of the kind that would be necessary . . . to satisfy
[the] Pike' test as petitioners conceive it."  Id. at 380
(quoting Department of Revenue of Kentucky v. Davis, 553 U.S.
328, 353 (2008)).  Triumph apparently wants the Court to attempt
to apply the Pike balancing test to the facts of its case.  As
the Supreme Court notes, however, "[t]he competing goods are
incommensurable. . . . In a functioning democracy, policy
choices like these usually belong to the people and their
elected representatives."  Id. at 382.

　　　"[C]ourts should not be in a position to choose between
different substantive moral positions based on an inchoate
balancing test.  Instead, the question should be whether the
state has a genuine and well-founded conscience concern
underlying its law."  Note, The Dormant Commerce Clause and
Moral Complicity in a National Marketplace, 137 Harv. L. Rev.
980, 1001 (2024) ("The Dormant Commerce Clause and Moral
Complicity").  As the Act here is the result of Massachusetts
citizens petition process, see Sec'y of the Commonwealth of
Mass., Information for Voters, Massachusetts 2016 Ballot, 8-11
(2016),[3] these "social norms . . . have won out in the political
process of [Massachusetts]."  The Dormant Commerce Clause and

---

[3] https://www.sec.state.ma.us/divisions/elections/download/
information-for-voters/IFV_2016-English.pdf.

<u>Moral Complicity</u>, <u>supra</u>, at 1000-01.  Accordingly, this Court declines to engage in <u>Pike</u> balancing and rejects the Pork Producers' argument.

The Pork Producers complain that summary judgment should not have entered against them on this point as the Court gave inadequate warning of that result.  <u>See</u> Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may (1) grant summary judgment for a nonmovant . . . .").  The point is of no practical moment (as the Court sought to explain during a busy motion session).  The legal issue had been fully briefed and the Court's resolution obviated the need for evidence.

**C.  Constitutionality of the "Slaughterhouse Exception"**

Finally, Triumph and the Commonwealth proceeded on a case stated basis regarding Triumph's last claim, the so-called slaughterhouse exception.

**1. Standard of Review**

"In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record."  <u>Sánchez-Rodríguez</u> v. <u>AT&T Mobility P.R., Inc.</u>, 673 F.3d 1, 10-11 (1st Cir. 2012) (quotation and citation omitted).  "'Case-stated' resolution is appropriate 'when the basic dispute between the parties concerns only the factual inferences that one might draw from the more basic facts to which the parties

have agreed, and where neither party has sought to introduce additional factual evidence or asked to present witnesses.'" Id. at 11 (quoting United Paperworkers Int'l Union, Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).  In a case stated procedure, "the Court approaches the issues as a neutral adjudicator and is entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'"  A & W Maint., Inc. v. First Mercury Ins. Co., 91 F. Supp. 3d 113, 118 (D. Mass. 2015) (citation omitted).

### 2. Analysis

The Act defines "sale" as: "a commercial sale by a business that sells any item covered by section 3 [of the Act]; provided, however, that 'sale' shall not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act."  Mass. Gen. Laws Ann. ch. 129 App., § 1-5. The Act provides further that "for purposes of this section, a 'sale' shall be deemed to occur at the location where the buyer takes physical possession of an item covered by said section 3." Id.  Sales covered under the Act must occur within the Commonwealth of Massachusetts.  Id. § 1-3.  The Act therefore exempts sales "undertaken" at federally inspected establishments within the Commonwealth of Massachusetts, so long as the "buyer

takes physical possession" of the covered items while on the premises of the inspected establishment.

Triumph alleges that as an out-of-state pork processor, it cannot take advantage of this exemption, even though it operates entirely federally inspected facilities, because it ships its product into the Commonwealth from out-of-state and, therefore, its buyers do not "take physical possession" of its product while at its facilities.  See Am. Compl. ¶¶ 232-37.  Meanwhile, the federally inspected pork processors in Massachusetts could operate within this exception.  Id.  For instance, "a large end-user of pork in Massachusetts -- a hospital system, the state prison system, a large school district, etc. -- who has for decades been buying and taking shipment of millions of dollars of pork each year," could now purchase and take possession of cheaper, noncompliant pork on the premises of an in-state facility.  Mem. Supp. Mot. Summ. J. 12, ECF No. 88.  In contrast, Triumph would have no way to provide that same customer with its noncompliant pork, because it does not have an in-state, federally inspected facility.

The Commonwealth does not dispute Triumph's analysis of the regulation's exemption.  See Mem. Supp. Mot. Dismiss 10. Instead, it argues that this "limited exception . . . does not evince an unconstitutional aim to advantage in-state businesses," id., and that "the law operates to give in-state

and out-of-state slaughterhouses the same access to
Massachusetts consumers."  Defs.' Br. Case Stated 8.  It is true
that the Commonwealth may not have had a discriminatory purpose
or intent in legislating this exception.

The dormant Commerce Clause, however, also asks the Court
to decide whether the Act results in a discriminatory effect.
"A state law is discriminatory in effect when, in practice, it
affects similarly situated entities in a market by imposing
disproportionate burdens on out-of-state interests and
conferring advantages upon in-state interests."  Family
Winemakers of Cal. v. Jenkins, 592 F.3d 1, 10 (1st Cir. 2010)
(citing Oregon Waste Sys., Inc. v. Department of Env't Quality
of State of Or., 511 U.S. 93, 99 (1994)).  "If the effect of a
state regulation is to cause local goods to constitute a larger
share, and goods with an out-of-state source to constitute a
smaller share, of the total sales in the market . . . [,] the
regulation may have a discriminatory effect on interstate
commerce."  Exxon Corp. v. Governor of Maryland, 437 U.S. 117,
126 n.16 (1978) (citing Hunt v. Washington State Apple Advert.
Comm'n, 432 U.S. 333, 347 (1977); Dean Milk Co. v. City of
Madison, Wis., 340 U.S. 349, 352 (1951)).

Triumph alleges that, under the Act, in-state processors
could "create a monopoly for pork processing because they can
accept all meat-- regardless of whether the meat complies with

the Act and the Regulations-- while out-of-state processors cannot." Am. Compl. ¶ 237.  The Commonwealth counters only that this is "pure speculation," and that in-state slaughterhouses could not "accommodate that sudden skyrocketing demand."  Mem. Supp. Mot. Dismiss 10; Defs.' Br. Case Stated 10.

The slaughterhouse exception has a discriminatory effect. The only way Triumph would be able to take advantage of the slaughterhouse exception would be to open its own federally inspected facility within the Commonwealth of Massachusetts, which the Supreme Court has held violates the Commerce Clause. See Granholm v. Heald, 544 U.S. 460, 475 (2005).  Instead, Triumph and other out-of-state pork processors must face higher costs to sell pork into Massachusetts than those of their counterparts in Massachusetts, similar to the issue in Hunt. See Hunt, 432 U.S. at 351 ("North Carolina apple producers, unlike their Washington competitors, were not forced to alter their marketing practices in order to comply with the statute. . . . Obviously, the increased costs imposed by the statute would tend to shield the local apple industry from the competition of Washington apple growers . . . .").

As the slaughterhouse exception is discriminatory, it "is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Jenkins,

592 F.3d at 5 (citing Davis, 553 U.S. at 338).  The Commonwealth fails to demonstrate that the provision advances a legitimate local purpose.  The Court takes no position on whether the Act itself serves a legitimate local purpose, see Ross, 598 U.S. at 382,[4] but the slaughterhouse exception itself does not appear to meet the Act's purported local purpose, as it does not prevent noncompliant pork meat from sale in the Commonwealth of Massachusetts.  The Court, therefore, rules that the slaughterhouse exception violates the dormant Commerce Clause because it discriminates against out-of-state commerce.

**D. Severability**

Although the slaughterhouse exception violates the dormant Commerce Clause, it does not render the entire Act unconstitutional; instead, the provision may be severed from the rest of the Act.  Severability is governed by state law.  See Schwann v. FedEx Ground Package Sys., 813 F.3d 429, 440 (1st Cir. 2016).  In Massachusetts, there is a "a well-established judicial preference in favor of severability and a recognition that 'the Legislature has announced its own preference in favor of severability' as well."  Id. (quoting Peterson v. Comm'r of Revenue, 444 Mass. 128, 138 (2005)); see Mass. Gen. Laws ch. 4,

---

[4] The Commonwealth argues that the local purpose of the Act is to "promot[e] animal welfare and remov[e] inhumane products and their negative effects from its markets."  Defs.' Br. Case Stated 10.

§ 6, Eleventh (setting forth statutory rule of construction that "the provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof[]").

The question of severability turns on legislative intent.[5] As the Act was passed by popular vote, the Court therefore must decide whether Massachusetts voters "would have enacted the particular bill without the [invalid] provision, or whether, in the absence of the [invalid] provision, the [voters] would have preferred that the bill have no effect at all."  Mass. Gen. Laws ch. 4, § 6 (quoting Peterson, 444 Mass. at 138).  "Severability entails a two-step examination in which [the court] determine[s], first, whether the invalid portion of the statute is 'capable of separation' and, second, whether 'upholding the statute as severed would frustrate the legislative purpose.'"

---

[5] Notably, the Act here contains a severability clause, Mass. Gen. Laws Ann. ch. 129 App., § 1-9, indicating the voters' intent to save any portion of the Act that could be upheld in the case of a constitutional challenge.  See Opinion of the Justices, 330 Mass. 713, 726 (1953) ("Where the statute contains a severability clause . . . , this is a declaration by the Legislature that it intends to have the principle of severability invoked wherever possible.").

K.J. v. Superintendent of Bridgewater State Hosp., 488 Mass.
362, 373 (2021) (citation omitted).

The slaughterhouse exception is "capable of separation"
from the rest of the statute.  A statute is "capable of
separation" when the "severed [portion] is not so connected with
and dependent upon other clauses of the act as to constitute an
essential factor of the whole."  Id. at 374-75 (internal
quotation marks omitted).  The provision here is a discrete
clause and, were it severed, the Act can still function as
intended.

Second, the statute as severed would not frustrate the
legislative purpose of the Act.  In fact, were the
slaughterhouse exception severed, the Act would only become
enforceable in more locations.  If anything, therefore, severing
the slaughterhouse exception from the Act only serves to bolster
its purpose.

### E.  Preemption under the Federal Meat Inspection Act

Triumph argues that the slaughterhouse exception cannot be
severed from the Act since "absent the exception, the Act is
unquestionably preempted by the FMIA."  Pl.'s Br. Case Stated
13.  This Court, however, has a number of questions before
reaching that conclusion.  Indeed, having declared the
slaughterhouse exemption unconstitutional, it necessarily must
revisit its dismissal of the Pork Producers' claim that the Act,

as originally drafted, was preempted by the FMIA.  Am. Compl.,
Count III, ¶ 200.  The Court thus vacates that dismissal and
grants the Pork Producers 30 days from the date hereof to move
for summary judgment on the ground that the Act -- with the
slaughterhouse exemption severed -- is now preempted by the
FMIA.

## IV.   CONCLUSION

The Commonwealth's motion to dismiss, ECF No. 114, is
**DENIED**.  The Court concludes that the slaughterhouse exemption
violates the dormant Commerce Clause, and orders that provision
**SEVERED** from the rest of the Act.

The Court entered summary judgment against all Plaintiffs
on all counts and claims save for a dormant Commerce Clause
claim regarding the slaughterhouse exemption of the Act.  See
Electronic Clerk's Notes, ECF No. 99.

That order must now be **VACATED in part** to allow the Court
to consider whether the Act -- with the slaughterhouse exemption
severed -- is now preempted by the FMIA.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
      JUDGE
     of the
  UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.

[23]