**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF REASONS IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................3

INTRODUCTION .......................................................................................................7

STANDARD OF REVIEW ..........................................................................................8

BACKGROUND ........................................................................................................9

ARGUMENT ...........................................................................................................11

I.   Express Preemption:  The Act is Expressly Preempted Because it Requires a FMIA
     Regulated Establishment to Change its Operations to Sell Pork....................................... 12

     A. Additional Conditions: The Act's sales ban results in the imposition of additional
        conditions for FMIA regulated establishments. ...........................................................14

        i.  Sales:  A *sales* ban regulates the *sales* of an FMIA Establishment...................... 16

        ii. Operational Procedures: A sales ban requires the FMIA establishment to add new
            or different  procedures from what are already imposed by the FMIA. .............. 17

     B.  Scope:  The Act's Additional Requirements Imposed on FMIA Facilities are Within
        the Scope of the FMIA. ................................................................................................19

II.  Conflict Preemption:  The Act's sales ban is also preempted under principles of conflict
     preemption as it conflicts with, and obstructs, the objectives of the FMIA...................... 23

CONCLUSION......................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ................................................................................. 13

*Am. Trucking Ass'ns v. City of Los Angeles*,
569 U.S. 641 (2013) ............................................................................... 15

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*,
403 U.S. 274 (1971) ............................................................................... 24

*Associated Indus. of Massachusetts v. Snow*,
898 F.2d 274 (1st Cir. 1990) ................................................................. 13

*California Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ............................................................... 19

*Capron v. Office of Attorney Gen. of Mass.*,
944 F.3d 91 (1st Cir. 2019 ..................................................................... 12

*Cormier*,
51 F.4th (cleaned up) ............................................................. 23, 24, 25

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ............................................................................... 24

*E.E.O.C. v. Com. of Mass.*,
987 F.2d 64 (1st Cir. 1993) ................................................................... 11

*Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*,
541 U.S. 246 (2004) ......................................................................... 15, 26

*Exch. Comm'n v. Sargent*,
589 F. Supp. 3d 173 (D. Mass. 2022) ..................................................... 9

*Fidelity Federal Savings and Loan Assn. v. De La Cuesta*,
458 U.S. 141 (1982) ............................................................................... 21

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ................................................................................. 24

*Gustavsen v. Alcon Labs.*,
   903 F. 3d 1 (1st Cir. 2018) ................................................................ 23

*In National Meat Association v. Harris*,
   565 U.S. 452 (2012 ............................................................... passim

*National Pork Producers Council v. Ross*,
   589 U.S.  (2023) ................................................................ 10

*Irobe v. U.S. Dep't Agric.*,
   890 F.3d 371 (1st Cir. 2018) ............................................................ 9

*Lionbridge Techs., LLC v. Valley Forge Ins. Co.*,
   No. CV 20-10014-WGY, 2023 WL 5985288 (D. Mass. Sept. 14, 2023) ................................ 8

*Michigan Canners Freezers v. Agric. Bd.*,
   467 U.S. 461 (1985) ........................................................................ 11

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) .................................................................... 26

*Napier v. Atlantic Coast Line R. Co.*,
   272 U.S. 605 (1926) ...................................................................... 24

*Nat'l Meat Ass'n. v. Harris*,
   565 U.S. 452 (2012) ............................................................... passim

*Ophir v. City of Bos.*,
   647 F. Supp. 2d 86 (D. Mass. 2009) .............................................. 13, 25

*Pittsburgh Melting Co. v. Totten*,
   248 U.S. 1 (1918) ........................................................................... 9

*Portland Pipe Line Corp. v. City of S. Portland*,
   288 F. Supp. 3d 321 (D. Me. 2017) .......................................... 13

*Rowe v. New Hampshire Motor Transp. Ass'n*,
   552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008) ........................ 15

*SPGGC, LLC v. Ayotte*,
   488 F.3d 525 (1st Cir. 2007) ...................................................... 11

*Tobin v. Fed. Express Corp.*,
   775 F.3d 448 (1st Cir. 2014) .................................................... 13

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council,*
589 F.3d 458 (1st Cir. 2009) ........................................................................ 23, 25

*Wos v. E.M.A. ex rel. Johnson,*
568 U.S. 627 (2013) ...................................................................................... 19

**Statutes**

21 U.S.C. § 601 ............................................................................................... 14

21 U.S.C. § 602 ............................................................................................... 20

21 U.S.C. § 603 ............................................................................................... 20

21 U.S.C. § 604 -606 ...................................................................................... 20

21 U.S.C. § 608 .......................................................................................... 14, 20

21 U.S.C. § 610(c) ........................................................................................... 14

21 U.S.C. § 621 ............................................................................................... 13

21 U.S.C. § 678 ........................................................................................ 9, 12, 19

Mass. Gen. Laws Ann. ch. 129 App., § 1-2 ...................................................... 8

Mass. Gen. Laws Ch. 129 App., § 1-1 through 1-10 ........................................ 7

Mass. Gen. Laws, ch. 129 App. § 1-5(M) ........................................................ 7

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................... 8

**Regulations**

9 CFR § 301.2 (3) ........................................................................................... 20

9 C.F.R. § 307.2(a) .......................................................................................... 21

9 C.F.R. § 309.1 .............................................................................................. 20

9 C.F.R. § 309.2 .............................................................................................. 21

9 C.F.R. § 309.19 ............................................................................................................... 21

**Other Authorities**

H.R. Rep. No. 90-653 ........................................................................................................ 10

## INTRODUCTION

This Court properly determined that the sales exception in Massachusetts Question 3 ("the Act")[1] for U.S. Department of Agriculture ("USDA") establishments regulated under the Federal Meat Inspection Act ("FMIA") is unconstitutional as a violation of the dormant Commerce Clause and severed it from the Act (hereafter "FMIA establishment exception").[2]   Now, the Act unquestionably regulates what pork FMIA establishments can sell into Massachusetts.[3] To say otherwise ignores a simple and uncontested reality: Does the Act prohibit the sale of Whole Pork Meat[4] that passes USDA inspection? Yes.   Even if this were not already abundantly clear, does the Act result in the FMIA regulated establishments having to add new or different operational conditions to sell product from the facility? Also, yes.

The Defendants admitted that the FMIA establishment exception was written into the Act to prevent a preemption violation. SOF ¶ 39. With this exception severed, the conclusion is inescapable. In *National Meat Association v. Harris*, the U.S. Supreme Court rejected any sales ban that "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" is preempted by the FMIA. 565 U.S. 452, 464 (2012). This Court should follow the Supreme Court's instruction and strike the Act's sales ban as preempted by the FMIA

---

[1] The Act was codified at Mass. Gen. Laws Ch. 129 App., § 1-1 through 1-10. SOF ¶ 15.

[2] This FMIA sales exception is sometimes referred to as the "slaughterhouse exception." However, as noted throughout Plaintiffs' prior briefing, the sales exception applied to *any* facility that inspection is provided for within the FMIA. Mass. Gen. Laws, ch. 129 App. § 1-5(M). Accordingly, it is referred to throughout this Memorandum as the "FMIA establishment exception."

[3] The Act violated the Supremacy Clause prior to the severance of the FMIA establishment exception, too, as outlined in the Amended Complaint and prior preliminary injunction briefing.   However, with the FMIA establishment exception severed, the preemptive effect is quite undisputable.

[4] Whole Pork Meat is defined as "any uncooked cut of pork, including bacon, ham, chops, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that 'whole pork meat' shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.  SOF ¶ 28.

as a matter of law. A state cannot cure one constitutional violation with another, which has been the issue with the Act from the onset.

The FMIA's preemption of the Act in the manner described above is dispositive of this case from the moment the FMIA establishment exception was severed. The Act directly regulates FMIA establishments; these federal establishments are now prohibited from selling into Massachusetts without complying with the state's Act. However, that is *far* from the only way the FMIA preempts the Act's sales ban. Regardless of the FMIA establishment exception, the Act's effects permeate the entire FMIA regulated facility, affecting operations from the time trucks carrying pigs arrive, to when pork products deliver to the customer, and ultimately disrupt the entire pork supply chain. This Court has already found (based on facts to which the Commonwealth stipulated) that Triumph itself has incurred substantial changes to its production process based on the Act's onerous requirements. SOF ¶¶ 62, 67. The Act's effects directly regulate both facilities and operations that are governed by the FMIA, and conflict with FMIA regulations. This Court should sever—at minimum—the sales ban within the Act and permanently enjoin its enforcement.[5]

### STANDARD OF REVIEW[6]

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Lionbridge Techs., LLC v. Valley Forge Ins. Co.*, No. CV 20-10014-WGY, 2023 WL 5985288, at *3 (D. Mass. Sept. 14, 2023) (citing Fed. R. Civ. P. 56(a)). "[A] party seeking summary judgment must, at the outset, inform the court 'of

---

[5] Plaintiffs do not take a position on whether Massachusetts can regulate the conduct of in-state farms through operation of Mass. Gen. Laws Ann. ch. 129 App., § 1-2. The only portion of the Act Plaintiffs seek to enjoin is the sales ban itself.

[6] On February 5, 2024, this Court vacated its prior ruling as to the dismissal of Plaintiffs' FMIA preemption claim premised on Defendants' Motion to Dismiss. ECF No. 125, ECF No. 99. Plaintiffs note the Court "vacated in part" its order [ECF No. 66 (sic)] to allow the Court to consider whether the Act – with the [sales] exception severed – is now preempted by the FMIA.

the basis for [its] motion and identif[y] the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact.'" *Sec. & Exch. Comm'n v. Sargent*, 589 F. Supp. 3d 173, 202 (D. Mass. 2022) (citing *Irobe v. U.S. Dep't Agric.*, 890 F.3d 371, 377 (1st Cir. 2018)). The burden then shifts to the nonmoving party who must "with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." *Id.* (internal quotations omitted).

## BACKGROUND

The FMIA express preemption clause preempts *any* state "requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678. Congress was intentional in making the preemptive scope of the FMIA broad, as the U.S. Supreme Court has recognized time and again. Congress granted broad authority to the USDA and the Food Safety and Inspection Service ("FSIS") for an important reason: to protect the United States consumer and prevent disruption in the interstate commerce food supply chain. SOF ¶¶ 40-45. From the 1880s, interested stakeholders began lobbying for uniform, nationwide federal legislation governing the nation's meat industry. Thus, the FMIA was born, and the federal government established "an elaborate system of inspecti[ng]" animal products "to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products." *Pittsburgh Melting Co. v. Totten*, 248 U.S. 1, 4–5 (1918).

With the FMIA 1967 Amendments, Congress recognized the "need for stronger, more effective and more uniform State inspection programs," due to the conflicting upsurge in individual states attempting to manage a national problem on a local scale. SOF ¶ 41; H.R. Rep.

No. 90-653, pt. 1, at 14 (1967). Instead of using conflicting state inspection processes to determine what food was safe, the FMIA sought "a uniform framework" which would "provide consumer protection for all citizens, regardless of where their meat originates." *Id*. The FMIA was meant to "[c]larify and broaden [federal] authority over meat and meat products capable of use as human food," and "help bring the requirements of Federal and individual State meat inspection programs into closer conformity toward eventual elimination of the multiple and conflicting requirements presently encountered," as "[w]ithout such a coordinated network of Federal and State inspection programs, the  health of the consumer cannot adequately be protected, nor can continued confidence in our meat supply be assured." *Id.* at 16–17. In *National Pork Producers Council v. Ross*, the U.S. Solicitor General raised concern about statutes like the Act and states' interference with federal law. The Office explicitly pointed to the federal government's statutory responsibility for the safety of the Nation's meat supply through the FMIA and FSIS. Brief for the United States as Amicus Curiae Supporting Petitioners, p. 1,6 *National Pork Producers Council v. Ross*, 589 U.S. 356 (2023) (No. 21-468).

Following nearly fifty years after the implementation of the 1967 FMIA Amendments and the federal government's expanded regulation of our country's food system, came the Question 3 ballot. On November 8, 2016, Massachusetts voters approved the Question 3, the Prevention of Farm Animal Cruelty, which was to go into effect on January 1, 2022. SOF ¶ 14. The ballot represented that the purpose of the Act was to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." SOF ¶ 22. To be clear, a justification for the Act was to protect the health and safety of Massachusetts consumers due to the claimed threat posed by certain

methods of farm animal confinement of breeding pigs. SOF ¶ 23. The Act prohibits "a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." SOF ¶ 24.[7] The Act also prohibits through Attorney General enforcement a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any . . . [w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." SOF ¶¶ 26, 32.

## ARGUMENT

Grounded in the U.S. Constitution's Supremacy Clause, federal law "may preempt a state regulatory scheme in three relevant ways." *Michigan Canners Freezers v. Agric. Bd.*, 467 U.S. 461, 469 (1985); *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007). First, there is express preemption, whereby Congress specifically states that federal law supplants any state law to the contrary; second, field preemption, whereby Congress (while not explicitly stating so) enacts a comprehensive regulatory scheme so there is "no room for the States to supplement it"; and last, conflict preemption, whereby compliance with both the federal and state law is impossible, or where "compliance with the state statute would frustrate the purposes of the federal scheme." *Id.* at 530–31. Another way to articulate preemption analysis is to identify two types of preemption: express and implied. *E.E.O.C. v. Com. of Mass.*, 987 F.2d 64, 67 (1st Cir. 1993). Implied preemption breaks down into two subcategories: field preemption and conflict preemption. *See id.* at 67–68. Further still, conflict preemption breaks down into two more subcategories: impossibility

---

[7] "Confined in a cruel manner" is defined as confining "breeding pig in a manner that prevents the animal from lying down, standing up fully extending the animal's limbs or turning around freely". SOF ¶ 25.

and obstacle preemption. *Capron v. Office of Attorney Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019). Here, Plaintiffs argue express and implied preemption. For clarity, the implied preemption Plaintiffs argue here is conflict; specifically, obstacle preemption.

This case illustrates precisely why the Framers included the Supremacy Clause. With the FMIA establishment exception severed as unconstitutional, the Act applies to the sales of ***all*** FMIA-inspected facilities. With or without this severance, it also creates additional, or different, requirements governing what constitutes safe, wholesome, and unadulterated pork products entering interstate commerce. This directly violates the express preemption clause of the FMIA or, at minimum, presents an obstacle to the FMIA objectives and goals because it conflicts with the need for uniformity and safety among the states' handling of meat.

## I.      Express Preemption:  The Act is Expressly Preempted Because it Requires a FMIA Regulated Establishment to Change its Operations to Sell Pork.

The FMIA "regulates a broad range of activities at slaughterhouses to ensure both the safety of meat and the humane handling of animals." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012). It regulates meat brokers, processors, renderers, salvagers, transporters, distributors, and warehouses. SOF ¶ 59. This includes Triumph, an FMIA establishment and USDA regulated facility. SOF ¶ 45. The USDA and FSIS oversight permeates every aspect of the establishment's operations from the unloading of Farmer Plaintiffs' pigs to the end meat products that may be sold into interstate commerce across the country. SOF ¶¶ 47-54, 56-58.

Congress accomplished this federal oversight through an express preemption clause. Here, the FMIA's express preemption clause preempts all state "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678. That express clause alone "does not immediately end the inquiry because the question of the

substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). The Court "focus[es] on the plain wording of the [express preemption] clause, which necessarily contains the best evidence of Congress' preemptive intent." *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted). The Court should also examine the "statutory structure, purpose, and history" of the FMIA and its preemption clause to determine its preemptive reach. *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014).

Because the Court's inquiry depends on the full scope and reach of this clause, it is dispositive that the Supreme Court has analyzed and parsed this language, holding that the clause's preemptive effect "sweeps widely" and "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Harris*, 565 at 459–60 (emphasis added).

The inquiry then moves to the Act to determine whether it is preempted by the FMIA. And "[r]ather than attempt to divine the Massachusetts Legislature's intent in enacting its . . . legislation, [the Court] look[s] instead to the *effect* of the regulatory scheme" to determine whether it is preempted. *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274, 279 (1st Cir. 1990) (emphasis added). In other words, while "general[ly] preemption doctrine and First Circuit precedent focus on the intent of the federal law," what matters for the challenged state regulation is "the effect . . . the local law [has] on that federal law's goals." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 433–34 (D. Me. 2017); *see also Ophir v. City of Bos.*, 647 F. Supp. 2d 86, 89 (D. Mass. 2009) (stating that within the "[First] Circuit . . . the focus on the Court's preemption analysis must be on the effects of the challenged regulation rather than its purpose." (quotation omitted)).

Using these principles, the elements are summarized as follows: (1) whether the Act's sales ban, by way of its effects, imposes different or additional requirements that concern an FMIA establishment's premises, facilities, or operations; and if so, (2) whether those requirements are within the scope of the FMIA as informed by what the USDA or FSIS[8] have issued—or even *could* issue—through the USDA's FSIS regulations. Both elements are met.

### A. Additional Conditions: The Act's sales ban results in the imposition of additional conditions for FMIA regulated establishments.

It is undisputed that the USDA approves the fully inspected product in the highly regulated FMIA establishments, and the Act blocks the sale of that product.  If selling to Massachusetts, the FMIA establishment must take additional actions to ensure that sale can proceed, despite the product being approved for sale by the USDA. In short, Massachusetts has pre-determined that a USDA approved product offered for sale in Massachusetts is adulterated, not fit for human consumption. Or said another way, the Act overrides the USDA's finding that product is not adulterated[9]—overriding the USDA's inspection and approval of the product for sale.

The sales ban is directly tied to how a breeding sow is raised on a farm nationwide. SOF ¶¶ 24-27. The FMIA already regulates what pigs can come into FMIA establishments' facilities and what meat products can be *sold* in interstate commerce. It does so by placing substantial ante- and post-mortem inspection requirements on the pigs and their carcasses. SOF ¶¶ 40, 43.  The FMIA does *not* condition the sale of pork based on how the breeding pig, the sow, of these pigs

---

[8] The FSIS "has responsibility for administering the FMIA" and issues "extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities." *Harris*, 565 U.S. at 456 (citing 9 C.F.R. § 300.1).

[9] The FMIA defines the word "adulterated" as any product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." 21 U.S.C. § 601. The word appears extensively throughout the statute. *See, e.g.*, 21 U.S.C. §§ 608, 610(c), & 621.

arriving at the facility was confined, or even contemplate the need to accommodate such state regulations for these breeding pigs back at the farms.

In contrast, the Act prohibits a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any . . . [w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." SOF ¶ 26. The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up fully extending the animal's limbs or turning around freely." SOF ¶ 25. And finally, a sale is defined in the Act as "a commercial sale by a business that sells any item covered by section 3 [of the Act]." SOF ¶ 27. As previously noted, until February 5, 2024, the Act included the FMIA establishment exception. SOF ¶ 35. Defendants admitted that the exception was originally included in the Act "for the purpose of ensuring that there was no question of preemption under the Federal Meat Inspection Act." SOF ¶ 39.

What the Commonwealth may attempt to argue is an "indirect" effect of the Act – a sales ban of product to be offered by the FMIA establishment – is nonetheless preempted by the FMIA. *See Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (stating that efforts by states to avoid preemption by "shifting their regulatory focus from one company to another in the same supply chain" is still an effective, albeit indirect, means of achieving a preempted goal); *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372, 128 S. Ct. 989, 996, 169 L. Ed. 2d 933 (2008) (explaining that while the regulation was "less direct," it was still preempted because it produced "the very effect the federal law sought to avoid"); *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 255 (2004) (holding that emissions regulations directly targeting car buyers rather than car manufacturers or sellers were preempted). Without

the FMIA establishment exception, the Act's sales ban *directly* creates additional or different requirements on FMIA establishments in two ways. First, it directly bans a FMIA establishment from selling USDA approved pork meat within Massachusetts, as these facilities are "businesses" who sell Whole Pork Meat within Massachusetts. SOF ¶¶ 26, 27. Second, the Act's effects necessitate additional or different operational procedures from those within the FMIA and FSIS regulations. SOF ¶¶ 61-63, 67.

### i. Sales: A *sales* ban regulates the *sales* of an FMIA Establishment.

Banning the *sale* of a product certainly regulates a facility that *sells* that product. This is not the first time the FMIA's express preemption clause has dictated a result concerning a sales ban equating to a regulation on a FMIA inspected facility. In *Nat'l Meat Ass'n v. Harris*, the U.S. Supreme Court analyzed a state regulation requiring a slaughterhouse to immediately kill a pig that became nonambulatory and preventing the animal's carcass from being processed or butchered to make food. 565 U.S. at 60–61. Like the Act here, the state law in *Harris* included a sales ban on such food products by banning the purchase, sale, or receipt of a nonambulatory animal or meat from such animals. *Id.* At 462–63. The *Harris* defendants argued the statute could not be preempted by the FMIA because it was only the *sale* of the product that was banned, which occurred "prior to delivery, away from the slaughterhouse itself"; thus, the sales ban did "not involve a slaughterhouse's 'premises, facilities, and operations.'" *Id.* At 462. Further still, the defendants argued the sales ban did not violate the FMIA's preemption clause because "[o]nce meat from a slaughtered pig has passed a post-mortem inspection, the [FMIA] 'is not concerned with whether or how it is ever actually sold'" and thus could not affect any onsite operations of the facility. *Id.* At 463.

16

The Supreme Court unequivocally rejected these arguments and reasoned that "[t]he idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Id.* At 464. The sales ban was more than just an incentive or motivator; it "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" and "regulates how slaughterhouses must deal with non-ambulatory pigs on their premises." *Id.* Thus, the state law was preempted; to hold otherwise would allow "any State [to] impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.* The Court's foreshadowing has now come to fruition.

The Act's sales ban now applies to all FMIA facilities that sell Whole Pork Meat within Massachusetts.  As this Court found, without compliant pork, Triumph cannot sell its products into Massachusetts. SOF ¶ 68. This functions as a command to FMIA facilities selling to Massachusetts to structure their operations in a manner to remove noncompliant Whole Pork Meat, just as the nonambulatory pig statute operated in *Harris*. This clear, direct regulation of a FMIA establishment should end this Court's inquiry without further hesitation.

>   **ii.  Operational Procedures: A sales ban requires the FMIA establishment to add new or different  procedures from what are already imposed by the FMIA.**

If the blatant sales ban itself of USDA approved product were not enough, the impact of the sales ban on the establishment requires additional or different requirements to a FMIA establishment's operations. The Act focuses on the front end (the farms) and the back end (the sales) of the supply chain. SOF ¶¶ 24-27. There is no way to comply with both unless the middle (the FMIA establishment) of the chain also complies, creating cascading implications through the

entire processing line and the food supply chain. Even at its most basic level, compliance with the Act requires FMIA establishments to segregate noncompliant pigs away from those that would have otherwise passed USDA inspection—and continue to do so through all stages of processing until the Whole Pork Meat exits an FMIA establishment's doors. These burdens are not abstract or theoretical. The existence of these additional or different inspection and handling requirements, and the impact on Plaintiffs, were uncontroverted at the case-stated hearing and are abundantly supported on this record. SOF ¶ 67. Specifically, Plaintiffs implemented new delivery schedules, segregation procedures, additional tracking systems, new SKU numbers, labeling requirements, sorting and transportation requirements, certification requirements between farmer and processor, and different storage requirements. SOF ¶¶ 67. ("Triumph has implemented physical segregation procedures, and additional tracking and inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures and new storage locations for purposes of ensuring Question 3 Whole Pork Meat remains segregated from conventional, non-compliant Whole Pork Meat.")); *see also* SOF ¶¶ 69-72. Triumph works hand in hand with the USDA from before pigs even go inside its facility, and throughout every aspect of the processing line. SOF ¶ 58. Further exacerbating the effects on FMIA establishments and the farmers who supply those facilities is the compounded effect flowing from multiple states regulating—and pre-conditioning—the sale of federally inspected pork products in different manners. SOF ¶ 74 ("Once Question 3 is in effect, these pigs that meet the California [Proposition 12] requirements would also have to be separated from Massachusetts [whole pork meat]. The requirement for segregation on a state-by-state basis that laws like Question 3 and Proposition 12 create is not sustainable for farms or processing lines."). USDA approved, non-compliant product must not be commingled with Question 3 product.

Again, the Court will not write on new cloth in finding such requirements are preempted. *Harris*, 565 U.S. at 464. The same is true here; the sales ban commands an FMIA establishment to take extra measures during the onsite inspection and production operations to ensure compliance. The FMIA express preemption clause does not allow this, and, as the Commonwealth concedes, it is why the FMIA establishment exception was included within the Act. ECF 78, pp. 6-7. But preemption "is not a matter of semantics, and a State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013). *See also California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024) ("States and localities can't skirt the text of the broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*.") (Emphasis in original). The constitutional Catch-22 the Commonwealth found itself in is evidence of why food safety measures for meat shipped through interstate commerce are *federal* issues and should not be meddled with by the various states or ballot initiatives.

### B. Scope: The Act's Additional Requirements Imposed on FMIA Facilities are Within the Scope of the FMIA.

The Act imposes additional requirements on a FMIA establishment from what the FMIA requires. Thus, the next issue under the express preemption analysis is whether those requirements fall within the "scope" of the FMIA. 21 U.S.C. § 678; *see also Harris*, 565 U.S. at 459–60 (stating that the FMIA preempts "requirements that fall within the scope of the [FMIA]"). The word "scope" is not defined within the FMIA, but its plain meaning is broad, meaning the "object aimed at," "room for exercise," or "free course." Scope, *Oxford English Dictionary* (1966). Thus, determining the "scope" of the FMIA is informed by a broad inquiry into its subject matter, purposes, and effects. *See Harris*, 565 U.S. at 465–68. Given this expansive definition, whether

the Act falls within the "scope" of the FMIA is straightforward. The FMIA was enacted given concerns that unhealthy meat products "impair[ed] the *effective* regulation of meat and meat food products in interstate or foreign commerce," and thus aimed "to prevent and eliminate *burdens* upon such commerce [and] to *effectively* regulate such commerce . . . ." 21 U.S.C. § 602. In contrast, the Act condones a system whereby each FMIA establishment must conduct their operations, facilities, and premises particularized to potentially 50 different state regimes. This is precisely what the FMIA's express preemption clause was intended to prevent, and the Act therefore easily falls within its scope.

Further, the FMIA covers "a broad range of activities" including inspection and handling procedures, as well as determination of what is (and is not) fit for human consumption. *Id.* at 455. The FMIA contains inspection and handling procedures for both live pigs and pork meat once processed at the FMIA facility. For example, the FMIA commands pre-slaughter inspection that must take place *before the product even enters the facility*. 21 U.S.C. § 603. The FMIA also mandates that the facility provide "satisfactory pens, equipment, and assistants for conducting ante-mortem inspection and for separating, marking and holding apart from passed livestock those marked 'U.S. suspect' and those marked 'U.S. condemned.'" 9 C.F.R. § 307.2(a). The FMIA also mandates post-slaughter inspections; inspections of product slaughtered off-site/slaughtered onsite, transferred offsite, and then transferred back onsite; inspections for purposes of labeling; and inspections of slaughterhouses for sanitation purposes, 21 U.S.C. § 604 -606, 608. The USDA mandated inspections are specifically designed to ensure the pork product is not "adulterated," defined as meaning, among other things, pork that is for "any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food[.]" 9 CFR § 301.2 (3).

The FSIS directives also command how these inspections are to occur and how products are to be handled within the facility itself.[10] For example, where the inspection is to occur. *See, e.g.*, 9 C.F.R. § 309.1 (requiring that the inspection be "made *on the premises of the establishment* . . . before the livestock shall be allowed to enter into any [part] of the establishment") (emphasis added). Also regulated is the type of product that is not allowed *into* the establishment, or how to keep certain types of products segregated within the facility. *See, e.g.*, 9 C.F.R. § 309.2 (inspection procedures relating to any livestock showing signs of specified conditions or diseases, and how they are to be handled to "retain its identity as suspect," how they "may be set apart and held for treatment," and how they "shall be set apart and [] slaughtered separately from other livestock"); § 309.3–.7, .9–.11, .13, .15–.16, .18. And most significantly, the regulations mandate how swine are to be sorted even before the animals are presented for processing within the facility to ensure that certain undesirable swine products "do not enter the human food supply[.]" 9 C.F.R. § 309.19.

A natural extension of these FSIS directives is a determination that those directives already accommodate for differing state regulations about how pork is processed. Because ultimately if farming processes are tied to whether the meat from such animals is healthy, wholesome or fit for human consumption, the FMIA facility itself is part of that process, as it is so often the last entity in the pork supply chain before the meat reaches the end-user. FSIS—the entity tasked with ensuring the United States meat supply is *safe to eat*—is the entity best positioned to articulate whether a certain condition in the animal raising process renders the meat from that animal unsalable for an entire population's marketplace. It has not done so.

The FSIS *could* identify the conditions in which a pig was raised as relevant to how they are to be segregated and treated before and during slaughter, for purposes of determining whether

---

[10]"Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings and Loan Assn. v. De La Cuesta*, 458 U.S. 141, 153–54 (1982).

those pigs are fit to enter the human food supply. **But it has not**. The FSIS *could* issue regulations dictating how to segregate pork based on whether that pork was raised in a manner commensurate with the Act, or that a slaughterhouse must segregate pork based on state law's requirements. **But it has not**. And this simply means the Act's "requirements [merely] differ from those of the FMIA—not that [the Act's] requirements fall outside the FMIA's scope." *Harris*, 565 U.S. at 466.

In *Harris*, the parties arguing against preemption contended that the challenged state law fell outside the scope of the FMIA because it purportedly excluded a class of animals—namely, nonambulatory pigs—from the slaughtering process and did not relate to the onsite slaughtering process of a FMIA facility. *Harris*, 565 U.S. at 464. But the Supreme Court rejected that argument and reasoned that the state law *did* fall within the ambit of the FMIA because the FMIA itself "exclude[d] many classes of animals from the slaughtering process." *Id.* at 465. Yet, nonambulatory pigs was *not* included in that list. *Id.* at 465–66. And this omission was simply proof that the state had imposed requirements different from the FMIA—not evidence that the state requirement fell *outside* the FMIA's scope. *Id.* at 466. Thus, the state law fell squarely within the scope of the FMIA because the state law "endeavors to regulate the same thing, at the same time, in the same place—except by imposing different requirements." *Id.* at 468.[11]

The same is true here. Although the Act's sales ban textually hinges on how a pig was raised, basic compliance with the Act has material effects throughout the *onsite* inspection procedures of a slaughterhouse, which are real, material, undisputed on this record, and directly attributable to the Act's distinction based on how a pig was raised. SOF ¶ 67; ECF 125 at p. 6. The

---

[11]They also argued that the challenged state law was more of a humane treatment law, and thus fell outside the scope of the FMIA which was framed as only being a meat safety law. *Harris*, 565 U.S. at 464–66. The Supreme Court determined the argument "misunderstands the authority—and indeed responsibility—that the FMIA gives to federal officials." *Id.* at 466. The Supreme Court pointed out that the FMIA has several provisions relating to the same objectives and goals the state law sought to implement, namely, the humane treatment of non-ambulatory animals. *Id.*

Act directly affects how Triumph structures such operations, which this Court has recognized. ECF No. 125, pp. 6, 11 (holding that "[i]n order to produce compliant pork, Triumph must (and in fact, has begun to) restructure its processing facility and procedures, segregating pork that meets the requirements of the Act. Triumph, therefore, must produce pork compliant with the Act in order to make its sales." *Id.* (citing Am. Compl. ¶ 89, ECF No. 17 & *Gustavsen v. Alcon Labs.*, 903 F. 3d 1, 8 (1st Cir. 2018))). This Court simplified the concrete injury and impact this Act has on Triumph, stating "[w]ithout compliant pork, Triumph is unable to sell its products into Massachusetts at all. These are both concrete, particularized injuries to Triumph." *Id.*, Citing *Gustavsen*, 903 F. 3d at 8.

*   *   *

As a natural result of the Act's sales ban, FMIA facilities are now forced to change their already highly regulated operations, facilities, and premises. This requires operational gymnastics to process only compliant pork or segregate compliant pork from non-compliant pork throughout the entire production process. This Court should sever—at minimum—the sales ban within the Act and permanently enjoin its enforcement.

## II. Conflict Preemption:  The Act's sales ban is also preempted under principles of conflict preemption as it conflicts with, and obstructs, the objectives of the FMIA.

While the Court should conclude that the FMIA express preemption clause preempts the Act's sales ban, even if it does not, the Act is still preempted under principles of conflict preemption. Conflict preemption is triggered "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 472–73 (1st Cir. 2009). And "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Cormier*, 51 F.4th at 6

(cleaned up). The question is whether the effect of the state law conflicts with the "natural effects" of the federal legislation. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373–74 (2000). As applied here, the Act's sales ban conflicts with the FMIA in several material ways.

The key issue is whether the Act's effects undermine the FMIA. Important to note in this analysis is that it matters not whether the purported goal of the Act is similar to those of the FMIA, for "[e]ven a state law that attempts to achieve one of the same goals as federal law may be preempted when it involves a conflict in the method of execution." *Cormier*, 51 F.4th at 11 (quotation omitted). Indeed, "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 287 (1971). Thus, health and safety laws that are stricter than federal counterparts may be preempted. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (reasoning that "[i]t would defeat the purpose of [a federal law] if a state could enact measures stricter than [the federal measures] by asserting a . . .purpose [different from the federal law] for the legislation."); *see also Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 612 (1926) (stating that a preemption analysis turns not on whether federal and state laws "are aimed at distinct and different evils" but whether they "operate upon the same object"). The Commonwealth cannot escape one of the justifications for the Act having been to protect the health and safety of Massachusetts consumers due to the perceived "threat" that was posed by certain methods of farm animal confinement. SOF ¶ 23. But the FMIA has a detailed regulatory framework for what constitutes adulterated meat and what is safe for human consumption. And therein lies the conflict: Pork meat product that has passed FMIA inspection and approved for sale by the USDA, is now otherwise deemed unfit for human consumption within Massachusetts and unable to be sold. This is the definition of a conflict. The Act takes it upon itself to predetermine

what product is wholesome or safe for human consumption, supplanting the FMIA's definition of what is adulterated for its own. This entirely circumvents the authority of the USDA. This jams up the nation's meat supply chain, undermining what the FMIA attempts to accomplish—an efficient and functional state and federal overlay on meat inspection. Time and again, courts have preempted such laws when they conflict with the objectives of a federal statute in this way. *See, e.g., Cormier*, 51 F.4th at 6 (holding a state statute preempted which "purport[ed] to forbid the employment of some of the very same laborers whom federal law authorizes to work"); *see also Weaver's Cove Energy*, 589 F.3d at 458.

Again, the effect of the Act's sales ban is well supported and uncontroverted on this record. For example, the record reflects instances where a farmer providing both compliant and non-compliant pigs to a facility erred in denoting pigs as compliant, resulting in pigs that already passed full USDA inspection and out for shipment being withdrawn from the market, wasting perfectly healthy, fresh pork. SOF ¶ 70-72. This burden on interstate commerce is exactly what the FMIA was intended to overcome – to allow USDA-approved product to ship interstate without interference. What the Act purports to do, is subject USDA-approved inspection processes to a single state's determination of what is fit for human consumption. By implication, Defendants would have this Court determine that an FMIA establishment could be subject to 50 state preferences as to what type of meat is fit for human consumption, thereby forcing USDA establishments to implement and master various separate segregation and inspection processes to abide by potentially conflicting state laws. This would return the meat inspection industry to the way it was before the FMIA, which conflict preemption does not allow.

The Act's sales ban is preempted under conflict preemption principles because Whole Pork Meat approved as USDA inspected cannot be sold in Massachusetts because of the Act. In *Ophir*,

this Court recognized the importance of local laws and regulations staying far from those areas in which the federal government has an important interest in regulating because "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." 647 F. Supp. At 94 (citing *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 124 S.Ct. 1756, 1762 (2004)). That is the case here, and the Court should hold the Act's sales ban preempted by the FMIA.

## CONCLUSION

Each preemption theory "work[s] in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018). The FMIA mandates how facilities are to conduct inspections, handle product, and determine what is fit to enter the supply chain and what is not. The Act supplants and interferes with that authority, creating grave consequences not only to the Nation's interstate pork market, but to the constitutional order established over 200 years ago. The USDA must continue to be entrusted to ensure quality, wholesome whole pork meat flows through the supply chain from farmer to consumer, without disruption from one, two or fifty states based on shifting moral or ethical viewpoints on federal issues pursued through ballot initiatives. These preferences are best left for consumer choices at the grocery store and not through interference with our country's delicate – and already highly regulated – food supply chain. This Court should sever and permanently enjoin the Act's sales ban to stop the disruption in the Nation's supply chain.

Dated: March 6, 2024

TRIUMPH FOODS, LLC, CHRISTENSEN
FARMS MIDWEST LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW
FASHION PORK, LLP, EICHELBERGER
FARMS, INC., and ALLIED
PRODUCERS' COOPERATIVE, Plaintiffs.


By: */s/ Ryann A. Glenn*

Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes *(admitted pro hac vice)*
Ryann A. Glenn (*admitted pro hac vice*)
Michael Raupp (*admitted pro hac vice*)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8381
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com
*Attorneys for Plaintiffs*


## CERTIFICATE PURSUANT TO LOCAL RULE 7.1.(a)(2)

Because Plaintiffs are filing this Motion pursuant to the Court's Order to do so, no additional meet and confer was conducted.  *See* ECF 125.


*/s/ Ryann A. Glenn*

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 6th day of March 2024, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.


<u>/s/ Ryann A. Glenn</u>