**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **DECLARATION OF RYANN A. GLENN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Ryann A. Glenn, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.      I have been admitted *pro hac vice* in this case. I am counsel of record for Plaintiffs Triumph Foods, LLC ("Triumph"), together with Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers' Cooperative ("APC"), both in its official capacity and on behalf of their members (collectively, "Plaintiffs").

2.      I submit this Declaration in support of Plaintiffs' Motion for Summary Judgment.

3.      Attached hereto as Exhibit 1 are true and correct copies of excerpts of Defendants' Answers to Plaintiffs' First Set of Interrogatories dated November 10, 2023.

1

4.      Attached hereto as Exhibit 2 is a true and correct copy of H.R. Rep. No. 90-651, pt. 1 (1967).

5.      I declare under penalty of perjury and pursuant to the laws of the State of Massachusetts that the preceding is true and correct, and that this declaration was made on this 6th day of March 2024, at Omaha, Nebraska.


_Ryann A. Glenn_
Ryann A. Glenn

2

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Commissioner of the Massachusetts Department of Agricultural Resources,<br><br>Defendants. | CIVIL ACTION<br>NO. 1:23-cv-11671-WGY |

## DEFENDANTS' ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Andrea Joy Campbell, in her capacity as Attorney General of Massachusetts, and Ashley Randle, in her capacity as the Commissioner of the Massachusetts Department of Agricultural Resources, submit these objections and responses to the Defendants' First Set of Interrogatories.

## PRELIMINARY STATEMENT

Defendants' responses to the Interrogatories are based on information known to them at this time and are set forth without prejudice to their right to supplement the responses or to assert additional objections should they discover additional information or grounds for objection at any time before trial. Defendants' responses are made without in any way waiving or intending to



**<u>INTERROGATORY NO. 7:</u>**    Please describe all research Defendants conducted

concerning the economic effect Question 3 may have on the residents and businesses within Massachusetts before Question 3 was submitted to vote in November 2016 to the public.

**ANSWER:**

Objections: Defendants incorporate the above General Objections, and object to this Interrogatory as vague to the extent it refers to Question 3 being "submitted to vote in November 2016 to the public" of regulations, which is unclear. Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it. For the purposes of responding to this Interrogatory, Defendants construe the phrase "submitted to vote" to mean "voted on" by the public on Election Day, November 8, 2016.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

Response: Subject to and without waiving the foregoing objections, Defendants state that they did not conduct research with respect to the economic effect Question 3 may have on the residents and businesses within Massachusetts before Election Day 2016.





**INTERROGATORY NO. 9:**        Please describe all research Defendants conducted concerning any effects Question 3 may have on processors who process Whole Pork Meat outside of Massachusetts.

**ANSWER:**

Objections:  Defendants incorporate the above General Objections.  Defendants further object to "any effects" and "processors who process" as vague.   Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it.  For purposes of this Interrogatory, Defendants construe "any effects" to refer to "economic effects" and "processors who process" to refer to commercial slaughterhouses.

Defendants assert that this Request is overly broad and unduly burdensome insofar it

contains no time limitation.  Consistent with Interrogatory Number 7, Defendants construe this Interrogatory to be limited in time to before Election Day 2016.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

<u>Response</u>: Subject to and without waiving the foregoing objections, Defendants state that they did not conduct research with respect to the economic effects Question 3 may have on out-of-state commercial slaughterhouses before Election Day 2016.

**<u>INTERROGATORY NO. 10:</u>**    Please  describe  all  research  Defendants conducted concerning any impact Question 3 may have on the operation of the pork industry

supply chain.

**ANSWER:**

Objections:  Defendants incorporate the above General Objections.  Defendants further object to "impact" and "pork industry supply chain" as vague.   Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it.  For purposes of this Interrogatory, Defendants construe "impact" to refer to "economic effects" and "pork industry supply chain" to refer to any segment of the supply chain involving pork producers, who raise pigs to be processed by slaughterhouses.

Defendants assert that this Request is overly broad and unduly burdensome insofar it contains no time limitation.  Consistent with Interrogatory Number 7, Defendants construe this Interrogatory to be limited in time to before Election Day 2016.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is

designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

Response: Subject to and without waiving the foregoing objections, Defendants state that they did not conduct research with respect to the economic effects Question 3 may have on the portion of the supply chain involving pork producers, who raise pigs to be processed by slaughterhouses, before Election Day 2016.

**INTERROGATORY NO. 11:**    Please describe all research Defendants conducted concerning any impact Question 3 may have on Massachusetts businesses or citizens.

**ANSWER:**

Objections:  Defendants incorporate the above General Objections.  Defendants further object to "impact" as vague.  Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it.

Defendants assert that this Request is overly broad and unduly burdensome insofar it contains no time limitation.  Consistent with Interrogatory Number 7, Defendants construe this Interrogatory to be limited in time to before Election Day 2016.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and

deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

Response: Subject to and without waiving the foregoing objections, Defendants state that they did not conduct research with respect to the impact Question 3 may have on Massachusetts businesses or citizens before Election Day 2016.

**INTERROGATORY NO. 12:**   Please describe all research Defendants conducted concerning any impact Question 3 may have to prevent the introduction of foodborne diseases into Whole Pork Meat sold within Massachusetts.

**ANSWER:**

Objections:  Defendants incorporate the above General Objections.  Defendants further object to "impact" and "introduction of foodborne diseases into Whole Pork Meat" as vague and confusing.   Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it.  For purposes of responding to this Interrogatory, Defendants construe "introduction of foodborne diseases into Whole Pork Meat" to mean "risk

of foodborne disease."

Defendants assert that this Request is overly broad and unduly burdensome insofar it contains no time limitation. Consistent with Interrogatory Number 7, Defendants construe this Interrogatory to be limited in time to before Election Day 2016.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. For the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

Response: Subject to and without waiving the foregoing objections, Defendants state that they did not conduct research with respect to the impact Question 3 may have with respect to the risk of foodborne disease before Election Day 2016.

**INTERROGATORY NO. 13:**    Please describe all research Defendants conducted or received from the Question 3 ballot initiative sponsors concerning the benefits to a sow's animal welfare directly caused by the Question 3 requirements before November 2016.

**ANSWER:**

Objections:  Defendants incorporate the above General Objections.  Defendants further object to "sponsors," "sow's animal welfare" "directly caused" and "Question 3 requirements" as vague and confusing.   Because the meaning of the Interrogatory is unknown to the Defendants, they cannot meaningfully or reasonably respond to it.  For purposes of responding to this Interrogatory, Defendants construe "sponsors" to refer to "proponents"; "sow's animal welfare" to refer to "sow's welfare" and "directly caused by" to mean "related to."  The "requirements" of Question 3, set forth in the law, speak for itself.

Defendants further object to this Interrogatory to the extent it seeks information that is protected by: (i) the attorney-client privilege; (ii) the work-product doctrine; and/or (iii) one or more other privileges existing under state or federal statute, regulation, or common law; and specifically insofar as it seeks information that is subject to the deliberative process privilege, which protects information which "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The deliberative process privilege protects documents that are: "(1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). "A predecisional document may be virtually any document that contains personal opinions and is

designed to assist agency decision-makers in making their decisions." *Id.* (quoting *Mo. Coal. For the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008)).

Defendants further object to this interrogatory to the extent that it seeks information not within the possession, custody, or control of the Defendants.

<u>Response</u>: Subject to and without waiving the foregoing objections, the Commissioner states that MDAR did not conduct or receive research from proponents with Question 3's respect to benefits to sow's welfare before Election Day 2016.



grace.gohlke@mass.gov
617-963-2107
vanessa.arslanian@mass.gov

Dated: November 10, 2023

## **VERIFICATION**

I, Paula M. McManus, hereby declare and verify under penalty of perjury that I read the foregoing responses, which are based on a diligent and reasonable effort by me to obtain information currently available. I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available. Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.

Subscribed and sworn to under the pains and penalties of perjury this 10th day of November 2023.

/s/ Paula M. McManus
Paula M. McManus
Chief Operating Officer/Acting General Counsel
Office of the Massachusetts Attorney General

## **VERIFICATION**

I, _Michael Cahill__, hereby declare and verify under penalty of perjury that I read the foregoing responses, which are based on a diligent and reasonable effort by me to obtain information currently available. I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available. Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.

Subscribed and sworn to under the pains and penalties of perjury this 10th day of November 2023.

Michael Cahill, Director of Animal Health
Massachusetts Department of Agricultural Resources

# EXHIBIT 2

 

DATE DOWNLOADED: Fri Feb 16 14:51:34 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967 (1967).

ALWD 7th ed.
. Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967 (1967).

APA 7th ed.
(1967). Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967. Washington, Covington & Burling.

Chicago 17th ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967. Washington, Covington & Burling.

McGill Guide 9th ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967 (Washington: Covington & Burling., 1967)

AGLC 4th ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967 (Covington & Burling., 1967

MLA 9th ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967. Washington, Covington & Burling. HeinOnline.

OSCOLA 4th ed.
Legislative History of the Wholesome Meat Act: P.L. 90-201: 81 Stat. 584: December 15, 1967. Washington, Covington & Burling.          Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

| 90TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *1st Session* | | No. 653 |

## FEDERAL MEAT INSPECTION ACT

SEPTEMBER 21, 1967.—Committted to the Committee of the Whole House on the
State of the Union and ordered to be printed

Mr. POAGE, from the Committee on Agriculture,
submitted the following

# REPORT

together with

## SUPPLEMENTAL VIEWS AND ADDITIONAL
## SUPPLEMENTAL VIEWS

[To accompany H.R. 12144]

The Committee on Agriculture, to whom was referred the bill
(H.R. 12144) to clarify and otherwise amend the Meat Inspection Act,
to provide for cooperation with appropriate State agencies with
respect to State meat inspection programs, and for other purposes,
having considered the same, report favorably thereon with amend-
ments and recommed that the bill do pass.

The amendments are as follows:

Page 3, line 13, strike the word "territory" and insert in lieu thereof
the word "Territory".

Page 3, line 18, strike the word "territory" and insert in lieu thereof
the word "Territory".

Page 3, line 19, strike the word "territory" and insert in lieu thereof
the word "Territory".

Page 3, line 22, strike the word "territories" and insert in lieu thereof
the word "Territories".

Page 10, line 19, strike the word "or" and insert in lieu thereof the
word "of".

Page 20, line 13, strike the period and insert the following:

: *Provided further*, That nothing in this section shall apply
to any individual who purchases meat or meat products out-
side the United States for his own consumption except that
the total amount of such meat or meat products shall not
exceed fifty pounds.

2                    FEDERAL MEAT INSPECTION ACT

Page 22, line 9, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 25, line 19, strike the word "territory" and insert in lieu thereof the word "Territory."

Page 29, line 18, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 32, line 21, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 34, line 5, insert the following:

> The determination and order of the Secretary with respect thereto under this section shall be final and conclusive unless the affected applicant for, or recipient of, inspection service files application for judicial review within thirty days after the effective date of such order in the appropriate court as provided in section 404. Judicial review of any such order shall be upon the record upon which the determination and order are based.

Page 34, line 19, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 37, line 4, strike the word "territories" and insert in lieu thereof the word "Territories".

Page 39, line 21, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 40, line 2, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 40, line 5, strike the word "territory" and insert in lieu thereof the word "Territory".

Page 40, line 14, strike the word "territory" and insert in lieu thereof the word "Territory".

### Statement

The Committee on Agriculture, by a 31-to-3 vote, recommends the enactment of H.R. 12144 which would strengthen our Nation's meat inspection services in three major respects.

First, it would broaden the present meat inspection program by establishing a Federal-State cooperative meat inspection arrangement under which the Federal Government would provide both personnel and financial assistance to State agencies in order to improve the quality of State meat inspection services.

Second, it would rewrite and modernize present meat inspection statutes as a single Federal Meat Inspection Act designed to provide the appropriate means for achieving the purposes of the program.

Third, it would give the Department of Agriculture new legislative authority to eliminate numerous opportunities now present to defraud consumers and endanger the public health.

About 15 percent of commercially slaughtered animals is not prepared for distribution in interstate or foreign commerce and, therefore, under present law is subject to State and not to Federal inspection at the time of slaughter. Approximately 25 percent of commercially processed meat food products is prepared without Federal inspection and to a significant degree is not subject to adequate State or local inspection.

FEDERAL MEAT INSPECTION ACT                    3

H.R. 12144 would provide authority for the Secretary of Agriculture to cooperate with the appropriate agency in any State, territory, or the District of Columbia in developing and administering laws of such jurisdictions with respect to meat inspection and other matters covered by the legislation. Cooperation with the State would include furnishing advisory program planning assistance and technical and laboratory assistance, as well as financial aid up to 50 percent of the total estimated total cost of the State program. Also funds would be made available for training State inspection employees.

H.R. 12144 would completely rewrite the act of March 4, 1907, the Horsemeat Act and the Imported Meat Act into a single new statute to be known as the "Federal Meat Inspection Act."

New authorities are established with respect to certain operators related to the meat processing industry whose activities have a significant part in the marketing of animal carcasses, meat, and meat food products. This group includes renderers, animal food manufacturers, meat brokers, wholesalers, transporters, and coal storage warehousemen and importers.

The bill clarifies the authority of the Department of Agriculture for regulating the marking, labeling, and packaging of carcasses, meats, and meat food products capable of use as human food. It would clarify prohibitions against counterfeiting, forgery, and other unauthorized use of official certificates, labels, and marking devices by brand manufacturers, printers, and others.

It would authorize registration requirements and impose record-keeping requirements for renderers, animal food manufacturers, meat brokers, wholesalers, transporters, cold storage warehousemen, importers, and others, and would further require them to give access to representatives of the Secretary to their places of business to examine records, inventories, and facilities and for taking samples upon payment therefor.

These new authorities would be conferred on the Secretary also with respect to persons, firms, and corporations that conduct the kinds of business specified in the bill but not in or for commerce, whenever the Secretary determines that a State or other jurisdiction concerned does not have or is not adequately exercising comparable authority under its laws.

Auxiliary provisions would provide for the detention, seizure, and injunction authority necessary to prevent distribution of products unfit for human food.

The legislation would also extend to meat imported from foreign nations the same standards applying to meat and meat products produced and processed in interstate commerce in the United States.

As the committee developed this legislation it found three basic approaches available to meet the need for adequate consumer protection.

*The first alternative* was to expand Federal inspection services to all intrastate slaughtering and processing facilities. This approach would have eliminated State inspection programs and assigned the responsibility for strictly State and local health protection exclusively to the Federal Government. *The committee rejected, by a 29-to-5 vote, a substitute bill which would have given the Federal Government direct inspection authority over a large area of the intrastate slaughter and processing of meats by assuming that any persons, firm, or establishment*

**4**              FEDERAL MEAT INSPECTION ACT

*doing more than a $250,000 annual business within a State would have substantial effect on interstate commerce, regardless of whether the product moved across a State line.*

*The second alternative* was to confine this legislation exclusively to interstate and foreign commerce by deleting any reference whatsoever to the establishment of a Federal-State cooperative program. The hearings showed, however, that only about one-half of the States are presently providing mandatory inspection over the meat and meat products that move within State boundaries. The following table shows the State-by-State breakdown of 28 States with mandatory inspection, 12 States with voluntary inspection, eight States with no meat inspection statutes, and two States with other programs:

STATUS OF STATE MEAT INSPECTION LAWS (AS OF SEPTEMBER 15, 1967)

*Mandatory laws.*—Twenty-eight States have laws providing for mandatory inspection of animals before and after slaughter, and of meat processing (exceptions noted):

| | |
|---|---|
| Arkansas | New Mexico |
| California | New York |
| Florida | North Carolina |
| Georgia | Oregon |
| Hawaii | Rhode Island |
| Idaho | South Carolina |
| Illinois | Tennessee |
| Indiana | Utah |
| Iowa | Vermont |
| Massachusetts [1] | Virginia |
| Michigan | Washington |
| Missouri | West Virginia |
| Nevada [1] | Wisconsin |
| New Jersey | Wyoming |

[1] Massachusetts and Nevada do not provide for mandatory processing inspection.

*Voluntary laws.*—Twelve States have laws providing for voluntary inspection of animals before and after slaughter, and of meat processing (exceptions noted):

| | |
|---|---|
| Arizona | Nebraska [1] |
| Kansas | North Dakota [1] |
| Kentucky [1] | Ohio [4] |
| Louisiana [1] | Oklahoma |
| Mississippi | Pennsylvania [2] |
| Montana | Texas [3] |

[1] Kentucky, Louisiana, Nebraska, and North Dakota provide only for inspection before and after slaughter; no inspection of meat processing.

[2] Pennsylvania has, in addition to a voluntary meat inspection law, a specific law covering sausage processing.

[3] Texas law provides for recognition of municipal voluntary inspection.

Ohio State Legislature passed mandatory State inspection bill awaiting Governor's approval as of Sept. 15, 1967.

FEDERAL MEAT INSPECTION ACT                     5

*No meat inspection laws.*—Eight States do not have a meat inspection statute, although they do have a general food and/or sanitation statute:

| | |
|---|---|
| Alabama [1] | Maryland |
| Alaska | Minnesota [3] |
| Colorado [2] | New Hampshire |
| Delaware | South Dakota |

[1] Alabama provides for voluntary municipal inspection.
[2] Colorado provides for voluntary municipal inspection with State recognition.
[3] Minnesota provides for a voluntary meat product labeling law.

*Other.*—Two States have very limited statutes regulating meatpacking:

Connecticut: Requires mandatory licensing only; no inspection of meat.

Maine: Requires mandatory licensing of meatpackers and marking of carcasses; no inspection of meat.

The committee feels that a definite need exists to improve State inspection programs. *Therefore, the committee, by a 26-to-6 vote, rejected an amendment to delete the Federal-State cooperative program from the bill.*

*The third alternative* was to establish a cooperative Federal-State inspection system under which the Federal Government would assist (while neither ignoring nor usurping) State efforts to meet their responsibilities to provide a high quality of meat inspection. This third alternative is the approach followed by the committee in H.R. 12144. The committee feels that it has developed a good bill which will adequately protect consumers, the legitimate operators in the affected industries, and others associated with the meat business. *Federal-State cooperation is structured in this legislation in a way that will do the job that needs to be done without the Federal Government preempting the jurisdiction of the States over intrastate commerce.*

SUMMARY OF PRINCIPAL PROVISIONS

H.R. 12144 would completely rewrite the provisions of the act of March 4, 1907, the present main statutory authority for Federal meat inspection. It would also repeal the "Horse Meat Act" and the "Imported Meat Act" while incorporating the salient features of all three of these statutes in a new statute to be cited as the "Federal Meat Inspection Act."

Under the provisions of H.R. 12144 (which may be cited as the "Wholesome Meat Act") the new "Federal Meat Inspection Act" would consist of four titles as follows:

Title I—Inspection Requirements; Adulteration and Misbranding.

Title II—Meat Processors and Related Industries.

Title III—Federal and State Cooperation.

Title IV—Auxiliary Provisions.

In addition, the bill contains four additional sections (secs. 17–20) which deal with annual reports, repeal of certain existing laws, constitutional invalidity, and effective dates.

**6**                    FEDERAL MEAT INSPECTION ACT

TITLE I

Title I of the "Federal Meat Inspection Act" would both revise and incorporate various provisions of law now found in the act of March 4, 1907, the Horse Meat Act and the Imported Meat Act.

Specifically, title I would—

(1) Define various terms and then coordinate these definitions with the Food, Drug, and Cosmetic Act where appropriate.

(2) Provide a legislative finding that all articles regulated under the act are either in interstate or foreign commerce or are substantially affected by such commerce.

(3) Make ante mortem inspection mandatory rather than permissive.

(4) Make products "capable of use as human food" (rather than present act's language "prepared for human consumption") subject to inspection.

(5) Clarify the authority to limit the entry of meat into federally inspected plants.

(6) Clarify the Secretary's authority to regulate the marking, labeling, and packaging of meat and meat products shipped from federally inspected plants or distributed in commerce and to prescribe standards for containers.

(7) Prohibit the slaughter of animals and the preparation of products except when done in compliance with the act.

(8) Strengthen the prohibition against unauthorized use of an official inspection mark or similar item.

(9) Require foreign slaughtering and processing facilities to meet the same standards required to be met by U.S. firms operating in interstate commerce.

(10) Repeal the present farmer and retailer exemptions and replace them with more restrictive exemption provisions.

(11) Include all equine carcasses, meat and parts thereof, and meat products within the coverage of the act.

(12) Permit the Secretary to issue appropriate regulations.

TITLE II

Title II deals with the Secretary's authority over unwholesome meat products and would—

(1) Prohibit Federal inspection under title I of the act of articles not intended as human food.

(2) Require denaturing of such articles prior to distribution in commerce.

(3) Require recordkeeping and provide for the Secretary's access to such records by certain persons engaged in processing, handling, or transporting of various human and animal foods and "4-D" animals (i.e., dead, dying, disabled, or diseased).

(4) Permit registration of certain persons handling, processing, or transporting 4-D animals.

(5) Prohibit 4-D sales except as provided by the Secretary's regulations.

(6) Permit the Secretary to take necessary action when and if the States have not adequately met their responsibility to protect the public's meat supply.

FEDERAL MEAT INSPECTION ACT 7

### TITLE III

Title III deals with the establishment and administration of the Federal-State cooperative meat inspection program. It would—

(1) Permit Federal technical and planning assistance to the States.

(2) Authorize cooperation by the Secretary of Agriculture with State and Federal agencies.

(3) Authorize grants to States of up to 50 percent of the total cost of any State program meeting the standards established by the Secretary.

(4) Permit the Secretary to appoint an advisory committee for consulting purposes.

### TITLE IV

Title IV contains auxiliary provisions to further implement the new "Federal Meat Inspection Act" and would:

(1) Subject to court review, permit the Secretary after opportunity for a hearing to deny inspection to any facility responsibly connected with any person convicted of one felony or two or more misdemeanors related to fraudulant food transactions.

(2) Authorize the Secretary's seizure and detention for up to 20 days of any meat or meat product subject to the act if there is reason to believe that the articles are adulterated or misbranded or distributed in violation of the act.

(3) Provide for seizure under court order of articles being transported in commerce if they are capable of use as human food and are adulterated, misbranded, or otherwise in violation of the act.

(4) Set forth the courts which have jurisdiction to enjoin violations of the act.

(5) Authorize use of warning letters for minor offenses and reduce from a felony to a misdemeanor certain specified crimes under the act in order to facilitate prosecution.

(6) Incorporate by reference certain provisions of the Federal Trade Commission Act and the Communications Act of 1934 relating to subpenas, reports, penalties, and confidentiality of information.

(7) Provide for separation of authority between State and Federal Governments regarding the inspection of meat and meat products. States would be prohibited from regulating federally inspected plants whose operations are governed by title I. Any recordkeeping and related requirements proposed by States for federally inspected plants must be in conformance with the Federal Meat Inspection Act. States could not impose marking, labeling, packaging, or ingredient requirements in addition to or different from Federal requirements for products prepared under Federal inspection.

(8) Extend authority to detain meat products outside of federally inspected plants to representatives of the Secretary of Health, Education, and Welfare.

(9) Provide for the annual appropriation of necessary sums to carry out the provisions of the act.

8                         FEDERAL MEAT INSPECTION ACT

## HEARINGS

Public hearings were held by the Livestock and Grains Subcommittee on H.R. 1314, H.R. 1321, and H.R. 6168 on June 26, 27, 28, and 29, and on July 17, 19, and 20, 1967. The subcommittee heard testimony from consumer groups, meat industry spokesmen, farm organizations, State and Federal officials, and Members of Congress.

## SUBCOMMITTEE ACTION

The subcommittee approved H.R. 6168 with various amendments which (a) clarified scope and application of the legislation, (b) strengthened the Secretary's authority to prevent criminal elements from acquiring control of meat-processing firms, (c) applied to foreign slaughterers and processors the same strict Federal health and building construction standards that apply to U.S. slaughterers and processors who are subject to the provisions of the act, (d) required the Secretary to annually report to Congress on the operations and effectiveness of the act, and (e) various technical amendments.

H.R. 12144 is a clean bill which reflects the changes made in H.R. 6168 by the Livestock and Grains Subcommittee.

## COMMITTEE AMENDMENTS

The committee amendments are of a technical or clarifying nature. These amendments make grammatical corrections, establish a 50-pound exemption for persons purchasing wholesome meat or meat food products in foreign nations for their own consumption, and spell out the terms and conditions for judicial review of the Secretary's determination in regard to the denial of inspection services to certain firms or individuals.

## COST

The departmental witnesses stated during the hearings that the estimated additional Federal cost of this legislation would be $4½ million during the first year with an eventual additional annual cost of from $10 million to $15 million. The Department furnished the committee with the following additional information:

DEPARTMENT OF AGRICULTURE,
*Washington, D.C., July 6, 1967.*

Hon. GRAHAM PURCELL,
*Chairman, Subcommittee on Livestock and Grains, House Agriculture Committee, House of Representatives.*

DEAR MR. PURCELL: During the legislative hearing on June 26, the subcommittee requested additional information regarding two items in the proposed bill H.R. 6168.

One request was for the number of businesses or firms in each category of meat processors and related industries included under title II.

The second request was for an explanation of cost estimates for Federal financial assistance to the States in developing and upgrading the meat inspection program referred to in title III.

Outlined below is the information requested:

1. Numbers by category of business referred to in title II:

FEDERAL MEAT INSPECTION ACT 9

| Category: | Number |
|---|---|
| Renderers [1] | 475 |
| Refrigerated Warehouses [2] | 622 |
| Food Lockers [2] | 1,873 |
| Wholesalers, meat and poultry [3] | 5,107 |
| Brokers [3] | 774 |
| Pet food manufacturers [4] | 177 |
| Other animal food manufacturers [4] | 466 |
| Mink Ranchers [1] | 5,000 |
| Transportation firms [5] | 80 |
| Total | 14,574 |

[1] U.S. Department of Agricultural Research Service, Animal Health Division, 1966, Survey report.
[2] County Business Patterns of 1965, SCC Code 4222 and 4223.
[3] SCC Code 5047.
[4] Census of Manufacturers, SCC Code 20423 and 20424.
[5] Carriers of refrigerated solid products—American Trucking Association.

2. Estimated cost for assisting States in intrastate meat inspection programs.

| Plants (by size) | Number of plants | Staffing [1] (man-years per plant) | Average cost per plant | Total |
|---|---|---|---|---|
| Small | 4,571 | ¼ | $2,700 | $12,342,000 |
| Medium | 781 | ¾ | 7,500 | 5,857,000 |
| Large | 813 | 1½ | 15,328 | 12,462,000 |
| Total | | | | 30,661,000 |
| 50 percent inspection cost to Federal Government | | | | 15,330,500 |

[1] Includes administrative and clerical costs.

A 1966 survey indicates that a nationwide Federal-State cooperative inspection program would involve approximately 6,165 nonfederally inspected plants.

If we may be of further assistance, please advise.

Sincerely yours,

ROD LEONARD.

CONSTRUCTION AND INTENT

During the course of its consideration of this legislation both the Subcommittee on Livestock and Grains and the full committee carefully considered various amendments and suggestions. In order to clarify the legislative intent of certain provisions of the bill, the following specific references are made.

In regard to section 15 of the bill establishing a title III of the new "Federal Meat Inspection Act," the committee specifically intends that any distribution of funds to the various States be done on a uniform, nondiscriminatory basis. If the Federal-State cost-sharing formula is set at 50 percent of costs, the committee anticipates that each participating State will receive payment for 50 percent of its cost from the Federal Government. The committee does not contemplate nor authorize the disbursement of funds to one State at a percentage different from the disbursement percentage made to another State. In other words, the committee does not expect the Department to reimburse State A for 20 percent of its costs and State B for 50 percent of its costs. On the contrary, the committee expects each State to be treated uniformly.

**10**            FEDERAL MEAT INSPECTION ACT

In regard to the establishment of standards for foreign meat slaughtering and processing, the committee points out that the original language of section 10 in H.R. 6168 provided that:

> No carcasses, parts of carcasses, meat or meat food products * * * shall be imported into the United States if such articles are adulterated or misbranded and unless they comply with the inspection and other requirements prescribed by *regulations of the Secretary* to assure that the imported articles have been prepared under *requirements equivalent* to those applicable to comparable domestic articles, and otherwise to effectuate the purposes of this act. [Emphasis added.]

In section 10 of H.R. 12144 the committee has changed this language to read as follows:

> No carcasses, parts of carcasses, meat or meat food products * * * shall be imported into the United States if such articles are adulterated or misbranded and unless they comply with *all the inspection, building construction standards, and all other provisions of this act and regulations issued thereunder applicable to such articles in commerce within the United States.* [Emphasis added.]

As can be seen by this comparison of the original and revised language, the committee intends to apply to foreigners the *same* high standards for meat inspection required of domestic firms. The committee does not intend to continue the present "substantially equivalent" policy in regard to foreign meat slaughtering and processing. The committee realizes that this provision will to some extent place an additional administrative burden on the Secretary but feels that U.S. consumers should be assured that foreign-produced meat, which in many cases is not readily identifiable, has been prepared under conditions as sanitary as meat produced in this country.

The committee is aware that sovereign foreign nations may not in some cases wish to conform their slaughtering and processing facilities to U.S. standards. This legislation does not force them to do so, but in the interest of American consumers, it simply establishes a standard that must be met in order to market foreign-produced meat in the United States.

In regard to section 17 of the bill dealing with annual reports, it is the committee's request that these reports be submitted to the committee by April 1 of each year in order for the committee to have ample opportunity during the current session to examine and evaluate the Secretary's recommendations.

In regard to section 16 of the bill which contains section 401 of the new act, the committee emphasizes that the main purpose of this provision is to prevent organized criminal elements from entering or dominating any portion of the meat industry. The Secretary is given broad discretion in section 401, but the committee does not intend for that discretion to be exercised in an arbitrary or capricious manner. It is the committee's intent that the crimes (both felonies and lesser offenses) of which the applicant has been convicted be of such a nature that bear directly upon that applicant's fitness to engage in a business which directly affects the health and safety of the public. The committee also intends to provide each applicant with due process of law and expects the Secretary to provide a fair opportunity for

FEDERAL MEAT INSPECTION ACT                    **11**

hearings. Specific court review is also provided in order to insure against arbitrary or capricious action by the Secretary.

In regard to section 15 of the bill which contains section 301(b) of the new act, the committee intends that municipalities which operate meat inspection programs which otherwise qualify for assistance under this legislation may qualify for Federal cost-sharing assistance even though such programs are not specifically authorized by State law.

The specific problem which came to the committee's attention concerns the city of New York. Under New York State law (art. 5B, sec. 96H of the New York State agriculture and markets law), New York City is specifically excluded from coverage of the State inspection system. Since the city of New York is specifically excluded from the State program by State law, the committee feels that in such a case the Secretary would have authority under section 301(b) to cooperate directly with the city of New York under the terms set forth in this legislation.

In this and similar instances, municipal inspection programs which meet required standards may be considered as part of the State program for the purposes of section 301 and would be eligible for an appropriate portion of the assistance made available to the State by this legislation.

In regard to section 16 of the bill which contains section 409(a) of the new act, the committee intends that the authority of the Secretary of Agriculture and the authority of the Secretary of Health, Education, and Welfare not be exercised in a manner that will cause any overlapping or conflicting requirements. It is the committee's, intent that both Secretaries shall, to the maximum extent feasible in the administration of this act and the Federal Food, Drug, and Cosmetic Act, exercise their respective authorities in connection with matters subject to concurrent jurisdiction under these acts in such manner as to avoid any unnecessary duplication of effort.

In order to clarify the effect of this legislation on meat processing plants now exempt from Federal meat inspection, the following letter from the Secretary of Agriculture is included:

DEPARTMENT OF AGRICULTURE,
*Washington, D.C., September 19, 1967.*

Hon. GRAHAM PURCELL,
*Chairman, Subcommittee on Livestock and Grains, House Agriculture Committee, House of Representatives.*

DEAR MR. PURCELL: This is in reply to your request for information on the effect of H.R. 12144 on those plants that are now operating under exemption from Federal meat inspection.

There are approximately 530 plants holding certificates of exemption. They receive periodic surveys to assure that they meet Federal sanitary standards and comply with other applicable regulations of the Federal meat inspection program. Compliance is determined by a review of the operations during the survey and sampling of products for laboratory examination.

Many of these plants have limited, and often seasonal operations, and it is planned to continue periodic reviews and sampling for those small plants that produce for interstate commerce after the Wholesome Meat Act is passed. Plants having a continuous and larger

interstate business will receive inspection service similar to that now provided, without cost, at federally inspected plants. Under the new legislation, products produced by these plants will be eligible to bear the marks of Federal inspection.

We do not anticipate any serious interference in the operation of these plants due to requirements of H.R. 12144. They will be asked to complete an application for inspection and an establishment number will be assigned to each one. We plan to provide an 18-month period for submittal of drawings showing the layout of their facilities and additional time will be provided as necessary where improvement in facilities is planned.

Our experience with these plants over the past years has been very good. Most of them are owner operated and take real pride in maintaining good facilities and producing high-quality products.

Sincerely yours,

ORVILLE L. FREEMAN,
*Secretary.*

ADMINISTRATION POSITION

Officials of the U.S. Department of Agriculture appeared before the subcommittee during the hearings and testified in favor of H.R. 6168 which was the basis for and was superseded by H.R. 12144. The Department's statement is as follows:

STATEMENT OF RODNEY E. LEONARD, DEPUTY ASSISTANT SECRETARY OF AGRICULTURE, ACCOMPANIED BY MRS. LOTUS PROKOP, ATTORNEY, ROBERT K. SOMERS, DEPUTY ADMINISTRATOR, AND JAMES PAYNE, ASSISTANT TO DEPUTY ADMINISTRATOR, CONSUMER AND MARKETING SERVICE, U.S. DEPARTMENT OF AGRICULTURE

Mr. LEONARD. I am here today to urge favorable action by this committee on H.R. 6168, a bill to amend the Meat Inspection Act.

This legislation seeks to further improve the programs which have helped to build meat packing and processing into an industry with $16 billion in annual gross sales, and which, in turn, have created nearly $13 billion in yearly sales of livestock by American farmers.

The availability of these markets for American livestock— the prosperity and potential for the American food industry— all rest on one basic fact: the continued confidence of today's homemaker in the integrity of our meat supply.

Thus, we must insure that every effort is made to provide her with the full assurance that the meat she buys for her family is safe and wholesome: a guarantee that today is taken for granted. To do this adequately, we must forge a viable Federal-State partnership through which the consumer is fully protected, the packing industry continues to prosper, and the producer is assured of an expanding market for his livestock.

The proposed Wholesome Meat Act is designed to accomplish just that.

It recognizes the role of the States as a vitally important link in this creative program, and seeks to provide a positive

means by which the States can integrate their efforts into a stronger, more unified system of meat inspection.

It proposes much-needed reforms in the present Federal system, to close existing loopholes and make it more responsive to all in the years ahead.

Sixty years ago—after the consumer's confidence in her meat supply was shattered by disclosures of vast irregularities in the meatpacking industry—Congress passed legislation under which a Federal inspection system was established for meat and meat products moving in interstate and foreign commerce. This legislation, which actually is only an appropriations measure, has become known as the Meat Inspection Act.

The system developed, basically, is a good one. It has served us well over the intervening years, and has come to be recognized as a model for the world. Refinements to it are constantly being made within the legal boundaries established by Congress.

Yet, this legislation contains several flaws in light of modern conditions—flaws which we believe require coorrective action by the Congress.

The most serious flaw is an absence in the present act of any provisions for coordinating Federal and State meat inspection efforts.

The role of the States is a vital one. The Federal law applies only to products moving in interstate and foreign commerce. Thus, the States have sole responsibility for the products of intrastate commerce.

The volume of these nonfederally inspected products is significant. Approximately 15 percent of the commercially slaughtered animals—over 19 million head—are slaughtered animals—over 19 million head—are slaughtered for intrastate commerce only. In addition, about one-fourth of the commercially processed meat products—an estimated 8.75 billion pounds—are processed and sold without crossing State lines.

Significant amounts of these intrastate products are sold without any form of Government inspection. The remaining amounts are subject to inspection by State or local governments. Inspection under these programs is generally well below Federal standards. Yet, these products are intermingled in many retail stores with federally inspected products for sale to the unknowing public.

There exists considerable disparity between statutory provisions of Federal, State, and local laws which creates a form of economic separation that carries with it significant competitive advantage for the unregulated.

Excessive water and extenders, chemicals that mask the true condition of a product, and misleading or deceptive labeling are typical examples. This variation in consumer protection at the State and local levels is demonstrated by a few statistics.

Nine States do not have any laws specifically covering the inspection of meat, although they have a general type food

**14**                    FEDERAL MEAT INSPECTION ACT

law which partially affects meatpacking from the standpoint of specified sanitation and/or labeling requirements.

There are 41 States with some form of a meat inspection statute—two require only mandatory licensing of packers with no provisions for actual inspection of meat, 13 provide for only voluntary programs, and 26 have mandatory inspection laws.

Only 26 States provide for mandatory inspection of animals before and after slaughter—the basic foundation for effective meat inspection protection. Further, only 25 States provide for mandatory inspection of processed meat products—an important area of potential adulteration and mislabeling.

Of the 41 States with meat inspection laws, 20 derive their funds solely from State appropriations, 14 utilize a combination of appropriated funds and packer assessments, and the remaining seven derive all funds from assessments on the users.

These figures relate only to State statutes. In addition, the degree of authority, implementation, and effectiveness of State inspection programs varies greatly from State to State. Even greater variation is found between State and local inspection programs, where local inspection exists.

Administrators of State meat inspection programs generally admit that they have neither the money nor manpower to conduct an intensive, continuous inspection service for both slaughtering and processing operations. State legislators, veterinary associations, industry groups, and others have tried repeatedly to obtain meaningful legislation and enforcement.

Nevertheless, the need for stronger, more effective and more uniform State inspection programs is of critical importance. In the past couple of years, there has been a tremendous upsurge among the States to initiate or improve existing programs. Eighteen States actively considered meat inspection legislation during the past year—eight of whom are among these without any present meat inspection law. The other 10 were attempting to upgrade and strengthen existing statutes.

These efforts by the States must be fostered and encouraged by the Federal program if this Nation is to achieve adequate, overall protection of the consumer with resulting prosperity for the industry and the producer. By providing legislative authority for meaningful Federal-State cooperation, a uniform framework can be constructed which will provide consumer protection for all citizens, regardless of where their meat originates.

The second basic flaw in the present Meat Inspection Act is related to the revolution that has swept through the meatpacking industry.

Advancing technology, rapid transportation and communication, intensified marketing, and new food preservation methods have revolutionized the industry's ability to produce meat products in tremendous volume. Major changes have

FEDERAL MEAT INSPECTION ACT                    **15**

taken place just in the past decade which have greatly altered the structure of the industry.

For example, plants engaged in slaughtering have moved from highly centralized locations around key metropolitan areas—such as Chicago—to widely decentralized locations in livestock feeding areas. On the other hand, plants which process and manufacture meat products have become highly specialized. They tend to locate away from production areas and nearer to large consumer markets.

In addition, there has been a sharp increase in the number of products which are ready for home use with a minimum of preparation. They are processed to a higher degree with more sophisticated techniques. Thus, they offer greater opportunity for adulteration with unwholesome meat or extenders, as well as deceptive labeling as to composition and quality that would not be obvious to the purchaser.

With the source of supply of meat more distant from the processing plants, a substantial market has developed for frozen boneless meat—particularly beef. Moving this meat in frozen blocks facilitates handling and protects against spoilage. New machinery has been developed which will flake, shred, or slice frozen blocks of meat at high speed without defrosting. In fact, beef can now be processed more efficiently in a frozen state than in the natural state, cutting labor, and processing time to a minimum.

Along with the high-speed equipment and use of frozen meat have come chemical and other "fast" curing processes, artificial tenderizing, artificial smoking, coloring agents, and other additives that are potentially deceptive or dangerous to one's health when their use is not regulated.

These sophisticated changes greatly complicated inspection procedures. Inspection of meat for wholesomeness, without using chemical analysis, is most effective when meat is in a fresh state. Thus, frozen meat must be defrosted prior to inspection. If there is any suspicion of adulteration or unwholesomeness, it must be examined and tested closely, oftentime requiring complicated laboratory analysis.

Adequate inspection of a complex processing line is mechanically and physically more difficult than is the visual examination of carcasses and fresh meat. Compounding the problem is the fact that in modern processing, there is often less opportunity for inspectors to check each stage of the operations.

Thus, the massive technological advancements in the industry have begun to greatly complicate our efforts to protect the consumer—we are dealing with problems not conceived by those who drafted the original legislation 60 years ago.

For example, the act does not provide specific authority for supervising certain types of independent operations where adulteration of our meat supply can occur—such as boning establishments, cold storage warehouses, wholesalers, jobbers, et cetera.

**16**                    FEDERAL MEAT INSPECTION ACT

The act does not provide sufficient tools of enforcement to checkmate and unscrupulous operator who seeks to pollute the Nation's meat supply with unwholesome products. It is far too easy—in the absence of more positive preventive measures—for dealers in dead animals, renderers, animal food handlers, and others to divert unfit meat into human food channels. As of now, we do not even have the authority to seize or detain meat which we know is unfit and is intended for human consumption when it is outside of a federally inspected plant.

The act now provides only implied and/or fragmented authority in some areas that greatly hinders effective administration and enforcement. Authority to refuse inspection service when warranted, adequate measures to deal with certain types of packaging, labeling, and standards of composition, all are presently lacking.

Thus, the act passed 60 years ago—and amended only once since then in a minor way—is becoming increasingly inadequate to deal with the problems of today's modern, aggressive industry, and for dealing with the industry in the years ahead.

We cannot rest upon old laurels. It is necessary that today's consumer, eating meat products produced in highly mechanized meat plants operated by highly skilled workmen, be protected by a 1967 meat inspection law—not a 1906 appropriations measure.

Thus, the proposed Wholesome Meat Act includes amendments to:

Broaden the present act to authorize cooperative arrangements with State and local authorities, through which the Federal Government could provide manpower and financial assistance for developing effective State meat inspection programs under State administration.

Provide tools of enforcement not presently authorized with which to checkmate the distribution of unwholesome and adulterated meat products.

Clarify and broaden authority over meat and meat products capable of use as human food, to replace vaguely defined, implied authority which has hindered effective administration.

Make additional "housekeeping" changes which are necessary to renovate a 60-year-old statute, clarify codification, and consolidate several related statutes into one.

### FEDERAL-STATE COOPERATION

The proposed legislation would enhance the role of the States by providing for Federal cooperation with appropriate State agencies in developing and administering State meat inspection programs. To qualify, a State must have a meat inspection law imposing mandatory inspection and sanitation requirements for intrastate operators that are consistent with Federal requirements.

Cooperation would include furnishing advisory assistance in planning and developing a meat inspection program, fur-

FEDERAL MEAT INSPECTION ACT                    **17**

nishing technical and laboratory assistance, and aid in the training of inspection personnel. Up to 50 percent of the estimated total cost of the cooperative program would be furnished by the Federal Government.

In addition, the Secretary could appoint advisory committees of State officials to consult with him on the administration of Federal and State meat inspection programs. This would assure equitable allocation of funds and would aid in developing better coordination between State and Federal inspection programs.

These proposals would provide the impetus for those States without mandatory statutes to initiate the necessary legislation.

They would help provide States with the financial, technical, and manpower resources which they presently lack but which are required for effective inspection.

Finally, they would help bring the requirements of Federal and individual State meat inspection programs into closer conformity—toward eventual elimination of the multiple and conflicting requirements presently encountered.

Competitive marketing of meat products, and uniform protection of the consumer would be greatly enhanced by these proposals. Without such a coordinated network of Federal and State inspection programs, the health of the consumer cannot adequately be protected, nor can continued confidence in our meat supply be assured.

I wish to emphasize the Department's deep commitment in this program to developing an effective Federal-State inspection system. The Department over the past century has built its program on this approach and now we seek to make Federal-State meat inspection system work in this new era of technology.

Strengthening enforcement: Enforcement tools would be overhauled by the proposed legislation to deal more effectively with unwholesome and adulterated meat products. Presently, there are many opportunities for illegitimate operators to introduce into human food channels meat derived from dead, dying, disabled, and diseased animals—commonly referred to as "4-D's."

The legislation would extend jurisdiction to those who handle products which are "capable" of use as human food, rather than being limited to those who prepare products "intended" for human consumption as is now the case. This would have the effect of removing the need for proving "intent" of those found in violation of provision of the present act.

It would include provisions for Federal-State cooperation to establish controls over persons handling such meat, including renderers, animal food manufacturers, and those who buy, sell, transport, pack, freeze, and import such meat products in or for commerce.

It would also provide authority over such persons who do not operate in commerce, when it is determined after con-

sultation with appropriate State advisory committees, that the State does not have or is not exercising comparable authority.

Further, all persons engaged in business—in or for commerce—as meatbrokers, wholesalers, and public warehousemen, as well as persons engaged in buying, selling, transporting, or importing "4–D" meat, would have to be registered with the Secretary. Continuous inspection in their places of business is not contemplated, but access to records, inventories, and facilities would be authorized.

Detention, seizure, injunctions, and Federal court actions are also authorized to deal expeditiously with criminal activity. This would provide the USDA with long-needed authority over articles of meat in transit or storage outside of federally inspected establishments.

Now, as in the past, USDA inspectors are unable to intercept shipments or parcels of unwholesome or suspect products under these circumstances. Their only recourse is to prevail upon State, local, or other Federal agencies to impound or seize goods outside of federally inspected plants.

With this proposed authority, enforcement of the basic intent of Congress and protection of the public would be greatly enhanced. USDA would be far better able to prevent unwholesome meat products from getting into human food channels, and could deal more swiftly with those who violate the law.

Several other areas receive specific attention under the proposed legislation—areas in which USDA is currently operating under implied authority that falls far short of promoting effective administration.

The first involves the acceptance or rejection of applicants for Federal inspection. Under the present act, USDA does not have clear-cut authority to deny inspection service to applicants who—by their past actions—have demonstrated that they are unfit to engage in a business requiring a high degree of public responsibility.

The legislation would authorize the Secretary of Agriculture to deny inspection service to such individuals. Included would be provisions for a hearing and legal review to protect the rights of the individual.

The second concerns labeling of meat and meat products. The present act does not clearly spell out the extent of the Secretary of Agriculture's authority to regulate some types of labeling, marking, and packaging which are misleading to consumers.

The Secretary would, therefore, be given specific authority to prescribe the size and style of type used for labeling; the size and form of containers; standards of identity, and standards of fill of containers. These would be consistent with provisions of the Federal Food, Drug, and Cosmetic Act. Also, judicial review of labels that have been disapproved would be provided, similar to provisions now contained in the Poultry Products Inspection Act. The proposed authority

FEDERAL MEAT INSPECTION ACT                    19

with respect to packaging is comparable to the provisions of the Fair Packaging and Labeling Act.

While these new provisions would require some industry adjustment at the outset, their application would be a major step toward elimination of the complicated and conflicting labeling requirements that presently exist between the various States and between some cities within a State. They would also insure coordination of labeling requirements among agencies of the Federal Government.

Third, the legislation would grant specific authority to prevent the counterfeiting or unauthorized use of inspection marks and marking devices. Unauthorized manufacture and possession of brands and marking devices also would be prohibited.

At the present time we have no authority to prevent a person from counterfeiting a marking device.

These changes do not involve new concepts of Government supervision, for they are similar to provisions now included in existing statutes such as the Poultry Products Inspection Act, the Federal Food, Drug, and Cosmetic Act, and the Agricultural Marketing Act.

Both industry and consumers would benefit from these changes. Standards of identities, greater uniformity of labeling requirements, and elimination of opportunities for fraud and deceit—as a result of these proposals—would greatly enhance the marketing of meat and meat products.

As in any 60-year-old statute, there is a need for additional revisions of purely a "housekeeping" nature. The proposal, first of all, would consolidate into one statute the present appropriations measure of 1960 which is popularly called the Meat Inspection Act, the Horse Meat Act, and the import meat provisions of the Tariff Act of 1930.

The "housekeeping" changes would also insure coordination between the USDA's Consumer and Marketing Service and the Food and Drug Administration of the U.S. Department of Health, Education, and Welfare, in making full, cooperative use of their respective powers to protect the consumer.

Also provided is the authorization to appropriate funds for the expanded program, and establishment of a specified time schedule for implementation of the amended Meat Inspection Act.

Additional minor changes are included to further aid administration of the law and strengthen its protection of consumers.

In summation, the original Meat Inspection Act is becoming increasingly outmoded in its ability to regulate the modern, aggressive industry as we know it today and envision it in the future. The role of the States is not sufficiently recognized in the existing legislation to encourage their effective contributions to a viable network of coordinated programs. Reforms in the Federal meat inspection program are urgently needed.

Yet, the consumer continues to buy her meat with presumed confidence in its wholesomeness. The prosperity of

the meatpacking industry and our Nation's livestock producers is greatly dependent upon her continued confidence.

Our responsibility, therefore, is to insure that both Federal and State Governments are provided with the necessary tools and resources to fulfill their responsibilities to protect the consumer in the manner she expects and demands. This proposed legislation will accomplish this purpose.

Thank you for your kind attention. I regret that the remarks were long. My colleagues and I would be very happy to respond to any questions you have.

The Department of Agriculture also filed formal reports on H.R. 1314 and H.R. 1321, bills which proposed alternative approaches based in part on a dollar volume test for determining Federal meat inspection jurisdiction. The Secretary of Agriculture conveyed the administration's opposition to these bills and strongly favored the enactment of H.R. 6168, the bill which was superseded by this legislation.

The departmental reports are as follows:

DEPARTMENT OF ALRICUGTURE,
*Washington, D.C., June 26, 1967.*

Hon. W. R. POAGE,
*Chairman, Committee on Agriculture,*
*House of Representatives.*

DEAR MR. CHAIRMAN: This is in reply to your request of March 3, 1967, for a report on H.R. 1314, a bill to extend Federal meat inspection and to permit cooperation with State meat inspection services, and for other purposes.

While the Department favors the objectives of the bill, we believe H.R. 6168, also introduced by Mr. Smith of Iowa, would provide greater consumer protection than would be provided by H.R. 1314.

On February 23, 1967, this Department transmitted to the Congress a draft of a proposed bill cited as the Wholesome Meat Act and recommended its enactment. This proposed bill was recommended by President Johnson in his special consumer message to the Congress on February 16, 1967. It subsequently was introduced by Mr. Smith of Iowa as H.R. 6168. We have worked with State departments of agriculture and industry groups in developing the provisions contained in H.R. 6168 and believe that it would enhance the role of States in meeting their public responsibility for consumer protection. H.R. 6168 would also significantly strengthen present Federal authority under the act by closing several loopholes and by extending Federal jurisdiction to presently unregulated meat handlers. We therefore strongly favor the enactment of H.R. 6168 rather than H.R. 1314.

The Bureau of the Budget advises that there is no objection to the presentation of this report from the standpoint of the administration's program. The Bureau also suggests that the committee may wish to secure the views of the Departments of Justice and Commerce on this bill.

Sincerely yours,

ORVILLE L. FREEMAN, *Secretary.*

FEDERAL MEAT INSPECTION ACT          21

DEPARTMENT OF AGRICULTURE,
*Washington, D.C., June 26, 1967.*

Hon. W. R. POAGE,
*Chairman, Committee on Agriculture,*
*House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in reply to your request of June 7, 1967, for a report on H.R. 1321, a bill to amend the Meat Inspection Act to extend its coverage in certain areas.

While this Department favors the objectives of the bill, we believe H.R. 6168 would provide greater consumer protection than is provided by H.R. 1321. We therefore strongly favor the enactment of H.R. 6168 rather than H.R. 1321.

H.R. 1321 provides for the extension of the Meat Inspection Act to a major consuming area if, following application by an appropriate State or local official or agency, or local meat industry group, and following a public hearing, the Secretary determines that meat or meat food products are handled or consumed in such volume as to affect, burden, or obstruct the movement of inspected meat or meat food products in interstate or foreign commerce and that designation of the area will tend to effectuate the purposes of the act.

On February 23, 1967, this Department transmitted to the Congress a draft of a proposed bill cited as the Wholesome Meat Act and recommended its enactment. This proposed legislation was recommended by President Johnson in his special consumer message to the Congress on February 16, 1967. It subsequently was introduced by Mr. Smith of Iowa as H.R. 6168.

Title III of the Wholesome Meat Act would provide Federal financial and technical assistance to the States to assist them in strengthening State meat inspection programs. We have worked closely with State departments of agriculture and industry groups in developing this proposed legislation and believe that the resulting combination of Federal and State inspection activities would provide greater consumer protection than would be provided by H.R. 1321.

Provisions similar to those in H.R. 1321 are contained in the Poultry Products Inspection Act. To date, these provisions have not been used to extend the coverage of that act. Based on this experience, we conclude that the use of the proposed provisions in the Meat Inspection Act also would be limited and the enactment of such provisions would not result in substantial additional costs in the administration of the inspection program.

The Bureau of the Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program. The Bureau also suggests that the Committee may wish to secure the views of the Departments of Justice and Commerce on this bill.

Sincerely yours,

ORVILLE L. FREEMAN.

22                    FEDERAL MEAT INSPECTION ACT

SECTION-BY-SECTION ANALYSIS

SECTION 1

Present legislation authorizing Federal meat inspection primarily consists of provisions in the Department of Agriculture Appropriation Act of March 4, 1907, as amended. This section first provides that H.R. 12144 may be cited as the "Wholesome Meat Act." This section would also designate the provisions of the act of March 4, 1907 as the "Federal Meat Inspection Act"; designate the first 20 paragraphs thereof respectively, as sections 3 through 22, and the 21st and 22d paragraphs thereof as section 23; and designate sections 3 through 23 as "Title I—Inspection Requirements: Adulteration and Misbranding."

SECTION 2

This section would add new sections 1 and 2 to title I of the "Federal Meat Inspection Act." New section 1 contains definitions of numerous terms used in the act: Paragraphs (a) and (b) define "Secretary" and "firm," respectively. Paragraphs (c), (d), and (e), respectively, define the terms "meat broker," "renderer," and "animal food manufacturer," used primarily in title II of the bill.

Paragraphs (f) through (i) would define "commerce" and other terms delineating the territorial applicability of the act and would extend it to the unorganized unincorporated possessions of the United States. The term "commerce" would not include commerce conducted wholly within the confines of a single State.

The definition of meat food product is in paragraph (j) and is in accord with long continued practice in administration of the act. It clarifies the authority of the Secretary of Agriculture to except articles from the definition and to impose conditions upon such exceptions. Paragraph (k) defines the term "capable of use as human food." Paragraph (l) would provide a definition of the term "prepared" which would determine the kind of establishments required to be inspected or exempted under the act.

Paragraphs (m) and (n) would define "adulterated" and "misbranded" in a manner almost identical to the definitions of the terms in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.). The specific reference to margarine contained in subparagraph (9) of paragraph (m) is not intended to require the Secretary to single out margarine for regulatory treatment different from that to be accorded any other food product using animal fat. Also the Secretary could prohibit the use in articles subject to the act of substances otherwise permitted by the definition of "adulterated"; and articles not bearing marks of inspection or other information when required by regulations of the Secretary would be deemed to be misbranded. Paragraphs (o) through (r) contain definitions of "label," "labeling," and other terms necessary to coordinate the act with the Federal Food, Drug, and Cosmetic Act. Paragraphs (s) through (u) define "official mark," "official inspection legend," and "official certificate."

New section 2 contains the legislative finding of the propriety of regulation and cooperation as provided in the bill to prevent and eliminate burdens on interstate and foreign commerce. This section supports the provisions of the bill which affect intrastate commerce.

FEDERAL MEAT INSPECTION ACT               **23**

### SECTION 3

This section would make a nonsubstantive drafting change by deleting "interstate or foreign" before "commerce" in sections 3 through 23 of title I of the Federal Meat Inspection Act, in view of the definition of "commerce" in section 1 of this bill. It also would make ante mortem inspection mandatory and change the reference to "Secretary of Agriculture" throughout title I of the act to "Secretary," in view of the definition of "Secretary" in section 1 of this bill.

### SECTION 4

This section would delete limiting language to make it clear that the post mortem inspection provisions of the act apply more broadly to articles "capable of use as human food" rather than merely to those intended for such use.

### SECTION 5

This section would clarify the authority of the Secretary of Agriculture to restrict entry of carcasses, parts thereof, meat, and meat food products into establishments that are federally inspected under title I, to federally inspected articles moved directly from other federally inspected establishments or from other locations under conditions necessary to assure that the articles were federally inspected and are otherwise in compliance with the act. Authority to regulate the entry of other materials would also be clarified.

### SECTION 6

The section would clarify the authority of the Secretary of Agriculture to regulate the marking, labeling, and packaging of articles specified in the bill, to prevent the use of false, deceptive or misleading marks, labels, or containers. This section also provides for judicial review of disapproval of marks, labels, and containers comparable to that contained in the Poultry Products Inspection Act (21 U.S.C. 457) which is similar to many of the provisions in this section of the bill. The authority with respect to packaging of articles covered by the bill is comparable to that provided with respect to other articles by the Fair Packaging and Labeling Act (Public Law 89–755).

### SECTION 7

This section would strengthen the principal prohibitory section of the act by—

(a) specifically prohibiting the slaughtering of animals or preparation of articles, specified in the bill, for commerce, except in compliance with the act;

(b) prohibiting sale, transportation, and other specified transactions, in commerce, with respect to meat and the other specified articles capable of use as human food if they are adultered or misbranded or have not been inspected and passed as required by title I. (The present act contains similar prohibitions on distribution in interstate or foreign commerce of noninspected articles which would be repealed.)

24                    FEDERAL MEAT INSPECTION ACT

(c) prohibiting the doing of acts with respect to such articles while they are being transported in commerce or held for sale after such transportation, which is intended to cause or has the effect of causing such articles to be adulterated or misbranded. (The adulteration and misbranding provisions in this section of the bill are comparable to provisions in section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 331(1)).

SECTION 8

This section of the bill would—

(a) clarify the application to brand manufacturers and printers, of a prohibition now in the act (21 U.S.C. 79) against counterfeiting official marks, labels or certificates;

(b) clarify the provisions of the act (21 U.S.C. 79) with respect to forgery, unauthorized use or failure to use official marks, or similar items, and similar offenses;

(c) add a restriction upon possession of official devices, or devices, labels, meat, or other articles bearing counterfeit official marks, counterfeit official certificates, or similar items, and add a prohibition against knowingly making any false representation that any article has been inspected and passed, or exempted, under the act. (These provisions are similar to the provisions in section 203(h) of the Agricultural Marketing Act of 1946, as amended (7 U.S.C. 1622(h)); and

(d) clarify prohibitions with respect to false statements in official or nonofficial certificates.

SECTION 9

This section would delete the present restriction (21 U.S.C. 87) on outstate sale or distribution of meat, etc., by meat processors, to be covered by section 7 of the bill. This section also would add requirements for identifying equine meat in commerce (similar to the present ones for horse meat, etc., in the Horse Meat Act (21 U.S.C. 96) to be repealed by sec. 18 of the bill); and add provisions clarifying the authority to require slaughter and preparation of equines separate from cattle, sheep, swine, or goats at establishments conducting such operations (for commerce) under inspection required by title I.

SECTION 10

This section would delete the present penalty section of the act (21 U.S.C. 88, which is replaced by sec. 406 of the act, as added by sec. 16 of the bill), and substitute a prohibition against imports of carcasses, parts thereof, meats, or meat food products, that are capable of use as human food and are adulterated, misbranded, or not in compliance with all the inspection, building construction standards, and all other provisions of the act and regulations issued thereunder applicable to such articles in commerce within the United States. This section also includes provisions for destruction of articles imported contrary to the act and other matters now covered by the import meat provisions of section 306 of the Tariff Act of 1930 (19 U.S.C. 1306). This section would also limit the import meat provisions of the bill to cattle, sheep, swine, goats, and equines, instead of "meat of

FEDERAL MEAT INSPECTION ACT                    25

any kind," and would expressly cover carcasses, parts thereof, and meat food products of such animals. The provisions of this section would not apply to any individual who purchases 50 pounds (or less) of wholesome meat or meat products outside the United States for his own consumption. Section 18 of the bill would repeal the import meat provisions presently found in 19 U.S.C. 1306.

### SECTION 11

This section would delete the present farmer and retailer exemption-from-inspection provisions and substitute restricted exemption provisions.

### SECTION 12

This section would substitute "adulteration" terminology for present terms (e.g. "unsound, unhealthful, unwholesome, or otherwise unfit for human food"), add reference to equines throughout the act, and delete obsolete descriptions of articles subject to the act.

### SECTION 13

Section 13 of the bill would add new section 24 to the act authorizing the Secretary to issue regulations prescribing the conditions under which carcasses, parts thereof, meat, and meat food products capable of use as human food, shall be stored or otherwise handled by persons engaged in the business of buying, selling, freezing, storing, or transporting, in or for commerce, or importing, such articles. Exception is made for certain retail stores and other establishments engaged in business in commerce if they are adequately regulated under the laws of the State, territory or District of Columbia in which they are located.

### SECTION 14

This section would add a new "Title II—Meat Processors and Related Industries" consisting of five new sections as follows:

Section 201 would (1) prohibit inspection under title I of the Federal Meat Inspection Act with respect to the slaughter of animals or the preparation of meat carcasses, parts or products not intended for use as human food and (2) require such articles to be denatured or otherwise identified as required by regulations of the Secretary prior to their purchase or distribution or offer for distribution in commerce or importation.

Section 202 would require keeping of records fully and correctly disclosing all business transactions by—

(1) Persons engaged (for commerce) in the business of slaughtering cattle, sheep, swine, goats, or equines, or preparing, freezing, packaging, or labeling meat carcasses, parts or products of such animals for use as human food or animal food;

(2) Persons engaged in the business of buying or selling in any capacity, transporting, or storing, in or for commerce, or importing any meat carcasses, parts or products of any such animals; and

(3) Persons engaged in business, in or for commerce, as renderers, or in the business of buying, selling, or transporting in commerce, or importing any dead, dying, disabled, or diseased cattle, sheep, swine, goats, or equines (i.e. "4–D animals") or parts of the carcasses of any such animals that died otherwise than by slaughter (e.g. from natural causes).

Section 202 also would require such operators to give representatives of the Secretary, under reasonable terms and conditions, access to their places of business, and opportunity to examine records, facilities, and inventories and to take samples of their inventories upon payment therefor.

Section 203 would authorize the Secretary to require registration of persons engaged in business, in or for commerce, as meat brokers, renderers, animal food manufacturers, wholesalers, or public warehousemen of meat, et cetera, and persons engaged in the business of buying, selling, or transporting, in commerce, or importing, any 4–D animals, or parts of the carcasses of such animals that died otherwise than by slaughter.

Section 204 would prohibit 4–D animal or carcass handlers from buying, selling, or transporting in commerce or importing, any 4–D animals, or parts of carcasses of such animals that died otherwise than by slaughter, unless such transactions are made in accordance with the Secretary's regulations.

Section 205 would provide that the authority conferred on the Secretary by sections 202, 203, and 204 with respect to persons engaged in the specified kinds of business in or for commerce, may be exercised by him with respect to persons engaged in such business but not in or for commerce, and with respect to their transactions, when he determines, after consultation with an appropriate advisory committee provided for in section 301 of the act that the State, territory, or District of Columbia involved does not have or is not adequately exercising comparable authority.

### SECTION 15

This section adds a new "Title III—Federal and State Cooperation," consisting of new section 301 which (1) provides for cooperation with appropriate State agencies in developing and administering a State meat inspection program in any "State" (as defined to mean any State, Puerto Rico, any territory or the District of Columbia) which has enacted a meat inspection law imposing mandatory inspection and sanitation requirements for intrastate operators, consistent with the Federal requirements under title I of the bill; (2) provides for cooperation with appropriate State agencies in developing and administering State programs under State laws containing authorities comparable to those provided in title II of the act; and (3) provides for cooperation with other Federal agencies in carrying out any provisions of the Federal Meat Inspection Act. The cooperation with States may include planning assistance in developing the program, technical, and laboratory assistance and training, and Federal financing up to 50 percent of the total cost of the cooperative program. Section 301 also would authorize the Secretary to appoint advisory committees of State personnel to consult with the Secretary on meat inspection and other programs within the scope of the bill. The term "appropriate State agency" is also defined and may include a municipality or other

FEDERAL MEAT INSPECTION ACT **27**

subordinate governmental unit when so designated by State law or policy.

SECTION 16

This section adds a new "Title IV—Auxiliary Provisions" consisting of 10 sections, as follows:

Section 401 would authorize refusal of meat inspection service under title I for any establishment if the applicant for, or recipient of, the service is determined, in a formal administrative proceeding, to be unfit to engage in a business requiring inspection under title I because he, or anyone responsibly connected with him, has been convicted in any Federal or State court of any felony, or of more than one violation of any law, other than a felony, based upon acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively packaged food or upon fraud in connection with transactions in food. Provision would be made for judicial review of orders in such proceedings.

Section 402 would authorize administrative detention of meat and other articles and 4–D animals if found on any premises where held for purposes of, or during or after, distribution in commerce or otherwise subject to title I or II of the act and there is reason to believe that they are adulterated or misbranded and capable of use as human food, or that they have not been inspected, in violation of Federal or other laws or have been or are intended to be distributed in violation of such laws.

Section 403 would authorize judicial proceedings for seizure and condemnation of meat and other articles and 4–D animals being transported in commerce or otherwise subject to title I or II of the act, or held for sale after such transportation, if they are or have been prepared or distributed or offered or received for distribution in violation of the act, or are capable of use as human food and are adulterated or misbranded, or are otherwise in violation of the act.

Section 404 would give specified courts jurisdiction of actions to enjoin violations of the act, and certain other cases under the act.

Section 405 would prohibit forcible assaults upon or other offenses against any person engaged in or because of the performance of his duties under the act. This provision parallels the provisions in 18 U.S.C. 1111 and 1114 which formerly applied to meat inspectors as employees of the Bureau of Animal Industry, but ceased to be applicable when the Bureau was abolished.

Section 406 would change the penalty for most violations of the act to a misdemeanor from a felony; it would facilitate prosecution; and it would authorize disposal of minor violations by warning letter.

Section 407 incorporates, by reference, provisions (including penalties) of the Federal Trade Commission Act and the Communications Act of 1934, as amended, authorizing requirement of reports, authorizing administrative subpenas, and conferring other investigative and hearing powers.

Section 408 would exclude States, territories, and the District of Columbia from regulating operations at plants inspected under title I or from imposing marking, labeling, packaging, or ingredient requirements in addition to or different than those under

se 1:23-cv-11671-WGY  Document 127-1  Filed 03/06/24  Page 46 of

28                    FEDERAL MEAT INSPECTION ACT

the Federal Meat Inspection Act for articles prepared under inspection in accordance with title I of the act, but would permit them to impose recordkeeping and related requirements with respect to such plants if consistent with the Federal requirements and to impose requirements consistent with the Federal provisions as to other matters regulated under the act.

Section 409 would coordinate the Federal Meat Inspection Act with the Federal Food, Drug, and Cosmetic Act by providing that the provisions of the former shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to enactment of the bill. The bill also would extend the detention authority of section 402 to representatives of the Secretary of Health, Education, and Welfare for purposes of enforcement of the latter act with respect to carcasses, parts thereof, meat, or meat food products.

Section 410 would authorize appropriations to carry out the provisions of the act.

### SECTION 17

This section would require annual reports to the Congress by the Secretary on the operations and effectiveness of this act.

### SECTION 18

This section of the bill would repeal the Horse Meat Act and the import meat provisions of the Tariff Act of 1930, in view of provisions elsewhere in the bill.

### SECTION 19

This section of the bill contains the usual "savings" provision in case of partial constitutional invalidity of the bill.

### SECTION 20

Section 20 of the bill contains effective date provisions making the bill effective upon enactment, except that the provisions relating to adulteration and misbranding in section 7 of the bill, and the import provisions in section 10 and related repeal provisions in section 18[1] of the bill, would become effective upon the expiration of 60 days after enactment; and the provisions of title I relating to equines other than horses and the title II restriction on distribution of 4–D animals (added by section 14 of the bill) would also become effective upon the expiration of 60 days after enactment. The amendment, made by section 11 of the bill, of the present provisions for exemptions for farm-slaughtered meat and meat food products and retail butchers and dealers would likewise become effective after such 60-day period.

### CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

[1] Section 20(a) of H.R. 12144 as reported to the House contains the incorrect internal reference to sec. 17 of the bill. The correct internal reference should be to sec. 18 of the bill.

FEDERAL MEAT INSPECTION ACT            **29**

## *Federal Meat Inspection Act* [1]

## *TITLE I—INSPECTION REQUIREMENTS; ADULTERATION AND MISBRANDING*

SECTION 1. *As used in this Act, except as otherwise specified, the following terms shall have the meanings stated below:*

(a) *The term "Secretary" means the Secretary of Agriculture of the United States or his delegate.*

(b) *The term "firm" means any partnership, association, or other unincorporated business organization.*

(c) *The term "meat broker" means any person, firm, or corporation engaged in the business of buying or selling carcasses, parts of carcasses, meat, or meat food products of cattle, sheep, swine, goats, horses, mules, or other equines on commission or otherwise negotiating purchases or sales of such articles other than for his own account or as an employee of another person, firm, or corporation.*

(d) *The term "renderer" means any person, firm, or corporation engaged in the business of rendering carcasses, or parts or products of the carcasses, of cattle, sheep, swine, goats, horses, mules, or other equines, except rendering conducted under inspection or exemption under title I of this Act.*

(e) *The term "animal food manufacturer" means any person, firm, or corporation engaged in the business of manufacturing or processing animal food derived wholly or in part from carcasses, or parts or products of the carcasses, of cattle, sheep, swine, goats, horses, mules, or other equines.*

(f) *The term "State" means any State of the United States and the Commonwealth of Puerto Rico.*

(g) *The term "Territory" means Guam, the Virgin Islands of the United States, American Samoa, and any other territory or possession of the United States, excluding the Canal Zone.*

(h) *The term "commerce" means commerce between any State, any Territory, or the District of Columbia, and any place outside thereof; or within any Territory not organized with a legislative body, or the District of Columbia.*

(i) *The term "United States" means the States, the District of Columbia, and the Territories of the United States.*

(j) *The term "meat food product" means any product capable of use as human food which is made wholly or in part from any meat or other portion of the carcass of any cattle, sheep, swine, or goats, excepting products which contain meat or other portions of such carcasses only in a relatively small proportion or historically have not been considered by consumers as products of the meat food industry, and which are exempted from definition as a meat food product by the Secretary under such conditions as he may prescribe to assure that the meat or other portions of such carcasses contained in such product are not adulterated and that such products are not represented as meat food products. This term as applied to food products of equines shall have a meaning comparable to that provided in this paragraph with respect to cattle, sheep, swine, and goats.*

(k) *The term "capable of use as human food" shall apply to any carcass, or part or product of a carcass, of any animal, unless it is denatured or otherwise identified as required by regulations prescribed by*

---

[1] For effective dates, see footnote at end of "Changes in Existing Law" section, post.

**30**                    FEDERAL MEAT INSPECTION ACT

the Secretary to deter its use as human food, or it is naturally inedible by humans.

(*l*) The term "*prepared*" means slaughtered, canned, salted, rendered, boned, cut up, or otherwise manufactured or processed.

(*m*) The term "*adulterated*" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

(2)(A) if it bears or contains (by reason of administration of any substance to the live animal or otherwise) any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on a raw agricultural commodity; (ii) a food additive; or (iii) a color additive) which may, in the judgment of the Secretary, make such article unfit for human food;

(B) if it is, in whole or in part, a raw agricultural commodity and such commodity bears or contains a pesticide chemical which is unsafe within the meaning of section 408 of the Federal Food, Drug, and Cosmetic Act,

(C) if it bears or contains any food additive which is unsafe within the meaning of section 409 of the Federal Food, Drug, and Cosmetic Act,

(D) if it bears or contains any color additive which is unsafe within the meaning of section 706 of the Federal Food, Drug, and Cosmetic Act: Provided, That an article which is not adulterated under clause (B), (C), or (D) shall nevertheless be deemed adulterated if use of the pesticide, chemical, food additive, or color additive in or on such article is prohibited by regulations of the Secretary in establishments at which inspection is maintained under title I of this Act;

(3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food;

(4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health;

(5) if it is, in whole or in part, the product of an animal which has died otherwise than by slaughter;

(6) if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health;

(7) if it has been intentionally subjected to radiation, unless the use of the radiation was in conformity with a regulation or exemption in effect pursuant to section 409 of the Federal Food, Drug, and Cosmetic Act;

(8) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor; or if damage or inferiority has been concealed in any manner; or if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is; or

(9) *if it is margarine containing animal fat and any of the raw material used therein consisted in whole or in part of any filthy, putrid, or decomposed substance.*

(n) *The term "misbranded" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:*

(1) *if its labeling is false or misleading in any particular;*

(2) *if it is offered for sale under the name of another food;*

(3) *if it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and immediately thereafter, the name of the food imitated;*

(4) *if its container is so made, formed or filled as to be misleading;*

(5) *if in a package or other container unless it bears a label showing (A) the name and place of business of the manufacturer, packer, or distributor; and (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: Provided, That under clause (B) of this subparagraph (5), reasonable variations may be permitted, and exemptions as to small packages may be established, by regulations prescribed by the Secretary;*

(6) *if any word, statement, or other information required by or under authority of this Act to appear on the label or other labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;*

(7) *if it purports to be or is represented as a food for which a definition and standard of identity or composition has been prescribed by regulations of the Secretary under section 7 of this Act unless (A) it conforms to such definition and standard, and (B) its label bears the name of the food specified in the definition and standard and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food;*

(8) *if it purports to be or is represented as a food for which a standard or standards of fill of container have been prescribed by regulations of the Secretary under section 7 of this Act, and it falls below the standard of fill of container applicable thereto, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard;*

(9) *if it is not subject to the provisions of subparagraph (7), unless its label bears (A) the common or usual name of the food, if any there be, and (B) in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient; except that spices, flavorings, and colorings may, when authorized by the Secretary, be designated as spices, flavorings, and colorings without naming each: Provided, That, to the extent that compliance with the requirements of clause (B) of this subparagraph (9) is impracticable, or results in deception or unfair competition, exemptions shall be established by regulations promulgated by the Secretary;*

(10) *if it purports to be or is represented for special dietary uses, unless its label bears such information concerning its vitamin, mineral, and other dietary properties as the Secretary, after consultation with the Secretary of Health, Education, and Welfare, deter-*

**32**                    FEDERAL MEAT INSPECTION ACT

mines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses;

(11) if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: *Provided*, That, to the extent that compliance with the requirements of this subparagraph (11) is impracticable, exemptions shall be established by regulations promulgated by the Secretary; or

(12) if it fails to bear, directly thereon or on its container, as the Secretary may be regulations prescribe, the inspection legend and, unrestricted by any of the foregoing, such other information as the Secretary may require in such regulations to assure that it will not have false or misleading labeling and that the public will be informed of the manner of handling required to maintain the article in a wholesome condition.

(o) the term "label" means a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article.

(p) The term "labeling" means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.

(q) The term "Federal Food, Drug, and Cosmetic Act" means the Act so entitled, approved June 25, 1938 (52 Stat. 1040), and Acts amendatory thereof or supplementary thereto.

(r) Thet erm "pesticide chemical", "food additive", "color additive", and "raw agricultural commodity" shall have the same meanings for purposes of this Act as under the Federal Food, Drug, and Cosmetic Act.

(s) The term "official mark" means the official inspection legend or any other symbol prescribed by regulations of the Secretary to identify the status of any article or animal under this Act.

(t) The term "official inspection legend" means any symbol prescribed by regulations of the Secretary showing that an article was inspected and passed in accordance with this Act.

(u) The term "official certificate" means any certificate prescribed by regulations of the Secretary for issuance by an inspector or other person performing official functions under this Act.

SEC. 2. Meat and meat food products are an important source of the Nation's total supply of food. They are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce. It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in sundry losses to livestock producers and processors of meat and meat food products, as well as injury to consumers. The unwholesome, adulterated, mislabeled, or deceptively packaged articles can be sold at lower prices and compete unfairly with the wholesome, not adulterated, and properly labeled and packaged articles, to the detriment of consumers and the public generally. It is hereby found that all articles and animals which are regulated under this Act are either in interstate or foreign commerce or substantially affect such commerce, and that regulation by the Secretary and cooperation

*by the States and other jurisdictions as contemplated by this Act are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers.*

SECTION 3. That hereafter, for the purpose of preventing the use in [interstate or foreign] commerce, as hereinafter provided, of meat and meat food products which are [unsound, unhealthful, unwholesome, or otherwise unfit for human food] *adulterated*, [the Secretary of Agriculture, at his discretion, may] *the Secretary shall* cause to be made, by inspectors appointed for that purpose, an examination and inspection of all [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in [interstate or foreign] commerce; and all [cattle, swine, sheep, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other [cattle, sheep, swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines*, and when so slaughtered, the carcasses of said [cattle, sheep, swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines* shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary [of Agriculture] as herein provided for.

*SEC. 4.* That for the purposes hereinbefore set forth the Secretary [of Agriculture] shall cause to be made by inspectors appointed for that purpose, as hereinafter provided, a post-mortem examination and inspection of the carcasses and parts thereof of all [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* to be prepared [for human consumption] at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment in any State, Territory, or the District of Columbia [for transportation or sale] as articles of [interstate or foreign] commerce *which are capable of use as human food;* and the carcasses and parts thereof of all such animals found to be [sound, healthful, wholesome, and fit for human food] *not adulterated* shall be marked, stamped, tagged, or labeled as "Inspected and Passed;" and said inspectors shall label, mark, stamp, or tag as "Inspected and Condemned," all carcasses and parts thereof of animals found to be [unsound, unhealthful, unwholesome, or otherwise unfit for human food] *adulterated;* and all carcasses and parts thereof thus inspected and condemned shall be destroyed for food purposes by the said establishment in the presence of an inspector, and the Secretary [of Agriculture] may remove inspectors from any such establishment which fails to so destroy any such condemned carcass or part thereof, and said inspectors, after said first inspection shall, when they deem it necessary, reinspect said carcasses or parts thereof to determine whether since the first inspection the same have become [unsound, unhealthful, unwholesome, or in any way unfit for human food] *adulterated* and if any carcass or any part thereof shall, upon examination and inspection subsequent to the first examination and inspection, be found to be [unsound, unhealthful, unwholesome, or otherwise unfit for human food] *adulterated*, it shall be destroyed for food purposes by the said establishment in the presence of an inspector, and the Secretary [of

34          FEDERAL MEAT INSPECTION ACT

Agriculture] may remove inspectors from any establishment which fails to so destroy any such condemned carcass or part thereof.

*SEC. 5.* The foregoing provisions shall apply to all carcasses or parts of carcasses of [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* or the meat or meat products thereof which may be brought into any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, and such examination and inspection shall be had before the said carcasses or parts thereof shall be allowed to enter into any department wherein the same are to be treated and prepared for meat food products; and the foregoing provisions shall also apply to all such products which, after having been issued from any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, shall be returned to the same or to any similar establishment where such inspection is maintained. *The Secretary may limit the entry of carcasses, parts of carcasses, meat and meat food products, and other materials into any establishment at which inspection under this title is maintained, under such conditions as he may prescribe to assure that allowing the entry of such articles into such inspected establishments will be consistent with the purposes of this Act.*

*SEC. 6.* That for the purposes hereinbefore set forth the Secretary [of Agriculture] shall cause to be made by inspectors appointed for that purpose an examination and inspection of all meat food products prepared for [interstate or foreign] commerce in any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, and for the purposes of any examination and inspection said inspectors shall have access at all times, by day or night, whether the establishment be operated or not, to every part of said establishment; and said inspectors shall mark, stamp, tag, or label as "Inspected and passed" all such products found to be [sound, healthful, and wholesome and, which contain no dyes, chemicals, preservatives, or ingredients which render such meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food], *not adulterated;* and said inspectors shall label, mark, stamp, or tag as "Inspected and condemned" all such products found [unsound, unhealthful, and unwholesome, or which contain dyes, chemicals, preservatives, or ingredients which render such meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food] *adulterated,* and all such condemned meat food products shall be destroyed for food purposes, as hereinbefore provided, and the Secretary [of Agriculture] may remove inspectors from any establishment which fails to so destroy such condemned meat food products: *Provided,* That, subject to the rules and regulations of the Secretary [of Agriculture], the provisions hereof in regard to preservatives shall not apply to meat food products for export to any foreign country and which are prepared or packed according to the specifications or directions of the foreign purchaser, when no substance is used in the preparation or packing thereof in conflict with the laws of the foreign country to which said article is to be exported; but if said article shall be in fact sold or offered for sale for domestic use or consumption, then this proviso shall not exempt said article from the operation of all the other provisions of this Act.

*Sec. 7. (a)* That when any meat or meat food product prepared for [interstate or foreign] commerce which has been inspected as hereinbefore provided and marked "Inspected and passed" shall be placed

or packed in any can, pot, tin, canvas, or other receptacle or covering in any establishment where inspection under the provisions of this Act is maintained, the person, firm, or corporation preparing said product shall cause a label to be attached to said can, pot, tin, canvas, or other receptacle or covering, under the supervision of an inspector, which label shall state that the contents thereof have been "Inspected and Passed" under the provisions of this Act, and no inspection and examination of meat or meat food products deposited or inclosed in cans, tins, pots, canvas, or other receptacle or covering in any establishment where inspection under the provisions of this Act is maintained shall be deemed to be complete until such meat or meat food products have been sealed or inclosed in said can, tin, pot, canvas, or other receptacle or covering under the supervision of an inspector [, and no such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted].

(b) *All carcasses, parts of carcasses, meat and meat food products inspected at any establishment under the authority of this title and found to be not adulterated, shall at the time they leave the establishment bear, in distinctly legible form, directly thereon or on their containers, as the Secretary may require, the information required under paragraph (n) of section 1 of this Act.*

(c) *The Secretary, whenever he determines such action is necessary for the protection of the public, may prescribe (1) the styles and sizes of type to be used with respect to material required to be incorporated in labeling to avoid false or misleading labeling in marking and labeling any articles or animals subject to this title or title II of this Act; and (2) definitions and standards of identity or composition for articles subject to this title and standards of fill of container for such articles not inconsistent with any such standards established under the Federal Food, Drug, and Cosmetic Act, and there shall be consultation between the Secretary and the Secretary of Health, Education, and Welfare prior to the issuance of such standards under either Act relating to articles subject to this Act to avoid inconsistency in such standards and possible impairment of the coordinated effective administration of these Acts. There shall also be consultation between the Secretary and an appropriate advisory committee provided for in section 301 of this Act, prior to the issuance of such standards under this Act, to avoid, insofar as feasible, inconsistency between Federal and State standards.*

(d) *No article subject to this title shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.*

(e) *If the Secretary has reason to believe that any marking or labeling or the size or form of any container in use or proposed for use with respect to any article subject to this title is false or misleading in any particular, he may direct that such use be withheld unless the marking, labeling, or or container is modified in such manner as he may prescribe so that it will not be false or misleading. If the person, firm, or corporation using or*

**36**       FEDERAL MEAT INSPECTION ACT

*proposing to use the marking, labeling or container does not accept the determination of the Secretary, such person, firm, or corporation may request a hearing, but the use of the marking, labeling, or container shall, if the Secretary so directs, be withheld pending hearing and final determination by the Secretary. Any such determination by the Secretary shall be conclusive unless, within thirty days after receipt of notice of such final determination, the person, firm, or corporation adversely affected thereby appeals to the United States court of appeals for the circuit in which such person, firm, or corporation has its principal place of business or to the United States Court of Appeals for the District of Columbia Circuit. The provisions of section 204 of the Packers and Stockyards Act, 1921 (42 Stat. 162, as amended; 7 U.S.C. 194), shall be applicable to appeals taken under this section.*

SEC. 8. The Secretary [of Agriculture] shall cause to be made, by experts in sanitation or by other competent inspectors, such inspection of all slaughtering, meat-canning, salting, packing, rendering, or similar establishments in which [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* are slaughtered and the meat and meat food products thereof are prepared for [interstate or foreign] commerce as may be necessary to inform himself concerning the sanitary conditions of the same, and to prescribe the rules and regulations of sanitation under which such establishments shall be maintained; and where the sanitary conditions of any such establishment are such that the meat or meat food products are rendered [unclean, unsound, unhealthful, unwholesome, or otherwise unfit for human food] *adulterated,* he shall refuse to allow said meat or meat food products to be labeled, marked, stamped, or tagged as "inspected and passed."

SEC. 9. That the Secretary [of Agriculture] shall cause an examination and inspection of all [cattle, sheep, swine, and goats], *cattle, sheep, swine, goats, horses, mules, and other equines,* and the food products thereof, slaughtered and prepared in the establishments hereinbefore described for the purposes of [interstate or foreign] commerce to be made during the nighttime as well as during the daytime when the slaughtering of said [cattle, sheep, swine, and goats], *cattle, sheep, swine, goats, horses, mules, and other equines,* or the preparation of said food products is conducted during the nighttime.

SEC. 10. [That on and after October first, nineteen hundred and six, no person, firm, or corporation shall transport or offer for transportation, and no carrier of interstate or foreign commerce shall transport or receive for transportation from one State or Territory or the District of Columbia to any other State or Territory or the District of Columbia, or to any place under the jurisdiction of the United States, or to any foreign country, any carcasses or parts thereof, meat, or meat food products thereof which have not been inspected, examined, and marked as "Inspected and Passed," in accordance with the terms of this Act and with the rules and regulations prescribed by the Secretary of Agriculture: *Provided,* That all meat and meat food products on hand on October first, nineteen hundred and six, at establishments where inspection has not been maintained, or which have been inspected under existing law, shall be examined and labeled under such rules and regulations as the Secretary of Agriculture shall prescribe, and then shall be allowed to be sold in interstate or foreign commerce.] *No person, firm, or corporation shall, with respect to any cattle, sheep,*

FEDERAL MEAT INSPECTION ACT **37**

*swine, goats, horses, mules, or other equines, or any carcasses, parts of
carcasses, meat or meat food products of any such animals—*

    *(a) slaughter any such animals or prepare any such articles
which are capable of use as human food, at any establishment pre-
paring any such articles for commerce, except in compliance with
the requirements of this Act;*

    *(b) sell, transport, offer for sale or transportation, or receive
for transportation, in commerce, (1) any such articles which (A)
are capable of use as human food, and (B) are adulterated or mis-
branded at the time of such sale, transportation, offer for sale or
transportation, or receipt for transportation; or (2) any articles
required to be inspected under this title unless they have been so
inspected and passed;*

    *(c) do, with respect to any such articles which are capable of use
as human food, and act while they are being transported in com-
merce or held for sale after such transportation, which is intended
to cause or has the effect of causing such articles to be adulterated
or misbranded.*

SEC. 11. 〔That no person, firm, or corporation, or officer, agent, or
employee thereof, shall forge, counterfeit, simulate, or falsely represent,
or shall without proper authority use, fail to use, or detach, or shall
knowingly or wrongfully alter, deface, or destroy, or fail to deface or
destroy, any of the marks, stamps, tags, labels, or other identification
devises provided for in this Act, or in and as directed by the rules and
regulations prescribed hereunder by the Secretary of Agriculture, on
any carcasses, parts of carcasses, or the food product, or containers
thereof, subject to the provisions of this Act, or any certificates in
relation thereto, authorized or required by this Act or by the said
rules and regulations of the Secretary of Agriculture〕 *(a) No brand
manufacturer, printer, or other person, firm, or corporation shall cast,
print, lithograph, or otherwise make any device containing any official
mark or simulation thereof, or any label bearing any such mark or simu-
lation, or any form of official certificate or simulation thereof, except as
authorized by the Secretary.*

  *(b) No person, firm, or corporation shall—*

    *(1) forge any official device, mark, or certificate;*

    *(2) without authorization from the Secretary use any official
device, mark, or certificate, or simulation thereof, or alter, detach,
deface, or destroy any official device, mark, or certificate;*

    *(3) contrary to the regulations prescribed by the Secretary fail to
use, or to detach, deface, or destroy any official device, mark, or
certificate;*

    *(4) knowingly possess, without promptly notifying the Secretary
or his representative, any official device or any counterfeit, simulated,
forged, or improperly altered official certificate or any device or label
or any carcass of any animal, or part or product thereof, bearing any
counterfeit, simulated, forged, or improperly altered official mark;*

    *(5) knowingly make any false statement in any shipper's certifi-
cate or other nonofficial or official certificate provided for in the
regulations prescribed by the Secretary; or*

    *(6) knowingly represent that any article has been inspected and
passed, or exempted, under this Act when, in fact, it has, respectively,
not been so inspected and passed, or exempted.*

*Sec. 12.* That the Secretary [of Agriculture] shall cause to be made a careful inspection of all [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* intended and offered for export to foreign countries at such times and places, and in such manner as he may deem proper, to ascertain whether such [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules and other equines* are free from disease.

*Sec. 13.* And for this purpose he may appoint inspectors who shall be authorized to give an official certificate clearly stating the condition in which such [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules and other equines* are found.

*Sec. 14.* And no clearance shall be given to any vessel having on board [cattle, sheep swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines* for export to a foreign country until the owner or shipper of such [cattle, sheep, swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines* has a certificate from the inspector herein authorized to be appointed, stating that the said [cattle, sheep, swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines* are sound and healthy, or unless the Secretary [of Agriculture] shall have waived the requirements of such certificate for export to the particular country to which such [cattle, sheep, swine, or goats] *cattle, sheep, swine, goats, horses, mules, or other equines* are to be exported.

*Sec. 15.* That the Secretary [of Agriculture] shall also cause to be made a careful inspection of the carcasses and parts thereof of all [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines*, the meat of which, fresh, salted, canned, corned, packed, cured, or otherwise prepared, is intended and offered for export to any foreign country, at such times and places and in such manner as he may deem proper.

*Sec. 16.* And for this purpose he may appoint inspectors who shall be authorized to give an official certificate stating the condition in which said [cattle, sheep, swine, or goats], *cattle, sheep swine, goats, horses, mules, or other equines*, and the meat thereof, are found.

*Sec. 17.* And no clearance shall be given to any vessel having on board any fresh, salted, canned, corned, or packed beef, mutton, pork, [or goat meat, being the meat of animals killed after the passage of this Act, or except as hereinbefore provided] *goat or equine meat* for export to and sale in a foreign country from any port in the United States, until the owner or shipper thereof shall obtain from an inspector appointed under the provisions of this Act a certificate that the said [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* were sound and healthy at the time of inspection, and that their meat is sound and wholesome unless the Secretary [or Agriculture] shall have waived the requirements of such certificate for the country to which said [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* or meats are to be exported.

*Sec. 18.* That the inspectors provided for herein shall be authorized to give official certificates of the [sound and wholesome] conditions of the [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines*, their carcasses and products as herein described, and one copy of every certificate granted under the provisions of this Act shall be filed in the Department [of Agriculture], another copy shall be delivered to the owner or shipper, and when the [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats,*

FEDERAL MEAT INSPECTION ACT                    **39**

*horses, mules, and other equines* or their carcasses and products are sent abroad, a third copy shall be delivered to the chief officer of the vessel on which the shipment shall be made.

*Sec. 19.* ⟦That no person, firm, or corporation engaged in the interstate commerce of meat or meat food products shall transport or offer for transportation, sell or offer to sell any such meat or meat food products in any State or Territory or in the District of Columbia or any place under the jurisdiction of the United States, other than in the State or Territory or in the District of Columbia or any place under the jurisdiction of the United States in which the slaughtering, packing, canning, rendering, or other similar establishment owned, leased, operated by said firm, person, or corporation is located unless and until said person, firm, or corporation shall have complied with all of the provisions of this Act.⟧ *No person, firm, or corporation shall sell, transport, offer for sale or transportation, or receive for transportation, in commerce, any carcasses of horses, mules, or other equines or parts of such carcasses, or the meat or meat food products thereof, unless they are plainly and conspicuously marked or labeled or otherwise identified as required by regulations prescribed by the Secretary to show the kinds of animals from which they were derived. When required by the Secretary, with respect to establishment at which inspection is maintained under this title, such animals and their carcasses, parts thereof, meat and meat food products shall be prepared in establishments separate from those in which cattle, sheep, swine, or goats are slaughtered or their carcasses, parts therof, meat or meat food products are prepared.*

*Sec. 20.* ⟦That any person, firm, corporation, or any officer or agent of any such person, firm, or corporation, who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor, and shall be punished on conviction thereof by a fine of not exceeding ten thousand dollars or imprisonment for a period of not more than two years, or by both such fine and imprisonment in the discretion of the court.⟧ *(a) No carcasses, parts of carcasses, meat or meat food products of cattle, sheep, swine, goats, horses, mules, or other equines which are capable of use as human food, shall be imported into the United States if such articles are adulterated or misbranded and unless they comply with all the inspection, building construction standards, and all other provisions of this Act and regulations issued thereunder applicable to such articles in commerce within the United States. All such imported articles shall, upon entry into the United States, be deemed and treated as domestic articles subject to the other provisions of this Act and the Federal Food, Drug, and Cosmetic Act: Provided, That they shall be marked and labeled as required by such regulations for imported articles: Provided further, That nothing in this section shall apply to any individual who purchases meat or meat products outside the United States for his own consumption except that the total amount of such meat or meat products shall not exceed fifty pounds.*

*(b) The Secretary may prescribe the terms and conditions for the destruction of all such articles which are imported contrary of all such articles which are imported contrary to this section, unless (1) they are exported by the consignee within the time fixed therefor by the Secretary, or (2) in the case of articles which are not in compliance with the Act solely because of misbranding, such articles are brought into compliance with the Act under supervision of authorized representatives of the Secretary.*

**40**          FEDERAL MEAT INSPECTION ACT

(c) *All charges for storage, cartage, and labor with respect to any article which is imported contrary to this section shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against such article and any other article thereafter imported under this Act by or for such owner or consignee.*

(d) *The knowing importation of any article contrary to this section is prohibited.*

SEC. 21. That the Secretary [of Agriculture] shall appoint from time to time inspectors to make examination and inspection of all [cattle, sheep, swine, and goats] *cattle, sheep, swine, goats, horses, mules, and other equines* the inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, and of the sanitary conditions of all establishments in which such meat and meat food products hereinbefore described are prepared; and said inspectors shall refuse to stamp, mark, tag or label any carcass or any part thereof, or meat food product therefrom, prepared in any establishment hereinbefore mentioned, until the same shall have actually been inspected and found to be [sound, healthful, wholesome, and fit for human food, and to contain no dyes, chemicals, preservatives, or ingredients which render such meat food product unsound, unhealthful, unwholesome or unfit for human food; and to have been prepared under proper sanitary conditions, hereinbefore provided for] *not adulterated*; and shall perform such other duties as are provided by this Act and by the rules and regulations to be prescribed by said Secretary [of Agriculture]; and said Secretary [of Agriculture] shall, from time to time, make such rules and regulations as are necessary for the efficient execution of the provisions of this Act, and all inspections and examinations made under this Act shall be such and made in such manner as described in the rules and regulations prescribed by said Secretary [of Agriculture] not inconsistent with the provisions of this Act.

SEC. 22. That any person, firm, or corporation, or any agent or employee of any person, firm, or corporation, who shall give, pay, or offer, directly or indirectly, to any inspector, deputy inspector, chief inspector, or any other officer or employee of the United States authorized to perform any of the duties prescribed by this Act or by the rules and regulations of the Secretary [of Agriculture] any money or other thing of value, with intent to influence said inspector, deputy inspector, chief inspector, or other officer or employee of the United States in the discharge of any duty herein provided for, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by a fine not less than five thousand dollars nor more than ten thousand dollars and by imprisonment not less than one year nor more than three years; and any inspector, deputy inspector, chief inspector, or other officer or employee of the United States authorized to perform any of the duties prescribed by this Act who shall accept any money, gift, or other thing of value from any person, firm, or corporation, or officers, agents, or employees thereof, given with intent to influence his official action, or who shall receive or accept from any person, firm, or corporation engaged in [interstate or foreign] commerce any gift, money, or other thing of value given with any purpose or intent whatsoever, shall be deemed guilty of a felony and shall, upon conviction thereof, be summarily discharged from office and shall be punished by a fine not less than one thousand dollars nor more than

FEDERAL MEAT INSPECTION ACT                    **41**

ten thousand dollars and by imprisonment not less than one year nor more than three years.

*Sec. 23* ⟦That within the meaning of this Act—

⟦(a) A "farmer" means any person or partnership chiefly engaged in producing agricultural products on whose farm the number of cattle, calves, sheep, lambs, swine, or goats is in keeping with the size of the farm or with the volume or character of the agricultural products produced thereon, but does not mean any person or partnership engaged in producing agricultural products who—

⟦(1) actively engages in buying or trading in cattle, calves, sheep, lambs, swine, or goats; or

⟦(2) actively engages, directly or indirectly, in conducting a business which includes the slaughter of cattle, calves, sheep, lambs, swine, or goats for food purposes; or

⟦(3) actively engages, directly or indirectly, in buying or selling meat or meat food products other than those prepared by any farmer on the farm; or

⟦(4) actively engages, directly or indirectly, in salting, curing, or canning meat, or in preparing sausage, lard, or other meat food products; or

⟦(5) slaughters, or permits any person to slaughter, on his or their farm cattle, calves, sheep, lambs, swine, or goats which are not actually owned by him or them.

⟦(b) A "retail butcher" means any person, partnership, association, or corporation chiefly engaged in selling meat or meat food products to consumers only, except that the Secretary of Agriculture, at his discretion, may permit any retail butcher to transport in interstate or foreign commerce to consumers and meat retailers in any one week not more than five carcasses of cattle, twenty-five carcasses of calves, twenty carcasses of sheep, twenty-five carcasses of lambs, ten carcasses of swine, twenty carcasses of goats, or twenty-five carcasses of goat kids, or the equivalent of fresh meat therefrom, and to transport in interstate or foreign commerce to consumers only meat and meat food products which have been salted, cured, canned, or prepared as sausage, lard, or other meat food products, and which have not been inspected, examined, and marked as "Inspected and Passed" in accordance with the terms of the Meat Inspection Act of March 4, 1907, and Acts supplemental thereto, and with the rules and regulations prescribed by the Secretary of Agriculture.

⟦(c) A "retail dealer" means any person, partnership, association, or corporation chiefly engaged in selling meat or meat food products to consumers only except that the Secretary of Agriculture, at his discretion, may permit any retail dealer to transport in interstate trade or foreign commerce to consumers and meat retailers in any one week not more than five carcasses of cattle, twenty-five carcasses of calves, twenty carcasses of sheep, twenty-five carcasses of lambs, ten carcasses of swine, twenty carcasses of goats, or twenty-five carcasses of goat kids, or the equivalent of fresh meat therefrom, and to transport in interstate or foreign commerce to consumers only meat and meat food products which have been salted, cured, canned, or prepared as sausage, lard, or other meat food products which have not been inspected, examined, and marked as "Inspected and Passed" in accordance with the terms of the Meat Inspection Act of March 4, 1907, and Acts supplemental thereto, and with the rules and regulations prescribed by the Secretary of Agriculture.

[That the provisions of the Meat Inspection Act of March 4, 1907, requiring inspection to be made by the Secretary of Agriculture shall not apply to animals slaughtered by any farmer on the farm and sold and transported in interstate or foreign commerce, nor to retail butchers and retail dealers in meat and meat food products, supplying their customers: *Provided,* That all meat and meat food products derived from animals slaughtered by any farmer on the farm which are salted, cured, canned, or prepared into sausage, lard, or other meat food products at any place other than by the farmer on the farm upon which the animals were slaughtered shall not be transported in interstate or foreign commerce under the farmers' exemption herein provided, and all fresh meat and all farm-cured or prepared meat and meat products derived from animals slaughtered by any farmer on the farm which are to be used in interstate or foreign commerce shall be clearly marked with the name and address of the farmer on whose farm the animals were slaughtered: *Provided further,* That if any person shall sell or offer for sale or transportation for interstate or foreign commerce any meat or meat food products which are diseased, unsound, unhealthful, unwholesome, or otherwise unfit for human food, knowing that such meat food products are intended for human consumption, he shall be guilty of a misdemeanor and on conviction thereof shall be punished by a fine not exeeding $1,000 or by imprisonment for a period of not exceeding one year, or by both such fine and imprisonment: *And provided further,* That the Secretary of Agriculture is authorized to maintain the inspection in this Act provided for at any slaughtering, meat canning, salting, packing, rendering, or similar establishment notwithstanding this exception, and that the persons operating the same may be retail butchers and retail dealers or farmers; and where the Secretary of Agriculture shall establish such inspection then the provisions of this Act shall apply notwithstanding this exception.]

(a) *The provisions of this title requiring inspection of the slaughter of animals and the preparation of the carcasses, parts thereof, meat and meat food products at establishments conducting such operations for commerce shall not apply to the slaughtering by any person of animals of his own raising, and the preparation by him and transportation in commerce of the carcasses, parts thereof, meat and meat food products of such animals exclusively for use by him and members of his household and his nonpaying guests and employees; nor to the custom slaughter by any person, firm, or corporation of cattle, sheep, swine, or goats delivered by the owner thereof for such slaughter, and the preparation by such slaughterer and transportation in commerce of the carcasses, parts thereof, meat and meat food products of such animals, exclusively for use, in the household of such owner, by him and members of his household and his nonpaying guests and employees: Provided, That such custom slaughterer does not engage in the business of buying or selling any carcasses, parts of carcasses, meat or meat food products of any cattle, sheep, swine, goats, or equines, capable of use as human food.*

(b) *The Secretary may, under such sanitary conditions as he may by regulations prescribe, exempt from the inspection requirements of this title the slaughter of animals, and the preparation of carcasses, parts thereof, meat and meat food products, by any person, firm, or corporation in any Territory or the District of Columbia solely for distribution within such jurisdiction when the Secretary determines that it is impracticable to provide such inspection within the limits of funds appropriated for administration of this Act and that such exemption will otherwise facilitate*

se 1:23-cv-11671-WGY   Document 127-1   Filed 03/06/24   Page 61 of

FEDERAL MEAT INSPECTION ACT                    **43**

enforcement of this Act. The Secretary may refuse, withdraw, or modify any exemption under this paragraph (b) in his discretion whenever he determines such action is necessary to effectuate the purposes of this Act.

(c) The adulteration and misbranding provisions of this title, other than the requirement of the inspection legend, shall apply to articles which are exempted from inspection or not required to be inspected under this section."

SEC. 24. The Secretary may by regulations prescribe conditions under which carcasses, parts of carcasses, meat, and meat food products of cattle, sheep, swine, goats, horses, mules, or other equines, capable of use as human food, shall be stored or otherwise handled by any person, firm, or corporation engaged in the business of buying, selling, freezing, storing, or transporting, in or for commerce, or importing, such articles, whenever the Secretary deems such action necessary to assure that such articles will not be adulterated or misbranded when delivered to the consumer. Violation of any such regulation is prohibited. However, such regulations shall not apply to the storage or handling of such articles at any retail store or other establishment that would be subject to this section only because of purchases in commerce, if the storage and handling of such articles at such establishment is regulated under the laws of the State or Territory or the District of Columbia in which such establishment is located, in a manner which the Secretary, after consulation with he appropriate advisory committee provided for in section 301 of this Act, determines is adequate to effectuate the purposes of this section.

## TITLE II—MEAT PROCESSORS AND RELATED INDUSTRIES

SEC. 201. Inspection shall not be provided under title I of this Act at any establishment for the slaughter of cattle, sheep, swine, goats, horses, mules, or other equines, or the preparation of any carcasses or parts or products of such animals, which are not intended for use as human food, but such articles shall, prior to their offer for sale or transportation in commerce, unless naturally inedible by humans, be denatured or otherwise identified as prescribed by regulations of the Secretary to deter their use for hu man food. No person, firm, or corporation shall buy, sell, transport, or offer for sale or transportation, in commerce, or receive for transportation, in commerce, or import, any carcasses, parts thereof, meat or meat food products of any such animals, which are not intended for use as human food unless they are denatured or otherwise identified as required by the regulations of the Secretary or are naturally inedible by humans.

SEC. 202. (a) The following classes of persons, firms, and corporations shall keep such records as will fully and correctly disclose all transactions involved in their businesses; and all persons, firms, and corporations subject to such requirements shall, at all reasonable times, upon notice by a duly authorized representative of the Secretary, afford such representative access to their places of business and opportunity to examine the facilities, inventory, and records thereof, to copy all such records, and to take reasonable samples of their inventory upon payment of the fair market value therefor—

(1) Any persons, firms, or corporations that engage, for commerce, in the business of slaughtering any cattle, sheep, swine, goats, horses, mules, or other equines, or preparing, freezing, packaging,

or labeling any carcasses, or parts or products of carcasses, of any such animals, for use as human food or animal food;

(2) Any persons, firms, or corporations that engage in the business of buying or selling (as meat brokers, wholesalers, or otherwise), or transporting, in commerce, or storing in or for commerce, or importing, any carcasses, or parts or products of carcasses, of any such animals;

(3) Any persons, firms, or corporations that engage in business, in or for commerce, as renderers, or engage in the business of buying, selling, or transporting, in commerce, or importing, any dead, dying, disabled, or diseased cattle, sheep, swine, goats, horses, mules, or other equines, or parts of the carcasses of any such animals that died otherwise than by slaughter.

(b) Any record required to be maintained by this section shall be maintained for such period of time as the Secretary may by regulations prescribe.

SEC. 203. No person, firm, or corporation shall engage in business, in or for commerce, as a meat broker, renderer, or animal food manufacturer, or engage in business in commerce as a wholesaler of any carcasses, or parts or products of the carcasses, of any cattle, sheep, swine, goats, horses, mules, or other equines, whether intended for human food or other purposes, or engage in business as a public warehouseman storing any such articles in or for commerce, or engage in the business of buying, selling, or transporting in commerce, or importing, any dead, dying, disabled, or diseased animals of the specified kinds, or parts of the carcasses of any such animals that died otherwise than by slaughter, unless, when required by regulations of the Secretary, he has registered with the Secretary his name, and the address of each place of business at which, and all trade names under which, he conducts such business.

SEC. 204. No person, firm, or corporation engaged in the business of buying, selling, or transporting in commerce, or importing, dead, dying, disabled, or diseased animals, or any parts of the carcasses of any animals that died otherwise than by slaughter, shall buy, sell, transport, offer for sale or transportation, or receive for transportation, in commerce, or import, any dead, dying, disabled, or diseased cattle, sheep, swine, goats, horses, mules or other equines, or parts of the carcasses of any such animals that died otherwise than by slaughter, unless such transaction, transportation, or importation is made in accordance with such regulations as the Secretary may prescribe to assure that such animals, or the unwholesome parts or products thereof, will be prevented from being used for human food purposes.

SEC. 205. The authority conferred on the Secretary by section 202, 203, or 204 of this title with respect to persons, firms, and corporations engaged in the specified kinds of business in or for commerce may be exercised with respect to persons, firms, or corporations engaged, in any State or Territory or the District of Columbia, in such kinds of business but not in or for commerce, whenever the Secretary determines, after consultation with an appropriate advisory committee provided for in section 301 of this Act, that the State, Territory, or District does not have comparable authority under its laws or such authority is not exercised in a manner to effectuate the purposes of this Act; and in such case the provisions of section 202, 203, or 204, respectively, shall apply to such persons, firms, and corporations to the same extent and in the same manner as if they were engaged in such business in or for commerce and the transactions involved were in commerce.

FEDERAL MEAT INSPECTION ACT                    **45**

## TITLE III—FEDERAL AND STATE COOPERATION

SEC. 301. (a)  *It is the policy of the Congress to protect the consuming public from meat and meat food products that are adulterated or misbranded and to assist in efforts by State and other Government agencies to accomplish this objective. In furtherance of this policy—*

(1)  *The Secretary is authorized, whenever he determines that it would effectuate the purposes of this Act, to cooperate with the appropriate State agency in developing and administering a State meat inspection program in any State which has enacted a State meat inspection law that imposes mandatory ante mortem and post mortem inspection, reinspection, and sanitation requirements that are consistent with those under title I of this Act, with respect to all or certain classes of persons engaged in the State in slaughtering cattle, sheep, swine, goats, or equines, or preparing the carcasses, parts thereof, meat or meat food products, of any such animals for use as human food solely for distribution within such State.*

(2)  *The Secretary is further authorized, whenever he determines that it would effectuate the purposes of this Act, to cooperate with appropriate State agencies in developing and administering State programs under State laws containing authorities comparable to those provided in title II of this Act; and to cooperate with other agencies of the United States in carrying out any provisions of this Act.*

(3)  *Cooperation with State agencies under this section may include furnishing to the appropriate State agency (i) advisory assistance in planning and otherwise developing an adequate State program under the State law; and (ii) technical and laboratory assistance and training (including necessary curricular and instructional materials and equipment), and financial and other aid for administration of such a program. The amount to be contributed to any State by the Secretary under this section from Federal funds for any year shall not exceed 50 per centum of the estimated total cost of the cooperative program; and the Federal funds shall be allocated among the States desiring to cooperate on an equitable basis. Such cooperation and payment shall be contingent at all times upon the administration of the State program in a manner which the Secretary, in consultation with the appropriate advisory committee appointed under paragraph (4), deems adequate to effectuate the purposes of this section.*

(4)  *The Secretary may appoint advisory committees consisting of such representatives of appropriate State agencies as the Secretary and the State agencies may designate to consult with him concerning State and Federal programs with respect to meat inspection and other matters within the scope of this Act, including evaluating State programs for purposes of this Act and obtaining better coordination and more uniformity among the State programs and between the Federal and State programs and adequate protection of consumers.*

(b)  *The appropriate State agency with which the Secretary may cooperate under this Act shall be a single agency in the State which is primarily responsible for the coordination of the State programs having objectives similar to those under this Act. When the State program includes performance of certain functions by a municipality or other subordinate governmental unit, such unit shall be deemed to be a part of the State agency for purposes of this section.*

**46**          FEDERAL MEAT INSPECTION ACT

(c) *As used in this section, the term "State" means any State (including the Commonwealth of Puerto Rico) or Territory as defined in section 1 of this Act; or the District of Columbia.*

## TITLE IV—AUXILIARY PROVISIONS

SEC. 401. *The Secretary may (for such period, or indefinitely, as he deems necessary to effectuate the purposes of this Act) refuse to provide, or withdraw, inspection service under title I of this Act with respect to any establishment if he determines, after opportunity for a hearing is accorded to the applicant for, or recipient of, such service, that such applicant or recipient is unfit to engage in any business requiring inspection under title I because the applicant or recipient, or anyone responsibly connected with the applicant or recipient, has been convicted, in any Federal or State court, of (1) any felony, or (2) more than one violation of any law, other than a felony, based upon the acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively packaged food or upon fraud in connection with transactions in food. This section shall not affect in any way other provisions of this Act for withdrawal of inspection services under title I from establishments failing to maintain sanitary conditions or to destroy condemned carcasses, parts, meat or meat food products.*

*For the purpose of this section a person shall be deemed to be responsibly connected with the business if he was a partner, officer, director, holder, or owner of 10 per centum or more of its voting stock or employee in a managerial or executive capacity. The determination and order of the Secretary with respect thereto under this section shall be final and conclusive unless the affected applicant for, or recipient of, inspection service files appliation for judicial review within thirty days after the effective date of such order in the appropriate court as provided in section 404. Judicial review of any such order shall be upon the record upon which the determination and order are based.*

SEC. 402. *Whenever any carcass, part of a carcass, meat or meat food product of cattle, sheep, swine, goats, horses, mules, or other equines, or any product exempted from the definition of a meat food product, or any dead, dying, disabled, or diseased cattle, sheep, swine, goat, or equine is found by any authorized representative of the Secretary upon any premises where it is held for purposes of, or during or after distribution in, commerce or otherwise subject to title I or II of this Act, and there is reason to believe that any such article is adulterated or misbranded and is capable of use as human food, or that it has not been inspected, in violation of the provisions of title I of this Act or of any other Federal law or the laws of any State or Territory, or the District of Columbia, or that such article or animal has been or is intended to be, distributed in violation of any such provisions, it may be detained by such representative for a period not to exceed twenty days, pending action under section 403 of this Act or notification of any Federal, State, or other governmental authorities having jurisdiction over such article or animal, and shall not be moved by any person, firm, or corporation from the place at which it is located when so detained, until released by such representative. All official marks may be required by such representative to be removed from such article or animal before it is released unless it appears to the satisfaction of the Secretary that the article or animal is eligible to retain such marks.*

SEC. 403. (a) *Any carcass, part of a carcass, meat or meat food product of cattle, sheep, swine, goats, horses, mules, or other equines, or any*

FEDERAL MEAT INSPECTION ACT                    **47**

*dead, dying, disabled, or diseased cattle, sheep, swine, goat, or equine, that is being transported in commerce or otherwise subject to title I or II of this Act, or is held for sale in the United States after such transportation, and that (1) is or has been prepared, sold, transported, or otherwise distributed or offered or received for distribution in violation of this Act, or (2) is capable of use as human food and is adulterated or misbranded, or (3) in any other way is in violation of this Act, shall be liable to be proceeded against and seized and condemned, at any time, on a libel of information in any United States district court or other proper court as provided in section 404 of this Act within the jurisdiction of which the article or animal is found. If the article or animal is condemned it shall, after entry of the decree, be disposed of by destruction or sale as the court may direct and the proceeds, if sold, less the court costs and fees, and storage and other proper expenses, shall be paid into the Treasury of the United States, but the article or animals shall not be sold contrary to the provisions of this Act, or the laws of the jurisdiction in which it is sold: Provided, That upon the execution and delivery of a good and sufficient bond conditioned that the article or animal shall not be sold or otherwise disposed of contrary to the provisions of this Act, or the laws of the jurisdiction in which disposal is made, the court may direct that such article or animal be delivered to the owner thereof subject to such supervision by authorized representatives of the Secretary as is necessary to insure compliance with the applicable laws. When a decree of condemnation is entered against the article or animal and it is released under bond, or destroyed, court costs and fees, and storage and other proper expenses shall be awarded against the person, if any, intervening as claimant of the article or animal. The proceedings in such libel cases shall conform, as nearly as may be, to the proceedings in admiralty, except that either party may demand trial by jury of any issue of fact joined in any case, and all such proceedings shall be at the suit of and in the name of the United States.*

*(b) The provisions of this section shall in no way derogate from authority for condemnation or seizure conferred by other provisions of this Act, or other laws.*

*SEC. 404. The United States district courts, the District Court of Guam, the District Court of the Virgin Islands, the highest court of American Samoa, and the United States courts of the other Territories, are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this Act, and shall have jurisdiction in all other kinds of cases arising under this Act, except as provided in section 7(e) of this Act.*

*SEC. 405. Any person who forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person while engaged in or on account of the performance of his official duties under this Act shall be fined not more than $5,000 or imprisoned not more than three years, or both. Whoever, in the commission of any such acts, uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both. Whoever kills any person while engaged in or on account of the performance of his official duties under this Act shall be punished as provided under sections 1111 and 1114 of title 18, United States Code.*

*SEC. 406. (a) Any person, firm, or corporation who violates any provision of this Act for which no other criminal penalty is provided by this Act shall upon conviction be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprison-*

48                    FEDERAL MEAT INSPECTION ACT

ment and fine; but if such violation involves intent to defraud, or any
distribution or attempted distribution of an article that is adulterated
(except as defined in section 1(m)(8) of this Act), such person, firm,
or corporation shall be subject to imprisonment for not more than three
years or a fine of not more than $10,000, or both: Provided, That no
person, firm, or corporation, shall be subject to penalties under this
section for receiving for transportation any article or animal in violation
of this Act if such receipt was made in good faith, unless such person,
firm, or corporation refuses to furnish on request of a representative of
the Secretary the name and address of the person from whom he received
such article or animal, and copies of all documents, if any there be,
pertaining to the delivery of the article or animal to him.

(b) Nothing in this Act shall be construed as requiring the Secretary
to report for prosecution or for the institution of libel or injunction pro-
ceedings, minor violations of this Act whenever he believes that the public
interest will be adequately served by a suitable written notice of warning.

SEC. 407. For the efficient administration and enforcement of this Act,
the provisions (including penalties) of sections 6, 8, 9, and 10 of the
Act entitled "An Act to create a Federal Trade Commission, to define
its powers and duties, and for other purposes", approved September 26,
1914 (38 Stat. 721–723, as amended; 15 U.S.C. 46, 48, 49, and 50)
(except paragraphs (c) through (h) of section 6 and the last paragraph
of section 9), and the provisions of subsection 409(1) of the Communica-
tions Act of 1934 (48 Stat. 1096, as amended; 47 U.S.C. 409(1)), are
made applicable to the jurisdiction, powers, and duties of the Secretary
in administering and enforcing the provisions of this Act and to any
person, firm, or corporation with respect to whom such authority is exer-
cised. The Secretary, in person or by such agents as he may designate,
may prosecute any inquiry necessary to his duties under this Act in any
part of the United States, and the powers conferred by said sections 9
and 10 of the Act of September 26, 1914, as amended, on the district
courts of the United States may be exercised for the purposes of this Act
by any court designated in section 404 of this Act.

SEC. 408. Requirements within the scope of this Act with respect to
premises, facilities and operations of any establishment at which inspection
is provided under title I of this Act, which are in addition to, or different
than those made under this Act may not be imposed by any State or
Territory or the District of Columbia, except that any such jurisdiction
may impose recordkeeping and other requirements within the scope of
section 202 of this Act, if consistent therewith, with respect to any such
establishment. Marking, labeling, packaging, or ingredient requirements
in addition to, or different than, those made under this Act may not be
imposed by any State or Territory or the District of Columbia with
respect to articles prepared at any establishment under inspection in
accordance with the requirements under title I of this Act, but any State
or Territory or the District of Columbia may, consistent with the require-
ments under this Act, exercise concurrent jurisdiction with the Secretary
over articles required to be inspected under said title, for the purpose of
preventing the distribution for human food purposes of any such articles
which are adulterated or misbranded and are outside of such an establish-
ment, or, in the case of imported articles which are not at such an establish-
ment, after their entry into the United States. This Act shall not preclude
any State or Territory or the District of Columbia from making require-
ment or taking other action, consistent with this Act, with respect to any
other matters regulated under this Act.

FEDERAL MEAT INSPECTION ACT          **49**

*SEC. 409. (a) Notwithstanding any other provisions of law, including section 902(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 392(a)), the provisions of this Act shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to enactment hereof.*

*(b) The detainer authority conferred by section 402 of this Act shall apply to any authorized representative of the Secretary of Health, Education, and Welfare for purposes of the enforcement of the Federal Food, Drug, and Cosmetic Act with respect to any carcass, part thereof, meat, or meat food product of cattle, sheep, swine, goats, or equines that is outside any premises at which inspection is being maintained under this Act, and for such purposes the first reference to the Secretary in section 402 shall be deemed to refer to the Secretary of Health, Education, and Welfare.*

*SEC. 410. There are hereby authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act.*

\*          \*          \*          \*          \*          \*          \*

21 U.S.C. 96

## HORSE MEAT ACT

[MEAT INSPECTION, BUREAU OF ANIMAL INDUSTRY

[For additional expenses in carrying out the provisions of the Meat-Inspection Act of June 30, 1906 (Thirty-fourth Statutes at Large, p. 674), as amended by the Act of March 4, 1907 (Thirty-fourth Statutes at Large, p. 1256), there is hereby appropriated for the fiscal year ending June 30, 1920, $903,960, of which sum $100,000 may be used for the inspection of equine meat in the manner provided in said Act, as amended. And hereafter, no person, firm, or corporation, or officer, agent, or employee thereof shall transport or offer for transportation, and no carrier of interstate or foreign commerce, shall transport or receive for transportation from one State or Territory or the District of Columbia to any other State or Territory, or the District of Columbia or to any place under the jurisdiction of the United States or to any foreign country any of such meat or food products thereof unless plainly and conspicuously labeled, marked, branded, or tagged "Horsemeat" or "Horse-meat Product" as the case may be, under such rules and regulations as may be prescribed by the Secretary of Agriculture. All the penalties, terms, and provisions in said Act, as amended, except the exemption therein applying to animals slaughtered by any farmer on a farm, to retail butchers and retail dealers in meat food products supplying their customers, are hereby made applicable to horses, their carcasses, parts of carcasses, and meat food products thereof, and the establishments and other places where such animals are slaughtered or the meat or meat food products thereof are prepared or packed for the interstate or foreign commerce, and to all persons, firms, corporations and officers, agents and employees thereof who slaughter such animals or prepare or handle such meat or meat food products for interstate or foreign commerce.]

\*          \*          \*          \*          \*          \*          \*

**50**          FEDERAL MEAT INSPECTION ACT

19 U.S.C. 1306

Cattle, Sheep, Swine, and Meats; Importation Prohibited in Certain Cases

(a) Rinderpest and Foot-and-Mouth Disease.—If the Secretary of Agriculture determines that rinderpest or foot-and-mouth disease exists in any foreign country, he shall officially notify the Secretary of the Treasury and give public notice thereof, and thereafter, and until the Secretary of Agriculture gives notice in a similar manner that such disease no longer exists in such foreign country, the importation into the United States of cattle, sheep, or other ruminants, or swine, or of fresh, chilled, or frozen meat of such animals, from such foreign country, is prohibited: *Provided,* That wild ruminants or swine may be imported from any such country upon such conditions, including post entry conditions, to be prescribed in import permits or in regulations, as the Secretary may impose for the purpose of preventing the dissemination of said diseases into or within the United States: *And provided further,* That the subsequent distribution, maintenance, and exhibition of such animals in the United States shall be limited to zoological parks approved by said Secretary as meeting such standards as he may by regulation prescribe for the purpose of preventing the dissemination of said diseases into or within the United States. The Secretary may at any time seize and dispose of any such animals which are not handled in accordance with the conditions imposed by him or which are distributed to or maintained or exhibited at any place in the United States which is not then an approved zoological park, in such manner as he deems necessary for said purpose.

〔(b) Meats Unfit for Human Food.—No meat of any kind shall be imported into the United States unless such meat is healthful, wholesome, and fit for human food and contains no dye, chemical, preservative, or ingredient which renders such meat unhealthful, unwholesome, or unfit for human food, and unless such meat also complies with the rules and regulations made by the Secretary of Agriculture. All imported meats shall, after entry into the United States in compliance with such rules and regulations, be deemed and treated as domestic meats within the meaning of and subject to the provisions of the Act of June 30, 1906 (Thirty-fourth Statutes at Large, p. 674), commonly called the "Meat Inspection Amendment," and the Act of June 30, 1906 (Thirty-fourth Statutes at Large, p. 768), commonly called the "Food and Drugs Act," and Acts amendatory of, supplementary to, or in substitution for such Act.〕

(c) Regulations.—The Secretary of Agriculture is authorized to make rules and regulations to carry out the purposes of this section, and in such rules and regulations the Secretary of Agriculture may

FEDERAL MEAT INSPECTION ACT                    **51**

prescribe the terms and conditions for the destruction of all cattle, sheep, and other ruminants, and swine, and of all meats, offered for entry and refused admission into the United States, unless such cattle, sheep, ruminants, swine, or meats be exported by the consignee within the time fixed therefor in such rules and regulations.

[1] *Effective dates for the Wholesome Meat Act:*
 *The provisions of this Act shall become effective upon enactment except as provided in paragraphs (a) through (d):*
 *(a) The provisions of paragraph (b)(1) and (c) of section 10 and the provisions of section 20 of the Federal Meat Inspection Act, as amended by sections 7 and 10 of this Act, and the provisions of section 18 of this Act repealing paragraph (b) of section 306 of the Tariff Act of 1930, shall become effective upon the expiration of sixty days after enactment hereof.*
 *(b) The provisions of title I of the Federal Meat Inspection Act, as amended by this Act, shall become effective with respect to equines (other than horses) and their carcasses and parts thereof, meat, and meat food products thereof upon the expiration of sixty days after enactment hereof.*
 *(c) Section 11 of this Act, amending section 23 of the Federal Meat Inspection Act, shall become effective sixty days after enactment hereof.*
 *(d) Section 204 of the Federal Meat Inspection Act, as added by section 14 of this Act, shall become effective upon the expiration of sixty days after enactment hereof.*

## SUPPLEMENTAL VIEWS

We, the undersigned, strongly believe that this bill would fail to come to grips with the basic and most important problem of meat inspection today. It would *not* extend the coverage of Federal meat inspection to the large uninspected or state-inspected plants. Accordingly, we are convinced it is seriously deficient. Thus we urge the approval of H.R. 12145 as a substitute, to extend the coverage of the Federal meat inspection program to any packing or processing establishment having an annual gross business (exclusive of excise or sales taxes) in excess of $250,000. Your committee did approve H.R. 12144. Its provisions are good *but only as far as they go*. They would improve some provisions of the Federal meat inspection law (21 *U.S.C.* 71–91) to provide Federal inspectors with additional authority to meet current conditions in the industry. We seek to cure the most glaring defects of the committee bill by advocating the adoption of H.R. 12145 on tne floor of the House of Representatives.

### THE CRISIS IN MEAT INSPECTION

#### LEGISLATION IS NEEDED

Unfortunately the American consumer—whether housewife or traveler—is not fully protected from unwholesome meat and meat products. Some 16 percent— or 5.3 billion pounds—of meat slaughtered in the United States annually, and some 26 percent—or 7.6 billion pounds—of meat processed into sausages and other products are *outside* the safeguards of Federal meat inspection.

The *scope* of the Federal program is deficient because the 61-year-old Meat Inspection Act provides it with authority only over plants selling across State lines. Modern Federal legislation interprets Federal or interstate authority much more realistically. An illustration of this is the fact that most of the very same plants which are exempted from Federal meat inspection are covered by *other* Federal laws.

Some State inspection programs do exist. But there is grave doubt that many of these programs provide adequate protection. In fact, 22 States have no mandatory meat inspection laws at all, as your committee points out in its report.

#### USDA FINDINGS

Both a 1962 and a *current* Department of Agriculture survey depicts a shocking situation in many packing and processing facilities operating outside the purview of the Federal meat inspection law.

The 1962 survey reported that some of the worst conditions observed included:

> 1. Allowing edible portions of carcasses to come in contact with manure, pus, and other sources of contamination during the dressing operations.

52

## FEDERAL MEAT INSPECTION ACT     53

2. Allowing meat food products during preparation to become contaminated with filth from improperly cleaned equipment and facilities.

3. Use of chemical additives and preservatives that would not have been permitted under Federal meat inspection.

4. Failing to use procedures to detect or control parasites transmissible to man that would lead to diseases, such as trichinosis and cysticercosis.

5. Use of inspection and operating controls that were not sufficient to prevent possible adulteration of meat food products during their preparation, with substances such as water, gum, cereals, or sodium caseinate.

6. The use of false or deceptive labels and packaging materials.

7. Failing to supervise destruction of obviously diseased tissues and spoiled, putrid, or filthy materials.

8. Working without any inspector, or with unqualified and poorly trained inspectors, without adequate supervision.

Observers reported meat from sick or unfit animals set aside in some plants for use in preparing human food.

Here are a few excerpts from the current USDA survey:

This is one of the most deplorable plants I ever saw.

Not a clean area in the building.

Live animals are penned in the same area as the slaughtering and processing.

In fact the entire operation is done in one large room.

A large door with no screen was open to the street, through which pass all live and dressed animals.

Rusty metal and dirty wooden barrels are used for both edible and inedible meats and offal.

The flies were so numerous it was next to impossible to carry on a conversation with the operator.

Calf liver was laying on a table that from appearance had never been cleaned.

The owner told me that he killed veal each Tuesday, Wednesday, and Friday. While I was present one was loaded in the trunk of a car for delivery. No wrapping was used. The veal was skinned. (Pennsylvania, July 30, 1967.)

Subject canning company operates with normal business permit, inspection furnished by the Los Angeles County Health Department. The operation is located in a building that is falling apart. It is infested with flies, cockroaches, and rodents since there are many openings located around the structure. Storage facilities are lacking; everything is out in the open. The cutting table where the tripe is cut is an old board, splinters are visible. The cooler is small, product is stacked on top of open containers, the whole place smells bad, the stench is terrible. There is nothing to help keep the operation clean, no semblance of sanitation. (California, July 27, 1967.)

\*     \*     \*     \*     \*

Idaho State in past years had a very good meat inspection program with laws based on Federal law. They had good control of mobile slaughter units until about a year ago legislation took all control away from meat inspection de-

partment. For nearly a year now they have had no supervision of meat inspection. I only hope it all works out for a better program. (USDA Official, Aug. 7, 1967.)

\*        \*        \*        \*        \*

Cattle being washed before hide removed. Head meat contained large amounts of hair and manure. Water pressure not adequate. Wash basin inoperative—no soap or towels. Walls throughout plant with block mold loose and scaling paint. Condemned stamped carcass in cooler not decharacterized. Calf carcasses in cooler very dirty. Beef carcasses in cooler dragging in sawdust. Meat being processed on broken plywood, edible lard stored in basement in sump pump area. No doors on tank room from killing floors. Sour musty smell throughout plant. Sanitation very poor. Meat gondolas and tubs broken rusty. Hog heads in cooler awaiting boning very dirty. (Idaho, July 31, 1967.)

\*        \*        \*        \*        \*

Smokehouse combined with a retail meat business and killing plant is located about 5 miles out of town. The surrounding environment is very unsanitary. The inside of this plant is as dirty and filthy as any place can get. Well water is used and the drainage from said plant is piped to a creek approximately 100 feet from the plant. Inedible material is picked up by the company of Texas. About 20 to 25 head of cattle are slaughtered per week.

This plant operated under no inspection, Mr. ——— indicated to me that he has been in business for 7 years and has never been visited by a State health official. Further stated that a county officer from ——— checks his premises for sanitation occasionally.

Observations: Flies, birds nests, cobwebs, weeds, manure, dried blood, causing very unpleasant odors welcomes any visitor to this plant. (Texas, July 28, 1967.)

\*        \*        \*        \*        \*

Meat inspection is virtually nonexistent in Nevada. There is no continuous coverage by inspectors of meat plant operations. So-called meat inspection consists of health department scrutiny of products offered for sale and could be compared to the casual scrutiny given to any product coming under their jurisdiction.

The State legislature has recently enacted a new law which will become effective July 1, 1968. What the provisions of the new law will accomplish is unknown to us at this time. The new law has not been printed for distribution as of this date.

No real progress has been made since 1963 to date. (USDA official, July 31, 1967.)

\*        \*        \*        \*        \*

This firm operates under the inspection program of the State of Kentucky. ——— Foreman, conducted the tour.

\*        \*        \*        \*        \*

Kill beef and swine—This area was observed after the normal cleaning was conducted from the previous kill. The

room is a small, poorly lighted, poorly ventilated, overly crowded room. The equipment, scalding tub, dehairing machine, etc., outdated, rusty, highly contaminated. The walls ceiling, floors, were filthy, fly covered; in fact, everything visible was badly in need of a thorough cleaning. This area, like the previous ones, had no sterilizers or hand washing facilities. This plant, without a doubt, is in need of some type of an inspection program that will assure the consumer some protection against a product manufactured under such unsanitary conditions.

This plant was recommended as part of this survey by USDA meat inspector, ——— who with 40 years of meat inspection claimed "the dirtiest plant I've seen in 40 years." (Kentucky, July 29, 1967.)

&ast;  &ast;  &ast;  &ast;  &ast;

Visited this firm on July 27, 1967. It is the largest non-federally inspected slaughtering and meat processing plant in the State of Indiana. Operates under the State of Indiana inspection permit number. This consists of ante and post mortem inspection. Their weekly volume of slaughter is approximately 300 head of cattle, 300 head of hogs.

Shipping and receiving docks—littered with refuse such as paper, paper cups, wire, string, and meat scraps. The stairs leading up to, and the floor of the shipping dock was grease packed. No visible refuse barrel present. The overhead rails for the movement of beef quarters, fronts, hinds and sides were rusty, grease covered; ceiling was in need of scraping from paint scale. The hooks and rollers were both greasy and rusty.

&ast;  &ast;  &ast;  &ast;  &ast;

Pork and beef cutting room—here again the equipment was contaminated and rusty. Walls and overhead ceiling needed repair—cutting boards were slivered, etc. The kill floors, both cattle and swine, were old. The equipment badly in need of repair. The equipment, such as splitting saws, the hog viscera table and all the associated equipment on the floors were badly in need of cleaning. Again no hand washing facilities or sterilizers were to be found in the work areas. (Indiana, July 28, 1967.)

&ast;  &ast;  &ast;  &ast;  &ast;

A State of Illinois meat inspection program has been in operation for a number of years and includes both slaughtering and processing operations. The city of Chicago's Board of Health has also conducted a meat inspection program. Chicago authorities do not consider the State program acceptable and do not permit sale of State inspected product within the city of Chicago. This lack of recognition creates political sensitivity—and problems. As an example, Chicago authorities were quick to tone down and minimize the discovery that ——— in ——— had used boneless beef covered with powdered charcoal as sausage raw material. They were aware that placed in its proper perspective, this discovery might have caused the Illinois Legislature to insist upon State inspection in the ———.

**56** FEDERAL MEAT INSPECTION ACT

A shrewd comparison of inspection systems was recently made by ——— a cattle dealer specializing in down and crippled cattle. ——— makes his living by his wits. He roams the ——— area in search of bargain cattle. Success depends upon "buying right" and "selling right." When ——— has made a purchase he evaluates the animal in terms of what it will bring him. His first choice is ——— ———, Illinois. If he feels the animal might not pass Federal inspection he hauls it to ——— at Seward, Ill., a State inspected plant. If he feels the animal would pass neither Federal nor State inspection he carts it to ———, Illinois. ——— stated he had never "lost" an animal at ———. He was aware ——— "gypped" him on weight, required trimming, and grade but the fact that he had never lost an animal at ——— had assured him of some minimal profit for his effort. He continues hauling to ——— when he feels certain the animal would pass neither Federal nor State inspection. ——— stated that even he became disgusted when he saw what the Chicago authorities would permit as human food.

——— of ———, Illinois, is known to specialize in the slaughter of down and disabled animals. ——— is well acquainted within the community of 4–d dealers, the ———.

——— of ———, Illinois operates under State inspection and specializes in the slaughter of down and disabled swine. Examination of the premises revealed direct contamination of product from overhead structures, rusty cooler rails, employees without head covering working directly over product, inedible material scattered about the floor in the boning room, product packed in paper cartons piled directly on the floor, filthy containers for edible product, and rusted equipment.

At ——— flies from the holding pens were seen to infest the killing floor, rails and overhead structures contaminated the product held in the cooler, no identifying marks distinguished the edible and inedible containers, and edible product was jammed in the cooler beneath hanging carcasses and quarters with resulting contamination of product from the dripping beef carcasses.

——— at, ——— Illinois, restricts slaughter of cattle and swine during the hot summer months and only limited curing and sausage production was being conducted. Sanitation was poor. Junk and unused equipment littered the perimeter of the curing and preparation rooms. Direct contamination of product from dripping beams and rusty overhead structures was observed. (USDA official, July 31, 1967.)

THE COMMITTEE BILL (H.R. 12144) IS SERIOUSLY DEFICIENT

H.R. 12144 would try to buy the States into enacting programs which are "consistent with" the Federal inspection system. It would pay 50 percent of the cost of the State programs. But it would not *require* the States to pass good inspection laws, which are strictly en-

FEDERAL MEAT INSPECTION ACT            **57**

forced and properly financed. In fact, the words "consistent with"— the bill's standard of comparison between the State and Federal program—are *undefined* by the measure.

### H.R. 12145 IS EFFECTIVE

*Only in H.R. 12145* are provisions relieving the overburdened State meat-inspection programs of the responsibility for inspecting the larger packers and processors (those not now covered by the Federal meat-inspection law but having an annual gross income in excess of $250,000) so that the States can focus on the often quite numerous smaller facilities.

This measure includes *all* of the provisions of the committee's bill, but it would *add* the following two significant ones:

(*a*) All meat plants which have more than $250,000 gross annual sales would be inspected by the Federal meat inspection program. (As a result, some 97 percent of meat slaughtered would be federally inspected.)

(*b*) Newly inspected plants, and State-inspected plants under federally aided inspection systems would be allowed to meet comparable construction standards of the Federal meat grading program for the first 5 years. The plant construction requirements of the Federal inspection program would have to be followed. (This amendment would not affect the cleanliness or wholesomeness of the meat, but it would allow plants more time to meet plant-construction standards concerning size of doors, height of rails, etc.)

H.R. 12145 would give the American consumer substantial protection. It would both increase the coverage of Federal inspection and modernize the program.

Virtually every single witness who testified during the meat inspection hearings praised the Federal meat-inspection program. Even the representatives of the meat industry, who oppose the extension of Federal inspection, joined in this praise. One estimate of the cost of this consumer protection is less than one-sixth of a cent (⅙ of a cent) per pound of meat.

### DOCUMENTARY BACKGROUND

### Data on Diseases Caused by Unwholesome Meat

A general description of the causes of meat spoilage and human diseases which can be caused by unwholesome meat is provided in the following report from the Deputy Commissioner of the Food and Drug Administration.

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE,
FOOD AND DRUG ADMINISTRATION,
*Washington, D.C., August 25, 1967.*

Hon. THOMAS S. FOLEY,
*House of Representatives,*
*Washington, D.C.*

DEAR MR. FOLEY: This is in reply to your request for factual information on the causes of meat spoilage and human diseases which can be caused by unwholesome meat.

58                FEDERAL MEAT INSPECTION ACT

Meat spoils because of the growth of certain micro-organisms. As these grow they cause changes in the protein and other nutrients in the meat which cause it to become putrid.

The rate of spoilage depends upon the initial number of micro-organisms on the meat and the conditions under which it is held which encourage or discourage their multiplication. Preparation of meat under insanitary conditions or processing with equipment which has not been properly cleansed may lead to contamination with bacteria which will increase the speed of spoilage. Under these conditions the contamination with bacteria, such as the salmonella, streptococci, and staphylococci, may cause human illness.

Spoilage is delayed by refrigeration, and meat may be kept inde-fi nitely if it is promptly frozen, dried, canned, and heat processed, or otherwise treated to stop the growth of spoilage organisms. Canned meats will spoil if the heat processing is inadequate to kill the orga-nisms, or the closures are imperfect so that recontamination occurs. Canned meats which have been inadequately processed may contain the bacteria that produce the deadly botulinus toxins.

To assure the wholesomeness of meat, it is essential that it be properly prepared and handled under clean conditions and that it be promptly refrigerated, frozen, or otherwise processed to prevent multiplication of the micro-organisms which may cause spoilage or render the meat injurious to health.

An excellent discussion of diseases which may be transmitted from animals to man is contained in an article by Dr. James H. Steele, found on pages 14 to 20 of the "Yearbook of Agriculture, 1956, Animal Diseases."

Among the 80 animal diseases which may be transmitted to man, there are those which can be transmitted through meat and constitute a direct potential threat to human health. These include bovine tuber-culosis, brucellosis, leptospirosis, salmonellosis, and several others.

On pages 21 to 28 of the same publication is an article by Benjamin Schwartz dealing with parasites that attack animals and man. Among those which may be transmitted by meat are the tapeworms cysticerci and taenia (trichinella spirellis or trichinae) that cause trichinosis.

If we can be of further assistance, please let us know.

Sincerely yours,

W. B. RANKIN,
*Deputy Commissioner.*

On August 25, 1967, the National Communicable Disease Center in Atlanta, Ga., submitted the following:

Trichinosis in the United States, Canada, Western Europe, and Scandinavia, of which we are reproducing these extracts here:

\*          \*          \*          \*          \*

Another source of information on the national experiences with trichinosis are autopsy studies on humans. Because trichinosis infection, whether clinically apparent or not, results in a permanent state of infection (although rarely disabling), analysis of muscle tissue will demonstrate pre-vious infection. Such anlayses of tissues removed after death (from any cause) have been performed in many areas; the studies demonstrate the percent of the population which had

FEDERAL MEAT INSPECTION ACT                59

acquired trichinosis infection at any time during life (and with or without overt illness). These data from various countries, when available, are perhaps more comparable because they are not influenced by the incompleteness of disease reporting.

The data provided below show numbers of cases of trichinosis from various countries, and the results of autopsy studies from the same countries. The data on cases for the United States represents the cases reported to the National Communicable Disease Center; data from other countries was obtained from the literature. The figures for autopsy studies frequently represent the average of several studies, of 10 performed over several years.

A. United States:

  1. Reported cases of trichinosis, by year:

| | | | |
|---|---|---|---|
| 1955 | 264 | 1961 | 306 |
| 1956 | 262 | 1962 | 171 |
| 1957 | 178 | 1963 | 208 |
| 1958 | 176 | 1964 | 198 |
| 1959 | 227 | 1965 | 199 |
| 1960 | 160 | 1966 | 115 |

  2. Autopsy studies: percent of specimens positive for trichinosis:

        1931–44: 15.9 percent positive.
        1948–63: 4.5 percent positive.

B. Canada:

  1. Reported cases: 273 cases from Quebec, 1953–64 (no other figures available).

  2. Autopsy studies: 1938–60: 1.5–7.3 percent positive.

C. Great Britain:

  1. Reported cases: sporadic outbreaks (1940, 500; 1941, 78; 1953, 82).

  2. Autopsy studies:

        1947: 10.8 percent.
        1958–63: 0.4 percent.

D. Scandinavia:

  1. Reported cases: Sporadic outbreaks (1940, 1952).

  2. No reported autopsy studies.

E. France:

  1. Reported cases: 4 since 1878.

  2. No reported autopsy studies.

F. Switzerland, Spain, Portugal, Italy:

  1. Reported cases: sporadic outbreaks.

  2. No reported autopsy studies.

G. Germany:

  1. Reported cases: 1939–44: 1520. Sporadic outbreaks (1949, 1950).

  2. No reported autopsy studies.

H. Poland:

  1. Reported cases: 1946–58: 5,322 cases (average of 409 per year; no breakdown by year).

  2. Autopsy studies: 1957–60: 5.4 percent positive.

60                 FEDERAL MEAT INSPECTION ACT

Trichinosis is only one of a number of diseases caused by unwhole-some meat. Salmonella infections are among the most widespread of these diseases. However, it is interesting to note in the following colloquy, the impression in thinking on this subject demonstrated by a representative of the Western Meat Packers Association during this summer's House Agriculture Livestock and Grains Subcommittee hearings on meat inspection.

> Mr. FOLEY. Mr. Liljenquist, you say on page 2 of your statement:
> "It is true. Americans can buy meat with confidence, know-ing that it is the safest, cleanest, and most wholesome in the world."
> Mr. LILJENQUIST. Yes, sir.
> Mr. FOLEY. Do you have some statistical or other evidence that we in fact have the safest, the cleanest, and the most wholesome meat in the world?
> Or is this just the usual kind of patriotic statement that witnesses make before committees of Congress?
> Mr. LILJENQUIST. I guess I should qualify that statement.
> The Department of Agriculture in Publication 870, entitled "The Food We Eat," issued this spring, says that our meat system is a model for the world. I would say from that state-ment that our Department feels that, at least, it is pretty good.
> Mr. FOLEY. That is not quite the same as saying it is the cleanest, the safest, and the most wholesome in the world.
> Mr. LILJENQUIST. This is what we believe in our industry, and I have heard it many times.

A 1957 World Health Organization report has one of the most shocking findings on trichinosis in the United States:

> Whereas trichinosis is fairly common in Mexico, and is prob-ably less uncommon in the settled parts of Canada than is generally recognized, it is more prevalent in the United States than in any other part of the world. An estimated one in six inhabitants of that country (roughly 25 million persons) harbor trichinae, which would entail the develop-ment of some 350,000 new infections annually. Further, it has been calculated that clinical symptoms would be dis-played by 4.5 percent of the infected; that is, by 16,000 persons each year, a much larger number than the 1942–51 yearly average of 336 reported cases.

A July 29, 1967, report by a USDA official on the situation in Wis-consin is illustrative of the danger of trichinosis from inadequately inspected meat:

> Events such as the Brownsville incident in which 38 people became ill with trichinosis and the ease with which ——— et al. could move undeterred about the State fostered a general awareness that some governmental sanction was vital and necessary to provide and mirror a favorable meat produc-tion image in Wisconsin.
> ——— Trichina controls have been voluntarily subscribed to by many sausage manufacturers out of fear that a "Brownsville incident" will ruin their business. The old die-

FEDERAL MEAT INSPECTION ACT          **61**

hard German sausagemaker still remains outside this main-
stream of nebulous compliance. He still contends frozen pork
or heating to 137 degrees F. "ist nicht gut fur die wurst" and
very difficult to convince otherwise.

What about salmonellosis in the United States? On August 24, 1967,
we were told by the Acting Surgeon General that:

> The most common disease transmitted through the con-
> tamination of meat and poultry is salmonellosis. We are
> unable specifically to identify the number of cases of this
> disease which result from contamination in packing plants.
> However, studies of individual epidemics of this disease lead
> us to believe that packing practice is an important factor in
> its spread. Last year a total of 20,000 cases of salmonellosis
> were diagnosed by isolation of salmonella organisms from
> infected persons. This total number of cases resulting from
> all sources of infection is, in our opinion, *only a very small
> percentage of all cases which actually occurred.* The disease
> ranges in severity from mild intestinal upset to severe
> gastroenteritis which may be fatal in infants or debilitated
> patients. [Emphasis added.]

Some analysts believe this percentage is *less than 5 percent.*
A report recently received from a major independent meat packer in
the United States discusses European requirements for the wholesome-
ness of meat imported from the United States and comments on the
meat-inspection practices of what is generally considered one of the
best State meat inspection programs.

            *          *          *          *          *

> As a matter of information, our company has ———
> plants, all of which prepare meat food items, and all of which
> are 100 percent subject to the Meat Inspection Act. We have
> no "axe to grind" with the nonfederally inspected packers
> except where they purport to maintain a State inspection
> system precisely the same as that carried out under the
> inspection regulations of the U.S. Department of Agriculture.
> As far as the processing of meat products in such nonfederally
> inspected plants operating under State regulations claiming
> to be identical to those in federally inspected plants, this
> is not only a farce but misleading to the consumer. We can
> give you concrete examples of products produced in plants
> operating under the State of California, whose regulations
> are identical to Federal regulations, which forbids a moisture
> content in excess of 10 percent in canned hams, but by actual
> analysis we have found them to contain from 25 to 35 percent
> added moisture. This has been called to the attention of the
> California Department of Agriculture at least three or more
> times, but the situation still exists.

            *          *          *          *          *

> Taking pork products as a glaring example, we do believe
> that Congress, and especially the Department of Agriculture,
> has missed a very important point in its efforts to increase
> the acceptability of them to foreign countries. Pork products

are not acceptable to England because of the presence of hog cholera in the United States. A program of eradication is now in progress to eradicate this disease by the animal disease control agencies. However, it will be a few years before the task is completed. For a period of 6 months in late 1966 and early 1967 it was not permissible to ship pork products to Germany because of the existence of brucellosis among hogs in the United States, which was not even required to be reported to those having to do with the control of animal health. Neither State nor Federal authorities required it. After the adoption of a requirement that all cases of brucellosis in swine be reported, the Federal meat inspection people were able to determine that hogs from certain areas were not derived from animals under quarantine because of this disease. So far as we are able to determine, there are no definite plans to eradicate this disease from hogs. Probably you already know that the majority of undulant fever cases in man are directly traceable to the handling of hogs or pork. The U.S. Department of Health, Education, and Welfare authorities there can provide additional details on this subject.

The main point we are trying to bring out here is that while our pork products, slaughtered under inspection regulations of the U.S. Department of Agriculture, are not good enough for consumers in foreign countries, nevertheless they are apparently good enough for you and me, and all the other U.S. citizens. Any action to correct this condition should therefore also include the 15 to 25 percent of the total slaughter in the United States which is accomplished under State inspection where efficiency is too often lacking in important phases of the task.

In the writer's opinion meat produced under Federal inspection is sound, healthful, wholesome, and fit for human food, and the same inspection requirements should be applied to all meat and meat food items produced in the United States.

The June 1967 recommendations on "consumer protection" of the HEW Task Force on Environmental Health and Related Problems are focused on the new technology as these recommendations relate to food. While these recommendations extend in scope beyond the instant question of broadening the coverage of the Federal meat inspection program, they put the crisis in meat inspection in a necessary larger perspective:

With respect to foods, the Department [of Health, Education, and Welfare] must have considerably more authority to assure adequate protection of the public health. The Department must be able to evaluate the *synergistic effect of food additives* so that the consumer is protected from threats that cannot be detected by the separate analysis of individual food additives. This means evaluating the sum total of the toxicological effects of a mixture.

Furthermore, the Department must have, *as it does not now*, adequate authority to inspect and evaluate the processing of foods to make certain that their safety is not impaired

FEDERAL MEAT INSPECTION ACT          **63**

through the effect of a process which may or may not involve the use of additives. [Emphasis added.]

In an effort to develop as much analytic data as possible on the relation etween unwholesome food and human diseases, the following questions were posed last month to the Secretary of Health, Education, and Welfare:

I am writing with reference to the Smith-Foley bill (H.R. 12145 to extend Federal standards of meat inspection to all packing and processing facilities having an annual gross income of over $250,000. This measure will shortly be offered as a substitute to the Purcell bill (H.R. 12144) on the floor of the House of Representatives.

I should deeply appreciate your having your personal staff consult with the appropriate agencies under your jurisdiction to advise me whether there is any correlation between the incidence of disease—e.g., trichinosis, salmonellosis, brucellosis—induced by unwholesome *meat* in a given State and the quality of that State's meat inspection program. The scope of these programs has been generally described by Mr. Rodney E. Leonard, Deputy Assistant Secretary of Agriculture, on page 17 and following pages of the attached *Agriculture Committee Record of Hearing on H.R. 1314, H.R. 1321, and H.R. 6168*.

I should also like to have an estimate of the annual economic costs of these illnesses that can be fairly attributed to unwholesome meat consumed by the American consumer.

Finally, I should like to be advised what your Department plans to do to implement the recommendations of the Linton report subsection entitled "Consumer Protection Goal" (pp. 21–22) insofar as these recommendations apply to meat inspection.

It would be most helpful to have this information at your earliest convenience since I expect that H.R. 12144 and H.R. 12145 will be considered by the whole House of Representatives soon after the Labor Day recess.

Finally, pertinent extracts are included from a memorandum on the competence of the Congress to expand the coverage of a revised Federal meat inspection law to include meat-processing plants not directly engaged in interstate commerce. This memorandum was prepared by Norman J. Small, Esq., of the Legislative Reference Service:

*III. Is it within the constitutional power of Congress to expand the scope of coverage of the existing Federal Inspection Act (21 U.S.C. 71–91) to the end that all meatpacking plants, including those engaged in purely local intrastate commerce, are made subject to the provision of either?*

Yes. As disclosed in the precedents hereinafter summarized, Congress has been deemed competent to subject local commercial activities to Federal regulations of interstate commerce whenever it can be established that control of the former is essential to the effective enforcement of an otherwise permissible exercise of Federal power over what is undeniably commerce between the States. Thus, it would be within the province of Congress to set forth in a preamble

to the existing Federal Meat Inspection Act findings to the effect that a substantial portion of the American population is engaged daily either in interstate travel or tourism or in vocations producing goods or services that enter directly into the channels of interstate and foreign commerce or which contribute substantially to such interstate or foreign commercial movement; and that meat products constitute a major portion of the diet of American inhabitants participating in this contribution. The sustained good health of the American population engaged in such endeavors being essential to the continuity and maximum volume of their contributions affecting interstate and foreign commerce, the Congress accordingly has concluded that additional safeguards are necessary to insure the purity and quality of meat products consumed by the American populace. Considerations of health being deemed to be paramount for these aforementioned reasons, the Congress therefore finds it advisable to impose a set of regulations which will insure that the purity and quality of meat products supplied from whatever source conform to uniform Federal standards.

To carry out this declaration of policy a revision or amplification of the substantive provisions of the existing Federal meat inspection law would then become necessary.

*Supporting precedents*

In *United States* v. *Wrightwood Dairy Co.* (315 U.S. 110, 118–119 (1942)) the Supreme Court sustained an order of the Secretary of Agriculture fixing the minimum prices to be paid to producers of milk in the Chicago marketing area. A dairy company demurred to the regulation on the ground of its applying to milk produced and sold intrastate. Sustaining the order the Court said: "Congress plainly has power to regulate the price of milk distributed through the medium of interstate commerce * * * and it possesses every power needed to make that regulation effective. The commerce power is not confined in its exercise to the regulation of commerce among the States. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. . . . The power of Congress over interstate commerce is plenary. . . . It follows that no form of State activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power."

In *Wickard* v. *Filburn*, 317 U.S. 111, 128–129 (1942) a still deeper penetration by Congress into the field of local production was sustained. As amended by the act of 1941, the Agricultural Adjustment Act of 1938 (7 U.S.C. 612 c, 1281–1282 *et seq.*) regulates production even when not intended for commerce but wholly for consumption on the producer's

FEDERAL MEAT INSPECTION ACT     **65**

farm. Sustaining the extension of the act, the Court pointed out that the effect of the statute was to support the market. "It hardly can be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such [home-consumed] wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies the need of the man who grew it which would otherwise be reflected by purchases in the open market. Homegrown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restriction thereon. This record leaves us in no doubt that Congress may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices."

Federal regulation of State railway rates—in the Shreveport case (*Houston & Texas Railway* v. *United States*, 234 U.S. 342 (1914)), the Interstate Commerce Commission ordered serveral Texas lines to increase certain of their rates between points in Texas until they should approximate rates already approved by the Commission to adjoining points in Louisiana. The latter rates, being interstate were admittedly subject to the Commission. The local rates were as clearly within the normal jurisdiction of the State, and had in fact been set by the Texas Railway Commission. The Supreme Court found that the Interstate Commerce Commission had not exceeded its statutory powers. As to the objection that "Congress is impotent to control the intrastate charges of an interstate carrier even to the extent necessary to prevent injurious discrimination against interstate traffic", the Court replied as follows. "Wherever the interstate and intrastate transactions of carriers are so related that government of one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the State, and not the Nation, would be supreme in the national field".

*IV. What laws affect slaughterhouses and other meat processing facilities not now covered for the purposes of Federal meat inspection?*

Presented hereinafter are those provisions of the Labor-Management Relations Act, Fair Labor Standards Act, Labor-Management Reporting and Disclosure Procedure Act, and the Civil Rights Act (Equal Employment Opportunities) which disclose the extent to which these laws encompass the regulation of local businesses, including meat-processing plants, which are not directly or substantially engaged in interstate or foreign commerce.

**66**            FEDERAL MEAT INSPECTION ACT

*(a) Labor-Management Relations Act*
   *Mercantile establishments subject to coverage thereof*

Industries engaged in commerce or *affecting commerce*. The term, "affecting commerce" means in commerce or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce (29 U.S.C. 142(1); 152(7); 158(b)(4)(i)).

   *Interpretive precedents indicating range of establishments within coverage of act*

*Meatpacker* who received livestock shipped to its Pittsburgh plant from points outside Pennsylvania valued at more than $7 million was engaged in interstate commerce within the meaning of this act. *Shore for and on behalf of National Labor Relations Board* v. *General Teamsters, Chauffeurs, and Helpers Local No. 249*, 169 F. Supp. 817 (1959).

*Drycleaner* who purchased one-half of his annual supplies, or $12,000 in value, from points outside the State of Washington was subject to the act. *National Labor Relations Board* v. *Stroller*, 207 F (2d) 305 (1953); cert. den. 347 U.S. 919 (1954).

*Consolidated Edison Co.* of New York City was subject to the act by reason of the fact that its customers who purchased and used its gas and electricity in New York City were engaged in interstate and foreign commerce (customers included Western Union, RCA, interstate airlines, etc.). *Edison Co.* v. *Labor Board*, 305 U.S. 197 (1938).

*Bakery* whose products were sold and consumed locally, but which purchased 25 percent of all of its raw materials from sources outside its State, materials which were valued at $60,000 was subject to the act—*National Labor Relations Board* v. *Richter's Bakery*, 140 F (2d) 870 (1944); cert. den., 322 U.S. 754 (1944).

*(b) Fair Labor Standards Act*
   *Mercantile establishments subject to the coverage thereof*

"Enterprise engaged in commerce or in the production of goods for commerce" means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

   "(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated and if such enterprise purchases or receives goods for resale that move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 or more;

   "(2) any such enterprise which is engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier if the annual gross volume of sales of such enterprise is

not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated;

"(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000;

"(4) any such enterprise which is engaged in the business of construction or reconstruction, or both, if the annual gross volume from the business of such enterprise is not less than $350,000;

"(5) any gasoline service establishment if the annual gross volume of sales of such establishment is not less that $250,000, exclusive of excise taxes at the retail level which are separately stated:

*Provided*, That an establishment shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce, or a part of an enterprise engaged in commerce or in the production of goods for commerce, and the sales of such establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection, if the only employees of such establishment are the owner thereof or persons standing in the relationship of parent, spouse, or child of such owner (29 U.S.C. 203(s))".

*Interpretive precedents indicating range of establishments within coverage of act*

An employee of packing company engaged in slaughtering animals purchased within State and processing meats for sale within the State, a substantial portion of whose duties were in connection with the processing of byproducts more than half of which were sold in interstate commerce was subject to the act—*Brooks Packing Co.* v. *Henry*, 192 Okl. 533; 137 P(2d) 918 (1943).

Employees who slaughtered cattle, removed hides, split carcasses, and did other incidental work in connection therewith were engaged in "production of goods for commerce" within this act, although beef and edible offal were sold for local consumption and only unsegregated portions of hides and inedible offal were shipped outside State, and employer did not receive more than 10 percent of gross revenue from the interstate business. *Selan* v. *Becker*, 71 F. Supp. 689 (1947).

*(c) Labor-Management Reporting and Disclosure Procedure Act*

*Mercantile establishments subject to the coverage thereof*

Employers required to file reports of payments to employees and to labor organizations (29 U.S.C. 433) includes employers engaged in an industry affecting commerce. "Industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of

FEDERAL MEAT INSPECTION ACT

commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor Management Relations Act, 1947, as amended (29 U.S.C. 402(c)(e)).

*(d) Civil Rights Act—Equal Employment Opportunities*

> *Mercantile establishments subject to the coverage of the provisions thereof*

"Employer" means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year (42 U.S.C. 2000e(b)).

The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes "any activity or industry within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 (42 U.S.C. 2000e(h)).

<div align="right">

THOMAS S. FOLEY.
JOSEPH Y. RESNICK.
JOSEPH P. VIGORITO.
JOHN G. DOW.
FRANK J. BRASCO.

</div>

## SUPPLEMENTAL VIEWS ON LABELING AMENDMENT, H.R. 12144

An amendment which would have required the labeling of all imported meat and meat products to the point of ultimate consumer was first adopted by the committee by a vote of 13 to 10 and later rejected after a motion to reconsider by a vote of 16 to 10.

The basic purpose of the amendment was to require foreign meat and meat food products to be honestly labeled as such so that American consumers could know that their purchase was of foreign origin.

The amendment did not require the specific country of origin but only "information that the product contains meat or food products all or in part produced in and imported from a foreign nation."

Specifically, the amendment would—

(1) Define as "misbranded" any imported carcass, part thereof, meat or meat food product unless it was clearly marked as being imported;

(2) Define the term "ultimate consumer" for the purposes of the act;

(3) Prohibit any person other than an ultimate consumer from removing or mutilating proper labels on any imported carcass, part thereof, meat or meat food product. If any such foreign meat were cut or repackaged, all the new packages would likewise be required to be properly labeled and marked;

(4) Prohibit the importation of articles contrary to the provisions of this act; and

(5) Provide that the foreign-origin labeling requirements be implemented 60 days after enactment and permit the Secretary to waive the application of these provisions in regard to items imported into the United States prior to the effective date of this provision.

Under existing laws and regulations which are administered by the Department of Agriculture's meat inspection program, foreign meat imported for manufacturing or processing purposes is normally shipped frozen in containers of 50- to 60-pound capacity, which are labeled as to origin as are imported meat carcasses and imported bone-in meat cuts. However, after processing in this country, the product is not further identified as being of foreign origin.

In other words, the processor, packer, canner, or distributor who purchases the meat at the port of entry, usually from large importers with processing, packing, and shipping facilities adjacent to the ports, is considered by the Department of Agriculture as the "ultimate consumer" and no further labeling of any imported meat or its products is required.

A substantial amount of the total red meat imported is frozen boned beef which is thawed, ground, blended with fat trimmings from domestic beef and then sold as hamburger. A housewife has no way of knowing when she purchases a package of hamburger at the retail outlet whether it is all or part imported beef.

70                    FEDERAL MEAT INSPECTION ACT

U.S. Department of Agriculture bulletins on processing beef, pork, lamb, and mutton for home use are specific in their warnings: "Cook thawed meat immediately or keep for only a short time in a refrigerator. Avoid refreezing thawed meat."

Retail cuts from imported carcasses or bone-in cuts require no labeling under present Department of Agriculture administration and need not be identified as to origin or grade.

The Food, Drug, and Cosmetic Act of 1938 prohibits the adulteration and misbranding of foods entering interstate and foreign commerce. According to the act, the *label* includes not only the immediate container but the outside container or wrapper of the retail package.

Earlier this year, a meat labeling bill, H.R. 432, was introduced and is now before the Committee on Interstate and Foreign Commerce. This bill would require labeling as to specific country of origin as now required of practically all other imported products. The labeling amendment to H.R. 12144, as mentioned before, requires only that the product be labeled as "produced in and imported from a foreign nation."

Departmental reports on H.R. 432 are most interesting in that the chief concern of the Departments of Agriculture, State, Treasury, and Commerce is with the effects the requirements might have on the administration's policy of reducing international trade barriers and that the bill is contrary to the U.S. obligations under the General Agreement on Tariffs and Trade (GATT) which seeks to prevent discriminatory trade practices. The Bureau of the Budget does add in their report that:

> The Tariff Act of 1930, as amended, already provides for the labeling of imported meats and the Department of Agriculture has issued rules and regulations designed to protect the consumer against imported meat and meat products which might be injurious to health.

Representative Glenn Cunningham, in introducing the bill, H.R. 432, said one of the compelling reasons for disclosure to consumers of the foreign origin of meat is the common practice of mixing domestic and foreign meat that had been frozen and thawed together for hamburger and sausage products which are often refrozen before use. The freezing, thawing, refreezing process could constitute a danger to one's health and the public has a right to know such facts, Mr. Cunningham said.

The Department of Agriculture in reporting on the Cunningham bill acknowledged that:

> All processed products, such as canned or potted meats, ground meats or sausage items, may be imported in consumer size packages only. They are required to be fully labeled, including a statement which identifies the country of origin. The origin statement must appear immediately below the name of the product.

So why such roars of indignation from users of imported meats—and the Washington embassies of the meat exporters—over an even less stringent requirement for labeling of foreign meat and meat products processed and packaged in this country?

The answer is a matter of dollars and cents. There is presently a price differential between imported boned processing beef and domestic

beef of the same grade of about 6 cents per pound. Imported processing beef is about 46 cents and domestic is 52 cents.

However, even the few processors who objected so strenuously to the labeling amendment were poles apart in their predictions of the dire effects the labeling amendment would have.

One of them said:

> If we would be required to label our packages "containing imported meats," it would create a stigma not completely understood by the consuming public. In fact, there would be many doubts, and much misunderstanding. The connotation of foreign or imported leaves a lot to be desired. You and I know that these meats are pure and wholesome as are our own federally inspected meats in the United States. This, however, would be most difficult to communicate to the consumer.

Another had the opposite to say:

> The product will not be less favored. Witness the sales of European canned hams, bacon, and luncheon meat. Witness also the sales of South American corned beef. All of this has been labeled with the country of origin since it is imported in package form.

Some of the processors insisted that there has been a shortage of the leaner types of domestic meats and that they have, therefore, turned to imported meats to supplement their needs.

If this is true, it is because of imports. Look at the record. In 1962, which incidentally was the year the Trade Expansion Act was passed, meat imports began their climb which ended only after they took over more than 10 percent of the domestic market in 1963. This almost wrecked the livestock industry which was already plagued by over-production brought on by cheap surplus feed grains dumped on the market by the Commodity Credit Corporation.

The Meat Import Act of 1964 rolled the rate of imports back but still allowed a yearly increase based on U.S. production increases and the rate is now back close to where it was.

Imports have served to alter domestic production and marketing practices. Faced with high labor costs for boning operations, U.S. meatpackers as a rule are no longer interested in "two-way" cattle—those which could go directly to slaughter from grass or into feedlots. In other words, packers have discovered they could not compete with imports for the grade of beef going to processors.

Consequently, most of the "two-way" cattle have gone into feedlots in the United States during 1966 and early 1967.

It is possible that domestic boning of beef will wither away entirely as fewer skilled boners are employed or trained, creating further economic imbalance in this area.

A proof of the cattleman's claim that his market for processing meat has been taken over by the more cheaply produced imported product, let us examine U.S. production and import figures.

In 1956, U.S. imports of fresh or frozen beef and veal amounted to about 31 million pounds. U.S. production of beef that year was 14,462 million pounds.

72                    FEDERAL MEAT INSPECTION ACT

During the year 1963, imports of fresh and frozen beef and veal had zoomed to 986 million pounds while U.S. production had increased to 16,425 million pounds.

Obviouly there was no shortage of processing beef before the more cheaply produced imports took over the market for that grade of beef and at the same time forced an overproduction situation onto the dressed beef industry.

Cattlemen this year have a 5-percent reduction program underway to eliminate the glut and accommodate to the continuing flood of imported meat.

In 1966, total meat imports subject to the 1964 meat import law amounted to 1,128.1 million pounds (carcass weight equivalent). This was 5.8 percent of U.S. commercial beef production. When all imported live cattle, and dressed, canned, and cured beef are considered (none of these are subject to the 1964 meat import law), total net beef imports in 1966 amounted to about 10 percent of the U.S. commercial beef production (carcass weight equivalent).

And meat imports this year are running even higher.

We mention this factor because of the concern expressed by processors over the costs of a labeling requirement and the concern expressed by the Departments of Agriculture, State, Treasury, and Commerce over the possible effects of the proposed labeling upon our relations with the countries producing the meat.

These Departments, including the Department of Agriculture, certainly show no concern over the effects such a provision might have on the domestic beef producer—only on the foreign producer.

We believe it is the inalienable right of a consumer to know when he is buying an imported product. This theory has been carried through successfully in practically every other imported item offered for sale by our merchants. And yet this meat, which by its sensitive nature should receive especially careful handling, is allowed to go on the dinner plates of unsuspecting Americans without the purchaser ever knowing it was imported. If the housewife chooses to buy hamburger meat made primarily from foreign produced beef, she has the right to do so. But she should at least have the freedom of choice.

The simple requirements of the labeling amendment to this bill are certainly much less severe than present requirements for all foreign produced or processed meat and meat products imported into the United States in consumer-size packages. These products are required to be fully labeled including identity of the country of origin.

This amendment would require only the notation that the products were, all or in part, "produced in and imported from a foreign nation."

ROBERT DOLE.
GEORGE HANSEN.
J. HERBERT BURKE.
WILEY MAYNE.
JOHN M. ZWACH.
BOB PRICE.
BILL NICHOLS.
JOHN RARICK.
G. B. MONTGOMERY.

O