IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,<br><br>    Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture,<br><br>    Defendants. | Case No. 1:23-cv-11671-WGY<br><br>**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Triumph Foods, LLC ("Triumph"), together with Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers' Cooperative ("APC"), both in its official capacity and on behalf of their members (collectively, "Plaintiffs"), by and through their counsel of record, hereby submit the following undisputed material facts for the Court's review:

**Farmer and Processor Plaintiffs**

1. Plaintiff Triumph Foods, LLC ("Triumph") is a farmer-owned company and produces high-quality pork products that are sold locally, nationally, and internationally. ECF No. 107, ¶ 1.

2. Triumph was founded in 2003 by independently owned pork farmers, including Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin,

1

LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers Cooperative ("APC"), both in its official capacity and on behalf of their members (collectively, "Farmer Plaintiffs"). ECF No. 107, ¶ 1.

3. Triumph largely receives its supply of pigs from its member-owners, the Farmer Plaintiffs. ECF No. 125, p. 5; *see also* ECF No. 17, ¶ 12; ECF No. 27-1, ¶ 7, 9; ECF No. 27-4, ¶ 7, 21.

4. Collectively, the Farmer Plaintiffs are located outside the Commonwealth of Massachusetts, in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana. ECF No. 125, p. 5. *See also* ECF No. 17, ¶ 12-19.

5. Triumph processes approximately 5.2 million pigs annually which results in approximately 1.45 billion pounds of pork products sold each year. ECF No. 107, ¶ 2.

6. Triumph processes, packages, and distributes the pork it processes directly from Triumph's facility into Massachusetts as well as throughout the country. ECF No. 125, p. 6; *see also* ECF No. 27-1, ¶ 19; ECF No. 17, ¶ 117.

7. In 2022, Triumph processed over eleven million pounds of pork meat sold into Massachusetts. ECF No. 125, p. 6; *see also* ECF No. 107-1, ¶ 4.

8. The majority of pigs that are sold to and then processed and packed by Triumph is the product of an animal not housed in compliance with the Act. ECF No. 107-1, ¶ 5.

9. Those Farmer Plaintiffs who came into partial compliance with the Act were done as a result of the Hog Procurement Agreements ("HPAs") with Triumph, which required the Farmer Plaintiffs to comply with all state and federal laws and regulations. As a result, the Farmer Plaintiffs have attempted to make significant changes to their operations that are both monetary

and non-monetary in nature, as a result of the Act. *See* e.g., ECF No. 27-4, ¶ 23-25.

10. Under its agreements with pig farmers – including Farmer Plaintiffs in this action as well as other independent farmers – Triumph takes title of the pig from the farmers once it passes USDA inspection, ante-mortem and post-mortem, at the Triumph Plant during processing. ECF No. 121-1, ¶ 15.

11. Triumph maintains title to the pig and then the Whole Pork Meat until it passes directly to the customer in Massachusetts. *Id.* at ¶ 16.

**Massachusetts Question 3: The Act**

12. A ballot committee, called the Citizens for Farm Animal Protection ("CFAP") was formed to support the passage of Initiative Petition 15-11, which was eventually deemed "Question 3" on the 2016 General Election Ballot. ECF No. 107, ¶ 32.

13. Question 3 proponents gathered a sufficient number of additional signatures to have the question placed on the November 8, 2016 ballot. *See* ECF No. 89, ¶¶ 23-24; ECF No. 96, ¶¶ 23-24.

14. On November 8, 2016, Massachusetts voters approved the Question 3, the Prevention of Farm Animal Cruelty. ECF No. 89, ¶ 26; ECF No. 96, ¶ 26. The Prevention of Farm Animal Cruelty Act was enacted by Chapter 333 of the Acts of 2016, on was to go into effect on January 1, 2022. ECF No. 89, ¶ 26; ECF No. 96, ¶ 26.

15. The Prevention of Farm Animal Cruelty Act, as amended, is codified at Mass. Gen. Laws Ch. 129 App., § 1-1 through 1-10 (herein, "the Act"). ECF No. 107, ¶ 18.

16. The Defendants did not perform any research concerning how the Act could benefit a sow's welfare prior to the Act passing in 2016. ECF No. 107-1, ¶ 45; *see also* Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 13.

17. The Defendants did not perform any research concerning what economic effects the Act would have on the residents and businesses within Massachusetts prior to the Act passing in 2016. Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 7.

18. The Defendants did not perform any research with respect to the economic effects the Act may have on out-of-state commercial processors prior to the Act passing in 2016. Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 9.

19. The Defendants did not perform any research with respect to the economic effects the Act may have on the portion of the supply chain involving pork producers, who raise pigs to be processed by pork processors, prior to the Act passing in 2016. Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 10.

20. The Defendants did not perform any research with respect to the impact the Act may have on Massachusetts businesses or citizens prior to the Act passing in 2016. Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 11.

21. The Defendants did not perform any research with respect to the impact the Act may have with respect to the risk of foodborne disease prior to the Act passing in 2016. Affidavit of Ryann Glenn, Ex. 1, Defendants' Answer to Interrogatory No. 12.

22. The Ballot stated that the purpose of the Act was to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." *See* ECF No. 125, p. 3-4; ECF No. 89, ¶ 25 (citing Ex. 1, Information for Voters, 2016 Ballot Questions); ECF No. 96, ¶ 25.

23. One of the justifications communicated to voters for the Act was protecting the health and safety of Massachusetts consumers due to the perceived threat that is posed by certain

methods of farm animal confinement. ECF No. 89, ¶ 25 (citing Ex. 1, Information for Voters, 2016 Ballot Questions).

24. The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." ECF No. 125, p. 4. *See also* ECF No. 107, ¶ 19 (citing Mass. Gen. Laws, ch. 129 App. § 1-2).

25. The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up fully extending the animal's limbs or turning around freely" ("Minimum Size Requirements"). ECF No. 125, p. 4 (citing Mass. Gen. Laws, ch. 129 App. § 1-5).

26. The Act also makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any . . . [w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." ECF No. 125, p. 4; *see also* ECF No. 107, ¶ 22 (citing Mass. Gen. Laws, ch. 129 App. § 1-3).

27. A sale is defined in the Act as "a commercial sale by a business that sells any item covered by section 3 [of the Act]." *Id.* § 1-5(M). The definition goes on to state that "for purposes of this section, a 'sale' shall be deemed to occur at the location where the buyer takes physical possession of an item covered by. . . section 3 [of the Act]." *Id.*

28. Whole Pork Meat is defined as "any uncooked cut of pork, including bacon, ham, chops, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that 'whole pork meat' shall not include combination food

5

products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives." *Id.* § 1-5; ECF No. 107-1, ¶ 27.

29. Sausage products that are not "comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives" are excluded from the Act's definition of Whole Pork Meat. *Id.*; ECF No. 107-1, ¶ 28.

30. The Act provides that, "It shall be a defense to any action to enforce this act that a business owner or operator relied in good faith upon a written certification or guarantee by the supplier that the… whole pork meat…at issue was not derived from a covered animal that was confined in a cruel manner or from the immediate offspring of a female pig that was confined in a cruel manner." *Id.* § 1-7; ECF No. 107-1, ¶ 30.

31. Delayed regulations to implement and address enforcement of the Act were promulgated by the Department of Agricultural Resources ("MDAR") and went into effect on June 10, 2022 (the "Regulations"), with certain exceptions. The Regulations are included at 330 CMR 35.01-08. ECF No. 107, ¶ 50.

32. The Attorney General has exclusive authority to enforce the provisions of the Act. ECF No. 125, p. 5 (citing Mass. Gen. Laws, ch. 129 App. § 1-6).

33. Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act. *Id.*

34. In connection with the Attorney General's rulemaking process, the Attorney General received written comments from Question 3's primary author, the Humane Society of the United States. One of those comments stated: "In drafting the regulations, special care should be taken to avoid providing fodder for preemption-based challenges pursuant to the express

preemption provisions of the Egg Product Inspection Act (EPIA) and Federal Meat Inspection Act (FMIA). 21 U.S.C. § 1052; 21 U.S.C. § 678." *Id.* at ¶ 46.

### FMIA Establishment Exception and this Court's Ruling

35. Until February 5, 2024, the Act included an exception for sales undertaken at an establishment at which inspection is provided under the FMIA. ECF No. 107, ¶ 24 (citing Mass. Gen. Laws, ch. 129 App. § 1-5); ECF No. 125, p. 7 (hereinafter the "FMIA establishment exception" which is also known in some docket entries as the "slaughterhouse exception" or "sales exception").

36. Plaintiffs asserted that this FMIA establishment exception was unconstitutional under the Commerce Clause at Article I, Section 8 of the United States Constitution and in proceeding on this claim, Plaintiffs and Defendants agreed to proceed on a case stated basis. ECF No. 125, ¶ 14.

37. This Court held that the FMIA establishment exception had a discriminatory effect and that the only way Triumph would be able to take advantage of the FMIA Establishment Exception would be to open its own federally inspected facility within the Commonwealth of Massachusetts, which the Supreme Court has held violates the Commerce Clause. ECF No. 125, p. 18.

38. Therefore, this Court held that "the [FMIA establishment] exception violates the dormant Commerce Clause because it discriminates against out-of-state commerce" and it was severed from the Act, effective February 5, 2024. ECF No. 125, p. 19, 21.

39. Defendants admitted that the reason the FMIA establishment exception was originally included in the Act "for the purpose[] of ensuring that there was no question of preemption under the Federal Meat Inspection Act." ECF No. 78, pp. 6:24-7:1; ECF No. 107, ¶

25.

**Purpose of and Requirements of the FMIA and Effects on Pork Processors**

40. In 1906, the FMIA was enacted in light of concerns that unhealthy meat products "impair[ed] the effective regulation of meat and meat food products in interstate or foreign commerce, and thus aimed "to prevent and eliminate burdens upon such commerce [and] to effectively regulate such commerce[.]" 21 U.S.C. § 602.

41. Later, Congress recognized the "need for stronger, more effective and more uniform State inspection programs," due to the conflicting upsurge in individual states attempting to deal with a national problem on a local scale. Affidavit of Ryann Glenn, Ex. 2, H.R. Rep. No. 90-653, pt. 1, at 14 (1967). The FMIA was subsequently amended several times, including, most relevantly, in 1967. The FMIA sought "a uniform framework" which would "provide consumer protection for all citizens, regardless of where their meat originates." *Id*. Due to developing technology in food preservation, Congress recognized new difficulties in inspection processes. *Id.* at 14–15. The FMIA was meant to "[c]larify and broaden [federal] authority over meat and meat products capable of use as human food," and "help bring the requirements of Federal and individual State meat inspection programs into closer conformity toward eventual elimination of the multiple and conflicting requirements presently encountered," as "[w]ithout such a coordinated network of Federal and State inspection programs, the health of the consumer cannot adequately be protected, nor can continued confidence in our meat supply be assured." *Id.* at 16–17.

42. In passing the FMIA, Congress found that meat products are an important source of the country's total supply of food, and that it "is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 42 U.S.C.

§ 602.

43. The FMIA reformed the meat industry, mandating that the U.S. Department of Agriculture ("USDA") inspect all amenable species both ante-mortem and post-mortem prior to being sold for human consumption.

44. The Food Safety and Inspection Service (FSIS), an agency of the USDA, was created to implement the FMIA and, specifically, the inspection provisions of the FMIA. 9 CFR § 300.1-3.

45. The USDA and Federal Safety and Inspection Service ("FSIS") requires Triumph to comply with federal law and the FMIA.

46. The FMIA contains an express preemption clause, which states that ""[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678.

47. The FMIA compels a pre-slaughter inspection that must take place before the product even enters the facility. 21 U.S.C. § 603 (referencing "an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment").

48. While the pigs are at the facility, the FMIA also mandates that the facility provide "satisfactory pens, equipment, and assistants for conducting ante-mortem inspection and for separating, marking and holding apart from passed livestock those marked "U.S. suspect" and those marked "U.S. condemned." 9 C.F.R. § 307.2(a).

49. The FMIA also mandates post-slaughter inspections, 21 U.S.C. § 604; inspections of product slaughtered off-site/slaughtered onsite, transferred offsite, and then transferred back

onsite, 21 U.S.C. § 605; inspections for purposes of labeling, 21 U.S.C. § 606; and inspections of slaughterhouses for sanitation purposes, 21 U.S.C. § 608.

50. The USDA mandated inspections are specifically designed to ensure the pork product is not "adulterated," which the regulations define as meaning, among other things, pork that is for "any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food[.]" 9 CFR § 301.2 (3).

51. The FMIA already has an expansive, detailed framework for what constitutes adulterated meat. *See* 21 U.S.C. §§ 601, 608, 610(c), and 621.

52. FMIA's regulations also direct where inspections must occur, specifically, that inspections must be "made on the premises of the establishment . . . before the livestock shall be allowed to enter into any [part] of the establishment." 9 C.F.R. § 309.1.

53. The FMIA regulations dictate the type of product that is not allowed into the establishment, and how to keep certain types of products segregated within the facility. *See e.g.*, 9 C.F.R. § 309.2.

54. The FMIA regulations dictate specific procedures for how swine are to be sorted before even the animals are presented for processing within the facility to ensure that certain undesirable swine products "do not enter the human food supply[.]" 9 C.F.R. § 309.19.

55. Triumph, like most plants, participates in the USDA's Voluntary Segregation Program ("VSP") and assists and supports the USDA inspection process to add to the resources for the inspection and review. ECF No. 27-1, ¶ 45.

56. The USDA's FSIS inspects the pigs before they enter the Triumph facility (ante-mortem) through Triumph's VSP and after they have entered the plant for processing (post-mortem). The USDA continues to inspect every phase of the pig's processing after the post-

mortem phase. ECF No. 121-1 ¶ 14.

57. When a farmer's delivery of pigs arrives at Triumph, trained plant officials on behalf of and pursuant to the USDA's VSP inspect the pigs on the farmer's delivery trucks for disease, injury, abnormalities or any other sign of adulteration before the pigs can be taken off the truck and delivered to the receiving alleys outside of the plant. If any possible issues of adulteration are identified on the truck, the pigs are placed in an individual antemortem inspection holding pen and must be individually inspected by an FSIS veterinarian. After the pigs pass this initial inspection and are unloaded into the receiving alley, the pigs are observed and monitored yet again through the FSIS program. After this phase of observation, they are humanely moved to a barn for resting and for further inspection. ECF No. 27-1, ¶ 46.

58. Triumph works hand in hand with the USDA from before pigs even go inside its facility, and throughout every aspect of the processing line. ECF No. 27-1, ¶ 43.

59. Entities that are subject to the FMIA include meat brokers, processors, renderers, salvagers, transporters, distributors, and warehouses. ECF No. 89, ¶ 36 (citing FSIS DIRECTIVE 8010.1 Rev. 6 (June 3, 2022), https://www.fsis.usda.gov/sites/default/files/media_file/2020-07/8010.1.pdf); ECF No. 96, ¶ 36.

**Effects of the Act on FMIA-Inspected Facilities and the Pork Industry, Generally**

60. Triumph ensures that pigs compliant with Question 3 are segregated so that non-compliant pork is not shipped into Massachusetts. ECF No. 121-1, ¶ 17.

61. If Triumph does not keep the compliant pigs separate from the non-compliant pigs that do not meet the requirements of the Act, they will be intermixed either during the preprocessing procedures described above or throughout the processing line after they have entered the facility. ECF No. 27-1, ¶ 49. This means separate trucks, separate unloading, separate

receiving alleys, separate areas in the barns, separation through each and every aspect of the processing line inside the processing plant itself. Then, of course, separate shipment to the final destination. ECF No. 27-1, ¶ 49.

62. Because of the Act, Triumph has also had to create a process required to differentiate between pork that meets the Act's requirements and the pork that does not, despite the non-compliant pork being fully USDA inspected and approved. ECF No. 125, p. 6, 11. For example, pork intended for Massachusetts (and California with regards to Proposition 12) must be further segregated as two separate states with different requirements and regulations, and the pork cannot be mixed with even one another. ECF No. 27-1, ¶ 28.

63. The Act has also required Triumph to implement new SKU's and new sorting procedures and storage locations within its facility. ECF No. 27-1, ¶ 29.

64. Each container with cuts of Whole Pork Meat is labeled in accordance with USDA regulations and bears a seal with Triumph's USDA Establishment Number 31965. Triumph tracks each pig back to the farmers. ECF No. 121-1, ¶ 18.

65. Triumph also tracks and maintains the shipping information for each container of products of Whole Pork Meat at the Triumph Plant. *Id.* at ¶ 19.

66. Triumph's ability to use/sell meat from the whole pig has been impacted. ECF No. 27-1, ¶ 30. Specifically, items for which there is no demand for utilization in Massachusetts are just sold into the commodity market without any premium to offset the cost of production (as caused by the requirements of the Act), resulting in those products being sold at a loss. ECF No. 27-1, ¶ 30.

67. In short, Triumph has implemented new, separate truck delivery schedules, physical segregation procedures, additional tracking systems, new SKU numbers, labeling

requirements, sorting and transportation requirements, certification requirements between farmer and processor, and different storage requirements, month other inventory management tools (e.g., stock keeping units, or bar codes), for purposes of ensuring Question 3 Whole Pork Meat remains segregated from conventional, non-compliant Whole Pork Meat. ECF No. 107-1, ¶ 7; ECF No. 27-1, ¶¶ 27–29, 49–50.

68. Without compliant pork and without these segregation procedures in the USDA processing line, Triumph is unable to sell its products into Massachusetts at all. ECF No. 125, p. 11.

69. Because of the Act, Farmer Plaintiffs have had to deliver Question 3-compliant pigs to Triumph separate from its other pigs destined for other states, and the USDA observes and inspects compliant pigs separately at Triumph as well. ECF No. 27-3, ¶ 13.

70. As way of example, in July of 2023, Hanor's conventional pigs were inadvertently mixed in with a set of pigs that were Question 3/Proposition 12 compliant, due to an administrative error of Hanor's truck. Hanor notified Triumph that it had inadvertently made an administrative error and one of their trucks they denoted as delivering Question 3/Proposition 12 product, was in fact offspring from pigs housed in traditional housing units." ECF No. 27-1, ¶ 50.

71. Despite the fact that these pigs were fully inspected and approved by the USDA as healthy and safe for consumption, as was every piece of processed meat that came from these pigs, Triumph was forced to call back all of the product shipped out from the plant, thereby wasting the healthy pigs and the pork meat not just from Hanor, but all of the other compliant product that it was inadvertently processed with it. This resulted in significant losses to both Hanor and Triumph. ECF No. 27-3, ¶ 14.

72. As a result of this error, even though these pigs had already passed full ante-

mortem and post-mortem USDA inspection, the perfectly healthy, fresh, USDA approved product was wasted. ECF No. 27-1, ¶ 50.

73. The process of segregating Whole Pork Meat for what Massachusetts and California demand from the rest of the country, and keeping Massachusetts and California separate from one another, uses resources well above and beyond what is normally required to produce pork products within the industry. In order to accomplish this, costs are increased substantially and makes the processing operation less efficient overall. To do this for every individual state preference would be catastrophic for Triumph. ECF No. 27-1, ¶ 26.

74. Pigs that meet the California [Proposition 12] requirements would also have to be separated from Massachusetts [whole pork meat]. The requirement for segregation on a state-by-state basis that laws like Question 3 and Proposition 12 create is not sustainable for farms or processing lines. ECF No. 27-3, ¶ 15.

**Judicial Notice Facts**

To the extent not incorporated above, Plaintiffs incorporate by reference the judicial notice facts previously submitted through ECF No. 86, and the supplementation submitted for purposes of the Case Stated proceeding found at ECF No. 111. On December 12, 2023, Defendants stated they did not object that the Court may take judicial notice of the exhibits submitted in connection with its summary judgment brief or any related supplementation to the judicial notice for purposes of the Case Stated proceeding as consistent and permitted under the Federal Rules of Evidence. *See* ECF No. 107, 107-1.

Dated: March 6, 2024

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER

FARMS, INC., and ALLIED
PRODUCERS' COOPERATIVE, Plaintiffs.

By: */s/ Ryann A. Glenn*

Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes *(admitted pro hac vice)*
Ryann A. Glenn (*admitted pro hac vice*)
Michael Raupp (*admitted pro hac vice*)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8381
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of March 2024, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Ryann A. Glenn*