UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | CIVIL ACTION NO. 1:23-cv-11671-WGY |

Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Commissioner of the Massachusetts Department of Agricultural Resources,

Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK .............................................. 3

    A. The Massachusetts Act.................................................................................. 3

    B. The Federal Meat Inspection Act ................................................................. 3

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 4

    A. Farmer Plaintiffs' Breeding Pig Confinement Methods ................................. 4

    B. Tracing and Segregation Used by the Pork Industry and Triumph................ 6

    C. Plaintiffs' Prior FMIA Preemption Claims ................................................... 7

STANDARD OF REVIEW....................................................................................... 9

ARGUMENT ........................................................................................................... 9

    I.    THE COURT SHOULD REINSTATE ITS PRIOR DISMISSAL BECAUSE
        PLAINTIFFS ADVANCE NO NEW ARGUMENT THAT THE ACT, AS
        SEVERED, "IS NOW PREEMPTED BY THE FMIA." ............................... 9

    II.  PLAINTIFFS' EXPRESS FMIA PREEMPTION CLAIM (COUNT III) WAS
        PROPERLY DISMISSED AND FAILS AS A MATTER OF LAW. ...........................11

        A. *Harris* Affirmed that State Regulation of a Slaughterhouse's Commercial
           Sales Generally Is Permissible as Outside the Scope of the FMIA. ............... 12

        B. The Act Imposes No Requirements within the Scope of the FMIA and
           Instead Acts at a Remove from Slaughterhouses, Only Incidentally
           Affecting Their Supply Chain Logistics. ......................................................... 14

        C. Even if the Act Could Fairly Be Characterized as Imposing a Record-
           keeping Requirement, Such Requirements Are Expressly Exempted from
           the FMIA's Preemption Clause. ..................................................................... 18

    III. PLAINTIFFS' CONFLICT PREEMPTION CLAIM UNDER THE FEDERAL
        MEAT INSPECTION ACT (COUNT IV) WAS PROPERLY DISMISSED AND
        FAILS AS A MATTER OF LAW.............................................................. 19

CONCLUSION ...................................................................................................... 20

## INTRODUCTION

This Court vacated its prior dismissal of Plaintiffs' express preemption claim to allow Plaintiffs to present argument on whether "the [Massachusetts Prevention of Farm Animal Cruelty] Act – with the slaughterhouse exemption severed – is now preempted" by the Federal Meat Inspection Act ("FMIA").  ECF No. 125, at 22.  Plaintiffs' summary judgment motion fails to answer that call.  Plaintiffs advance the same preemption theories the Court previously dismissed when it correctly concluded the FMIA does not preempt the Act's ban on the in-state sale of whole pork meat derived from pigs forced to live on farms in crates so small they cannot turn around.  ECF No. 66.  Plaintiffs do not contend the severance of the slaughterhouse exemption changed their arguments in any relevant way — to the contrary, they effectively concede the exemption is immaterial.  *See* ECF No. 127, Mem. in Supp. of Mot. for Summ. J. (hereinafter "Pl. Mem."), at 10 (arguing "[w]ith or without this severance," the Act is preempted).  Indeed, it is difficult to see how the severance could change their arguments because the exemption never applied to Triumph in the first place: Triumph neither makes on-premises sales nor operates a slaughterhouse in Massachusetts.  Accordingly, the Court should reinstate its prior dismissal of Plaintiffs' express preemption claim.

If the Court revisits the substance of Plaintiffs' claim, it again should conclude that the FMIA does not preempt the Act, even with the exemption severed.  The FMIA's preemption clause prohibits state laws that impose additional or different "requirements" within the "scope" of the FMIA with respect to the "premises, facilities and operations of" regulated establishments – as relevant here, slaughterhouses. 21 U.S.C. § 678.[1]  The Act, unlike the California law struck

---

[1] Plaintiff Triumph Foods, LLC, is the only FMIA-inspected establishment that is a party.  Defs.' Statement of Undisputed Material Facts ("DSOF") ¶¶ 21-22.

down in *National Meat Association v. Harris*, 565 U.S. 452 (2012), does not attempt to directly or indirectly regulate slaughterhouses.  Instead, the Act – consistent with its purpose to "phase out extreme methods of farm animal confinement" – incentivizes more humane confinement on farms and is entirely silent with respect to slaughterhouse practices.  It therefore is the type of law that three other Circuit Courts of Appeal and the *Harris* Court recognized "acts at a remove" from slaughterhouses and is not preempted by the FMIA.

Plaintiffs' express preemption argument contorts both the text of the FMIA and the Court's reasoning in *Harris* in two principal ways.  First, Plaintiffs assert that any regulation of Triumph's commercial sales is preempted simply because Triumph is a slaughterhouse.  Plaintiffs ignore the *Harris* Court's plain statement that "the FMIA's preemption clause does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses.'"  565 U.S. at 463 (quoting Br. for United States as *Amicus Curiae*, at 17).  A sales ban runs afoul of *Harris* only if it seeks to indirectly impose a requirement on slaughterhouses that would, if imposed directly, be preempted by the FMIA.  *Id.* at 463-64.  The Act contains no such measure.  Second, and again relying on *Harris*, Plaintiffs claim that the Act is preempted because it "functions as a command to slaughterhouses" to adopt specific "segregation procedures."  The Act does no such thing.  The indirect and incidental effects on Plaintiffs' inventory management are not "requirements" within the scope of the FMIA's inspection and slaughter regime.  Even if those effects could fairly be characterized as a "requirement," they amount, at most, to a record-keeping requirement, which is explicitly allowed by the FMIA's express preemption clause.

Lastly, there is no merit to Plaintiffs' conflict preemption claim that the Act supplants the FMIA's definition of "adulterated."  The Act does not use the term "adulterated" at all and functions to incentivize certain farm practices, not supplant federal adulteration determinations.

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Massachusetts Act

The Massachusetts Act to Prevent Cruelty to Farm Animals (the "Act") was enacted by ballot initiative in 2016 with overwhelming public support. DSOF ¶ 1. The Act's purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement." Mass. G.L. c. 129 App. § 1-1; DSOF ¶ 2 & Ex. V. In pertinent part, the Act bans the in-state "sale" of "whole pork meat" derived from breeding pigs (or from their immediate offspring) who are "confined in a cruel manner," *i.e.*, "in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely." *Id.* §§ 1-3, 1-5. Confinement during slaughter or transport is excluded. *Id.* § 1-4. This Court's February 5, 2024, Order severed from the definition of "sale" an exemption for "any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act," referred to as the "slaughterhouse exemption." ECF No. 125, at 22.

### B. The Federal Meat Inspection Act

The FMIA, as amended by the 1967 Wholesome Meat Act and the 1978 Humane Methods of Slaughter Act, aims "to protect the consuming public from meat and meat food products that are adulterated or misbranded and to assist in efforts by State and other Government agencies to accomplish this objective." 21 U.S.C. § 661(a). The FMIA has "dual goals of safe meat and humane slaughter." *Harris*, 565 U.S. at 455. Accordingly, the FMIA regulates specified "activities at slaughterhouses to ensure both safety of meat and humane handling of animals." *Id.* at 455. Relevant here, the FMIA prescribes a system of meat inspection that requires ante-mortem inspection of animals prior to entry into a slaughterhouse, humane handling in the slaughterhouse, and post-mortem inspection of carcasses after slaughter,

to evaluate whether the animals (or their meat) show signs of disease, decay, or other adulteration.  *See generally* 21 U.S.C. §§ 603, 605.

The Food Safety and Inspection Service ("FSIS"), an agency within the United States Department of Agriculture ("USDA"), promulgates regulations to implement the FMIA and carries out its inspection regime.  *See* 9 C.F.R. § 300.1 *et seq.*  FSIS regulations require that all livestock "entering" slaughterhouses, as well as all products prepared therein, "shall be inspected, handled, stored, prepared, packaged, marked, and labeled as required by the regulations in this subchapter," and sets forth requirements for those processes.  9 C.F.R. § 302.3; *see generally* 9 C.F.R. §§ 300 *et seq.*

The FMIA's express preemption clause, incorporated by the Wholesome Meat Act of 1967, prohibits a state from imposing any "[r]equirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this [Act], which are in addition to, or different than those made under this [Act]."  21 U.S.C. § 678.  The clause also provides, however, that any state "may impose recordkeeping and other requirements within the scope of [21 U.S.C. § 642, 'Recordkeeping requirements'], if consistent therewith, with respect to any such establishment." *Id.*

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Farmer Plaintiffs' Breeding Pig Confinement Methods

The "Farmer Plaintiffs" – Christensen Farms Midwest ("Christensen Farms"), The Hanor Company of Wisconsin ("Hanor"), New Fashion Pork ("NFP"), Eichelberger Farms ("Eichelberger"), and members of the Allied Producers Cooperative ("APC") – run "farrow-to-finish" operations, raising pigs from birth until they reach slaughter weight.  DSOF ¶ 10.

Farmer Plaintiffs use different methods to confine (or "house") breeding sows.  DSOF ¶¶

4

10-20.  Gestation "crates" or "stalls" (also referred to as "conventional" housing or "individual maternity pens (IMP)") enable farmers to house thousands of pigs in a single barn.  DSOF ¶¶ 12-13 & Ex. N, at 1.  Gestation crates typically are about fourteen square feet, a size which prevents breeding pigs from turning around.  DSOF ¶ 13 & Ex. AC.  Other confinement systems include "Open Pen Gestation" or "OPG," in which pig farmers confine a sow in a gestation crate from artificial insemination until they confirm pregnancy, and then move the sow into a group pen which targets only about twenty square feet per sow.  DSOF ¶¶ 14, 18.

To serve consumers with concerns about these confinement methods, organizations like the Global Animal Partnership ("GAP") have created humane standards requiring that pigs be allowed enough space to express their natural behaviors, which producers may voluntarily adopt.  DSOF ¶ 15.  Similarly, USDA's recently revised organic standards prohibit use of gestation crates for pork producers who wish to market their products under the "USDA Organic" label.  *See* 88 Fed. Reg. 75394, 75414 (eff. Jan. 2, 2024).  And relevant here, California's Proposition 12 requires that pork products sold in the state derive from breeding pigs that are allotted twenty-four square feet, as well as have sufficient space to lie down, extend their limbs, and turn around.  Cal. Health & Safety Code Ann. § 25991.[2]

Most of Farmer Plaintiffs' facilities use gestation crates and several use OPG.  DSOF ¶¶ 17-18.  Some have facilities that meet the "GAP Level 1" standard, which exceeds the Massachusetts and California standards.  DSOF ¶¶ 19. Several have converted facilities to meet the standards of California's Proposition 12, which also meets the Act's standards.  DSOF ¶ 20.

---

[2] Defendants' understanding is that, because the Act includes only the "turn-around" standard but not a minimum square-footage standard, *see* Mass. G. L. ch. 129 App. § 1-5, compliance with California's standards is sufficient to meet Massachusetts' standards.

**B. Tracing and Segregation Used by the Pork Industry and Triumph**

Triumph is a pork processor that operates a slaughterhouse and sources pigs primarily

from its member-owners, the Farmer Plaintiffs, under the terms of contracts referred to as Hog

Production Agreements (HPAs).  DSOF ¶¶ 4-6, 21, 24.  Pursuant to their HPAs, the Farmer

Plaintiffs must provide to Triumph a specific number of pigs annually corresponding to their

ownership percentage in Triumph or jeopardize their ownership stake.  DSOF ¶¶ 7-8.  Triumph

also sources pigs from over 1,500 other independent pig farmers.  DSOF ¶ 9.

Triumph processes pigs into a wide array of brands, products, and byproducts.  DSOF ¶¶

25-30.  To distribute specific, branded products, large slaughterhouses like Triumph must be able

to trace pigs back to individual originating farms, track those pigs, carcasses, and meat products

through their facilities, and dispatch orders to customers in an orderly manner.  DSOF ¶¶ 25-31.

Triumph touts its ability to "select the right fit from our hog supply to accurately meet" a given

product's specifications.  DSOF ¶ 23.  The industry has innovated several methods of tracing and

segregating products for marketing purposes, ranging from tattoos to RFID chips.  DSOF ¶ 32.

For example, Triumph markets its products under its own brands, like Daily's Premium

Meats, Prairie Fresh, and 67th Street BBQ, and under private labels. DSOF ¶¶ 25, 27.  Triumph

has over 1,000 product codes for specific cuts of meat as well as byproducts like heparin, an

anticoagulant.  DSOF ¶¶26-30.  It has product codes specific to its different brands, as well as

codes for grocery stores like Kroger and Costco.  DSOF ¶¶ 26-27.  It also has product codes for

pigs housed in "OPG" (open pen gestation) on originating farms.  DSOF ¶ 29.  Triumph's

distributor, Seaboard Foods, also participates in USDA's "Process Verified Program" to allow it

to market pork with the claim that the pigs were "Never Fed Beta Agonist" on-farm. DSOF ¶ 31.

For purposes of creating pork products that comply with Proposition 12 (and, by default,

the Act), certain Farmer Plaintiffs have modified some barns to allow the required space for breeding pigs. DSOF ¶ 20. To identify compliant pigs and ship compliant product, Triumph drafted a "Proposition 12 Segregation Procedure," which also purports to include steps specific for processing pigs that meet Massachusetts standards. DSOF ¶¶ 33-34 & Ex. G.[3] Triumph's procedure requires pig farmers to deliver Prop-12 compliant pigs at specific times; Triumph then counts them; tags the first and last pig with tape; runs them as a group on the kill floor and re-counts them; processes them; and maintains them in separate storage prior to shipment. *Id.*

Triumph does not offer any facts to support that the FSIS ante-mortem and post-mortem inspection procedure varies, or needs to vary, in any way to accommodate any of Triumph's tracing or segregation procedures, including Triumph's (1) tracking its suppliers' deliveries to ensure fulfillment of their contractual obligations; (2) tracing cuts of meat or products specific for its own specialty brands, or destined to specific customers; or (3) tracing Proposition-12 or Massachusetts-compliant product. *See* Plfs.' Statement of Facts, ECF No. 128 ("PSOF").

### C. Plaintiffs' Prior FMIA Preemption Claims

Plaintiffs' operative amended complaint contained ten counts, including express and conflict preemption by the FMIA. ECF No. 17 (Count III, ¶¶ 187-203; Count IV, ¶¶ 204-22). Defendants moved to dismiss all counts, arguing as to FMIA preemption that the Act does not (1) redefine what constitutes "adulterated" pork meat, nor (2) "force" slaughterhouses to undertake specific segregation procedures; nor does the Act conflict with the FMIA's objective to

---

[3] The Plaintiffs do not appear to raise or process Massachusetts-specific product, only Proposition-12 compliant product that also is sold in Massachusetts. *See, e.g.,* Defs' Res. to PSOF ¶ 62. This factual dispute is not material because, as described below, the Act does not impose any impermissible "requirements" within the scope of the FMIA, regardless of whether Plaintiffs choose to sell product complying with Massachusetts standards or California's more stringent standards.

ensure "adulterated" meat is kept out of commerce. ECF No. 54 at 11-17.

This Court dismissed from the bench all claims except the dormant Commerce Clause

claim.  Tr., Hr'g on Mot. to Dismiss, p. 18, ll. 9-12.  On FMIA preemption, the Court explained:

> I've parsed the language, I -- again, respectfully, I just disagree. I think that [the Massachusetts Act] ha[s] not, as this is drafted, come in conflict with [the Federal Meat Inspection Act], and I'm not sure they come in conflict with any Act.

*Id.* at p. 18, ll. 4-8.

After the Court granted summary judgment for Defendants on certain of Plaintiffs'

theories under the dormant Commerce Clause, ECF No. 99 & 125, the Parties agreed to case

stated on Plaintiffs' final theory regarding the "slaughterhouse issue," *i.e.*, that the Act's

exemption for "any sale undertaken at an establishment at which inspection is provided under the

Federal Meat Inspection Act" was discriminatory against out-of-state slaughterhouses like

Triumph because the only slaughterhouses "that can benefit from the exception" are those

"*within* Massachusetts," which Triumph is not.  ECF Nos. 99; 110 (Plfs.' Case-Stated Br.) at 4.

In an Order dated February 5, 2024, the Court held the "slaughterhouse exemption" was

unconstitutionally discriminatory and severed it from the remainder of the Act.  ECF No. 125.

After severance, the on-premises sales of slaughterhouses in Massachusetts—which previously

were excluded from the Act—will now be covered by the Act.  The severance does not change

the Act's application to the Massachusetts sales of out-of-state slaughterhouses, like Triumph.

The Court had "a number of questions" regarding Plaintiffs' assertion that severance

would "unquestionably" render the Act preempted by the FMIA, and so vacated its prior

dismissal of Plaintiffs' Count III and granted Plaintiffs leave to "move for summary judgment on

the ground that the Act—with the slaughterhouse exemption severed—is now preempted by the

FMIA."  *Id.* at 22.  Plaintiffs moved on March 6, 2024, and Defendants oppose and cross-move.

**STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must consider "all of the record materials on file, including the pleadings, depositions, and affidavits," but may not "evaluate the credibility of witnesses nor weigh the evidence."  *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  All inferences are to be drawn in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**ARGUMENT**

Plaintiffs contend that because the exemption was included to ensure there was "no question of preemption" under the FMIA, PSOF ¶ 39, that necessarily means the Act is preempted without the exemption.  They are wrong.[4]  But the Court need not revisit the merits of this question because the Plaintiffs' preemption arguments – and the facts upon which they rely – are identical to those previously raised, and the Court should reinstate its prior dismissal without further analysis.  The conflict preemption claim is also barred because this Court did not vacate dismissal of that claim.  If the Court reaches the merits of express and conflict preemption, it should enter judgment for Defendants because the Act neither imposes additional or different requirements within the scope of the FMIA, nor stands as an obstacle to the FMIA's objectives.

I.    **THE COURT SHOULD REINSTATE ITS PRIOR DISMISSAL BECAUSE PLAINTIFFS ADVANCE NO NEW ARGUMENT THAT THE ACT, AS SEVERED, "IS NOW PREEMPTED BY THE FMIA."**

The Court already "parsed the language" and concluded nothing in the Act "c[a]me in

---

[4] Defendants have repeatedly noted the exemption was an overcautious and legally unnecessary attempt by the initiative proponents to avoid a preemption challenge, and advanced other reasons why there is no preemption.  *See, e.g.,* ECF 54 (Defs.' Motion to Dismiss Brief), at 12-15; ECF No. 109 (Defs.' Case Stated Brief), at 7, ECF No. 94 (Defs.' Opp. to Summ. Judg.), at 16 n.7.

conflict with [the Federal Meat Inspection Act]." Tr., Hr'g on Mot. to Dismiss, p. 18, ll. 4-8; ECF No. 66. The Court's most recent order allowed Plaintiffs to move for summary judgment based on whether "the Act -- *with the slaughterhouse exemption severed* -- is *now* preempted by the FMI," not reargue the motion to dismiss. *See* ECF No. 125 at 22 (emphases added).

And yet Plaintiffs' motion for summary judgment argues the same rejected theories from their complaint and their opposition to Defendants' motion to dismiss, namely that the Act imposes "segregation requirements" on slaughterhouses like Triumph and supplants USDA's "adulteration" determinations. *Compare* ECF No. 58, at 10-15, *with* ECF No. 127. Absent is any argument reflecting any *change* following the Court's severance, *i.e.*, whether the Act's *new* application to certain on-premises sales within Massachusetts affects the preemption analysis.

Plaintiffs fail to present a new theory because severance had no effect on how the Act operates with respect to them. Prior to severance, the exemption excluded sales undertaken at slaughterhouse premises in Massachusetts. Plaintiffs operate no such facilities, which was the basis for their discrimination argument. *See* ECF No. 110 (Pls.' Case Stated Briefing), at 4. Severing the exemption leaves Plaintiffs in the same position as when the Court dismissed their FMIA preemption claims the first time, except that Triumph – by its own reasoning – no longer faces "discriminatory" competition from Massachusetts slaughterhouses.[5]

Under Plaintiffs' own logic, then, severing the exemption has no impact on Plaintiffs' FMIA preemption claims, so the Court should reinstate their dismissal without further analysis. *See Negron-Almeda v. Santiago*, 579 F.3d 45, 51 (1st Cir. 2009) (courts should only revisit prior

---

[5] It is questionable whether these Plaintiffs even have standing to challenge the modified application of the Act after severance, as only *in-state* slaughterhouses experienced a change in legal status by newly having on-premises sales subject to the Act. *Cf. Weaver's Cove Ener., LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 468 (1st Cir. 2009) (plaintiff must "suffer a concrete injury from [the state] subjecting it to a preempted state law" to have standing).

holdings "sparingly" upon "a showing of exceptional circumstances," namely a "dramatic[]" change in "controlling legal authority," "significant new evidence, not earlier obtainable" or "serious injustice" due to "blatant error in the prior decision" (citations omitted)).

## II.   PLAINTIFFS' EXPRESS FMIA PREEMPTION CLAIM (COUNT III) WAS PROPERLY DISMISSED AND FAILS AS A MATTER OF LAW.

If the Court chooses to revisit its preemption analysis, much of what follows will be familiar and warrants judgment for Defendants. The Supreme Court already has noted that, "[d]espite the persistent efforts of certain pork producers, Congress has yet to adopt any statute that might displace [California's] Proposition 12 or laws regulating pork production in other States." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (citing proposed federal bills). Thus, although "congressional enactments may preempt conflicting state laws," "everyone . . . agrees that we have nothing like that here." *Id.*

The FMIA preempts state "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any establishment at which inspection is provided under [the FMIA], which are in addition to, or different than those made under [the FMIA]," except that states "may impose recordkeeping and other requirements within the scope of [21 U.S.C. § 642], if consistent therewith, with respect to any such establishment." 21 U.S.C. § 678.

Congressional intent is "the ultimate touchstone" in an express preemption claim. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). To determine a clause's preemptive scope, a court "rel[ies] on the plain language of the statute and its legislative history to develop a reasoned understanding of the way in which Congress intended the statute to operate." *Medicaid & Medicare Adv. Prod. Ass'n of P.R., Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted)).

The Plaintiffs' FMIA express preemption argument fails because they have identified no

"requirements" "within the scope" of the FMIA that the Act imposes "with respect to premises, facilities and operations" of slaughterhouses.  The Act's sales provision is a commercial sales regulation outside the "scope" of the FMIA's regulation of safe meat production and humane slaughter.  The Act operates "at a remove" from slaughterhouses because it incentivizes hog production practices on *farms*, and is silent as to slaughterhouse premises, facilities, or operations.  Triumph's efforts to ensure it ships the right product to the right customer is no more than a downstream incidental effect on slaughterhouses – one in which Plaintiffs, and the pork industry, already engage as a matter of course – not "requirements" "within the scope of the FMIA."  At most, the effect on Plaintiffs' supply chain amounts to a recordkeeping requirement that the FMIA's preemption clause expressly allows states to impose.

### A. *Harris* Affirmed that State Regulation of a Slaughterhouse's Commercial Sales Generally Is Permissible as Outside the Scope of the FMIA.

"[T]he FMIA's preemption clause does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses.'"  *Harris,* 565 U.S. at 463 (quoting Br. for United States as *Amicus Curiae*, at 17)).  Ignoring this rule, Plaintiffs first attempt to argue exactly that: that the Act's sales ban impermissibly "regulates a facility," like Triumph, "that *sells* that product."  Pl. Mem. at 16.  But the FMIA's preemption clause is "concerned with the methods, standards of quality, and packaging that slaughterhouses use," not with "the entire field of meat commerce."  *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333-34 (5th Cir. 2007).

Plaintiffs' misread *Harris* for the proposition that regulation of commercial sales activities alone falls "within the scope" of the FMIA and acts "with respect to premises, facilities and operations" of a slaughterhouse.  Pl. Mem., 16-17.  Yet *Harris* was clear that the FMIA preempted the California law not simply because it included a sales ban, but because the sales

ban was part of a statutory scheme that directly regulated slaughterhouse premises, facilities and operations. *Harris*, 565 U.S. at 464. The California law provided that "[n]o slaughterhouse . . . shall buy, sell, or receive a nonambulatory animal" or "shall process, butcher, or sell meat or products of nonambulatory animals for human consumption" or "shall hold a nonambulatory animal without taking immediate action to humanely euthanize the animal." *Harris*, 565 U.S. at 458 (quotation omitted). The "sales ban" worked together with provisions that directly instructed slaughterhouses to handle nonambulatory animals in a specific way. *Id.* at 458.

The Court acknowledged the "general rule" that a slaughterhouse's "commercial sales activities" are *outside* the scope of the FMIA. *Id.* at 463. But, for the challenged law, the sales ban was "calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia." *Id.* at 463-64. Those "other regulations" fell firmly within the FMIA's scope because they "compel[led]" certain actions with regard to "the slaughtering and processing of animals at a given location." *Id.* at 460, 463. Thus, "[l]ike the rest of § 599f, the sales ban regulate[d] how slaughterhouses must deal with non-ambulatory pigs on their premises" and so the FMIA "preempt[ed] it for all the same reasons." *Id.* at 464.

Unlike the law in *Harris¸* the Act does not operate to indirectly accomplish regulation of slaughterhouses that it otherwise could not achieve directly. Instead, the sales ban – which applies to any commercial business engaging in sales in Massachusetts, not just slaughterhouses – is the *sole* provision of the Act that Plaintiffs challenge. The Act excludes from its definition of "cruel confinement" any confinement during slaughter or transport, *i.e.*, any confinement by slaughterhouses. Mass. Gen. L. ch. 129 App. § 1-4(A), (C). As Plaintiffs concede, the goal and effect of the Act is not to incentivize specific slaughterhouse practices or procedures, but instead

13

to incentivize (or disincentivize) certain production practices on *farms*.  Pl. Mem. at 17.

Plaintiffs nevertheless attempt to equate the California law's "command" to slaughterhouses to "remove nonambulatory pigs from the production process," *Harris*, 565 U.S. at 464, with the Act's purported "command" to "FMIA facilities selling to Massachusetts to structure their operations in a manner to remove noncompliant Whole Pork Meat."  Pl. Mem. at 17.  This plainly misstates what the Act requires and what *Harris* found problematic.  *See Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1115 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2493 (2023) ("The California law was preempted not because it was a sales ban but because it operated as a 'command to slaughterhouses to structure their operations.'" (quoting *Harris*, 565 U.S. at 464)).  The Act's sales ban neither directly nor indirectly commands slaughterhouses on how to handle and slaughter pigs.

The Act's only act of regulation is at the point of sale within Massachusetts and so, with respect to slaughterhouses, it functions solely as a permissible commercial sales regulation.

### B. The Act Imposes No Requirements within the Scope of the FMIA and Instead Acts at a Remove from Slaughterhouses, Only Incidentally Affecting Their Supply Chain Logistics.

It is undisputed that the sales ban is tied not to how a pig is inspected, slaughtered, or processed at a slaughterhouse, but instead "is directly tied to how a breeding sow is raised on a farm."  Pl. Mem. at 14.  The Act accordingly "works at a remove from the sites and activities the FMIA most directly governs," and as *Harris* and three different Courts of Appeal have recognized in relation to other sales bans, therefore falls outside the scope of the FMIA's preemptive sweep.  *See Harris*, 565 U.S. at 467 (distinguishing California law from horse meat bans); *Ass'n des Éleveurs*, 33 F.4th 1107 (upholding state law banning force-fed foie gras); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007), *cert denied*, 554 U.S. 902 (2008) (upholding

14

state ban on horse meat); *Empacadora*, 476 F.3d 326 (upholding state ban on horse meat).

In *Association des Éleveurs* (2022), the foie gras industry challenged a California law that prohibited the in-state sale of "products that are 'the result of force feeding a bird,'" *i.e.*, a sales ban tied to a particular method of farm production. 33 F.4th at 1112 (quoting Cal. Health & Safety Code § 25982). The Ninth Circuit looked to *Harris* as instructive authority on what constitutes an "additional or different requirement" under the Poultry Products Inspection Act ("PPIA")'s preemption clause because of the identical relevant language between the FMIA and PPIA. *Id.* at 1114-15.[6] The Ninth Circuit noted that the Supreme Court "differentiated the [*Harris*] sales ban from laws like the one in this case," *i.e.*, a sales ban tied to methods of *farm* production, not to methods of slaughter. *Id.* at 1115. The Ninth Circuit explained that "[w]hen a sales ban 'works at a remove' from the sites and activities directly governed by federal law . . . it is not preempted on [*Harris*]'s reasoning." *Id.* The Act, like the foie gras ban, similarly "works at a remove" from slaughterhouses by focusing on on-farm practices and does not "reach into the slaughterhouse's facilities" by requiring or even incentivizing any particular methods of inspection, slaughter, processing, packaging, or labelling.

The Circuit cases also show how widely the Plaintiffs miss the mark when framing the question of preemption as turning on whether "the Act prohibit[s] the sale of Whole Pork Meat that passes USDA inspection." Pl. Mem. at 7. In each case cited above, a state had prohibited the sale of certain meat – whether foie gras produced through force-feeding or horse meat – that could have been submitted for USDA inspection and passed. *See, e.g., Cavel*, 500 F.3d at 553-54

---

[6] The PPIA's "ingredient" clause preempts "ingredient requirements . . . in addition to, or different than, those made under [the PPIA]." 21 U.S.C. § 467e. Courts often draw on case law interpreting the PPIA or FMIA to analyze questions raised under the other. *See, e.g., Ass'n des Éleveurs v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017), *cert. denied*, 139 S.Ct. 862 (2019); *Edwards v. Johnsonville LLC*, 2024 WL 686925, *3 n.4 (N.D. Ill. 2024) (slip op.).

(noting the FMIA is "applicable to horse meat"). But that is not the legal test. Instead, the test is whether a state law imposes different or additional requirements on the way in which the inspection and slaughter processes are carried out. *See id.* ("The [FMIA] is concerned with inspecting premises at which meat is produced for human consumption . . . rather than with preserving the production of particular types of meat for people to eat."); *Empacadora*, 476 F.3d at 333 ("[The FMIA's] preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements"). The Act does not touch the USDA's inspection process, its adulteration determinations, or a slaughterhouse's methods of slaughter.

Rather than address this precedent, Plaintiffs claim the "impact" of the Act is to "require" slaughterhouses to "segregate noncompliant pigs away from those that would have otherwise passed USDA inspection . . . through all stages of processing[.]" Pl. Mem. at 18. But by redefining any "indirect' effect of the Act as a "requirement," Pl. Mem. at 15, Plaintiffs would read the word "requirements" out of the FMIA's express preemption clause. The word "requirements" makes clear that a state law must "compel" or "instruct" a preempted course of action. *See Harris*, 565 U.S. at 460, 461. And the general proposition that preemption focuses on a law's effects, rather than the motivation for enacting the law, does not erase the FMIA preemption clause's reference to "requirements." Pl. Mem. at 13, 15. Plaintiffs' attempt to circumvent the clause's plain language should be rejected.

Here, Plaintiffs describe, at most, indirect effects on Triumph's inventory management and marketing activities, not a "requirement" within the scope of the FMIA's inspection regime. Plaintiffs describe a process for tracing the origin of pigs Triumph receives, ensuring it keeps track of those pigs throughout the slaughterhouse, and eventually dispatching the resulting pork products to the appropriate destination. Put another way, Triumph tracks and manages its

inventory to ensure customers receive what they ordered.  This process is no different from the standard marketing and supply chain management procedures that Triumph—and indeed, the pork industry generally—already uses to ensure its suppliers fulfill their contract obligations and to market and distribute its own differentiated products.  See *supra* pp. 6-7.  Nowhere do Plaintiffs suggest that the FSIS ante-mortem or post-mortem inspection procedures required by the FMIA varies, or need vary, in any way because Triumph is running a particular batch of pigs through its processing line.

Moreover, while Triumph has described particular measures it voluntarily put in place to be able to identify product that can lawfully be sold in Massachusetts, it has pointed to nowhere in the Act or its regulations that "required" it to undertake those specific measures.  *See* DSOF ¶¶ 2-3 & Exs. V, W.  For example, the Act does not prohibit the commingling[7] of compliant and non-compliant pigs at any stage prior to slaughter or of compliant and non-compliant pork products during shipment (so long as they can be identified).  Plaintiffs have decided these various mechanisms are the most efficient way to structure their business operations while serving the Massachusetts market, but that does not amount to a "requirement" within the Act that "forced" them to adopt those procedures.[8]  This stands in stark contrast to the "command," backed by criminal sanctions, in *Harris* that slaughterhouses immediately euthanize nonambulatory pigs, even though FSIS could have determined that a nonambulatory pig could recover and then be passed for slaughter.  *Harris,* 565 U.S. at 458, 464.

Even if the Act's effect of incentivizing certain confinement practices on farms could be construed as a "requirement," it would not be within the scope of the FMIA.  If it was, no state –

---

[7] Plaintiffs appear to read into the Act—without basis—a religiously-inflected concept, equating Whole Pork Meat with kosher or halal meat, where "commingling" is prohibited.

[8] Other slaughterhouses nationwide have adopted different mechanisms.  DSOF ¶ 32 & Ex. T.

including Plaintiffs' own – could regulate pig farming because some downstream effect on a slaughterhouse could result. As Plaintiffs admit, the Act "focuses on the front end (the farms) and the back end (the sales) of the supply chain," and is silent as to slaughterhouses. Pl. Mem. at 17. In fact, the Act neither regulates nor incentivizes a single activity related to "the slaughtering and processing of animals at a given location," *Harris,* 565 U.S. at 463, nor does it purport to prohibit a slaughterhouse from slaughtering a non-compliant pig, nor regulate how a slaughterhouse may confine a pig. *See* Mass. Gen. L. ch. 129 App. §§ 1-3, 1-4 (excluding confinement during "transport" and "slaughter" from definition of "cruel confinement").

Plaintiffs finally argue that FSIS *could* theoretically issue regulations requiring slaughterhouses to "segregate pork based on whether that pork was raised in a manner commensurate with the Act," and therefore, the Act falls within the scope of the FMIA. Pl. Mem. at 21-22. But Plaintiffs point to no provision of the FMIA which would authorize such a regulation, nor any other authority to support this proposition. FSIS regulates what happens at inspected facilities, like slaughterhouses, not on farms. FSIS itself has confirmed this: in a publicly filed affidavit in another matter, a FSIS senior director attested that "FSIS does not regulate or have the authority to regulate farm production practices or the care . . . of [amenable species] prior to their entry into the slaughter facility." Ex. AJ (Decl. of Alice M. Thaler in Supp. of Defs' Mot. for Summ. J., *ALDF v. U.S. Dep't of Ag.*, No. 12-cv-04028, C.D. Cal.).

### C. Even if the Act Could Fairly Be Characterized as Imposing a Record-keeping Requirement, Such Requirements Are Expressly Exempted from the FMIA's Preemption Clause.

At most, the practical result of the Act is that a slaughterhouse that wishes to sell whole pork meat in Massachusetts must be able to identify whether that meat originated from a compliant pig. This could be accomplished several ways, none of which are mandated by the

Act.  *See, e.g.,* Ex. T, at 4 (providing examples of methods slaughterhouses use to identify product compliant with Proposition 12).  And even if this effect could be construed as imposing a record-keeping requirement on inspected facilities—which Defendants do not concede—such requirements are explicitly *allowed* by the FMIA's express preemption clause.  *See* 21 U.S.C. § 678.  The FMIA's record-keeping provisions already require facilities that slaughter swine to keep records of the "name or description of the livestock," its net weight, the "buyer" of the livestock, all shipping information, and "each person from whom [the slaughterhouse] purchased or otherwise obtained each swine."  9 C.F.R. § 320.1(b)(1)(i)-(viii), (ix).  Any measures to identify and track inventory that might result from the Act's effects would fall comfortably within the record-keeping exception to the preemption clause.

### III.  PLAINTIFFS' CONFLICT PREEMPTION CLAIM UNDER THE FEDERAL MEAT INSPECTION ACT (COUNT IV) WAS PROPERLY DISMISSED AND FAILS AS A MATTER OF LAW.

Plaintiffs' separate conflict preemption claim, Count IV of the complaint, was not revived by the Court's February 5 Order, which cited only to "Am. Compl., Count III, ¶ 200."  ECF No. 125 at 22.  Thus, the dismissal of Count IV has not been vacated and should stand.

In any case, Plaintiffs' conflict preemption claim fares no better than their express preemption claim.  To start, that claim is inappropriate given that the FMIA has a preemption provision.  *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (conflict preemption analysis applies in the "absence of explicit statutory language").  Further, outside the realm of express preemption, a presumption against preemption applies.  *See Medicaid*, 58 F.4th at 11.  There is a history of state law regulation against animal cruelty.  *See Ross*, 598 U.S. at 365 ("As far back as 1641, the Massachusetts Bay Colony prohibited "Tirranny or Crueltie towards any bruite Creature"); *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (rejecting

"notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.")  Compelling evidence of intent to preempt is required "even if there is also a history of federal regulation."  *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 582 F.3d 156, 178 (1st Cir. 2009).  Courts refrain from a "free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives," because "'it is Congress rather than the courts that preempts state law.'"  *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Naional Sold Wastes Mgmt. Ass'n*, 505 U.S. 88, 111(1992) (Kennedy, J. concurring).

Moreover, because Plaintiffs seek relief that reaches beyond their particular circumstances, they must show that "no set of circumstances exists under which" the Act "would be valid."  *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st Cir. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  A hypothetical or potential conflict between state and federal law is insufficient – instead, Plaintiffs must show "an irreconcilable conflict between the federal and state regulatory schemes," *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).  They have failed to do so.  Pl. Mem. at 10, 12, 23-24.

As already described, there is no overlap between the Act's and FMIA's requirements, no potential for overlap to arise, and no conflict between them.  *See* Part II, *supra*.  It is eminently possible for Plaintiffs to comply both with the FMIA and the Act; indeed, Plaintiffs are currently processing thousands of pounds of pork products compliant with the Act.  DSOF ¶ 35.  Plaintiffs accordingly have not met their burden to demonstrate conflict preemption.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request the Court deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted,

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of Massachusetts, and

ASHLEY RANDLE, in her official capacity as
Commissioner of the Massachusetts Department of
Agricultural Resources,

By their attorneys,

*/s/ Grace Gohlke*
Grace Gohlke, BBO No. 704218
Vanessa A. Arslanian, BBO No. 688099
Assistant Attorneys General
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
One Ashburton Place
Boston, MA  02108
617-963-2527
grace.gohlke@mass.gov
617-963-2107
vanessa.arslanian@mass.gov

Maryanne Reynolds, BBO No. 627127
Assistant Attorney General
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
10 Mechanic Street, Suite 301
Worcester, MA  01608
774-214-4407
maryanne.reynolds@mass.gov

Dated:  April 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies
will be sent to those indicated as non-registered participants.

*/s/ Grace Gohlke*
Assistant Attorney General

Dated:  April 5, 2024

21