UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,<br><br>                         Plaintiffs,<br><br>            v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Commissioner of the Massachusetts Department of Agricultural Resources,<br><br>                         Defendants. | Case No. 1:23-cv-11671-WGY |

**BRIEF OF *AMICI CURIAE* ANIMAL WELLNESS ACTION AND THE CENTER FOR A HUMANE ECONOMY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Adam Keats
Mass. Bar No. 642686
LAW OFFICE OF ADAM KEATS, PC
2489 Mission St., Suite 16
San Francisco CA 94110
Tel: 415-964-0070
adam@keatslaw.org

Jessica L. Blome
Cal. Bar No. 314898
GREENFIRE LAW, PC
2001 Addison Street, Suite 300
Berkeley, CA 94704
(510) 900-9502
jblome@greenfirelaw.com
(*Pro hac vice* application pending)

## TABLE OF CONTENTS

I.    Introduction and *Amici Curiae*'s Statement of Interest ..................................1

II.   Argument .........................................................................................................3

    A.   The FMIA's Intent Is Constrained to Public Health, Food
        Safety, and Humane Handling Around the Point of Slaughter,
        and Is Completely Distinct from the Act's Intent...............................6

    B.   The FMIA Does Not Expressly Preempt the Act. ............................10

        1.   The Act Does Not Fall Within the Scope of the FMIA............11

        2.   The Act Does Not "Impose" Any "Requirements" On Federally
            Inspected Premises, Facilities, and Operations. ......................14

    C.   The FMIA Also Does Not Impliedly Preempt the Act......................17

III.  Conclusion .....................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008)..................................................3, 4, 11

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140 (9th Cir. 2017)............................................................................................18

*Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274 (1st Cir. 1990) .....16, 17

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)...........................................11

*Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021).......................................13

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011) ......................................17

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326 (5th Cir. 2007)............................................................................................10

*Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064 (N.D. Iowa 2020)............13

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992).....................6, 17, 18

*Hines v. Davidowitz*, 312 U.S. 52 (1941)...............................................................19

*Leining v. Foster Poultry Farms, Inc.*, 61 Cal. App. 5th 203 (2021), *as modified* (Mar. 15, 2021) ..............................................................................................18

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).......................................................4, 6

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ..................................9, 11, 12, 15

*National Pork Producers Council v. Ross,* 598 U.S. 356 (2023).......................2, 14

*New State Ice Co. v. Liebman*, 285 U.S. 2621 (1932)...............................................4

*Ophir v. City of Bos.*, 647 F. Supp. 2d 86 (D. Mass. 2009) ...................................16

*Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321 (D. Me. 2017)...................................................................................................16

*Retail Clerks v. Schermerhorn*, 375 U.S. 96 (1963)................................................6

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)..............................3, 4, 6, 10

*United States v. Agnew*, 931 F.2d 1397 (10th Cir. 1991)........................................7

*Wyeth v. Levine*, 555 U.S. 555 (2009).....................................................................6

## Statutes

21 U.S. Code § 601(m) ......................................................................................7

21 U.S.C. § 601 ...............................................................................................1

21 U.S.C. § 610(b) ...........................................................................................9

21 U.S.C. § 661(a) ...........................................................................................6

21 U.S.C. § 678 ..............................................................................................11

7 U.S.C. § 1901 *et seq.* ...................................................................................9

7 U.S.C. § 6501 *et seq.* .................................................................................13

Cal. Penal Code Ann. § 599f(a)–(c). .............................................................11

Mass. Gen. Laws 129 App. § 1-1 ..................................................................17

Mass. Gen. Laws 129 App. §§ 1-2, 1-3 ..........................................................4

## Other Authorities

Arlene Finger Kantor, Upton *Sinclair and the Pure Food and Drugs Act of 1906*, 66 Am. J. Pub. Health 1202 (1976) ...............................................................8

Ending Agricultural Trade Suppression (EATS) Act, S. 2019, H.R. 4417, 118th Congress (2023). ...................................................................................14

Pigs in Gestation Stalls (PIGS) Act, H.R. 2939, 118th Congress (2023) ..............14

Upton Sinclair, *What Life Means to Me*, Cosmopolitan (October 1906) ................8

## Rules

Federal Rule of Appellate Procedure 26.1 .....................................................iv

Federal Rule of Appellate Procedure 32 .........................................................21

## Regulations

88 Fed. Reg. 75394 (Nov. 2, 2023) ................................................................13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record for *amici curiae* certifies that neither Animal Wellness Action, a 501(c)(4) nonprofit corporation, nor the Center for a Humane Economy, 501(c)(3) nonprofit corporation, as of this date, has a parent corporation and that no publicly held corporation holds 10% or more of their stock.

## RULE 29(A)(4)(E) CERTIFICATION

I, Jessica L. Blome, undersigned counsel for Animal Wellness Action, a 501(c)(4) nonprofit corporation, and the Center for a Humane Economy, a 501(c)(3) nonprofit corporation (collectively "Animal Advocates"), certify that a party's counsel did not author this brief in whole or in part; neither a party nor a party's counsel contributed money that was intended to fund preparing or submitting this amicus curiae brief; and no person, other than the *amici curiae*, its members, or its counsels, contributed money that was intended to fund preparing or submitting the brief.

Dated: April 12, 2024

*/s Jessica L. Blome*
Jessica L. Blome

## ANIMAL ADVOCATES' *AMICI CURIAE* BRIEF
## IN SUPPORT OF DEFENDANTS

Animal Wellness Action, a 501(c)(4) nonprofit corporation, and the Center for a Humane Economy, a 501(c)(3) nonprofit corporation (collectively "Animal Advocates"), respectfully request leave to file the accompanying *amici curiae* brief in support of Defendants. Animal Advocates support Defendants' Opposition to Plaintiffs' Motion for Summary Judgment because the law in question is not preempted, whether expressly or impliedly, by the Federal Meat Inspection Act, or FMIA, 21 U.S.C. § 601 *et seq*. Animal Advocates respectfully request that this Court deny the Plaintiffs' Motion for Summary Judgment on the sole remaining issue in this ongoing matter.

Per Rule 29(a), counsel for Animal Advocates asked the parties for their consent to the filing of this brief, and Defendants consented to the filing of this brief while Plaintiffs did not object. Animal Advocates therefore respectfully request leave of this Court to file this brief.

### I.       Introduction and *Amici Curiae*'s Statement of Interest

Animal Wellness Action and the Center for a Humane Economy have a special interest in this litigation and file this brief to provide the court with their perspective on the balance between the federal and the state authority with regards to farmed animal issues generally, and intensive confinement and bans on its

products specifically. Animal Advocates have previously filed an *amici curiae* brief in *National Pork Producers Council v. Ross,* 598 U.S. 356 (2023).[1]

Animal Wellness Action, a 501(c)(4) nonprofit headquartered in Washington, D.C., works to promote animal welfare by advocating for the passage and enforcement of laws that protect animals from cruelty. It champions policies that alleviate the suffering of companion animals, wildlife, and farm animals, including pigs. Through its staff, extensive network of members and supporters, and collaborating organizations, Animal Wellness Action battles systemic forms of animal exploitation by advocating for the passage of laws that will protect animals from unnecessary cruelty, encouraging the enforcement of existing animal protection laws, lobbying for the election of candidates who care about animal causes, and building partnerships with groups, agencies, and other stakeholders.

The Center for a Humane Economy (the Center) is a 501(c)(3) nonprofit headquartered in Maryland. It is the first nonprofit of its kind, focusing specifically on influencing the conduct of corporations to forge a more humane economy. Its efforts include corporate engagement, advocacy campaigns, consumer education, and research and analysis of business practices. In a society where consumers, investors, and stakeholders consistently report a preference for the humane

---

[1] *Available at* https://www.supremecourt.gov/DocketPDF/21/21-468/233366/20220812151510363_CHE_Ross_Amicus%20Main%20E%20FILE%20Aug%2012%202022.pdf.

treatment of animals, the Center works to make these desires for social responsibility a reality.

In addition, the founder of Animal Wellness Action and the Center for a Humane Economy, Wayne Pacelle, has specialized knowledge and expertise in this area, as Mr. Pacelle was personally involved in the creation of Question 3 while in his previous role as President and CEO of the Humane Society of the United States. Mr. Pacelle also initiated Proposition 12, the analogous California, voter-approved measure recently survived Supreme Court review.

## II.    Argument

Even before any inquiry into preemption begins, Plaintiffs necessarily face a steep uphill battle due to the strong presumption against federal preemption of state law and, more broadly, the well-balanced federalism our system so zealously guards. "When addressing questions of express or implied pre-emption, [a court] begin[s] [its] analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This presumption is especially powerful when the legislation in question is within the area traditionally governed by states, such as public health, consumer protection,

product safety, marketing, and more. *Altria*, 555 U.S. at 77; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Rice*, 331 U.S. at 230.

Under Plaintiffs' unreasonably expansive view of federal preemption, in which state laws are preempted when any remote or collateral *effects* of these laws enter the same general arena inhabited by federal regulation or *possible future regulation* (Pl. Mem. 14, 21-22), innumerable state and local laws would be invalid. But instead, with the carefully protected balance between federal and state powers, we permit states to exercise their rightful positions as "courageous" "laboratories" of democracy. *See New State Ice Co. v. Liebman*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Courts must be wary of disturbing this delicate federalist equilibrium, as former Justice Brandeis famously warned. "[T]o stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation." *Id.*

Here, the Massachusetts Act to Prevent Cruelty to Farm Animals ("the Act") accomplishes two goals: first, prohibiting the in-state extreme confinement of breeding pigs, veal calves, and egg-laying hens; and second, banning the sale of products arising out of these specified animals, no matter where the production occurs. Mass. Gen. Laws 129 App. §§ 1-2, 1-3. The Act does not, however, regulate the handling of pigs around the point of slaughter, nor pre- or post-mortem

inspection of carcasses, nor the act of slaughter itself. In fact, the ethical concerns that are the impetus for, and implicated by, the Act are concerns over pigs that are the *most* removed, both in a spatial and temporal sense, from the slaughter process, because they are the sows that breed the "meat pigs." It is these meat pigs that have the primary purpose of slaughter, whereas the *sows'* primary purpose is to breed the meat pigs (although they eventually also go to slaughter after a lifetime of breeding as a matter of disposal and economy).

In sum, the Act imposes discrete and specific requirements on the in-state living conditions of the above-described sows and the in-state sale of certain pork products due ethical concerns over sow housing. The Act survives any FMIA preemption analysis, as the Court previously determined. Plaintiffs have not advanced any new argument in their renewed briefing as to why, with the "slaughterhouse exemption" severed from the Act, the Act is now preempted by the FMIA.[2]

---

[2] In their current briefing, Plaintiffs appear to mostly rely on their claim that the state Defendant suggested that the now-stricken "slaughterhouse exemption" originally existed in the Act to foreclose FMIA preemption. Needless to say, such an argument bears no weight or relevance to the proper preemption analysis that this court must undertake.

### A.    The FMIA's Intent Is Constrained to Public Health, Food Safety, and Humane Handling Around the Point of Slaughter, and Is Completely Distinct from the Act's Intent.

The "two cornerstones" of preemption analysis are, first, "Congressional intent [as] the ultimate touchstone," and second, a strong presumption against preemption. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. at 494 (alteration in original) (internal quotation marks omitted); also citing *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963) and *Rice*, 331 U.S. at 230).

"Congress' intent, of course, is primarily discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic* at 486 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). This includes the "'structure and purpose of the statute as a whole' … as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the [federal] statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic* at 486 (citing *Gade*, 505 U.S. at 98 (opinion of O'Connor, J.)).

The FMIA's intent is plainly stated within the statutory language itself: "[i]t is the policy of the Congress to protect the consuming public from meat and meat food products that are adulterated or misbranded and to assist in efforts by State

and other Government agencies to accomplish this objective." 21 U.S.C. § 661(a).
Under the FMIA, an "adulterated" product is one which has become or been
rendered unhealthy, dangerous, or otherwise unfit for human consumption for
safety and health reasons, and nothing more.  21 U.S.C. § 601(m); *see, e.g.*, *United
States v. Agnew*, 931 F.2d 1397, 1404 (10th Cir. 1991), *cert. denied*, 112 S.Ct. 237
(1991) (finding that the term "adulterated" clearly means meat that is unfit for
human consumption due to potentially being unsafe, rather than any other issue
with it, despite the possible alternative meanings of terms such as "unsound").

The original intent behind the 1906 FMIA was solely to protect public
health, rather than public morality, worker safety, or consumer ethics – indeed, one
notable criticism of the first iteration of the FMIA was that it did not address the
extra-sanitation moral failings of the slaughterhouses of the time. While Upton
Sinclair's *The Jungle* is famously considered to be one of the major immediate
impetuses behind the FMIA, Sinclair had meant his work to be a political
indictment of contemporary labor conditions, rather than a call to arms over food
cleanliness and consumer safety. The same year the FMIA was enacted, Sinclair
lamented,

> Perhaps you will be surprised to be told that I failed in my purpose,
> when you know of the uproar that "The Jungle" has been creating. But
> then that uproar is all accidental… I wished to frighten the country by
> a picture of what its industrial masters were doing to their victims… In
> other words, I aimed at the public's heart, and by accident I hit it in the
> stomach.

Upton Sinclair, *What Life Means to Me*, Cosmopolitan (October 1906).[3]

Sinclar's famous wordplay is relevant because it reveals, in memorable fashion no less, how narrowly focused the outrage of the public and politicians was over the evils that were unveiled by *The Jungle* and the Neill-Reynolds report that had been commissioned by Roosevelt as a result of his reading an advance copy of *The Jungle*. The center of attention was on what everyday Americans were unwittingly eating at the dinner table, rather than on the miserable labor conditions that Sinclair had meant to expose. The time was ripe for action, too, as the issue of food safety was gaining widespread attention, and even Roosevelt felt intense pressure to act. In his December 5, 1905 State of the Union address, he proclaimed that "[t]raffic in foodstuffs which have been debased or adulterated so as to injure health or to deceive purchasers should be forbidden." Arlene Finger Kantor, Upton *Sinclair and the Pure Food and Drugs Act of 1906*, 66 Am. J. Pub. Health 1202, 1203 (1976). Roosevelt was deeply suspicious of socialists and muckrakers, however, and he likely would not have supported a measure enacting broader "socialist" reform. *Id.* at 1205. As it turns out, the 1906 FMIA was enacted with a single-minded focus on sanitation and safety. *See* Bruce Friedrich, *Ritual*

---

[3] Original images *available at* https://undercover.hosting.nyu.edu/files/original/767972abd84fe84d88b47b8c70eef410cecbb758 .pdf.

*Slaughter, Federal Preemption, and Protection for Poultry: What Legislative History Tells Us About USDA Enforcement of the Humane Slaughter Act*, 24 Animal L., 137, 167 (discussing the legislative history of FMIA and HMSA with regards to preemption).

Since 1906, the "reforms" achieved by the FMIA have indeed been expanded by a number of amendments. One such amendment was the Humane Methods of Slaughter Act of 1978 (HMSA), 7 U.S.C. § 1901 *et seq.*, which expanded the earlier HMSA of 1958 to apply to all slaughterhouses and inserted HMSA into the FMIA framework. 21 U.S.C. § 610(b); *see Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 456 (2012) ("*Harris*"). Thus, the FMIA's purpose has been expanded since 1906 to encompass "dual goals of safe meat and humane *slaughter*." *Harris*, 565 U.S. at 456 (emphasis added). But only in two places in the FMIA does one find any language regarding humane treatment of animals – establishing inspection to ensure humane slaughter in § 603(b), and the incorporation into the FMIA of HMSA in § 610(b).

The purpose of HMSA was, and remains, narrow: to ensure that "the slaughtering of livestock and the handling of livestock *in connection with slaughter* shall be carried out only by humane methods." 7 U.S.C. § 1901 (emphasis added). In other words, HMSA does not apply until animals destined for slaughter step off the transport truck and enter the slaughterhouse. Indeed, HMSA does not affect

transportation[4] of animals, pre-slaughter confinement, or any aspect of animal husbandry outside any connection to slaughter – nor does any other provision in the FMIA. Therefore, the FMIA in no way preempts state animal protection or anti-cruelty laws outside of the slaughterhouse,[5] including laws governing which meats may be sold for ethical reasons, whether it is horses or cruelly confined pigs. *See Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) (finding that a ban on horsemeat is not preempted; the FMIA directs "meat packaging, inspection and labeling regulations" due to a need for nationwide uniformity, but "there is no similar need for uniformity with regard to *what types of meat states permit to be sold*" (emphasis added)).

## B.    The FMIA Does Not Expressly Preempt the Act.

The intent of Congress to preempt state legislative powers must be "clear" and "manifest" in order to supersede state authority. *Rice*, 331 U.S. at 230. And "[w]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors preemption.'" *Altria*,

---

[4] The "Twenty Eight Hour" law, which provides that animals, including those raised for food, cannot be transported by for more than 28 consecutive hours without being unloaded for five hours for rest, water and food, is housed within Title 49, rather than within HMSA or the FMIA. 49 U.S.C. § 80502.

[5] Indeed, in the legislative history of the 1978 amendments to the FMIA (which incorporated the HMSA of 1958 into the FMIA), discussion of preemption is completely absent; HMSA only gained a preemption clause due to its incorporation into the larger FMIA. Friedrich, *supra* page 8-9.

555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

The express preemption clause of the Federal Meat Inspection Act (FMIA) prohibits states from "impos[ing]" "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any establishment at which inspection is provided under . . . [the FMIA] which are in addition to, or different than those made under [the FMIA]." 21 U.S.C. § 678.

### 1.  The Act Does Not Fall Within the Scope of the FMIA.

Plaintiffs fail to demonstrate how the Act's provisions fall under the "scope of [the FMIA] *with respect to premises*, *facilities*, and *operations*" of an inspected establishment (emphasis added). Indeed, with the unconstitutional provision excised, the Act fails to even have a whisper of a direct reach into an FMIA-inspected establishment.

Plaintiffs repeatedly use *Harris* to assert that the Act is preempted by the FMIA. But *Harris* is easily distinguishable from the facts here. The California law at question in *Harris* prohibited, in relevant part, slaughterhouses from "buy[ing], sell[ing], or receiv[ing] a nonambulatory animal"; "process[ing], butcher[ing], or sell[ing] meat or products of nonambulatory animals for human consumption"; or "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize the animal." Cal. Penal Code Ann. § 599f(a)–(c).

The Court found that California's law was preempted for two reasons. First, the FMIA and implementing regulations explicitly address the handling of nonambulatory livestock during the slaughter process, so the many prohibitions contained in the California law "in essence … substitute[d] a new regulatory regime" in place of the FMIA's and FSIS's. *Harris*, 565 U.S. at 460.

Second, the sales ban operated impermissibly within the rest of the statute. Despite the Court's acknowledgement that "the FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses," *id*. at 463 (quoting Br. for United States as *amicus curiae*, at 17), the Court still found the sales ban unlawful due to the sales ban's placement within the broader statute and function as an enforcement mechanism *for the statute's other rules* on what to do (or not to do) with nonambulatory animals – in other words, an enforcement mechanism for a whole "new regulatory regime." *Id.* at 463–64 (describing the sales ban as "a criminal proscription calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia").

In contrast, Massachusetts' Act here exists in a space that the FMIA entirely neglects: humane husbandry vis-à-vis on-farm confinement conditions. There is no

"old" regulatory regime to supplant. [6] *See, e.g.*, *Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064, 1083 (N.D. Iowa 2020), *aff'd sub nom. Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021) (finding that Covid-19 pandemic safety procedures to be outside the scope of the FMIA, despite Food Safety and Inspection Service regulations regarding infectious diseases). States began formulating animal anti-cruelty laws hundreds of years ago, and these laws are now part of the fabric of state governance. They address countless concerns, including malicious cruelty, dogfighting and cockfighting, puppy mills, wildlife trafficking, farm animal welfare, and more. And in the face of these advancements, Congress has remained silent on the subject of farm animal confinement, much less humane husbandry or sales of products from intensively confined animals. Humane standards for the raising of farm animals remain entirely within states' purview; indeed, as of now, fifteen states and counting have state laws on intensive confinement of farmed animals.[7]

---

[6] The only federal regulations on humane farm animal confinement are found under the National Organic Program's regulations, recently updated at 88 Fed. Reg. 75394 (Nov. 2, 2023), but these regulations only apply to products that opt into the federal organic labeling system. They are more aptly described as labeling regulations, rather than humane husbandry rules, and are not enacted pursuant to the FMIA but rather the Organic Foods Production Act, 7 U.S.C. § 6501 *et seq*.

[7] *Farm Animal Confinement Bans by State*, ASPCA, https://www.aspca.org/improving-laws-animals/public-policy/farm-animal-confinement-bans (last visited Apr. 7, 2024).

In a challenge to California's Proposition 12,[8] which in relevant part similarly banned the sale of whole pork meat from intensively confined animals, Justice Gorsuch pointedly remarked that "Congress has yet to adopt any statute that might displace Proposition 12 or laws regulating pork production in other States." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (citing a host of unadopted bills). Indeed, the most recent iteration of an attempt to fill this federal vacuum is the still-pending Ending Agricultural Trade Suppression (EATS) Act, S. 2019, H.R. 4417, 118th Congress (2023). Very similar policy proposals, known as the "King amendment," named for their lead author, former U.S. Rep. Steve King, were soundly rejected in 2014 and 2018 when Congress passed those years' omnibus agriculture measures known as the "Farm Bills." Finally, a year ago, a House bill entitled the Pigs in Gestation Stalls (PIGS) Act, H.R. 2939, 118th Congress (2023), was introduced to insert into the Animal Welfare Act – *not* the FMIA – a federal ban on certain methods of confining breeding pigs that restrict their movement.

### 2.  The Act Does Not "Impose" Any "Requirements" On Federally Inspected Premises, Facilities, and Operations.

Nor does the Act "*impose*" any "*requirements*" as prohibited by the FMIA's express preemption clause. Plaintiffs argue that the "[t]he Act directly regulates

---

[8] This challenge was premised on the dormant Commerce Clause, rather than federal preemption, but Justice Gorsuch's point remains highly instructive nevertheless.

FMIA establishments." Pl. Mem. 8. But "[t]he FMIA's preemption clause expressly focuses on 'premises, facilities and operations'—at bottom, the slaughtering and processing of animals at a given location … and the distinction between a slaughterhouse's site-based activities and its more far-flung commercial dealings … is a fundamental feature of the FMIA's preemption clause." *Harris*, 565 U.S. at 463. In other words, the FMIA does not generally preempt laws that impact a slaughterhouse's "more far-flung commercial dealings," i.e., any potential sales activity that could be impacted by the Act. *Harris* represents the exception, rather than the rule.

Plaintiffs also argue that the Act's "effects permeate the entire FMIA regulated facility, affecting operations from the time trucks carrying pigs arrive, to when pork products deliver to the customer, and ultimately disrupt the entire pork supply chain," Pl. Mem. 8, and use this in conjunction with First Circuit case law to claim preemption. Pl. Mem. 13-14. But Plaintiffs critically misapprehend and misapply First Circuit case law here. This case law does not stand for the proposition that the collateral effects of a law broadly on other actors or subjects is the focus of a preemption inquiry, despite Plaintiffs' claim. Pl. Mem. 13-14. Rather, the preemption inquiry looks to the effect of the local law on the local law's own stated purpose(s) – this is a far narrower and more defined effects analysis. *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274, 279–80 (1st

Cir. 1990) ("Rather than attempt to divine the Massachusetts Legislature's intent in enacting its asbestos legislation, we look instead to the effect of the regulatory scheme. That is, we examine the effect that the Massachusetts standards have on their two stated purposes,[9] the protection of 'the general public and the occupational health and safety of workers'") (emphasis added); *see also Ophir v. City of Bos.*, 647 F. Supp. 2d 86, 89 (D. Mass. 2009) (citing *Snow*, 898 F.2d at 279). The *Snow* court strongly implied that it adopted this preemption inquiry methodology because, as it stated in a footnote, "[t]he Massachusetts Legislature does not publish an official record of the hearings, debates, drafts and redrafts which constitute the legislative history of a statute." *Snow*, 898 F.2d at 279 n.5. Analyzing the effect of a state law on its own purported goals is the route the First Circuit takes in determining the legislative intent behind a Massachusetts state law. In other words, the law's effect on its own goals is a substantive and observable expression of said law's intent.

    As Plaintiffs also point out, the First Circuit preemption inquiry can also examine the effect of the state law on a federal law's goals, *see Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 433–34 (D. Me. 2017), but this is properly understood as merely a restatement of a conflict/obstacle preemption

---

[9] Plaintiffs omitted the emphasized text when quoting this portion of *Snow*. Pl. Mem. 13-14. In this way Plaintiffs make a critical error in misapprehending both *Snow* and *Ophir*.

analysis. It does not mean, as Plaintiffs argue, that the broad collateral effects of a state law are dispositive in a preemption inquiry.

Therefore, the appropriate inquiry here is to examine the effect of the Act on the Act's stated purpose; namely, "to prevent animal cruelty by phasing out extreme methods of farm animal confinement." Mass. Gen. Laws 129 App. § 1-1. If the effect is to accomplish the prevention of animal cruelty from intensive confinement, as the Act most certainly does, in an arena where there are no federal standards, then the Act is not preempted. *See Snow*, 898 F.2d at 280 ("If the effect is to protect the public, the state regulation is not preempted. If the effect is solely to protect workers, the OSHA Standard prevails and the state regulation falls. If the effect is to protect the public by regulating workers and work[]places, the regulation stands because its ultimate effect is protection of the public").

## C. The FMIA Also Does Not Impliedly Preempt the Act.

In *Chamber of Commerce v. Whiting*, a four-Justice plurality warned that "implied preemption analysis does not justify a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" which "'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade*, 505 U.S. at 111 (Kennedy, J., concurring)). The plurality then formally adopted a

"high threshold" burden that must be overcome to establish implied federal preemption of state law.

Plaintiffs have failed to meet this high threshold in their argument for obstacle preemption (which can either be considered a subtype of conflict preemption, as implied by *Gade*, 505 U.S. at 98, or a separate third type of implied preemption). Plaintiffs claim that it "is the definition of a conflict" for "[p]ork meat product that has passed FMIA inspection and approved for sale by the USDA, is now otherwise deemed unfit for human consumption within Massachusetts and unable to be sold." Pl. Mem. 24. As a preliminary matter, the Act does not "deem unfit for human consumption" any product or "supplant[] the FMIA's definition of what is adulterated for its own," as Plaintiffs also claim. Pl. Mem. 24-25. By its plain language, the Act prohibits the sale of certain products for numerous reasons, but predominantly due to animal cruelty concerns. *Compare Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1147-8 (9th Cir. 2017) (finding that the California state ban on products made by force-feeding birds was not preempted by the Poultry Products Inspection Act [PPIA] because the force-feeding aspect, having nothing to do with physical composition of the product itself, was not an "ingredient requirement" under the PPIA's preemption clause); *with Leining v. Foster Poultry Farms, Inc.*, 61 Cal. App. 5th 203, 216 (2021), *as modified* (Mar. 15, 2021) (finding that a humane labelling claim was preempted by

the PPIA because the FSIS had already determined that the meaning of the word 'humane' should be left to the certifier).

Further, there is no obstacle here. The state law does not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the FMIA, given the above discussion of the purposes of the FMIA. *See Hines v. Davidowitz*, 312 U.S. 52, 67, 70-71 (1941) (holding that a Pennsylvania naturalization law is preempted because federal power in the field of foreign relations is supreme; there has been enacted a broad and comprehensive federal naturalization system; there is a fundamental importance of immigration and naturalization laws to personal liberties; and there has been a history of political upheavals engendered by registration and naturalization laws).

### III.   Conclusion

In summary, Animal Advocates respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment.

Dated: April 12, 2024                    Respectfully submitted,

_/s Adam Keats_
Adam Keats
Mass. Bar No. 642686
LAW OFFICE OF ADAM KEATS, PC
2489 Mission St., Suite 16
San Francisco CA 94110
Tel: 415-964-0070
adam@keatslaw.org

_/s Jessica L. Blome_
Jessica L. Blome
Cal. Bar No. 314898
GREENFIRE LAW, PC
2001 Addison Street, Suite 300
Berkeley, CA 94704
(510) 900-9502
jblome@greenfirelaw.com
(_Pro hac vice_ application pending)

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32 because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32 because it contains 4,395 words, excluding exempt material, according to the count of Microsoft Word.

Dated: April 12, 2024,

*/s/Jessica L. Blome*
Jessica L. Blome

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing brief with the Clerk of Court for the United States District Court for the District of Massachusetts by using the appellate CM/ECF system.

Dated: April 12, 2024

*/s/ Adam Keats*
Adam Keats