**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
|      Plaintiffs, | |
| v. | |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
|      Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR <u>SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.      **Defendants fail to recognize that the posture of this litigation changed dramatically once the sales exception was severed from the Act** ........................... 1

II.    **Defendants fail to materially respond to the express preemption problems caused by the sales ban** ....................................................................................... 5

      A.  A sales ban extends through the supply chain, not just initial farming practices ........................................................................................................ 5

      B.  Nothing in the opposition brief changes Harris' central holding that a state may not circumvent the FMIA's express preemption clause by using a sales ban .............................................................................................................. 6

      C.  The other cases cited by Defendants do not change the fact that Harris is dispositive in favor of preemption ........................................................... 8

III.   **Defendants' attempts to distinguish "effects" of the sales ban from the "requirements" of the sales ban are distinctions without a difference; both fall within the preemptive scope of the FMIA** ............................................... 10

      A.  The "effects" of the Act are the "requirements" of the Act ................................ 11

      B.  The FMIA express preemption clause covers additional and different requirements, not just conflicting requirements ...................................... 13

      C.  The Act's requirements are within the scope of the FMIA ................................ 14

      D.  The sales ban does not fall within the recordkeeping exception of the FMIA ..... 15

IV.   **Even if the express preemption clause does not preempt the Act, the sales ban is still preempted under Plaintiffs' alternative theory of conflict preemption** ....................................................................................................... 16

      A.  The Court's order reopened all preemption theories, including conflict preemption ......................................................................................... 16

i

B. Defendants' scattershot arguments do not overcome the disruptive impact of the sales ban on interstate sales of pork meat ....................................................... 17

**CONCLUSION** ........................................................................................................... 20

**CERTIFICATE OF SERVICE** ................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012)................................................................................................ 17

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta,*
    33 F.4th 1107 (9th Cir. 2022) ............................................................................... 9

*Bissereth v. United States,*
    No. 1:21-11068-TSH, 2023 WL 7496521 (D. Mass. Nov. 13, 2023) ...................... 2

*Cavel Int'l, Inc. v. Madigan,*
    500 F.3d 551 (7th Cir. 2007) ................................................................................ 8

*CSX Transp., Inc. v. Mass. Bay Transp. Auth.,*
    697 F. Supp. 2d 213 (D. Mass. 2010) ................................................................. 17

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,*
    476 F.3d 326 (5th Cir. 2007) ................................................................................ 8

*Freightliner Corp. v. Myrick,*
    514 U.S. 280 (1995)............................................................................................. 17

*McCullen v. Coakley,*
    571 F.3d 167 (1st Cir. 2009)............................................................................... 18

*Me. Forest Prod. Council v. Cormier,*
    51 F.4th 1 (1st Cir. 2022)............................................................................... 17, 19

*Nat'l Meat Ass'n v. Brown,*
    No. CVF-08-1963 LJO DLB, 2009 WL 426213 (E.D. Cal. Feb. 19, 2009) ............ 8

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012)....................................................................... 1, 6, 7, 8, 9, 11, 12

*New York Times Co. v. FBI,*
    822 F. Supp. 2d 426 (S.D.N.Y. 2011)................................................................... 2

*Ophir v. City of Bos.,*
    647 F. Supp. 2d 86 (D. Mass. 2009) ....................................................... 12, 19, 20

*Pabst Brewing Co. v. Crenshaw,*
    198 U.S. 17 (1905)............................................................................................... 18

*Pharm. Rsch. & Mfrs.of Am. v. Concannon,*
    249 F.3d 66 (1st Cir. 2001) ........................................................................... 4, 18

*Raymond Motor Transp., Inc. v. Rice,*
    434 U.S. 429 (1978) ...................................................................................... 18

*Union Water Power Co. v. Loc. Union No. 42,*
    No. 99-14-P-H, 2000 WL 761632 (D. Me. Feb. 16, 2000) ....................................... 2

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................... 18

*Wash. State Grange v. Wash. State Repub. Party,*
    552 U.S. 442 (2008) ...................................................................................... 18

**Statutes**

21 U.S.C. 601 (m) ............................................................................................. 7

21 U.S.C. 610(c)(1) ........................................................................................... 7

21 U.S.C. 678 ............................................................................................... 7, 16

21 U.S.C. § 602 ................................................................................................ 9

21 U.S.C. § 661 ............................................................................................... 15

Ariz. Rev. Stat. Ann. § 13-2910.07 ....................................................................... 14

Colo. Rev. Stat. Ann. § 35-50.5-102 ..................................................................... 14

Fla. Const. art. X, § 21 ...................................................................................... 14

Mass. Gen. Laws Ann. ch. 129 App., § 1-2 .............................................................. 5

Mass. Gen. Laws Ann. ch. 129 App., § 1-1 ............................................................. 10

Me. Rev. Stat. tit. 7, § 4020 .............................................................................. 14

Mich. Comp. Laws Ann. § 287.746 ....................................................................... 14

Or. Rev. Stat. Ann. § 600.150 ............................................................................ 14

R.I. Gen. Laws Ann. § 4-1.1-3 ............................................................................ 14

**Regulations**

9 C.F.R. § 320.1 ................................................................................................ 16

9 C.F.R. § 320.7 ................................................................................................ 16

330 CMR 35.05 ................................................................................................ 16

Ohio Admin. Code 901:12-8-02 ...................................................................... 14

**Other Authorities**

*Br. for United States as Amicus Curiae*, 2011 WL 3821398 (August 29, 2011) ....................... 6, 7

*California Bill Analysis*, S.B. 1520 Sen., 8/17/2004 .................................................. 10

*Survey of Illinois Law: Conservation, Energy and Food Developments in Agricultural Law*, 32 S. Ill. U. L.J. 793 (2008) .......................................................................... 10

## INTRODUCTION

Regardless of Defendants' gymnastics in the opposition brief attempting to reframe Plaintiffs' arguments, it does not change the fatal preemption issues created by the Act's sales ban. Now that the sales ban directly applies to FMIA-inspected facilities, *the statutory language itself inherently also regulates FMIA-inspected facilities*. Without any need to further evaluate evidence, based on legal argument alone, the Act now expressly regulates the federally regulated facilities under the FMIA.

If that were not clear enough, an FMIA-inspected meat processor must make changes to its premises, operations, and facilities to comply with the Act if it wants to sell pork in Massachusetts. The existence of these requirements is undisputed on the record, and thus the Court need not look further. Any other holding would "make a mockery of the FMIA's preemption provision" because if "the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012). But even if that were not the case, having a single, or potentially 50 different and independent state regimes for pork production, undoubtedly conflicts with the purposes and goals of the FMIA. This Court should sever—at minimum—the sales ban and permanently enjoin its enforcement.

## ARGUMENT

### I. Defendants fail to recognize that the posture of this litigation changed dramatically once the sales exception was severed from the Act.

Tellingly, Defendants open their briefing not by attempting to justify their statute, but instead arguing that Plaintiffs' preemption arguments should not even be considered. They believe this, apparently, because of an order this Court made before the Court found the Act violated the Constitution and severed the offending statutory provision. This is nonsensical, turns a blind eye

1

to the Court's own order severing the sales exception from the Act, and effectively reargues a standing challenge the Court already rejected.

Any previous preemption analysis was conducted only at the *pleading stage* and was also necessarily impacted by the existence of an exception that was specifically crafted to avoid a preemption problem—the very provision the Court severed. This Court's own order recognized the substantially changed circumstances created by the severance, which is why the Court expressly reinstated the preemption claims and directed Plaintiffs to brief the issue.[1] ECF No. 125 at 22. It's unclear why Defendants continue to protest these express directions, but they do, criticizing Plaintiffs for failing to "present a new theory" or "any argument reflecting any *change* following the Court's severance . . .." ECF No. 137 at 12. That's wrong on the law and wrong on the record.

On the law, the operative question is not whether Plaintiffs have alleged a "new theory." Indeed, asserting a "new theory" on the same statutory language at this stage would be procedurally improper (nor did the Court remotely suggest anything like that was needed).[2] Plaintiffs'

---

[1] Although Defendants have styled their opposition brief to Plaintiffs' motion for summary judgment as their own cross-motion for summary judgment (which they did not have leave of Court to submit in the first place), not once do they substantively argue *why* they are entitled to summary judgment or actually apply the standard of review. Their so-called cross-motion is nothing more than an attempt to get a sur-reply, and thus the Court should deny it summarily.

[2] Although it is the wrong question to ask in the first place, it is unclear how Defendants could possibly fault Plaintiffs for failing to allege "new theory" of the case in a motion for summary judgment. *Bissereth v. United States*, No. 1:21-11068-TSH, 2023 WL 7496521, at *3 (D. Mass. Nov. 13, 2023) ("New theories not alleged in a complaint cannot be raised in an opposition to summary judgment." (citation omitted)); *Union Water Power Co. v. Loc. Union No. 42*, No. 99-14-P-H, 2000 WL 761632, at *6 (D. Me. Feb. 16, 2000) ("Summary judgment may not be granted on a ground not included in the complaint."); *New York Times Co. v. FBI*, 822 F. Supp. 2d 426, 431 (S.D.N.Y. 2011) ("[A] motion for summary judgment must be based on the claims in the Complaint."). To the extent the Court is inclined to accept such an argument—and hold that Plaintiffs should have asserted a "new theory" of their preemption claim in light of the severance of the exception—the Court should grant leave for Plaintiffs to amend their pleadings to assert

preemption arguments are based upon the statute post-severance and the same theories asserted in the operative complaint: the sales ban adds additional or different requirements on slaughterhouses, which is expressly preempted by the FMIA's express preemption clause, or at least conflicts with the FMIA such that the sales ban is preempted regardless.[3]

On the record, Defendants' characterization is also wrong. Plaintiffs' arguments *do* account for the changed circumstances resulting from the Court's recent order rendering the sales ban unconstitutional: because the sales exception has been severed, Massachusetts is now ***directly*** regulating FMIA-inspected facilities that sell pork meat products from their facilities into Massachusetts. As Plaintiffs described, this now makes this Court's resolution on the preemption question much more straightforward, as binding precedent now squarely establishes preemption. Defendants fail to address this point head-on (likely because they cannot); instead, they focus on issues that have been resolved repeatedly in this case, or direct the Court to examine issues pertaining only to "animal welfare" while ignoring the fact the Act was passed by promising "food safety" to the Massachusetts voters. SOF ¶ 22, ECF No. 128.

Relatedly, Defendants argue that Plaintiffs should be precluded from making this challenge because they do not operate any in-state slaughterhouses—but this is a blatant attempt at smuggling back in the standing challenge this Court already rejected when it severed the exception from the Act (and which the Court implicitly rejected in ordering Plaintiffs to file a motion for

---

such a theory. Presumably, in light of their argument, Defendants would not be opposed to such relief.

[3] Indeed, Defendants moved to dismiss Plaintiffs' preemption claims on the basis that the sales ban did not have any plausible effect on FMIA-inspected facilities *because* of the very sales exception the Court severed. ECF No. 54 at 3, 14; *see also* ECF No. 78 at 6–7.

summary judgment post-severance).[4] The Court already held that Plaintiffs have standing regardless of whether the sales exception existed, holding that "[i]n order to produce compliant pork, Triumph must (and in fact, has begun to) restructure its processing facility and procedures, segregating pork that meets the requirements of the Act." ECF No. 125 at 11.

But even if that clear (and correct) conclusion was not enough, the argument fails for another reason. As the First Circuit's binding precedent holds: "an entity does not need prudential standing to invoke the protection of the Supremacy Clause[.]" *Pharm. Rsch. & Mfrs. Of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001). "On the contrary, a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption." *Id.* Even if in-state slaughterhouses were the only entities who experienced a "change" as a result of the Court's severance order (which Plaintiffs do not admit) Plaintiffs still have the right to challenge the sales ban as preempted because the Act's sales ban continues to affect Plaintiffs.

In sum, Plaintiffs' argument is that the Act's sales ban is preempted by the FMIA. Nothing has changed that central theory. Plaintiffs alleged it in the operative complaint, and argued and briefed it in seeking a preliminary injunction and in opposing Defendants' motion to dismiss. What *has* changed is that Defendants may no longer hide behind the sales exception for FMIA-inspected facilities to argue that those facilities are *not* regulated directly by the Act. This Court should reject Defendants' invitation to ignore the changed circumstances in this case and rest on its prior dismissal of Plaintiffs' preemption claims, and instead analyze the question anew now that the sales exception has been severed.

---

[4] Defendants' own opposition brief hesitates to directly raise the argument, stating only that "[i]t is questionable whether these Plaintiffs even have standing to challenge the modified application of the Act after severance . . .." ECF No. 137 at 10 n.5.

II.   **Defendants fail to materially respond to the express preemption problems caused by the sales ban.**

Now unable to hide behind the sales exception, Defendants argue that the Act targets only farm practices, not slaughterhouse practices. *See* ECF No. 137 at 11–19. Accordingly, the majority of their brief and Statement of Undisputed Material Facts focuses on irrelevant material that pertains to what occurs on Farmer Plaintiffs' premises. However, this is simply an attempt to distract the Court from the effects the Act has on the FMIA-inspected facilities through the sales ban, and the Court should not accept Defendants' invitation to ignore one half of the Act.

A.   A sales ban extends through the supply chain, not just initial farming practices.

Undoubtedly, there are portions of the Act that do regulate farming practices, and only farming practices. *See, e.g.*, Mass. Gen. Laws Ann. ch. 129 App., § 1-2 (barring farm owners or operators from engaging in certain farming techniques). And as repeatedly recognized by Plaintiffs, Massachusetts remains free to regulate any farming practice that occurs within its own borders. But those provisions are separate and apart from the sales ban, which again, is the only portion of the Act that Plaintiffs challenge. And no matter how much Defendants try to reframe or obfuscate Plaintiffs' arguments, the sales ban is simply more than a ban on farming techniques. Indeed, if the Act were simply about "farming techniques," Defendants should be able to show that all sales of whole pork meat within Massachusetts are completed only on *farms*. But, of course, that's not the case, as this Court has already found that Triumph sells whole pork meat within Massachusetts. ECF No. 125 at 6. And it is that sales ban that runs headlong into the Supreme Court's preemption precedent established in *National Meat Association v. Harris*.

B. <u>Nothing in the opposition brief changes *Harris*' central holding that a state may not circumvent the FMIA's express preemption clause by using a sales ban.</u>

Defendants go to great lengths to circumvent the plain applicability of *National Meat Association v. Harris*, illustrating just how fatal it is for the sales ban. Defendants first cite to a single line in *Harris*'s opinion, stating that the "FMIA's express preemption clause does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses.'" *Harris*, <u>565 U.S. at 463</u> (quoting *Br. for United States as Amicus Curiae*, <u>2011 WL 3821398</u>, at \*17 (August 29, 2011)). Thus, Defendants argue, the sales ban at issue in this case falls outside the scope of the FMIA; the only reason that *Harris*'s sales ban ran afoul of the FMIA was because it worked in tandem with a statutory scheme that more directly regulated a slaughterhouse's premises, facilities, and operations. <u>ECF No. 137 at 12</u>–14.

But *Harris*'s discussion of sales bans was not so limited. While *Harris* happened to invalidate other portions of the state law at issue (relating to nonambulatory pigs), in no way was this a necessary condition for its holding. Instead, the problem was that "[t]he idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Harris*, <u>565 U.S. at 464</u>. As applied here, one can easily replace "nonambulatory pigs" with "pigs raised from sows housed in gestation crates," and the holding is ***identical***. The "inevitable effect" of the sales ban at issue here is that noncompliant pork must be segregated by processors, or removed them from the process from the beginning, because Massachusetts has unilaterally declared it unfit for sale within the Commonwealth.

Likely for this reason, Defendants carefully omit the next few lines of the federal government's amicus brief cited in *Harris* and which supplied the Defendants' statement that the FMIA preemption clause "does not usually" foreclose state regulation of commercial sales:

> That said . . . to some extent the FMIA preempts state judgments about what finished meat and meat products are fit for commerce and human consumption, in that the FMIA defines certain conditions that render such products "adulterated" (21 U.S.C. 601 (m)), bans commerce in adulterated products (21 U.S.C. 610(c)(1)), and authorizes concurrent state enforcement on that subject only when "consistent with requirements under [the FMIA]" (21 U.S.C. 678). ***[The state law]'s sale ban could reasonably be characterized as an impermissible effort to add a class of adulteration unrecognized in federal law.***

*Br. for United States*, 2011 WL 3821398, at *17 (emphasis added). Thus, far from establishing that a state has authority through a sales ban to dictate what finished meat and meat products are fit for commerce and human consumption or how a slaughterhouse must run its operations, *Harris* specifically held that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision." *Harris*, 565 U.S. at 464 (2012). This is the *exact* upshot of Defendants' argument. Somehow, they want this Court to determine that the sales ban *doesn't* impact a FMIA-inspected slaughterhouse's operations (and thus falls outside the scope of the FMIA), even though it directly regulates what Triumph, can and cannot do at its facilities, and adds a class of adulteration unrecognized in federal law by predetermining what meat may be sold. The Court should not condone such a blatant attempt at circumventing plainly applicable federal law.

Equally off the mark is Defendants' back-pedaled suggestion that the now-severed sales exception was merely an "overcaution and legally unnecessary" inclusion to ward off preemption arguments. ECF No. 137 at 9 n.4. What Defendants fail to discuss, and what further proves *Harris*' applicability here, is that the sales exception for FMIA-inspected facilities is *directly attributable* to *Harris*. In 2012, *Harris* identified the preemption problem created by laws with sales bans, like the challenged Act here. A few short years later, the drafters of the Act specifically *and intentionally* included the sales exception in an effort to creatively draft around that preemption

problem. ECF No. 78 at 6–7 ("[The exception was] done for the purposes of ensuring that there

was no question of preemption under the [FMIA]."). Chief among those drafters, of course, was

the Humane Society of the United States, who was the same organization that intervened in

*Harris*.[5] But in so doing, the drafters stepped squarely into a dormant Commerce Clause violation.

And this should not be surprising; the plaintiffs in *Harris* had *also* brought a dormant Commerce

Clause challenge, but because the FMIA preempted the sales ban there, the district court didn't

need to reach the preemption issue. *Nat'l Meat Ass'n v. Brown*, No. CVF-08-1963 LJO DLB, 2009

WL 426213, at *11 (E.D. Cal. Feb. 19, 2009). Now that the exception has been severed, the

analysis has come full circle back to the preemption problem, identical to the one in *Harris*.

      C.   The other cases cited by Defendants do not change the fact that *Harris* is dispositive in favor of preemption.

Defendants cite to a litany of out-of-circuit cases for the proposition that the sales ban here

is merely a permissible commercial sales regulation, attempting to distract from the effects the Act

has on FMIA facility operations. But a quick analysis shows just how inapposite such reliance

would be in this case. Two of the cases—*Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir.

2007), and *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir.

2007)—involved wholesale bans on horsemeat, not just a ban on how horsemeat was produced or

processed. As a result, the laws at issue simply could not have plausibly added additional or

different requirements to the operations of an FMIA-inspected slaughterhouse, given that they

would never even need to process horsemeat again. And it was precisely on this basis the Supreme

Court distinguished these cases in *Harris*. As the Supreme Court correctly reasoned: "When such

---

[5] The Humane Society of the United States intervened in *Harris* to defend the state law and continued as a respondent before the Supreme Court. 565 U.S. at 459 n.4. It also was the "primary author and proponent of Question 3." *See, e.g.*, Joint Pretrial Memo. ¶ 13, ECF No. 64.

a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance." *Harris*, 565 U.S. at 467. Here, the precise opposite is true: the sales ban applies to only a certain *subset* of pork, and thus an FMIA facility will be necessarily forced to change its operations, as entities like Triumph continue to serve the rest of the 48 States, as well as other countries, that do *not* have sales bans.

The other out-of-circuit case that Defendants cite to—*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107 (9th Cir. 2022)—involved a ban to the sale of products derived from force-feeding, like foie gras. The case is similarly unhelpful to the Court's analysis, because it involved an entirely different portion of the relevant statute—the "ingredient requirement" portion of the Federal Poultry Inspection Act's preemption clause, not the "premises, facilities and operations" portion (which is the clause at issue here). Indeed, on this basis, the Ninth Circuit distinguished *Harris*, holding that the matter before them "differ[ed] from [*Harris*]" because it "was an express preemption case about the 'operations' provision in another federal statute." *Id.* at 1115. And this difference also relates to a more substantive distinction: the *Éleveurs* plaintiffs simply *did not argue* that the "the sales ban affects slaughterhouse operations like the sales ban challenged in [*Harris*]." *Id.* (emphasis added). In contrast, that is *precisely* what Plaintiffs' argument is here.

Even if those cases did analyze the correct provision of the FMIA, it makes sense why a force-fed duck ban, or a horsemeat ban, would still not run afoul of the FMIA. In enacting the FMIA, Congress determined that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602 (emphasis added). The horsemeat and foie gras bans simply did not reflect such a concern, and

thus did not invade into the provinces of the FMIA. *See, e.g.*, A. Bryan Endres & Donald L. Uchtmann, *Survey of Illinois Law: Conservation, Energy and Food Developments in Agricultural Law*, 32 S. Ill. U. L.J. 793, 810 (2008); *California Bill Analysis*, S.B. 1520 Sen., 8/17/2004. In contrast, Defendants cannot ignore the representations made to Massachusetts voters when urging them to pass the initiative in November of 2016—that the Act would help to phase "out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers [and] increase the risk of foodborne illness…." Mass. Gen. Laws Ann. ch. 129 App., § 1-1. Tellingly, Defendants' brief avoids mentioning that the supposed health and safety of the consumer was one of the primary purposes behind the Act. And for good reason: it is only further evidence of the way in which the Act's sales ban usurps the purposes behind the FMIA.[6]

In sum, the cases that Defendants rely upon do not overcome the binding *Harris* precedent. The Court should not be required to engage in such suggested mental gymnastics and instead, should hold that Defendants may not circumvent the FMIA's express preemption clause through a sales ban as *Harris* mandates.

### III. Defendants' attempts to distinguish "effects" of the sales ban from the "requirements" of the sales ban are distinctions without a difference; both fall within the preemptive scope of the FMIA.

Defendants' cavalier, unsupported attempt to minimize the substantial efforts undertaken by Triumph to comply with the Act by arguing that the additional and different compliance

---

[6] Exhibit U to Defendants' opposition brief is an excerpt of the certified election results in 2016 that the Governor of Massachusetts ultimately signed into law. Notably, it summarizes the law pertaining only to the in-state confinement of covered animals in the prohibited manner and does not refer to the sales prohibition. *See* ECF No. 140-21 ("A YES VOTE would prohibit any confinement of pigs, calves, and hens that prevents them from lying down, standing up, fully extending their limbs, or turning around freely. A NO VOTE would make no change in current laws relative to the keeping of farm animals."). It demonstrates the likely uncertainty Massachusetts voters faced at the polls.

procedures the sales ban imposes on its operations are simply "indirect effects" on "Triumph's inventory management and marketing activities" and thus do not constitute a "requirement" within the scope of the FMIA, should not be given any credible weight. ECF No. 137 at 16–17. In essence, the Defendants argue if the Act does not expressly state in its text any requirement on a federally inspected meat processing facility—the facility that operates as the *last step in the supply chain prior to entrance into Massachusetts*—then any change made is a voluntary act and it isn't within the scope of the FMIA. This argument is remarkable, not the least because Defendants openly concede that a preemption analysis *does* hinge on the effects of a state law. ECF No. 137 at 16. Regardless, this argument fails for numerous other reasons.

A. The "effects" of the Act are the "requirements" of the Act.

Defendants cite to no legal authority or make any legal justification for why the word "requirement" in the FMIA's express preemption clause should be read so narrowly, or how "indirect" effects should somehow be ignored under FMIA express preemption analysis. If anything, such an interpretation conflicts with the Supreme Court's interpretation that the FMIA's express preemption clause "sweeps widely . . .." *Harris*, 565 U.S. at 459. It also conflicts with the plain meaning of the word "requirement," which means "[s]omething that must be done because of a law or rule . . .." *Requirement*, BLACK'S LAW DICTIONARY (11th ed. 2019). And the *only reason* that Plaintiffs have engaged in any of the additional procedures and operations outlined in its Statement of Undisputed Material Facts is *because* of the Act's sales ban. *See, e.g.*, SOF ¶¶ 62–63, ECF No. 128; *see also* ECF No. 140-7. Contrary to Defendants' best attempt to make the additional procedures appear as "business as usual" for Triumph in comparison to other premium pork products that Triumph may sell (through open pen gestation sales or otherwise), this is absolutely not the case. *Id.* Further, and most importantly, Plaintiffs are *required* to separate their

11

hogs and implement the additional processing and segregation procedures on-site that are *distinct* from what was previously implemented at Triumph for other products. *See, e.g.*, ECF No. 125 at 11. These are requirements directly caused by the Act, no matter how much Defendants try to argue otherwise.

Relatedly, Defendants also argue that there is no preemption problem because Triumph's segregation procedures are not required by the specific text of the Act. ECF No. 137 at 17. For example, Defendants point out that the Act does not specifically prohibit commingling of compliant and non-compliant pigs during the slaughtering process and have introduced evidence of processors adopting other types of procedures to comply with Proposition 12 in California. ECF No. 137 at 14 & n.18.[7]

But these arguments are unpersuasive. What Defendants are effectively arguing is that to be preempted, the sales ban must expressly state—in black-and-white text—that processors must implement changes to their facilities to ensure non-compliant/compliant meat do not mix. To be sure, such a regime would create a preemption problem, but that's far from the *only* way. In suggesting otherwise, Defendants ask the Court to ignore black-letter law (and a general proposition Defendants recognize) that the preemption analysis centers on the *effects* of the state law, *Ophir v. City of Bos.*, 647 F. Supp. 2d 86, 94 (D. Mass. 2009), and *Harris*'s point that a state cannot "impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." 565 U.S. at 464. As applicable here, Defendants simply cannot dispute that some type of procedure is required to prohibit commingling, and in fact, produce evidence themselves of such practices. ECF No. 137 at 17 n.8. While that evidence is

---

[7] Although Plaintiffs respond to this argument on the merits for purposes of this brief, they also contend that it is a gross misrepresentation based on an erroneous reading of the referenced authority and is the subject of Plaintiffs' motion to strike filed contemporaneously herewith.

inadmissible for reasons set forth in Plaintiffs' Motion to Strike, Defendants have said the quiet part out loud: the Act doesn't prohibit commingling of compliant and non-compliant pigs, "*so long as they can be identified . . ..*" *Id.* at 17 (emphasis added). If the Act does anything, it requires identification of non-compliant meat, something additional not within the FMIA and not required by the FSIS.

> ### B. The FMIA express preemption clause covers additional and different requirements, not just conflicting requirements.

Defendants next make an argument that smacks of yet *another* standing challenge, contending the segregation procedures required by the Act actually do not harm Plaintiffs, since such a requirement is no different than the "standard marketing and supply chain management procedures" that the "pork industry generally [] already uses to ensure its suppliers fulfill their contract obligations and to market and distribute its own differentiated products." ECF No. 137 at 17. But in making that argument, Defendants run afoul of the fact that the FMIA express preemption clause bars not only conflicting rules, but *additional* and *different* rules as well. *Harris*, 565 at 459–60 (stating the FMIA preemption clause "sweeps widely" and "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements" (emphasis added)). And it is undisputed that Triumph has implemented new procedures because of the Act. *See, e.g.*, ECF No. 125 at 11. In fact, Defendants stipulated that Triumph implemented those new procedures **because of the Act,** and now assert as an undisputed fact that compliance with the Act differs from previous, separate categorization of meat products as open pen gestation ("OPG") compliant. *Id.*; ECF No. 107-1, ¶ 7; ECF No. 138, ¶¶ 18, 33–34. There is no way around it: these are *new* requirements.

C.  The Act's requirements are within the scope of the FMIA.

Finally, Defendants argue that, assuming that the Act imposes additional or different requirements, those requirements are not "within the scope of the FMIA." ECF No. 137 at 17. If it were otherwise, so the argument goes, no state "could regulate pig farming because some downstream effect on a slaughterhouse could result." *Id.* Relatedly, Defendants argue that the Act doesn't fall within the scope of the FMIA express preemption clause because Plaintiffs have failed to point to any provision of the FMIA that would allow the federal government to regulate what occurs on farms. ECF No. 137 at 18.

With respect to Defendants' argument that Plaintiffs are seeking a ruling, in effect, that a state cannot regulate pig farming in its own borders, that simply isn't true. A state can pass plenty of regulations on pig farming which would not be preempted by the FMIA for the reasons a horsemeat ban was not preempted—because the regulations would have no impact on anything that happens once the animal reaches the processing facility. Indeed, the vast majority of state laws involving gestation crate bans, for example, do not have any sales ban accompanying the prohibition and accordingly, would not be preempted under the FMIA. *See* Or. Rev. Stat. Ann. § 600.150; Ariz. Rev. Stat. Ann. § 13-2910.07; Colo. Rev. Stat. Ann. § 35-50.5-102; Mich. Comp. Laws Ann. § 287.746; Ohio Admin. Code 901:12-8-02; Fla. Const. art. X, § 21; Me. Rev. Stat. tit. 7, § 4020; 4 R.I. Gen. Laws Ann. § 4-1.1-3. Again, as Plaintiffs have reiterated, it is the sales ban here that causes all of the preempted mischief.

And with respect to the other argument—that the federal government could not regulate farms directly—Defendants misunderstand the main thrust of Plaintiffs' challenge. Plaintiffs do not take any position on whether the provisions of the Act directly regulating farming procedures applicable to pig farmers within Massachusetts are preempted. *See, e.g.*, Mot. for Summ. J., ECF No. 127 at 8 n.5 ("Plaintiffs do not take a position on whether Massachusetts can regulate the

14

conduct of in-state farms . . ..."). Instead, Plaintiffs' argument is that if FSIS *wanted* to regulate the sale of meat tied to how those animals were raised for a food safety reason—then it could have. If the FSIS *wanted* processors shipping interstate to accommodate each and every state law's determination of what should enter into the food supply chain based upon food safety principles, it could have. But the FMIA simply does not allow for a state to pass regulations unfettered on the interstate meat market. Indeed, there is an entire section of the FMIA dedicated to federal and state cooperation, 21 U.S.C. § 661, and yet the Act does not include a single reference to that section, and Defendants have never argued that the Act falls within the scope of that statute.

Unless Defendants are ready to concede that the Act's sales ban does not apply to Plaintiffs, and that Plaintiffs can sell non-compliant pork meat to Massachusetts consumers and businesses, Defendants' assertions that the effects of the sales ban are not the Act's imposed requirements, or that those effects are not within the scope of the FMIA, should be rejected.

### D.  The sales ban does not fall within the recordkeeping exception of the FMIA.

Lastly, Defendants feebly reference the FMIA recordkeeping exception as an escape hatch to the Act's preemption. *See, e.g.*, ECF No. 137 at 12. But this simply isn't going to save the Act's sales ban. The Act does not merely impose "recordkeeping" requirements on FMIA-inspected facilities. The Act *bans sales from those facilities*. The Act imposes new processes such as creating new SKU's, physical sorting procedures both ante-mortem and post-mortem, and changes to how pork is physically stored at and shipped from Triumph's facility to ensure compliance with the Act. ECF No. 27-1 at ¶ 27; ECF No. 125 at 11; ECF No. 138 ¶¶ 33–34.

Even if these adaptions could be viewed as mere recordkeeping requirements, such requirements are not within the scope of, and are not consistent with, § 642 (which is a prerequisite for any recordkeeping exception in 21 U.S.C. § 678). The FSIS has promulgated regulations that

describe the *exact* records and reports that business are required to keep. *See* 9 C.F.R. §§ 320.1, 320.7. Those regulations do not require covered businesses to keep records regarding how the supplier farmer confines breeding pigs before arriving at the FMIA-inspected facility, or records regarding segregation of the hogs prior to and after slaughter based on a farm's confinement conditions. Further yet, the one true "recordkeeping" requirement the Act does impose on FMIA-inspected facilities and farmer suppliers—the certifications provided for under 330 CMR 35.05— is significantly different and imposes a substantial risk of liability to businesses like Triumph and the Farmer Plaintiffs. First, the certification must be made under the penalty of perjury and/or be a sworn representation. *See* 330 CMR 35.05(1), (2). This is *far* beyond keeping records of business transactions, and no such requirement exists in 9 C.F.R. §§ 320.1, 320.7 or under § 642. Further, the certifications "shall be produced upon demand" to the Massachusetts Office of the Attorney General, the Department, and any person who will rely on the certification, and the certifications effectively provide a roadmap to any of these entities to use for an enforcement action given the level of detail required in the certifications. Again, this goes far beyond the scope of § 642 or the regulations promulgated thereunder.

In sum, any argument that the Act and its effects fall within the recordkeeping exception of the FMIA's express preemption clause is a red herring. The Court should reject that argument and analyze the sales ban for what it is—the precise type of regulation banned in *Harris*.

**IV.    Even if the express preemption clause does not preempt the Act, the sales ban is still preempted under Plaintiffs' alternative theory of conflict preemption.**

> A.   The Court's order reopened all preemption theories, including conflict preemption.

In the Court's February 5th order, it referenced its previous dismissal "on all counts and claims" and specifically said that "[t]hat order must now be **VACATED in part** to allow the Court

to consider whether the Act—with the slaughterhouse exemption severed—is now preempted by the FMIA." ECF No. 125 at 22. As "that order" had dismissed both the express preemption theory and conflict preemption theory, both are now plainly available for the Court to conduct the preemption analysis.

      B.   <u>Defendants' scattershot arguments do not overcome the disruptive impact of the sales ban on interstate sales of pork meat.</u>

In responding to Plaintiffs' arguments with respect to conflict preemption, Defendants throw everything in but the kitchen sink, yet somehow fail to address the main arguments presented in Plaintiffs' briefing. First, Defendants argue because there is an express preemption clause, conflict preemption simply doesn't apply. ECF No. 137 at 21. This is wrong as a matter of law; considering an argument that "implied pre-emption cannot exist when Congress has chosen to include an express preemption clause in a statute," the Supreme Court plainly held it to be "without merit." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Arizona v. United States*, 567 U.S. 387, 406 (2012) ("[T]he existence of an express preemption provision does not bar the ordinary working of conflict preemption principles" (quotation omitted)); *CSX Transp., Inc. v. Mass. Bay Transp. Auth.*, 697 F. Supp. 2d 213, 230 (D. Mass. 2010) ("[T]he presence of an express preemption provision does not automatically preclude the possibility of implied conflict preemption.").

Defendants also briefly raise the issue of the presumption against preemption as a defense. Although the presumption is not determinative anyway, the presumption against preemption only applies in cases where "Congress has legislated in a field which the States have traditionally occupied[.]" *Me. Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quotation omitted). Defendants repeatedly—and likely intentionally—fail to recognize that one of the purposes behind the Act was the health and welfare of state citizens; and while that is generally a

17

prime example of an area of traditional state interest, it cannot be used as a carte blanche by a state government to regulate interstate commerce. *See Pabst Brewing Co. v. Crenshaw*, 198 U.S. 17, 27 (1905); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 n.15 (1978) ("[M]any cases have distinguished between regulations that are an exercise of the State's police powers, and those that are regulations of commerce."). Nor do states historically have any interest in regulating the areas of food safety for products shipped interstate, which is exactly what the sales ban does.

Next, Defendants vaguely cite to *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st Cir. 2001), arguing that Plaintiffs are required to prove there is no set of circumstances under which the Act could be valid to succeed on a conflict preemption basis. There are several issues with this argument. First, the only portion of the Act that Plaintiffs seek to invalidate is the sales ban, not the entire Act. Thus, the question, even if it applied, would be whether there is any set of circumstances in which the *sales ban* is valid. Second, the standard that Defendants quote— that a plaintiff seeking "relief beyond their particular circumstances" must show "no set of circumstances" under which a challenged law is valid—is no longer good law. *See McCullen v. Coakley*, 571 F.3d 167, 174 (1st Cir. 2009) (stating that the Supreme Court recently "refine[d]" the applicable standard (quoting *Wash. State Grange v. Wash. State Repub. Party,* 552 U.S. 442, 449 (2008) & *United States v. Salerno*, 481 U.S. 739, 745 (1987))). Regardless of these deficiencies, no preemption challenges made pursuant to the FMIA have required this standard. For example, all *Harris* did was hold that the state law sales ban was preempted, which is exactly the relief sought by Plaintiffs here and which is certainly not beyond Plaintiffs' particular circumstances as an FMIA inspected facility.

Next, Defendants argue that there must be an irreconcilable conflict between the Act and the FMIA for there to be conflict preemption. ECF No. 137 at 22. Defendants argue that there is

no such conflict here as Plaintiffs are currently processing thousands of pounds of compliant and non-compliant pork. ECF No. 137 at 22. But in making this argument, Defendants unduly mix up two distinct types of conflict preemption: impossibility preemption, and obstacle preemption. Plaintiffs could not have been clearer what type of conflict preemption they raise here: "For clarity, the implied preemption Plaintiffs argue here is conflict; specifically, obstacle preemption." ECF No. 127 at 12. And under obstacle preemption, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Cormier*, 51 F.4th 1 at 6 (quotation omitted). Thus, it is not determinative in any respect whether it is *possible* to comply with the Act and the FMIA; indeed, "[e]ven a state law that 'attempts to achieve one of the same goals as federal law' may be preempted when 'it involves a conflict in the method' of execution." *Id.* at 11.

Here, it's simple: pork meat product that has passed FMIA inspection and is approved for sale by the USDA is now unable to be sold, as a result of the Act dictating what is appropriate for human consumption in Massachusetts. This conflicts with at least one of the purposes of the FMIA, which was to obtain efficient and functional state and federal overlay on meat inspection. *See, e.g.*, *id.* at 6 (holding a state statute preempted which "purport[ed] to forbid the employment of some of the very same laborers whom federal law authorizes to work"). And Defendants have wholly failed to respond in any material way to the record evidence providing instances where a farmer providing both compliant and non-compliant pigs to a facility erred in denoting pigs as compliant, resulting in pigs that already passed full USDA inspection and out for shipment being withdrawn from the market, wasting perfectly healthy, fresh pork. SOF ¶¶ 70, 72, ECF No. 128.

Moreover, Defendants failed to respond to the alternative theory underpinning Plaintiffs' conflict preemption claim: as this Court wisely recognized in *Ophir v. City of Bos.*, 647 F. Supp.

2d 86, 94 (D. Mass. 2009), "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." (citation omitted)). There is no uniformity in fifty different production methods, and it would bog down meat processing procedures set forth by the FMIA. One cannot imagine a truer conflict.

## **CONCLUSION**

The Court should hold that the sales ban of the Act is preempted under express preemption principles, or at the very least, conflict preemption principles.

Dated: April 26, 2024

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, Plaintiffs.

By: */s/ Ryann A. Glenn*
Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes *(admitted pro hac vice)*
Ryann A. Glenn *(admitted pro hac vice)*
Michael T. Raupp *(admitted pro hac vice)*
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com

*Attorneys for Plaintiffs*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this Friday, April 26, 2024, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Ryann A. Glenn*